# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | 21-CR-175-5 (TJK) |
| : | |
| ENRIQUE TARRIO, : | |
| also known as "Henry Tarrio," : | |
| : | |
| DEFENDANT. : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER

This Court should deny defendant Enrique Tarrio's Motion for Revocation of Detention Order. ECF 341 ("Defendant's Motion"). As established by the evidence set forth in the Second Superseding Indictment (ECF 305) and the United States' Memorandum in Support of Motion for Detention ("Detention Memo") that was filed in the United States District Court in the Southern District of Florida in Case 22-mj-2369, and that has been included here as Attachment A, defendant Tarrio "presents an identified and articulable threat to an individual or the community[.]" *United States v. Munchel*, No. 21-3010 at \*16 (D.C. Cir. Mar. 26, 2021), quoting *United States v. Salerno*, 481 U.S. 739, 751 (1987). As Magistrate Judge Lauren Fleischer Louis found, even though Tarrio was not present at the Capitol on January 6, the government presented substantial evidence that Defendant exercised "command and control" over the men who were present at the Capitol, encouraged their actions, and claimed credit for their achievements. *United States v. Enrique Tarrio*, 22-mj-2369 (S.D. Fla Mar. 17, 2022), ECF 14 at ¶ 7. Moreover, Magistrate Judge Louis found that the government presented unrebutted evidence that Tarrio had planned for and committed unlawful acts on January 6 while he was under court supervision for another offense in

1

Washington, D.C. and had attempted to conceal or destroy his and others' communications relating to their plans for January 6. *Id.* at ¶ 11.

Just as he did before Magistrate Judge Louis at his detention hearing, Tarrio presents no evidence to rebut these findings. Rather than address the evidence of Tarrio's wrongdoing, Tarrio denies its existence.

The Court must consider four factors to determine whether pretrial detention is warranted and necessary. 18 U.S.C. § 3142(g). For the reasons set forth in its Detention Memo, which the government hereby incorporates into this opposition and relies upon as its bases for detention, all four factors weigh heavily in favor of detention. In summary, based on the compelling evidence of Tarrio's leadership of this conspiracy, there are no conditions of release that can reasonably assure the safety of the community or the defendant's appearance in court.

The government briefly addresses herein the arguments set forth in Defendant's Motion.

**A. Applicable Law.**

The United States moved for defendant Tarrio's pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A), because this is a case that involves an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; pursuant to 18 U.S.C. § 3142(f)(2)(A), because this case involves a serious risk of flight; and pursuant to 18 U.S.C. § 3142(f)(2)(B), because this case involves a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror. Here, as Tarrio concedes, he is subject to a rebuttable presumption in favor of detention because he is charged with felony destruction of government property (18 U.S.C. § 1361), a statute listed in 18 U.S.C. § 2332b(g)(5)(B) that carries a maximum term of imprisonment of 10 years or more. 18 U.S.C. § 3142(e)(3)(C).

The government agrees with defendant Tarrio that this Court should review Magistrate Judge Louis's decision under a *de novo* standard of review. *United States v. Chrestman*, 525 F. Supp. 3d 14, 23 (D.D.C. 2021) ("[B]oth the BRA and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order de novo.").

### B. Defendant Tarrio Organized, Directed, and Admitted Responsibility for the MOSD's Attack on the Capitol.

Tarrio claims that he "in no way, instructed []or encouraged anyone to go into the Capitol or to act in a violent or destructive manner." Defendant's Motion at *4. Tarrio then doubles down on this false narrative by arguing that the comments among his men in message groups "mention no type of planned violence at the Capitol or anywhere else." *Id.* These claims are pure sophistry.

Tarrio launched the so-called "Ministry of Self Defense" (MOSD) and prepared its return to Washington, D.C. against the backdrop of Tarrio's defiant celebration of property destruction. As early as December 17, 2020, Tarrio proudly claimed credit for the Proud Boys public destruction of a #BLACKLIVESMATTER banner in Washington, D.C. Tarrio was unrepentant, asserting on social media, "Come get me if you feel like what I did was wrong. We'll let the public decide."

