1                      UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA

2

                   CASE NO. 22-MJ-2369-AOC

3

UNITED STATES OF AMERICA,

4                               Miami, Florida
           Plaintiff(s),

5                           March 15, 2022
       vs.

6

ENRIQUE TARRIO,

7
              Defendant(s).     Pages 1 - 74

8  --------------------------------------------------------

9                    DETENTION HEARING
          TRANSCRIBED FROM DIGITAL AUDIO RECORDING

10      BEFORE THE HONORABLE LAUREN FLEISCHER LOUIS
           UNITED STATES MAGISTRATE JUDGE

11

APPEARANCES:

12

FOR THE PLAINTIFF(S):  MICHAEL PORTER, ESQ.

13                   ERIK M. KENERSON, ESQ.
                   UNITED STATES ATTORNEY'S OFFICE

14                 101 South U.S. Highway 1
                 Fort Pierce, FL 34950

15                 772-359-3849
                 michael.porter2@usdoj.gov

16                 erik.kenerson@usdoj.gov

17

                 EDUARDO GARDEA, JR., ESQ.

18                 UNITED STATES ATTORNEY'S OFFICE
                 99 N.E. 4th Street

19                 Miami, Florida 33132
                 305-961-9000

20                 eduardo.gardea.jr@usdoj.gov

21

22

23

24

25

```
 1    APPEARANCES (CONT'D)

 2

 3    FOR THE DEFENDANT(S):   NAYIB HASSAN, ESQ.
                              6175 NW 153rd Street
 4                            Miami Lakes, FL 33014
                              305-403-7323
 5                            hassan@nhassanlaw.com

 6
                              SABINO JAUREGUI, ESQ.
 7                            JAUREGUI LAW, P.A.
                              1014 W 49th St
 8                            Hialeah, FL 33012-3322
                              305-822-2901
 9                            sabino@jaureguilaw.com

10

11

12    TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                              Court Reporter
13                            jemancari@gmail.com

14

15

16

17

18

19

20

21

22

23

24

25
```

1                INDEX OF EXAMINATION

2

3  EXAMINATION OF:                    PAGE

4  NICHOLAS HANAK

5  Cross By Mr. Hassan  . . . . . . . . . . . . . .10

6  Redirect By Mr. McCullough . . . . . . . . . .42

7  Recross By Mr. Hassan  . . . . . . . . . . . .50

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Thereupon,

2  the following proceedings were held:

3           THE COURT:  Please be seated.  I appreciate your

4  patience.  Let me address -- I have a packed courtroom and so

5  let me make sure that everyone who is here understands the

6  rules of this courtroom.

7           There is no recording of federal court proceedings.

8  So if you are not an attorney and you have been permitted to

9  bring a cell phone into this courtroom, you cannot use it in

10  this courtroom, and there is no reason for it to be in the on

11  position.  So if you have a cell phone, take it out now and

12  turn it to the off -- not airplane -- off mode.

13           If it comes back out of your pocket, there is a good

14  chance one of the officers is going to ask you to leave the

15  courtroom.  So let me make sure that everyone here who has a

16  cell phone, it is off.

17           Also, we do wear masks in this courtroom.  So that

18  means over your nose and your mouth.  If the mask slides,

19  likewise, you may be asked to leave the courtroom.  So if you

20  have to make a phone call or otherwise communicate, you have to

21  leave the courthouse with that.

22           OK.  I think that was it.  You can call the case.

23           THE DEPUTY CLERK:  Calling United States v. Enrique

24  Tarrio, case No. 22 2369, magistrate Judge Otazo-Reyes.

25           Counsel, please announce your appearances for the

1  record.

2         MR. MCCULLOUGH:  Good morning, your Honor.  Jason

3  McCullough.  I am an assistant United States attorney for the

4  District of Columbia.  I am here with my colleague Erik

5  Kenerson, who is also an AUSA from the District of Columbia,

6  and joined by our colleague from this district Ed Gardea.

7         THE COURT:  OK.  Tell me your last name again, sir.

8         MR. MCCULLOUGH:  Last name is McCullough,

9  M-C-C-U-L-L-O-U-G-H.

10        THE COURT:  OK.  Will you be presenting?

11        MR. MCCULLOUGH:  Yes, I will.

12        THE COURT:  OK.  All right.  Thank you,

13 Mr. McCullough.

14        MR. MCCULLOUGH:  Thank you, your Honor.

15        THE COURT:  On behalf of the defendant.

16        MR. HASSAN:  Good morning, Judge.  Nayib Hassan on

17 behalf of Enrique Tarrio, Judge, which is present before the

18 court, Judge.  He is currently in the box, along with my

19 colleague Sabino Jauregui, which is seated to my right, Judge.

20        THE COURT:  OK.  Appreciate that.

21        I have you, Mr. Tarrio, on my calendar this morning

22 for a report re counsel, removal, and pretrial detention.

23        What is the status with counsel, Mr. Hassan?

24        MR. HASSAN:  Judge, I filed the notice of appearance

25 for the purposes of this hearing and for the removal hearing.

1           THE COURT:  OK.

2           MR. HASSAN:  Along with my colleague Sabino Jauregui,

3    Judge.

4           THE COURT:  So he will have separate counsel appear

5    when he arrives in D.C.?

6           MR. HASSAN:  Judge, our anticipation is to file a

7    permanent counsel in D.C., Judge.

8           THE COURT:  OK.  Well, we are not arraigning him

9    today.

10          So, Mr. McCullough, any issue with the temporary

11   appearance for now?

12          MR. MCCULLOUGH:  No, your Honor.  Thank you.

13          THE COURT:  OK.  All right, then.  What about removal?

14   It is my understanding the detention hearing is going forward.

15          MR. HASSAN:  That is correct, your Honor.

16          THE COURT:  What about removal?  Is that contested?

17          MR. HASSAN:  No, Judge, that is not contested.

18          THE COURT:  Appreciate that.  Then if we are ready to

19   proceed, I see the Brady warnings were already given.

20          MR. HASSAN:  Judge, if I may real quick.  I understand

21   he is currently in the box, Judge.  I would ask the court to

22   exercise their discretion in allowing Mr. Tarrio to sit with

23   both counsel at our table, if the court would so use their

24   discretion.

25          I spoke with the marshals earlier on and they told me

1    there would be an issue because the front row, there are guests

2    that are here, so that may be a security concern.

3              In the alternative, what we have also requested,

4    Judge, is for Mr. Jauregui, who is seated with our client in

5    the box so we can confer with our client during the

6    questioning.  I don't know if the court can use their

7    discretion in that.

8              THE COURT:  OK.  I see Mr. Houlihan on his feet.  So

9    let me first address his motion.

10             MR. HOULIHAN:  We are moving to withdraw, your Honor.

11             THE COURT:  Granted.

12             MR. HOULIHAN:  Thank you, your Honor.

13             THE COURT:  Thank you, Mr. Houlihan.

14             Then with Mr. Houlihan not at the podium, I am looking

15   to my marshals as to whether or not the attorneys can come into

16   the well, but I defer to you.

17             I know that you don't want -- I know that Mr. Tarrio

18   is not going to be permitted behind that bench because we don't

19   have the first row empty for the U.S. marshals, which is where

20   they would normally be.  So whether or not the attorneys can

21   come into the well is up to the marshals.

22             THE MARSHAL:  Your Honor, we have already spoken to

23   the attorneys and we mentioned to them that would not be

24   (inaudible).

25             THE COURT:  All right.  So understand, again, we have

1    a packed courtroom. If you need time to confer with your
2    client during the hearing, you will let me know. We will take
3    a break. You won't be pushed.

4         MR. HASSAN: Thank you, Judge.

5         THE COURT: So if you need an opportunity to consult
6    with Mr. Tarrio, you will get it, but we are going to proceed
7    with the safety of the U.S. marshals and everyone else in mind.
8    OK.

9         MR. HASSAN: Understood, Judge. Thank you so much.

10        THE COURT: So, Mr. McCullough, this is your motion.

11        I have read the indictment and your memorandum, which
12   I'll treat as your proffer. So I would anticipate that you
13   have an agent available and that Mr. Hassan wants to question
14   that person.

15        MR. MCCULLOUGH: Yes, your Honor. So we have special
16   agent Nick Hanak, who is available for cross-examination.

17        THE COURT: OK.

18        MR. MCCULLOUGH: We have made available to the
19   defense, consistent with prior practice, local practice in this
20   district, we have made available to defense prior statements of
21   special agent Hanak that may relate to the scope of his
22   testimony here today. We have also produced the grand jury
23   transcript that represents special agent Hanak's testimony
24   before the grand jury as it relates to this matter.

25        So the government is prepared to proceed by proffer

```
 1    and would ask that your Honor accept the statement of facts in
 2    the detention memorandum for that purpose.
 3             THE COURT:  That is precisely what I have done.  I
 4    agree.  I know Mr. Hassan's received a copy of that memorandum
 5    as well.
 6             MR. HASSAN:  Judge, we have.
 7             THE COURT:  All right.  Would you like to question the
 8    agent?
 9             MR. HASSAN:  We would, Judge.
10             THE COURT:  Have him come forward into the witness
11    box, please.
12             MR. HASSAN:  Judge, may I move the podium?
13             THE COURT:  To turn it?
14             MR. HASSAN:  Just to see him, Judge.
15             THE COURT:  Just leave it still.  It has some
16    connectivity issues.  Rather than make the whole courtroom go
17    dark abruptly, just leave it as is.  You can turn yourself.
18             MR. HASSAN:  Yes.
19             THE COURT:  OK.
20             THE DEPUTY CLERK:  Please raise your right hand to be
21    sworn.
22             Do you solemnly swear or affirm that the testimony you
23    are about to give will be the truth, the whole truth, and
24    nothing but the truth so help you God?
25             THE WITNESS:  I do.
```

1          THE DEPUTY CLERK:   Thank you.   Please be seated.

2   Speak into the microphone.

3          Can you state your name, spell your first and your

4   last name for the record, and tell us where you're employed.

5          THE WITNESS:   Nicholas Hanak.   I'm an employee of the

6   FBI.

7   NICHOLAS HANAK,

8          called as a witness,

9          having been duly sworn, testified as follows:

10   CROSS-EXAMINATION

11   BY MR. HASSAN:

12   Q   Good morning, agent Hanak.

13   A   Good morning.

14   Q   It's my understanding that you had the opportunity to

15   review the memorandum that the government provided yesterday.

