UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

ENRIQUE TARRIO,

*Defendant*.

Criminal Action No. 21-175-5 (TJK)

## MEMORANDUM OPINION

On March 7, 2022, a grand jury returned a Second Superseding Indictment charging Enrique Tarrio with, among other things, conspiring with his five codefendants to obstruct the certification of the Electoral College vote related to the 2020 presidential election. Each of his codefendants was previously charged, and all of them are detained pending trial. Tarrio was arrested on a warrant the day after the indictment was returned, and Magistrate Judge Lauren F. Louis of the Southern District of Florida held a hearing to determine whether Tarrio should be detained too. After considering the factors enumerated in 18 U.S.C. § 3142(g), Judge Louis found by clear and convincing evidence that Tarrio presented a danger to the community and that no condition or combination of conditions will reasonably assure the safety of the community. She therefore ordered him detained. Tarrio now moves for bond, which requires this Court to review Judge Louis's determination de novo. After holding its own hearing, the Court reaches the same conclusion for substantially the same reasons. Thus, his motion will be denied, and the Court orders him detained pending trial.

**I.    Legal Standard**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Under the Bail Reform

Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *Salerno*, 481 U.S. at 747).  As a result, a detention hearing must be held at the government's request only "in a case that involves" a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, *id*. § 3142(f)(2)(A)–(B).

A subset of offenses requiring a detention hearing triggers a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community"—that is, as long as "the judicial officer finds that there is probable cause to believe that the person committed" that subset of offenses.  18 U.S.C. § 3142(e)(3).  The subset includes any "offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." *Id.* § 3142(e)(3)(C).

The presumption places "a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Taylor*, 289 F. Supp. 3d 55, 63 (D.D.C. 2018) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)).  And even when the defendant offers evidence to rebut the presumption, it "is not a 'bursting bubble' that becomes devoid of all force once a defendant has met his burden of production." *Taylor*, 289 F. Supp. 3d at 63 (quoting *United States v. Jessup*, 757 F.2d 378, 382 (1st Cir. 1985)).  Instead, it is "incorporated into the other factors considered by this Court in determining whether to grant a conditional release and is given substantial weight." *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011).

2

The BRA provides that a judicial officer "shall order" the "detention of the [defendant] before trial," if, after a detention hearing held under 18 U.S.C. § 3142(f), and upon consideration of "the available information concerning" enumerated factors, *id*. § 3142(g), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," *id.* § 3142(e)(1). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). Even if the defendant does not pose a flight risk, danger to the community alone is sufficient reason to order pretrial detention. *Salerno*, 481 U.S. at 755. But the BRA "requires that detention be supported by 'clear and convincing evidence' when the justification is the safety of the community." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

In assessing whether pretrial detention or release is warranted, the judicial officer must "take into account the available information concerning" four factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). At the detention hearing, both the government and the defendant may offer evidence or proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam).

If a defendant is ordered detained under § 3142 by a judicial officer, including "by a magistrate judge," the BRA allows the defendant to "file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The statute does not specify the standard of review to be applied by a district court reviewing a magistrate judge's detention order, and "the D.C. Circuit has not yet addressed the issue." *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017). That said, both the BRA and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order de novo. *See United States v. Chrestman*, 525 F. Supp. 3d 14, 23 (D.D.C. 2021). And courts in this District routinely apply that standard. *See id.* at 24; *Hunt*, 240 F. Supp. 3d at 132–33.

**II.   Analysis**

The government mainly seeks to detain Tarrio under 18 U.S.C. § 3142(f)(1)(A), because he is charged with an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed: in this case, a felony violation of 18 U.S.C. § 1361.[1] And, the government argues, that same offense provides a rebuttable presumption of detention because the grand jury found probable cause to believe that Tarrio committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." 18 U.S.C. § 3142(e)(3)(C). For the below reasons, the Court agrees that a rebuttable presumption arises from the charges against Tarrio and that he has not offered sufficient evidence to rebut it. And after considering all the § 3142(g) factors, the Court finds that the government has shown, by clear and convincing evidence, that "no

---

[1] The government also argues that Tarrio should be detained under 18 U.S.C. §§ 3142(f)(2)(A) and (f)(2)(B). Because the Court finds that detention is proper under § 3142(f)(2)(A), it need not address these alternative grounds.

