**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-175-5 (TJK)** |
| **v.** | : | |
| | : | |
| **ENRIQUE TARRIO,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO TRANSFER VENUE**

Defendant Tarrio has moved to transfer venue in this case to the Southern District of Florida.  Tarrio has failed to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny Tarrio's motion.[1]

## BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.  While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

---

[1] Every judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion.  *See United States v. Alford*, No. 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

The Indictment alleges that Tarrio was a leader of a conspiracy to obstruct Congress' certification of the Electoral College vote.  ECF No. 305.  Tarrio engaged in numerous planning conversations and traveled to Washington, D.C., before being arrested and ordered to leave the District of Columbia on January 4, 2021.  After his release, the defendant continued engaging in planning conduct, monitored the events of January 6 from Baltimore, and he took credit for them in encrypted chat rooms, among other places.  Based on this conduct, Tarrio has been charged with conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); civil disorder, in violation of 18 U.S.C. § 231(a)(3); destruction of government property, in violation of 18 U.S.C. § 1361; and assault on a federal officer, in violation of 18 U.S.C. § 111(a). *Id*.

Tarrio now moves to transfer venue to the Southern District of Florida, based in part on the District of Columbia's voting record in the past two Presidential elections and the results of two pre-voir dire surveys.  Forty-five years ago, the *en banc* D.C. Circuit rejected similar arguments in a case arising from the Watergate prosecutions, in *United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (*en banc*).  The Court should follow D.C. Circuit and Supreme Court precedent and decline to transfer venue to the Southern District of Florida.

## ARGUMENT

The defendant contends that he cannot receive a fair trial in the District of Columbia because the nature, proximity, and extent of pretrial publicity about January 6 has irreparably tainted the jury pool here in the District of Columbia and because voir dire is insufficient to identify and cure pretrial prejudice.  The surveys and arguments cited in his motion, however, fail to show (1) that anything about the size or characteristics of this district make it particularly ill-suited to supply a fair and impartial jury pool; (2) that pretrial publicity has affected the jurors in this district

any more than anywhere else in the United States; (3) that the potential jurors in this district have become so biased against these defendants as to create a presumption of prejudice; and (4) that the normal voir dire process is insufficient to identify and disqualify biased jurors.

## I.   Legal Standard

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

"The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or

innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire."  *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary."  *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

## II.    The District of Columbia's Political Makeup Does Not Support a Presumption of  Prejudice.

The defendant contends that he cannot obtain a fair trial in the District of Columbia because more than 90% of its voters voted for the Democratic Party candidate in the 2020 and 2016 Presidential Elections.  ECF No. 349 at 7.  The *en banc* D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively.  *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part).  The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue."  *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C.

Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here. To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendant's political aims. But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire. This Court should not presume that every member of a particular political party is biased simply because this case has a political connection. Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895). The same is true here. The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, and Roger Stone, have all been tried in the District. *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States*

*v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-CR-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020).  Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone."  2020 WL 1892360, at *30-31.  Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

### III.    Prejudice Should Not Be Presumed Under the *Skilling* Factors.

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau v. Louisiana*, 373 U.S. 723 (1963).   In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v.*

*Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based.  *Skilling*, 561 U.S. at 382-83.  First, the Court considered the "size and characteristics of the community."  *Id.* at 382.  Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service.  *Id.* at 382.  Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse."  *Id.* at 383.  "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias."  *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity.  *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011).  And contrary to the defendant's contention, these factors do not support a presumption of prejudice in this case.

A.     *The size and characteristics of the jury pool in the District of Columbia do not support a presumption of prejudice.*

The defense contends that the District's size and characteristics support a presumption of prejudice.  First, defendant observes that the District of Columbia has fewer than 700,000 residents.  ECF No. 349 at 7-8 (citing *Skilling*, 561 U.S. at 382).  Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*.  The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found.  In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected.  *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals."  *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled."  *Id.*

The defense also contends that a D.C. jury could not be impartial because D.C. residents make up the "least diverse political population in the country" where "propaganda" "has *programmed* the potential D.C. jury pool to believe that an attack was committed by white supremacists intent on insurrection" as well as to believe that these "violent fanatical actions caused a curfew, a lockdown to be placed, and a military occupation and hold for their protection

over a period of months."  ECF No. 349 at 7-8 (emphasis added).  But January 6 is now more than a year in the past.  Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed.  And the defendant provides no support for his assertion that most or all D.C. residents have been "programmed" to hold certain beliefs about January 6.  The District's populace is highly educated and politically savvy and has been exposed to the essentially the same news sources people in other parts of the country.  There is no reason to believe that the District's entire population of nearly 700,000 people has been so affected by the events of January 6 or the subsequent media coverage that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon).  In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice."  *Skilling*, 561 U.S. at 384 (quotation omitted).  "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.*  In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors.  There is no reason to presume prejudice.

