UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**                                                                          CASE NO: 21-CR-175-TJK

**ENRIQUE TARRIO,**

        **Defendant.**

_____/

### DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO MOTION TO TRANSFER VENUE

On June 6, 2022, the grand jury returned a Third Superseding Indictment adding two additional counts: Seditious Conspiracy 18 U.S.C. § 2384 and Conspiracy to Prevent an Officer from Discharging Any Public Duties 18 U.S.C. § 372. This indictment coincides nicely with the House Select Committee's public hearing scheduled for prime-time television on June 9, 2022 at 8:00pm ET. All major television networks including ABC, CBS, CNN, and NBC/MSNBC are expected to air the hearings in full. The Select Committee even went so far as to hire a former TV executive/producer to help with "the theater" of the hearing. The central focus of the hearing is going to be Enrique Tarrio and the Proud Boys.

If the facts and argument as presented in this motion do not rise to the level of negative pretrial publicity that irreparably taints a jury pool with already absurd amounts of extraordinary local prejudice that will prevent a fair trial, then no other case in the future history of this country will. *United States v. Skilling,* 561 U.S. 358, 378 n.11 (2010). Under Supreme Court precedent, in certain unique cases, prejudice is presumed and venue is transferred in advance of voir dire. *Rideau v. State of*

*Louisiana,* 83 S. Ct. 1417 (1963) (finding a presumption of prejudice "without pausing to examine a particularized transcript of the voir dire"). **This is such a case.**

### I. Tarrio is entitled to an impartial jury, not the 12 least-prejudiced D.C. residents

The Constitution guarantees an impartial jury to Tarrio not the Government. His right to an impartial jury is secured by the Sixth Amendment and arguably the Fifth Amendment's Due Process Clause. Indeed, the framers of the Constitution considered trial by jury to be sacrosanct to individual liberty, based on their experiences with British tyranny in the colonies. To safeguard this right, the Supreme Court has recognized that in unusual, rare cases the local prejudice in the community where the crime occurred is at such high levels, prejudice is presumed before voir dire, and a motion for transfer of venue is granted under Fed. R. Crim. P. 21(a). *See Rideau v. State of Louisiana*, 83 S.Ct. 1417 (1963).

A trial in D.C. would violate Tarrio's constitutional right to an impartial jury, based on multiple surveys of D.C residents and the *Skilling* factors detailed in his motion. *Id.* at 378; *Irvin v. Dowd,* 366 U.S. 717, 722 (1961) ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors."); *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due Process requires that the accused receive a trial by an impartial jury free from outside influences.").

In rebuttal, the Government cites distinguishable cases, casts aspersions on pretrial prejudice surveys as a whole, and does not believe there is any case with extreme pretrial prejudice that voir dire will not cure. In this regard, in deciding to move the tragic Oklahoma City bombing case to Colorado, Chief District Judge Martsch's apt statement on the hidden power of juror prejudice is applicable here:

> "Pride is defined as satisfaction in an achievement, and the people of Oklahoma are well deserving of it. But it is easy for those feeling pride to develop a prejudice. . .[t]he existence of is difficult to prove. Indeed it may go unrecognized in those who are affected by it. The prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude. It includes an impairment of the deliberative reasoning from evidentiary facts resulting from an attribution to something not included in the evidence. That something has its most powerful effect if it generates strong emotional responses and fits into a pattern of normative values."

Tarrio asks this Court to heed Judge Martsch's ominous warning, as he fears that well- intentioned jurors will be so latently biased that the court and the jurors themselves will not be able to discern it. *See Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before ones fellows is of its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight.").

Similarly, Tarrio reasonably fears many potential D.C. jurors will be reluctant to admit their bias in voir dire and give people-pleasing answers. Tarrio is rightfully apprehensive about partisan activists downplaying their extreme bias in voir dire questionnaires and purposely being sat on this jury. This is what precisely seemed to occur in *United States v. Stone*, No. 19-cr-0018, which the Government paradoxically cited as support for maintaining the venue in D.C.

