## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **No. 1:21-cr-175-1, 2, 3, 5 (TJK)** |
| **v.** | **:** | |
| | **:** | |
| **ETHAN NORDEAN,** | **:** | |
| | **:** | |
| **JOSEPH BIGGS,** | **:** | |
| | **:** | |
| **ZACHARY REHL,  and** | **:** | |
| | **:** | |
| **ENRIQUE TARRIO,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

## UNITED STATES' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS PART OR ALL OF THE THIRD SUPERSEDING INDICTMENT

Defendants Ethan Nordean, Joseph Biggs, Zachary Rehl, Enrique Tarrio, and Dominic Pezzola (the defendants) have moved to dismiss some or all of the Third Superseding Indictment (ECF Nos. 434, 437, 439, 440, 442, 443). The Third Superseding Indictment, which details the defendants' participation in an attack on the United States Capitol on January 6, 2021, alleges that they joined and took acts in furtherance of a plot to use force directed at the government, including at specific laws and provisions of the Constitution of the United States governing the election of a President.  None of the defendants' various challenges to the Third Superseding Indictment has merit, and their motions to dismiss should be denied.

## FACTUAL BACKGROUND

Defendants Ethan Nordean, Joseph Biggs, Zachary Rehl, Enrique Tarrio, and Dominic Pezzola are charged in the Third Superseding Indictment (TSI), ECF No. 380, with seditious conspiracy and other offenses stemming from their actions leading up to and on January 6, 2021.

Charles Donohoe was previously charged with those five defendants, and he entered a plea of guilty to conspiring to obstruct an official proceeding and assaulting a federal officer, in violation of 18 U.S.C. §§ 1512(k) and 111(a)(1) prior to the grand jury returning the TSI.

As described in the first few paragraphs of the TSI, the United States Constitution and federal statutes codify the procedures and dates governing the transfer of presidential power in the United States. ECF No. 380 at ¶ 2.  "The Twelfth Amendment . . . requires that the Vice President 'shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted.'"  *Id.* at ¶ 4.   Moreover, the "United States Congress must convene during a joint session proceeding . . . at 1:00 p.m. 'on the sixth day of January succeeding every meeting of the electors,' with the Vice President presiding, to count the electoral votes, resolve any objections, certify their validity, and announce the result."  *Id.* (citing 3 U.S.C. § 15).

The conspiracy charged in Count One of the TSI alleges a plot to oppose by force the authority of the Government of the United States and by force to prevent, hinder, and delay the execution of any law of the United States.  *Id.* at ¶¶ 26-27.  The TSI alleges that in the days after the 2020 election, multiple co-conspirators, including the defendants here, began expressing support for violence if then-President Donald Trump did not remain in power.  For example, on November 16, 2020, Tarrio posted online, "If Biden steals this election, [the Proud Boys] will be political prisoners. We won't go quietly… I promise."  *Id.* at ¶ 13.c.  Nordean stated on November 27, 2020, "We tried playing nice and by the rules, now you will deal with the monster you created. The spirit of 1776 has resurfaced and has created groups like the Proudboys and we will not be extinguished. We will grow like the flame that fuels us and spread like love that guides us. We are unstoppable, unrelenting and now . . . unforgiving. Good luck to all you traitors of this country we so deeply love . . . you're going to need it."  *Id.* at ¶ 14.c.  Rehl stated on the same date, "Hopefully

the firing squads are for the traitors that are trying to steal the election from the American people." *Id.* at ¶ 14.d.

On December 12, 2020, Tarrio and other members of the Proud Boys attended a rally in Washington, D.C. that involved violence, including at least one member of the Proud Boys suffering a knife wound. The rally also involved property destruction, with Tarrio participating in the theft and destruction of a banner that read, "#BLACKLIVESMATTER," which was property of Asbury United Methodist Church. *Id.*, ¶¶ 15-17.

On December 19, 2020, shortly after plans were announced for a "wild" protest in Washington, D.C. on January 6, 2021, Biggs lamented to Tarrio that the Proud Boys "recruit losers who wanna drink." Biggs then suggested, "Let's get radical and get real men." *Id.* at ¶ 29. The next day, Tarrio created an encrypted messaging group called the Ministry of Self-Defense (MOSD), which was to be a national rally-planning committee that would include hand-selected members. *Id.* at ¶ 30. Tarrio emphasized that recruits to this chapter would be expected to follow the commands of leadership. *Id.* at ¶ 33.

On December 29, 2020, Tarrio messaged prospective MOSD members to notify them of a live video meeting taking place the next day to explain how the new chapter would work. *Id.* at ¶ 38. Tarrio explained that MOSD "will have a top down structure" and advised prospects that "if that's something you're not comfortable with," they should not bother attending the live session. *Id.*[1] The following day, Tarrio convened a video call where he and other MOSD leaders again advised prospective members that they could "fit in or fuck off." *Id.* at ¶ 42. On the same day as

---

[1] Rehl claims that this meeting was exculpatory and that the government's alleged failure to provide portions of it to the grand jury merits dismissal of the indictment. *See* ECF No. 440. That claim lacks merit for the reasons discussion *infra* at 44-46.

the MOSD video call, Tarrio received a document entitled "1776 Returns" that set forth a plan to occupy a few "crucial buildings" in Washington, D.C. *Id* at ¶ 41.  The individual who sent the document to Tarrio stated, "The revolution is important than anything [sic]," and Tarrio responded, "That's what every waking moment consists of . . . I'm not playing games." *Id.*  The following day, Tarrio posted a photograph of Pezzola, along with the message "Lords of War. #J6 #J20." *Id.* at ¶ 44.

On New Years' Day 2021, Tarrio posted messages referencing "[r]evolt" and "[r]evolution." *Id.* at ¶ 45.  The next day, he provided a debit card number to Nordean for Nordean to purchase his flight to Washington. *Id.* at ¶ 47.

On January 3, a participant in a MOSD Leaders chat messaged that the "main operating theater" should be "out in front of the Capitol building.  That's where the vote is taking place and all of the objections." *Id.* at ¶ 49.  Rehl responded that the Capitol was a good start, *id.*, and the next morning, Tarrio stated "you want to storm the Capitol." *Id.* at ¶ 50.

On January 4, 2021, Tarrio was arrested upon his entry to Washington, D.C.  Donohoe advised the group of MOSD leaders that "[e]ach one of us should personally clear our history of that MOSD chat," and Rehl instructed the group, "you gotta manually delete each message from each chat," and stated a hope that Tarrio had logged out of an encrypted messaging service, since he knew the police were after him. *Id.* at ¶ 51.

On the night of January 5, 2021, a member of the MOSD Leaders chat posted to that group, "Rufio [*i.e.*, Nordean] is in charge, cops are the primary threat, don't get caught by them or [Black Lives Matter], don't get drunk until off the street." *Id.* at ¶ 62.  Donohoe reposted those messages in a MOSD Members group. *Id.*  Biggs told his fellow MOSD leaders that he had been in a meeting

with lots of guys and had just spoken to Tarrio. *Id.* at ¶ 63. Three minutes later, Tarrio was re-added to the new MOSD Leaders group. *Id.* at ¶ 64.

On the morning of January 6, approximately 100 Proud Boys met near the Washington Monument, before Biggs and Nordean led the group on a march to the Capitol—away from the rally happening near the Washington Monument—around to the east side of the Capitol, and back to its west side. *Id.* at ¶¶ 70-73. Biggs, Nordean, and Rehl then led the assembled group back to the pedestrian entrance to the Capitol grounds near the Peace Monument. *Id.* at ¶ 75. Immediately after the gates at that entrance were breached, they and others advanced towards the building. *Id.* at ¶¶ 77-78. As they charged up the walkway, Biggs recorded himself stating, "Dude, we're right in front of the Capitol right now. American citizens are storming the Capitol—taking it back right now. There's millions of people out here; this is fucking crazy. Oh my God! This is such history! This is insane. We've gone through every barricade thus far. Fuck you!" *Id.* at ¶ 79.

While unlawfully on Capitol grounds, the defendants engaged in mayhem. Nordean and Biggs participated in tearing down a black metal fence. *Id.* at ¶ 81. Biggs then announced in a video, "we've just taken the Capitol." *Id.* at ¶ 84. Pezzola robbed a riot shield from an officer and later posed with it while making a hand gesture associated with the Proud Boys. *Id.* at ¶¶ 86, 88. Donohoe threw a water bottle at a line of law enforcement officers. *Id.* at ¶ 87.

Donohoe, Pezzola, and others retreated to the back of the plaza to the west of the Capitol, as did Biggs, Nordean, Rehl, and others. *Id.* at ¶¶ 89-90. Biggs filmed a video of himself, Nordean, and others, in which he stated, "So we just stormed the fucking Capitol. Took the motherfucking place back. That was so much fun." Biggs then added, "January 6 will be a day in infamy." *Id.* at ¶ 89. Donohoe, Pezzola, Biggs, Nordean, and others then pressed forward, towards a set of stairs that led towards the Capitol building. *Id.* at ¶ 90. Donohoe, Biggs, and Pezzola participated with

the crowd in overwhelming law enforcement who were attempting to stop the crowd from advancing up the stairs. *Id.* at ¶ 91. At the top of those stairs, Pezzola yelled at a police officer, "We ain't stopping! We ain't fucking stopping! Fuck you! . . . You think Antifa's fucking bad, just you wait!," among other things. *Id.* at ¶ 92. Minutes later, he used the stolen riot shield to break a window on the Capitol, allowing the first rioters to stream into the building. *Id.* at ¶ 93.

Pezzola entered the Capitol through the window he broke. Biggs entered through an adjacent door shortly thereafter. *Id.* at ¶¶ 94-95. Biggs subsequently exited the Capitol on the east side. *Id.* at ¶ 96. After exiting, he filmed a video in which he surveyed the crowd on that side of the building and stated, "We've taken the Capitol." *Id.* Nordean entered the Capitol building at 2:37 p.m., Biggs re-entered at 2:40, and Rehl entered at 2:53. *Id.* at ¶¶ 98, 101, 104.

