UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-CR-175 (TJK) |
| | : | |
| ETHAN NORDEAN, et al., | : | |
| | : | |
| Defendants. | : | |

## GOVERNMENT'S MOTION TO ADMIT TELEGRAM CHATS

The United States respectfully submits this filing to establish the admissibility of exhibits that will be offered during the testimony of FBI Special Agent Peter Dubrowski. Accompanying this filing, the government will submit to chambers a PDF file containing the proposed exhibits. To promote judicial efficiency, and consistent with the Court's Trial Procedures Order (ECF 595 at 3), the government requests that the Court hear and resolve any objections to these exhibits in advance of Agent Dubrowski's testimony.

## BACKGROUND PRINCIPLES

### A. Declarant's State of Mind

As the Court explained in its oral ruling on the government's original Statements Motion, statements that circumstantially show a declarant's state of mind are admissible against all defendants insofar as that state of mind is relevant to the conspiracy:

> If the jury credits the declarant's state of mind suggested by the evidence, there's no reason the jury can't use that more broadly as evidence of the existence of the conspiracy just as, for example, acts of one alleged co-conspirator can be admitted into evidence against the other co-conspirators, if relevant to prove the existence of the conspiracy.

12/14/22 Tr. at 14-15 (citing *Anderson v. United States*, 417 U.S. 211 at 219 (1974)). As the Court went on to discuss the various types of "state of mind" evidence, it explained that the declarants

whose states of mind were relevant included the defendants and "admitted co-conspirator[s]." *Id.* at 17; *see also id.* at 20 ("[T]o the extent we're talking about defendants or those who have pled guilty to one of the charged conspiracies, the relevance of the declarant's statement is self-evident.").

At trial, the Court rightly found that the state of mind of the conspiracy's "tools" is also relevant. This issue arose during the testimony of Nicholas Quested, when the government offered a video of Gilbert Fonticoba reacting to television coverage of the riot. The Court explained: "I think anybody conceptually who is a tool, it seems to me their state of mind is relevant, whether that's in the middle of running up the Capitol, whether that's inside the Capitol or whether it's afterward expressing some view about what has happened." 1/19/23 Tr. at 4605; *see also id.* at 4607-08 ("[A]s it has been described to me, I think the state of mind of the tools are relevant evidence. So I think it would come in on that basis alone.").

### B. Effect on the Listener

As the government argued in its original Statements Motion, the statements of subordinate Ministry of Self Defense [MOSD] members are relevant and admissible for purpose of showing the effect on the listeners – those listeners being the defendants and other co-conspirator MOSD leaders who recruited the members into the group and planned to lead them on January 6. *See* Government's Motion *in limine* to Admit Statements, ECF 475 at 25-57.

In its oral ruling, the Court explained that this basis of admissibility would require a factual predicate:

> I get that the Government has proffered that at the first MOSD member meeting, Tarrio and other leaders told members, again, to fit in or eff off and to stay on topic and if they didn't, they'd be removed. And defendants have, at various points, insisted to me that the MOSD's purpose was to get, sort of, Proud Boys rallies under control -- this is the defendants -- under control to reduce the risk of violence. So all of that actually, sort of, backs the Government's theory to some degree. But I don't think I have any specific representations before me --

at least none was teed up in the motion -- about how many people were in these chats, how often a supposed listener against whom the Government might seek to admit these statements ever responded to comments like the ones at issue such that the listener's silence could take on the kind of meaning the Government wants to suggest that it has. So I'm not going to bless admitting these statements on this theory now without more information, without more of a foundation along the lines that I've suggested.

12/14/22 Tr. at 25-26.

## APPLICATION TO EXHIBITS

With the above principles in mind, the government offers the following discussion of exhibits to which defense objections are anticipated:

**A.  MOSD Membership groups (exhibit series 503, 505, 507, 510, 512)**

Most of the statements from non-defendants that the government will offer are from the private Telegram chat groups associated with the Ministry of Self Defense (MOSD). During the course of the conspiracy, the defendants operated small chat groups exclusively for the MOSD leaders (Gov. Exs. 501, 509) as well as larger groups where discussion between leaders and the general membership could take place (Gov. Exs. 503, 505, 507, 510). The conspirators also created and operated the "Boots on Ground" chat (Gov. Exs. 512) which was made up mostly of MOSD members but also included Proud Boys who were not part of MOSD.

