**Enrique Tarrio Additional Sentencing Arguments**

The evidence at trial showed Tarrio to be a naturally charismatic leader, a savvy propagandist, and the celebrity Chairman of the national Proud Boys organization. In that capacity, he had influence over countless subordinate members of his group and members of the general public, and he used that influence to organize and execute the conspiracy to forcibly stop the peaceful democratic transfer of power. His guidelines range rightly reflects the seriousness of that offense and his unique leading role in it. Tarrio's conduct warrants a sentence of 33 years (396 months) of incarceration.

## I.     Sentencing Guidelines Analysis

Tarrio was convicted of Counts One through Six. The Sentencing Guidelines are applied for each of the convictions as follows:

*Count One*     **(Seditious Conspiracy)**
*Count Two*     **(Conspiracy to Obstruct an Official Proceeding)**
*Count Three*   **(Obstruction of an Official Proceeding)**
*Count Four*    **(Conspiracy to Use Force, Intimidation, or Threats to Prevent Officers of the United States from Discharging Their Duties)**

| Base Offense Level: | 14 | §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction) |
| Total | 33 | |

*Count Five*      **(Interference with Law Enforcement During a Civil Disorder)**

| Base Offense Level: | 14 | §2A2.4(c) → §2A2.2 |
|---|---|---|
| Specific Offense Characteristic | +2 | §2A2.2(b)(1) (more than minimal planning) |
| Specific Offense Characteristic | +6 | §3A1.2(b) (official victim) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction) |
| Total | 28 | |

*Count Six*      **(Destruction of Government Property)**

| Base Offense Level: | 6 | §2B1.1 |
|---|---|---|
| Adjustment | +26 → 32 | §3A1.4 (terrorism) (increase by +12 or to level 32) |
| Adjustment | +4 | §3B1.1(a) (aggravating role—organizer or leader) |
| Adjustment | +2 | §3C1.1 (obstruction) |
| Total | 38 | |

All the counts of conviction group. Tarrio PSR ¶¶ 111, 112. Tarrio's total adjusted offense level is therefore the highest of the offense levels from the six counts, which is 38 and a guidelines sentence of 360 months to life.

### A.  *Additional factual support for terrorism enhancement*

Tarrio's individual conduct fortifies the conclusion that his offense was calculated to influence or affect the conduct of government by intimidation or coercion. In his references to the event, he constantly reaffirmed that he regarded the siege of the Capitol as a justified attack *on the government* to force it into compliance with his wishes or to punish it for failing to comply.

That was never clearer than during the afternoon of January 6, when Tarrio posted encouragement to his tens of thousands of followers on Parler.[1] He referred approvingly to the

---

[1] Defense counsel's suggestion that Tarrio was not in touch with his men on January 6 is belied by the evidence. In fact, among other contacts, Tarrio exchanged messages with other MOSD leaders concerning "live feeds" that others were using to monitor the conditions on the ground in Washington, D.C. Ex. 509-28.

rioters (including his co-conspirators) as "Revolutionaries," echoing his frequent invocation of the phrase "1776" in the weeks leading up to event. Ex. 600-61. Shortly thereafter, he posted that "liberty" comes "[w]hen the government fears the people."[2] Ex. 600-63. When he wrote those words, Tarrio was not referring to politicians' fear of being voted out of office. He was speaking concretely and approvingly about what the members of Congress and their staffs were experiencing that very afternoon: fear of injury and death at the hands of a vicious mob that included Tarrio's own hand-picked soldiers. To erase any doubt, Tarrio accompanied the post with a photograph of terrified legislators cowering in the gallery of the House chamber. *Id.* Later that evening, Tarrio claimed he did not want the day's events to "continue to happen," but that the "elected officials" who had "created the problem" had better "listen… Because things can get ugly." Ex. 600-65. This veiled threat of further violence is the political version of an extortionate shakedown: *Nice democracy you've got there; be a shame if something were to happen to it.*

To Tarrio, January 6 was an act of revolution. Indeed, Tarrio had been consumed with revolution in the weeks leading up to January 6. Shortly before New Year's Eve, Tarrio received a document from a girlfriend—titled "1776 Returns"—that contained plans calling for the occupation of government buildings in Washington, D.C. to protest the election results. Ex. 528-1. The document called for groups of people to amass outside government buildings and overwhelm the defenses with a sudden surge of the crowd. Ex. 528-1A.[3] Tarrio's girlfriend told

---

[2] Although the quotation is sometimes attributed to Thomas Jefferson, *e.g.*, Tr. 18025 (Rehl), there is no evidence Jefferson ever said or wrote any variation of it. *See* Thomas Jefferson Foundation, "When government fears the people, there is liberty… (Spurious Quotation)," *available at* https://www.monticello.org/research-education/thomas-jefferson-encyclopedia/when-government-fears-people-there-liberty-spurious-quotation/.

