**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

**CASE NO: 0090 1:21CR00175-005**

**v.**

**ENRIQUE TARRIO,**

    **Defendant.**

_____/

## <u>DEFENDANT'S SENTENCING MEMORANDUM AND RESPONSE TO THE GOVERNMENT'S OBJECTIONS TO THE PRESENCE INVESTIGATION REPORT (PSR)</u>

    **COMES NOW** the Defendant, **Enrique ("Henry") Tarrio**, by and through undersigned counsel, moves this Honorable Court to consider the previously-filed objections to the defendant's presentence investigation report (PSR) by the defendant; to overrule the government's objections to the PSR; and to consider the statutory sentencing factors pursuant to 18 U.S.C. § 3553(a), including the defendant's lack of participation in the events on January 6, 2023, and his personal characteristics.   The PSR was made available to the parties on July 26, 2023.  The defendant's objections were filed under seal on August 9, 2023.   The government filed its objections to the PSR via a letter dated August 9, 2023.   Those objections will be addressed by the defendant prior to delving into certain sentencing factors and his personal characteristics which he would respectfully ask the Court to consider in order to arrive at a fair punishment.

1

**Introduction including Brief Procedural History of the Case**

On June 6, 2022, a federal grand jury in the District of Columbia returned a ten-count Third Superseding Indictment charging Ethan Nordean, a/k/a "Rufio Panman," Joseph Biggs, Zachary Rehl, Enrique Tarrio, a/k/a "Henry Tarrio," and Dominic Pezzola, a/k/a "Spaz," "Spazzo", and "Spazzolini," with **Seditious Conspiracy**, in violation of 18 USC § 2384 (**Count One**); **Conspiracy to Obstruct an Official Proceeding**, in violation of 18 USC § 1512(k) (**Count Two**); **Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of 18 USC §§ 1512(c)(2) and 2 (**Count Three**); **Conspiracy to Prevent an Officer from Discharging Any Duties**, in violation of 18 USC § 372 (**Count Four**); **Obstruction of Law Enforcement During Civil Disorder and Aiding and Abetting**, in violation of 18 USC §§ 231(a)(3) and 2 (**Count Five**); **Destruction of Government Property and Aiding and Abetting**, in violation of 18 USC §§ 1361 and 2 (**Counts Six, a black fence and Seven, a Capitol window**); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 USC § 111(a) (Counts Eight and Nine); and Robbery of Personal Property of the United States, in violation of 18 USC § 2112 (Count Ten).

The defendant was arrested on March 8, 2022, and has been in continuous custody on these federal charges since that date.

On May 4, 2023, the defendant was found guilty, by jury trial, as to **Counts One, Two, Three, Four, Five,** and **Six** of the Third Superseding Indictment.  He was acquitted of Count Nine. The jury hung on Counts Seven and Eight.

This Court is well aware of the general background of the people and their actions that occurred in our nation's Capitol on January 6, 202l.  At the end of this month (August

2023), Your Honor will begin handing down sentences for six members of the Proud Boys group for their roles in the Jan. 6th insurrection, including five (all but Pezzola) convicted of seditious conspiracy.  Ethan Nordean, a president from Washington State on August 30th; Joseph Biggs, a leader from Volusia County, Florida on August 31st; Zachary Rehl, a president from Philadelphia on August 31st; Charles Donohoe, a local leader in North Carolina to be set; Dominic Pezzola, a leader on September 1st; and this defendant, **Enrique (*whose true first name is Henry*) Tarrio**, the national chairman, will be sentenced on the 30th of this month.   The PSR has taken the position that each of Tarrio, Nordean and Biggs had a leadership role.  In sum, they all are assessed the same aggravating role assessment and are basically viewed as being equally culpable with each other, at least by the probation office.

## ADDITIONAL FACTUAL OBJECTION TO THE PSR

As to the **Identifying Data** contained in **Page 3** of the defendant's PSR, he is erroneously identified as "White." The defendant is multiracial and is of Afro-Cuban ancestry, so his race should be reported as "Black" on Page 3.