After Tarrio's creation of the MOSD, and as planning for January 6 took shape in the Telegram message groups that Tarrio himself had created, the hand-selected members of the MOSD began to discuss attacking the Capitol. Indeed, one of Tarrio's own hand-selected MOSD members posted a message that read, "time to stack those bodies in front of Capitol Hill." Messages exchanged among the group then turned specific, with one member asking, "what would they do [if] 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not." In response, one of Tarrio's MOSD "operations" leaders stated, "They would do nothing because

3

they can do nothing." Second Superseding Indictment (ECF 305) at ¶ 48. Tarrio encouraged these communications. Indeed, Tarrio responded to a message from the same MOSD "operations" leader by saying, "I didn't hear this voice note until now, you want to storm the Capitol." *Id.* at ¶ 50.

Two days later, as the riot unfolded, Tarrio encouraged actions by his men on the ground. Just over 20 minutes after Pezzola breached the Capitol with a riot shield, Tarrio made a public post on social media that read, "After I finish watching this I'll make a statement about my arrest...But for now I'm enjoying the show...Do what must be done. #WeThePeople." *Id.* at ¶ 97. At 2:38 p.m., Tarrio made a public post on social media that read, "Don't fucking leave." *Id.* at ¶ 99. At the time of this post, multiple MOSD members and leaders were inside the Capitol. At 2:41 p.m., Tarrio made a public post on social media that read, "Proud Of My Boys and my country." *Id.* at ¶ 103.

Around this same time, a Proud Boys member posted in an encrypted message chat: "Are we a militia yet?" Tarrio responded with a one-word voice note, "Yep." He then posted, "Make no mistake…" and then "We did this…" *Id*. at ¶ 100. Later that day, Tarrio posted a message in that same group chat that stated, "They'll fear us doing it again…" A member of the group asked, "So what do we do now?" Tarrio responded at 4:14 p.m., "Do it again."

The "true purpose" of the MOSD was laid bare by Tarrio's own statements in advance of and on January 6.

### C. Defendant Tarrio Continued to Plan and Carry Out an Attack on the Capitol While He was on Supervised Release for Crimes Committed in Washington, D.C.

Tarrio claims that his surreptitious meeting with Elmer Stuart Rhodes III and others in an underground parking garage was "secondary to why he was there." Defendant's Motion at *5.

Tarrio's claim is plainly disproven by video of the event, but even if it were accurate, it misses the point.

First, Tarrio intentionally traveled to the Hall of States Parking Garage near the Phoenix Hotel where he met with others who were planning to remain in Washington, D.C. Tarrio's decision to do so—even while at risk of violating the D.C. Superior Court stay-away order—demonstrates that even after his arrest, Tarrio remained engaged in planning for January 6. This point is further underscored by Tarrio's efforts to rejoin encrypted communications and coordinate with Nordean and Biggs about the plans for January 6. Second Superseding Indictment (ECF 305) at ¶¶ 63-67 (Biggs: "I gave Enrique a plan. The one I told the guys and he said he had one.").

Second, video from the documentary crew shows Tarrio making the conscious decision to travel to an underground downtown parking garage to meet with others rather than departing Washington, D.C., as he had been ordered to do. Specifically, filmmakers captured Tarrio preparing to enter the Phoenix Hotel. The next clip captured Tarrio standing outside the hotel near a truck. When asked what happened, Tarrio told the filmmaker, "We went in [the Phoenix Hotel] and somebody advised us that they're going to call the cops." Tarrio was then advised by a female companion, "I think we should leave." The next clip showed Tarrio in a truck stopped outside the Phoenix Hotel, with Tarrio talking to two people standing on the sidewalk. Tarrio then directed the driver of the truck to travel around the corner from the hotel and enter the Hall of States parking garage—where he offered to pay for the entry. While driving down the ramp into the garage, Tarrio was filmed on a phone call advising the other communicant that he could not come back near the front of the hotel because "they're already looking out the window." Tarrio then provided directions to the underground garage. The same two people with whom Tarrio communicated in

front of the Phoenix Hotel appeared less than five minutes later in the underground parking garage, along with a handful of others.

Third, and most importantly, Defendant misapprehends Magistrate Judge Louis's concern about Tarrio's compliance with release conditions and its import to the court's detention decision. Magistrate Judge Louis was not preoccupied with the pace of Defendant's departure from Washington, D.C. Rather, the court was rightfully alarmed that shortly after having been released on court supervision on January 5 for the destruction of property in Washington, D.C., Tarrio resumed planning and directing an attack on the Capitol that would take place the very next day. Such evidence "undermines the Court's confidence that [Defendant] would obey" any restrictions that could be imposed by the Court. Det. Order at ¶ 11.