16   Is that correct?

17   A   Correct.

18   Q   And when you reviewed the memorandum, would you adopt the

19   findings and the determinations as far as what the government

20   provided in their memorandum?

21   A   I do.

22   Q   And prior to commencing my examination would you like to

23   correct anything that is in the document in and of itself?

24   A   No.

25   Q   How long have you been working on this case?

1   A   Since January 6th.

2   Q   January 6th of 2020?

3   A   January 6, 2021.

4   Q   Have you had an opportunity to listen to all statements by

5   all the parties in this case?

6   A   I have reviewed a lot of evidence associated with this

7   case.

8   Q   Have you had the opportunity to sit in on the various

9   detention hearings regarding various other alleged

10   coconspirators?

11   A   I did not participate in the other detention hearings for

12   the coconspirators.

13   Q   Have you had the opportunity to review some of the findings

14   regarding the other detention hearings?

15           THE COURT:   Mr. Hassan, will you slow down a little

16   bit?  I'm having trouble hearing your questions.  Will you

17   repeat that one.  Did he have a?

18   BY MR. HASSAN:

19   Q   Have you had the opportunity to review some of the findings

20   that have been determined in the other detention hearings?

21           MR. MCCULLOUGH:   Objection, your Honor.  I think this

22   is steering towards a legal conclusion, this line of

23   questioning.

24           THE COURT:   Whether or not he's reviewed it?

25   Overruled.

| | | |
|---|---|---|
| 1 | A | The findings, I don't think so. |
| 2 | Q | Prior to today, prior to this here, did you have an |
| 3 | | opportunity to review your material? |
| 4 | A | Yes. |
| 5 | Q | May I ask what type of material you reviewed in the days |
| 6 | | leading up to today? |
| 7 | A | Yes. I've reviewed a lot of material to include search |
| 8 | | warrant returns, interviews, statements, videos, etc. |
| 9 | Q | Would text message feeds, things of that sort of things, be |
| 10 | | other items that you reviewed? |
| 11 | A | Yes. I've reviewed communications that occurred via text |
| 12 | | messages and other encrypted apps. |
| 13 | Q | Well, as we get into it, it is part of the allegations in |
| 14 | | the government's memorandum, it is alleged that Enrique Tarrio |
| 15 | | started a new message group called MOSD, Ministry of Self |
| 16 | | Defense, is that correct? |
| 17 | A | That's correct. |
| 18 | Q | It's accurate to also state that Enrique Tarrio stated what |
| 19 | | the purpose of this mission of self -- MOSD is, correct? |
| 20 | A | He described the MOSD in various chats. |
| 21 | Q | Well, you had an opportunity to review the indictment, is |
| 22 | | that correct? |
| 23 | A | I did. |
| 24 | Q | And it is my understanding that you were part and parcel to |
| 25 | | the grand jury minutes, is that correct? |

1    A    I was.

2    Q    It's fair to say that Mr. Tarrio makes a statement in and

3    of itself within those, what the purpose of the MOSD is, and

4    part of it states, in part, the purpose is to discourage and

5    remove new members and aggressive members from attending

6    national events, is that correct?

7    A    I'd have to review the statements, but that sounds about

8    correct.

9    Q    It sounds about correct?

10   A    Yes.

11   Q    So part of it basically says, discourage and remove

12   aggressive members from attending national events?

13   A    Again, I would like to review it, but that sounds about

14   right.

15   Q    Do you need me to refresh your recollection based upon the

16   grand jury minutes?

17   A    Yes.  That would be great.

18              MR. HASSAN:  Judge, if I may have just a minute.

19              THE COURT:  Of course.

20              (Pause)

21              MR. HASSAN:  Judge, I will come back to that in a

22   minute.  My colleague is going to be looking for it while I

23   continue, Judge.

24   BY MR. HASSAN:

25   Q    Furthermore, the statement basically supports in that same

1  exact entitlement, we need to be able to control the numbers

2  and harness ourselves in these large numbers.  Is that correct?

3  A    Again, I'd like to review the statements, but that sounds

4  generally correct.

5  Q    There is a third statement in there that, again, it says,

6  in part he goes on and says, "We need" -- and I put this in

7  quotes -- "we need to hold unruly members accountable at these

8  events."  Is that correct?

9  A    Sounds generally correct.

10 Q    OK.  Would it seem to annotate that what Mr. Tarrio was

11 trying to do by creating this new MOSD was removing unruly

12 members from participating in large-scale events?

13 A    Our investigation has shown that he's created this group to

14 get members that will follow the lead of the MOSD leadership

15 and follow their demands and not have guys in the group that

16 just go off and do their own thing.

17 Q    So basically manage, control, and not have unruly members,

18 is that correct?

19 A    To have command and control over the members of the MOSD.

20 Q    When you say command and control, and we will get into that

21 in a minute, but it's fair to say that you've had an

22 opportunity to review Mr. Tarrio's criminal history, is that

23 correct?

24 A    Yes.

25 Q    And nothing in his criminal history -- criminal history --

1    would show that Mr. Tarrio was violent in any case, correct?

2  A    Well, it depends on your use of violent.

3  Q    Well, let me ask you, was there a battery charge at any

4    point in time?

5  A    I'm not aware of a battery charge.

6  Q    Was there a robbery charge?

7  A    I'm not sure about that.

8  Q    Trespass of a structure, is that a violent crime?

9  A    I'm sorry?

10  Q    Trespass of a structure, is that a violent crime?

11  A    Trespass of a structure?

12  Q    Correct.

13  A    It doesn't sound --

14              THE COURT:  Mr. Hassan.

15              MR. HASSAN:  Yes, your Honor.

16              THE COURT:  This is not an appropriate line of

17    questioning for this witness.

18              MR. HASSAN:  Understood, Judge.  I'll move along.

19    BY MR. HASSAN:

20  Q    During the course of what the Proud Boys is at the various

21    groups, was there any event where individuals were hurt during

22    those events leading up to January 6?

23  A    Yes.

24  Q    And in fact, during one of those events one of the members

25    was attacked, is that correct?

1   A   At a previous rally, I believe it was December 2020, there

2   was a conflict between one of the MOSD members at one of these

3   events, yes.

4   Q   And during that conflict an individual was stabbed, is that

5   correct?

6   A   Yes.

7   Q   And that would be on December 12th, correct?

8   A   Yes.

9   Q   During the provisions or during the documents that you

10  provided there was a basic gear list that was provided to the

11  members of the organization, is that correct?

12  A   Yes.

13  Q   And the basic gear list are more so protective material,

14  correct?

15  A   That's a generalization.  I can tell you some of the items

16  that were on the gear list.

17  Q   Well, let's go one by one.

18          Protect -- stab-proof vest?

19  A   That's correct.

20  Q   Is that protective gear?

21  A   That is a protective item, yes.

22  Q   Med kits.  Is that protective gear?

23  A   I'd assess that to be correct.

24  Q   Stab-proof goggles.  Is that protective gear?

25  A   That could be used as protective gear.

1    Q    Helmets?

2    A    That could be used as protective gear.

3    Q    Is it fair to say -- well, let me rephrase that.

4             Are you aware whether Mr. Tarrio has been stabbed in

5    the past?

6    A    I'm not.

7    Q    You're not aware whether he has been hurt at any rally or

8    anything like that in the past?

9    A    If he has, I'm not aware of it.

10   Q    Were any like Antifa or other left-wing groups, did they

11   carry the exact same equipment?

12   A    I'm not an expert on left-wing groups, so I'm not exactly

13   sure what type of gear they carry.

14   Q    At some of the events, such as the December 12th event, you

15   were made aware that the other left-wing groups had knives,

16   correct?

17   A    I know one of the MOSD leaders were stabbed with a knife.

18   Q    And you don't know who stabbed them?

19   A    That's correct.

20   Q    It could have been possibly a left-wing group, is that

21   correct?

22   A    It's possible.

23   Q    Crossing over to January 4th, Henry traveled to D.C.,

24   correct, Mr. Tarrio?

25   A    Yes, he did.

1   Q    And when he traveled to D.C., he traveled by plane, is that
2   correct?
3   A    Yes.
4   Q    And it's a fair assumption that he knew when he landed in
5   D.C. he was going to be arrested, correct?
6   A    The investigation to date shows, yes, he knew he was going
7   to be arrested when he landed.
8   Q    So he knew, was well aware that he was going to be arrested
9   for the allegations from burning a Black Lives Matter flag,
10  correct?
11  A    Yes.
12  Q    But yet he traveled by plane?
13  A    That's correct.
14  Q    He could have traveled by vehicle, correct?
15  A    Yes.
16  Q    And it would have made him less detectable to law
17  enforcement if he traveled by vehicle; is that correct?
18  A    I don't know if I agree with that assumption.
19  Q    Let me ask you this.  He could have jumped in any vehicle
20  and been in D.C., is that correct?
21  A    Yes, he could have.
22  Q    And when you travel by plane, you need a registry, is that
23  correct?
24  A    That's correct.
25  Q    And there is a flight plan that is addressed, correct?

1   A   Yes.

2   Q   And when you have the flight plan as an officer, as an

3   agent that you are, you are well aware before he takes off that

4   he is going to be landing in D.C., is that correct?

5   A   If he was a subject of our investigation, prior to that we

6   would be notified.

7   Q   Prior to his arrival there is a voice message that he

8   listens to right before he is arrested.  Do you recall the

9   voice message that he listens to?

10  A   Prior to his arrival?

11  Q   When he arrives, from January 3rd to January 4th, there is

12  a message that he listens to.  Do you recall that message about

13  the Capitol?

14  A   Yes.  There were several messages.

15  Q   There is one in particular that you reference through your

16  grand jury minutes.  It states in part:  "I did not hear the

17  message until now.  You want to storm the Capitol?"

18          Do you recall that?

19  A   I remember the statement; however, he never said question

20  mark.