4

condition or combination of conditions will reasonably assure" the safety of the community, *id.* § 3142(e)(1). Thus, the Court will order that Tarrio be detained pending trial.

### A. A Rebuttable Presumption of Detention Arises from the Charges Against Tarrio

Tarrio does not contest that a rebuttable presumption of detention arises here, because grand jury found probable cause to believe that he committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." 18 U.S.C. § 3142(e)(3)(C). One of those offenses charged in the Second Superseding Indictment—18 U.S.C. § 1361—is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B)(i). And in cases such as this one involving alleged damage or attempted damage to property of the United States in excess of $1,000, that offense carries a maximum sentence of ten years in prison. Under Circuit precedent, the return of that indictment "makes conclusive the existence of probable cause to hold the accused for further prosecution." *United States v. King*, 482 F.2d 768, 776 (D.C. Cir. 1973). Thus, the rebuttable presumption arises.

### B. Pretrial Detention Factors

#### 1. The Nature and Circumstances of the Offense

The first statutory factor requires the Court to consider "the nature and circumstances of the offense charged." 18 U.S.C. § 3142(g)(1). Tarrio is charged with one count of Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k); one count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); one count of Obstruction of Law Enforcement During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); two counts of Destruction of Government Property, in violation of 18 U.S.C. § 1361; and two counts of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1). ECF No. 305 at 8, 24–29. The Court will not belabor the point that these offenses are, to say the least, very serious.

They involve, among other things, an alleged conspiracy to obstruct the certification of the Electoral College vote and thus to interfere with the peaceful transfer of power, one of our Nation's crown jewels. This factor supports detention.

### 2. The Weight of the Evidence Against Tarrio

The second statutory factor requires the Court to consider "the weight of the evidence against the person." 18 U.S.C. § 3142(g)(2). To begin with, the Court incorporates by reference its findings about the evidence the government relied on in arguing that Tarrio's codefendants should be detained pending trial, as well as the evidence they submitted over time to argue otherwise, as if reiterated here.[2] While that evidence does not say much about Tarrio's personal involvement in the charged conspiracy, it *does* constitute substantial evidence of the conspiracy itself, which is still relevant to the Court's assessment of the weight of the evidence against him.

The parties here understandably focus on Tarrio's alleged role. According to the Second Superseding Indictment, through at least January 6, 2021, Tarrio was the national chairman of the Proud Boys, and most of his codefendants are alleged to have filled leadership or organizational roles with that group. ECF No. 305 ¶¶ 6–10. In November 2020, Tarrio is alleged to have made these statements on social media about the 2020 presidential election:

- On November 6, 2020: "The media constantly accuses us of wanting to start a civil war. Careful what the fuck you ask for we don't want to start one . . . but we will sure as fuck finish one." *Id.* ¶ 13.

- On November 12, 2020: "Fuck Unity. No quarter. Raise the black flag." *Id.*

- On November 16, 2020: "If Biden steals this election, [the Proud Boys] will be political prisoners. We won't go quietly . . . I promise." *Id.*

- On November 25, 2020, in response to a "post from Joe Biden" that stated, "We need to remember: We're at war with a virus – not with each other": "No, YOU need to

---

[2] *See, e.g.*, ECF Nos. 71, 101, & 252; *United States v. Pezzola*, 531 F. Supp. 3d 139, 142–45 (D.D.C. 2021).

6

remember the American people are at war with YOU.  No Trump…No Peace.  No quarter." *Id*.