B.    *The nature and extent of the pretrial publicity do not support a presumption of prejudice.*

Tarrio has failed to show that the residents of the District of Columbia have been bombarded with such prejudicial publicity or with so much of it that they could not be fair.  The defendant argues that prejudice should be presumed based on statements by Members of Congress, the Attorney General of the United States, and other political leaders.  ECF No. 93 at 10-15.  But harsh condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice.  In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Skilling*, 561 U.S. at 382.  And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations."  *Haldeman*, 559 F.2d at 61.  The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession."  *Id.*  The same is true here, where news coverage has not reported on any confession or other blatantly prejudicial information about Tarrio's guilt.  Moreover, statements by politics leaders like Members of Congress and the Attorney General are ordinarily reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C.

The defendant asserts that a fair trial cannot be had in D.C. because of the volume of news coverage and remarks from politicians regarding of January 6.  ECF No. 349 at 8-13.  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  And a comparatively small percentage of the news coverage of January 6 has focused

on defendant Tarrio.  Moreover, although the defendant's motion is long on rhetoric about the Democratic party having "seething hatred" for him, "which cannot be contained, mitigated, or controlled," ECF No. 349 at 9, and D.C. residents being "told over and over again that their punishment was the fault of the January 6 defendants," *id.* at 10, he cites no specific articles or statements to support that rhetoric.[2]

Citing a study on political bias, the defendant argues that "D.C. jurors would be statistically more likely to skew their verdict in favor of the more politically correct verdict—a guilty verdict." ECF No. 349 at 12.  But one of the studies he cites undermines that claim.  When asked whether they would "worry that finding a January 6th defendant Not Guilty would be an unpopular decision that might impact [their] career[s] or friendships," D.C. respondents answered "yes" at essentially the same rate as respondents in the other surveyed jurisdictions.  ECF 351-1 at 22, 26 (19.29% in D.C., 17.68% in Middle Florida, 19.66% in Eastern North Carolina, and 18.56% in Eastern Virginia).

Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 800 people.  Here, the defendant has not cited to any specific comments about him individually.[3]  The Court can guard against any spillover prejudice

---

[2] The reference to "punishment" in the defendant's motion appears to relate to his claim that "There was a curfew in place as well as road and bridge closures for months."  ECF No. 349 at 10.  Although there was a curfew in place on January 6, 2021, additional closures around the Inauguration on January 20, 2021, and fencing erected around the Capitol remained for some time, it is not accurate to say that the curfew, road, and bridge closures continued for months.

[3] The closest the defendant comes to doing so is a reference to a press conference held by D.C. Attorney General Karl Racine following the filing of a civil suit against Tarrio and others.  ECF No. 349 at 9.  Although the defendant does not cite to A.G. Racine's specific remarks, he

from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)).

Thus, the nature and extent of the pretrial publicity regarding the events of January 6 do not support a presumption of prejudice in this case.

> C.    *The passage of time before trial and the possibility of a favorable jury verdict weigh against a presumption of prejudice.*

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial."  *Skilling*, 561 U.S. at 383.  In this case, 16 months have already elapsed since the events of January 6, and more time will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession.  *Rideau*, 373 U.S. at 724.  Although January 6 continues to be in the news, the "decibel level of media

---

appears to be referencing this statement: "In the complaint, we specifically allege that these vigilantes, insurrectionists and masters of a lawless mob conspired against the District of Columbia, its law enforcement officers and residents by planning, promoting and participating in the violent attack on the United States Capitol."   *See*   https://www.npr.org/2021/12/14/1064144431/d-c-attorney-general-karl-racine-sue-proud-boys-oath-keepers-jan-6-capitol (last visited May 31, 2022).  The civil suit in question named multiple defendants, as well as the Proud Boys and Oath Keepers organizations.

attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, only a relatively small percentage of the recent stories have mentioned this particular defendant, and much of the reporting has been national is scope, rather than limited to Washington, D.C.