By having the trial in D.C., the Government is demonstrating that convictions from prosecutorial-friendly jurors are more important than constitutional guarantees for the accused—something not lost on the rest of the world and the Nation. Regrettably, in such a historic prosecution, any conviction of a Proud Boy or Oath Keeper by a D.C. jury will forever be tainted, questioned, and held to ridicule as

vigilante-like justice, reeking of political comeuppance. If their evidence is strong enough for an indictment, the Government should be able to meet their burden for conviction in any jurisdiction in America. Ultimately, the Government cannot have it both ways: on the one hand they accuse Tarrio of engaging in premeditated coup d'état by obstructing the peaceful transfer of power of a presidential election, applying the rarely prosecuted seditious conspiracy statute, 18 U.S.C. §2384, where there is a 20-year prison maximum sentence; and on the other hand, they assert his case is nothing special and just another criminal trial where voir dire will filter out any pretrial prejudice.

### A. The Proud Boys and D.C's ongoing vitriolic feud

Contrary to the Government's argument, Tarrio is not moving for a change of venue solely because D.C. residents voted overwhelmingly against President Trump. He is not asserting that every January 6 (J6) defendant should be considered the same in deciding to transfer venue. Rather, he is moving for a change of venue because of the exceptional nature of extreme prejudice against Miami-based Proud Boys charged in the J6 riot, like him. Further, Tarrio is the face of the Proud Boys. As the group's former chairman, he was their symbol, their leader, all the group's actions are automatically attributable to him.  He has given countless interviews, and has been featured in the media incessantly throughout this process and to this very day. The timing of filing the third superseding indictment and the conveniently scheduled prime-time TV Select Committee Hearing justifies a venue change coupled with all the *Skilling* factors, mandates a change of venue. *Id*. at 378.

Tarrio is in a unique position as the most famous J6 Defendant and as a matter of law, warrants the rare presumption of prejudice to grant a change of venue before voir dire. *Calley v. Callaway*, 519 F.2d 184, 204 (5th Cir.1975) (en banc) (dictum), *cert. denied.* 423 U.S. 888 (1976) (stating in certain rare cases "prejudice to the defendant's rights may be presumed."). Moreover, Tarrio is not forum shopping for some conservative or Republican-friendly jurisdiction either.

This feud between the Proud Boys and D.C. dates back to at least the night of November 14, 2020, when Proud Boys and Antifa clashed on the D.C. streets.[1] Shortly thereafter in December 2020, the Proud Boys made national headlines again for purportedly fighting in the D.C. streets with Antifa members.[2]

Additionally, in a much-publicized lawsuit, the District of Columbia is currently suing the Proud Boys and the Oath Keepers for allegedly conspiring to terrorize the city with the violent attack on the U.S. Capitol on Jan. 6.  And, to further pollute the jury pool, D.C. Attorney General Karl Racine boldly announced its filing:

> "I'm suing the Proud Boys and Oath Keepers, the first civil lawsuit by a government entity against the Jan. 6 insurrectionists . . . They caused extensive damage to the District, our democracy and particularly the brave men and women of our Metropolitan Police Department . . . We're holding these insurrectionists accountable for conspiring to terrorize the District by planning, promoting, and participating in the deadly attack on the Capitol."

[3](emphasis added).

There was also the local prosecution this past summer of Tarrio for burning a Black Lives Matter banner belonging to a venerated D.C. church, heaping even more negative publicity on Tarrio and the Proud Boys.

---

[1] Violence erupts as Proud Boys riot in DC - REVOLT
[2] Proud Boys, anti-Trump protesters tangle in DC as daytime rallies end (nypost.com)
[3][4] ABC 13 News, December 14, 2021, by Sam Ford and Greg Dailey, WJLA, WSET.COM

In support of his motion, Tarrio directs this Court's attention to the survey by Harrison Hickman of D.C. residents commissioned by the Federal Public Defender of Eastern District of Virginia, and used in support of a change of venue motion in the J6 case of *United States v. R. Gieswein*, 21-CR-24-EGS, which was filed after Tarrio's. (*Attached here as Exhibit A*). The results and conclusions parallel Zogby's survey. For example, in that survey, 85% of D.C. jurors already think they know that those who went into the Capitol on January 6 were there to try to "overturn the election and keep Donald Trump in power." *USA v. R. Gieswein*, 21-CR-24-EGS, ECF No. 101-115, 18.6. And, 76% of respondents describe those who went into the Capitol as "insurrectionists," and 72% would describe them as "trying to overthrow the United States government." Id. at ECF No. 101-115, 18. The Harrison Hickman study also compared D.C. jurors' results with national polling data.