At 2:38 p.m., Tarrio made a public social media post that read, "[d]on't fucking leave." *Id.* at ¶ 99. At 2:39 p.m., responding to a question as to whether Proud Boys were a militia, Tarrio stated, "Yep." Soon thereafter, Tarrio told members of the Proud Boys, "Make no mistake . . . We did this . . ." *Id.* at ¶ 100. While Biggs and Nordean were in the Capitol, Tarrio attempted to contact them by phone and successfully spoke with Biggs for 42 seconds. *Id.* at ¶ 105. At 7:39 p.m. on January 6th, in response to a MOSD leader telling him, "You know we made this happen," Tarrio responded, "I know." *Id.* at ¶ 107. At 11:16 p.m., Tarrio posted a message on social media that featured a video of a masked man resembling Tarrio, wearing a flowing black cape, standing in front of a deserted Capitol. The video was captioned, "Premonition." *Id.* at ¶ 108.

## PROCEDURAL BACKGROUND

On June 6, 2022, the grand jury returned the TSI, charging all defendants with violations of 18 U.S.C. §§ 2384 (seditious conspiracy), 1512(k) (conspiracy to obstruct an official proceeding); 1512(c)(2) (obstruction of an official proceeding), 372 (conspiracy to prevent an

officer from discharging any duties), 231(a)(3) (obstruction of law enforcement during civil disorder), 1361 (destruction of government property), and 111(a)(1) (assaulting, resisting, or impeding certain officers.  Pezzola—who has not filed or joined any defense motions—was additionally charged with robbery of personal property of the United States, in violation of 18 U.S.C. § 2112.

The parties have previously engaged in extensive litigation regarding whether the First Superseding Indictment, which charged, *inter alia*, violations of 18 U.S.C. § 1512(c)(2) and (k), should be dismissed.  The Court denied the motions on December 28, 2021.  ECF Nos. 262, 263.

Nordean has moved to dismiss all charges against him except the violation of 18 U.S.C. § 231(a)(3).[2]  ECF No. 434.  Rehl, Tarrio, and Biggs have joined that motion.  *See* ECF Nos. 435, 436, 446; Minute Orders dated August 31, 2022.  Defendant Rehl has filed additional motions to dismiss, alleging that the TSI is duplicitous (ECF No. 437); violates the First Amendment (ECF No. 439[3]); violates his rights under the Presentment Clause of the Fifth Amendment (ECF No. 440); and that the seditious conspiracy charge is unconstitutionally vague (ECF No. 443).  He also asks this Court to revisit its prior order denying motions to dismiss the First Superseding Indictment for violations of 18 U.S.C. § 1512(c)(2) and (k).  ECF No. 442.

## ARGUMENT

None of the defendants' various challenges to the Indictment has merit.  This Court should deny the defendants' motions to dismiss.

---

[2] The Court previously denied Nordean's motion to dismiss that charge in the First Superseding Indictment.  ECF No. 263.

[3] Biggs has joined this motion.  ECF No. 447; Minute Order dated August 31, 2022.

### A. Legal Standard

A defendant may move before trial to dismiss an indictment in whole or in part for, among other things, "lack of specificity" and "failure to state an offense." *See* Fed. R. Crim. P. 12(b)(3)(B)(iii), (v). An indictment's main purpose is to inform the defendant of the nature of the charged offense. *United States v. Ballestas*, 795 F.3d 138, 148-149 (D.C. Cir. 2015). Thus, an indictment need "only contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *Id.* at 149 (quoting Fed. R. Crim. P. 7(c)). "When testing the sufficiency of the charges in an indictment, 'the indictment must be viewed as a whole and the allegations [therein] must be accepted as true.'" *United States v. Hillie*, 227 F. Supp. 3d 57, 71 (D.D.C. 2017) (quoting *United States v. Bowdoin*, 770 F. Supp. 2d 142, 145 (D.D.C. 2011)). The "key question" is whether "the allegations in the indictment, if proven, are sufficient to permit a petit jury to conclude that the defendant committed the criminal offense as charged." *Id.*

### B. Count One properly charges a seditious conspiracy.

Count One of the TSI charges the defendants with conspiring to oppose by force the authority of the government, and by force to prevent, hinder, or delay the execution of any federal law. ECF No. 380 at ¶ 26. Nordean argues (ECF No. 434 at 8-29) that Count One fails to state an offense because (1) the alleged conduct falls outside the scope of what Section 2384 prohibits, (2) it does not identify federal officers whom the defendants targeted, and (3) it includes insufficient facts that he agreed to use force against persons. Rehl argues (ECF No. 443 at 1-5) that Count One is unconstitutionally vague. Those arguments fail.

### 1.  Background

Congress passed what became the seditious conspiracy statute in July 1861, approximately

three months after the beginning of the Civil War.  *See* Act of July 31, 1861, ch. 33, 12 Stat. 284.

The Conspiracies Act of 1861 made it a crime, punishable by up to six years of imprisonment, for

> two or more persons within any State or Territory of the United States [to] conspire
> together to overthrow, or to put down, or to destroy by force, the Government of
> the United States, or to levy war against the United States, or to oppose by force
> the authority of the Government of the United States; or by force to prevent, hinder,
> or delay the execution of any law of the United States; or by force to seize, take, or
> possess any property of the United States against the will or contrary to the
> authority of the United States; or by force, or intimidation, or threat to prevent any
> person from accepting or holding any office, or trust, or place of confidence, under
> the United States.

*Id.*  The bill's sponsor, Senator Trumbull, explained that the bill's purpose was "to punish persons

who conspire together to commit offenses against the United States not analogous to treason."

Cong. Globe, 37th Cong., 1st Sess. 277 (July 26, 1861); *see id.* (explaining that the offense would

apply to circumstances where a group of people "conspired together to seize an article of property

belonging to the United States"; where "settlers meet together, and, by threats and intimidation,

deter" a federal land officer from arranging "any sale of . . . public lands"; or where "a number of

persons, by threats of violence and intimidation, prevent[] a postmaster from performing the duties

of his office," even though none of those circumstances would "constitute treason").

The Conspiracies Act was intended to fill a "lacuna" in federal law.  Leslie Friedman

Goldstein, *Legal Histories of America's Second Revolutionary War (1860-1876)*, 52 Tulsa L. Rev.

495, 504 (2017).  Before the Conspiracies Act, no general federal felony existed to punish efforts

to obstruct or subvert the government by force:  the only tools at prosecutors' disposal were "the

crime of treason (which carried a statutory death penalty)" and the misdemeanor offense of

obstructing a federal officer.  *Id.* at 504 & nn. 73-74 (citing William A. Blair, *With Malice Toward*

*Some: Treason and Loyalty in the Civil War Era* 16-17 (2014)); *see also* U.S. Const. art. III, § 3, cl. 1 (defining treason as "only in levying War against" or "adhering to" and "giving . . . Aid and Comfort" to the country's "Enemies," and providing that a treason conviction required the "Testimony of two Witnesses to the same overt Act"). The Conspiracies Act provided a middle option to address serious criminal conduct that did not rise to the level of a capital offense, including conspiracies to commit acts of treason, insurrection, or obstruction of government functions that failed to achieve their purpose. *See* Goldstein, *Legal Histories of America's Second Revolutionary War (1860-1876)*, 52 Tulsa L. Rev. at 504.

Ten years later, Congress enacted a nearly identical conspiracy provision in the Enforcement Act of 1871 (also known as the Ku Klux Klan Act), which otherwise included a broad range of civil and criminal provisions to enforce the guarantees of the Fourteenth Amendment. *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13 (codified at Rev. Stat. title 70, ch. 2, § 5336 (1878)). In *Baldwin v. Franks*, 120 U.S. 678 (1887), the Supreme Court held that, despite its presence in the Enforcement Act, the seditious conspiracy statute[4] focuses on resistance to the government itself and could not be used to prosecute a conspiracy that seeks solely to deprive private individuals of rights guaranteed by federal law. The defendants in *Baldwin* had conspired to forcibly remove Chinese laborers who were lawfully present in the United States pursuant to a treaty between the United States and China. *Id.* at 693. Rejecting the government's contention that the conspirators had "'oppos[ed]' by force the authority of the United States" by seeking to drive away persons who were protected by treaty, the Supreme Court held that the seditious

---

[4] Although Congress did not identify the conspiracy prohibition currently in Section 2384 as "seditious conspiracy" until 1948, *see infra* at 12, this brief refers to Section 2384's materially identical predecessors as the "seditious conspiracy" statute or provision.

conspiracy statute "implies force against the government *as a government*," and thus requires that a defendant use force "to resist some positive assertion of authority by the government. A mere violation of law is not enough." *Id.* (emphasis added); *see id.* (explaining that the defendants conspired to use force "in opposition to a class of persons who had the right to look to the government for protection against such wrongs, not in opposition to the government while actually engaged in an attempt to afford that protection"). The Supreme Court similarly rejected the government's assertion that the conspirators violated the prohibition on "preventing, hindering or delaying the 'execution' of any law of the United States," holding that this provision likewise "means something more than setting the laws themselves at defiance. There must be a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution." *Id.*

In 1909, Congress adopted a new criminal code that included essentially the same seditious conspiracy provision that exists under current law. *See* Act of Mar. 4, 1909, ch. 1, § 6, 35 Stat. 1089 (codified at 18 U.S.C. § 6 (1940)). Courts generally upheld convictions under the statute where the defendants had agreed to use force against the government itself. *See, e.g.*, *Reeder v. United States*, 262 F. 36, 38-39 (8th Cir. 1919) (conspiracy to commit armed insurrection against federal officers in order to prevent enforcement of military conscription laws); *Orear v. United States*, 261 F. 257, 258-260 (5th Cir. 1919) (same); *Wells v. United States*, 257 F. 605, 612-614 (9th Cir. 1919) (same); *Bryant v. United States*, 257 F. 378, 380-382 (5th Cir. 1919) (same); *Isenhouer v. United States*, 256 F. 842, 842-843 (8th Cir. 1919) (conspiracy to prevent enforcement of military conscription laws by threatening to kill police officers); *Phipps v. United States*, 251 F. 879, 880 (4th Cir. 1918) (conspiracy to forcibly disarm federal troops and steal their weapons). Consistent with the Supreme Court's decision in *Baldwin*, however, courts reversed seditious

conspiracy convictions where the defendants agreed to use force against private businesses or individuals, and not the government itself.  *See, e.g.*, *Anderson v. United States*, 273 F. 20, 26-27 (8th Cir. 1921) (overturning seditious conspiracy convictions where defendants conspired to use force against "industrial and commercial activities and interests," not "those charged with the duty of executing the laws of the United States," even though the defendants' goal was to impede the government's ability to fight World War I); *Haywood v. United States*, 268 F. 795, 800 (7th Cir. 1920) (same).