When Tarrio created MOSD, he made clear that members were required to conform to the expectations of leadership. The application form, Gov. Ex. 614, required prospective members to agree they would "Fit in or Fuck off." In a video briefing given shortly after the chat group formed, the leaders again stressed the need to "fit in or fuck off," Gov. Ex. 613J; told members they would be removed from the group if they did not follow the rules, particularly the rule of staying on topic, Gov. Ex. 613L; and told members that they would need to "turn [their] brains off" and follow the directions of leadership, Gov. Ex. 613E.

All of the groups descried above were private, invitation-only groups that could not be accessed by members of the general public. They are therefore not comparable to public groups like "Enrique's House of Propaganda," which anyone could join and which functioned more like a social media channel. *See* 1/23/23 Tr. at 4976 (defense counsel cross-examining Nicholas Quested about whether he was "in the group with Enrique in his House of Propaganda on Telegram"); *id.* at 5124-25 (Quested testifying on redirect that the "House of Propaganda" was a public group with several thousand members).

Unlike large public Telegram groups, the MOSD membership groups had multiple features that compel the inference that the defendants and co-conspirators were regularly monitoring the content, such that a failure by leaders to discourage violent discourse can be understood as tacit approval. First, the groups were invitation-only, and the leaders made clear that members were chosen based on their willingness to follow orders and "fit in." Second, the members were expressly instructed to stay on topic. Third, the leaders had the ability to remove members from the group, which Tarrio purported to have done to a member who failed to stay "on topic." *See* Gov. Ex. 613L. Fourth and fifth, the size of the chats and the frequency of participation by the leaders both show that the leaders were actively engaged in the discussions, not passively letting them transpire without their notice. In particular, the government would proffer:

- The original MOSD members group, Gov. Ex. 503, at its peak had approximately 67 active participants, of whom six were conspiracy leaders.[1] Those six people were responsible for approximately 17% of the messages in the chat.

---

[1]   By "conspiracy leaders," the government refers to the four defendants who held MOSD leadership roles — Tarrio, Nordean, Biggs, and Rehl — plus the three other MOSD leaders who have pleaded guilty to conspiracy offenses. Nordean was a member of the original MOSD membership group but did not send any messages; he is therefore not counted as an active participant.

- On December 31, Tarrio created the "MOSD Op" group, Gov. Ex. 505, which at its peak had approximately 37 active participants, of whom six[2] were conspiracy leaders. Those six people were responsible for approximately 25% of the messages in the chat.

- On January 2, 2021, the original MOSD members group was converted to a "supergroup" with additional features. Gov. Ex. 507. That group, at its peak, had approximately 55 active participants, of whom six[3] were conspiracy leaders. Those six people were responsible for approximately 17% of the messages in the chat.

- On January 4, in response to Tarrio's arrest, the MOSD leaders "nuked" the old chats and started a new MOSD members group. Gov. Ex. 510. At its peak, that group had approximately 83 active participants, of whom seven were conspiracy leaders. Those seven people were responsible for approximately 19% of the messages in the chat.

- On January 5, Jeremy Bertino created the "Boots on Ground" Telegram group. Gov. Ex. 512. At its peak, that group had approximately 65 active members, of whom five were conspiracy leaders.[4] Those five people were responsible for approximately 13% of messages sent to the chat.

Based on the above figures, the jury can readily find that the conspiracy leaders were actively aware of all the discussions taking place in the MOSD membership chats and were therefore in a position to admonish members who expressed intentions inconsistent with the

---

[2] Nordean was a member of the chat but did not send any messages to it.
[3] Nordean was a member of the chat but did not send any messages to it.
[4] Tarrio was a member of the chat but did not send any messages to it.

group's purpose. Fortifying this conclusion, the government will also show that the conspiracy leaders *did in fact* register their disapproval when they believed subordinates were going "off topic." In particular:

- On December 28 at 6:07 PM, MOSD member "BrotherHunter Jake Phillips" sent a video message suggesting that "guys that can't go" to DC should go "rally[] at [their] state capitol" instead: "Represent, countrywide. Storm everyone's capitols. Do that in fifty states, they just can't avoid it." Gov. Ex. 503-13. Approximately eleven minutes later, Biggs sent the following to Tarrio via text message: "This chat has already become annoying. They are all talking about other events." Gov. Ex. 525-7. (Notably, Biggs's complaint was not with the notion of "storming capitols," but with the location of the capitols to be stormed.)