[3] The document referred to this effort as storming the "Winter Palace," which referenced the Russian Revolution, and which obscure reference would later be invoked by Tarrio in private

him that the "revolution is more important than anything," to which Tarrio replied, "[t]hat's what every waking moment consists of." Ex. 523-1. Tarrio then assured his girlfriend that he was "not playing games." *Id.*

In the weeks following the riot, Tarrio continued to describe the offense in the same terms. On January 9, in a message later deleted, he invoked revolutionary language again, saying that the riot sent the message "DON'T FUCKING TREAD ON US." Ex. 600-72. And he made clear that he regarded the attack on the Capitol as politically justified, posting messages to his followers like "NEVER APOLOGIZE. YOU ARE THE RESISTANCE… NEVER STOP FIGHTING," Ex. 600-66, "I'm not denouncing shit," Ex. 600-75, and "FUCK THE SYSTEM," Ex. 600-67. Amplifying his portrayal of the federal government as the enemy of the people, Tarrio scorned the legitimacy of its efforts to investigate what was self-evidently a serious crime, calling law enforcement authorities "Gestapo forces," Ex. 600-69, and describing suspects as being "hunted by the tyrannical government," Ex. 600-67. *See also* Ex. 514-57 (Tarrio: "In the gulag we'll be heroes.").

All this rhetoric from Tarrio, as leader of the conspiracy, underscores the common-sense conclusion that the crimes committed by him and his co-defendants on January 6 were calculated to influence or affect the conduct of government by intimidation or coercion.

### B. *Factual support for role enhancement*

Tarrio's conduct warrants an adjustment to reflect his clear leadership role. Tarrio's role as primary organizer is most evident from his creation of and command over the Ministry of Self Defense, which was the primary instrument through which the defendants planned and prepared

---

messages as the riot unfolded on January 6. *Id.*; *see also* Ex. 530-5. Tarrio thereafter Googled "Winter Palace," and interacted with the document on his phone. Tr. 12966:11 – 12967:1 (Miller).

for January 6. However, Tarrio's pernicious, violence-oriented leadership predated his creation of MOSD. Following a July 4 rally in 2020, Tarrio posted on Parler, "[W]e were whooping Antifa and BLM ass at the Washington monument while fireworks were going off. Best Independence Day EVER!" Tarrio Ex. 1. And after the election, Tarrio's violent rhetoric only intensified. Most vividly, on November 25 he posted the "Bad Company" propaganda video that portrayed the Proud Boys as vigilante warriors in a physical battle of good against evil. Ex. 600-22. Content like this, from a figure as prominent as Tarrio, had the natural and intended effect of recruiting and radicalizing members who would be eager for violence. Tr. 5336-37 (Greene discussing "propaganda video[s]" that "appeal[ed] to [him] at the time"); Tr. 14575 (Nugent admitting violent videos helped with recruitment)

The importance of Tarrio's leadership was evident in how his co-conspirators and other subordinates responded to his temporary absence upon his arrest. One MOSD member asked whether "our task" would be "aborted" now that Tarrio was unavailable. Ex. 510-8. While Biggs, Nordean, and Rehl each stepped up to exercise authority (see their respective Attachments accompanying this filing), the group still felt Tarrio's absence acutely, with Donohoe asking, "Hey who's boots on ground with a plan RN… Guys are asking." Ex. 509-23. Biggs assured the other leaders that he had "[j]ust spoke with Enrique," *id.*, and Bertino reasoned that Tarrio could "take the reigns back" as soon as he obtained "a burner phone." Ex. 509-21. Tarrio did, in fact, take the reins back immediately upon his release, moving quickly to reset his Telegram account and obtain a burner phone. *See, e.g.*, Ex. 490A at 3:16 – 5:30 (Tarrio instructing sister on how to remotely access his Telegram); Tr. 4515 (Quested: "[H]e expressed a need to communicate with his colleagues."); Tr. 4517 (Quested: "[L]ater that evening, we went to buy a phone at a drug store in Baltimore."). Before leaving Washington, D.C., Tarrio met with the leader of the Oath Keepers in

an underground garage and assured others that law enforcement would not be able to access his phone. *See* Ex. 490-F (Tarrio exchange with Bianca Gracia explaining his security settings).