## RESPONSE TO THE GOVERNMENT'S OBJECTIONS TO THE PSR

### *Government Suggests Terrorism Enhancement Should Apply*

By letter dated August 9, 2023, the government filed its response to the PSR.   After recommending an upward *departure* for "terrorism" pursuant to Application Note Four of § 3A1.4 of the guidelines, the government asserts that a 12-level increase (or minimum offense level 32) in the offense level computation under §3A1.4 *is mandatory* and applies to all five defendants because Count Six constitutes a "federal crime of terrorism" as that term is defined under the Guidelines.

While the government does not dispute the guidelines calculations by the probation officer as to each of Counts One through Five, it has requested the terrorism enhancement be applied to Count Six since that count "constitutes a federal crime of terrorism" as that term is defined under the guidelines.  Count Six charges Tarrio with the destruction of Government Property, a black fence, and Aiding and Abetting, in violation of 18 U.S.C. §§ 1361 and 2.  About 45 Capitol riot defendants are charged with this crime that is on the terrorism list: destruction or "depredation" of federal property, which carries a maximum 10-year prison term. Notably, the jury was undecided as to Count Seven, which charged Tarrio with the same offense in connection with the smashing of a Capitol window.  (In a footnote within its objections, the government also suggests the terrorism enhancement should apply to all the defendant's counts of conviction.) Pursuant to § 3A1.4(a), if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, **a 12-level increase** is recommended, unless the resulting offense level is less than a level 32.  In the latter case, the offense level simply should be increased to 32.  For purposes of this suggested terrorism enhancement under § 3A1.4, a "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5).

Under 2332b(g)(5) of Title 18 of the United States Code, a federal crime of terrorism is defined as one that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and is one of the enumerated offenses set forth in section (B) of the aforementioned section and statute. The range of crimes that can trigger this sentencing enhancement is sprawling. Under current law, 57 offenses are on the list, including such crimes as hostage-taking, destroying an aircraft, using fire or explosives to destroy a building and computer hacking that creates a public health or safety threat or impacts national security systems.  These enumerated offenses include very extreme crimes involving biological and chemical weapons, explosives, arson, nuclear and weapons of mass destruction threats and bombing of properties.  While the instant offenses are serious in nature, they are nowhere near and should not be grouped in the same category or considered to be the same caliber as the heinous acts committed by individuals such as Timothy James McVeigh (who perpetrated the 1995 Oklahoma City

bombing that killed 168 people, 19 of whom were children, injured 680, and destroyed one-third of the Alfred P. Murrah Federal Building) or Osama bin Laden (who engineered a series of attacks in multiple countries that killed thousands of men, women, and children).  This federal sentencing guideline enhancement is really meant for those with ties to foreign terrorist organizations such as ISIS and al-Qaeda, or to violent domestic extremists like McVeigh or even Cesar Sayoc, who mailed 16 pipe bombs to members of the U.S. Congress. Here, the government property "destroyed" was a part of a black fence that was pulled down by others. How does this conduct, not even committed by Tarrio personally, rise to the level of "terrorism" to support an enhancement that more than doubles Tarrio's prison sentence from 14 to 30 years?  While the statute of conviction may be an enumerated one (supporting the enhancement), common sense dictates this does not result in a "sufficient, but not greater than necessary" sentence required by 18 U.S.C. § 3553(a).

Invoking the terrorism enhancement typically adds about 15 years in prison to a defendant's recommended sentence, and also flips the person charged into the criminal-history category used for serial offenders.  In the case of Mr. Tarrio, his recommended sentence would go from 14 years (168 months at the low end) to 30 years as suggested by the government in its August 9th letter of objections to the PSR.

The defendant does not need to remind the Court that this guideline enhancement is not a statutory sentencing enhancement and therefore is not mandatory, but advisory. In fact, the government has arbitrarily chosen to seek this enhancement only for certain defendants involved in the infamous January 6th event, but has not even brought up the guideline enhancement in other cases with much more violent offenders than this defendant who stands before Your Honor.