### D. Tarrio Recognized that His Communications Were Incriminating.

As to Tarrio's efforts to obstruct the government's investigation, Tarrio argues that "there is no showing that anything Mr. Tarrio had on his communications show any illegal conduct or any indication that he encouraged, planned, or organized anyone to enter the US Capitol." This is a remarkable denial given the communications set forth in the Second Superseding Indictment—a few of which are highlighted herein. Moreover, the fact that certain of Tarrio's communications, including his own voice note about storming the Capitol, were not recovered from other devices strongly suggests that Defendant's co-conspirators found the statements sufficiently incriminating that they required deletion. Indeed, while he was in the parking garage, Tarrio told an individual that he had cleared all of the messages on his phone before he was arrested. Tarrio further assured the individual that no one would be able to get into his phone because there were "two steps" to get into it.

6

Tarrio's efforts to obstruct the government's investigation continued after January 6. By April 2021, four of Tarrio's MOSD leaders had been indicted, charged, and detained in connection with the events of January 6. In July 2021, Tarrio sent a voice message to Proud Boys around the country. See EXCLUSIVE Proud Boys Leader Urged Group Not to 'Turn on Each Other,' Reuters (Sept. 9, 2021), available at https://www.reuters.com/world/us/exclusive-proud-boys-leader-urged-group-not-turn-each-other-riot-probe-2021-09-09/. In that message, Tarrio addressed the possibility that one of the four leaders may have been cooperating with law enforcement. Tarrio denied this possibility, adding "[t]he moment that they think one of the guys flipped, it throws everything off and it makes everybody turn on each other, and that's what we are trying to f---ing avoid." *Id.*

**E.  Defendant Tarrio Presents an Ongoing Threat to the Safety of the Community.**

In his motion, Tarrio suggests that he is a model of compliance and would not use his position of influence with the Proud Boys or any other group to organize any action against the government. In fact, Tarrio has used his previous incarceration to communicate a message to the world about the Proud Boys. On September 6, 2021, shortly before Tarrio reported to D.C. Jail for his prison term for burning a church banner, Tarrio traveled to the Peace Monument in front of the U.S. Capitol. While there, Tarrio posed for a picture holding a lighter up to the Capitol while wearing a t-shirt that read "@FREETHEPROUDBOYS BY ANY MEANS NECESSARY." Proud Boys leader Enrique Tarrio poses for 'burning Capitol' pics before surrendering to DC jail, New York Post (Sept. 7, 2021), *available at https://nypost.com/2021/09/07/proud-boys-enrique-tarrio-takes-burning-capitol-pics-before-jail/*



This Court should heed Tarrio's words on January 6 when Tarrio claimed responsibility for the storming of the Capitol (Tarrio: "Make no mistake…" [] "We did this…") and proposed doing it again (Tarrio: "They'll fear us doing it again…" Response: "So what do we do now?" Tarrio: "Do it again.").

## CONCLUSION

Tarrio must remain detained pending trial to protect the safety of the community, ensure his return to Court, and safeguard the integrity of evidence and the proceedings. Tarrio's release—even into home confinement—would return the Tarrio to essentially the same conditions from which he organized and directed the attack on the Capitol on January 6. As the evidence shows and Tarrio himself admitted on January 6, Tarrio directed and orchestrated the MOSD's violent acts on January 6 entirely remotely -- using encrypted media and social media in the weeks leading

8

up to January 6, and on the day itself, to organize, direct, and celebrate the success of a criminal conspiracy to obstruct the Certification of the Electoral College vote.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:     /s/ Jason McCullough

JASON B.A. MCCULLOUGH
D.C. Bar No. 998006; NY Bar No. 4544953
ERIK M. KENERSON
Ohio Bar No. 82960
LUKE JONES
VA Bar No. 75053
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7233 //
jason.mccullough2@usdoj.gov
(202) 252-7201 // Erik.Kenerson@usdoj.gov
(202) 252-7066 // Luke.Jones@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel via the Electronic Case Filing (ECF) system, on May 2, 2022

By: /s/ Jason McCullough

JASON B.A. MCCULLOUGH