21  Q   Do you remember your grand --

22          MR. HASSAN:  Judge, may I, for a minute?

23          THE COURT:  Approach the witness?

24          MR. HASSAN:  Yes, Judge.

25          THE COURT:  Yes.

```
 1              MR. HASSAN:  I'm going to show the government.

 2              THE COURT:  Exactly.

 3              (Pause)

 4              MR. HASSAN:  Judge, may I approach?

 5              THE COURT:  Yes.

 6    BY MR. HASSAN:

 7    Q    I'm going to be showing you the grand jury minutes, a

 8    portion of the grand jury minutes here.

 9    A    Yes.

10    Q    Do you want an opportunity to review them?

11    A    Yes.

12              (Pause)

13    A    OK.

14    BY MR. HASSAN:

15    Q    Have you finished reviewing?

16    A    Yes.

17    Q    In fact, in the grand jury minutes there is a question mark

18    after the statement "you want to storm the Capitol," is that

19    correct?

20    A    That's correct.  I did not write the minutes.

21    Q    Did you make any attempts to edit?

22    A    No, I did not.

23    Q    Did you ask the agents to read the transcript and make any

24    alterations or changes to the transcript as edited?

25    A    I did not.
```

1   Q   But yet what is stated on there is a question mark, is that

2   correct?

3   A   That's correct.

4   Q   So based upon the interpretation of what we're reading on

5   that document today, it would seem that Mr. Tarrio was not

6   aware that the individuals wanted to storm the Capitol, is that

7   correct?

8          MR. MCCULLOUGH:  Objection, your Honor.  Calls for

9   speculation.

10         THE COURT:  Sustained.

11  BY MR. HASSAN:

12  Q   He gets arrested, correct, on January 4th?

13  A   Yes.

14  Q   At that moment when he is arrested there is a new chat that

15  commences, correct?

16  A   They removed the chats associated with the original MOSD

17  leadership chat and they created a new one.

18  Q   And when that new chat is created, Mr. Tarrio is not in

19  that chat, correct?

20  A   Initially he's not in that chat.

21  Q   It seems through the reading of the grand jury minutes that

22  there's two different plans that are going on.  Is that fair

23  and accurate to say?

24  A   No.

25  Q   No?  There is not one statement that says there is one

1    proposed by Biggs and one proposed by Tarrio?

2    A    It's very clear that Biggs and Mr. Tarrio were trying to

3    communicate on the night of the 5th to coordinate the plans.

4    Q    There is communications that happen on January 4th,

5    correct, amongst other members of the organization?  Is that

6    fair and accurate to say?

7    A    Yes.

8    Q    Do those individuals now have questions regarding what the

9    plans are?

10   A    Can you clarify which individual?

11   Q    Any of the individuals, and I'll talk to, as described in

12   the grand jury minutes, YutYut Cowabung and Johnny Blackbeard.

13   A    There are communications, yes.

14   Q    Going back to, before we get into any other details there,

15   in the D.C. case he is granted a bond, is that correct?

16   A    Yes.

17   Q    When he's granted a bond, he attends every court

18   appearance, is that correct?

19   A    I can't speak to that.  I'm not sure.

20   Q    Did he ever miss a court date?

21   A    I do not know.

22   Q    Are you aware whether he was sentenced for six months'

23   incarceration?

24   A    I know he was sentenced and I know he served time in D.C.

25   Q    But you're not aware whether he failed to appear or not?

1    A    I am not.

2    Q    Mr. Tarrio didn't get involved in being at the Capitol on

3    January 6th, correct?

4    A    Mr. Tarrio we do not believe was at the Capitol on January

5    6th.

6    Q    In fact, he was ordered to leave D.C. as a condition of his

7    bond, is that correct?

8    A    That's my understanding.

9    Q    And in fact, for the most part he did just that, correct?

10   A    As soon as released he went to a parking garage near the

11   Phoenix Hotel, and then my understanding is he left the

12   district.

13   Q    Do you know what the purpose of that going to the parking

14   garage was for?

15   A    I can tell you who he met with --

16   Q    That is not my question.

17   A    -- at the parking garage.

18   Q    My question is, do you know why he went to the parking

19   garage?

20   A    He met with individuals in the parking garage.  Outside of

21   that I have nothing further to provide.

22   Q    I'm going to ask you for a third time.  Do you know why he

23   was at the parking garage that morning, that day?

24            MR. MCCULLOUGH:   Your Honor, objection.  It is asked

25   and answered.

1            THE COURT:  Sustained.

2    BY MR. HASSAN:

3    Q    There were multiple individuals -- when he goes into the

4    parking garage, does he have a documentary film crew with him?

5    A    Yes.

6    Q    And are you aware whether that documentary film crew went

7    to pick up some of their belongings before leaving?

8    A    You're asking did the film crew pick up his belongings?

9    Q    Not his belongings, their belongings.

10   A    I don't know exactly what the film crew did.

11   Q    Have you had an opportunity to speak to some of the film

12   crew?

13   A    We've interviewed one person from the film crew.

14   Q    Did they give you any information regarding what they went

15   to go do at the parking garage?

16   A    I'd have to review.  My recollection is they were just with

17   Mr. Tarrio when he was released and was with him when he was in

18   the parking garage.

19   Q    Are you aware whether the film crew was staying at the

20   hotel or not?

21   A    I am not.

22   Q    Let me ask you this.  There's seven other individuals which

23   have been arrested, I believe seven individuals which have been

24   arrested in regards to this case or have been charged in the

25   indictment.  Is that correct?

```
 1            MR. MCCULLOUGH:  Objection, your Honor.  That
 2    misstates.
 3            THE COURT:  Overruled.
 4    A    The individuals, I believe there's six charged in the
 5    conspiracy indictment.
 6    Q    Out of those six the only individual which was not present
 7    on January 6th is Mr. Tarrio, correct?
 8    A    That's correct.
 9    Q    All the other individuals were involved in some part or
10    another into going into the Capitol that day, correct?
11    A    No.
12    Q    Well, Biggs was present in D.C., correct?
13    A    He was.
14    Q    Nordean was present in D.C., correct?
15    A    Correct.
16    Q    Pezzola was also in D.C., correct?
17    A    Correct.
18    Q    Zachary Rehl was also in D.C., is that correct?
19    A    Correct.
20    Q    And Charles Donohoe, was he in D.C.?
21    A    He was in D.C., but we do not believe he went into the
22    building.
23    Q    But yet he was in D.C. when all the actions happened,
24    correct?
25    A    Correct.
```

1  Q   Was he on the Capitol grounds?

2  A   He was.

3  Q   So in fact, all the other individuals in some capacity or

4  another had some involvement with being at the Capitol or being

5  inside the Capitol, is that fair to say?

6  A   Yes.  All the other individuals were either at the Capitol

7  or went into the Capitol.

8  Q   Mr. Tarrio did not throw a water bottle, correct?

9  A   No.

10  Q   Mr. Tarrio did not strike any officer with any object, is

11  that fair to say?

12  A   Not on January 6th, from what I'm aware of.

13  Q   He didn't use a shield to break into the Capitol, correct?

14  A   No.  Yes, you are correct.

15  Q   So he did not use a shield to break into the Capitol,

16  correct?

17  A   That's correct.

18  Q   He didn't make a call at any point in time to go into the

19  Capitol in and of itself, correct?

20  A   He was communicating, he communicated that day with

21  multiple members of MOSD.

22  Q   The communications on January 6th, there's a separate chat

23  he is added on at some point in time on January 5th, correct?

24  A   Yes.

25  Q   He doesn't make a communication on that new chat that is

| 1 | created until January 6th at 2:28 p.m., correct? |
|---|---|
| 2 | A | Can you tell me which chat you're referring to? |

1  created until January 6th at 2:28 p.m., correct?

2  A   Can you tell me which chat you're referring to?

3  Q   Well, does he make any statements whatsoever between

4  January 5th and January 26th on any chat?

5  A   Between January 5th and January 26th?

6  Q   January 6 at 2:28.

7  A   On Parler, while MOSD members are in and around the

8  Capitol, he states, "don't fucking leave," and then on

9  Telegram, in a private Telegram group for the other Proud Boys,

10  he says:  "Make no mistake. . . we did this."

11  Q   That's subsequent to 2:28 p.m., correct?

12  A   Before 2:28 p.m.?

13  Q   I said that's subsequent --

14  A   After.

15  Q   -- to 2:28 p.m.?

16  A   After 2:28 p.m.?

17  Q   Correct?

18  A   Yes, I believe that's right around that time or a little

19  bit after 2:28 p.m.

20  Q   In fact, the intrusion had already happened at that point

21  in time into the Capitol, correct?

22  A   Yes.  The intrusion into the building happened at 2:13 p.m.

23  Mr. Pezzola broke the window of the Capitol.

24  Q   The communications that you say that he was having with

25  members are phone conversations, correct?

1  A    I said he put a Parler post --

2  Q    OK.

3  A    -- that said "don't fucking leave," and I said he had a

4  Telegram message that said "Make no mistake. . . we did this,"

5  on Telegram.

6  Q    You had the opportunity to review the government's

7  memorandum, as we discussed earlier, correct?

8  A    I did.

9  Q    And during that presentation that the government made

10  there's a statement on page 11 of 21 that highlights that there

11  is a 42-second phone call between Tarrio and Biggs, is that

12  correct?

13  A    That's correct.

14  Q    You don't know what was stated in that 42-second call,

15  correct?

16  A    I do not.

17  Q    You don't know during that phone call whether he asked

18  Biggs to not go into the building, is that fair and accurate to

19  say?

20  A    I do not know what was discussed.

21  Q    At any point in time do you have any records prior to

22  January 6 showing that Mr. Tarrio asked any of the young

23  boys -- Proud Boys or any other organization to go into the

24  Capitol, in the Capitol I say?

25  A    Well, he said in Telegram that Boys' note we referenced,

1     "You want to storm the Capitol."

2           There's also comments in Telegram rooms that

3     Mr. Tarrio is part of talking about storming the Capitol

4     building.

5     Q    And you reference again the statement that we discussed

6     earlier that was in a question format, correct?

7     A    The one that is on the notes with a question mark on it,

8     yes.

9     Q    There's statements between Biggs and Nordean that they were

10    starting plans for January 6th on January 4th.  Is that fair

11    and accurate to say?

12    A    Between Biggs and Nordean?

13    Q    Correct.

14    A    Payments?

15    Q    No.  Plans, making plans.

16    A    Making plans.

17    Q    Correct, for January 6.

18    A    The investigation showed there was planning occurring on

19    January 5th, Biggs and Nordean.

20    Q    And also on January 4th, is that fair and accurate to say?

21    A    Can you reference the specific piece of evidence you're

22    referring to?

23          MR. HASSAN:  Judge, if I could just have one minute,

24    Judge.

25          THE COURT:  OK.

1          (Pause)

2          MR. HASSAN:   While my colleague looks for that:

3     BY MR. HASSAN:

4     Q     On January 3, approximately 7:06 p.m., Johnny Blackbeard

5     writes:   "We haven't planned anything operationally for D.C.