The Second Superseding Indictment also alleges that in December 2020, Tarrio and other Proud Boys members created new Proud Boys chapter known as the MOSD, or Ministry of Self-Defense, which Tarrio allegedly described it as a "national rally planning" chapter that would include only "hand selected members."  ECF No. 305 ¶ 20.  It also alleges that Tarrio and others created an encrypted communications channel for use by the MOSD leaders.  *Id*. ¶ 21.  And it alleges ways in which Tarrio and his codefendants used this and related encrypted channels, as well as social media and other electronic communications, to plan and organize the conspiracy, even if they never spelled out its details in doing so.  Focusing on Tarrio, the Second Superseding Indictment alleges that he:

- On December 29, 2020, "posted a message to a MOSD Prospect Group to notify prospective members of a virtual meeting on December 30 to explain 'how this all works,'" advising that "the MOSD 'will have a top down structure'" and that "'if that's something you're not comfortable with' [prospective members] should not bother attending the live session."  *Id*. ¶ 38.  In that meeting, Tarrio and others emphasized that members "were to follow the commands of leadership," with one codefendant warning that January 6 was going to be a "completely different operation."  *Id*. ¶ 42.

- On December 29, 2020, "posted a message on social media that the Proud Boys planned to 'turn out in record numbers on Jan 6th but this time with a twist . . . . we will not be wearing our traditional Black and Yellow.'"  *Id*. ¶ 37.

- Between December 30 and December 31, 2020, "communicated multiple times with an individual" who sent him a document titled "1776 Returns."  *Id*. ¶ 41.  "The document set forth a plan to occupy a few 'crucial buildings' in Washington, D.C., on January 6, including House and Senate office buildings around the Capitol, with as 'many people as possible' to 'show our politicians We the People are in charge.'"  *Id*.  "After sending the document, the individual stated, 'The revolution is important than anything.'  Tarrio responded, 'That's what every waking moment consists of . . . I'm not playing games.'"  *Id*.

- On December 31, 2020, posted a picture of Pezzola from an earlier event in Washington, D.C, along with the message: "Lords of War. #J6 #J20."  *Id*. ¶ 44.

7

- On January 1, 2021, "posted separate messages on social media that read, 'Let's bring this new year with one word in mind . . . Revolt' and later, 'New Years Revolution.'" *Id.* ¶ 45.

- On January 3, 2021, "as efforts to plan for January 6 intensified in the MOSD leadership chat," "stated in the MOSD Leaders Group that he wanted to wait until January 4 to make final plans. In response, at 7:10 p.m., a person posted a voice note to the MOSD Leaders Group in which he stated: 'I mean the main operating theater should be out in front of the house of representatives. It should be out in front of the Capitol building. That's where the vote is taking place and all of the objections. So, we can ignore the rest of these stages and all that shit and plan the operations based around the front entrance to the Capitol building. I strongly recommend you use the national mall and not Pennsylvania avenue though. It's wide-open space, you can see everything coming from all angles." *Id.* ¶ 49. On January 4, 2021, Tarrio posted a voice note to the MOSD Leaders Group at 7:36 a.m. in which he stated, "I didn't hear this voice note until now, you want to storm the Capitol." *Id.* ¶ 50.

On January 4, 2021, Tarrio was arrested in Washington, D.C., and charged with destruction of property and possession of two large capacity magazines in D.C. Superior Court. ECF No. 305 ¶ 22. The charges were related to an incident on December 12, 2020, in which Tarrio allegedly burned a banner belonging to a church in Washington, D.C., that read "#BLACKLIVESMATTER." *Id.* ¶ 17. He was briefly detained after his arrest but was released around 5:00 p.m. on January 5 and ordered to leave the District of Columbia. *Id.* ¶ 22.