> D.    *The fourth Skilling factor suggests the presumption of prejudice is—and should be—rarely applied.*

Because these defendants have not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors support the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

## IV.    The Polls Submitted by the Defendant Do Not Support a Presumption of Prejudice.

The defendant relies on a poll conducted by In Lux Research ("ILR") at the request of defendants charged in another case, as well as another poll of D.C. residents conducted by John Zogby Strategies.  ILR conducted a telephone poll of potential jurors in the District of Columbia and in four other jurisdictions: the Ocala Division of the Middle District of Florida, the Eastern District of North Carolina, and the Eastern District of Virginia.  Neither poll supports the defendant's request for a venue transfer

> A.    *Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.*

The defendant argues that this Court should find a presumption of prejudice based on polls of prospective jurors.  But "courts have commonly rejected such polls as unpersuasive in favor of

effective voir dire as a preferable way to ferret out any bias." *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005).  As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice." *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey.  *Haldeman*, 559 F.2d at 64.[4]  In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal.  *Id.* at 51.  According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty.  *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part).  Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64.  The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel."  *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal of the claim [of local

---

[4] Although the defendant makes a passing reference to *Haldeman*, ECF No. 349 at 14, he makes no attempt to distinguish it.

community prejudice] can be made" (quotation omitted)).

Other circuits have similarly rejected attempts to elevate polling results over voir dire. In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *Campa*, 459 F.3d at 1157 (Birch, J., dissenting). The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt. *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19. Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786. And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions.

Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722. Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723. But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls. The defendant attempts to overcome this overwhelming preference, including binding case law from the D.C. Circuit and Supreme Court, by citing to one study discussed in a law review article purporting to show that voir dire is inadequate to address prejudice from pretrial publicity. See ECF No. 349 at 15-20. Undersigned counsel has found only one federal decision in which that article—which was published in 1991—was cited, and that citation occurred in an order denying a motion to transfer

venue.  *United States v. Houlihan*, 926 F. Supp. 14, 17, n.4 (D. Mass. 1996).  In any event, if the defendant's argument about "emotional publicity" were correct (and we do not concede that there has been "emotional publicity as defined by the study), to find an impartial jury, the Court would have to find 12 jurors who had not been exposed to pretrial publicity at all.  See ECF No. 349 at 16 ("'emotional publicity' can not be cured, not even through time and continuances").[5]  Not only would this requirement fly in the face of precedent, it would be an exceedingly difficult task in any district.  For example, according to the ILR poll relied upon by Tarrio, awareness of the events of January 6 was actually higher in the Eastern District of Virginia and Middle District of Florida than in the District of Columbia.  ECF No. 351-2 at 24 (response to Question 1).

The defendant has not offered any reason to depart from that usual practice of assessing juror bias through voir dire here.  Thus, this Court need not give substantial weight to the polling or to the study cited by the defendant when considering whether to presume prejudice.  But, as explained below, the polls submitted by the defendant do not support a presumption of prejudice in any event.

---

[5] The study cited by the defendant, if adopted, would arguably also stand for the proposition that a fair trial cannot be held in any district, even where there has been "only" factual, as opposed to emotional publicity, close in time to trial.  *See* N.L. Kerr, et. al., *On the Effectiveness of Voir Dire in Criminal Cases with Prejudicial Pretrial Publicity: An Empirical Study*, 40 Am. Univ. L. Rev. 665, 765-76 (1991) ("Juries exposed to the factual publicity were significantly more likely to convict the defendant than those not exposed, but only when there had been no delay between exposure and trial. When there had been a delay, factual publicity had no significant effect").  Given the ongoing, national nature of the coverage, if the defendant were correct, it would mean that he could not obtain an impartial jury in *any* district in the absence of a continuance to distance potential jurors from any coverage.  Such a result is clearly barred by the binding precedent discussed above, and in any event exposure to factual news coverage about January 6 is hardly unique to the District of Columbia.

B.    *The In Lux Research poll does not demonstrate pervasive prejudice in the District of Columbia.*

Contrary to the defendant's contention, the In Lux Research ("ILR") poll does not support a presumption of prejudice in this District.  As an initial matter, the defendant has not requested transfer to any of the ILR survey's three comparator jurisdictions—the Ocala Division of the Middle District of Florida, the Eastern District of North Carolina, and the Eastern District of Virginia.  Instead, the defendant has requested a transfer to the Southern District of Florida.  The ILR survey tells the Court nothing about the views or media exposure of prospective jurors in that district.  The poll therefore cannot show that selecting an impartial jury would be any more difficult in the District of Columbia than in the defendant's preferred district.  *See United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc) (per curiam) (observing that a change of venue "would have been only of doubtful value" where the pretrial publicity was national in scope).