Tellingly, the high-level of bias of D.C. residents when compared to the data from the rest of the country further highlights the extreme prejudice particular to D.C. (See the data table at pages 4 and 5 of Harrison Hickman Survey).

### B. Supreme Court precedent mandates a change of venue before voir dire in unique cases where there is presumed prejudice

There are indeed federal cases where venue was changed prior to voir dire to ensure the constitutional guarantee of an impartial jury was preserved, and Tarrio's case falls in this category. *See United States v. McVeigh*, 918 F. Supp. 1467, 1474 (W.D. Okla. 1996) (reasoning that the "emotional burden of the explosion and its consequences" on all Oklahoma City residents, even those personally unaffected, caused "so great a prejudice against defendants in the State of Oklahoma that they cannot obtain a fair and impartial trial."); *cf. United States v. Awadallah*, 457

F.Supp.3d 246, 252 (S.D.N.Y. 2006) ("If Awadallah was actually charged with participating in the September 11 attacks it is possible to imagine that the prejudice in this case would be comparable to the community scrutiny and outrage that justified a change of venue in *McVeigh*.").

The Supreme Court has held that the refusal to grant a change of venue is a denial of due process as guaranteed by the federal Constitution, based on extreme community prejudice fueled by the media of the case. *Rideau v. State of Louisiana*, 83 S.Ct. 1417 (1963). Such is the case here. Under *Rideau*, there is no requirement to wait and see if voir dire comes off successfully, because of the extreme nature of the case and the circumstances. Just like Rideau's jailhouse confession was televised widely throughout the parish, the events of January 6 at the Capitol were broadcast live, and have been replayed almost every day since through television, laptops, and smartphones. Further, with the fortuitous filing of the third superseding indictment just days before the prime-time TV Select Committee hearings, millions more people, especially D.C. residents will be bombarded with negative pre-trial publicity that further taints the already unfriendly jury in D.C.

Historically, state courts have also transferred venue before voir dire in certain infamous cases, in order to adhere to the Fourteenth Amendment's requirement of an impartial jury. *See, e.g., Parker v. Gladden*, 385 U.S. 363 (1966). For example, the D.C. Sniper John Muhammad's case was transferred to another county in Virginia.  There, the trial judge found all of Fairfax County could be considered victims.[4] In the Casey Anthony trial, the judge granted a change of venue by picking

---

[4] 2nd Sniper Trial Venue Changed - CBS News

a jury from a venire from a different county, Pinellas County, and then moved the actual trial back to Orlando.[5]

## II. The Government's argument that January 6 prosecutions are analogous to Watergate-era cases is unpersuasive, as are all the cases they rely on

The Government relies heavily on the *Haldeman* case and its antiquated rationale. *United States v. Haldeman*, 559 F.2d 31, 61 (D.C. Cir. 1976) (en banc) (per curiam). *Haldeman* is not analogous to the January 6 cases, much less to Tarrio's. In all of the cases the Government cites, they were individuals being tried for their discrete crimes, and not part of the largest, and arguably most unique, prosecution in DOJ history. Most of these cases were decided under vastly different procedural grounds at the appellate level, where their burdens were unusually high.