In 1948, Congress reorganized Title 18 and moved the seditious conspiracy provision to 18 U.S.C. § 2384, where it remains today.  *See* Act of June 25, 1948, ch. 645, § 2384, 62 Stat. 683, 808.  The 1948 Act was the first time Congress used the term "seditious conspiracy" as a statutory heading for that provision.  *See* Rev. Stat. title 70, ch. 2, § 5336 (1878) (margin).  Congress's decision to use the term "seditious conspiracy" in the 1948 Act does not appear to have reflected any change in the underlying offense.  *See* H.R. Rep. No. 80-304, at A148 (1947) (stating that the new Section 2384 was "[u]nchanged" from the 1909 statute); *United States v. Rahman*, 189 F.3d 88, 116 (2d Cir. 1999) (noting that "sedition" appears in Section 2384's title, but not its terms, which are "far more precise").

Following a 1954 attack on the United States Capitol by Puerto Rican nationalists, in which several armed intruders entered the gallery of the House of Representatives, opened fire, and wounded five congressmen, Congress amended the seditious conspiracy statute to increase its maximum penalty from six to 20 years of imprisonment.  *See* Pub. L. No. 84-766, ch. 678, 70 Stat. 623 (1956); H.R. Rep. No. 84-922, at 2 (1955) (the "grave nature" of the attack "clearly demonstrated" the need for "much more severe penalties than the law provides for [seditious

conspiracy] at the present time"); *see also United States v. Lebron*, 222 F.2d 531, 533-534 (2d Cir. 1955) (affirming convictions for seditious conspiracy).

> **2. A conspiracy to oppose by force the government or to use force to prevent, hinder, or delay laws governing the transfer of presidential power violates Section 2384.**

Section 2384 prohibits a conspiracy to "overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof." 18 U.S.C. § 2384. The defendants are alleged to have violated Section 2384 by conspiring "to oppose by force the authority of the Government of the United States," and "by force to prevent, hinder, and delay the execution of any law of the United States" by the government, ECF No. 380 at ¶ 26, namely, the "laws governing the transfer of power, including the Twelfth Amendment to the Constitution and Title 3, Section 15 of the United States Code." *Id.* at ¶ 27. Those allegations, if proven, establish a violation of Section 2384.

a. A violation of Section 2384 under the two prongs charged here requires proof that a defendant agreed to use force against the "government *as a government*," and thus requires that a defendant planned to use force "to resist some positive assertion of authority by the government" or to resist "the authority of the United States while endeavoring to carry the laws into execution." *Baldwin*, 120 U.S. at 693 (emphasis added). A defendant who merely conspires to use force to violate the law is "not enough." The indictment here alleges (ECF No. 380 at ¶ 26) that the defendants planned to use force to oppose or otherwise prevent the certification of the Electoral College vote required by the Constitution, *see* U.S. Const. art. II, § 1, cl. 3, and the Electoral Count Act of 1887, *see* 3 U.S.C. § 15. Unlike in *Baldwin*, where the defendant's exertion of force "in opposition to a class of persons who had the right to look to the government for protection" was

insufficient under the seditious conspiracy provision, *see* 120 U.S. at 693, the defendants here are alleged to have conspired to use force directly against the government to "oppose the lawful transfer of presidential power by force," ECF No. 380 at ¶ 27.  Along with the additional supporting facts describing the conspiracy, that allegation is "sufficient to plead" a violation of Section 2384. *See United States v. Rhodes*, No. 22-cr-15, 2022 WL 2315554, at *7 (D.D.C. June 28, 2022).

Ignoring that straightforward application of the Supreme Court's decision in *Baldwin* to the allegations here, Nordean instead contends (ECF No. 434 at 8-14) that the two prongs charged in this case only encompass conduct akin to that covered in Section 2384's first two prongs, which prohibit plotting either to use force to overthrow the government or to levy war against it.  *See* 18 U.S.C. § 2384.  That contention is flawed.  First, Nordean relies principally (ECF No. 434 at 9) on the *ejusdem generis* and *noscitur a sociis* canons, but those canons have no application here. "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category."  *United States v. Espy*, 145 F.3d 1369, 1370-1371 (D.C. Cir. 1998).  That canon does not apply where, as here, the provision at issue involves "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," *United States v. Aguilar*, 515 U.S. 593, 615 (1995) (Scalia, J., concurring in part and dissenting in part). Similarly, the *noscitur a sociis* canon is used only to construe terms that are "of obscure or doubtful meaning," not to change the meaning of unambiguous terms that are simply broad.  *Russell Motor Car Co. v. United States,* 261 U.S. 514, 520 (1923).  Moreover, the canon may be invoked only "when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning."  *S. D. Warren Co. v. Maine Bd. of Env't Prot.,* 547 U.S. 370, 378 (2006) (internal quotation marks omitted); *see Beecham v. United States,* 511 U.S. 368, 371 (1994) ("That

several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). The "five distinct" (ECF No. 434 at 9) prohibitions in Section 2384, which cover different types of forcible plots directed at the government, from waging war, to preventing the execution of laws, to seizing property, are not susceptible to the *noscitur* canon.

Moreover, Nordean's suggestion (ECF No. 434 at 10) that upholding the allegations here will render other provisions superfluous is incorrect. For one, the allegations here do not imply that "every plan to forcibly interfere with a federal law's execution" amounts to seditious conspiracy (ECF No. 434 at 10); as noted above, the allegations must involve a plot to use force "to resist some positive assertion of authority by the government." *Baldwin*, 120 U.S. at 693.[5] Construed in that way, Section 2384 would not overlap with the various provisions in 18 U.S.C. § 1512 Nordean cites (ECF No. 434 at 10) because the Section 1512 provisions do not require any attack on the government or government actors. Even if an interpretation of Section 2384 overlapped with other provisions, such overlap is "not uncommon in criminal statutes." *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014).

Nordean further suggests (ECF No. 434 at 11-12) that the courts of appeals' decisions in *Anderson*, *supra*, and *Haywood*, *supra*, support his argument. But those decisions simply illustrate the uncontested principle that for an individual to violate Section 2384, he or she must plan to use force in service of resistance against the government. *See Baldwin*, 120 U.S. at 693 (to violate the predecessor of the seditious conspiracy provision, the defendant must intend the use of "force against the government as a government," including "a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution"). No Section 2384 violation

---

[5] Accordingly, Nordean's "petty drug dealer" hypothetical (ECF No. 434 at 10), which does not involve any attack on the government, would fall well outside of Section 2384's scope.

therefore occurs where the defendant exerts force against private parties committing acts that the government would "prevent," *id.* at 694; or against "industrial and commercial activities and interests," *Anderson*, 273 F. at 26-27; like "the operations of producers from whom the government was expecting to buy or had contracted to buy war munitions and supplies," *Haywood*, 268 F. at 799-800; instead of against the government's own assertion of authority.  By contrast, Section 2384 is validly charged here, where the defendants planned to use force directly against the government to preclude it from executing the laws involved in the transfer of presidential power. *See Rhodes*, 2022 WL 2315554, at *6 (noting that *Anderson* and *Haywood* are "better read to emphasize that the seditious conspiracy must be directed at government officials or employees, as opposed to nongovernment actors").

b.  Nordean next argues (ECF No. 434 at 14-26) that Count One fails for the interrelated reasons that (1) it does not allege any specific officer who was executing the law, and (2) to the extent it could be read to allege that Congress was executing the law, Congress is constitutionally prohibited from doing so.[6]  Those claims lack merit.

1.  A defendant violates Section 2384 by agreeing to use force or to prevent, hinder, or delay the execution of any federal laws even if that defendant does not target a specific government official.  *See Rhodes*, 2022 WL 2315554, at *5 ("A seditious conspiracy charge . . . need not allege a conspiracy aimed at a particular federal official authorized to execute the law.").  That conclusion flows principally from Section 2384's text, which criminalizes a conspiracy to use force directed at the "Government of the United States," the "law[s] of the United States," and the "property of the United States."  18 U.S.C. § 2384.  Unlike statutes—such as 18 U.S.C. § 111 (which addresses

---

[6] This challenge thus applies only to the hinder-prevent-delay prong, and not to the oppose-the-authority prong.

forcible assaults on federal officers) or 18 U.S.C. § 231(a)(3) (which addresses obstructing or interfering with officers or firefighters during a civil disorder)—that focus on a defendant's acts directed at a particular officer, Section 2384 encompasses attacks on the authority of the government *qua* government.  *See Baldwin*, 120 U.S. at 693.  Furthermore, Nordean's interpretation that a seditious conspiracy violation must involve an attack on a federal officer would read Section 2384's property prong entirely out of the statute.

That textual reading also draws support from Section 2384's history.  When Congress enacted the seditious conspiracy in the Enforcement Act of 1871, it also passed 18 U.S.C. § 372, which criminalized attacks conspiring to target certain officers.  *See infra* at 32-33.  When Congress reorganized the criminal code in 1909, it included seditious conspiracy along with other provisions addressing "Offenses Against the Existence of the Government," while moving Section 372 to a separate chapter.  *See Rhodes*, 2022 WL 2315554, at *5.  That change made clear Congress's view that the seditious conspiracy constituted "a crime against the United States, and not a particular federal official."  *Id.* at *6.