- On December 30, participants in the MOSD membership chat were discussing whether women should be allowed to join the group. After telling the group they should stay on topic, leader Charles Donohoe sent a separate message to the leaders-only group, saying: "The problem is all this shit keeps getting the subject brought up in every chat. . . . Even when we make a super serious MOSD chat where you have to sign a document and obey the rules of staying on topic ppl still bring it [u]p." He then remarked that the members' conversation had moved on to "talking about Escalation of Force as well as Standard Operating Procedures," and stated, "I think we should definitely hear the guys out on these two subjects." Gov. Ex. 501-41.

- On January 4, MOSD member "Ash Barkoziba" sent a message suggesting that the group make a plan for how to handle "nazi offshoots" who might damage the Proud Boys' reputation "when we cannot properly represent ourselves because we

6

will be colorless." Within minutes, MOSD leader John Stewart reprimanded him: "This fucking group has a mission; either get with it or fuck off, alright? . . . We're not changing our fucking mission. We're not going to DC to identify people who wore a fucking shirt that triggers you. If you don't like it fuck off, seriously." Gov. Ex. 505-20. Approximately thirteen minutes later, Tarrio sent the message "Focus," and Jeremy Bertino added, "Ash, I don't think he is trying to police you and what you are saying what he's trying to do is keep it out of this chat. Uh, this chat has a mission, this chat has its objective and it doesn't need to be um you know distracted from the mission at hand." Gov. Ex. 505-21.

Finally, in some instances the conspiracy leaders' attention to the discussion is self-evident, because they respond directly and approvingly to comments from members. For example:

- When MOSD members discussed the "need to be better organized" and the merits of breaking into small groups for "'seek and destroy' type missions where we have a goal, such as in DC, where we had a target which was Black Lives Matter Plaza," Rehl replied, "Events will def be much more uniform/organized in the future, especially national events. We don't want DC situations happening again, we're putting a lot of time into getting this right, one of those steps is this chapter here." Gov. Ex. 503-10.

- When an MOSD member said that "the internet exposed all these fuckin' douchebags" (apparently referring to officials involved in certifying the election) and said the "whole country" was going to "stand up and fuckin' do bad things to bad people," Rehl replied, "Seems they are saying Biden beat him and fuck him if

7

he wants to run in 2024 too." Gov. Ex. 507-12. Shortly thereafter, Rehl added, "These scumbags are arrogant." Gov. Ex. 507-13.

- When an MOSD member asked, "what would they do of 1 million patriots stormed and took the capital building. Shoot into the crowd?," leader and co-conspirator John Stewart replied, "They would do nothing because they can do nothing." Gov. Ex. 507-16.

Based on the foregoing facts, the statements in the MOSD members chat are admissible under three distinct but complementary theories. First, messages expressing a desire to use aggressive, unlawful violence — which included celebratory videos of apparent Proud Boys committing street violence against apparent adversaries (Gov. Exs. 503-6, 603-7) — are relevant to show the mental state of the "tools" whom the defendants recruited to be part of the special rally chapter created in anticipation of January 6. Second, because the conspiracy leaders were aware of all this violent discourse, the messages are relevant to show the effect on the leaders as listeners (reassuring them that the "real men" they had recruited into MOSD were appropriately willing to use force to advance the group's objectives) and explain their subsequent conduct (failing to admonish or remove the violent members). Third, and especially important in light of Matthew Greene's testimony,[5] the leaders' tacit approval of this violent discourse sent a clear message to the other MOSD members that aggressive violence was "on topic" and reinforced the norm within the group that force was the appropriate means for pursuing MOSD's goals.

These arguments carry even more weight now that the defendants have opened on the argument that MOSD's purpose "wasn't to find real men to do violence . . . The point of

---

[5] Greene testified that he understood he was expected to use force on January 6 because, in his prior experience with the Proud Boys, violence "was never discouraged; and when it happened, it was celebrated." Trial Trans., 1/24/23 PM session at 5477-78.