The period after January 6 included still more evidence of Tarrio's unequaled influence over other participants in the offense, and his use of that influence to condone and promote violence. In the uncertainty following the riot, an MOSD member implored that Tarrio "need[ed] to speak," with another agreeing, "Yeah a good pick me up would be good for the boys." Ex. 510-50. In response, Tarrio — who had been quiet on the chat — emerged to provide approval ("Proud of y'all"), warning ("we're going to be the fuckdolls of the government for a little"), and direction ("Let's chill our for a sec while we reassess"). Ex. 510-51. Likewise, in the late afternoon of January 6 when the riot was waning, an upper-echelon Proud Boy "Elder" wanted to know "what do we do now?" Ex 500-86. It was Tarrio who answered: "Do it again." *Id.*

Based on all the foregoing, a four-point increase is necessary to account for Tarrio's role as the organizer and leader of the conspiracy.

### C. Tarrio obstructed justice by seeking to conceal and destroy evidence, directing Pezzola to lie to authorities, and discouraging other subordinates from cooperating with law enforcement.

The PSR correctly applies a two-point adjustment for obstruction of justice. Tarrio PSR ¶ 96. This adjustment is appropriate because Tarrio sought to conceal his group's communications from law enforcement, he instructed Pezzola to provide materially false information to law enforcement and/or a court, and he used his leadership influence to discourage potential witnesses from providing information to the government,.

When Tarrio was arrested, his lieutenants' immediate reaction was to destroy their communications in an attempt to prevent law enforcement from obtaining them. *See, e.g.*, Ex. 501-62. This was in accordance with Tarrio's continuous emphasis on secrecy and operational security,

or "OPSEC." *See, e.g.*, Ex. 613-A (MOSD video briefing, with discussion of "OPSEC"); Ex. 503-1 (welcome message for MOSD members chat, prohibiting "[S]creenshots or the sharing of information outside of this chat" on penalty of "instant disavowal out of the chapter. NO EXCEPTIONS"). Tarrio's own actions were similar: Within minutes of his release from custody, he spoke with his sister on a borrowed cell phone and (in a conversation he asked not to be recorded) instructed her on how to log out of his devices. Ex. 490A at 3:16 – 5:30. Shortly thereafter, he assured another worried associate that the chats on his seized phone would not be accessed by law enforcement because "I cleared that out… They couldn't get in there… 'cause I have two steps." Ex. 490F at 8:15 – 8:45. Likewise, after the riot when Proud Boys leaders learned that Nordean would soon be arrested, Tarrio assured them that had just spoken to Nordean and "[h]e's keeping his phone away but we need to remove em."[4] Ex.500-107. All these were willful attempts to conceal and destroy evidence related to the offenses of conviction, justifying the application of the obstruction guideline. *See* U.S.S.G. § 3C1.1, Application Note 4(D).

In addition, after Pezzola was arrested, Tarrio recorded a voice note directing that Pezzola state he was not affiliated with the Proud Boys. Tr. 19253 (Pezzola testimony). The message was transmitted to Pezzola by way of co-conspirator Jeremy Bertino as an intermediary; Bertino forwarded the message, and Pezzola received and listened to it. *Id.* In this message, clearly intended to shield the group and its leadership from legal exposure, Tarrio was attempting to corruptly influence Pezzola at best and to suborn perjury at worst; regardless of how the conduct is characterized, the enhancement applies. *See* U.S.S.G. § 3C1.1, Application Notes 4(A); 4(B). Such effort was likely to succeed, as shown by another exchange from roughly the same timeframe

---

[4] Nordean did not, in fact, successfully keep his phone away from law enforcement, and it was the source of many incriminating messages introduced at trial.

that illustrates the loyalty Tarrio commanded from lower-level subordinates, even those facing serious charges. Tarrio forwarded to the Elders a message from "one of the two in the news" (i.e., one of the Proud Boys who had recently been charged with conspiracy offenses)[5] in which the sender provided assurance, "I'm a Proud Boy for life boss and I'm with you 100%. Uhuhu." Ex. 500-105.

Finally, Tarrio broadcast a voice message to a Proud Boys group in which he discouraged anyone from cooperating with law enforcement. Disputing the truth of media reporting that Rehl had been "talking or cooperating with the feds," Tarrio assured his listeners that Rehl would "hold fast." Tarrio went on to explain that "guys that are in prison right now" — i.e., Biggs, Nordean, Rehl, and Pezzola — were "holding onto hope" that everyone was "fucking staying put because they didn't do anything wrong." Elaborating, Tarrio made clear that "staying put" meant refusing to cooperate with the ongoing investigation: "The moment that they think that one of the guys flipped, it throws everything off, and it makes everybody turn on each other, and that's what we're trying to fucking avoid. Until I don't see hard evidence of one of these guys fucking flipping on the others… Like, dudes, we gotta support these guys a hundred and fucking fifty percent." Tarrio Ex. 13; *see also* Reuters, "EXCLUSIVE Proud Boys leader urged group not to 'turn on each other' in riot probe" (September 9, 2021), *available at* https://www.reuters.com/ world/us/exclusive-proud-boys-leader-urged-group-not-turn-each-other-riot-probe-2021-09-09/ (reporting on audio message, including response by Tarrio). The obstructive intent is clear on the face of the messages, but coming from Tarrio—who previously cooperated with the government—that obstructive intent

---

[5] Based on the name of the attorney identified in the message, the sender appears to be Pezzola's original co-defendant, William Pepe.

is clear as can be. In a subsequent message to the group, Tarrio complained that whoever had shared the message with the press had potentially put him in "felony territory." *Id.*

Based on the totality of Tarrio's conduct, the obstruction adjustment is warranted.

## II.      Section 3553(a) Factors

The government's specific recommendation for Tarrio of a sentence of 33 years of incarceration is further justified by the nature and circumstances of Tarrio's individualized conduct, his personal history and characteristics, and the need to protect the public from future crimes by Tarrio.

### A.  Nature and Circumstances of Tarrio's Conduct.

Tarrio is unique among his co-defendants in that he was not present at the Capitol on January 6. That fact, however, does not significantly mitigate his culpability when viewed against the totality of the circumstances. The only reason Tarrio did not march alongside the others is because he was arrested upon his arrival in Washington, DC and placed under a court order to leave the District. *See generally* Tr. 4212-14 (Koble). As demonstrated by his messages with fellow MOSD leaders and with a Metropolitan Police Department officer, Tarrio knew full well that he would be arrested if he came to D.C., but he did so anyway, all while using his social media account to taunt law enforcement. Tarrio Ex. 2 ("Come get me if you feel like what I did was wrong. We'll let the public decide.").

Those same messages, and his social media activity, suggest that Tarrio strategically calculated his arrest as a means to inspire a reaction by his followers. *See* Ex. 503-40 (MOSD leaders discussing likely responses by "our guys" and "the normies," with Tarrio explaining he was "pushing for" the arrest to happen "on the 6th"); Tarrio Ex. 2 ("[L]et the public decide."). The arrest did, in fact, serve the Proud Boys' strategic interests on January 6: both Biggs and Nordean delivered speeches to the marching group in which they portrayed Tarrio's arrest as an injustice

demanding a response. *See* Ex. 1000 at 4:10 (Nordean: "Enrique shows up and gets detained… For what? … [T]hese people put us in jail. Well, I'm tired of it. It's time to just say no. Back the yellow."); *id.* at 5:00 (Biggs: "[A]fter what they did to our boy Enrique, we're gonna let D.C. fucking know we're goddamn here."). Clearly there was some pre-planning to this aspect of the rally, because although Tarrio was arrested less than 48 hours before the Proud Boys marching group assembled on the morning of January 6, various members arrived wearing custom "ENRIQUE TARRIO DID NOTHING WRONG" t-shirts. *See generally id.*

Moreover, if Tarrio *had* been able to accompany his subordinates during the attack on the Capitol, there is every reason to believe he would have been an active and enthusiastic participant. In the Proud Boys Presidents Chat, he said "They should have sat in. God didn't put me there for a reason. We would still be there." Ex. 514-59. And as Jeremy Bertino testified, Tarrio told Bertino after the fact that he would have been waving the crowd forward while urging "Go. Go. Go." if he had been there. Tr. 10224.

In short, Tarrio's physical absence does nothing to detract from the severity of his conduct, because (as argued above) he was a general rather than a soldier. By provoking a desire for political violence among his followers, creating MOSD, filling it with men he could trust to "fit in or fuck off," inflaming the group with rage against law enforcement, and then turning it loose on the Capitol, Tarrio did far more harm than he could have as an individual rioter. His sentence should reflect that.

### B. Tarrio's Personal History and Characteristics

Tarrio is an individual of uncommon ability. He is intelligent, charming, creative, and articulate — a gifted communicator who excels at attracting followers and "creat[ing] compelling spectacles." Trial. Trans. 6451 (Special Agent Camiliere, quoting from "laws of power" referenced

in Tarrio Parler post). Regrettably, Tarrio has used those talents to inflame and radicalize untold numbers of followers, promoting political violence in general and orchestrating the charged conspiracies in particular.

Nor is this Tarrio's first serious criminal offense. In 2012, Tarrio was charged with, and ultimately pleaded guilty to, offenses related to a scheme to misbrand, mishandle, and fraudulently sell large quantities of stolen diabetic testing supplies. *See* Tarrio PSR ¶ 127.[6] As the prosecutor on that case explained, that offense — like this one — drew upon Tarrio's marketing skills, with him acting as the conspiracy's "savvy" and "sophisticated" "lead salesperson." Tarrio Ex. 5 at 10; *see also id.* at 13 (Tarrio's counsel not disputing mass-marketing guideline enhancement).

More recently, Tarrio participated in the burning of a Black Lives Matter banner that subordinate Proud Boys had stolen from a historic Black church in Washington, D.C. In accordance with the Court's pretrial rulings, this episode appeared at trial only in sanitized form and for narrow purposes. Now at the sentencing stage, however, the Court should consider the incident for all it shows about Tarrio's respect for the law, his supposed tolerance of opposing viewpoints, his malign influence on his followers, his likelihood of reoffending, and his overall character.

Just as telling as the banner burning itself are Tarrio's public statements about it, which displayed a total lack of remorse and a brazen contempt for law enforcement and the victims. Roughly a week after committing the crime, after his "Come get me" post cited above, Tarrio posted a screenshot of a news headline referencing his "burning the Black Lives Matter banner of a historic Black church"; he accompanied it with the caption "I'M DAMN PROUD I DID IT!"

---

[6] The loss amount for that offense was calculated at roughly $1.1 million. *See* Tarrio Ex. 5 at 37.

Tarrio Ex. 3. Several days later, on December 22, he posted the following meme, mocking the

notion that he had committed a "hate crime" and announcing "I"LL FUCKING DO IT AGAIN":



Tarrio Ex. 4. Tarrio added the caption, "Ayo… Pass me the lighter." *Id.* This behavior, which took

place while Tarrio was actively recruiting co-conspirators for the instant offense, was a show of

total disdain for the rule of law and an explicit approval of criminal action in furtherance of the

Proud Boys' goals.

To the extent Tarrio expresses remorse during his sentencing allocution at the upcoming

hearing, the Court should be mindful that he has done so before. At his sentencing on the stolen

test strips case, Tarrio expressed his "sincerest apology" for what he called a "lapse in judgment,"

and he professed to have developed "a better sense of responsibility, a better sense of community"

as a result of the experience. *See* Tarrio Ex. 5 at 61-62. Similarly, at sentencing for the more recent

banner burning and magazine possession, Tarrio purported to "profusely apologize" for what he

called a "very, very, very bad mistake." Tarrio Ex. 6 at 16. Although the transcript of his allocution

is somewhat hard to follow, he appears to portray his early public admissions to having burned the

banner (e.g., "I'LL FUCKING DO IT AGAIN") as a sincere effort to take responsibility and "do

what is right." *See id*. ("I did consult a media post and at that time I didn't see the consequences

of what I did because I believe that was just two or three days after the events of December 12th

and to give you context on that, I did see it and I did see what I did was wrong and that's why before I got anything -- before I got Congress on the case, anything, any pictures of anything, I needed to do what is right and to do what is right was to plead guilty to this case.").

False contrition would be entirely consistent with Tarrio's broader pattern of duplicity and double-dealing. Examples abound: Tarrio told the House Select Committee under oath that "with almost 100 percent certainty… if I would've been on the ground on January 6th, there would be absolutely zero Proud Boys that got arrested," Tarrio Ex. 7 at 173, but he told the Proud Boys Presidents Chat that, if he had been present, "We would still be there," Ex. 514-59. When Gavin McInnes, the founder of the Proud Boys, raised concern that a member was generating controversy by wearing a t-shirt emblazoned "6MWE" (a grotesque reference to the Holocaust, standing for "six million wasn't enough"), Tarrio proposed to falsely claim it meant "6 man weapon and equipment." Tarrio Ex. 8 at 1.[7]  Tarrio publicly accused a media outlet of intentionally publishing a "false" and "EXTREMELY dangerous" report that Proud Boys were wearing orange hats, Tarrio Ex. 9, but numerous photos and videos from the event prominently show the orange hats worn by members of the marching group from the Arizona chapter, *e.g.*, Tarrio Ex. 10. On an episode of his "War Boys" podcast, he told his audience that they should attend the inauguration "in Biden gear" and "turn [it] into a fucking circus, a sign of resistance, a sign of revolution.," Tarrio Ex. 11; then, responding to media coverage that quoted the statement verbatim, Tarrio took to Parler to deny ever having said it, Ex. 604-14. All this flows from Tarrio's apparent worldview, in which "all politics revolves around half-truths and some lies," Ex. 490K at ~8:32, and in which

---

[7] In an apparent effort to placate McInnes, Tarrio also falsely denied that he had "any more rallies planned" as of December 22. *See* Tarrio Ex. 8 at 2.

"Goebbels" is flip shorthand for the use of "misinformation" to deceive the public and "cultivate[]
fear," Ex. 514-47.

In sum, Tarrio's personal history and characteristics provide every reason to impose a
substantial sentence.

### C.  The Need to Protect the Public from Further Crimes by Tarrio

Tarrio was able to orchestrate a conspiracy — one that very nearly succeeded in provoking
a constitutional crisis — thanks to his powerful influence over others, both associates and
strangers.  One defense witness described Tarrio as "like a movie star." Tr. 15786 ("Aaron").
Another witness, called by Tarrio, noted Tarrio's "great leadership skills" before going on to
reaffirm his belief that January 6 was a "glorious event" that was "the most patriotic act in this
country in the last hundred years." Tr. 15426-27 (Meza).

In fact, even while the jury was deliberating on his case, Tarrio gave an interview from jail
that was heard by more than 26,000 people. *See* Tarrio Ex. 12, *available at*
https://twitter.com/i/web/status/1651015232741945345. On the interview, Tarrio echoed the
positions of his testifying co-defendants, stating "we know we're innocent," *id.* at 33:27, and
accusing the government of "manipulat[ing]" the Proud Boys' "locker room" talk in an effort to
wrongly convict him, *id.* at 30:15 – 31:15. *See also id.* at 44:10 (Tarrio: "The Proud Boys did
nothing wrong.").

Using his powerful platform, Tarrio has repeatedly and publicly indicated that he has no
regrets about what he helped make happen on January 6. As summarized above, his post-riot social
media activity and internal communications have described the rioters as the patriotic "resistance"
and the government as a "tyrannical" oppressor using "Gestapo forces" to "hunt" the revolutionary
"heroes." There is no reason to believe this violent anti-government sentiment has abated at

present: during his interview from jail while the verdict was pending, Tarrio explained that ever since his incarceration for the banner burning, his "priorities have changed" from "God, family, and *country*" to "God, family, and *tribe*." (emphasis added)). Tarrio Ex. 12 at 45:44 - 46:35.

In sum, Tarrio continues to possess the same motive (a belief the government is illegitimately infringing his rights) and the same means (massive popular influence, including over those willing to embrace political violence) that led to the offenses of conviction. For the sake of specific deterrence, and to limit his ability to recruit and direct followers, a significant sentence is necessary.