Notably, this same terrorist enhancement was not even applied to Dylann Roof, who was convicted of massacring nine people attending bible study at a church in Charleston.  Nor was it applied in the federal case of James Fields, who was convicted of using his motor vehicle to plow down and kill a Charlottesville demonstrator.  Yet it seems

the government wants to use this enhancement as a tool to punish Tarrio because he exercised his right to go to trial, as opposed to other, violent defendants charged in the January 6th event that did plead guilty.  Tarrio was not even present at the scene in Washington D.C.; he did not direct his fellow members of Proud Boys or anyone else to assault people on the day in question or to destroy any government property.

Notably, defendant Guy Wesley Reffitt, who went to trial and had been observed on video bragging about and actually planning the riot on January 6th, was not given the terrorism enhancement when sentenced by U.S. District Judge Dabney L. Friedrich.  The government said he "planned to overtake the government"; however, the Judge declined to apply the enhancement with the explanation it would create a sentencing disparity with other J6 defendants. Reffitt was armed at the U.S. Capitol on January 6, provoked the boisterous crowd and led other rioters up a set of stairs outside the Capitol building. Federal prosecutors asserted other rioters at the Capitol looked to Reffitt as their leader. Reffitt even told his fellow militia members that he planned to drag US House of Representatives Speaker Nancy Pelosi out of the Capitol building by her ankles, "with her head hitting every step on the way down."; and threatened to shoot his own 18-year-old son for being a traitor and reporting him to the FBI.   If Reffitt did not receive this enhancement, why should Tarrio, who was not even at the scene directing anyone else, nor did he participate in any violent acts on January 6.

Or consider the case of David Judd.  Amid the most extreme violence on January 6, 2021, David Judd launched a lit object — which appeared to be a firecracker — at a tightly packed tunnel full of police and members of the mob, an effort to clear a path so rioters could derail the transfer of power from Donald Trump to Joe Biden.  The government argued in favor of the terrorism enhancement; however, the Court did not apply it, presumably for Judd's lack of preplanning.

Consider Elmer Stewart Rhodes and Kelly Meggs of the Oath Keepers who received an enhancement for "terrorism" but a fraction of the increase sought in the case of Tarrio. According to the government, their conspiracy revolved around amassing an arsenal of

firearms across the Potomac River. Rhodes and his co-conspirators accumulated firearms and other weapons, and planned for their transport to the Capitol and the QRF staging location just across the river.   According to the government, Meggs was wearing paramilitary gear and led the infamous "stack" military formation (a tactic used by the infantry) of Oath Keepers inside the Capitol on January 6.   The formation is used in the infantry to weave through crowds or when entering a room. The group places hands on the back of the person in front of them in order to communicate effectively. Meggs, and others, according to prosecutors, were part of a crowd that burst through the Capitol's Rotunda doors on Jan. 6. They are not alleged to have broken the doors themselves. The group was wearing matching uniforms of "camouflaged combat attire" and had patches and other insignia for the Oath Keepers. Videos and photos were widely circulated of the group "aggressively approaching an entrance to the Capitol" in a stack formation. They were also wearing helmets and reinforced vests.   Rhodes remained outside, directing and coordinating activities.  Rhodes and Meggs had their sentences enhanced (via an upward departure) for domestic "terrorism;" Rhodes by six levels and Meggs by four levels.

To avoid unneeded sentencing disparities among similarly situated defendants, including but not limited to Reffitt, and to abide by the sentencing rules set forth in 18 U.S.C. § 3553(a)(6), the Court should avoid applying this enhancement in Tarrio's case.

***Government Disputes Criminal History Category and Erroneously Asserts Defendant was on Federal Supervision when he Committed the Instant Offense***

The government asserts Mr. Tarrio's criminal history calculation is incorrect.  The government asserts the defendant was on supervised release in the cases set forth in **paragraph 128** (2021 CF2 000105 and 2021 CMD 000106) when he committed the instant offense.  The government is wrong.  As noted in paragraph 14 of the PSR, all acts in this case took place from December 2020 to January 6, 2021.  The criminal conduct charged in Counts One, Two, and Four of the Third Superseding Indictment occurred from in and

around December 2020 through in and around January 2021. The events forming the basis of the remaining Counts (Three, Five and Six) occurred on January 6, 2021.  Mr. Tarrio pled guilty in those prior cases AFTER the instant offense, on August 24, 2021, and did not start his term of federal supervision as to those two cases until January 14, 2022. Therefore, he could not have been on federal supervision at the time he committed the instant offense, which is required in order to apply two criminal history points under § 4A1.1(d).

The government then suggests the defendant's criminal history category be increased to VI, based on the terrorism enhancement which was not applied in several others who participated in the January 6 event.

Under § 3A1.4(b), if applied, the terrorism enhancement that the government believes applies would also increase the defendant's criminal history category by several levels, all the way to the highest category possible, a VI.   The government is suggesting the defendant be punished the same as violent career offenders, serial offenders and/or offenders with very serious criminal histories, with many lengthy prior sentences of imprisonment and/or repeated violations of probation, parole and/or supervised release.

According to the PSR, the defendant has a total of five criminal history points and a criminal history category of III.   As noted in the defendant's objections, he is asking the Court to make a finding that the activities leading to the convictions set forth in paragraph 128 were part of the relevant conduct on the instant offenses of conviction.  If so, no criminal history points would be assessed as to the sentences imposed for the cases referenced in paragraph 128.  In that case, he would have a total of three criminal history points and a criminal history category of II.

## 18 U.S.C. § 3553(a) SENTENCING FACTORS WHICH WARRANT CONSIDERATION BY THE COURT

As the Court is well aware, the Federal Sentencing Guidelines are no longer mandatory.  Instead, they are just **advisory**.  Although the guidelines continue to have significance, they are among several factors to be weighed by the Court in its determination of a punishment that is sufficient but not greater than necessary to satisfy the purposes and goals set forth in 18 U.S.C. § 3553(a), *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

Under *Gall*, the advisory guideline range does not have "any particular weight." *United States v. Irey*, 612 F.3d 1160, 1217 (11th Cir. 2010) (en banc). The Court must conduct its own evaluation of the sentencing factors listed in 18 U.S.C. § 3553(a), and may "reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 552 U.S. at 113.

The purpose of the provision in § 3553(a) is to ensure the imposition of a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing established by Congress. This section of the statute directs courts to consider: (1) "the nature and circumstances of the offense," (2) "the history and characteristics of the defendant," (3) "the sentencing range established" by the guidelines; (4) "the need for the sentence imposed to reflect the seriousness of the offense, and to deter the criminal conduct," (5) "the need to avoid unwarranted sentence disparities among defendants"; and (6) the "need to provide restitution to any victim(s) of the offense."

### 18 U.S.C. § 3553(a)(1): Nature and Circumstances of the Offense

As noted in the defendant's previously filed objections to his PSR, being a leader in the Proud Boys organization is not the equivalent of being a leader and

organizer of the events which led to the criminal offenses of which he was found guilty. These two roles do not go hand in hand.  There is zero evidence to suggest Tarrio directed any participants to storm the U.S. Capitol building prior to or during the event. Participating in a plan for the Proud Boys to protest on January 6 is not the same as directing others on the ground to storm the Capitol by any means necessary.  In fact, Tarrio was not in contact with anyone during the event he is alleged to have led or organized.  Instead, as noted previously, many of the participants who were at the scene of and participated in the insurrection wore microphones and used Walkie Talkies to communicate with each other, not with him.  Among these participants were Biggs and Nordean, as noted in The Offense Conduct section of the PSR.

Shortly before noon, Nordean and Biggs led the other men back to the west side of the US Capitol. As they marched, Nordean and Biggs led the men onto a four-lane road (First Street, NE and Constitution Avenue, NE) that was open to traffic.  At approximately 12:45pm, 15 minutes before the certification of the Electoral College vote was scheduled to start, Nordean and his men marched back toward the US Capitol. Biggs and Nordean tore down the fixed black metal fence that separated the crowd from law enforcement, then these codefendants, along with Pezzola and others, advanced past the trampled barrier into the west plaza of the Capitol grounds.  Nordean, Biggs, Rehl and Pezzola ignored the police officers' directives, and members of the crowd began to physically engage with law enforcement.  While on the terrace, Biggs gestured back down to the ground to encourage those still on the ground to join him.  Biggs exited but entered the US Capitol a second time through another entrance. Biggs took advantage

of the crowd's overwhelming numbers, and made his second entry of the building as part of a tactical line of four Proud Boys immediately after the crowd overwhelmed officers guarding the door.   Biggs' group pushed directly past those officers, with Biggs brushing up against one. Once inside, Biggs and his men went to the Senate gallery. One of the men with Biggs stole a flag from outside the Senate Chaplain's Office.

Unlike Tarrio, who was a state and at least an hour away in Baltimore, Maryland, during the insurrection, his codefendants, Biggs and Nordean, were on the ground, wearing microphones and in constant communication with each other during the rebellion and acts of violence, none of which Tarrio directed, ordered or even planned. In fact, Tarrio was nowhere near the ground(s) of the U.S. Capitol to direct these other participants' actions.   Instead, he was in another state and city, Baltimore, Maryland. The Offense Conduct section of the PSR does not reference any action taken by Tarrio just prior or during the chaos and invasion into the Capitol.

Notably, in late-February 2021, When Tarrio sat down to be interviewed by CNN reporter Sara Sidner, he told her that the men "**should not have breached the Capitol with violence**."(00:21).  He firmly states on more than one occasion that he does not believe the 2020 presidential election was stolen. (04:36)  When addressing his fellow Proud Boy who used a police officer's shield to break a window to gain access to the Capitol building, he said the following:  "**I condemn the actions**, I don't think he should have done that. **I think it was completely wrong**."   He described the other Proud Boys who entered the Capitol as trespassers whom he believed got caught up with the entire crowd.   He further remarked, "**They made a poor decision to go in there**." (5:15) He

used the word "**unequivocally**" when reiterating it was "**wrong**" for his fellow Proud Boy to have broken the window to breach the Capitol.  He said he does not blame the cops for doing their job, and again says it was a mistake for people to enter the Capitol. All these comments made shortly after the event show he not only did not plan the invasion of the Capitol, but are also indicative of someone who did not lead, organize or manage the actions on January 6, despite having a leadership role within the Proud Boys organization.

The interview can be accessed via the following link:

https://www.cnn.com/videos/politics/2021/02/26/proud-boys-leader-enrique-tarrio-intv-capitol-riot-government-fear-people-sidner-dnt-ac360-vpx.cnn

## 18 U.S.C. § 3553(a)(1): History and Personal Characteristics of the Defendant

Tarrio has been portrayed by the media as well as the government in a certain light based on his association with the Proud Boys.  The flooding of images of the Proud Boys on news and other media outlets has unfairly created a distorted and mostly negative image of the defendant.   The defendant hopes that after reviewing several character letters, listening to people who speak on his behalf at his sentencing hearing, and reviewing the points made in this memo that the Court will see another, more true side of him that is much more positive and gentle than the persona created by the media and the government.

## **Family Background**

Henry Tarrio, age 39, was born and reared in Miami, Florida, in 1984.  He was reared mostly by his mother, but lived some of his teenage years with his father and/or his now-deceased paternal grandparents.   When he was a teenager, he moved a few blocks away from his father's home to his paternal grandparents' home to help his family after his grandmother had become bedridden.   He is close to both parents.  The defendant calls his mother several times per day, and his father several times weekly.

The defendant's parents have no criminal record. As far as the family's religious beliefs, the defendant's parents are Catholics, but practice Yoruba (Santeria religion with West African roots).   Tarrio was never the victim of any form of sexual, physical, or mental abuse during his upbringing. Looking back on his childhood, he admitted to being a "rebellious kid," but did not give his parents too many problems. He recalled being 11 years old when he had his first interaction with the police. He built a "potato gun" and his neighbors called the police. When the police arrived, they sat him in the back of the squad car and drove him around the block in an attempt to scare him. He later got into trouble with his father due to his police interaction.   He also noted that although truancy was considered normal behavior for kids his age, he loved school so he rarely failed to attend.

The defendant has a large, close-knit family unit. The defendant and his family frequently took road trips, went on cruises, and took annual ski trips.   Although his biological parents initially were not close after their divorce, they have maintained a very amicable relationship for several years.  In fact, his parents still take family trips and spend

holidays together.   The defendant's mother and stepmother are extremely close/friends. The defendant's mother describes her son as a very good man, despite the media's portrayal of him and the federal charges of which he was recently convicted.   His mother remarked the defendant never gave her any problems regarding drug use.   She stated that when he went out at night, she could go to sleep at night while he was out because she "knew he would be fine."

## Employment History

The defendant's employment history has varied in nature and demonstrates his ability to adapt to a variety of situations.   Despite not obtaining a college degree, he has been able to earn an honest living in several different capacities.  In 2011 and 2012, he was a sales agent for a freight forwarding company, Inter Customs Logistics in Doral, Florida. He earned $4,800 per month from this employment.   In 2013, Tarrio began earning a living by installing security cameras.   After he served a period of imprisonment and was released in September 2014, he worked at his second cousin's car dealership, Auto Expo, Inc., in Miami, for about six months. He has even done mechanic work with his grandfather; and sold shirts/clothing online.   Tarrio opened and operated Spie Security/Spie Surveillance and Automation Technologies, 5730 NW 2nd Street, Miami, a security and camera installation company.  Although at one point he earned $100,000 annually, the company eventually did not perform well after larger corporations such as Google and Nest began offering similar security services at discounted prices.

In a character letter written by the owner of Sun Speed Transport, G. Pardo informed that Tarrio installed GPS devices in his company's trucks; and monitored the company's GPS system and night security from 2015 until he closed his business in 2019. According to Mr. Pardo, there were no issues with the work of the defendant, who "was trusted with the most delicate part of our business, security." The owner of 57 Merchandise, LLC, confirmed the defendant began working as a sales representative for her business when she opened it in 2019. She noted the defendant has "great customer service skills." Raunel Cabrera, the warehouse manager of ICL in Miami, confirmed the defendant worked with him for a few years. During that time, Tarrio proved to be a responsible coworker who paid attention to detail. Mr. Cabrera further recalled the defendant was helpful, "genuinely kind" to his coworkers, and "always ready for a new challenge."

### History of Cooperation and Assisting Law Enforcement Agencies

In 2014, a federal prosecutor, Vanessa Singh Johannes, noted during a court hearing in which Tarrio was involved that he "cooperated with local and federal law enforcement, to aid in the prosecution of those running other, separate criminal enterprises, ranging from running marijuana grow houses in Miami to operating pharmaceutical fraud schemes." The prosecutor, an FBI agent and Tarrio's lawyer at the time went into details regarding his undercover work and said he had helped authorities prosecute **more than a dozen people in various cases involving drugs, gambling and human smuggling**. Tarrio's former lawyer, Jeffrey Feiler, described him as a "prolific" cooperator and pointed out Tarrio worked in an undercover capacity in conjunction with numerous investigations. These investigations varied in nature in that one involved **the sale of anabolic steroids, another regarding "wholesale prescription narcotics" and a third investigation targeting human smuggling.** According to Mr. Feiler, his former client assisted the police in

discovering **three marijuana grow houses**. Tarrio risked his life to assist law enforcement officers on many occasions. An FBI agent who attended Tarrio's hearing in 2014 described him as a "key component" in drug investigations conducted by local law enforcement agencies. The District Court in the Southern District of Florida concluded the defendant had "provided substantial assistance in the investigation and prosecution of other persons involved in criminal conduct." Although the defendant did receive a sentencing reduction as a result of that cooperation, these prior yet significant efforts to assist law enforcement agencies should not go unnoticed by this Court and speak to the character of Mr. Tarrio.

## **Volunteer and Charitable Work**

Hurricane Harvey was a devastating Category 4 hurricane that made landfall on Texas and Louisiana in August 2017, causing catastrophic flooding and more than 100 deaths. The defendant traveled on a dinghy (a small, motorized boat) to the impacted areas to reach and help people get out of the flooded areas where they were stranded. Tarrio also provided them with telephones to use to contact their loved ones and find additional assistance and support.




The defendant has also participated in many other community outreach events such as Toys for Tots.  In 2019, the defendant helped organize and participated in a drive to collect donations for gift cards to be used to buy food and items at department stores for disadvantaged youth.  The event took place on December 17, 2019, at Duffy's Tavern, a popular family restaurant in Miami, and was to benefit a youth center of the Miami Bridge Family Services, Inc.  Lavern Spicer of Curley's House Food Bank in Miami-Dade County has also written a letter of support on behalf of the defendant.



In 2000, Tarrio and some other Proud Boys members joined in a peaceful protest in support of the Jewish community in South Florida.   An attendee observing the event noticed Tarrio and Proud Boys actually offered protection to the elderly attendees, many of whom were survivors of the Holocaust.

During a March 2013, deposition of George Meza, an IT administrator and Rabbi who teaches theology (Judaism) courses online, testified that he never saw the Proud Boys instigating anything.  In places where Conservatives were cornered while leaving rallies, the Proud Boys were there to come to their defense.  He further testified the Proud Boys

never engaged in such activities such as chasing people down who were rioting.



**Family and Community Support & Excerpts from Character Letters**

Despite his arrest and the recent guilty verdict on several counts of the Indictment, the defendant has received an outpour of support from the community and his family, many of whom are law enforcement officers.   The defendant's cousin, Melinda Perez-Tavarez, who has been employed by the City of Miami Police Department for 16 years, states she can truly attest to the defendant's character "that upholds our values and represent(s) everything this country was founded on."   She holds the greatest respect for her cousin, who sincerely loves their family and the United States.   Melissa Rodriguez, a longtime neighbor of Tarrio, advised he has never been a nuisance in any way, shape or form, and described him as a cheerful and respectful individual.   Laura Hosman, a family friend of the defendant's mother that works in the counseling field, described the defendant as a man with "great family values."   She noted he has been an "excellent source of guidance" and has relied on him for moral support.   Ms. Hosman asks the Court to be lenient toward Tarrio when imposing his sentence.

**Model Behavior since arrest in Instant Case**

The defendant was arrested on March 8, 2022, and has been in continuous custody on these federal charges since that date.  As noted in the PSR, Tarrio has remained incarcerated for about one and one-half years and has had no behavioral problems since being in detention.

### Subject to More Severe and/or Cruel Punishment while in Detention

The defendant, who never previously struggled with any mental health issues, began receiving counseling from the mental health department at the county jail facility in Alexandria, Virginia, where he is being detained.   Because of the nature of his federal charges and the county jail's policy, he has been "locked down" in his jail cell 22/24 hours per day.  This isolation has impacted his mental health, as confirmed by the defendant's mother, who visits him  confirmed this information.  She has noticed he has seemed very anxious during recent jail visits or telephone conversations.    His mother travels to visit him twice monthly at the facility.  In March 2023, he began receiving counseling at the jail to help him cope with this situation.    The nature of the defendant's incarceration and enhanced restrictions are factors that should warrant consideration by the Court.

### Conclusion

The defendant hopes the Court denies the government's objections to the PSR as to his criminal history points and category and the terrorism enhancement; and that it grants the defendant's previously filed objections to the PSR , to avoid an unnecessarily and unfairly severe punishment for his specific actions in the events that took place on January 6th.   The defendant further urges the Court to consider this memorandum to see another side of him - one that is benevolent, cooperative with law enforcement, useful in the

community, hardworking and with a tight-knit family unit and community support.   Tarrio

urges the Court to give sufficient weight to and consider some of these 3553(a) sentencing

factors that are deserving of a downward variance from his guideline imprisonment range.


Date of filing via CM/ECF:  August 18, 2023


Respectfully submitted,

/s/ Nayib Hassan

_____

Nayib Hassan, Esq., Fla Bar No. 20949
Attorney for Defendant
LAW OFFICES OF NAYIB HASSAN, P.A.
6175 NW 153 St., Suite 221
Miami Lakes, Florida 33014
Tel. No.: (305) 403-7323


/s/ Sabino Jauregui, Esq., Fla Bar No. 503134

_____

Attorney for Defendant
1014 West 49th Street
Hialeah, Florida 33012
Tel No:  (305) 822-2901