6     Should we be?"

7          Do you recall that?

8     A     Yes, I recall that note.

9     Q     So Johnny Blackbeard on January 3rd doesn't know if there

10    are any plans whatsoever for D.C., is that fair?

11    A     I can just tell you that he made that statement.

12    Q     And they're all communicating, correct?

13    A     There are messages occurring in the MOSD leadership chat

14    during that time.

15    Q     And they were discussing regarding what would go on in

16    D.C., correct?

17    A     Yeah.   I mean, Johnny Blackbeard stated in that chat, You

18    know, the main operating theater should be the House of

19    Representatives.   At least that's where the vote's taking

20    place.

21    Q     January 5, 2021, Bertino creates a new group called Boots

22    on the Ground.

23          Do you recall that?

24    A     I do.

25    Q     And in that separate group Biggs writes the following:

 1    "Trying to get numbers so we can make a plan."  Correct?

 2  A    That sounds correct.

 3  Q    And Whallon-Wolkind writes:  "Rufio is in charge."

 4        Is that correct?

 5  A    That sounds correct, yes.

 6  Q    Subsequent to the entry of the Capitol one of the MOSD

 7  members makes the following statement:  "Hey, Tarrio.  I told

 8  you we should have rushed the police line of the 12th.  This

 9  could have been us, but you're a" -- and it seems like a

10  rational epithet is said there.

11        What is the statement that's said there, if you don't

12  mind me --

13  A    The racial epithet?

14  Q    Correct.

15  A    I would have to review the record.  I don't recall.

16  Q    Because none of the documents that we, have been tendered

17  over show the statement in itself.  All it does is fill in the

18  blank.

19  A    OK.

20  Q    Do you recall what it said there?

21  A    I do not.

22  Q    Would it be fair to say that the individual making this

23  comment was making a racial epithet as to our client?

24  A    Can you read the statement one more time?

25  Q    Well, was he making a mockery of our client?

1   A   I don't know what that individual is intending to do.

2   Q   He says we should rush the police line on the 12th,

3   correct?

4   A   Yes.  That sounds correct.

5   Q   Let me ask you this.  Did you have an opportunity to

6   review, and I know you may not be partial to this, but some of

7   the motions to revoke pretrial release that the government had

8   filed before as to some of the other individuals?

9          THE COURT:  I'm sorry.  Motion to what?  I can't hear

10  you.

11         MR. HASSAN:  Motions to revoke bond in regards to some

12  of the other individuals.

13  BY MR. HASSAN:

14  Q   No?

15  A   I have not.

16  Q   Did at any point in time Mr. Tarrio discuss or plan any

17  destruction of government property?

18  A   At any point in time did Mr. Tarrio discuss destruction of

19  property?

20  Q   For the January 6th event.

21  A   Not that I'm aware of.

22  Q   Tarrio never planned, chatted or discussed obstructing an

23  official proceeding, is that accurate?

24  A   No.  He just said, "you want to storm the Capitol."

25  Q   Again, when you say "you want to storm the Capitol," that's

1   the same one that has a question mark at the conclusion of the

2   grand jury minutes, is that correct?

3   A    On the grand jury minutes it has a question mark.

4   Q    Tarrio never planned, chatted or discussed obstructing law

5   enforcement officers, is that fair to say?

6   A    He said in prior communications that he had a plan to

7   obstruct law enforcement officers at previous events.

8   Q    When we're talking about this, we're talking about January

9   6th.  Was there any communication regarding January 6th as far

10  as obstructing or impeding law enforcement on January 6th?

11  A    There were multiple comments and chats Mr. Tarrio was in

12  where they talk about impeding law enforcement.

13  Q    Regarding January 6?

14  A    Regarding, yes, regarding January 6.

15  Q    And Mr. Tarrio is the one making those comments?

16  A    He's in the chats when these comments are being made.

17  Q    Does Mr. Tarrio make those statements?

18  A    Not that I'm aware of.

19  Q    During the course of the government's memorandum, they also

20  quote a CNN article.  Is that fair to say?

21  A    Yes.

22  Q    And that is an article from subsequent, right thereafter to

23  the January 6th events.  Is that fair to say?

24  A    I don't know the date of it.

25  Q    But it's after January 6, is that correct?

1   A   That's correct.

2   Q   And you also discussed this in the grand jury minutes,

3   correct, if you recall?

4   A   Can you tell me the name of the CNN article or which

5   article were you referencing?

6   Q   Well, the CNN article, the CNN interview, correct?

7   A   The one after January 6.

8   Q   Correct.

9   A   Yes, I believe that he was interviewed after January 6th.

10   I believe it was reported on CNN.

11   Q   In fact, during the course of the grand jury minutes, there

12   is a question that is made to you, and the question is:  In one

13   of those interviews did he indicate that -- did he say -- did

14   he make the statement I condemn the actions?

15         "I don't think he," and you quote referring to

16   Pezzola, "should have done that," referring to going into the

17   Capitol.

18   A   I'd have to review the minutes, but that sounds generally

19   correct.

20   Q   "I think it was completely wrong."  Correct?

21         "The other seven individuals were trespassing.  I

22   think they got caught up with the entire crowd."

23         Is that correct as well?

24   A   Sounds about right, yes.

25   Q   "They made a poor decision to go in there."

```
 1              Is that correct?
 2    A    It sounds correct.
 3    Q    And "there" is meaning the U.S. Capitol, correct?
 4    A    That's my understanding.
 5    Q    And then the question, then you say:  And then when he was
 6    later asked did the Proud Boys have a plan to, and then Tarrio
 7    interrupted:  Into the Capitol, he said no.
 8              Is that fair to say?
 9    A    It sounds right.
10    Q    And he followed that up with "absolutely not" into storming
11    into the Capitol.
12              Is that fair to say?
13    A    It sounds right.
14    Q    As part of some of the documents that have been provided to
15    ourselves, did an individual Gilbert Fonticoba at any point in
16    time cross your desk?
17    A    Yes.
18    Q    Have you had the opportunity to review some of the
19    statements that Gilbert made?
20    A    Some of the statements, yes.
21    Q    Do you recall a statement that says:  I'm with Enrique.  He
22    said, That's not a good idea, and I agree.  Correct?
23    A    When did that conversation take place?
24    Q    On January 7th.
25    A    January 7th.  In what chat?
```

1   Q   Well, if you recall.  Do you recall that chat?

2   A   You'd have to refresh my memory on that one.

3   Q   So at this point in time you don't recall those messages

4   being relayed over?

5   A   Can you repeat it one more time?

6   Q   "I'm with Enrique," and he said that "that's not a good

7   idea, and I agree."

8   A   Yeah.  I'd have to review the evidence.

9   Q   Let me ask you this.  After the January 4th arrests, what

10   leads you to believe that Tarrio was in any command or control

11   after his arrest?

12   A   As soon as he is released he immediately, as soon as he is

13   released, he immediately starts engaging with other members of

14   MOSD.  He's put back into the chats, the leadership chats.

15   He's immediately communicating with Biggs and Nordean, trying

16   to coordinate plans, etc.  So he immediately gets back involved

17   when he's released from prison.

18   Q   Well, he doesn't make any comments, correct, on those

19   chats?  We just went over that.  On January 5th he's admitted

20   onto the chat at some point in time and he doesn't come in

21   until 2:28.  Is that fair to say?

22   A   On January 5th, he --

23           MR. MCCULLOUGH:  Objection, your Honor.  That

24   misstates the prior testimony.

25           THE COURT:  Overruled.

1    A    Can you restate the question?

2    Q    On January 5th, subsequent to his release, he's added on by

3    one of the members, correct?

4    A    He's later added.

5    Q    Correct, and he makes no statements until 2:28 the

6    following day on January 6, is that accurate?

7    A    In the chats?

8    Q    In the chats.

9    A    Yes, that sounds correct.

10   Q    What you are referencing that he is in control and command

11   is a 42-second conversation that he has with one of the other

12   MOSD members, correct?

13   A    No.  He is immediately coordinating with Biggs on the night

14   of the 5th.

15   Q    When you say he's coordinating with Biggs, what did he do

16   that he coordinated with Biggs?

17   A    It was clear from the evidence Biggs was trying to

18   coordinate his plans with Tarrio.

19   Q    Maybe you can inform on what that evidence is because what

20   we have is a 42-second phone call.

21        Do you recall anything else other than a 42-second

22   phone call with Biggs or Nordean?

23   A    Biggs said he was trying to coordinate his plan with

24   Mr. Tarrio the night of the 5th.

25   Q    So it's Biggs the one that is making a statement saying

1  that Mr. Tarrio is the one that's making plans or coordinating

2  plans with him, is that fair to say?

3  A    Yeah, Biggs is saying he's trying to coordinate with Tarrio

4  on the night of the 5th.

5  Q    This is a statement that Biggs is saying on the chats,

6  correct?

7  A    Yes.

8  Q    Nothing that Tarrio is telling the group, correct?

9  A    That's correct.

10 Q    So Biggs, for all we know, could be misleading the group.

11 Is that fair to say?

12 A    I don't know what Mr. Biggs' intention to mislead was.

13 Q    Is there any showing that Biggs actually had any

14 communications with Tarrio?

15 A    He said he's trying to reach out to Tarrio.

16 Q    What is it?

17 A    He said he's trying to reach out to Tarrio.

18 Q    Trying to, but there is no showing that he actually did

19 make contact with Tarrio except for that 42-second phone call,

20 correct?

21 A    I'm not sure.

22 Q    Let me ask you this.  What evidence do you, have you

23 developed during the course of the investigation that

24 Mr. Tarrio is a flight risk, if any?

25 A    We haven't identified anything that indicates he may be a

1   flight risk.

2   Q   For the most part throughout the course of your

3   investigation, you have learned that Mr. Tarrio lives in the

4   same house for approximately 38 years, correct?

5   A   Yeah, that's my understanding.

6   Q   It's also your understanding that he has an expired

7   passport and he hasn't traveled outside of the country in ten

8   years?

9   A   I do not know.

10  Q   The vast majority, if not all, family lives in South

11  Florida.  Is that fair to say?

12  A   I'm not sure.

13  Q   Are you aware whether he has any ties outside the country?

14  A   I do not know.

15  Q   Subsequent to January 6th, have there been any indications

16  that Mr. Tarrio has tried to create an ensemble of individuals

17  at any point in time?

18  A   Create an ensemble?

19  Q   Yes, correct, go to another location, whether it be

20  Atlanta, North Carolina, D.C.  Is there any part of your

21  investigation that shows that subsequent to January 6

22  Mr. Tarrio at any point in time became involved with any

23  planning for any other event?

24          MR. MCCULLOUGH:  Your Honor, objection.

25          THE COURT:  Basis?

1           MR. MCCULLOUGH:  It's a compound question.

2           THE COURT:  Rephrase the question.

3    BY MR. HASSAN:

4    Q    Well, subsequent to January 6th did Mr. Tarrio do any

5    planning for any other event?

6    A    Yeah, I don't have any information to show he's planning

7    another event after January 6th.

8    Q    My question wasn't that he was planning.  My question was

9    that there was one planned or something between January 6 to

10   September 23rd is when he self-surrendered, correct, to the

11   jail?

12   A    There was an event planned between those dates.

13   Q    Did Mr. Tarrio plan an event to go to any location between

14   January 6th and September 23rd when he was arrested, to your

15   knowledge?

16   A    To my knowledge, I do not know.

17   Q    And then subsequently thereto he was released in January

18   from custody, correct?

19   A    Yes, he was released in January.

20   Q    Between the time period of January and today's date, to

21   your knowledge, has Mr. Tarrio done any plans for any event

22   between that time period of his release date in January to

23   March?

24   A    I do not know.

25   Q    And is there, to your knowledge -- he just was arrested

1    last week -- is there any showing that there are any plans in

2    the future for any other events?

3    A    I do not know.

4    Q    I imagine that you continue your investigation as part of

5    your course of conduct, correct?

6    A    Correct.

7    Q    But yet there is no showing of that, correct?

8    A    Again, I do not know.

9    Q    Most of the communications in regards to this case are

10   derived from whether it be Parler or whether it be some other

11   social media device, is that fair to say?

12   A    Parler and a lot of Telegram.

13   Q    To your knowledge, is there any evidence of danger of

14   Tarrio if he is without his computer or phone?

15   A    Danger if he is without his computer or phone?  I don't

16   understand the question.

17   Q    Well, he wouldn't be able to congregate individuals,

18   correct?

19            THE COURT:  Mr. Hassan, is this for argument or is

20   this for this witness?

21            MR. HASSAN:  Judge, it is for this witness, but if the

22   court --

23            THE COURT:  I want to make sure that your questions

24   are --

25            MR. HASSAN:  I will proceed, Judge.

```
 1              THE COURT:  -- directed to elicit that which he knows.
 2              MR. HASSAN:  That's fine, Judge.
 3              Give me just a minute, Judge.
 4              THE COURT:  OK.
 5              (Pause)
 6              MR. HASSAN:  Judge, may I confer with the client?
 7              THE COURT:  Of course.
 8              (Pause)
 9              MR. HASSAN:  Judge, nothing further at this time,
10    Judge.
11              THE COURT:  OK.  Mr. McCullough, do you have any
12    examination for this witness?
13              MR. MCCULLOUGH:  I do, your Honor, briefly.
14              THE COURT:  OK.
15    REDIRECT EXAMINATION
16    BY MR. MCCULLOUGH:
17    Q    Special agent Hanak, you were asked a number of questions
18    about whether Enrique Tarrio had posted any communications in
19    the encrypted messaging chats after he was re-added to them.
20              Do you remember those questions?
21    A    Yes.
22    Q    And did Enrique Tarrio post any messages within the new
23    MOSD leadership chat after he was added, and is there anything
24    that would refresh your recollection as to whether he did?
25    A    If I could see the chat.
```

```
1            THE COURT:  If you are not on the mic, you are not on
2    the transcript.
3            So, Mr. McCullough, you are showing him what's been
4    marked as Exhibit 3?
5            MR. MCCULLOUGH:  Yes.
6    BY MR. MCCULLOUGH:
7    Q   I'm showing you what was marked as Exhibit 3 in the grand
8    jury, and specifically the chats involving Enrique Tarrio in
9    the MOSD leadership chat that was created after the time of his
10   arrest.
11           Focusing your attention at the line at what is written
12   at 9:01 p.m. on January 5th.
13   A   I see it.  I see it.
14   Q   And focusing your attention on 9:07 p.m. on the 5th.
15   A   Yes, I see it.
16   Q   Focusing your attention on 9:08 p.m. on the 5th.
17   A   Yes, I see it.
18   Q   Focusing your attention on 10:57 p.m. on the 5th.
19   A   Yes.  It says this.
20   Q   Focusing your attention -- I prefer no response, special
21   agent Hanak -- focusing your attention on 5:30 a.m. on the 6th.
22   A   Yes, I see it.
23   Q   5:33 a.m. on the 6th.
24   A   Yes, I see it.
25   Q   5:34 a.m. on the 6th.
```

```
 1    A    Yes, I see it.

 2    Q    5:56 a.m. on the 6th.

 3    A    I'm sorry.  What time?

 4    Q    Five five six.

 5    A    Yes, I see it.

 6    Q    6:31 a.m. on the 6th.

 7    A    Yes, I see it.

 8    Q    And 6:34 a.m. on the 6th.

 9    A    Yes, I see it.

10    Q    And 6:35 a.m. on the 6th.

11    A    Yes.

12              MR. MCCULLOUGH:  May I approach, your Honor?

13              THE COURT:  Yes.

14              MR. MCCULLOUGH:  I am retrieving this from the

15    witness.

16    BY MR. MCCULLOUGH:

17    Q    Special agent Hanak, now that you've had an opportunity to

18    refresh your recollection, does Enrique Tarrio make posts

19    within the new MOSD leadership group beginning what is shortly

20    after midnight on January 6th and continuing through the

21    morning?

22    A    Yes.

23    Q    And the times that you referred to in the MOSD leadership

24    chat, were those times in west coast time?  So were all those

25    times, are those actually plus three hours --
```

1    A   Yes.

2    Q   -- for east coast time?

3         Special agent Hanak, you were asked a number of

4   questions about gear planning.

5         Do you remember those questions?

6    A   Yes.

7    Q   In addition to the gear that my colleague mentioned to you,

8   was there also discussion of kitty knuckles?

9    A   Yes.

10   Q   Were there also discussion of pepper spray?

11   A   Yes.

12   Q   Was there also discussion of gas masks?

13   A   Yes.

14   Q   Special agent Hanak, you were asked a few questions about

15   Gilbert Fonticoba.

16         Do you remember those questions?

17   A   Yes.

18   Q   Who did Gilbert Fonticoba enter the Capitol with?

19   A   With Joe Biggs.

20   Q   And is Joe Biggs one of the coconspirators that's been

21   charged in this indictment?

22   A   He is.

23   Q   And after entering the Capitol, did Gilbert Fonticoba post

24   any messages on the MOSD membership chat?

25   A   He did.

1  Q   And what, in summary, did he post?

2  A   "We just stormed the Capitol."

3  Q   And after Gilbert Fonticoba entered the Capitol with Joe

4  Biggs, do you have an understanding as to where he went next?

5  A   Where Mr. Fonticoba went?

6  Q   Yes.  Did Mr. Fonticoba travel anywhere after leaving the

7  Capitol?

8  A   After he departed the Capitol, my understanding is he went

9  up and met with Mr. Tarrio.

10  Q   And special agent Hanak, there is a documentary film crew

11  that was present in Mr. Tarrio's hotel room in Baltimore, is

12  that right?

13  A   Yes.

14  Q   And have you reviewed the footage of that film crew in the

15  hotel in Baltimore?

16  A   Yes.

17  Q   At any time does Mr. Tarrio admonish Mr. Fonticoba?

18  A   No.

19  Q   You were asked a number of questions about why, if you

20  understood why Mr. Tarrio was in the garage, the parking garage

21  on January 5th after his release.

22      Do you remember those questions?

23  A   Yes.

24  Q   Mr. Tarrio was ordered to leave Washington, D.C., is that

25  right?

| | | |
|---|---|---|
| 1 | A | Yes, he was. |
| 2 | Q | Part of the conditions of his release, is that right? |
| 3 | A | That's my understanding. |
| 4 | Q | And was the documentary film crew in charge of ensuring |
| 5 | | Mr. Tarrio's compliance? |
| 6 | A | I don't know, but I -- I don't know. |
| 7 | Q | Was the documentary film crew driving Mr. Tarrio? |
| 8 | A | No. |
| 9 | Q | Who was he being driven by, without naming any names? |
| 10 | A | Another Proud Boy who was in MOSD. |
| 11 | Q | Special agent Hanak, you were asked a few questions about |
| 12 | | Mr. Tarrio's arrest on January 4th. |
| 13 | | Do you remember those questions? |
| 14 | A | Yes. |
| 15 | Q | My friend here asked you a few questions about whether |
| 16 | | Enrique Tarrio knew that he would be arrested ahead of time, is |
| 17 | | that right? |
| 18 | A | Yes. |
| 19 | Q | Did he communicate his belief that he would be arrested |
| 20 | | ahead of time to the tight circle of MOSD leadership? |
| 21 | A | Yes. |
| 22 | Q | Can you summarize how they reacted? |
| 23 | A | Right before he was arrested, my understanding, he had |
| 24 | | communication with Joe Biggs and he had said "whatever, |
| 25 | | whatever happens, make it a spectacle." |

1   Q   How about Person 1, as he is identified in the indictment,

2   did Person 1 have any statements about what should be done in

3   response?

4   A   In response to?

5   Q   In response to the news of Enrique Tarrio's arrest.

6   A   Person 1 I think at one point said let them loose, in one

7   chat.

8   Q   Speaking in the context of what to do on January 6, is that

9   right?

10   A   Yes.

11   Q   You were asked a number of questions at the outset about

12   Enrique Tarrio's creation of this new chapter.

13         Do you remember those questions?

14   A   Yes.

15   Q   You were asked a number of questions about the purpose of

16   creating this new chapter, is that right?

17   A   Yes.

18   Q   Within this new chapter, between January 2nd and January

19   4th, was there discussion among the members about storming the

20   Capitol?

21   A   Yes.

22   Q   On January 6th, who were the leaders on the ground?

23   A   On the ground, Ethan Nordean and Joe Biggs.

24   Q   And who had Ethan Nordean and Joe Biggs indicated that they

25   had been talking to?

1   A   Tarrio.

2   Q   And where did Ethan Nordean and Joe Biggs take the group

3   that they had assembled?

4   A   To the Capitol.

5   Q   And once they arrived at the Capitol, what did they do?

6   A   Within minutes of them arriving at the Capitol, they led a

7   group on the Capitol grounds.

8   Q   And after Dominick Pezzola smashed the Capitol window at

9   2:13 p.m., did Enrique Tarrio post anything publicly on Parler?

10  A   On Parler, yeah, he posted "don't fucking leave."

11  Q   And after the 42-second call with Joe Biggs at

12  approximately 2:54 p.m., did Enrique Tarrio post anything else

13  on Parler?

14  A   He posted "1776." He also posted on Parler: Revolution's

15  at the Rayburn Building.

16  Q   Had Joe Biggs been in the Senate Chamber in the time period

17  before Enrique Tarrio made those posts?

18  A   I believe so.

19           MR. MCCULLOUGH:  No further questions, your Honor.

20           THE COURT:  OK.

21           MR. HASSAN:  Judge, if I may briefly, Judge, over the

22  new subjects that were discussed, Judge.

23           Very briefly, Judge.

24           THE COURT:  OK.  Within the scope of what was covered,

25  please.

1      MR. HASSAN:  Absolutely, Judge.

2   RECROSS-EXAMINATION

3   BY MR. HASSAN:

4   Q   Agent, you said earlier that when he was released from

5   custody there was an MOSD member, correct?

6      THE COURT:  Sorry.  I don't understand the question.

7   BY MR. HASSAN:

8   Q   When he was picked up from the jail on January 5th, there

9   was an MOSD member when they went to the parking garage.  Is

10   that correct?

11   A   Yes.  I believe the driver of the vehicle was a Proud Boy

12   and I believe he was also an MOSD.

13   Q   It's fair to say that there are other individuals that were

14   in that vehicle, correct?

15   A   Yes.  I think the video crew was also in that vehicle as

16   well.

17   Q   So it's not only -- and do you know why the film crew was

18   with the other individual that was in the vehicle?

19   A   I mean, my understanding is the film crew was to be with

20   Mr. Tarrio.

21   Q   Was the film crew, to your knowledge, recording the other

22   MOSD member?

23   A   The film crew was in the vehicle with Mr. Tarrio and the

24   other MOSD member.

25   Q   Prior to going to go pick up Mr. Tarrio, is there any

1   indication that the film crew was recording the other MOSD
2   member?
3   A   I don't know.
4   Q   You stated during the examination that Biggs and Nordean
5   would communicate with Mr. Tarrio, correct?
6   A   Correct.
7   Q   Those communications are communications that were
8   conducted -- how many phone calls do you have that show that
9   Mr. Tarrio was communicating with Biggs and Nordean?
10  A   Phone calls?
11  Q   Yes.
12  A   Regular phone calls, we talked about the one on the 6th.
13  Q   Correct.
14  A   But there are also communications in Telegram.
15  Q   What showings are there Mr. Tarrio instructed Biggs and
16  Nordean to go to the Capitol?
17  A   Well, Mr. Tarrio created MOSD with a strict command and
18  control structure.  They talked about going to the Capitol,
19  discussed going to the Capitol prior to the 6th, and Biggs and
20  Nordean took the crew to the Capitol on the 6th.
21  Q   Prior to January 4th there is no indication, there is no
22  notations in any message chat, encrypted message, of going into
23  the Capitol?
24          MR. MCCULLOUGH:  Objection, your Honor.  Beyond the
25  scope of redirect.

```
 1                    THE COURT:  Sustained.

 2    BY MR. HASSAN:

 3    Q    The government asked you questions regarding the chats that

 4    were going on regarding December 30th, correct?

 5    A    December 30th?

 6    Q    Correct.  December 30, 2020.

 7                    MR. MCCULLOUGH:  Objection, your Honor.

 8                    THE COURT:  Let him answer.  Overruled.

 9    A    Which chats are you referring to?

10                    MR. HASSAN:  Judge, may I approach?

11                    THE COURT:  OK.  I want to make sure of two things,

12    that not only these questions are in fact arising from the

13    examination but that they are focused enough to permit the

14    agent to meaningfully answer them.

15                    MR. HASSAN:  Understood, Judge.

16                    THE COURT:  So please focus the questions more.

17    BY MR. HASSAN:

18    Q    Agent, are you aware whether Mr. Tarrio made any statements

19    at any point in time during any of these messages that shows

20    they are not going to punch the cops, it will be calm?  Do you

21    recall that?

22    A    Can you show me the messages?

23                    MR. HASSAN:  Judge, may I approach?

24                    THE COURT:  Yes.

25    A    OK.  What is your question?
```

1    Q    Isn't it a fact --

2         MR. MCCULLOUGH:  Your Honor, if we could give the

3    agent a moment to review the chat in front of him.

4         THE COURT:  Do you also want the record to reflect

5    what he is looking at, Mr. Hassan?

6         MR. HASSAN:  Judge, what I'm showing the agent is a

7    line of questions -- is a line item by line item, of which was

8    provided to us during the presentation of the case, and I

9    believe what this is is a line of statements providing a text

10   message chat which is encrypted, Judge.

11        THE COURT:  So he is reviewing former text messages.

12        MR. HASSAN:  Correct, Judge.

13        THE COURT:  Your question is whether or not Mr. Tarrio

14   made the statement --

15        MR. HASSAN:  Those two statements, Judge.

16        THE COURT:  I only heard one.  What is the question?

17        MR. HASSAN:  It will be calm and, Judge, may I just go

18   back?

19        THE COURT:  Yes.  Go ahead.

20        MR. HASSAN:  They're not gonna punch cops.

21        THE COURT:  So, agent Hanak, I understand the question

22   to be in December 30th, did Mr. Tarrio make the statements on

23   the group chat that it will be calm and they won't punch cops?

24   Is that accurate?

25        THE WITNESS:  Yes.

1           THE COURT:  OK.

2           THE WITNESS:  The chats I'm looking at, it says it

3    will be calm and they're not going to punch cops on December

4    30, 2020.

5           THE COURT:  OK.

6           MR. HASSAN:  Judge, may I have just one minute, Judge?

7           THE COURT:  Of course.

8           (Pause)

9           MR. HASSAN:  Nothing else.  Thank you, Judge.

10          THE COURT:  I appreciate it.  OK.

11          As we transition here into argument, I want to make

12   sure that we are legally oriented.  So let me, Mr. Hassan,

13   start with you.

14          You have looked at the government's memorandum.  Is

15   there any dispute that there is a presumption that attaches

16   because of the nature of the offenses here?

17          MR. HASSAN:  Judge, that's correct, there is a

18   rebuttable presumption, Judge.

19          THE COURT:  So again, we know where our respective

20   burdens are, and I'm aware of the government's argument, which

21   is very thoroughly laid out in its memorandum.  So my

22   inclination is to hear the defense response, unless there is

23   something different or additional that the government wants to

24   advance as argument.  I am also, of course, aware of the

25   Pretrial Services report.

1           MR. MCCULLOUGH:  Your Honor, if the court would

2    indulge just a few minutes, I would just like to highlight a

3    few things.

4           THE COURT:  OK.

5           MR. MCCULLOUGH:  If the court would allow.

6           Your Honor, may the witness be excused?

7           THE COURT:  Yes.  Step down.  Just be careful.  There

8    is a step.

9           (Witness excused)

10          THE COURT:  I will also tell you, Mr. McCullough, it

11   is your motion and you will get the last word.  So just because

12   I was going to start with the defense doesn't mean that you are

13   foreclosed from making an argument thereafter.

14          MR. MCCULLOUGH:  I understood, your Honor, and I am

15   happy to proceed as you suggest.  I did want to make sure I had

16   an opportunity to present our argument.

17          THE COURT:  Of course.  I promise you will.

18          MR. MCCULLOUGH:  I am happy to, if your Honor would

19   like, defense counsel can certainly --

20          THE COURT:  Well, I'd like to hear the proposal.  What

21   is your ask?

22          MR. HASSAN:  Judge --

23          THE COURT:  As long as you are next to a microphone,

24   whether you are at counsel table or at the podium, either way

25   is fine with me.

1           MR. HASSAN:  That is fine, Judge.

2           What we are proposing, Judge, is a personal surety

3    bond cosigned by the grandfather, which is present before the

4    court, Judge, and Gladys Pardo, in the amount of $1 million.

5    That is to be secured by two properties of which both the

6    grandfather and Gladys Pardo own.

7           The location of that address is 5730 Northwest 2nd

8    Street, Miami, Florida 33126.  That's where the grandfather

9    lives.  And also the address of the aunt, which is 1290

10   Southwest 142nd Court, Miami, Florida.

11          The grandfather's property is worth $600,000 and the

12   aunt's property is worth $575,000.  Those properties are owned

13   free and clear, Judge.

14          Also we are proposing a $250,000, 10 percent bond to

15   be posted by the aunt, Gladys Pardo.

16          Judge, as the record reflects, his entire family lives

17   here.  If the court deems that any other securance is

18   necessary, we would be proposing location monitoring, a GPS

19   monitor, to be placed, and he would be confined to his home

20   here in Miami, and the only exception would be to travel to

21   D.C. for the purposes of this case at hand.  He would also be

22   forbidden to use social media and/or messaging service unless

23   the court provides written approval or the pretrial supervised

24   written approval.

25          Judge, I can go into arguments now if the court

1   wishes, but that is what the court inquired was our proposal.

2   THE COURT:  I appreciate knowing it.  OK.  So I
3   understand that especially through the examination of the agent
4   there is a heavy emphasis on the strength of the evidence and I
5   can, I hope, foresee some of the arguments you want to make
6   with respect to that.  However, one of the reasons I ask what
7   your proposal is going to be is so that I can assess whether or
8   not you are appropriately addressing the concerns that the
9   court has.

10   So you're proposing home detention and forbidding him
11   to use social media and text messages with a defendant, it is
12   unrebutted, who failed to abide by the conditions of his
13   release in D.C.  So I don't understand how these are conditions
14   that would give this court any assurance with the incredibly
15   recent failure to comply with the court's order of release in
16   D.C.

17   MR. HASSAN:  Judge, what I would indicate to the court
18   is that the court in D.C. at no point in time violated the
19   conditions of his bond whatsoever.  Subsequent to the meeting
20   that happened on the parking garage, where the production crew
21   picked up their belongings, thereafter they left the location
22   and he did not come back into D.C.  He left to Baltimore.  So
23   he was not in D.C. on January 6th, and subsequent thereto he
24   was not in January 6th -- he was not in D.C. at all.

25   He went to all the court hearings, attended all court

1  matters, and he was -- he pled his case.  As a condition of his

2  plea, he was allowed three weeks to surrender, and he

3  surrendered three weeks thereafter, on 8/23/2021, to custody

4  without no violations of the conditions of the court, Judge.

5  What the court -- Judge, as I'm being told by my

6  colleague, Judge, and based upon information that we have been

7  provided, the court gave him until 12:00, until midnight of

8  that night, to leave D.C.  So there was some time period for

9  him to leave D.C., get his belongings, get all the stuff that

10  he had and leave D.C. with the production crew that was

11  following Mr. Tarrio throughout this whole time.  So, in

12  essence, he did not violate the conditions of his release,

13  Judge.  He was not in D.C. on January 6th.

14  THE COURT:  No.  The proffer isn't that he was there

15  on the 6th.  The proffer was that he was released and went to a

16  garage and met with other people.  It is not a question of the

17  6th.  There is no evidence that has been advanced or proffered

18  about the 6th with respect to his presence in D.C.

19  MR. HASSAN:  Judge, but if the court permit him to

20  leave by midnight, he didn't violate any of the conditions

21  either because he had left by midnight of that night D.C.

22  Judge, as I am being told in my ear, he wasn't there

23  to make any plans for January 6th, Judge.  All we have is that

24  there was a discussion on January 5th in the basement but no

25  indication whatsoever as far as what was being discussed in

1   that parking garage and nothing to contradict that whatsoever,

2   that there is any indication that there was any planning or

3   anything done on the basement on January 5th of the Phoenix

4   Hotel.

5          THE COURT:  All right.  I understand.  Recognizing,

6   then, that -- now I know where you are headed in terms of what

7   your bond ask is and we are oriented as to your burden, you

8   have the floor.

9          MR. HASSAN:  Judge, this is where we are at.  Judge,

10  in order for the court to make a determination regarding

11  whether he is a danger to the community, because I think we can

12  all agree that he is not a flight risk at all.  I think the

13  evidence shows that he is not a flight risk.  He has been here

14  in South Florida his whole life.  He's always agreed with all

15  the conditions that the courts have imposed, including the

16  federal court system here in South Florida when he was

17  sentenced in 2012.

18         If the court read the Pretrial Services report, on the

19  Pretrial Services report it indicates that he was sentenced to

20  a period of 30 months of incarceration.  In that case he

21  self-surrendered.  He did everything he had to and he was

22  released.  Additionally, he agreed and partook in all the

23  conditions of supervision, and he completed his supervision

24  without any issues.

25         There is no indications as far as the Pretrial

1    Services of any violence in and of itself.  If you go through
2    the Pretrial Services report, there is dealing in stolen
3    property, grand theft, a petty theft, possession of stolen
4    property.  The only issue that you have that is any notation of
5    anything is destruction of property, which he answered for,
6    which is the Black Lives Matter flag, Judge.  Other than that,
7    we are talking about charges way back into his youth when he
8    was 16, 17, and 19 years old respectively, Judge.

9          Judge, here in the courtroom there is a multitude of
10   individuals that are here on his behalf.  So you have Pablo
11   Pardo, which is a family friend.  You have Leanne Lee, which is
12   the wife of Pablo Pardo.  You have Natalie Pardo, his cousin.
13   You have Sean Shelley.  You have Sheila Marqueda.  Leonardo
14   Marqueda.  Sonia Ramos, which is also a family friend.  You
15   have Alexandra Padron, which is his sister.  Again, Judge,
16   Rigoberto Tarrio, which is his grandfather.  Gladys Pardo, his
17   aunt, and Sumi Tarrio, his mother, Judge.

18         These are all individuals that, if the court wishes,
19   and I have had discussion with them, they would all be willing
20   to sign off on the same document that Mr. Tarrio is not a
21   flight risk at any point in time, Judge, and that they would
22   feel assured to secure any notation.  I highlighted those three
23   individuals to secure the personal surety bond -- the mom, the
24   aunt and the grandfather -- just because they have the
25   properties in this case, Judge.

1           Judge, with regards to danger to the community, Judge,

2     there is nothing showing that Mr. Tarrio -- if we take the

3     allegations of this case, January 6th, outside of the spectrum,

4     Mr. Tarrio has been out for a consistent time period of over 14

5     months.  There is no showing whatsoever that Mr. Tarrio has

6     done anything within the last 14 months.  Noted, 155 days have

7     been spent in custody, but there is no showing that he has

8     tried to congregate individuals, incite any other issues.  I

9     questioned the agent regarding that and the agent could not

10    answer as to the question that there is no showing that

11    Mr. Tarrio tried to collect any individuals, to create any

12    presence at any other location whatsoever.

13          The analysis is four prong.  So the nature and

14    circumstances of the offense charged, including or whether, for

15    example, the offense is a crime of violence, Judge.

16          Judge, in this case this is the only defendant which

17    was not present on January 6th.  I want the court to note one

18    thing, Judge.  All the other defendants that are mentioned in

19    this conspiracy were initially granted a court by their

20    respective jurisdictions.  So all the jurisdictions that

21    handled their case at one point in time were granted bond, for

22    the most part, and I'll go into notations.

23          Mr. Biggs was provided a bond initially.  Thereafter

24    the government filed a motion to revoke the pretrial release.

25    Mr. Nordean was also addressed, provided a pretrial release,

1    and thereafter the government filed --

2         THE COURT: But can I ask, to contextualize your

3    argument while you're telling me that, because I don't have the

4    Pretrial Services report for any of those defendants. I have

5    no information except for the indictment, which, as you have

6    noted, is only one factor. So how do I contextualize the

7    argument you're making?

8         MR. HASSAN: Judge, if the court looks at the basis of

9    the D.C. case in making the determination what the appropriate

10   bond in this case --

11        THE COURT: By "D.C. case," I'm sorry, which one do

12   you mean? His prior arrest or do you mean this D.C.

13   indictment?

14        MR. HASSAN: This D.C. indictment, Judge.

15        THE COURT: OK.

16        MR. HASSAN: And it goes to show, Judge, what I'm

17   trying to get at is all the other individuals were granted

18   pretrial release in some condition or another, yet all the

19   other individuals were present on the ground on January 6th.

20   This is the only individual that was not present on the ground

21   on January 6th, did not storm the Capitol, did not go into the

22   Capitol at any point in time. I think that speaks volumes

23   regarding this case.

24        The only thing that the government has attaching

25   Mr. Tarrio to this case, it is statements and messaging or

1  encrypted messages by other individuals relating with

2  Mr. Tarrio instructed or commanded or did anything regarding

3  January 6th, but there is no indication that Mr. Tarrio

4  instructed at any point in time anybody to go into the Capitol.

5  It is quite the contrary. There is nothing to indicate that.

6  Nothing. There is just statements that were made thereafter

7  regarding what they were doing inside the Capitol. But

8  instructing individuals to go to the Capitol building, at no

9  point did that happen whatsoever, Judge. So when you talk

10 about the weight of the evidence in this case, we would argue

11 that it is weak in and of itself, Judge.

12          When you look at the nature and seriousness or the

13 danger to any person or the community regarding the defendant's

14 release, there is no indication, Judge. Should the court

15 restrict his ability to use social media and/or any devices or

16 any encrypted messaging or any phone for that matter, it would

17 remove his ability to communicate with any individuals in this

18 case.

19          So there would not be that worry for the court that he

20 would communicate with other individuals to tell them to go to

21 a certain location or anything of that sort, Judge. Again,

22 there's been nothing of that sort between January 6th to now,

23 and we're talking about a year and two months later, Judge.

24          So in essence, Judge, what I am asking the court to do

25 is place the personal surety bond and the 10 percent bond as

1    previously stated, Judge.

2          THE COURT:  OK.  Let me make sure that I understand

3    your argument.  It is premised, I think, on an absence of

4    evidence that he committed any act after his release on the

5    5th.

6          MR. HASSAN:  No, Judge.  When you look at the

7    indictment, right, the indictment shows --

8          THE COURT:  Sorry.  I'm trying to make sure you and I

9    are on the same page.  I think that your argument is that he

10   committed no act after the 5th, after he was released, because,

11   alternatively, if that is not what your argument is, then I

12   have an indictment that alleges his conduct occurred while he

13   was on release on another bond, right?

14         I understood the argument you were advancing to be

15   that there is no evidence that Mr. Tarrio did anything after

16   the 5th, that the government's case depends on other people's

17   actions after the 5th.

18         MR. HASSAN:  Correct, Judge.

19         THE COURT:  OK.

20         MR. HASSAN:  So when we look at that, we're looking

21   at, and I will just highlight a couple of individuals that are

22   on the actual indictment.

23         THE COURT:  My question was going to be, the agent

24   just testified as to the statements that Mr. Tarrio made on

25   public platforms on the 5th and 6th.  So I'm trying to make

1    sure that I understand your argument both factually and
2    legally.

3         MR. HASSAN: Well, Judge, when the agent testified, he
4    testified that he saw messages coming in. He didn't testify as
5    to what messages were actually on there. So when he was
6    cross-examined, the government basically asked him, well, did
7    he make a statement at 9:01, and I can go through the minute to
8    minute, but at no point in time does the agent at any point in
9    time testify to what those messages are that are being
10   communicated on January 5th.

11        THE COURT: OK. What I am thinking of in particular
12   just as I'm asking you these questions, again, because I'm
13   trying to make sure that I understand your argument, if the
14   argument is premised on me finding that he didn't do anything
15   after he was released on bond in furtherance of the conspiracy,
16   I want to make sure that you have a chance to address the three
17   statements that he made right after the phone call on public
18   media. He is alleged to have said, instructed that no one
19   leave, 1776, and the thing about a revolution. My
20   understanding of that evidence is that all occurred on the
21   6th --

22        MR. HASSAN: Judge --

23        THE COURT: -- and that that was Mr. Tarrio's
24   statements, right?

25        MR. HASSAN: Judge, I agree with you, but at that

1    point in time the acts had already been committed.

2    THE COURT: Understood. Again, I'm just trying to

3    make sure that I am following what your argument is and what

4    findings it would require me to make. So I thought you were

5    traveling on an argument that would require me to find that

6    Mr. Tarrio did not in fact do or say anything once he was

7    released from the D.C. bond.

8    MR. HASSAN: Judge, I don't disagree with the court

9    that he made those statements subsequent to the individuals

10    going into the building. My argument is to he didn't make any

11    statements to instruct anybody to go into the Capitol building.

12    THE COURT: That I understand. OK. Then I'm with

13    you.

14    MR. HASSAN: Because the crime is going into the

15    Capitol building and pretty much, in essence, causing a breach

16    of the peace and interfering with proceedings and what

17    transpired on January 6th. But at no point in time did

18    Mr. Tarrio instruct anybody to go to the Capitol building, and

19    I think through the proffer that the government provided there

20    is no indication that Mr. Tarrio, in essence, instructed

21    anybody to go to the Capitol building. It is only statements

22    that he made thereafter.

23    THE COURT: OK. Right.

24    MR. HASSAN: I don't know if the court has any other

25    questions based on my arguments, Judge.

1            THE COURT:  No.  I'm sorry.  I took you off script.

2    So if you have anything else that you wanted to advance or

3    argue, please do without me interrupting you.

4            MR. HASSAN:  Judge, again, I'm going to harp on the

5    fact regarding the cell phone, the devices, social media

6    devices, if the court restricts that, Judge, I think it assures

7    the court that this won't transpire during the course of this

8    case, Judge.

9            THE COURT:  OK.  All right.  I promised the government

10   last word.

11           MR. MCCULLOUGH:  Thank you, your Honor.

12           Enrique Tarrio has been indicted for leading a

13   conspiracy to corruptly obstruct, influence, and impede the

14   certification of the Electoral College votes.  This is a crime

15   that was carried out by the defendant and his coconspirators

16   that struck at the heart of our democracy.  Your Honor, that is

17   not just rhetoric.  It is not rhetoric.  You have to ask

18   yourself in the years ahead will the people of this country

19   ever again dismiss the idea that this normal, peaceful

20   transition of power that we witnessed for years on end, this

21   miracle that other countries look upon will just be shrugged

22   off.

23           The way Mr. Tarrio thinks of this is that it was just

24   trespass.  It was just trespass.  This is the words in the CNN

25   interview that was quoted by my opponent, my colleague.  Your

1  Honor, the defendant organized a group of men under a command

2  and control scheme and directed them to go to the Capitol and

3  celebrated their achievements at the Capitol.  He posted that

4  on both public media, his public social media profile, "don't

5  fucking leave," and he also posted it in private.

6           If you have any doubt about whether Enrique Tarrio

7  understood the criminal objective here, after rioters breached

8  the Capitol and the certification had stopped, Enrique Tarrio

9  was asked:  "Are we a militia yet?"  And his answer was:  "Yes.

10  Make no mistake .  .  . we did this."

11          "We did this," and he is talking to the same group of

12  people to whom he had presented this idea for his special

13  chapter, his hand-selected men.  That is the proof that Enrique

14  Tarrio was leading these men and directing them to the criminal

15  objective of stopping the proceedings at the Capitol that day.

16          Your Honor, all four factors here weigh heavily in

17  favor of detention.  The first factor, the nature and

18  circumstances of the crime, as I said, it is difficult to image

19  something that is graver than this crime -- to plot an

20  obstruction of a joint session of Congress.  It is in fact a

21  crime of terrorism, your Honor.  It meets the definition in

22  2332b(g)(5)(A) and (B).  It is the destruction of government

23  property, and it's done, it's calculated to influence and

24  affect the conduct of government by intimidation and coercion.

25  That is what is taking place there, your Honor.

1         Enrique Tarrio created leadership structure, he

2   oversaw the hand selection of the men, he organized and

3   administered planning meetings, and even after his release, the

4   leaders on the ground were deferring to him.  They were

5   contacting him trying to get on the same page with Enrique

6   Tarrio.

7         The communications, the weight of the evidence, your

8   Honor, there are communications within the encrypted messaging

9   groups that he created by the men that he handpicked.  On

10   January 3rd, one of the men that Enrique Tarrio himself picked

11   for inclusion in the group said: "It's time to stack those

12   bodies in front of Capitol Hill."

13         That is what is happening within the special group of

14   command and control, the men that he wanted to harness, the men

15   that he directed to the Capitol ten minutes before the

16   certification was supposed to start, and within minutes the

17   leaders on the ground, Nordean and Biggs, were across the

18   barriers.  They moved to the front.  They tore down a fence.

19   They allowed the rioters to push forward.

20         If you look at the coordinated effort and the

21   contemporaneous statements, Joe Biggs films himself saying:

22   "American citizens are storming the Capitol right now."  That

23   is at 12:56.  At 1 p.m., in the encrypted messaging chat for

24   the members of Enrique Tarrio's special chapter, one of the

25   leaders says:  "Storming the Capitol building right now."

1        THE COURT:  OK.  Mr. McCullough, I just want to remind

2    you that I am aware of all of the proffer that is in your

3    memorandum, and it is an indicted case.  So I mean it when I

4    say that you have the last word, but I want you to use it

5    wisely.

6        MR. MCCULLOUGH:  Thank you, your Honor.

7        THE COURT:  Thank you.

8        MR. MCCULLOUGH:  I appreciate that.

9        Look, I think, your Honor, as I said, it is the

10   coordinated movement, the contemporaneous statements, and

11   Enrique Tarrio's own words that really punctuate that Enrique

12   Tarrio was the leader and commander of this conspiracy and he

13   understood its criminal objective.

14       I think kind of when you look at the ultimate inquiry

15   here, right, the government submits that the defendant will not

16   abide by any terms and conditions imposed by this court.  To be

17   sure, January 6th has passed, but there is no reason to believe

18   that this fight is over for Mr. Tarrio.

19       The defendant stands accused of conspiring to stop the

20   peaceful transition of power in this country, and after

21   plotting and successfully executing that, does the court take

22   any comfort -- while he was on release for public destruction

23   of property in Washington, D.C., does the court have any

24   confidence that it can fashion conditions that would ensure

25   that Enrique Tarrio would not plot and direct other acts of

1  mayhem if they served his purpose.  Nothing about this

2  defendant's conduct -- his crime, his leadership, his history

3  of noncompliance, recent history -- should give this court any

4  reason to conclude that any release conditions can be fashioned

5  that could adequately protect the public.

6  Thank you, your Honor.

7  THE COURT:  Thank you, Mr. McCullough.

8  Let me make sure that we address removal because I

9  need to take that waiver from Mr. Tarrio.

10  Mr. Tarrio, have you had a chance to consult with your

11  attorney, and do you understand that you have the right to a

12  removal hearing, that is, a hearing at which time the

13  government would have to show evidence that you are the person

14  who was wanted in the district of D.C. for these charges?  Do

15  you understand you have a right to that proceeding?

16  OK.  Will you answer audibly for me because that is

17  how this proceeding is recorded.

18  THE DEFENDANT:  Yes.

19  THE COURT:  Thank you, sir.  And you've had a chance

20  to consult your attorney about what would happen at that

21  hearing?

22  THE DEFENDANT:  Yes, your Honor.

23  THE COURT:  Having consulted your attorney about what

24  would happen at a removal or identity hearing, it is my

25  understanding you have decided to waive that proceeding so that

1    your next appearance will be in D.C., is that right?

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  OK.  I will accept that waiver.  I find it

4    knowing and voluntarily made after consulting with competent

5    counsel of record.  So we won't engage in a removal or identity

6    hearing.

7            Now you can have a seat again.  Thank you for coming

8    to your feet for me, but I was afraid that we would forget to

9    take care of that, and it had been the proffer that removal

10   wasn't contested.

11           Mr. Hassan, I will enter a written order, and you know

12   that there is another judge that can see it differently than I

13   do.  You guys have focused a lot on the weight of the evidence,

14   the sufficiency of the evidence, and I understand the

15   challenges that you have made there, including the examination

16   of the agent and the extent of one person's participation

17   versus another and in which forum, but that is but one factor,

18   and whether or not -- and you've also focused on risk of

19   flight, which the statute actually deals with a reasonable

20   assurance that the person will appear as required by a

21   condition of release.  So it is not limited to the concern that

22   he would flee from this district or from D.C. but, rather, just

23   simply that he wouldn't show up and answer to the charges.

24           I do take note that I probably have two dozen family

25   members and friends in the courtroom who have been here since

1     9:00 and it is now 12:30.  Mr. Tarrio clearly has the support

2     of his family and significant ties to the community, all of

3     which are factors that weren't heavily brought out, and I will

4     list them all in the written order, but I don't find here that

5     I will need to focus on whether or not he is a risk of flight

6     because the evidence of danger to the community is unrebutted.

7           There is a presumption under the statute.  It's been

8     acknowledged that legally that is our standard, and the family

9     showing is quite significant and your examination of the agent

10    was quite thorough, but the danger to the community is

11    unrebutted.

12           I am going to enter a written order of detention and I

13    will more fully explain the reasonings therefor, but, as I have

14    indicated, the conditions that you suggested I do not find

15    would reasonably assure the community of the particular danger

16    that Mr. Tarrio has demonstrated in the evidence that was, with

17    respect at least to that finding, unrebutted.

18           So I will flesh it out, I will file it today, and you

19    will make a decision whether or not you want to appeal it,

20    which I understand, but that -- anyway, so you will see that in

21    a written order.

22           I appreciate your presentation and the careful

23    examination of the evidence.  There is only so much that

24    counsel can do with the facts that they are handed, including,

25    and it wasn't really mentioned, the prior probation violation.

1      I will put it all, as I said, in a written order so
2   that you can both scrutinize the reasoning there.

3      With that, I think that concludes our hearing for
4   Mr. Tarrio.  I will enter the order of commitment.

5      Mr. Tarrio, that will get you moving to D.C.  I can't
6   tell you how long it will take.  It is the marshals who move
7   you.  But when you appear, that will be your next proceeding in
8   D.C., and your attorneys will tell you the date of that.  OK.

9      I'll just write it in court.

10      All right.  Thank you, government counsel, as well.
11      (Adjourned)

12

13                C E R T I F I C A T E

14

15      I hereby certify that the foregoing is an accurate
16   transcription to the best of my ability of the digital audio
17   recording in the above-entitled matter.

18

19   March 23, 2022          s/ Joanne Mancari
                              Joanne Mancari, RPR, CRR, CSR
20                           Court Reporter
                              jemancari@gmail.com
21

22

23

24

25