According to the Second Superseding Indictment, Tarrio's codefendants, within an hour of his arrest, created new encrypted communications channels that did not at first include Tarrio. ECF No. 305 ¶ 51. One remarked that he hoped Tarrio had logged out from the encrypted messaging application before his arrest. *Id.* Others discussed the need to "manually delete each message from each chat." *Id.* Another responded that "Well at least they won't get our boots on the ground plans because we are one step ahead of them." *Id.* Still, that same codefendant was concerned that "[e]verything is compromised and we can be looking at Gang charges." *Id.* ¶ 53. The next night, on January 5 at 9:17 p.m., another codefendant allegedly posted that "We just had a meeting with a lot of guys. Info should be coming out," then: "Just spoke with Enrique." *Id.* ¶ 63.

8

A few minutes later, that same codefendant posted: "I gave Enrique a plan. The one I told the guys and he said he had one." *Id*. ¶ 65. Within fifteen minutes or so, Tarrio allegedly had been added to two of these new encrypted channels, the New MOSD Leaders Group and the New MOSD Members Group. *Id*. ¶¶ 64, 66.

On the morning of January 6, the Second Superseding Indictment alleges, Tarrio's codefendants organized a large group of Proud Boy members (not dressed in the group's usual colors) at the Washington Monument. They marched the group to the Capitol, where the group crossed barriers meant to restrict the access to the Capitol grounds, helped overwhelm law enforcement officers, and stormed into the Capitol, causing Congress to suspend the certification of the Electoral College vote. ECF No. 305 ¶¶ 70–96. Several of Tarrio's codefendants allegedly used a bullhorn to direct the group. *Id*. ¶ 71. Several allegedly carried walkie-talkie style communication devices. *Id*. One codefendant is alleged to have spoken to a person who was the first to breach a barrier protecting the Capitol grounds moments before he did so. *Id*. ¶ 76. Another codefendant is alleged to have ripped away an officer's riot shield and used it to break a window through which the first members of the mob entered the Capitol. *Id*. ¶ 93.

Tarrio is not alleged to have been present in Washington, D.C., that day. But according to the Second Superseding Indictment, he:

- At 2:36 p.m., posted on social media that "After I finish watching this I'll make a statement about my arrest . . . But for now I'm enjoying the show . . . Do what must be done. #WeThe People." *Id*. ¶ 97.

- At 2:38 p.m., made a public post on social media that read, "Don't fucking leave." *Id*. ¶ 99.

- At 2:39 p.m., "responded to question posed by a Proud Boys member—'Are we a militia yet?'—with a one word voice note in which he stated 'Yep.'" *Id.* ¶ 100. He then posted two additional messages that stated, "Make no mistake . . ." and then "We did this . . ." *Id*.

9

- At 2:41 p.m., made a public post on social media that stated, "Proud of My Boys and my country." *Id*. ¶ 103.

- At 2:54 p.m., had a phone call with one of his codefendants. *Id*. ¶ 105.

- At 2:57 p.m., posted a message on social media that read "1776" and then "Revolutionaries are now in the Rayburn building," referring to a House of Representatives office building. *Id*. ¶ 106.

- At 11:16 p.m., posted a message on social media that "featured a video of a masked man resembling [him], wearing a flowing black cape, standing in front of a deserted Capitol. The video was captioned, 'Premonition.'" *Id*. ¶ 107.

The government also represents that that afternoon, on one of the Proud Boys' encrypted messaging channels, Tarrio posted a message that "They'll fear us doing it again . . . ." A member of the group asked, "So what do we do now?" Tarrio responded: "Do it again." ECF No. 350 at 4. And months later, in September 2021, before surrendering himself to serve his sentence after his pled guilty in the Superior Court matter, Tarrio posed for a picture in front of the Capitol, holding a lighter up to its dome while wearing a t-shirt that read "@FREETHEPROUDBOYS BY ANY MEANS NECESSARY." *Id*. at 7–8.

Finally, the parties have provided video clips to the Court apparently created by a documentary filmmaker. The clips show a few moments just after Tarrio was released from jail on January 5. They depict, in part, an informal meeting in an underground parking garage in which Tarrio participated. The Second Superseding Indictment identifies one of the meeting's participants as "Elmer Stewart Rhodes III, the founder and leader of the Oath Keepers." ECF No. 305 ¶ 23. Rhodes is currently charged for his activities on January 6 with—among other things—Seditious Conspiracy, in violation of 18 U.S.C. § 2384. *United States v. Rhodes III, et al.*, 22-cr-15, ECF No. 1 (APM). But not much about the substance of the meeting can be gleaned from the clips—at one point, Tarrio and others motion for the filmmaker to stop. The government points out that the clips depict Tarrio as focused on obtaining a communications device to reestablish

10

access to the encrypted communications channels, as well as saying that he has "a lot of stuff to do tomorrow." And at another point Tarrio disclaims any concern about law enforcement breaking into his phone (which law enforcement still possessed) because of the two-step security feature he employed, and because he had deleted evidence of his communications. For his part, Tarrio points out that the clips also contain evidence suggesting that he ended up in the garage in part because it was near the hotel where the documentary filmmaker was staying, and in part to talk to a lawyer about the possibility of representing him in the case for which he had just been arrested.

Given all the above, the Court finds the evidence against Tarrio very strong, so this factor supports detention. Tarrio makes several broad arguments to the contrary, but none are persuasive. He suggests alternative explanations for some allegations and evidence. For example, he argues that the MOSD was created as a defensive measure to ensure the safety of Proud Boys members, rather than part of a plan to storm the Capitol. He is right that some of the evidence, viewed in isolation, is susceptible to alternative explanations. But that does not mean that taken as a whole, the evidence is not very strong. Similarly, Tarrio argues that, essentially, the government does not have a smoking gun, perhaps in the form of direct evidence of an order from Tarrio to other Proud Boys to storm the Capitol. True, but again, that is hardly necessary for the evidence to be very strong in the aggregate for detention purposes. Tarrio also claims that he is no longer associated with the Proud Boys, and points to certain statements he has given to law enforcement and to the media after January 6 in which he expresses disapproval for what happened that day and denies participating in any plan to storm the Capitol. But the Court can hardly give much weight to these post-hoc, self-serving representations, especially given the above evidence that (especially in private) he approved of and took credit for the events of the day.

11

### 3. Tarrio's History and Characteristics

The third statutory factor requires the Court to consider Tarrio's "history and characteristics." 18 U.S.C. § 3142(g)(3). Tarrio argues, and the government does not contest, that he has strong ties to the community in South Florida, and that he is employed. That is all to his credit.

The problem for Tarrio is his criminal record, which (among other things) makes it hard for him to rebut the presumption of detention in the context of all the other factors the Court must weigh. The government represents that Tarrio has seven adult arrests that have resulted in three convictions. In 2004, he was sentenced to three years of probation by a Florida court for a felony charge of dealing in stolen property and grand theft. More recently, in 2013, he was convicted on federal charges of Conspiracy to Receive or Possess Stolen Goods, in violation of 18 U.S.C. § 371; Possessing, Concealing, Storing, Selling, and Disposing of Stolen Goods, in violation of 18 U.S.C. § 2315; Transporting, Transmitting, and Transferring Stolen Goods in Interstate Commerce, in violation of 18 U.S.C. § 2314; and Misbranding FDCA Devices While Held for Sale after Shipment in Interstate Commerce, in violation of 21 U.S.C. §§ 331(k), 352(a), and 333(a)(2). His sentence was reduced from 30 months to 16 months incarceration (along with two years of supervised release) after the government filed a Rule 35 motion, but he has still paid just some of his required restitution. Finally, in 2021, he was sentenced to 155 days incarceration after pleading guilty to one count of destruction or property and one count of attempted possession of a large-capacity ammunition feeding device in D.C. Superior Court. As explained more below, one reason why the Court has little confidence that he would comply with conditions of release here is that the allegations and evidence suggest that, after his release on conditions in the Superior Court case on January 5, he continued to engage in the conspiracy for which he is charged here. As Tarrio points out, things could be worse: there is no evidence, for example, that he failed to appear in any

of his prior criminal matters. But that does not get him very far. All in all, this factor also weighs in favor of detention.

### 4. The Nature and Seriousness of the Danger to Any Person or the Community that Would be Posed by Tarrio's Release

The final factor requires the Court to weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). To justify detention based on dangerousness, the Court must find by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(f). As the Circuit held in *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), a "defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety," or as the Supreme Court described in *Salerno*, "an identified and articulable threat to an individual or the community." 481 U.S. at 751. For the reasons explained below, the Court finds—as with each of his codefendants—that this factor supports detention, and that this ultimate standard for detention is met.

First, Tarrio is charged with very serious offenses that created an obvious danger to the peaceful transfer of power under the U.S. Constitution, the safety of members of Congress and law enforcement officers guarding the Capitol, and the community at large on January 6. One of the offenses creates a rebuttable presumption of detention all by itself. And as the Circuit recognized in *Munchel*, those who "aided, conspired with, planned, or coordinated" the events of January 6 are in "a different category of dangerousness" than many others present that day. *Munchel*, 991 F.3d at 1284.

Second, Tarrio's alleged statements and actions show a deep and forward-looking commitment to the causes that the allegations and evidence suggest motivated the charged conspiracy, and a willingness to resort to similar violent tactics against the United States government in the future. To take just one example, the government represents that Tarrio posted a message that "They'll fear us doing it again . . ." A member of the group asked, "So what do we do now?" Tarrio responded: "Do it again." ECF No. 350 at 4.

Third, even though he was not physically present near the Capitol that day, Tarrio's alleged leadership and organizational role in the conspiracy—as well as his alleged experience using encrypted communications channels to conceal his activity from law enforcement—suggests that he has skill set, resources, and networks to plan similar challenges to the lawful functioning of the United States government in the future.

Fourth, the Court has carefully considered the conditions of release proposed by Tarrio, including the proposed personal surety bond, home detention, and a ban on the use of social media. In the end, given all the above, the Court agrees with Judge Louis that they do not adequately mitigate the threat of dangerousness Tarrio poses. And like Judge Louis, the Court reaches this conclusion in part because it is unconvinced that Tarrio will abide by his conditions of release. That is so because of the evidence that Tarrio "committed the alleged acts while he was on bond for another offense, thereby violating that court's bond; and his apparent attempt to conceal or destroy his and other's communications relating to their plans for January 6th, thereby substantiating the government's motion predicated on the risk that he would obstruct justice." *United States v. Tarrio*, No. 22-mj-2369-AOR, ECF No. 14 ¶ 11 (S.D. Fla. Mar. 17, 2022). And this conclusion does not depend on any assumption about exactly how and why Tarrio ended up meeting with Rhodes in an underground parking garage on January 5.

14

Thus, the Court finds that this last factor supports detention, and, upon review of all the factors, it finds by "clear and convincing evidence" that because of the prospective danger to the community that Tarrio presents, that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(f).

**III.   Conclusion**

For all the above reasons, upon consideration of Tarrio's motion for pretrial release, the government's opposition, and Tarrio's reply, the evidence proffered and arguments presented in connection with the motion, including at the detention hearing, the entire record, and the factors set forth in 18 U.S.C. § 3142(g), the Court finds that all four of the statutory factors favor pretrial detention, and that the statutory presumption of detention has not been rebutted. Thus, the government has met its burden of establishing, by clear and convincing evidence, that no condition or combination of conditions can be imposed that would reasonably assure the safety of the community if he were released pending trial. 18 U.S.C. § 3142(e)(1). The Court will therefore deny Tarrio's motion in a separate order.

/s/ Timothy J. Kelly<br>
TIMOTHY J. KELLY<br>
United States District Judge

Date: May 27, 2022