Furthermore, to the extent the poll is useful at a more general level in comparing the District of Columbia to other districts, the poll demonstrates that that respondents in all four jurisdictions surveyed were aware of the events of January 6 at similar rates.  ECF No. 351-1 at 24 (Question 1) (93.12% of D.C. respondents "aware of" the demonstration at the U.S. Capitol, compared to 94.07% in Middle Florida, 91.60% in Eastern North Carolina, and 94.27% in Eastern Virginia).  The survey also shows that respondents' media or conversational exposure to the events of January 6 did not vary significantly between jurisdictions.  The survey asked respondents how often they "see, read or hear about the events of January 6th from either the Media, Local Leaders or the people around you."  ECF No. 351-1 at 21 (Question 4).  The percentage of respondents reporting "[a]t least 10 times a week" was only slightly higher in D.C., with a response rate of 32.02%, compared to rates between 25% and 28% in the other three jurisdictions.  ECF No. 351-1 at 24.

And the percentage of D.C. respondents answering "[s]everal times a week" or "[o]nce or twice a week" were generally within one or two percentages points of respondents from other jurisdictions. *Id.* (41.09% of D.C. respondents reported exposure "[s]everal times a week," compared to 39.82%, 39.30%, and 34.58% in the other jurisdictions, and 22.05% of D.C. respondents reporting exposure "[o]nce or twice a week," compared to 20.66%, 22.68%, and 23.99% in the other jurisdictions). The survey thus confirms that exposure to reports of the events of January 6 is not confined to D.C., and the relatively small different does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

The ILR survey's summary focuses on responses to "prejudicial prejudgment" questions. ECF No. 351-1 at 2. But those questions do not show that an impartial jury cannot be selected in this District. The questions categorized as "prejudgment questions" were:

(1) "Are you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty? Or is it too early to decide?" (72% of D.C. respondents answered "Guilty.")

(2) "In your opinion, which of the following terms best characterizes the Events of January 6th? 1) An insurrection, 2) An attack, 3) A riot, 4) A protest that got out of control, 5) A rally." (82% of D.C. respondents chose insurrection, attack, or riot.)

(3) "Do you believe that the individuals who entered the Capitol on January 6th planned to do it in advance or decided to do it that day?" (71% of D.C. respondents selected "planned in advance.")

(4) "Do you believe The Events of January 6th were racially motivated?" (40% of D.C. respondents answered in the affirmative.)

ECF No. 351-1 at 2-3, 8, 21-22. The last three of these questions do not support a presumption of

prejudice because they have little relevance to the potential issues at trial.  The trial in this case would not require jurors to determine whether the events of January 6 were an "insurrection," an "attack," a "riot," or a "protest that got out of control."  Indeed, no defendant has been charged with the offense of insurrection, 18 U.S.C. § 2383, or of violating the Anti-Riot Act, 18 U.S.C. § 2101, in connection with the events of January 6.

Nor would the charges in this case require the jurors to determine whether the defendant "planned in advance" to enter the Capitol or whether the crimes were "racially motivated."  The fact that some D.C. respondents have formed "prejudgments" on those questions does not demonstrate that they cannot follow this court's instructions and decide this case based on the law and the evidence.  And even if it did, the solution would be to exclude prospective jurors who indicated "prejudgments" during voir dire.  The ILR survey shows that some percentage of respondents in *all* surveyed jurisdictions expressed these so-called "prejudgments."  ECF No. 351-1 at 25 (Questions 6 and 9) (between 39% and 49% of respondents in other surveyed jurisdictions thought entry into the Capitol was planned in advance, and between 11% and 20% believed the events of January 6 were racially motivated).  This demonstrates that a careful voir dire would be necessary in any jurisdiction, and it fails to show that voir dire would be inadequate to weed out biased jurors in the District of Columbia.

Nor do the responses to the first "prejudicial prejudgment" question support a presumption of prejudice.  That question asked respondents whether, in the abstract, they were "more likely" to find a defendant charged in connection with January 6 "guilty or not guilty."  The question failed to ask about any specific crimes.  And it failed to ask respondents whether they could keep an open mind and decide a case based on the law and the evidence if selected as a juror.  Yet the Supreme Court has made clear that the key question in jury selection is whether a prospective juror could

"lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 722-23.

When focusing on whether prospective jurors could set aside their "prejudgments" and decide a case fairly, the ILR survey's responses actually undermine the defendant's claim that prejudice should be presumed in this district. When asked whether it would be "possible for [them] to be a fair and unbiased juror for a January 6th Defendant," ECF No. 351-1 at 23, a full 70.13% of D.C. respondents said that they "could," *id.* at 26. This number was actually *higher* than the affirmative responses in the other three jurisdictions: Middle Florida (61.29%), Eastern North Carolina (65.38%), and Eastern Virginia (69.52%). *Id.*

The ILR survey's administrator asserts that "this representation may actually indicate a failure to recognize or admit threats to fairness and impartiality." ECF No. 351-1 at 5. But the survey's findings do not justify that assertion. The administrator claims that because D.C. residents were more likely to characterize the events of January 6 as an "insurrection," "attack," or "riot," or to believe they were criminal, pre-planned, or racially motivated, *id.* at 22, 25, those residents "demonstrate[d] an inability to identify or unwillingness to report previously disclosed bias when asked if they could be a fair and impartial juror," *id.* at 5. But this assumes, contrary to clear decisions from the Supreme Court, that any knowledge of or preconceived opinions about a case make a juror unable to be impartial. *See Reynolds*, 98 U.S. at 155-56; *Irvin*, 366 U.S. at 723. It also assumes that these jurors would fail to report these views to a judge during voir dire. Particularly because the ILR survey had already asked respondents specific questions that the survey claims showed "prejudicial prejudgment," there is no reason to believe that D.C. respondents were somehow unable or "unwilling[]" to report their own biases when asked if they could be impartial.

Moreover, when asked if their "neighbors would be fair and unbiased jurors for a January 6th Defendant," D.C. respondents still answered "Yes" at a higher rate than the other surveyed districts.  ECF No. 351-1 at 26 (53.25% in D.C., compared to 36.57% in Middle Florida, 45.10% in Eastern North Carolina, and 40.89% in Eastern Virginia).  Thus, even when controlling for respondents' potential inability to discern their own biases, the survey does not indicate that D.C. residents are substantially less able to be fair than prospective jurors from other jurisdictions.  Nor were D.C. respondents significantly more likely to worry about negative consequences to their career or friendships if they were to "find[] a January 6th defendant Not Guilty."  *Id.* at 22, 26 (19.29% in D.C., compared to 17.68% in Middle Florida, 19.66% in Eastern North Carolina, and 18.56% in Eastern Virginia).  The ILR survey does not support the conclusion that an impartial jury cannot be found in Washington, D.C.

C.    *The Zogby poll does not demonstrate pervasive prejudice in the District of Columbia.*

Nor does the poll conducted by John Zogby Strategies at the request of another January 6 defendant, Gabriel Garcia, support a presumption of prejudice.  In fact, there are particularly strong reasons to doubt poll's reliability.  For one thing, the poll does not provide the Court with all the information needed to assess its accuracy.   The American Society of Trial Consultants' Professional Standards for Venue Surveys state the following:

> The trial consultant's presentation of survey results to a court shall include [t]he questionnaire that was used in the survey, identification of the primary persons who performed the work (including their qualifications), and descriptions of how each of the following standard steps for conducting a survey was completed:
> - Design of the survey instrument.
> - Determination of eligibility and sampling measures.
> - Training of interviewers and supervisors to conduct the interviewing.
> - Interviewing procedures.
> - Dates of data collection
> - Calculation of sample completion rate.
> - Tabulation of survey data.

American Society of Trial Consultants (ASTC), Professional Standards for Venue Surveys at 7, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf.

The Zogby poll fails to provide critical information, such as how the 400 survey participants were selected for the vaguely described "online survey" and whether they self-selected.  ECF No. 351-2 at 2.  *See United States v. Thomley*, No. 2:18-CR-18-KS-MTP, 2018 WL 5986754, at *2 (S.D. Miss. Nov. 14, 2018) ("The Court is . . . troubled by [the polling firm's] failure to explain *how* they selected their sample. Did they obtain responses online or via social media? Did respondents self-select?").  Additionally, the explanation that is provided indicates that the poll was underinclusive, in that it was only of "Washington DC registered voters," ECF No. 351-2 at 2, whereas this Court's jury pool is generated based on voter registration, Department of Motor Vehicles records, and D.C. income tax forms.  Jury Selection Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors at 1, available at https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf.

Moreover, the Zogby poll uses a number of compound, non-neutral, and leading questions. *See Campa*, 459 F.3d at 1131-32, 1146 (affirming district court's decision to reject venue survey that used "ambiguous" and "non-neutral" questions).  For example, Question 8 asked respondents which description of January 6 "comes closer to your opinion," giving options only for (A) "a dire threat to the fabric of our nation and . . . the worst assault on US democracy since 9/11, Pearl Harbor, or even the Civil War" or (B) "unwise and caused senseless damage to the Capitol building and people's lives, some of which were lost, but the events were not insurrectionist and did not pose a threat to US democracy."  ECF No. 351-2  at 21, 40.  These answers, in addition to being compound, forced respondents into a binary choice between extreme options.  For example, there was no choice for someone who believed the events *did* pose a threat to U.S. democracy but did

not approach the level of 9/11, Pearl Harbor, or the Civil War.  Nor was there a choice for someone who believed the events did *not* pose a threat to U.S. democracy but was also unwilling to describe them as "unwise" or "senseless."

The survey's next question asked whether respondents believed that "any individual who was inside the US Capitol on January 6, 2021 should be convicted of insurrection."  ECF No. 351-2 at 22, 40.  This question is poorly worded, considering that hundreds of "individual[s] who w[ere] inside the US Capitol on January 6" had every right to be there, including the Vice President, the members of Congress, and the U.S. Capitol Police and U.S. Secret Service.  Moreover, the question provided no background on potential criminal offenses involved in the events of January 6 other than "insurrection"—which the question does not define or describe, *see* 18 U.S.C. § 2383, and with which no defendant has been charged in connection with the events of January 6.  And the setup for this question naturally prompted respondents to condemn the actions of January 6 rather than to consider whether they actually believed everyone who entered the Capitol without permission was an insurrectionist.  In short, these questions have the earmarks of an inappropriate "push poll" that is "primarily designed to influence survey respondents' opinions in a particular direction by presenting systematically biased information."  ASTC Professional Standards for Venue Surveys at 7; *see id.* at 8 ("Efforts should be made to avoid context, wording or other influences that raise the likelihood of responses due to social desirability or other response bias."); *Campa*, 459 F.3d at 1146 (observing that "the survey was riddled with non-neutral questions").

The poll's executive summary also misstates the poll's own findings.  For example, it claims that "Close to 9 out of 10 respondents (88%) who are familiar with Mr. Garcia, felt that if he were shown to have been inside the Capitol building on January 6, 2021 he should be convicted of obstruction of justice and civil disorder."  ECF No. 351-2 at 3 (removing emphasis).  It was not,

however, 88% of "respondents . . . familiar with Garcia" who held this belief, but rather 88% of respondents familiar with (a) the events of January 6, (b) the Proud Boys, and (c) Garcia. *Id.* at 19, 23, 27. When the respondents who lacked this familiarity are accounted for, the percentage of overall respondents believing Garcia should be convicted if he entered the Capitol falls to 31%. *Id.* at 19, 27 (125 of 401). The executive summary's omission of important qualifiers in reciting the poll's findings further calls into question the poll's reliability.

In addition, the Zogby poll is particularly unhelpful in determining whether transfer is warranted because it fails to provide a comparison with the defendant's preferred venue in the Southern District of Florida, or any other district. According to the poll, 54% of respondents indicated their views about January 6 were shaped more by national media sources, compared to only 39% that were shaped by more local media sources. ECF No. 251-2 at 5. Thus, the Zogby poll fails to establish that the views of D.C. voters are substantially different than potential jurors in other jurisdictions. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest).

Even if the Zogby poll's results are taken at face value, the poll does not support a presumption of prejudice in this district. The defendant contends that the Zogby poll shows that "73% of respondents believed that anyone who merely entered the Capitol building on January 6, 2021 is guilty of insurrection." ECF No. 349 at 8. Leaving aside the fact that Tarrio did not in enter the Capitol on January 6, the Zogby poll showed that 73% of respondents who were "Very familiar" or "Somewhat familiar" with January 6 held this belief. ECF No. 351-2 at 22 (277 of 380 respondents). When respondents who were "Not familiar/Not sure" are taken into account, the percentage falls to 69%. *Id.* at 19, 22 (277 of 401 respondents). And this does not raise a

presumption of prejudice.  In *Patton v. Yount*, nearly 99% of prospective jurors had heard of the case, and 77% indicated on voir dire that "they would carry an opinion into the jury box," yet the Supreme Court rejected a claim of presumed prejudice.  *Patton*, 467 U.S. at 1029.  Thus, the number of poll respondents who had formed a general opinion about January 6 defendants was lower than in *Patton*, even though the Zogby poll did not ask respondents whether they could set aside their opinions and determine guilt based solely on the evidence if called as jurors.  *Compare Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part) (61% of survey respondents held the opinion that defendants were "guilty" in connection with Watergate even when provided a survey option for "Not Guilty Until Proven").  At most, these responses indicate the Court might have to call a somewhat larger venire in order to find 12 impartial jurors; they do not demonstrate that it is impossible to pick an unbiased jury.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases.  But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses.  As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required.  *Haldeman*, 559 F.2d at 62.

### V. The Voir Dire Process in the First January 6 Jury Trials Has Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.

At this point, five other January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort.  *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who

appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire").  Instead, the judges presiding over each of those trials was able to select a jury in one or two days.  *See United States v. Reffitt*, 21-cr-32, Minute Entries (D.D.C. Feb. 28 and Mar. 1, 2022); *United States v. Robertson*, 21-cr-34-CRC, Minute Entry (D.D.C. Apr. 5, 2022); *United States v. Thompson*, 21-cr-161, Minute Entry (D.D.C. Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (D.D.C. Apr. 25, 2022); *United States v. Hale-Cusanelli*, 21-cr-37, Minute Entry (D.D.C. May 23, 2022).  And although the government does not yet have transcripts from the *Thompson* or *Hale-Cusanelli* trials, the voir dire in the other three cases undermines the defendant's claim that prejudice should be presumed.[6]

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined).  *See Reffitt* Trial Tr. 521.  The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror.  *Reffitt* Trial Tr. 23, 30.  The Court then followed up during individual voir dire and qualified ten prospective jurors who had answered one or more of those bias questions affirmatively but who clarified during individual questioning that they could decide the case fairly and impartially.[7]  Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about

---

[6] The transcripts from the voir dire proceedings in *Reffitt*, *Robertson*, and *Webster* are being submitted under separate cover to the Court and counsel.

[7] *Reffitt* Trial Tr. 60-61 (Juror 1541); 87-88 (Juror 1332); 104-06 (Juror 457); 162-65 (Juror 1486); 188, 191-94, 201 (Juror 1675); 289-90, 297-98 (Juror 365); 301-03, 307-09 (Juror 38); 326-33 (Juror 1655), 427-31 (Juror 344), 436-40 (Juror 1221).

the events of January 6 that they could not serve as fair or impartial jurors.[8]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined). *See Robertson* Trial Tr. 302.  The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict." *Id.* at 14.  It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial." *Id.* at 13, 15.  As in *Reffitt*, the Court followed up on affirmative answers to those questions during individual voir dire, and of the 12 prospective jurors who raised potential concerns about their partiality during voir dire, the Court qualified two who indicated that they could, in fact, be impartial, and struck one for a different reason.[9]  Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[10]

---

[8] For those struck based on a professed inability to be impartial, see *Reffitt* Trial Tr. 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046), 172-73 (Juror 443), 174-78 (Juror 45), 202-09 (Juror 1747), 223-35 (Juror 432), 263-74 (Juror 514), 358-69 (Juror 1484).  For those struck for other reasons, see *Reffitt* Trial Tr. 168-172 (Juror 313, worked at Library of Congress), 209-24, 281 (Juror 728, moved out of D.C.), 284 (Juror 1650, over 70 and declined to serve), 340-51 (Juror 548, unavailability), 382 (Juror 715, anxiety and views on guns), 398 (Juror 548, medical appointments), 441-43 (Juror 1240, health hardship), 453-65 (Juror 464, worked at Library of Congress), 465-81 (Juror 1054, prior knowledge of facts).

[9] *Robertson* Trial Tr. 23-26 (Juror 1566, struck based on hardship), 64-73 (Juror 254, qualified); 130-36 (Juror 1219, qualified).

[10] For those struck based on a professed inability to be impartial, see *Robertson* Trial Tr. 26-34 (Juror 1431), 97-100 (Juror 1567), 121-30 (Juror 936), 136-42 (Juror 799), 160-71 (Juror 696), 189-93 (Juror 429), 256-65 (Juror 1010), 265-68 (Juror 585), 287-92 (Juror 1160).  For those struck for other reasons, see *Robertson* Trial Tr. 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.), 156-60 (Juror 1122, language concerns), 193-96 (Juror 505, work hardship), 245-50 (Juror 474, work trip); 279-82 (Juror 846, preplanned trip).

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%). *Webster* 4-26-22 AM Tr. 6, though it later excused one of those 35 based on hardship, *Webster* 4-25-22 PM Tr. 217-18.  The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster* 4-25-22 AM Tr. 19. During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly. *See, e.g., id.* at 32-33, 41-42, 54-56, 63, 65-66.  The presiding judge observed that the Court was able to "qualify 35 jurors after questioning 53 of them" and recalled that only "about 50 percent" of those stricken for cause were stricken based on "either connections to the events or because they expressed an inability to be fair and impartial." *Webster,* 4-26-22 AM Tr. 7.  The transcripts confirm that only 10 out of 53 prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be impartial, as opposed to some other reason.[11]  The *Webster* Court observed that this number "was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case. *Id.*

In these first few trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of

---

[11] Nine of the 19 stricken jurors were excused based on hardship or a religious belief. *See Webster* 4-25-22 AM Tr. 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster* 4-25-22 PM Tr. 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203-04 (Juror 1262).  Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office. *See Webster* 4-25-22 AM Tr. at 58-60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster* 4-25-22 PM Tr. at 139-41 (Juror 625's former mother-in-law was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728.  In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727.  The percentage of partiality-based strikes in these January 6-related trials— between 16% and 19% of those examined—is far lower than the 62% in *Irvin*.  The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803.  *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.*  As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first few January 6-related trials have confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case.  The Court should deny the defendant's request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

**VI.    A Change of Venue Is Not Warranted Under Federal Rule of Criminal Procedure 21(b) Based on Convenience or the Interest of Justice.**

The defendant argues that this Court should transfer venue to the Southern District of Florida under Rule 21(b), which allows transfer to another district "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." *See* ECF No. 349 at 22-23; Fed. R. Crim. P. 21(b).  The defendant asserts that a change in venue is warranted because of the "appearance of prejudice and the cost and logistical difficulties involved in dealing with prejudice amongst a D.C. jury pool."  These arguments are duplicative of those addressed above and in any event do not support a transfer of venue under Rule 21(b).

"There is a general presumption that a criminal prosecution should be retained in the original district." *United States v. Bowdoin*, 770 F. Supp. 2d 133, 138 (D.D.C. 2011) (quoting *United States v. Baltimore & Ohio R.R.*, 538 F. Supp. 200, 205 (D.D.C. 1982)).  That presumption is rooted in the Constitution, which states that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  And it is reflected in the Federal Rules of Criminal Procedure, which state that, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18.  To obtain a change of venue under Rule 21(b), a defendant must demonstrate that trial in the district where the crime occurred "would be so unduly burdensome that fairness requires the transfer to another district of proper venue where a trial would be less burdensome."  *Bowdoin*, 770 F. Supp. 2d at 138 (quotations marks omitted).  Factors a court considering a motion to transfer venue are:

> (1) location of the defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of the defendant's business; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district of division involved; and (10) any other special elements which might affect the transfer.

*Id.* at 137-38.  Those factors strongly support keeping the prosecution in this District.  The events at issue took place in the District of Columbia, and the witnesses and evidence are in this District.  Holding a trial in the Southern District of Florida would require a significant expenditure of government funds for the prosecution team and witnesses to travel to that district, in addition to counsel and the defense teams for other defendants in this case, two of which (those for defendants Rehl and Biggs) are based in the D.C. area (counsel for defendant Nordean additionally has one attorney based in the area, and a second in the New York area).

Moreover, none of the defendant's reasons for transfer under Rule 21(b) support an interest

of justice transfer.  A trial in the Southern District of Florida would undoubtedly be more convenient for the defendant.  But that fact alone is not sufficient to justify transfer, particularly considering that the defendant chose to travel to Washington, D.C. and remained in Maryland, rather than travel back to Florida, after his arrest on January 4, 2021.

The defendant's claim that venue should be transferred under Rule 21(b) because the Southern District of Florida would provide him with a fairer jury pool, ECF No. 349 at 23, is similarly unavailing.  As explained above, the defendant cannot obtain a change of venue based on prejudicial publicity under the constitutional standard or Rule 21(a).  And the defendant cannot use Rule 21(b)'s "interest of justice" standard as an alternative way to raise a claim of "local community prejudice." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).  In *Jones*, the D.C. Circuit denied a petition for mandamus which challenged the presiding judge's denial of his motion to transfer under Rule 21(b) based on a claim of prejudicial publicity.  *Id.* at 1234, 1238-39.  The court of appeals held "that the standard of Rule 21(a) is the exclusive gauge by which circumstances of that character (prejudice) are to be measured."  *Id.* at 1239.  The defendant has failed to establish that he cannot receive a fair trial in this District and has failed to articulate a basis for transfer under Rule 21(b).

## CONCLUSION

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Erik M. Kenerson*
ERIK M. KENERSON // Ohio Bar No. 82960
JASON B.A. MCCULLOUGH
   D.C. Bar No. 998006
NADIA E. MOORE // N.Y. Bar No. 4826566
   On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530
(202) 252-7201
Erik.Kenerson@usdoj.gov

*/s/ Conor Mulroe*
Conor Mulroe // N.Y. Bar No. 5289640
Trial Attorney // U.S. Department of Justice,
   Criminal Division
1301 New York Ave. NW
Suite 700
(202) 330-1788
conor.mulroe@usdoj.gov