In *Tsarnaev*, the defendant took an interlocutory appeal after the first day of jury selection on a writ of mandamus. *In re Tsarnaev,* 780 F.3d 14, 19 (1st Cir. 2015). The standard of review for such a writ in the First Circuit was exceptionally high, "ha[ving] customarily been granted only when the lower court . . . [has] exceeded its discretion to such a degree that its actions amount to a usurpation of power." *Id.*

And in *Moussaoui*, the Fourth Circuit affirmed the denial of pretrial prejudice motions, but did so on the grounds that the *pro se* defendant's interlocutory appeal was not within the jurisdiction of the appellate court. *United States v. Moussaoui,* 43 Fed.Appx. 612, 614 (4th Cir. 2002). In *Yousef,* the Second Circuit held that the trial court did not abuse his discretion by denying a request to change venue, but on a procedural ground as Yousef ``did not renew [his] motion for a change of venue after

---

[5] Clearwater Just the Right Change of Venue to Find Jurors for the Casey Anthony Trial | Clearwater, FL Patch

Page 8

the voir dire—an indication that counsel was satisfied that the voir dire resulted in a jury that had not been tainted by publicity." *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003). Further, the *Yousef* trial also took place five years after the 1993 World Trade Center bombing. *Id.*

In *Haldeman*, the court dismissed a survey of D.C. residents' pretrial prejudice by reasoning that it could not be trusted because it was paid for. *Haldeman*, 559 F.2d at 62. The Government's reliance on trials involving H.R. Haldeman, Oliver North, and John Poindexter are equally misplaced. These cases were tried more than 30 years ago and did not garner the media sensation that the January 6 Capitol Riot did and does. Further, news coverage and media technology, along with the evolution of social media and smartphones, have advanced light years to what it was in the 1970's and 1980's.

Finally, the Government cites to the Cuban spy case of *United States v. Campa*, 459 F.3d 1121 (11th Cir. 2006) (en banc) to cast more aspersions on polling. The Government's reliance here completely omits the full context of that case. Indeed, the polling and bias were certainly strong and valid enough to convince the original panel of the 11th Circuit in a 73-page opinion that venue should have been transferred out of Miami. 419 F.3d 1219 (2005). Subsequently, in a remarkable passage about the importance of fair jury trials to American jurisprudence as an example to the world, the last paragraph of Circuit Judge Birch's dissent in *Campa* is quite pertinent:

> I am aware that, for many of the same reasons discussed above, the reversal of these convictions would be unpopular and even offensive to many citizens. *However, I am equally mindful that those same citizens cherish and support the freedoms they enjoy in this country that are unavailable to residents of Cuba. One of our most sacred freedoms is the right to be tried fairly in a noncoercive atmosphere and thus be afforded a fair trial. In the final analysis, we are a nation of laws*

>*in which every defendant, no matter how unpopular, must be treated fairly-a concept many consider alien to the current Cuban regime. Our Constitution requires no less.*(emphasis added).

### III. The Government's Predictable Attacks on Zogby's Survey Fail to Refute its Conclusion: Extreme Prejudice Exists Among D.C. Residents for Proud Boys and J6 Defendants

The Government's attacks on Zogby's survey are not surprising, given their wholesale dismissal of all such studies. In the Government's view, there is no survey of pretrial prejudice justifying a transfer of venue, and there is no community prejudice too high that voir dire cannot remedy. This archaic prejudice was certainly found in the trial courts of yesteryear. *United States v. Haldeman*, 559 F.3d 31, 64 n. 43 (1979) (describing all pretrial prejudice polls as "suspect" and stating that the trial court did not have to consider a poll "paid for by one side"). But this has no place today. Fortunately, advances in the evidence code have allowed for courts to consider scientifically reliable studies on pretrial prejudice.

Along these lines, Tarrio is not arguing that polling is a better substitute for voir dire. The Government's claim that "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias," neglects the exceptional context of this case. Further, there are plenty of examples of scholarship that say the exact opposite: "The Use of Public Opinion Polls in Continuance and Venue Hearing," E.F. Sherman,1964; "Pre-Trial Publicity, Change of Venue, Public Opinion Polls-- A Theory of Procedural Justice," P.D. O'Connell (University of Detroit Law Review, Vol 65, #2, Winter 1988); "The Use of Social Science Data in a Change of Venue Application," JWT Judson andNeil Vidmar, The Canadian Bar Review, Vol. 59, 2018; and "Know Your Venue: Polling Still Works," Ken Broda-Bahm, PhD.

In addition, their argument that "polling lacks many of the safeguards of court- approved voir dire, including involvement of both parties in formulating the questions" is unpersuasive. First, Garcia's survey results are similar to other polls used by other defendants. Second, the prosecution can always conduct a poll for comparison. Third, the actual question wording was submitted in the file labeled "Cross-Tabulations." Fourth, Zogby's survey followed all of the American Association for Public Opinion Research's (AAPOR) guidelines and Associated Press requirements for release of data and methodology. More importantly, the study's executive-like summary meets the norms of acceptability under AAPOR standards.

In terms of the sample criticism, Zogby's study relied on the "Jury Selection Plan for the U.S District Court for D.C. for the Random Selection of Grand and Petit Jurors," which currently states: "The judges of the Court find, pursuant to 28 U.S.C. § 1863(b) (2) that while the registered voters master file of the D.C. Board of Elections represents a fair cross-section of the community in this district . . . . ." And anyone with a D.C. driver's license is automatically registered to vote. Thus, it is bewildering what the critique is here: is the Government saying that only "registered voters" are eligible and that Zogby's results are questionable because they only sought out registered voters?

As to the use of "compound, non-neutral, and leading questions," the question wording is standard in the polling industry. These surveys are not a fishing expedition to find an endless supply of options that represent views on all things at all times, but instead on a quest to discover which of the expressed views comes closer to one's own view.

In terms of the question cited on statements A and B of the survey, there is a "not sure" option that provides sufficient neutrality. This is splitting hairs. Zogby tested familiarity with the "events" on January 6, which was clear and obvious in the context of the question. And if there was a modicum of ambiguity, respondents had a not sure option.

And their criticism that the summary misstates its own findings is baseless. When the survey authors wrote "respondent," they meant respondents to that question, and it is implied that the sample would shrink because of the survey questionnaire logic.

The Government maligns the entire study by calling it a push poll, a sinisterly loaded term. The study is not even close to the definition of a push poll. The questions are benign, well-developed, probative and thoughtful. AAPOR defines a push poll as a negative campaigning technique "used to influence voters by asking specific questions about an issue or a candidate. Under the guise of an objective opinion poll, loaded questions are posed to mislead or bias the listener against an opposing candidate or political party." Zogby's survey has not attempted to influence responses, and such ad hominem-like attacks are unwarranted.

Even more perplexing was the Government's use of air quotes to denigrate Zogby's use of an "online" survey. It is 2022. This old-fashioned criticism belongs in the past with *Haldeman's* rejection of all polling. This goes for some of the Government's other ridiculous complaints. For instance, the Government makes a sophistic gripe that a survey's question wording is vague in that "everyone who went inside Capitol" on January 6 may have included members of Congressional members or the Vice President. Equally perplexing was the Government's critique of 5% not familiar, not sure. Zogby legitimately found a large majority of the jury

pool who are already familiar and analyzed those 5% of the sample as 8 people—too small for any statistically significant analysis and like finding a needle in a haystack of potential "unbiased jurors."

    WHEREFORE, Tarrio respectfully moves this District Court grant his motion to transfer venue to the Southern District of Florida, any other District, or use a venire from any of D.C.'s neighboring districts while holding the trial in the D.C. courthouse.

    Respectfully submitted,

**BY: /s/ Sabino Jauregui, Esq.**
Florida Bar Number 503134
Jauregui Law, P.A.
1014 West 49 Street
Hialeah, Florida 33012
Phone 305-822-2901
FAX 305-822-2902

*/s/ Nayib Hassan*
Florida Bar No. 20949
Attorney for Defendant
LAW OFC.OF NAYIB HASSAN 6175 NW 153 St., Suite 221
Miami Lakes, Florida 33014
Tel. No.: 305.403.7323
Fax No.: 305.403.1522

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically noticed through the CM/ECF system to the US Attorney's Office on this 9th of June, 2022 to the following:

Jason McCollough
Conor Mulroe
Nadia Moore
Erik Kenerson

*BY: /s/ Sabino Jauregui, Esq.*
Florida Bar Number 503134
Jauregui Law, P.A.
1014 West 49 Street
Hialeah, Florida 33012
Phone 305-822-2901
FAX 305-822-2902