Nordean's contention (ECF No. 434 at 20) that construing Section 2384 to encompass an attack on the government (but not a specific officer) is "inconsistent" with Section 2384's force requirement is inaccurate.  Contrary to his suggestion, a defendant who plans to blow up a federal courthouse to prevent judges there from adjudicating cases or to destroy servers housing legislative materials to prevent lawmakers from enacting certain laws would violate Section 2384's opposing-the-authority and prevent-hinder-or-delay prongs without rendering the force requirement vague or abstract.  The same is true with Count One here, which alleges that the defendants planned to use force in an effort to oppose, prevent, hinder, or delay Congress's constitutional and statutory duty to certify the Electoral College vote.

2.   Nordean's related contention—that Congress cannot execute the law—also fails. "Execution" refers to the "carrying out or putting into effect (as a court order or a securities transaction)," *Execution*, Black's Law Dictionary (11th ed. 2019); "[t]he action of carrying into effect (a plan, design, purpose, command, decree, task, etc.)," *Execution*, Oxford English Dictionary, *available at* https://www.oed.com; or simply the "act or process of executing," *Execution*, Merriam-Webster Online, *available at* https://www.merriam-webster.com/dictionary/execution.   The term carried the same meaning in the mid-nineteenth century for the legislators who enacted the first seditious conspiracy prohibition, *see Execution*, Webster's American Dictionary of the English Language (1828) ("1828 Webster's") (defining execution to include the "last act of the law in completing the process by which justice is to be done" and as "something done or accomplished"), *available at* https://webstersdictionary1828.com/Dictionary/execution.   And it carried the same meaning for the lawmakers in the early twentieth century when they codified the materially identical seditious conspiracy prohibition that remains in place today.   *See Execution*, Webster's American Dictionary of the English Language (1913) (execution is "[t]he act of executing; a carrying into effect or to completion; performance; achievement; consummation"), *available at* http://www.webster-dictionary.org/definition/execution.

Further, the term "law" plainly includes the Constitution and amendments to the Constitution, in addition to statutes enacted by Congress.   *See* U.S. Const. art. VI (describing "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof" as "the supreme Law of the Land"); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("[c]ertainly all those who have framed written constitutions contemplate them as formulating the fundamental and paramount law of the nation"); *id.* at 180 ("in declaring what shall be the *supreme*

law of the land, the *constitution* itself is first mentioned") (emphases in original); *Law*, Black's Law Dictionary, *supra* ("[t]he regime that orders human activities and relations through systematic application of the force of politically organized society"); *Federal Law*, *id.* ("[t]he body of law consisting of the U.S. Constitution, federal statutes and regulations, U.S. treaties, and federal common law").

To execute a law, therefore, means to carry out a law or to bring a law into effect.  As such, Congress and the Vice President, serving as President of the Senate, quite literally "execute" the Twelfth Amendment—a "law"—when carrying out that provision's specific directives that the "President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates [of the Electors] and the votes shall then be counted."  Likewise, Congress and the President of the Senate execute (*i.e.*, carry out or bring into effect) the Electoral Count Act of 1887 when they meet in a Joint Session at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors," with the President of the Senate presiding, where Members of Congress may submit written objections and debate may ensue.  3 U.S.C. § 15.  This process, in turn, facilitates the execution of the Twentieth Amendment, which requires the President and Vice President to end their terms "at noon on the 20th day of January . . . of the years in which such terms would have ended," so that the "terms of their successors" can then "begin."  U.S. Const. amend. XX.  The TSI's allegations that the defendants conspired to use force to stop the transfer of presidential power as set out in those provisions therefore properly charges that the defendants conspired to "prevent, hinder, or delay the execution of any law of the United States."  18 U.S.C. § 2384.

Nordean resists that straightforward reading by contending (ECF No. 434 at 21-26) that liability under Section 2384 attaches only to defendants who conspire to use force against the

Executive Branch because the Executive Branch alone is responsible for the "execution of any law of the United States."  18 U.S.C. § 2384.  The statute, however, requires only "forcible resistance of the authority of *the United States* while endeavoring to carry the laws into execution."  *Baldwin*, 120 U.S. at 693 (emphasis added).  It is not limited to forcible resistance to the actions of any particular class or category of government officials.  And in the context of the laws governing the presidential election, a plan to forcibly prevent the certification of the results is a plan to forcibly resist the authority of the United States in executing its laws.

It is of course true that, in many contexts, the "execution" of the laws is the responsibility of the Executive Branch.  Congress cannot, for example, assign to itself any role in prosecuting crimes, collecting taxes, or executing other ordinary statutes regulating the public.  But even if Nordean is correct that Section 2384's reference to the "execution" of the laws should be read to incorporate those separation-of-powers principles, the constitutional and statutory provisions governing the certification of election results are different.  In that special context, the Constitution unambiguously makes the "President of the Senate," the "Senate," and "the House of Representatives" responsible for executing the Twelfth Amendment by opening and counting the electoral votes—and, if no candidate has a majority, by choosing the next President.  U.S. Const. amend. XII.  Consistent with that direction, the Electoral Count Act prescribes further procedures by which the President of the Senate, the Senate, and the House are to carry out—that is, execute—those responsibilities.  3 U.S.C. § 15.

Recognizing that the President of the Senate and the House of Representatives execute the Twelfth Amendment and the Electoral Count Act is entirely consistent with the Constitution's system of separated powers, which allows—indeed, mandates—a "partial intermixture" of legislative, executive, and judicial powers for certain "special purposes" such as impeachment,

ratification of treaties, and administration of the presidential election. *The Federalist No. 66*, at 401 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *see id.* No. 47, at 304-06 (James Madison); *see also Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2046 (2020) (Thomas, J., dissenting). Nordean's contrary view is untenable: He insists that only executive officials can execute the laws, but the Executive Branch obviously could not supplant the House of Representatives in implementing the Twelfth Amendment and the Electoral Count Act. As a result, Nordean's argument reduces to the implausible assertion that the relevant provisions of the Twelfth Amendment and the Electoral Count Act are not "executed" at all.

Nordean's argument thus fails even if one accepts his assumption that Congress intended to limit Section 2384's reference to "execution of the laws" to exercises of what would be regarded as executive power in a separation-of-powers sense. The argument also fails because Nordean provides no basis in the statute's text, structure, or history to support that assumption. And although Congress generally does not execute ordinary statutes, it is perfectly sensible to speak of Congress "executing" laws of other sorts. Indeed, the Constitution explicitly provides Congress the power to "make all Laws which shall be necessary and proper for carrying into *Execution*" the powers vested by the Constitution in "the Government of the United States." U.S. Const. art. I, § 8, cl. 18 (emphasis added). Likewise, the Supreme Court has described the power of "the legislature" to "execute" treaties by enacting legislation to bring their terms into effect. *Medellín v. Texas*, 552 U.S. 491, 514 (2008) (quoting *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829), *overruled on other grounds*, *United States v. Percheman*, 32 U.S. (7 Pet.) 51 (1833)). Similarly, the President's power to execute the laws obviously does not extend to the Constitution's requirements that the Senate and House of Representatives maintain and "from time to time" publish "a Journal of [their] proceedings," U.S. Const. art. I, § 5, cl. 3. So too here. The

constitutional and statutory provisions underpinning the transfer of presidential power involve the "execution" of the law by Congress and the President of the Senate.  U.S. Const. amend. XII.

That conclusion is consistent with Section 2384's broader context.  The statute's other prohibitions—against conspiracies "to overthrow, put down, or to destroy by force the Government of the United States"; "to levy war against them"; "to oppose by force the authority thereof"; or "by force to seize, take, or possess any property of the United States contrary to the authority thereof"—are plainly not restricted to conduct directed against any particular branch of government, and it would be arbitrary and anomalous for Congress to have included among that group a type of conspiracy that could be directed only against the Executive Branch.  Nowhere in the legislative history of Section 2384 or its predecessors did lawmakers suggest that a plot to attack the government violates the seditious conspiracy provision regarding the execution of the laws only where that plot takes aim at Executive Branch officials.  *See supra* at 8-13.  Indeed, when Section 2384 was used to prosecute Puerto Rican nationalists for a shooting that took place at the U.S. Capitol in 1954, *see Lebron*, 222 F.2d at 533-534, Congress responded not by curtailing the statute's reach to emphasize that it covered only plans that targeted the Executive Branch, but instead by *increasing* Section 2384's statutory maximum sentence, *see supra* at 13.  *Lebron*—as well as Congress's subsequent decision to raise the statutory maximum sentence for Section 2384—demonstrates that an attack against Congress is precisely the sort of conduct that Congress sought to target in Section 2384.[7]  That history illustrates that Section 2384 "protects basic societal

---

[7] The Second Circuit's opinion in *Lebron* does not specify which provision or provisions of Section 2384 was used to prosecute the conspirators.  The court's synopsis, however, describes the case as a "[p]rosecution for conspiring to the overthrow government of United States by force and to oppose by force the authority of the United States Government."  *See Lebron*, 222 F.2d at 531. The oppose-the-authority prong is also charged here.

interests" and is properly "read to cover a wide spectrum of activities." *United States v. Rahman*, 854 F. Supp. 254, 259 (S.D.N.Y. 1994).

Furthermore, other provisions of the criminal code demonstrate that when Congress intends a prohibition to apply to particular employees or officers of a specific branch of government, Congress says so clearly. *See, e.g.*, 18 U.S.C. § 207(a)(1) (imposing certain restrictions on, among others, "[a]ny person who is an officer or employee . . . of the executive branch of the United States"); 18 U.S.C. § 227 (prohibition on wrongfully influencing a private entity's employment decision by certain government officials, including members of Congress, congressional employees, and "executive branch employee[s]"); 18 U.S.C. § 351(a) (prohibition on murder of, among others, "Member[s] of Congress," certain "member[s] of the executive branch of the Government," and "Justice[s]" of the Supreme Court); 18 U.S.C. § 1001(a) (prohibition on false statements "within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States"). No such specification is found in Section 2384. *Cf. Russello v. United States,* 464 U.S. 16, 23 (1983) (presumption that Congress "acts intentionally and purposely" where it adopts language in one statute but omits it elsewhere) (internal quotation marks omitted).

Nordean relies principally (ECF No. 434 at 22-23) on *Bowsher v. Synar*, 478 U.S. 714 (1986), but that decision sheds no light on the question in this case. In *Bowsher*, the Supreme Court considered whether Congress's assignment of certain powers to the Comptroller General of the United States and Congress's ability to remove that officer ran afoul of the "doctrine of separation of powers," 478 U.S. at 717, ultimately concluding that the Constitution did not authorize Congress to "reserve for itself the power" to remove an executive officer because to "permit the execution of the laws to be vested in an officer answerable only to Congress would, in

practical terms, reserve in Congress control over the execution of the laws," *id.* at 726.  Similarly, in *Myers v. United States*, 272 U.S. 52 (1926), the Supreme Court addressed whether the separation-of-powers doctrine permitted the President the exclusive power to remove an Executive Branch officer (there, a postmaster), holding that a law that "denied" the President the "unrestricted power of removal" was unconstitutional.  *Id.* at 176.  Those cases stand for the straightforward principle that Congress may not play "a role in the removal of executive officials other than [through] its established powers of impeachment and conviction."  *Morrison v. Olson*, 487 U.S. 654, 686 (1988).  Understood in that context, language from those cases observing that the Constitution's "structure . . . does not permit Congress to execute the laws," *Bowsher*, 478 U.S. at 726, simply makes clear that Congress may not "infringe the constitutional principle of the separation of governmental powers," *Myers*, 272 U.S. at 161, by enacting legislation that affords the Legislative Branch control over power properly vested in the Executive Branch.  But as demonstrated above, the Constitution unambiguously makes the House of Representatives and the President of the Senate—not the Executive Branch—responsible for executing the relevant provisions of the Twelfth Amendment and the Electoral Count Act.  Indeed, defendants do not and could not contend that any of the individuals who execute the laws involved in the transfer of presidential power—including the Vice President (as President of the Senate) and Members of Congress—lack the constitutional or statutory authority to carry out those duties.

c.  Nordean's claim (ECF No. 434 at 26-29) that Count One fails to allege that he conspired to use force is flawed.  An indictment is sufficient under the Constitution and Federal Rule of Criminal Procedure 7 if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished by "echo[ing] the operative statutory text while also

specifying the time and place of the offense," *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018).  "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)).  And an indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (per curiam).

Count One's detailed allegations easily "clear[] th[e] low bar," *see United States v. Sargent*, No. 21-cr-258, 2022 WL 1124817, at *1 (D.D.C. Apr. 14, 2022) (Hogan, J.), to sufficiently plead a violation of Section 2384.  Specifically, Count One describes various ways—the manner and means—in which the defendants planned to use force to carry out their conspiratorial objective: equipping themselves with paramilitary gear, leading member of the crowd onto Capitol grounds, "[d]ismantling" some metal barricades while "[s]torming past" others, "[d]estroying property, including a metal fence and a window," and "[a]ssaulting law enforcement officers."[8]  ECF No. 380 at ¶ 28.  Count One's factual recitations further describe ways in which the defendants in fact *used* force, including Nordean, Biggs, and Rehl leading a group that vastly outnumbered police to a pedestrian entrance to Capitol grounds, *see id.* at ¶ 80,  Biggs leading others in charging past barricades, *id.* at ¶¶ 76-80, Nordean, Biggs, Rehl, and Pezzola pushing past trampled police barricades, *id.* at ¶ 82, Nordean and Biggs tearing down a metal fence, *id.* at ¶ 81, Pezzola "ripp[ing] away a Capitol Police officer's riot shield," *id.* at 86, Donohoe throwing water bottles

---

[8] Nordean's claim (ECF No. 434 at 26) that "by force" in Section 2384 is limited to force "against persons, not merely property" is mistaken for the reasons given above, *see supra* 17, but even if Section 2384 were so limited, the indictment includes allegations that the defendants used force against law enforcement officers.

at police officers, *id.* at ¶ at 87, Pezzola using the stolen riot shield to smash a window in the Capitol, *id.* at ¶ 93, and Biggs pushing past law enforcement, *id.* at ¶ 101.

### 3. Count One is not unconstitutionally vague.

Rehl's constitutional vagueness challenge (ECF No. 443) to Count One lacks merit. The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). A provision is impermissibly vague

only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

Rehl has not overcome the "strong presumpti[on]" that Section 2384 is constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). He principally contends (ECF No. 443 at 4) that the term "force" is vague because it has been interpreted differently or (*id.* at 3) "has been defined as involving the use of weapons of mass destruction and firearms." But force is readily susceptible to definition, including by reference to dictionaries in use at the time that Congress enacted the original seditious conspiracy provision. *See* 1828 Webster's (force defined as "any unlawful violence to person or property"), *available at* https://webstersdictionary1828.com/Dictionary/force. And courts have regularly defined the term as used in different statutes, *see, e.g.*, *Johnson v. United States*, 559 U.S. 133, 139-140 (2010) (defining force for purposes of the Armed Career Criminal Act, 18 U.S.C. § 924(e)), noting, for example, the linkage between force and violence, *see Stokeling v. United States*, 139 S. Ct. 544, 550 (2019) ("common-law authorities frequently used the terms 'violence' and 'force' interchangeably"). Nor is the term "force" limited in the way that Rehl suggests; it connotes an act that "threatens or results in violence or . . . threatens or results in harming or destroying property or harming or killing people." *United States v. Abdel Rahman*, 93-cr-181, Jury Instructions, at 15 (S.D.N.Y. Mar. 17, 1993) (defining force for purposes of Section 2384) (attached as Exhibit A). That "conventional" definition gives rise to no vagueness concerns.

### C. Counts Two and Three validly charge conspiracy and substantive violations of obstructing a congressional proceeding.

Counts Two and Three of the TSI charge the defendants with conspiring to corruptly obstruct, influence, and impede, and with corruptly obstructing, influencing, or impeding, an "official proceeding"—*i.e.*, Congress's certification of the Electoral College vote on January 6, 2021—in violation of 18 U.S.C. § 1512(k) (Count Two) and § 1512(c)(2) (Count Three).  Rehl argues (ECF No. 442) that a conspiracy or substantive violation of Section 1512(c)(2) requires the government to allege and prove that the defendants' actions were targeted at a record, document, or other object.  Because this Court has already considered and rejected that argument in this case, it is not properly raised again here.  The argument also fails on the merits.

### 1.  Background

In 2002, Congress enacted Section 1512(c)'s prohibition on "Tampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807.  Section 1512(c)'s prohibition applies to

> [w]hoever corruptly--
>
> > (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
> >
> > (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.*

18 U.S.C. § 1512(c) (emphasis added).  Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress."  18 U.S.C. § 1515(a)(1)(B).  And Section 1512(k) makes it a crime to conspire to violate any offense in Section 1512, including Section 1512(c)(2).

As this Court has concluded, a person violates Section 1512(c)(2) when, acting with the requisite *mens rea*, he conspires to engage, or does engage, in any conduct that obstructs a specific congressional proceeding—including, as here, Congress's certification of the Electoral College vote.  ECF No. 263 at 13-18.  Rehl urges reconsideration based on Judge Nichols's contrary decision in *United States v. Miller*, No. 21-cr-119, 2022 WL 823070 (D.D.C. Mar. 7, 2022).  This Court has already disagreed with *Miller*'s reasoning.  *See United States v. Hughes*, No. 21-cr-106, Minute Order denying motion to dismiss count charging Section 1512 (D.D.C. May 9, 2022) (rejecting the "narrow reading" of Section 1512(c)(2) and agreeing with an opinion that "directly responded to and rejected the logic employed in *Miller*").  So has every other judge of this Court to have considered the issue.  *See, e.g.*, *United States v. McCaughey et al.*, No. 21-cr-40, ECF No. 388 at 2 (D.D.C. July 20, 2022) (McFadden, J.) (rejecting defendants' argument premised on *Miller* and observing that "*Miller* has also persuaded no other judge on this question"); *United States v. Robertson*, No. 21-cr-34, 2022 WL 2438546, at *3-*5 (D.D.C. July 5, 2022) (Cooper, J.); *United States v. Williams*, No. 21-cr-618, 2022 WL 2237301, at *17 n.13 (D.D.C. June 22, 2022) (Berman Jackson, J.); *United States v. Fitzsimons*, No. 21-cr-158, 2022 WL 1698063, at *6-*12 (D.D.C. May 26, 2022) (Contreras, J.); *United States v. Bingert*, No. 21-cr-91, 2022 WL 1659163, at *7-*11 (D.D.C. May 25, 2022) (Lamberth, J.); *United States v. McHugh*, No. 21-cr-453, 2022 WL 1302880, at *2-*13 (D.D.C. May 2, 2022) (Bates, J.); *United States v. Puma*, No. 21-cr-454, 2022 WL 823079, at *12 n.4 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. Grider*, No. 21-cr-22, 2022 WL 392307, at *5-*6 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); *United States v. Montgomery*, No. 21-cr-46, 2021 WL 6134591, at *10-*18 (D.D.C. Dec. 28, 2021) (Moss, J.); *United States v. Mostofsky*, No. 21-cr-138, 2021 WL 6049891, at *11 (D.D.C. Dec. 21, 2021) (Boasberg, J.); *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718, at *11-*21 (D.D.C.

Dec. 20, 2021) (Mehta, J.); *United States v. Sandlin*, No. 21-cr-88, 2021 WL 5865006, at *5-*9 (D.D.C. Dec. 10, 2021) (Friedrich, J.).

### 2. The defendants' challenge to Section 1512 is foreclosed by this Court's prior decision in this case.

This Court should not reach the merits of the defendants' challenge to Counts Two and Three.  As noted above, this Court concluded that the defendants' view that Section 1512(c)(2) requires proof that the defendants targeted tangible evidence "cannot be squared with Section 1512's statutory text or structure."  ECF No. 263 at 13. The law-of-the-case doctrine forecloses Rehl's materially identical argument here.  That doctrine provides that "a court involved in later phases of a lawsuit should not re-open questions decided (i.e., established as the law of the case) by that court or a higher one in earlier phases."  *Beach TV Properties, Inc. v. Solomon*, 324 F. Supp. 3d 115, 123 (D.D.C. 2018) (internal quotation marks omitted).  The Court's earlier disposition of Section 1512(c)(2)'s scope—from which the defendants did not file reconsideration motions—should provide the law of the case here.  *See Rhodes*, 2022 WL 2315554, at *13 (applying law-of-the-case doctrine to deny challenge to Section 1512(c)(2)'s scope based on prior ruling).

### 3. The defendants' challenge to Section 1512 lacks merit.

The defendants' challenge to Section 1512(c)(2) also fails on the merits.  Section 1512(c)(2)'s verbs plainly cover conduct that blocks or interferes with an official proceeding, and the contrasting language in Section 1512(c)'s subsections clarifies that while Section 1512(c)(1) covers destruction of documents, records, and other objects used in a proceeding, Section 1512(c)(2) covers other obstructive behavior that targets the proceeding directly.  That straightforward construction of Section 1512(c)(2) aligns with the interpretation of similar verbs

in other obstruction provisions, *see* 18 U.S.C. §§ 1503, 1505, and the interpretation of every court of appeals to have considered Section 1512(c)(2).

The term "otherwise" in Section 1512(c)(2) further illustrates that it applies to "other," non-document-related obstruction, and, as such, ensures coverage of additional types of corrupt conduct that impedes an official proceeding.  The *Miller* court's contrary conclusion disregards that straightforward construction and instead places undue emphasis on the Supreme Court's decision in *Begay v. United States*, 553 U.S. 137 (2008), where the Court adopted a less common and context-dependent interpretation of "otherwise" in a statute structurally and grammatically unlike Section 1512(c).  Nor do statutory canons or Section 1512(c)(2)'s legislative history support the *Miller* court's unintuitive interpretation.[9]

> ### D.   Count Four validly charges a conspiracy to prevent Members of Congress and law enforcement officers from discharging their duties or to induce them to leave the place where those duties were to be performed.

Nordean's next challenge (ECF No. 434 at 29-36) is to Count Four, which charges the defendants with conspiracy to prevent Members of Congress and law enforcement officers by force, intimidation, or threat from discharging the duties of an office, trust, or place of confidence under the United States, and with conspiracy to induce Members of Congress and law enforcement officers by force, intimidation, and threat to leave the place where their duties as officers were required to be performed, in violation of 18 U.S.C. § 372.  Nordean argues that neither Members

---

[9] An interlocutory appeal of *Miller* and two other cases in which Judge Nichols dismissed counts charging violations of Section 1512(c)(2) is currently pending before the court of appeals.  The government's opening brief explains in detail why the reasoning in *Miller* is flawed.  *See* Brief for Appellant, *United States v. Fischer et al.*, Nos. 22-3038, 22-3039, & 22-3041 (D.C. Cir.), at 16-59 (filed Aug. 8, 2022).

of Congress (ECF No. 434 at 30-35) nor law enforcement officers (*id.* at 35-36) are "officer[s] of the United States" for purposes of Section 372. He is incorrect on both scores.

### 1. Background

Section 372 makes it a crime, punishable by up to six years in prison, for two or more persons to

> conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, or to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties . . .

18 U.S.C. § 372.  As relevant here, to prove a violation of Section 372, the government must prove (1) a conspiracy, (2) that the defendants voluntarily joined the conspiracy, and (3) that conspirators agreed to prevent an officer of the United States from discharging his or her duties "by force, intimidation or threat."  *United States v. Beale*, 620 F.3d 856, 864 (8th Cir. 2010).

Congress first enacted an abbreviated form of the conspiracy provision that became Section 372 in the same legislation in which it adopted the seditious conspiracy provision discussed above. *See* Act of July 31, 1861, ch. 33, 12 Stat. 284 (making unlawful a conspiracy "by force, or intimidation, or threat to prevent any person from accepting or holding any office, or trust, or place of confidence, under the United States").  Section 372's current language first appeared in full ten years later in the Enforcement Act of 1871.  *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13 (codified at Rev. Stat. title 70, ch. 2, § 5336 (1878)).  That broader language sought "to protect Federal officers by providing for Federal prosecution whenever they were injured because of or in the course of their duties."  1 Op. O.L.C. 274, 276, 1977 WL 18071, at *2 (1977).  Like its

counterpart in civil law, 42 U.S.C. § 1985(1), Section 372 "safeguards federal officials and employees against conspiratorial acts directed at preventing them from performing their duties." *Thompson v. Trump*, No. 21-cv-400, 2022 WL 503384, at *2 (D.D.C. Feb. 18, 2022).

Most reported prosecutions under Section 372 involve threats made to federal officials. *See, e.g., Beale*, 620 F.3d at 864-865 (multiple threatening emails and calls to federal district court judge); *United States v. Rakes*, 510 F.3d 1280, 1285 (10th Cir. 2007) (threatening letter to federal prosecutor); *United States v. Fulbright*, 105 F.3d 443, 446 (9th Cir. 1997) (threatening notices seeking to arrest federal bankruptcy judge), *overruled on other grounds by United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc); *United States v. Bridges*, 551 F.2d 651, 653 (5th Cir. 1977) (per curiam) ("threats and physical and verbal abuse" directed at agents from U.S. Department of the Interior in connection with dispute about hunting season); *United States v. Barber*, 442 F.2d 517, 521 (3d Cir. 1971) (threats and violence toward FBI agents arresting an deserter from the Army).  At least one prosecution involved an armed confrontation between defendants and federal authorities; the defendants had refused to return to the courthouse where they had been on trial for tax-related charges.  *See United States v. Gerhard*, 615 F.3d 7, 13 (1st Cir. 2010).  Section 372 was also successfully prosecuted in a case involving an effort by defendants to conduct a warrantless arrest of a United States Attorney, who submitted to the arrest without resisting.  *See Finn v. United States*, 219 F.2d 894, 897 (9th Cir. 1955) (per curiam).

### 2. Members of Congress and law enforcement officers discharge duties under an "office, trust, or place of confidence" and are "officers of the United States" for purposes of Section 372.

The defendants are alleged to have violated Section 372 in two alternative respects, each involving a conspiracy by "force, intimidation, and threat."  ECF No. 380 at ¶ 114.  First, the TSI alleges that they conspired to prevent "any person, that is, Members of the United States Congress and law enforcement officers, from discharging any duties of any office, trust, and place of

confidence under the United States." *Id.* Second, the Indictment alleges that the defendants conspired to induce "any officer of the United States, that is, Members of the United States Congress and law enforcement officers, to leave the place where their duties as officers were required to be performed." *Id.* Each of those independent bases for conviction is sound.

a. Members of Congress discharge duties under an "office, trust, or place of confidence under the United States." 18 U.S.C. § 372. Given that Congress enacted these "decidedly expansive" words in the Enforcement Act of 1871, it would "strain[] credulity to think that Reconstruction-Era members of Congress meant to protect low-level Executive Branch employees but not themselves." *Thompson*, 2022 WL 503384, at *25. As Judge Mehta concluded, Reconstruction-Era dictionaries defined the terms "office" and "trust" in a manner that readily encompasses Members of Congress. *Id.* at *25-*27. For example, a leading mid-nineteenth century dictionary defined "office" to include "'members of the legislature.'" *Id.* at *26 (emphasis omitted) (quoting John Bouvier, Law Dictionary, Adapted to the Constitution and Laws of the United States, and of the Several States of the Union 259 (5th ed. 1855)). And the broader terms "trust" and "place of confidence" would also have included federal legislators. *Id.* at *27. In short, "[t]here can be little doubt" that Section 372's plain text "reaches members of Congress." *Id.*; *accord Rhodes*, 2022 WL 2315554, at *15.

While the Enforcement Act's plain terms are decisive, its legislative history further confirms that Members of Congress fall within Section 372's ambit. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1750 (2020) (noting that although "the law's ordinary meaning at the time of enactment usually governs," courts may also consult the legislative history at the time of a statute's enactment to determine "the understandings of the law's drafters as . . . evidence" of how terms in the statute were "ordinarily understood"). While the Senate was debating the statute that ultimately

became Section 372 and its civil analogue, Senator Trumbull suggested that the statute would reach, for example, "the *Senator who sits before me* [Mr. Hamilton of Maryland] . . . while he is *here in the discharge of the duties of his office*."  Cong. Globe, 42d Cong., 1st Sess. 580 (Apr. 11, 1871) (emphasis added; brackets in original); *see also* Cong. Globe, 42d Cong., 1st Sess. 486 (Apr. 5, 1871) (Rep. Cook: "A citizen of the United States, in any State of the Union, has a right to *vote for any officer of the United States Government*.") (emphasis added); Cong. Globe, 42d Cong., 1st Sess. 492 (Apr. 5, 1871) (Rep. Butler: "I never held any *office of profit or salary* until I held the office of brigadier general. . . . I never held any other except that of *Representative* of the people.") (emphasis added).  Additionally, one member of the House noted that "*officers are elected by the people*."  Cong. Globe, 42d Cong., 1st Sess. 484 (Apr. 5, 1871) (Rep. Leach) (emphasis added) (discussing "States with republican forms of government").

b.  For many of the reasons that Members of Congress discharge duties under an "office, trust, or place of confidence under the United States," Members of Congress are also "officer[s] of the United States" for purposes of Section 372.  *See Thompson*, 2022 WL 503384, at *25-*26 (internal quotation marks omitted); *Rhodes*, 2022 WL 2315554, at *15-*17.  Nordean argues otherwise by relying principally on a series of cases involving low-level Executive Branch officials where Section 372 was not at issue.  *See* ECF No. 434 at 33-34 (citing *United States v. Hartwell*, 73 U.S. 385 (1867) (clerk in the office of the assistant treasurer of the United States); *United States v. Germaine*, 99 U.S. 508 (1878) (surgeon appointed by the Commissioner of Pensions); *United States v. Smith*, 124 U.S. 525 (1888) (clerk in the office of the collector of customs); *United States v. Mouat*, 124 U.S. 303 (1888) (pay-master's clerk)).  Nordean draws from those decisions the principle that the term "officer" as used in Section 372 must correspond to the term as used in the

Constitution's Appointments Clause, U.S. Const. art. II, § 2, cl. 2, or in the Fourteenth Amendment, U.S. Const. amend. XIV, § 3.[10]

But courts have "not reflexively imported constitutional meanings into federal statutes." *Thompson*, 2022 WL 503384, at *26; *Rhodes*, 2022 WL 2315554, at *8 & *14-*15. In *Lamar v. United States*, 240 U.S. 60 (1916), for example, a defendant prosecuted for impersonating a Member of Congress made an argument similar to Nordean's, and the Supreme Court concluded that the relevant consideration was "obviously . . . not" the Constitution's definition of the term "officer," but instead how the term is used in the "Criminal Code." *Id.* at 65. And in *Steele v. United States*, 267 U.S. 505 (1925), the Supreme Court declined to interpret the term "civil officer of the United States" to "mean an officer in the constitutional sense" but instead found that "in consideration of context," the term is "sometimes given . . . an enlarged meaning." *Id.* at 507; *see Buckley v. Valeo*, 424 U.S. 1, 269 (1976) (White, J., concurring) ("The Appointments Clause applies only to officers of the United States whose appointment is not 'otherwise provided for' in the Constitution. Senators and Congressmen are officers of the United States, but the Constitution expressly provides the mode of their selection."); *cf. Williams v. Brooks*, 945 F.2d 1322, 1324 n.2 (5th Cir. 1991) ("removal is proper under section 1442(a)(1), however, as a congressman is an 'officer of the United States' within the meaning of that subsection"); *Hill Parents Ass'n v. Giaimo*, 287 F. Supp. 98, 99-100 (D. Conn. 1968) ("A member of Congress is unquestionably an officer

--------

[10] Nordean's argument overlooks the Constitution's reference to Members of Congress as "Officers" in other provisions. *See, e.g.*, U.S. Const. art. I, § 2, cl. 5 ("The House of Representatives shall chuse their Speaker and other Officers."); U.S. Const. art. I, § 3, cl. 5 ("The Senate shall chuse their other Officers, and also a President pro tempore, in the Absence of the Vice President.")

of the United States as this term is commonly used and must be considered as such pursuant to Section 1442(a)(1).").

A definition of "officer of the United States" for purposes of Section 372 that omits a Member of Congress would "leave an omission so wide and important" in Section 372 that Congress "ought not to be presumed to have intended" such an interpretation. *Hartwell*, 73 U.S. at 395-396. That is particularly the case where the Enforcement Act's legislative history suggests that Members of Congress were personally affected by the violence that prompted them to draft the Enforcement Act. For instance, a House member testified, "I am reliably informed that not three days ago a member of this House was urged by an official, who is charged with the important duties in connection with the enforcement of the criminal law, not to vote for this bill, for the reason that he could not safely return to his home if he did." Cong. Globe, 42d Cong., 1st Sess. 484 (Apr. 5, 1871) (Rep. Wilson).

c. Equally meritless is Nordean's claim (ECF No. 434 at 35-36) that Capitol Police officers are not "officers of the United States" for purposes of Section 372. For one, that claim is entirely derivative on his argument that Members of Congress do not qualify as officers as used in Section 372, and that argument fails for the reasons given above. Moreover, the Capitol Police, like Members of Congress, are the type of federal officers that Section 372 was enacted to protect. Under 2 U.S.C. § 1961, the Capitol Police "shall police the United States Capitol Buildings and Grounds," and shall do so "under the direction of the Capitol Police Board." The "purpose" of the Capitol Police Board, in turn, is "to oversee and support the Capitol Police in its mission." Pub. L. No. 108-7, div. H, § 1014(a)(1), 117 Stat. 11, 361 (2003). Section 372 encompasses conduct, such

as that alleged here, that involves planning to use force to target federal officials, including federal protective officers.  *See Gerhard*, 615 F.3d at 13.[11]

### E.  Count Seven, Eight, and Nine are sufficiently pleaded.

Nordean asserts (ECF No. 434 at 37) that Count Seven (destruction of government property, in violation of 18 U.S.C. § 1361) and Counts Eight and Nine (forcibly assaulting, resisting, or impeding a federal officer, in violation of 18 U.S.C. § 111(a)) lack probable cause and represent an "abuse of process."  In fact, those counts reflect familiar vicarious liability principles that a defendant both may be liable for those acts he aids and abets and bear criminal responsibility for the reasonably foreseeable acts committed by a coconspirator with the scope of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 647-648 (1946).  Even though a theory of liability "need not be pleaded in the indictment," *United States v. Washington*, 106 F.3d 983, 1011 (D.C. Cir. 1997) (per curiam), the indictment both specifically charges Nordean under an aiding-and-abetting theory and describes both the property destruction and the assaultive conduct.  Nothing more is required.  *See* ECF No. 263 at 41-43 (rejecting similar argument for Section 231(a)(3) and Section 1361 in an earlier indictment).

### F.  A bill of particulars is not required.

As an alternative to dismissal, Nordean requests (ECF No. 434 at 37-39) a bill of particulars.   A bill of particulars "is not a discovery tool or a devise for allowing the defense to preview the government's theories or evidence."  *United States v. Ramirez*, 54 F. Supp. 2d 25, 29

---

[11] Nordean briefly contends (ECF No. 434 at 36) that Count Four insufficiently alleges facts that support a Section 372 violation.  But the extensive factual recitation in Count One, *see* ECF No. 380 at ¶¶ 29-108, which Count Four incorporates, *id.* at ¶ 113, adequately alleges a conspiracy to use force, intimidation, or threat to prevent officers from discharging their duties or to induce them to leave from their posts.

(D.D.C. 1999); *accord United States v. Brodie*, 326 F. Supp. 2d 83, 91 (D.D.C. 2004).  Rather, a bill of particulars "is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his *own* investigation and not to provide the defendant with the fruit of the government's investigation."  *United States v. Sanford Ltd.*, 841 F. Supp. 2d 309, 316 (D.D.C. 2012) (internal quotation marks omitted).  Therefore, a bill of particulars "properly includes clarification of the indictment, not the government's proof of its case." *United States v. Martinez*, 764 F. Supp. 2d 166, 173 (D.D.C. 2011) (internal quotation marks omitted); *United States v. Savoy*, 889 F. Supp. 2d 78, 115 (D.D.C. 2012) (same); *see also United States v. Taylor*, 17 F. Supp. 3d 162, 178 (E.D.N.Y. 2014) (bill of particulars "may not be used by the defense as a fishing expedition or to force the government to reveal all its evidence before trial").

This Court denied Nordean's earlier request for bill of particulars (ECF No. 138), and the same disposition is appropriate here for the same reasons.  Just as the First Superseding Indictment "specifie[d] in great detail how Nordean and his co-defendants" were alleged to have committed the charged offenses, *id.* at 4, the TSI provides even further detail, including by describing the alleged actions taken by additional co-defendants.  Although Nordean's bill-of-particulars request purports to seek (ECF No. 434 at 39) "facts" such as how he agreed to use force to prevent the execution of law or how he aided or abetted certain actions allegedly taken by others, his request impermissibly targets the government's "evidence or theories" as opposed to the "core acts underlying the charged offenses."  ECF No. 138 at 7.  Finally, just as Nordean's earlier request failed to explain why the detailed allegations in the First Superseding Indictment did not "provide him with enough information to understand the conspiracy charge against him and prepare his defense," *id.* at 8, so too here is his request bereft of any such explanation.

### G. Rehl's other challenges lack merit.

In addition to the defendants' attacks on specific counts in the TSI, Rehl moves to dismiss the entire TSI on three separate grounds: (1) the conspiracies alleged in Counts One (Section 2384), Two (Section 1512(k)), and Four (Section 372) are duplicitous (ECF No. 437); (2) the TSI violates the First Amendment (ECF No. 439); and (3) the government improperly instructed the grand jury and provided inaccurate evidence (ECF No. 440).  Those attacks fail.

### 1.  The conspiracy counts are not duplicitous.

Rehl's contention (ECF No. 437) that the conspiracy charges impermissibly allege multiple conspiracies in a single count lacks merit.  For one, it fails for two threshold reasons.  First, Rehl suggests that he is improperly charged with "a single conspiracy count which, in fact, encompasses multiple conspiracies." *Id.* at 8.  But the Third Superseding Indictment belies that description, as he is charged in three different conspiracies.  To be sure, however, the relevant facts underlying those conspiracies are the same.  Second, even assuming Rehl's premise that he is a charged with single conspiracy only, his claim is premature.  Where an indictment "sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury." *United States v. Rajaratnam*, 736 F. Supp. 2d 683, 688 (S.D.N.Y. 2010) (internal quotation marks omitted).

Rehl's claim also misunderstands conspiracy law and the Third Superseding Indictment. "Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975); *see United States v. Jimenez Recio,* 537 U.S. 270, 274 (2003).  A conspiracy statute therefore "punishes" the agreement, "[w]hether the object of a single agreement is to commit one or many crimes." *Braverman v. United States*, 317 U.S. 49, 53 (1942); *accord United States v. Broce*, 488 U.S. 563, 570-571 (1989) ("A single

agreement to commit several crimes constitutes one conspiracy.").  Here, Count One charges the defendants with a single overarching conspiracy to use force to prevent, hinder, or delay the execution of federal laws that facilitate the transfer of presidential power.  Count Two charges a single conspiracy to obstruct the certification of the Electoral College vote.  Count Four charges a conspiracy to prevent Members of Congress and law enforcement officers from discharging their duties.  Even treating these distinctly charged conspiracies as a single conspiracy, the "single" conspiracy charged in Counts One, Two, and Four would nonetheless allege a single agreement—a plan to use force to prevent the certification proceeding and thereby stop the transfer of presidential power—that the defendants sought to accomplish through different means, such as by breaching the Capitol Grounds and building, interfering with federal officers, and aiming to stop the constitutionally and statutorily required certification proceeding.  Rehl does not cite any case or other legal authority that supports his claim that such an allegation embodies multiple conspiracies.

Rehl also worries (ECF No. 437 at 9-10) that he will be affected by spillover prejudice from evidence that does not pertain to him.  That concern is also premature as even if statements or other evidence is not admissible under the coconspirator hearsay exception, *see* Fed. R. Evid. 801(d)(2)(e) or another Rule of Evidence, the Court can use a limiting to instruction to ensure that the jury does not improperly consider any evidence as to Rehl that should apply only as to other defendants.  That that concern is unlikely to arise, however, is evident from Rehl's failure to identify any specific evidence that he anticipates will not be admissible as to him.  Moreover, his assertion (ECF No. 437 at 10) that he did not personally engage in property destruction or assaultive behavior—which, if true, could prejudice not him but those other codefendants who did

engage in such conduct—does not mean that he does not bear criminal responsibility for that conduct under vicarious liability principles.  *See supra* 38.

### 2.   The TSI does not violate the First Amendment.

Rehl argues (ECF No. 439) that his prosecution violates the First Amendment because it "rests solely" on his "political views and First-Amendment protected statements."  *Id.* at 1.  But as this Court has already observed, "[n]o matter [the rioters'] political motivations or any political message they wished to express, this alleged conduct is simply not protected by the First Amendment."  ECF No. 263 at 29.  Even if Rehl's charged conduct involved some expressive aspect, it lost whatever First Amendment protection it may have had. *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment.")); *see also Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (government may punish physical obstruction); *Cox v. Louisiana*, 379 U.S. 536, 555 (1965) (The First Amendment does not allow a "group of demonstrators" to "insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."); *United States v. Gregg*, 226 F.3d 253, 267-268 (3d Cir. 2000) ("Activities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message.").

And even assuming some aspect of Rehl's charged conduct warranted First Amendment protection, applying the charged statutes to him still passes muster. "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Under *O'Brien*, a statute is constitutional if (1) "it is within the constitutional power of the Government"; (2) "it

furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377. As this Court has recognized, the government has a "weighty interest in protecting Congress's ability to function without 'corrupt' interference, and that interest is unrelated to the suppression of free expression." ECF No. 263 at 30.  Moreover, applying the statute to the defendant "imposes no more than an incidental limitation on First Amendment freedoms, if even that." *Id.*  Indeed, "by focusing on 'corrupt' actions, the statute does not even reach free speech," and goes no further than what is essential to prevent the obstruction of official proceedings of Congress. *Id.* (citing *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996) ("By targeting only such persuasion as is corrupt, § 1512(b) does not proscribe lawful or constitutionally protected speech[.]" (cleaned up))); *see also Caldwell*, 2021 WL 6062718, at *22 ("Section 1512(c)(2) targets only 'corrupt' acts of obstructing, influencing, or impeding an official proceeding. Therefore, it does not 'proscribe lawful or constitutionally protected speech.'" (quoting *Thompson*, 76 F.3d at 452)). Finally, the charged statutes "'leave[] open ample alternative channels for communication of the information.'"   ECF No. 263 at 30 (quoting *Am. Libr. Ass'n v. Reno*, 33 F.3d 78, 88 (D.C. Cir. 1994)).

Rehl is also mistaken when he claims (ECF No. 439 at 2-3; ECF No. 440 at 6-8) that he is being impermissibly prosecuted for advocating force, which is inconsistent with *Brandenburg v. Ohio*, 395 U.S. 444 (1969).  To the extent Rehl's quibble is with the seditious conspiracy statute itself, his "generalized First Amendment challenge" falls short because Section 2384 "proscribes 'speech' only when it constitutes an agreement to use force against the United States."  *Rahman*, 189 F.3d at 114; *see also id.* at 115 ("To be convicted under Section 2384, one must conspire

to *use* force, not just to *advocate* the use of force.  We have no doubt that this passes the test of constitutionality.").  If Rehl's claim instead presses the broader position that the First Amendment prevents any evidence of his words or beliefs, that position is foreclosed by *Wisconsin v. Mitchell*, 508 U.S. 476 (1993), where the Supreme Court observed that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Id.* at 489.  Indeed, "[e]vidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.*

Rehl also asks the Court (ECF No. 440 at 5-6) to apply the *strictissimi juris* doctrine, which derives from prosecutions in 1960s for individuals who were prosecuted for membership in the Communist party, *see Scales v. United States*, 367 U.S. 203, 229 (1961); *Noto v. United States*, 367 U.S. 290, 299 (1961), and which requires that for a "membership crime," there must exist "clear proof that a defendant specifically intends to accomplish the aims of the organization by resort to violence." *Scales*, 367 U.S. at 229 (cleaned up).  The doctrine is only applied in "extraordinary circumstances." *United States v. Stone*, 848 F. Supp. 2d 719, 722 (E.D. Mich. 2012).  It does not apply here because Rehl is not charged with a "membership crime" and is not being prosecuted for publicly advocating the use of force. *See id.* at 722-25 (not applying *strictissimi juris* in prosecution under Section 2384); *United States v. Rodriguez*, 803 F.2d 318, 322 (7th Cir. 1986) (same).

### 3.   No grand-jury error warrants dismissal.

Rehl contends (ECF No. 440 at 9-18) that two errors before the grand jury require dismissal.  That contention fails because no such errors occurred.  But even if they did, Rehl fails to satisfy the demanding standard for dismissal of an indictment based on grand-jury errors.

Rehl's argument fails at the outset because the two "instructional errors" (ECF No. 440 at 9) he claims were not erroneous.  First, he faults the government for failing to alert the grand jury that "only speech that poses an imminent danger can be punished" under *Brandenburg*, *supra*.  But that is not the correct standard.  As noted above, evidence including a defendant's words is regularly admitted in a criminal trial "to establish the elements of a crime or to prove motive or intent." *Wisconsin*, 508 U.S. at 489.  That principle is well established even in the relatively sparse seditious conspiracy case law.  As early as 1937, a court recognized that a defendant's "speeches made at various places" supplied relevant evidence to show that that leader intended to "incite his followers and members . . . to oppose the authority of the United States with force." *Albizu v. United States*, 88 F.2d 138, 142 (1st Cir. 1937).  More recent courts have reached the same conclusion. *See Rahman*, 189 F.3d at 118 (the First Amendment does not prevent the government from using a defendant's speeches or words to "prove a pertinent fact in a criminal prosecution," such as motive); *accord United States v. Stone*, No. 10-cr-20123, 2012 WL 1034937, at *8 (E.D. Mich. Mar. 27, 2012) ("protected speech and mere words can be sufficient to show a conspiracy").

The second purported "error" that Rehl identifies fares no better.  In his view, "where speech falls within the shadow of the First Amendment, the alleged criminal intent must be judged *strictissimi juris*." ECF No. 440 at 9.  But as noted above, the *strictissimi juris* doctrine is rarely applied and has never been applied in a seditious conspiracy prosecution. *See Stone*, 848 F. Supp. 2d at 722-25.  Moreover, no court has ever applied the *strictissimi juris* to a jury, let alone a grand jury; instead, *strictissimi juris* "imposes a duty on the Court, in the case of defendants accused of membership in an organization with both lawful and unlawful aims, to consider evidence against each defendant 'according to the strictest law' so as to avoid conviction of members who used the organization for legitimate purposes." *Id.* at 724 (citing *N.A.A.C.P. v. Clairborne Hardware*, 458

U.S. 886, 920 (1982)).  Thus, if the doctrine applies at all—and it does not—it is applied by courts, not the grand jury.

Even if Rehl had correctly identified instructional error before the grand jury, he still fails to establish that dismissal is the proper remedy.  A district court may not dismiss an indictment based on errors in grand-jury proceedings absent a showing of prejudice.  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).  Specifically, "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."  *Id.* at 256 (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring in the judgment)).  Rehl does not claim that the grand jury received doctored statements that did not reflect his actual words or was based on inaccurate witness testimony, but instead suggests that reading certain communications in a different context would not tend to support a finding of probable cause that he had violated the charged offenses. That is a far cry from showing that the grand jury was "substantially influenced" by erroneously supplied evidence.

## CONCLUSION

For the foregoing reasons, this Court should deny the defendants' motions to dismiss.


Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:       */s/ Erik M. Kenerson*
ERIK M. KENERSON // Ohio Bar No. 82960
JASON B.A. MCCULLOUGH
  D.C. Bar No. 998006
NADIA E. MOORE // N.Y. Bar No. 4826566
  On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530
(202) 252-7201
Erik.Kenerson@usdoj.gov


 */s/ Conor Mulroe*
Conor Mulroe // N.Y. Bar No. 5289640
Trial Attorney // U.S. Department of Justice,
  Criminal Division
1301 New York Avenue, Suite 700
(202) 330-1788
conor.mulroe@usdoj.gov


*/s/ James I. Pearce*
James I. Pearce
Appellate Counsel, Capitol Siege Section
United States Attorney's Office
NC Bar No. 44691
601 D Street NW
Washington, DC 20530
James.Pearce@usdoj.gov