8

that was to try and eliminate these confrontations that they had with Antifa in the past." Trial Trans., 1/12/23 PM, at 3342-44 (Tarrio opening statement). The government should be permitted to show that the discussions in the chat — in full view of its creator and leaders — were 180 degrees removed from its purportedly peaceable purpose.

### B. "Skull and Bones" (the "Elders" chat)

The government will present evidence that the Proud Boys "Elders" were a small group within the organization's structure that exercised leadership at the national level. Particularly relevant to this case, the Elders voted on whether to approve or reject Tarrio's proposal to create MOSD in late December of 2020. *See* Gov. Exs. 500-69, 500-72. Tarrio and Nordean were both participants in the Elders chat during the timeframe of the conspiracy.[6]

The Elders communicated with one another in an 11-member private Telegram group called "Skull and Bones." Gov. Ex. 500. The government's exhibits include various excerpts from the Skull and Bones chat. Most of these include messages from Tarrio and/or Nordean, along with any surrounding conversation that is necessary to provide the context of the discussion.

One exhibit, Gov. Ex. 500-51, does not include messages from Tarrio or Nordean but is nonetheless relevant to show the reaction of top Proud Boys leadership to violence that occurred at the December 12 rally. In that exhibit, Elder "Angel Valentine" sends a link to a video of apparent Proud Boys assaulting an apparent innocent bystander, and expresses concern that the episode "doesn't look good." Angel Valentine would later be in

---

[6] Another Elder was Nicholas Ochs, who has pled guilty to obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) based on his conduct at the Capitol on January 6. *See United States v. Ochs*, D.D.C. no. 1:21-cr-73. Based on his coordination with the defendants before the fact, Gov. Ex. 500-79, and his celebration with Nordean after the breach of the building, Gov. Ex. 410M, the government submits that Ochs is a co-conspirator.

the minority of Elders who voted *against* Tarrio's proposal to form MOSD, Gov. Ex. 500-72, a fact whose significance depends on the jury's understanding of Angel Valentine's previously stated concerns about Proud Boys violence at rallies. The Angel Valentine message in Gov. Ex. 500-51 should therefore be admitted.

### C. Official Presidents Chat

Tarrio, Nordean, Rehl, and numerous others were members of a private Telegram group called "Official Presidents Chat" that served as a discussion forum for the "presidents" of Proud Boys chapters across the country. The Presidents Chat was larger and more active than the MOSD, more discursive in its subject matter, and less hierarchical in its structure; accordingly, for messages from persons other than the defendants and admitted co-conspirators, the government is not offering the same "effect on the listener" and "tacit approval" theories described above in relation to the MOSD groups.

Nonetheless, the reactions of the Proud Boys "presidents" to certain events, such as the violence at the November and December rallies, are relevant to the conspiracy inasmuch as they reveal aspects of Proud Boys organizational culture that Tarrio and the other MOSD leaders would later exploit for the purpose of forcibly interfering with the certification of the election. *See, e.g.*, Gov. Exs. 514-18, 514-19 (Proud Boys presidents stating they are "proud of" members who gave a "world class epic ass beating" and who "stomped Antifa in D.C." in November); *see also* Gov. Ex. 514-28, 514-29 (presidents describing December rally as "amazing" and discussing potential for greater success with more organization and "a respected chain of command"); *cf.* 1/24/23 Tr. at 5477-78 (Matthew Greene testifying that his actions on January 6 were based on his experience within the Proud Boys that violence "was never discouraged; and when it happened, it was celebrated").

## **CONCLUSION**

For the above reasons, the government respectfully requests that the Court find the government's proposed Telegram exhibits to be relevant and admissible.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By: */s/ Jason McCullough*
JASON B.A. MCCULLOUGH
D.C. Bar No. 998006, NY Bar No. 4544953
ERIK M. KENERSON, OH Bar No. 82960
NADIA E. MOORE, NY Bar No. 4826566
   On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7233 //
jason.mccullough2@usdoj.gov

By: */s/ Conor Mulroe*
CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov