1
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2
     * * * * * * * * * * * * * * *  )
3    UNITED STATES OF AMERICA,        )      Criminal Action
                                      )        No. 21-00175
4                    Plaintiff,       )
                                      )
5         vs.                         )
                                      )
6    ETHAN NORDEAN, JOSEPH R. BIGGS,  )      Washington, D.C.
     ZACHARY REHL, ENRIQUE TARRIO and )      December 20, 2022
7    DOMINIC J. PEZZOLA,              )      1:39 p.m.
                                      )
8                    Defendants.      )
                                      )
9    * * * * * * * * * * * * * * *    )

10

11              TRANSCRIPT OF JURY TRIAL - DAY 2
                      **AFTERNOON SESSION**
12           BEFORE THE HONORABLE TIMOTHY J. KELLY,
                  UNITED STATES DISTRICT JUDGE
13

14
     APPEARANCES:
15
     FOR THE GOVERNMENT:      JASON B.A. McCULLOUGH, ESQ.
16                            ERIK M. KENERSON, ESQ.
                              CONOR MULROE, ESQ.
17                            NADIA MOORE, ESQ.
                              UNITED STATES ATTORNEY'S OFFICE
18                              FOR THE DISTRICT OF COLUMBIA
                              555 Fourth Street, Northwest
19                            Eleventh Floor
                              Washington, D.C. 20530
20

21   FOR THE DEFENDANT        NICHOLAS D. SMITH, ESQ.
              NORDEAN:        DAVID B. SMITH, PLLC
22                            1123 Broadway
                              Suite 909
23                            New York, New York 10010

24

25

```
 1       APPEARANCES, CONT'D:

 2       FOR THE DEFENDANT        JOHN D. HULL, IV, ESQ.
                 BIGGS:          HULL McGUIRE, P.C.
 3                               1420 N Street, Northwest
                                 Washington, D.C. 20005
 4
                                 NORMAN A. PATTIS, ESQ.
 5                               PATTIS & SMITH, LLC
                                 383 Orange Street
 6                               First Floor
                                 New Haven, Connecticut 06511
 7

 8       FOR THE DEFENDANT        CARMEN D. HERNANDEZ, ESQ.
                  REHL:          7166 Mink Hollow Road
 9                               Highland, Maryland 20777

10
         FOR THE DEFENDANT        NAYIB HASSAN, ESQ.
11               TARRIO:         LAW OFFICES OF NAYIB HASSAN, P.A.
                                 6175 Northwest 153rd Street
12                               Suite 209
                                 Miami Lakes, Florida 33014
13
                                 SABINO JAUREGUI, ESQ.
14                               JAUREGUI LAW, P.A.
                                 1014 West 49th Street
15                               Hialeah, Florida 33012

16
         FOR THE DEFENDANT        STEVEN METCALF, II, ESQ.
17               PEZZOLA:        METCALF & METCALF, P.C.
                                 99 Park Avenue
18                               Sixth Floor
                                 New York, New York 10016
19

20       REPORTED BY:            LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
21                               United States District Court for the
                                    District of Columbia
22                               333 Constitution Avenue, Northwest
                                 Room 6706
23                               Washington, D.C. 20001
                                 (202) 354-3269
24

25
```

<u>I N D E X</u>

Jury Selection                                         Page 409

1          THE COURTROOM DEPUTY:  Your Honor, we're back on

2     the record in Criminal Matter 21-175, United States of

3     America versus Ethan Nordean, et al.

4          THE COURT:  All right.  Good afternoon, everyone.

5          We are going to start, as we mentioned, out of

6     order with someone who has a time issue.  It's Juror No.

7     0105.  I'm going to just -- before we bring the potential

8     juror out, I'm going to just point counsel to her answer to

9     Questions 1, 11, 70, 71, that, for a variety of reasons, I

10    think it makes sense to excuse her.

11          I'm going to bring her out and ask her about her

12    childcare to start, No. 1.  But I'm inclined to -- if that

13    plays out -- hold on.  Okay.  I can't be competing with

14    counsel.  All right.

15          If that plays out, then I plan on just dismissing

16    her for cause pretty quickly.

17          Any objection to that from -- I see a lot of nods

18    on the defense side.  What about from the Government?

19          MR. McCULLOUGH:  No objection, your Honor.  I

20    think we should just start with the childcare issue.

21          THE COURT:  Yes.

22          THE COURTROOM DEPUTY:  Are you ready, Judge?

23          THE COURT:  Yes, ma'am.

24          (Thereupon, Prospective Juror No. 0105 entered the

25    courtroom and the following proceedings were had:)

1          THE COURT:  Good afternoon, ma'am.

2          PROSPECTIVE JUROR:  Good afternoon.

3          THE COURT:  Can you remove your mask, just while

4     you're answering these questions?

5          PROSPECTIVE JUROR:  Sure.

6          THE COURT:  Okay.  So let me start with Question

7     No. 1 that you answered.  It sounds like -- tell us about

8     your childcare issues and whether anyone -- there's any

9     other -- you have the ability to have anyone else step in,

10    and what time you'd have to pick up your child.

11         PROSPECTIVE JUROR:  Sure.  So I have a 9-year-old

12    daughter.  So she gets dropped off at 8:30 and then picked

13    up at 3:30.  So my dilemma would be -- I mean, from looking

14    at the timeline, would be my pickups --

15         THE COURT:  Right.

16         PROSPECTIVE JUROR:  -- just because I wouldn't be

17    able to make it in time.

18         THE COURT:  Right.

19         PROSPECTIVE JUROR:  I am pretty limited.  The

20    father is not really involved, so it would just be on me to

21    really make sure to find some alternative care.

22         THE COURT:  Is there anyone that comes to mind

23    that you could turn to?

24         PROSPECTIVE JUROR:  I mean, I have siblings, but

25    they all work.  So it's -- you know, just as far as

1    flexibility, I think it would be very difficult for me.

2          THE COURT:  All right.  Have they ever done

3    anything like that before for you for long, long stretches

4    like this?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  All right.  Any objection?

7          MR. McCULLOUGH:  (Shakes head in the negative.)

8          THE COURT:  Ma'am, we're going to excuse you for

9    cause.  Thank you very much.

10          PROSPECTIVE JUROR:  Thank you.  I appreciate that.

11          THE COURT:  Absolutely.  Thank you for coming

12    down.  You'll be excused.

13          PROSPECTIVE JUROR:  Thank you.

14          (Thereupon, Prospective Juror No. 0105 retired

15    from the courtroom and the following proceedings were had:)

16          THE COURTROOM DEPUTY:  Your Honor, are you ready

17    for the next juror?

18          THE COURT:  We are.

19          THE COURTROOM DEPUTY:  That juror number is 0237.

20          (Thereupon, Prospective Juror No. 0237 entered the

21    courtroom and the following proceedings were had:)

22          THE COURT:  Good afternoon, sir.  Thank you for

23    coming down here and being willing to serve.

24          Could you remove your mask just so -- just when

25    you're answering these questions, just so we can hear you

1    properly.  Thank you.

2            First of all, you are Juror 0237.  Correct?

3            PROSPECTIVE JUROR:  Yes, sir.

4            THE COURT:  Okay.  So I want to start with your

5    answer to Question 1.  It says you can't take off work.  Is

6    that -- is that the case?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Tell me what kind of work you do.

9            PROSPECTIVE JUROR:  Construction.

10           THE COURT:  Construction?

11           PROSPECTIVE JUROR:  Yes, sir.

12           THE COURT:  Okay.  And do you get paid by the

13   hour, then?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  And if you didn't work, you wouldn't

16   get paid.  Is that correct?

17           PROSPECTIVE JUROR:  Right.

18           THE COURT:  All right.  You also had a number

19   of -- let's put it this way:  You answered a number of --

20   well, let me ask the parties whether there's any objection

21   to excusing this juror.

22           All right.  I see everyone is in agreement.  Sir,

23   you'll be excused for cause.  Thank you very much for coming

24   down.

25           PROSPECTIVE JUROR:  Thank you.

```
1              THE COURT:  And you'll get further instructions

2      from the courtroom deputy.  Thank you.

3              PROSPECTIVE JUROR:  Thank you.

4              (Thereupon, Prospective Juror No. 0237 retired

5      from the courtroom and the following proceedings were had:)

6              THE COURTROOM DEPUTY:  Your Honor, the next juror

7      is 0363.

8              (Thereupon, Prospective Juror No. 0363 entered the

9      courtroom and the following proceedings were had:)

10             THE COURT:  Good afternoon, sir.  Thank you for

11     being here.

12             PROSPECTIVE JUROR:  Good afternoon.

13             THE COURT:  Let me start by addressing what you

14     raised in Question -- your answer to Question 1.  Do you

15     have firm -- it sounds like you often go to the U.K.  I

16     couldn't tell from your answer whether you had any firm

17     plans right now and, frankly, if there -- well, do you have

18     any firm plans?

19             PROSPECTIVE JUROR:  I do not.  I tend to go for

20     two weeks and then come back for two weeks every month.

21             THE COURT:  Okay.  I don't think -- given that, I

22     don't think this can qualify as an extreme hardship -- let's

23     put it that way -- without a firm plan and even -- given the

24     fact that it's sort of something of a personal nature that

25     you do routinely.  So I don't think I can excuse you for
```

1    that basis.

2         You indicate on Question 15 that you or a close

3    friend have been -- ever been employed by the Federal

4    Government.  Who is that person to you?

5         PROSPECTIVE JUROR:  I worked as a legislative

6    assistant for the House of Representatives as my first job.

7         THE COURT:  Okay.  How long ago was that?

8         PROSPECTIVE JUROR:  1992.

9         THE COURT:  Okay.  And if you could just remove

10   your mask just so we can make sure we can hear you.

11        PROSPECTIVE JUROR:  Certainly.

12        THE COURT:  Super.

13        All right.  And -- okay.  So quite a while ago?

14        PROSPECTIVE JUROR:  Yes, sir.

15        THE COURT:  Okay.  Any other close friend or

16   family member been employed by the Federal Government?

17        PROSPECTIVE JUROR:  No.  I would not categorize a

18   close friend.

19        THE COURT:  Okay.  Well, one of the charges in

20   this case is that -- one of the allegations is that the

21   Defendants opposed the government of the United States by

22   force.  So the first question I ask is -- for anyone who has

23   a kind of connection like this to the Federal Government,

24   even one as attenuated as yours, is whether just by virtue

25   of that connection you think the fact that you once worked

```
1    for the Federal Government and once worked in Congress --
2    whether that by itself suggests to you that you can't be
3    fair and impartial.
4            PROSPECTIVE JUROR:  I think I can still be fair
5    and impartial despite that.
6            THE COURT:  Okay.  You also prior served on a jury
7    before.  Anything about that experience again that makes you
8    think you couldn't again render service as a juror?
9            PROSPECTIVE JUROR:  No, sir.
10           THE COURT:  Now, you also checked box --
11   Question 45, just to kind of orient you.  You checked yes.
12   I assume the answer to that question is just your prior
13   service as a staffer.  But if it's not, if there's some --
14   if you checked that for some other reason --
15           PROSPECTIVE JUROR:  No.  That's my prior service
16   as a staffer.
17           THE COURT:  Okay.  That's what I thought was
18   possible.
19           All right.  So you checked a bunch of boxes
20   about -- suggesting that you, like many folks, have seen
21   news coverage of January 6th and what happened that day.  Do
22   you want to give us a sense of -- you know, a high-level
23   sense of how closely you followed that and how you -- what
24   kinds of news and media you've consumed about January 6th
25   generally?
```

1      PROSPECTIVE JUROR:  Well, I certainly watched it

2   live on TV, like I'm sure most Americans did.  And I live

3   here in the District, so I experienced the noise and the

4   aftermath of the National Guard coming into the District.

5      I flew to D.C. on January 5th, and my plane was

6   very loud and rowdy with people coming to D.C. during that,

7   so that was a time when certainly I heard the buildup to the

8   event.

9      And since then, I do follow the news and watch

10   news shows as part of my regular schedule.  So I've

11   continued to read and/or see that on TV since then.

12      THE COURT:  Okay.  Look, many people, obviously,

13   to varying degrees have seen and heard things about what

14   happened that day.  And so my question to you is:  Can you

15   take what you -- can you take those things you've learned --

16   and this was your answer to -- you answered this question

17   already, which is Question No. 47.  And you said -- the

18   question was:  Could you set aside all those things and

19   render service in this case and base any verdict, if you

20   were selected as a juror, on just the facts and the law as I

21   instruct you?

22      PROSPECTIVE JUROR:  I believe so, yes.

23      THE COURT:  Okay.  Now, you gave -- for 48, you

24   checked the box no:  Do you have any strong opinions -- or

25   checked the box, sorry, yes on 48:  Do you have any strong

1    opinions about any aspect of the events that occurred that

2    would affect your ability to be a fair and impartial juror

3    in this case?  What occurred on January 6th.

4            So, you know, in order to be a juror, you not only

5    have to be able to set aside whatever -- the facts that you

6    may have -- you know, whatever you may have heard or seen,

7    but also any feelings you have about what happened.

8            What are the strong opinions you have that day?

9    And do you still believe you wouldn't be able to -- or at

10   least the answer to that question suggests you might not be

11   able to set them aside.  Talk about that, if you would.

12           PROSPECTIVE JUROR:  Yeah.  I didn't know exactly

13   how to answer this question.  I do have strong feelings

14   about that day.  I -- and I can get into that if you would

15   like.

16           THE COURT:  Sure.  Just as a first step.  Yes.

17           PROSPECTIVE JUROR:  I feel that -- certainly I

18   believe in the right of peaceful assembly and protest.  But

19   I also felt that at some point the events that -- of that

20   day went beyond that.  And I think the people who were on

21   the Mall, when they went beyond the barricades and they went

22   beyond forces, certainly violated that area.  So I have an

23   opinion about that.

24           I do believe I can try to separate that and listen

25   to the instructions of the Court and to do that, but I

1    wanted to disclose that.

2          THE COURT:  Okay.  So -- I mean, I know some of

3    the wording of these questions is -- it's not always clear

4    whether you think you could set it aside.  So that's -- that

5    is the key question here, is whether you can take -- you

6    know, obviously, the Defendants in this case are only

7    charged with -- they're not charged with events of the day

8    writ large.  Right?  There's going to be evidence in the

9    case.  The Government has to prove the allegations beyond a

10   reasonable doubt in each and every element of the offenses

11   they think occurred.

12          And so, you know, especially given that you

13   checked yes, I need to make sure you feel you can take

14   whatever strong feelings you have, put them aside and render

15   a verdict only on the evidence and only on the law.

16          PROSPECTIVE JUROR:  I would think so.  Yes.

17          THE COURT:  All right.  A similar question

18   about -- the next set of questions is about the Proud Boys.

19   You, again, checked yes for you had read, seen or heard

20   anything about the Proud Boys.  Tell us what you have heard,

21   seen or read about the Proud Boys.

22          PROSPECTIVE JUROR:  Well, again, just following

23   the news over the past couple of years, they've come up from

24   time to time.  My opinion on them is not positive.  I would

25   categorize them as a hate group, quite honestly.

1          And I think I can separate that, again, follow the

2     instructions.  But I do have an informed opinion about the

3     Proud Boys.

4          THE COURT:  Obviously, you -- given that you think

5     they're a hate group, that's something that's offensive to

6     you.  Is that the fair to say?

7          PROSPECTIVE JUROR:  Correct.

8          THE COURT:  Okay.  And yet, despite that, you're

9     telling us you think you can set that opinion aside and,

10    again, just judge this case based on the evidence and the

11    facts?

12         PROSPECTIVE JUROR:  Yes, sir.

13         THE COURT:  You know, do you think, given the --

14    well, let's put it this way:  Given the folks you interact

15    with either at work or in your personal life, would you

16    be -- would you still be able to return to your work life

17    and personal life and after -- if the evidence -- if the

18    Government failed to meet its burden, rendering a judgment

19    of acquittal and finding these Defendants not guilty if the

20    Government didn't prove its case?

21         PROSPECTIVE JUROR:  I would have no problem with

22    friends or colleagues.

23         THE COURT:  All right.  Again, your answer to

24    Question 50, where you checked yes, it's sort of the same

25    thing as 47.  You wanted to -- I mean, I don't want to put

1    words in your mouth, but it sounds like, from what you just

2    said, you wanted to disclose that there are things that

3    could affect your ability but, as you're sitting here today,

4    you think you could set it aside?

5         PROSPECTIVE JUROR:  Yes.  You know, I wanted to

6    disclose my feelings, because that seemed to be the first

7    part of the sentence.  I feel that I can follow the

8    instructions of the Court if that's what I'm told.

9         THE COURT:  Okay.  It is absolutely what you will

10   be told.

11        PROSPECTIVE JUROR:  I assumed so.

12        THE COURT:  All right.  You also checked that you

13   have read, seen or heard things about Antifa.  Can you

14   describe to us what you have read, seen or heard about

15   Antifa?

16        PROSPECTIVE JUROR:  Just -- much like the Proud

17   Boys, constantly coming up at various times in the news over

18   the course of months and the past year.  And it seems to be

19   on the opposite side of the Proud Boys equation, that they

20   seem to be antagonists or -- I don't know if that's the

21   right phrase, but the Proud Boys are -- would make comments

22   against Antifa, is how I would have it in my mind.

23        So -- I have not researched Antifa.  I don't

24   really know details about them specifically other than

25   hearing them brought up in the context of this case.

```
 1            THE COURT:  Do you have a sense of what Antifa

 2     stands for or represents other than, as you said, sort of

 3     just being the opposite of whatever the Proud Boys stand

 4     for?

 5            PROSPECTIVE JUROR:  I mean, I believe that it's an

 6     amalgamation of antifascists.  I think that's where Antifa

 7     comes from, and certainly -- I'm not pro-fascist, but -- I'm

 8     not supportive of Antifa, but I believe that's what it

 9     stands for.

10            THE COURT:  Okay.  That's the extent of your

11     knowledge of Antifa?

12            PROSPECTIVE JUROR:  Yes, sir.

13            THE COURT:  Okay.  And what about the Oath

14     Keepers?  You said you had read, seen or heard something

15     about the Oath Keepers.

16            PROSPECTIVE JUROR:  Just in a similar context of

17     the Proud Boys, although I believe, right before we came in,

18     there was a judgment or something in the news against the

19     Oath Keepers.  I could be wrong.  But I certainly followed

20     the headlines and saw that there was a court case that had

21     some convictions, some nonconvictions, if I remember

22     correctly.

23            THE COURT:  Okay.  Another -- especially since you

24     mentioned the other court case, you need to be able to,

25     if -- to be able to give faithful service in this case, you
```

1    need to set aside, again, whatever you might have seen or

2    heard about the Oath Keepers, including any other headlines

3    you may have seen about court cases, relating that --

4            PROSPECTIVE JUROR:  Certainly.

5            THE COURT:  -- and only judge this case based on

6    the facts -- based on the evidence introduced in this case

7    and the law as I instruct you.

8            Do you think you can do that?

9            PROSPECTIVE JUROR:  Yes, sir.

10            THE COURT:  For Question 58 you indicated that a

11    close friend or family member had been in the legal

12    profession.  Who's that person to you?

13            PROSPECTIVE JUROR:  So I did go to law school and

14    I worked in the city attorney's office in Springdale,

15    Arkansas, as my first job -- or my second job.

16            But I don't hold myself out as an attorney.  My

17    license is not active.  But that is me.  I do know a number

18    of attorneys.  It seems like at least half of my friends are

19    attorneys in one capacity or another.  So...

20            THE COURT:  Anything -- do you have any -- first

21    of all, did you ever practice criminal law?

22            PROSPECTIVE JUROR:  No, sir.

23            THE COURT:  Any of your close friends who are

24    attorneys practice criminal law?

25            PROSPECTIVE JUROR:  No, sir.

1            THE COURT:  You also checked that someone had been

2    the victim of a crime on 62.  Is that you or someone else?

3            PROSPECTIVE JUROR:  Me, but it's not a personal

4    crime.  I've had my car stolen and other events like that.

5            THE COURT:  Okay.  Anything about those

6    experiences that leads you to think you wouldn't be able to

7    be a fair juror here?

8            PROSPECTIVE JUROR:  No, sir.

9            THE COURT:  All right.  A couple of other

10    questions similar to the questions on Antifa that I asked

11    you.  The question on Antifa was whether you had read, seen

12    or heard anything about Antifa.

13            Have you read, seen or heard anything about the

14    Black Lives Matter organization?

15            PROSPECTIVE JUROR:  Not the organization itself.

16    Certainly, you know, the events that happened and the

17    presence in Washington, with the march on Washington, or the

18    events that occurred here.

19            THE COURT:  Okay.  What do you mean by "the events

20    that occurred here"?

21            PROSPECTIVE JUROR:  The Black Lives Matter -- the

22    people going down by Pennsylvania Avenue and just that

23    time -- I believe it was in June, some time ago, when

24    basically the demonstrations occurred and -- across America,

25    but certainly in D.C.

```
 1              THE COURT:  What do you -- whether -- we're

 2    talking about the -- so you separate --

 3              PROSPECTIVE JUROR:  I'm not talking about the

 4    organization itself.  Just about the movement, I guess.

 5              THE COURT:  Okay.  Do you know anything about the

 6    organization itself?

 7              PROSPECTIVE JUROR:  No, sir, I do not.

 8              THE COURT:  Okay.  Well, what does the movement

 9    stand for to you or what's your perception of what they

10    stand for?

11              PROSPECTIVE JUROR:  Certainly trying to right an

12    injustice, kind of a historical injustice.  And certainly

13    the Black Lives Matter occurrence with the death of the -- I

14    believe the gentleman in Minneapolis and the response about

15    overdue police force, and the arrest, historically, and the

16    outrage, I think, of that situation that led to the

17    demonstrations, which generally I'm supportive of.

18              I'm not supportive of demonstrations getting out

19    of control, but certainly the -- the feelings behind the

20    movement I am supportive of.

21              THE COURT:  This case might involve evidence that

22    the Defendants opposed the Black Lives Matter organization.

23              Do you have any strong feelings about Black Lives

24    Matter that would -- if that were the case, do you have such

25    strong feelings about it that would affect your ability to
```

1    be fair and impartial in this case?

2            PROSPECTIVE JUROR:  No.  I certainly understand

3    that people have the right to their opinions, and people can

4    disagree on that.  Again, it's something that I personally

5    feel strongly in, but I understand that other people can

6    have differing opinions.  That -- that's not illegal.

7            THE COURT:  This case also might involve evidence

8    that one of the Defendants unlawfully possessed a

9    high-capacity magazine, although none of the Defendants are

10   charged with that crime in this case.  But that's what the

11   evidence may show.

12           Do you have any strong feelings about firearms or

13   ammunition or related laws, again, that could affect your

14   ability to be fair and impartial?

15           PROSPECTIVE JUROR:  I don't think it would affect

16   my ability to be fair or impartial.

17           THE COURT:  All right.  Let's see.  Why don't

18   you -- can I have you -- Ms. Franklin, if you could take

19   this juror and have him stand outside both sets of double

20   doors again.

21           THE COURTROOM DEPUTY:  Yes.

22           THE COURT:  Sir, we may have some more questions

23   for you.  Just give me a moment to talk with the lawyers.

24           (Thereupon, Prospective Juror No. 0363 retired

25   from the courtroom and the following proceedings were had:)

1           THE COURT:  Any followup?  I did go into the -- he

2      was offended, you know, but I -- I don't see a reason he

3      shouldn't be qualified.  But I'll hear -- well, let me put

4      it this way.  I'll hear from -- either whether you want

5      followup or, if not, whether he should be qualified.

6           MR. PATTIS:  My attention may have lapsed, but I

7      didn't recall anything about recent publicity, similar to

8      what had occurred prior to the lunch.  And -- again, if I

9      missed it, I missed it.

10          THE COURT:  You mean over the last 24 hours?

11          MR. PATTIS:  Yes.  Yes.

12          THE COURT:  Okay.

13          MR. JAUREGUI:  Judge, Sabino Jauregui on behalf of

14     Tarrio.

15          Along those lines, he seems to be a news junkie.

16     If your Honor could ask him if he's heard anything in the

17     media specifically about our clients, Enrique Tarrio and the

18     people accused in this case specifically.

19          Also --

20          THE COURT:  Well, I mean, to be clear, he did -- I

21     mean, I'm going to ask him about the last few days.  But he

22     did answer this question already no, he hadn't heard

23     anything about your client.

24          MR. JAUREGUI:  Judge, also, I'd like to know what

25     this gentleman does for a living.  I have no idea.  He

1    basically just put consultant/self-employed.  I'd like to

2    know what he does.  He is suspended currently in the

3    Arkansas Bar, so I'd like to know if there's any misconduct

4    there with the State of Arkansas with his bar license.  I

5    think that's important.

6            And I know I've asked before.  I think we should

7    ask him if the Proud Boys offends any -- how can I say this

8    correctly? -- any ideals in the LGBT community, in the gay

9    community, and if any of the Proud Boys' core beliefs

10   offends him as a gay man.

11           THE COURT:  He said he was offended.  I mean, I

12   don't know that the reason really matters.  He answered the

13   question and said, I'm offended by them.  So -- you know,

14   and then said, I can set it aside.

15           So I'll ask the living question.  I'll ask the

16   recent publicity question, especially for somebody who --

17   this is the first set of folks who we didn't have yesterday

18   at all.

19           Anything else?

20           MR. JAUREGUI:  And why he thinks that the Proud

21   Boys are a hate group, Judge.  That's important.

22           THE COURT:  Well, he said they were a hate group.

23   I don't really know that it matters much more why.

24           Ms. Hernández, do you have something quickly?

25           MS. HERNANDEZ:  I agree with your Honor.  He said

1   the Proud Boys are a hate group.  I think that's enough to

2   strike for cause.

3            THE COURT:  I'll take up your argument on that

4   once we just are done --

5            MS. HERNANDEZ:  Two things:  He said his primary

6   news source is MSNBC.  It is difficult for me to believe,

7   because I watch MSNBC from time to time, that he has not

8   heard more about the Proud Boys, he doesn't know Tarrio's

9   name.  I mean, you cannot watch MSNBC for any period of time

10  and not know much about the Proud Boys.

11           So I'd like the Court to explore more about what

12  he has heard or knows about the Proud Boys, so why he

13  believes they're a hate group.

14           THE COURT:  All right.

15           MS. HERNANDEZ:  Sorry.  And -- I -- I already sort

16  of mentioned this hate group issue.  I think there is a -- I

17  think there is -- if an organization offends you in a way --

18  in part because of your lifestyle or who you are -- I mean,

19  I don't want to say -- if he's a gay person, I don't want to

20  say that's a lifestyle.  That's who he is.

21           THE COURT:  Ms. Hernández, the microphone.

22           MS. HERNANDEZ:  So I don't want to refer to being

23  gay as a lifestyle.  That is who he is.  And if some of the

24  offense that he takes from the Proud Boys relates to who he

25  is, I think that's an immutable, you know, element.  It's

1    not like, oh, it offends me because you don't like my art.

2            So I'd like -- I don't know how -- it's a

3    sensitive topic.  I don't know how to explore it.  That's my

4    concern.

5            THE COURT:  And there's nothing in the record

6    about this at all.

7            You know, I -- I've asked him whether he was

8    offended.  He conceded he was.  And then he said he could

9    set it aside.  I don't think it's --

10           MS. HERNANDEZ:  Can we explore why -- what is

11   it -- what about the Proud Boys offends him?  Or maybe --

12   did you explore that?

13           MR. JAUREGUI:  Judge, just for the record, on the

14   questionnaire, he says he has a husband.

15           THE COURT:  I'm sorry.  It says what?

16           MR. JAUREGUI:  That he has a husband in the

17   questionnaire.

18           THE COURT:  Okay.  Fair.

19           MR. JAUREGUI:  Just to be clear.

20           THE COURT:  Fair point.  Thank you.  Fair point.

21           MR. HULL:  Your Honor, not to tag-team with

22   Mr. Pattis, but he kind of had me at hate group.  But twice

23   I think you asked him whether he had strong views about A or

24   B.  And he didn't say yes or no; he just said he thought he

25   could be fair and impartial, sort of skipping a couple of

 1    answers or questions.

 2            So -- and the transcript will reflect whether I'm

 3    correct.  But I thought he was evasive.  I don't credit a

 4    couple of his answers.

 5            THE COURT:  Anything further?

 6            I'm going to ask him about the recent news over

 7    the last 24 hours, and I'm going to ask him what he does for

 8    a living.

 9            On this other thing, I think we have -- look, I

10    asked him, was he offended?  He explained that he was and

11    that he doesn't share their views.  You know, it's an

12    argument.  You can make your argument to strike him.  I get

13    it.  But I don't think I need to probe any further about,

14    you know, the reasons why he is offended by them.

15            MS. HERNANDEZ:  I disagree with a lot of groups.

16    I don't like a lot of groups.  They don't necessarily offend

17    me.  I think that's a very personal response.  So I just --

18    if the Court would just ask a couple of questions of what

19    about the Proud Boys offends him.

20            THE COURT:  Well, okay.  I did ask -- in other

21    words -- I take your point that disagreeing with a group is

22    different than being offended.  But he said he was offended.

23    So he went that extra mile.

24            But -- okay.  I'll -- I'll ask why he was

25    offended.  I don't know that it's going to change any of his

1    answers.

2              Mr. McCullough, do you have something you want to

3    say?

4              MR. McCULLOUGH:  I was just going to -- if your

5    Honor would like, just to weigh in, I think exploring kind

6    of the basis for his hate group suggestion.  Given the fact

7    that he's a voracious consumer of news, I think that's an

8    appropriate question.

9              And in addition, I think one of the other things

10   that was raised by the defense was to ask whether he

11   identified any of these Defendants.

12             I appreciate that he says no in the questionnaire.

13   But given the voracious consumer of news, awareness of the

14   Oath Keepers verdict, which he said he knew some people were

15   guilty and not guilty -- note, I think it's useful just to

16   confirm that he has not -- he's not familiar with these

17   individual Defendants.

18             THE COURT:  Okay.

19             MR. PATTIS:  Judge, I'm sorry to do this to you.

20   I've been debating whether to raise this.  I mean, I take

21   our job to decide -- this jury's job is to decide whether

22   the Defendants have -- the Government has proven that the

23   Defendants committed conduct that violates the elements of

24   an offense.

25             But I think it takes place over an overlay that

1    makes this trial potentially very significant.  And so when

2    a person says hate -- when a person identifies the Proud

3    Boys with hate or with extremism, I begin to get concerned.

4        And I haven't raised it yet because I don't want

5    to make this into an overtly political trial, but it may be

6    unavoidable, hearing the arguments.

7        Given the folks I've been representing for the

8    last three or four years, the Proud Boys are mainstream in

9    my world.  And the hate groups are the people -- and what

10   they hate is what's happening to this country.  And from

11   their -- and so every time they're labeled an extremist, I'm

12   starting to feel like a stranger in my own land.  And I

13   think that's what unites them.

14       And so I just want to be careful here.  But I

15   would suggest -- it would be helpful for me to know, and I

16   think for my client to understand, that when a person refers

17   to them as an extremist, what are they talking about?

18       THE COURT:  Okay.

19       MR. PATTIS:  Because there is a segment of the

20   population now that says if a white male criticizes the

21   diversity agenda or identity politics --

22       THE COURT:  Sure.

23       MR. PATTIS:  -- they're a supremacist --

24       THE COURT:  Sure.

25       MR. PATTIS:  -- and they may not be.  They may

1    simply be hateful of having their identity called into

2    questions that are new in this country.

3           And I just don't know if we can go there safely

4    without making this trial more than it is.  But we seem to

5    be there with these last few colloquies on this topic.

6           THE COURT:  That's fair.  I mean, that's fair.

7           And it may be -- you know, Mr. Pattis, that's why

8    I asked a number of folks -- I was a little reluctant do

9    this because it assumes kind of what you all might do in

10   your defense.  But I asked a few people:  Well, okay.

11   That's your perception of Proud Boys.  Are you open to

12   hearing that there's, you know, other information about what

13   they're about?  Or I forget how I phrased it.  Because,

14   again, part of this is going to be, I think -- I'm sure --

15   it seems to me you are very likely to put on some kind of --

16          MR. PATTIS:  I don't know if we are.  And I don't

17   know if you'll permit it, candidly, because it might come

18   close to nullification.

19          I think, when people raise extremism, it concerns

20   me.  Because what we're here to evaluate is conduct.  And,

21   you know, if the Government opens the door broadly as to

22   motive, we'll walk through it.  I understand that motive

23   isn't a necessary element.

24          But it seems to me that this -- to me, what's

25   going on in the country is a broad-scale crisis of

1    legitimacy.  And if this trial is going to become a trial

2    about what should we be as a people, that's very different

3    than the narrow offense that's been charged.

4         And every time I hear somebody talk hate group,

5    extremism, all the bells go off, and I feel like, do you

6    want make this into a barroom brawl?  We're here, but that's

7    not what you're going to want.

8         THE COURT:  Well, no.  No.  Of course you are

9    correct.  We don't want the trial to be anything like what

10    you're describing.

11         I think part of the issue is -- and if I ask the

12    question, we may find out the answer.  But part of the issue

13    is that a lot of folks, I suspect, have an understanding

14    that may be not very deep.  Right?  And they see that word

15    "extremist," or something like that, bandied about in the

16    press.  And they just -- they associate it with the Proud

17    Boys because that's what -- that's what is in *The Washington*

18    *Post*, or something like that.  I mean, I shouldn't pick a

19    particular group.

20         But then you poke beyond it and they'll say:

21    Well, actually, I don't know.  That's just -- you know,

22    that's the general -- my general understanding.

23         But we'll see.  I mean, you know, that's different

24    than saying, I've studied it and here's my --

25         MR. PATTIS:  It's just a hinky area to get into

 1    here.

 2                   THE COURT:  Yeah.

 3                   MR. PATTIS:  You know, I wanted you to hear from

 4    my perspective.  If you go there, that's the information I'm

 5    looking for.  But I'm not going to raise it without the

 6    Court's permission.

 7                   THE COURT:  Right.  But if they open it -- if they

 8    open the door to it -- all right.

 9                   I'll ask him a little bit more about those things.

10                   MS. HERNANDEZ:  One last thing on this point, your

11    Honor.

12                   One of the clients -- I won't identify who --

13    asked, Does this mean we're going to be facing two trials:

14    one trial to determine whether we're a hate group, and

15    another trial to determine whether we committed these

16    crimes?

17                   Because this is how it's feeling to them.  Person

18    after person identifies them as hate group, as armed

19    militia, as, you know, offensive to them.  And these are the

20    people who are going to be standing in judgment of whether

21    they committed a crime?  It's a very scary proposition for

22    the Defendants personally.  It's a very scary proposition

23    for a defense attorney.

24                   If we were doing voir dire for a drug case and we

25    had person after person come up and say, Urban youth are

1    thugs, urban youth are gang members, urban youth are

2    whatever, are very violent, are an armed group, none of

3    us -- we would all join in saying we can't -- but I'll be

4    fair.  You have a pre- -- it is an expression.  And the fact

5    that they don't give us the reasons why makes it worse.

6    Because that's what prejudice is.  Right?  An opinion based

7    on not facts, but some sense of something out there.

8           It's a very scary proposition in a case where we

9    know that the Government's theory of the case is novel and

10   that the entire country has been captivated by these issues

11   for two years.

12          Again, if someone came up there and expressed the

13   kind of animus towards this group against any other kind of

14   defendant that appears before your Honor, you would not

15   stand for it.  And I just don't know what else to say except

16   I think these people have to be struck for cause.

17          THE COURT:  Why don't I give just the Government

18   an opportunity to respond, if it would like, to respond to

19   any of that.

20          MR. McCULLOUGH:  Your Honor, this -- these

21   individual Defendants are charged with not being Proud Boys;

22   they are charged with assembling on the National Mall and

23   walking directly to the Capitol, arriving there ten minutes

24   before the certification was to start, and charging across

25   the barricades.

1          The question will be whether they planned to do so

2     and whether they -- that was the criminal objective from the

3     outset.

4          And I think the issue with respect to each juror

5     is whether they are prepared to set aside any biases, any

6     information they may have heard, and assess the evidence and

7     the facts in the case and apply the law that you present

8     them.

9          There -- there is no -- the Supreme Court has said

10    you expect and anticipate that you will have an informed

11    jury pool and, if there is information in the media that

12    they have consumed, that they will hear that and they will

13    share that -- what they've heard with you and they will

14    explain to you and to the parties whether or not they can

15    set that aside and judge these Defendants on what they're

16    being charged with.

17         I think that's the situation we're in here.

18         MS. HERNANDEZ:  Your Honor, I've heard the

19    Government and the Court say these gentlemen are not charged

20    with being Proud Boys.

21         I will refer the Court to the first four pages, I

22    believe, maybe five pages, of the Government's exhibit list:

23    Proud Boys flag, Proud Boys protective vest, Proud Boys

24    T-shirt, Proud Boys coins, Proud Boys coins, Proud Boys

25    coins, Proud Boys coins, Proud Boys polo shirt.

1        THE COURT:  Ms. Hernández, I take your point.  I

2   take your point.  Okay?  I'm going to ask a number of the

3   followup questions that the parties wanted and will -- and

4   will push in these areas with future witnesses.

5        But -- Ms. Franklin, we can bring the gentleman

6   back in.

7        THE COURTROOM DEPUTY:  Yes, your Honor.

8        (Thereupon, Prospective Juror No. 0363 entered the

9   courtroom and the following proceedings were had:)

10       THE COURT:  Thank you again, sir, for your

11  patience.

12       PROSPECTIVE JUROR:  Certainly.

13       THE COURT:  A couple of followup questions.

14       Just, first, to tie down some things, again, you

15  were -- when you came in originally, you were asked not

16  to -- to try to avoid media about these things.

17       Over the last 24 hours, have you heard anything

18  about -- any stories about January 6th or read any --

19  consumed any media about January 6th or the Proud Boys?

20       PROSPECTIVE JUROR:  Well, I saw the headlines of

21  what happened regarding the president yesterday.  I did not

22  watch the hearings or follow the news other than that.

23       THE COURT:  Okay.  Nothing beyond that headline?

24       PROSPECTIVE JUROR:  Correct.

25       THE COURT:  Okay.  Tell me what you do for a

```
 1    living.

 2              PROSPECTIVE JUROR:  I work with airlines on the

 3    payment side, and technology.  So I'm a consultant, but I

 4    work specifically in that field, with airlines or technology

 5    providers for the airlines.

 6              THE COURT:  Okay.  And I think you had

 7    indicated -- I just want to confirm -- that you don't -- you

 8    haven't read, seen or heard anything about the allegations

 9    against the Defendants in this case.  Is that correct?

10              PROSPECTIVE JUROR:  Apart from what was in the

11    materials handed to us on the first day --

12              THE COURT:  Right.

13              PROSPECTIVE JUROR:  -- no, sir, I have not.

14              THE COURT:  Okay.  That's right.  There are a few

15    characterizations of what the --

16              PROSPECTIVE JUROR:  Right.

17              THE COURT:  -- charges are.

18              Do you -- to the best of your knowledge, have you

19    ever heard the names of any of the Defendants?

20              PROSPECTIVE JUROR:  You know, I could, but not to

21    the point that I know that.  When I looked at the names on

22    the sheet, I had -- none of them stood out as being in my

23    mind.

24              THE COURT:  And I think -- you know, you

25    characterized the Proud Boys as a -- I think you had said a
```

1    hate group.  Tell us -- and you said you were offended by

2    that.  Tell us why -- can you give us a little bit more

3    about why you consider them a hate group and why that's

4    offensive to you?

5            PROSPECTIVE JUROR:  So I use that terminology

6    specifically because I think that is what the Southern

7    Poverty Law Center uses to describe groups that are

8    organized.  So I don't specifically know the official

9    doxology, if that's the word, or what the mission statement

10    is for the organization.

11            But I believe, based on the news reports over the

12    preceding year to two years prior to January 6th, that it

13    seemed like demonstrations would occur -- and forgive me,

14    but I honestly don't know the difference between the Proud

15    Boys and Oath Keepers other than their names.  I don't know

16    details about what one officially stands for versus the

17    other.  But I've categorized both of them in that group and

18    with events and the opposition -- or the public oppositions

19    that they've stated.

20            Every time I've seen it in the news, I've

21    sympathized with the other side.  So I -- I didn't want to

22    say terrorist group.  I didn't want to say that.  I kind of

23    used the Southern Poverty phrase of a hate group.

24            THE COURT:  Okay.  And can you describe a

25    little -- I think you, in your answer there, talked about

1    news over the course of the last two years.  Give us a sense

2    of what you recall from those news stories.

3         PROSPECTIVE JUROR:  Well, certainly the events in

4    Charlottesville, in Virginia, was in the news.  And again, I

5    don't know for sure if it's the Proud Boys or the Oath

6    Keepers or just groups, but it's that type of movement and

7    the type of organizations that I associate with.

8         So just kind of, in my mind, there is a movement

9    of frustration or bigotry that is -- conflicts going on

10   right now.  And I associate the Proud Boys with being on one

11   side of that, and I'm on the other side of that in how I

12   perceive things and how I view things.

13        THE COURT:  And despite the fact that you think of

14   that group as bigotry -- as bigoted, and that's a group, you

15   think, as to these individual Defendants, you can set that

16   aside and judge this case just based on the evidence that's

17   presented and none of that?

18        PROSPECTIVE JUROR:  I think so.  I mean, I

19   understand that there are people that I disagree with, and I

20   understand that there's parties, political parties or

21   rhetoric, that I disagree with.  But there's a difference in

22   my mind between disagreeable rhetoric and a crime.  So I

23   believe I can separate a group that I disagree with and, if

24   they haven't committed a crime, I can understand that and

25   understand that they have the right to their opinions and

1    their place going forward.

2         THE COURT:  Even if those opinions are so -- are,

3    as you would say, bigoted?

4         PROSPECTIVE JUROR:  Correct.  Correct.

5         THE COURT:  All right.  Thank you, sir.  You'll be

6    given further instructions from Ms. Franklin.  Thank you for

7    coming down and for your willingness to serve.

8         (Thereupon, Prospective Juror No. 0363 retired

9    from the courtroom and the following proceedings were had:)

10         MS. HERNANDEZ:  Your Honor, I move to strike for

11    cause.  You cannot have a juror who believes the Proud Boys

12    are on one side and he's on the other side and expect -- I

13    don't care how many times he says he's going to try to be

14    fair.

15         The burden is on the Government.  He's starting

16    with the burden as the hate group.  "I could have called

17    them terrorists, but I'll call them a hate group instead."

18    The Southern Poverty Law Center, some of -- whose members I

19    respect very much --

20         THE COURT:  I was wondering where you were going

21    to go with this, Ms. Hernández.

22         MS. HERNANDEZ:  I -- I respect Steve -- I forget

23    his last name.  Great lawyer.  But you open the website

24    right now, and it's terrorism for a year, or something like

25    that.  It's article after article.

1          I just don't see how we can expect to have a fair

2    trial when people on the jury see themselves as on the other

3    side of our clients.

4          THE COURT:  But they're not -- all right.  I

5    understand your argument.

6          MS. HERNANDEZ:  It's just -- it's just -- it's

7    just -- I've never been in a trial where anybody has stood

8    there and said they were on the other side.  As I say, if

9    this were -- if my client were a young black man and I had

10   somebody on there saying, They're on the other side, if he

11   were a Latino, MS-13, and they're telling me they're on the

12   other side, I just -- I don't see that a judge would allow

13   it.

14          THE COURT:  Mr. Pattis?

15          MR. PATTIS:  I join Ms. Hernández's remarks, but

16   from a slightly different perspective.  I accept what

17   Mr. McCullough says and -- not that it matters to him, but I

18   think he's right that, as a matter of law, did these folks

19   breach the law -- or did they -- excuse me -- did they break

20   the law?

21          And the Government's case is going to be largely

22   circumstantial because any case involving states of mind and

23   an agreement usually is.  And so there will be certain facts

24   that are established, and jurors will be given the

25   invitation to draw reasonable inferences from those facts.

1          In a close case, I think, if you've got strong

2     feelings about that, that's likely to color what you see.

3     Now, there's plenty about this man that I like.  I love

4     having jurors on a conspiracy case, or an inchoate crime

5     case, because lawyers will follow -- you know, they're

6     sophisticated listeners and consumers.

7          But I question whether, in this case, a person who

8     thinks that he's on the side of BLM, that they're right,

9     they're trying to right a historical injustice, and that

10    these folks, the Proud Boys, represent bigotry and

11    frustration -- that struck me and was a tell.  Because I

12    think both BLM and the Proud Boys are frustrated.  They're

13    frustrated about what -- a vision of justice and whether

14    it's being fulfilled in the country as they see it.

15         And this is a man who has chosen sides adverse to

16    my client.  And my fear is that in the area of permissive

17    inferences, which is what circumstantial evidence is,

18    they'll be inclined to draw inferences against my client.

19         Put another way, would they be as fair and

20    impartial to a Black Lives Matter -- if this were a trial

21    about somebody committing arson in the summer of 2020 for

22    burning down whatever got burned here in D.C., would they be

23    inclined to draw an inference in that person's favor?

24         And I have my doubts.  I genuinely do.  And I

25    think Ms. Hernández raises a good point.  I would press for

1    a categorical rule in this case, if I could be so bold, that

2    a person who has strong feelings against BLM or for BLM or

3    has strong feelings against Oath Keepers or Proud Boys or

4    against Oath Keepers -- the problem is neither are probably

5    suitable for this jury.

6              THE COURT:  Government?

7              MR. McCULLOUGH:  Your Honor, so categorically,

8    this juror described being opposed to certain issues, not

9    being opposed to these individual Defendants.  And that is a

10   very important distinction here, and we cannot begin to just

11   blur the lines, that, you know, if there are opinions out

12   there that I disagree with that the other side might hold,

13   or that these, you know, kind of -- that might be impugned

14   to these Defendants in some way, that we just have to strike

15   those people categorically.  That is certainly not what the

16   law requires.

17             Now, I will say, with respect to this juror, upon

18   further inquiry, he did reveal and describe having some

19   specific kind of facts from which he was drawing his

20   opinion, the fact that he was familiar with the -- the

21   Southern Poverty Law Center and the fact that he's familiar

22   with Charlottesville, and I think believed that the, kind

23   of, Proud Boys were involved in those things.

24             I think that is a closer case, your Honor, quite

25   frankly.  I just think that that is not the categorical

1    rule, Oh, if they are on the other side of the issue, then

2    they need to be struck.  I think this does present a closer

3    case to your Honor.

4         I think that he did say that he can be fair and

5    impartial, and I do think that he could be qualified.  But,

6    your Honor, the Government would defer to your Honor here

7    because of the specific information that he had and what he

8    described as having -- being an active consumer of news, and

9    seems to have gone out and collected additional information

10   about the kind of hate groups and those people that he

11   ascribes to be opposed to.

12        THE COURT:  All right.  Given all of that, we'll

13   strike him for cause.  And the specifics -- the specifics as

14   you indicated.

15        Ms. Franklin.

16        THE COURTROOM DEPUTY:  Your Honor, I just want to

17   let you know that the next one will be Line 22, because Line

18   20, Juror 1015, did not show today.

19        THE COURT:  Okay.

20        THE COURTROOM DEPUTY:  1015 --

21        THE COURT:  1015.

22        THE COURTROOM DEPUTY:  -- did not show up today.

23        THE COURT:  And then --

24        PROSPECTIVE JUROR:  So next should be 1327.

25        THE COURT:  Okay.

```
 1                THE COURTROOM DEPUTY:  Which is Line 22.
 2                MS. HERNANDEZ:  What happens to the ones that
 3      didn't show up?  Do we keep them on the list?
 4                THE COURT:  Well, I mean, we're not going to
 5      address them today.  If we get them this week, we'll see
 6      what happens.
 7                MR. HASSAN:  Judge, we also had a juror yesterday
 8      who failed to appear.  Is that juror here or is that also a
 9      juror who failed to appear as well?
10                THE COURT:  If -- look, if --
11                THE COURTROOM DEPUTY:  Your Honor, are you ready
12      for 1327?
13                THE COURT:  Can you hold the person just for one
14      second?
15                If we -- obviously, if we get more contact with
16      that person and they come in, you'll be -- you'll be advised
17      and we'll bring the person back if we can.
18                Yes.
19                THE COURTROOM DEPUTY:  The next juror is 1327.
20                (Thereupon, Prospective Juror No. 1327 entered the
21      courtroom and the following proceedings were had:)
22                THE COURTROOM DEPUTY:  Good afternoon, ma'am.  You
23      are Juror 1327.  Correct?
24                PROSPECTIVE JUROR:  Yes.
25                THE COURT:  Okay.  If you can remove your mask
```

1    just while you're there so that we can hear you better.

2                    PROSPECTIVE JUROR:  Yes.

3                    THE COURT:  Thank you.  Thank you much.

4                    You indicated on Question 1 that serving as a

5    juror in this case would be an extreme hardship because of

6    this issue with a disabled adult needing your assistance.

7                    Can you describe a little bit more about that?

8                    PROSPECTIVE JUROR:  Yes.  She's a 21-year-old --

9                    THE COURT:  I'm sorry.  If you could just move the

10   microphone a little closer to your mouth.  Yes.  Or your

11   mouth closer to it, whichever.

12                   PROSPECTIVE JUROR:  Okay.  21-year-old, disabled,

13   suffered a brain injury, and I'm her caregiver.

14                   THE COURT:  Okay.

15                   PROSPECTIVE JUROR:  She has special needs.

16                   THE COURT:  Okay.  And there's no one else that

17   can fill in for you and provide that care?

18                   PROSPECTIVE JUROR:  No.  It's just me.

19                   THE COURT:  Okay.  Any objection from either side?

20                   MR. McCULLOUGH:  None.

21                   THE COURT:  Ma'am, we're going to excuse you

22   because of that.  So thank you for coming down here.  And

23   good luck with the job you're doing.

24                   PROSPECTIVE JUROR:  Thank you.

25                   (Thereupon, Prospective Juror No. 1327 retired

```
1    from the courtroom and the following proceedings were had:)

2              THE COURTROOM DEPUTY:  Juror 0342, your Honor.

3              (Thereupon, Prospective Juror No. 0342 entered the

4    courtroom and the following proceedings were had:)

5              THE COURT:  Ma'am, if you could remove your mask

6    just so we can hear you better just for these few minutes.

7    Thank you.

8              You are Juror 0342.  Correct?

9              PROSPECTIVE JUROR:  Yes, I am.

10             THE COURT:  All right.  Well, let me start with --

11   you indicated, on Questions 15 and 16 -- who's the person

12   who served in the Federal Government and in the Armed

13   Forces?

14             PROSPECTIVE JUROR:  My father.

15             THE COURT:  Okay.  Is that the answer to both

16   questions?

17             PROSPECTIVE JUROR:  What was the other question?

18             THE COURT:  A family member employed -- a close

19   friend -- you, a close friend or family member employed by

20   the Federal Government.

21             PROSPECTIVE JUROR:  No.  My daughter is presently

22   employed by the Federal Government.

23             THE COURT:  Okay.  Where does she work?

24             PROSPECTIVE JUROR:  She works for USAID.

25             THE COURT:  Okay.  So one of the allegations in
```

1    this case is that the Defendants are alleged to have opposed

2    the authority of the Federal Government by force.

3           So I need to ask whether, just by virtue of those

4    connections to the Federal Government that you've suggested,

5    your daughter, the service in the Armed Forces, whether you

6    think either of those things affect your ability -- would

7    affect your ability to be fair and impartial?

8           PROSPECTIVE JUROR:  I don't think either of those

9    things would.

10          THE COURT:  Okay.  I see you have prior jury

11   service, too.  Anything about that service makes you think

12   you couldn't be -- serve again on a jury?

13          PROSPECTIVE JUROR:  No, because they were so

14   different, the cases, and very simple.  I mean, two days

15   each.

16          THE COURT:  Okay.  I see, on 24, you have a close

17   friend or family member in the last five years who attended

18   a rally.  Is that you or is that someone else close to you?

19          PROSPECTIVE JUROR:  That was myself and my

20   daughter.  And the -- do you need to know the rally?

21          THE COURT:  Yes.

22          PROSPECTIVE JUROR:  It was in front of the

23   Washington Monument, and it was for students who had been

24   victims of school shootings.

25          THE COURT:  Okay.

```
1              PROSPECTIVE JUROR:  It was a few months ago.

2              THE COURT:  So it may be that the Defendants in

3    this case don't share your views on that subject or any

4    other subject.

5              PROSPECTIVE JUROR:  Of course.

6              THE COURT:  Any reason to think that would be a

7    reason you couldn't be fair and impartial to them as a juror

8    and only judge the case based on the evidence?

9              PROSPECTIVE JUROR:  I don't think so.

10             THE COURT:  Now, you also indicated that you

11   had -- well, let me start with, I guess, 27.  Were you or a

12   close friend or family member at the Capitol on January 6th?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Okay.  Oh.  Okay.  That's a no.

15             But yes to a friend or family member living or

16   working on Capitol Hill.  Who is the person that you

17   answered yes to for 26?

18             PROSPECTIVE JUROR:  My daughter lives on Capitol

19   Hill.

20             THE COURT:  Okay.  She lives on Capitol Hill?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Can you say roughly how close to the

23   Capitol?  You know, roughly?

24             PROSPECTIVE JUROR:  I'm terrible with this kind of

25   thing.  But I would guess about three-fourths of a mile.
```

1          THE COURT:  Okay.  Could you say it in blocks?  Is

2    that easier?  Or not really?

3          PROSPECTIVE JUROR:  Not really.

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR:  She wasn't there that night.

6    But, you know, that still --

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR:  -- is that day.

9          THE COURT:  So she lives, you think, about

10   three-quarters of a mile from the Capitol?

11         PROSPECTIVE JUROR:  Basically, yes.

12         THE COURT:  And -- so you answered 28 about

13   whether you had a concern for the safety of yourself or a

14   close friend or family member.  I assume that's her?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Okay.  And as it turned out, you said

17   she wasn't there that day?

18         PROSPECTIVE JUROR:  As it turned out, yeah.  I was

19   trying to phone her and she wasn't there that day.

20         THE COURT:  Okay.  Were you able to get in touch

21   with her quickly to find that out?

22         PROSPECTIVE JUROR:  No.  It took a little while.

23         THE COURT:  Okay.  And she, to be clear, doesn't

24   work in the Capitol.  Correct?

25         PROSPECTIVE JUROR:  No, she doesn't.

1          THE COURT:  All right.  So, you know, the question

2     is for -- you had some period there where you were concerned

3     for her.  And the question is whether that -- whether you

4     think you can set that concern, that feeling you had that

5     day, aside and judge this case just on the evidence in it.

6     So, you know, do you think you can do that?

7          PROSPECTIVE JUROR:  Well, if there were a fire or

8     if there were any physical -- something else happening or

9     anything in an area where someone you're related to lives,

10    you're going to be concerned.

11         THE COURT:  Sure.

12         PROSPECTIVE JUROR:  I mean, so I think that's a

13    completely natural -- I mean, unless you have no feeling.

14    But I think you also can listen to evidence and try to see

15    it from a different perspective.

16         THE COURT:  I mean, you can imagine, if I had

17    somebody in front of me who said -- you could see, you

18    know -- take one extreme example:  Somebody who said, my

19    best friend was in the Capitol that day.  Right?  That's --

20    and I couldn't get ahold of them, I was panicked.  That kind

21    of emotion would be, I think, you know, hard to put aside.

22         Do you find yourself -- do you think you were

23    anywhere close to a feeling like that with your daughter

24    such that you think, Jeez, that might play a role in how I

25    would view this case?  Or was it --

```
1              PROSPECTIVE JUROR:  Well, if she had been in the

2    Capitol --

3              THE COURT:  No, no --

4              PROSPECTIVE JUROR:  -- definitely.

5              THE COURT:  -- I'm not asking that.  But given

6    what did, in fact, happen, given the fact that she lives

7    where she lives and whatever you experienced that day, is it

8    the kind of thing you think you can set aside?

9              PROSPECTIVE JUROR:  I think it is, because also --

10   sort of the first of this kind of action.  One is sort of in

11   a state of disbelief.  Well, it's going to be contained.  So

12   you're not -- I mean, if this thing were happening all the

13   time and one was in a constant state of alert and fear, I

14   think -- and -- I mean, in that reaction, you're going to

15   have a completely different response where, really?  Is this

16   happening?

17             THE COURT:  Okay.  So you feel you can set it

18   aside?

19             PROSPECTIVE JUROR:  I think I can.

20             THE COURT:  So let's look at some of the other

21   things.  You indicated, like many people, you saw news

22   coverage and saw video of what happened at the Capitol on

23   January 6th, in and around the Capitol.

24             Why don't you give us a sense of over the --

25   either at that time and then, over the months, what your --
```

1  the amount of sort of news and media you've consumed about

2  it and what you recall about what you have consumed.

3          PROSPECTIVE JUROR:  Well, I definitely watched the

4  videos of it and I watched the January 6th commission.  You

5  know, I would spend some time -- every time they had -- they

6  were showing something, to find out what they discovered

7  or -- it's a very important event in this country.  So I

8  can't say that I was indifferent or -- you know, I was

9  watching.

10         THE COURT:  Right.  Okay.  But just as a matter

11 of -- tell us -- you said you were watching.  So what, as a

12 matter of fact, do you recall learning about that -- the

13 January 6th event?

14         PROSPECTIVE JUROR:  What was I learning about it?

15         THE COURT:  Yes.  You know, I mean --

16         PROSPECTIVE JUROR:  I was learning that it was a

17 lot more complicated than it appeared.  It was -- that maybe

18 that people were going to get hit the hardest weren't

19 necessarily the ones who deserved it.

20         THE COURT:  The people -- I'm sorry.  Say that

21 again.

22         PROSPECTIVE JUROR:  I'm saying that the -- I don't

23 know if they've been referred to -- the foot soldiers or --

24 but that it was bigger than what one would have liked to

25 have believed.

```
 1              THE COURT:  What do you mean by "bigger"?

 2              PROSPECTIVE JUROR:  Well, that there were members

 3      of Congress involved.

 4              THE COURT:  Oh.

 5              PROSPECTIVE JUROR:  And it went up higher than

 6      that.

 7              THE COURT:  Okay.  What, if anything, do you

 8      recall -- well, you've indicated that -- on Question 47,

 9      that it sounds like you've -- you've consumed a lot of

10      information and a lot of media about January 6th.  Question

11      47 asked you to -- if you could set aside the things you've

12      seen and heard and decide this case only on the evidence

13      presented and the law as instructed by the Court.

14              You said yes.  Do you still feel that way today?

15              PROSPECTIVE JUROR:  I think I can.  I think I can

16      try to listen.  All I can do is say that I can try to

17      listen.  You know, you have this belief about yourself.  You

18      can, you know, listen to, okay, what really happened.  There

19      are exaggerations, distortions in the media.  I know that.

20              THE COURT:  Okay.  Well, to be technical -- maybe

21      it's not a technicality.  I need to know that you really can

22      set those things aside.  I can't have a situation where you

23      say, Well, maybe I can and maybe I can't.

24              PROSPECTIVE JUROR:  Well, I'm not saying maybe I

25      can, maybe I can't.
```

1          THE COURT:  Okay.  I'm not --

2          PROSPECTIVE JUROR:  I said I believe --

3          THE COURT:  I don't want to put words in your

4     mouth.  But I need to be confident that you can do that and

5     that you -- that's your testimony under oath that you can do

6     that.

7          PROSPECTIVE JUROR:  I believe I can.  I mean, I

8     can say yes, I can.  But it's a belief.  I believe I can.

9     And maybe that's a matter of semantics.

10          THE COURT:  No.  I take your point.

11          You also indicated that -- Question 48 was:  Do

12     you have strong opinions about any aspect of the events that

13     occurred at the Capitol that would affect your ability to be

14     a fair and impartial juror?

15          You said no.  So let me just ask you the first

16     part of that question first.  Do you have strong opinions

17     about what happened that day?

18          PROSPECTIVE JUROR:  I have strong opinions that

19     happened that day [sic] --

20          THE COURT:  Okay.

21          PROSPECTIVE JUROR:  -- but I do believe --

22          THE COURT:  First tell us what those opinions are.

23          PROSPECTIVE JUROR:  Well, the idea of people

24     breaking into the Capitol.  Obviously, I do not feel

25     indifferent about that.  I don't see how anybody really

 1    could, regardless of the side you're on:  yes/no.

 2              THE COURT:  Right.

 3              PROSPECTIVE JUROR:  I don't like to see people

 4    hurt.  I don't -- and all the disruption, yes, I have strong

 5    feelings about this should not have occurred.  There are

 6    other ways to address grievances.

 7              But I also believe that I can listen to evidence.

 8              THE COURT:  Okay.  And the Defendants in this case

 9    are not charged with sort of the event writ large.  Right?

10    They're charged with, and the Government will have to show

11    you evidence, about particular criminal charges.  They'll

12    either -- you know, and it would be, if you were called to

13    serve, your duty to decide whether the Government had met

14    its burden as to each of those --

15              PROSPECTIVE JUROR:  Right.

16              THE COURT:  -- offenses.

17              Let me ask you -- so Question 49 is sort of the

18    same -- 49 and 50 are the same -- similar types of

19    questions:  Have you read, seen or heard anything about the

20    Proud Boys?  You wrote yes.  And then you checked, but not

21    anything -- I'm paraphrasing -- but not anything that would

22    affect your ability to be a fair and impartial juror here.

23              So let's start out with what have you read, seen

24    or heard about the Proud Boys --

25              PROSPECTIVE JUROR:  Well, I --

1          THE COURT:  -- generally and then in relation to

2    January 6th, if anything?

3          PROSPECTIVE JUROR:  Generally, I read that they

4    came on January 6th, and they came armed, and that they were

5    the ones who actually broke into the Capitol.

6          THE COURT:  Ma'am, if you could use the

7    microphone.

8          PROSPECTIVE JUROR:  They were the ones who broke

9    into the Capitol.  I recognized some of the names, the top

10   three that were listed.  And also I remember reading

11   about -- what is it? -- Enrique Tarrio, who had been

12   expelled from D.C. for, I think, burning a Black Lives

13   Matter flag.

14         THE COURT:  Okay.

15         PROSPECTIVE JUROR:  And the rest -- there's so

16   much coming out, it's really hard to remember other details

17   except -- okay.  Is that an adequate answer to your

18   question?  Or should I --

19         THE COURT:  Yes.  Yes.  Yes.

20         Why don't we do this:  Let me take a quick break

21   with you -- actually, let me just ask the lawyers:  Any

22   objection from the Government?

23         MR. McCULLOUGH:  (Shakes head in the negative.)

24         THE COURT:  All right.  Ma'am, here's what we're

25   going to do:  We're going to excuse you for now.  And

 1    Ms. Franklin will have further instructions on what you

 2    should -- how you should follow up on your service.

 3              PROSPECTIVE JUROR:  Thank you.

 4              THE COURT:  Thank you very much.  I appreciate it.

 5              PROSPECTIVE JUROR:  Thank you.

 6              (Thereupon, Prospective Juror No. 0342 retired

 7    from the courtroom and the following proceedings were had:)

 8              THE COURT:  Just for the record, she'll be struck

 9    for cause, again, based on the very particular things that

10    she remembered, including some things that I've already

11    ruled aspects of won't be admitted at trial.

12              MR. SMITH:  Judge, you didn't hear from -- the

13    Court didn't hear from the defense that we were moving to

14    strike her for cause and, in fact, we are beginning to be

15    curious about what specific comments she made that would

16    distinguish her, for example, from a juror who said that the

17    Defendants have anti-Christian bias and support dictatorship

18    and -- we don't understand the difference.

19              THE COURT:  To be clear, the dictatorship is not

20    what the witness said.  You keep saying that.

21              MR. SMITH:  They support dictatorship.

22              THE COURT:  No, no, no.  The person didn't say

23    that the Defendant -- look at the transcript.  They said

24    they linked that to former President Trump, not to these

25    Defendants and not to the Proud Boys.  That's what was said.

1          In any event, this person knew all about the Black

2     Lives Matter flag, the details surrounding that whole event.

3     That distinguished her.

4          MR. SMITH:  Judge, we would object because you

5     didn't give an opportunity to the defense to comment on

6     whether there should be a strike for cause.

7          THE COURT:  You want me to bring her back?

8          MR. SMITH:  No.  I don't think the witness -- the

9     juror is not necessary for the parties to comment.  But

10    we -- this was the first juror, I believe, that the Court

11    has struck for cause without looking to whether the defense

12    has any objection.

13         THE COURT:  I actually --

14         MR. SMITH:  I'm just noting that.

15         THE COURT:  I actually did look.  I didn't get --

16    I guess I didn't get a head nod from you.  I got a head nod

17    from various -- I got a head nod from Ms. Hernandez, who's

18    nodding.  I got it from -- the lawyers for Tarrio were

19    nodding, and the lawyers for Mr. Biggs were nodding.  So

20    I'll just put all that on the record.

21         MR. SMITH:  We object, your Honor.

22         THE COURT:  All right.

23         MR. HULL:  Your Honor, this lawyer for Mr. Biggs

24    did not nod.  And I would ask that she be pressed with a few

25    more questions maybe explore what -- namely what this Black

1    [sic] burning flag, pilfering by --

2            THE COURT:  Mr. Hull, I'm not going to do that.

3            Mr. Pattis, you did not.  Correct?

4            For purposes of court reporter, please, to the

5    microphone.

6            MR. PATTIS:  I'd ask that the Court appoint

7    Mr. McCullough to represent me.

8            While you ponder that appointment, I thought I

9    gestured to my colleagues behind me, because I knew there

10   was some disagreement.  But I -- I'm not in this fight.

11           THE COURT:  So for the record, Mr. -- so for the

12   record, Mr. -- let me just say this.  Ms. Hernández, you

13   objected.  You had no objection.  Correct?

14           MS. HERNANDEZ:  I plead the Fifth.

15           No, your Honor.  I heard the Court say if anybody

16   has any objections.  I heard the judge say, does anybody

17   have any objections?  I interpreted that to mean you were

18   going to excuse her and, if anybody objected, we should --

19   that's how I interpreted it.

20           THE COURT:  Right.

21           MS. HERNANDEZ:  I'm not sure everybody else

22   interpreted it the same way.

23           THE COURT:  Okay.  There's how we've been

24   proceeding.  That's the most efficient way to proceed.  And

25   if someone -- all right.

1            MS. HERNANDEZ:  I don't -- I'm half-joking here.

2   Don't out me like this, Judge.  I did interpret the Court's

3   question as, if anybody objected to her being struck for

4   cause, we should speak up.  That's how I interpreted it.

5            MR. JAUREGUI:  Judge, for the record, we did

6   not -- we did not have an objection for her being struck for

7   cause, for Tarrio.

8            MR. McCULLOUGH:  Your Honor, Jason McCullough for

9   the United States.

10           So this juror had particularized information about

11  these Defendants.  And it related to the facts that would be

12  presented in this case.  And that is why, when your Honor

13  was inclined to excuse this juror, looked to the Defendants,

14  then looked to the Government, the Government agreed.

15           Just to be very clear, she said -- you know, kind

16  of had strong opinions about people breaking into the

17  Capitol.  People have strong opinions about murder.

18           And -- so I just want to be very clear about kind

19  of -- what kind of was the triggering event for the

20  Government here, and that was the particularized information

21  as to these particular Defendants and information that would

22  be relevant and relate to the information and evidence that

23  would be presented in this case.

24           THE COURT:  Correct.  And that was the basis for

25  my ruling.

 1              All right.  Let's bring in our next -- actually,

 2      before we do that, this is another -- it would be Juror

 3      0306, Ms. Franklin.  Is that correct?

 4              THE COURTROOM DEPUTY:  That's the next juror.

 5      Yes, your Honor.

 6              THE COURT:  Okay.  Hold one moment.

 7              This is a person who, again, you know, when we

 8      look at, for example, what the person went out of their way

 9      to say, that they couldn't -- if you look at the answer to

10      Questions 71, 72, that the person would not be able to

11      follow my instructions.

12              I think there's a very good argument that she

13      should be struck.

14              So if I take her in here, I'm going to ask her

15      about 71 and 72.  She is saying she could not -- she had

16      personal beliefs that would make it difficult to follow my

17      legal instructions.  If she doesn't -- if that remains her

18      view, I'm going to strike her for cause.  That's the first

19      time we've had, I think, someone say that.

20              Will there be an objection?

21              MR. SMITH:  Judge, there is an objection.  But

22      which particular question is the Court referring to?

23              THE COURT:  71.  Actually, 72.  I believe it's the

24      first person who has -- for nothing -- that went out of

25      their way to say they would not be able to follow my

 1    instructions.  They thought they wouldn't be able to.

 2            Also, Question 32, in which the person said they

 3    would not be able to follow my instructions about the media.

 4    I believe it's the first person that has checked that box.

 5            So again, based on 32 and based on 72, I'd like to

 6    strike -- again, if the person maintains those views, to

 7    strike them.

 8            Is there any objection from the Government?

 9            MR. McCULLOUGH:  No objection from the Government,

10    your Honor.

11            THE COURT:  Is there any objection from any

12    Defendant?

13            MR. SMITH:  We object.

14            THE COURT:  All right.  And what's the basis for

15    your objection?  Do you think I should --

16            MR. SMITH:  The basis for the objection, your

17    Honor --

18            THE COURT:  Hold on.  You think I should seat

19    jurors that say they won't follow my instructions with

20    regard to the media?

21            MR. SMITH:  Your Honor, I would -- I hate to

22    answer a question with a question.  But would the Court

23    believe that it can seat jurors who have checked boxes that

24    show prejudice if they're then rehabilitated?  And we've

25    seated such jurors.  And what happens --

1           THE COURT:  Sadly -- sadly, Mr. Smith, you haven't

2     been listening to what I've said, because what I said was,

3     if she maintains those views.

4           I'm going to call her in and ask her the

5     questions.  If you'd been listening, you would have known

6     that's what I said.

7           So if she maintains the views, do you have an

8     objection?

9           MR. SMITH:  No.  No, your Honor.  I think -- the

10    way I was going to complete the thought here is that, so

11    far, the juror has indicated she's willing to set aside her

12    beliefs.  And if she were -- if she were to respond to a

13    question about whether she could comply with the reasonable

14    doubt standard or any of the questions in the 70 series,

15    then I would -- yes, I would object if she were struck at

16    that point.

17          THE COURT:  All right.  I'm not going to get to

18    those if the other two are not --

19          MR. PATTIS:  Just for preservation purposes -- I

20    wasn't going to raise this issue at this trial, but here's

21    the opportunity -- I would object to just discharging her if

22    the basis is that she cannot follow the law.  It's our -- I

23    would like to preserve the issue that jurors have a right to

24    decide questions of fact and law, and that the Court's

25    policy against jury nullification arises out of dicta in the

1    case of *United States versus Sparf*, which is a maritime

2    capital case --

3              THE COURT REPORTER:  Sparf?

4              MR. PATTIS:  S-P-A-R-F, *United States versus*

5    *Sparf*.  And in that case -- it was a case involving lesser

6    included offenses -- the Court said in dicta that it was the

7    jury's job to find facts, the Court's to find the law.

8              From that has been spun in whole cloth a policy

9    inimical to jury nullification.  There's not been a holding

10   by the Supreme Court since that affirmed that.  The only

11   thing that was close was *United States versus Shannon*, which

12   dealt with sentencing consequences.

13             I'm going to say no more than that.  I just wanted

14   to preserve the issue for appeal.

15             THE COURT:  All right.  Very well.  Your objection

16   is noted.

17             Ms. Franklin, can you bring the juror in, please.

18             PROSPECTIVE JUROR:  Yes, your Honor.

19             (Thereupon, Prospective Juror No. 0306 entered the

20   courtroom and the following proceedings were had:)

21             THE COURT:  You are Juror No. 03 -- hold on one

22   second, ma'am.

23             Can I have order, please, in this courtroom.

24             Ma'am, you are Juror No. 0306.  Correct?

25             PROSPECTIVE JUROR:  Yes, your Honor.

1          THE COURT:  All right.  And if you would remove

2     your mask just while you're answering these questions so we

3     can hear you.  Thank you.

4          PROSPECTIVE JUROR:  Uh-huh.

5          THE COURT:  All right.  So let me start with a

6     couple of your answers here.

7          First, on No. 32, just to orient you, it was a

8     question about whether you'd be able to follow my

9     instructions regarding media coverage.  And you checked no.

10         So can you tell me why you wouldn't be able to

11    follow those instructions?

12         PROSPECTIVE JUROR:  Mostly because I live in a

13    family that listens to NPR all the time.  So there's -- the

14    news is on.  My husband discusses it.  We get *Washington

15    Post* at home.  So even though I try and avoid the news, it's

16    often in my feed or in conversations.  So even though I'm

17    not actively seeking it out, it's in the periphery.

18         THE COURT:  Okay.  So if I -- but if I instructed

19    you to avoid it, you don't think --

20         PROSPECTIVE JUROR:  It's avoidable.

21         THE COURT:  Given -- you think it is avoidable?

22         PROSPECTIVE JUROR:  It is -- I just have to remove

23    myself from the spaces.

24         THE COURT:  Right.  Exactly.  Okay.  Fair enough.

25         Now, the second question is -- I'm going to go

1    right to Question -- let's see -- 72.  That's Page 12, just

2    for you.  You wrote -- the question was, with an

3    introduction, do you have any personal beliefs that would

4    make it difficult to follow the Court's instructions?  You

5    wrote yes.

6         So tell me about what you meant by that yes

7    answer.

8         PROSPECTIVE JUROR:  Thank you, your Honor.

9         I put it a little bit in my response on the final

10   page.  I wonder if I would struggle with some of the

11   instructions because I don't believe that all laws are just,

12   and it has been proven in the United States itself.  And

13   laws can change and there are lawful ways to do that, and I

14   acknowledge it.  But in this case, I feel I am very

15   prejudiced in one way, and it would be hard for me to

16   maintain neutrality.

17        THE COURT:  So tell me about -- so those are, I

18   think, two separate things.  But let's pull them apart.  One

19   is you want -- you tell me if I've got this right.  And

20   don't let me put words in your mouth.  One is you think --

21   you're concerned that there are laws at issue that you would

22   disagree with and you would have a hard time applying the

23   law as I instruct you.  Is that correct?

24        PROSPECTIVE JUROR:  That is correct.

25        THE COURT:  Okay.  That's one -- I think that's a

```
 1      separate thing than what we're about to talk about, this
 2      other thing, which is you feel you have prejudice against
 3      these Defendants.
 4              PROSPECTIVE JUROR:  Absolutely.
 5              THE COURT:  And that you wouldn't be able to set
 6      that prejudice aside?
 7              PROSPECTIVE JUROR:  No.  No, your Honor.  I
 8      wouldn't.
 9              THE COURT:  And that's -- describe the kind of
10      prejudice -- just for the record, what kind of prejudice
11      you're talking about.
12              PROSPECTIVE JUROR:  Your Honor, I am a recent
13      immigrant.  I am recently naturalized.  I take my honor and
14      my oath to the United States very seriously.
15              THE COURT:  I'm glad you do.
16              PROSPECTIVE JUROR:  Thank you.
17              What happened in Washington, D.C., on Jan the
18      6th -- oh, it makes me very emotional -- it was not moral.
19      It wasn't right.  It brought violence to my home, to my
20      house.  It brought down the United States in the eyes of the
21      world.
22              I come from a country -- and I have lived through
23      civil war.  I have seen how it destabilizes nations and
24      peoples and generations, and that is not what I want to see
25      here.  And I think it set a really terrible precedent.  And
```

1    I am glad that there is accountability in the United States

2    and it is happening here.

3                THE COURT:  All right.  Is there any objection?

4                MR. METCALF:  No.

5                MR. PATTIS:  None.

6                THE COURT REPORTER:  Who said that, please?

7                MR. PATTIS:  Norman Pattis on behalf of Mr. Biggs.

8                MR. METCALF:  Steven Metcalf on behalf of

9    Mr. Pezzola.

10               MR. JAUREGUI:  Sabino Jauregui on behalf of

11   Tarrio.

12               MS. HERNANDEZ:  No objection.

13               MR. SMITH:  No objection.

14               THE COURT:  Mr. Smith, is that no objection from

15   you?

16               MR. SMITH:  No objection.

17               THE COURT:  From the Government?

18               MR. McCULLOUGH:  No objection, your Honor.

19               THE COURT:  All right.  Ma'am, thank you very much

20   for coming down here.  You may have further instructions for

21   your service.  But you won't have to serve in this case.

22               PROSPECTIVE JUROR:  Thank you.

23               THE COURT:  Thank you very much.

24               PROSPECTIVE JUROR:  Thank you, your Honor.

25               (Thereupon, Prospective Juror No. 0306 retired

```
 1         from the courtroom and the following proceedings were had:)

 2                  THE COURT:  Let's take a -- I don't think we can

 3         take a five-minute break, but let's take a ten-minute break,

 4         and we'll come back and continue.

 5                  (Thereupon a recess was taken, after which the

 6         following proceedings were had:)

 7                  THE COURTROOM DEPUTY:  Your Honor, we're back on

 8         the record in Criminal Matter 21-175, the United States of

 9         America versus Ethan Nordean, et al.

10                  THE COURT:  Mr. Pattis?

11                  MR. PATTIS:  Ms. Hernández has questioned my

12         loyalty to the defense team, so I wanted to --

13                  THE COURT REPORTER:  Could you pull down

14         the microphone?

15                  MR. PATTIS:  Yes.  Can you hear me now?

16                  THE COURT REPORTER:  Yes, sir.

17                  MR. PATTIS:  This is like the United States

18         District Court of Verizon.

19                  Ms. Hernández has questioned my loyalty to the

20         defense team, so I wanted to formally withdraw my offer to

21         Mr. McCullough to represent me.

22                  MR. HULL:  Your Honor, Dan Hull for Mr. Biggs.

23                  It's a good time, I think, to do my Tylenol

24         motion.  Apparently, the protocol for getting Tylenol to

25         Mr. Biggs, who does suffer legitimately from migraine
```

```
 1    headaches, is to ask you for an order.  And if you say,
 2    presumably from the bench, that I can feed it to him around
 3    noon when his migraines start to start up because of lights,
 4    that's all we need to do.  And I checked with everyone, and
 5    it seems to be the protocol.
 6              I understand that the Government will not object
 7    to this.
 8              MR. McCULLOUGH:  Your Honor, we do not believe as
 9    long as this -- this comports with the marshal's directives.
10              THE COURT:  All right.  Do we have a
11    representative from the marshals here who can confirm that
12    there's no issue with me -- all right.
13              Mr. Hull, we'll have the marshals come back.  I
14    just want to hear them tell me that this is an appropriate
15    thing to order.  If it is, I'll order it.
16              MR. HULL:  I've heard it from three people, and
17    apparently none of them are in the room at this point, that
18    it would be good, and Mr. Biggs would appreciate it.
19              THE COURT:  Understood.  Understood.
20              Ms. Franklin, will you bring in --
21              Any reason we shouldn't bring in the next juror?
22              What number, Ms. Franklin?  Refresh us on the
23    number.
24              THE COURTROOM DEPUTY:  0732, Line 25.
25              (Thereupon, Prospective Juror No. 0732 entered the
```

```
 1    courtroom and the following proceedings were had:)
 2              THE COURT:  All right, sir.  Thank you very much
 3    for your patience.  If you could just remove your mask so we
 4    can hear you with the microphone.
 5              PROSPECTIVE JUROR:  Okay.
 6              THE COURT:  Thank you, sir.
 7              And if you, also, could speak directly into it.  I
 8    know -- perfect.
 9              All right, sir.  So first of all, you are Juror
10    0732.  Correct?
11              PROSPECTIVE JUROR:  That's correct.
12              THE COURT:  Okay.  You indicated in Question 15
13    that you or a close friend or family member had been
14    employed by the Federal Government on -- Question 15, Page
15    5.
16              PROSPECTIVE JUROR:  Uh-huh.
17              THE COURT:  Can you tell me who that person is?
18    Is that you or someone close to you?
19              PROSPECTIVE JUROR:  My mother.
20              THE COURT:  Your mother?
21              PROSPECTIVE JUROR:  Yes.  She works for the post
22    office.  I guess it's federal.
23              THE COURT:  Perfect.
24              So one of the allegations in this case is that the
25    Defendants are alleged to have opposed the authority of the
```

1    United States Government by force.

2            So because the United States Government is

3    involved, I ask everyone with a connection to the Federal

4    Government whether you think that fact, the fact that your

5    mom worked for the post office, suggests to you that you

6    couldn't be a fair and impartial juror.

7            PROSPECTIVE JUROR:  No, it didn't.

8            THE COURT:  Okay.  If you could speak up just

9    because there's a court reporter who has to record your

10    words.

11            PROSPECTIVE JUROR:  Okay.  No.

12            THE COURT:  Okay.  Very well.

13            I see you also had prior jury service.

14            PROSPECTIVE JUROR:  Yes.

15            THE COURT:  Anything about that service that

16    suggests to you that you couldn't serve on a jury another

17    time?

18            PROSPECTIVE JUROR:  No.

19            THE COURT:  You also indicated on Question 37,

20    which is Question [sic] 9, that you identified -- or you had

21    heard of a number of the witnesses, and you indicated the

22    names there on the -- you wrote down the names.

23            So the first one was Stewart Rhodes.  What do

24    you -- well, first of all, are these people you've heard of

25    as opposed to personally know?

1    PROSPECTIVE JUROR:  Yeah.  Heard of.

2    THE COURT:  Okay.  What have you heard about

3    Stewart Rhodes?

4    PROSPECTIVE JUROR:  Oath Keeper.

5    THE COURT:  Okay.  That he's an Oath Keeper?

6    PROSPECTIVE JUROR:  Uh-huh.

7    THE COURT:  Anything else about him you recall

8    knowing?

9    PROSPECTIVE JUROR:  There was a trial recently.

10    THE COURT:  Okay.

11    PROSPECTIVE JUROR:  I think he was convicted.

12    THE COURT:  Okay.  Okay.  Anything -- anything

13    more other than that?

14    PROSPECTIVE JUROR:  No.

15    THE COURT:  We'll get to some questions about the

16    Oath Keepers in a moment.

17    What about John Stewart?  Who's that?

18    PROSPECTIVE JUROR:  I mistook him for somebody

19    else.

20    THE COURT:  Okay.  Different John Stewart?

21    PROSPECTIVE JUROR:  Different John Stewart, yeah.

22    THE COURT:  You were thinking the comedian?

23    PROSPECTIVE JUROR:  Yeah.

24    THE COURT:  Okay.  Fair enough.  Okay.  Fair

25    enough.

```
1              Have you ever heard of any other John Stewart
2     besides the comedian?
3              PROSPECTIVE JUROR:  No.
4              THE COURT:  Eugene Goodman.  What do you know
5     about him?
6              PROSPECTIVE JUROR:  Capitol Police officer.
7              THE COURT:  Okay.  Anything -- and what more do
8     you know?
9              PROSPECTIVE JUROR:  Didn't he get a badge of
10    honor, medal of honor, or something like that?
11             THE COURT:  It's whatever you remember -- whatever
12    you remember hearing or seeing.
13             PROSPECTIVE JUROR:  I think he did.
14             THE COURT:  Okay.  And do you know what for?
15             PROSPECTIVE JUROR:  For his service on the -- on
16    January 6th.
17             THE COURT:  Do you know anything more about what
18    his service was or what he did that day?
19             PROSPECTIVE JUROR:  Not particularly, no.
20             THE COURT:  And then Daniel Hodges.  Who -- who is
21    that?  How do you think you recognize that person?
22             PROSPECTIVE JUROR:  Also a Capitol Police officer,
23    I think.
24             THE COURT:  Okay.  And what do you know about him
25    other than that he's a Capitol Police officer?
```

1          PROSPECTIVE JUROR:  Pretty much the same thing.

2    He was, you know, at work that day.

3          THE COURT:  Okay.  Anything more about -- any

4    further details about what he did that day or anything?

5          PROSPECTIVE JUROR:  Nothing in detail.  No.

6          THE COURT:  Okay.  Well, we'll come back to --

7    let's come back to Mr. Rhodes in a moment.  We'll talk about

8    the Oath Keepers.

9          But anything about -- so the Defendants in this

10   case -- the charges are related to January 6th, but the

11   Defendants are not charged with, you know, January 6th writ

12   large; they're just charged with specific other related

13   things.  Let's put it that way.  Right?  They're not charged

14   with the whole event.

15         So anything about what you know about Eugene

16   Goodman, what you know about Daniel Hodges, makes you think

17   you couldn't set those things aside and judge this case just

18   on the evidence and the law as I instruct you?

19         PROSPECTIVE JUROR:  Nothing.  I don't think it

20   will be a problem.

21         THE COURT:  Let me -- so now let me move to

22   questions on the next page, on Page 10.

23         You actually indicated, you know, that you

24   occasionally saw news coverage of what happened on

25   January 6th, et cetera.  I guess -- you answered Question

1    47, that you could set aside what you'd seen and heard about

2    what happened at the Capitol on January 6th and decide this

3    case only on the evidence presented in this courtroom, not

4    on anything you might have seen, and on the law as I

5    instruct you.  Is that still your view?

6            PROSPECTIVE JUROR:  That's still my view.

7            THE COURT:  Okay.  Give us a sense of what you --

8    you know, a sense of what you did see and hear and read,

9    really.  Not hear, but see and read about what happened on

10    January 6th.

11            PROSPECTIVE JUROR:  On the day of or after?

12            THE COURT:  Both.  I mean, what -- how you

13    consumed the story that day versus then afterward, how you

14    consumed it after that.

15            PROSPECTIVE JUROR:  I watched some of the

16    coverage.  I wasn't down on the Mall myself.  So I watched

17    it on television.  And I've watched some news programs when

18    they rebroadcast some of the events of that day.

19            THE COURT:  All right.  What do you remember

20    seeing?

21            PROSPECTIVE JUROR:  I remember seeing people -- a

22    lot of people climbing on the walls and stuff at the Capitol

23    and parading through the halls of the Capitol and calling

24    out the names of politicians.

25            THE COURT:  Now -- let's see.  We also asked a

1    question about whether you'd read, seen or heard anything

2    about the group the Proud Boys.

3               PROSPECTIVE JUROR:  Uh-huh.

4               THE COURT:  You said yes.  And you then answered

5    the question about whether -- that whatever you had read,

6    seen or heard, that you didn't think it would affect your

7    ability to be fair and impartial.

8               But before we get to that second part, tell us

9    what you do know or what you have read, seen or heard about

10   the Proud Boys.

11              PROSPECTIVE JUROR:  Pretty much the same thing

12   with the Oath Keepers.  Just a group -- a paramilitary

13   group, I think, that were down on the Mall that day and

14   making trouble.

15              THE COURT:  Okay.  Well, why do you say -- well,

16   let me put it this way:  Do you know -- do you have a --

17   have you read, seen or heard anything about what the Proud

18   Boys stand for, what they -- apart from whatever they might

19   have been doing that day?

20              PROSPECTIVE JUROR:  Not particularly, no.

21              THE COURT:  Okay.  And why do you say

22   paramilitary?  What -- what put that word in your mind?

23              PROSPECTIVE JUROR:  Aren't they ex-military, a lot

24   of them?  Not really?

25              THE COURT:  Unfortunately, the way this works is I

1    ask you questions about your perceptions and what you've

2    seen and heard.  Forget --

3              PROSPECTIVE JUROR:  Okay.  My perception is that I

4    thought they were mostly, maybe not all, but ex-military.

5              THE COURT:  I see.

6              PROSPECTIVE JUROR:  And that's basically all I

7    know.

8              THE COURT:  Okay.  And what -- I think you said

9    they were there that day causing trouble.  Is that the

10   extent of your knowledge about -- or what you've read, seen

11   or heard, to be clear?  Or do you recall reading or seeing

12   anything else about their -- allegations against them

13   related to that day?

14             PROSPECTIVE JUROR:  Nothing specific.  No.

15             THE COURT:  And so given what you know or given

16   what you've read, seen or heard about the Proud Boys, is

17   that -- let me put it this way:  What are your feelings

18   about them and your perception of them as a group?

19             PROSPECTIVE JUROR:  I don't have any feelings

20   about them.

21             THE COURT:  Okay.  Nothing -- does anything about

22   them offend you?

23             PROSPECTIVE JUROR:  Not really.

24             THE COURT:  You -- but whatever these -- whatever

25   then you've described here, you don't think you'd have

1  trouble setting it aside and -- and being fair to them as

2  Defendants in this case?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  The Government has the burden of

5  proving the charges in this case, as they do in every

6  criminal case, beyond a reasonable doubt.  You wouldn't

7  have any -- would you have any problem if the Government

8  didn't meet its burden of acquitting them, finding them not

9  guilty?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Now, you also indicated here, on 51,

12  that you'd read, seen or heard about allegations regarding

13  these specific Defendants; that is, Tarrio, Nordean, Biggs,

14  Rehl and Pezzola.  You checked yes.

15         What do you -- what have you read, seen or heard

16  about either these Defendants or the allegations against

17  them?

18         PROSPECTIVE JUROR:  Okay.  Because it asked about,

19  you know, all of them as a group?

20         THE COURT:  Yes.

21         PROSPECTIVE JUROR:  I didn't specify, but I hadn't

22  heard, really, of any of them except for Mr. Enrique Tarrio.

23         THE COURT:  Okay.  And have you heard about him

24  generally or about allegations in this case against him?

25         PROSPECTIVE JUROR:  About him being the leader of

1    the Proud Boys.

2        THE COURT:  Okay.  All right.  Anything else about

3    him?  Or just that he's the leader of the Proud Boys?

4        PROSPECTIVE JUROR:  He's the leader of the Proud

5    Boys, as far as I know.

6        THE COURT:  Okay.  But, again, I'm asking you not

7    what reality is, but what you've heard.

8        PROSPECTIVE JUROR:  All right.

9        THE COURT:  So you've heard that.  Have you heard

10   anything about the allegations against him related to this

11   case?

12       PROSPECTIVE JUROR:  That he talked with some of

13   the Oath Keepers, or the leader of the Oath Keepers.

14       THE COURT:  Okay.  Anything else surrounding that?

15   That's something you think you read somewhere?

16       PROSPECTIVE JUROR:  I think I read that or heard

17   it on television.

18       THE COURT:  Okay.  Anything else relating to his

19   activities on January 6th that you can recall?

20       PROSPECTIVE JUROR:  Not that I can recall.  I

21   can't really say that I know that he was even down on the

22   Mall.

23       THE COURT:  Okay.  Let's see.  There's also a

24   question here -- so you also checked -- I guess I should

25   close this off -- whatever you -- and to be clear, with

1    regard to the other Defendants, you haven't read, seen or

2    heard anything about them or the allegations against them.

3    Is that fair?

4              PROSPECTIVE JUROR:  That's fair.

5              THE COURT:  Okay.  And then as to Question 52,

6    given that we've fleshed out some of these things about

7    Mr. Tarrio that you'd seen and heard, any reason to question

8    your answer there on 52 that you could -- that whatever you

9    had read, seen or heard about him, that it wouldn't affect

10   your ability to be fair and impartial toward him in a case

11   like that?

12             PROSPECTIVE JUROR:  No, it wouldn't.

13             THE COURT:  Now, Question 53 asks you if you'd

14   read, seen or heard anything about Antifa.  You checked yes.

15   Tell us what -- what you've read, seen or heard about that

16   group.

17             PROSPECTIVE JUROR:  Antifa?  I think they're an

18   antifascist group.  I don't know if they're -- I think

19   they're left-leaning, I guess.  And I don't know if they've

20   been involved in any real violence lately or -- you know,

21   maybe over -- there might have been some riots or something

22   over the summer a couple of years ago, maybe.

23             THE COURT:  Okay.  You associate that with them?

24             PROSPECTIVE JUROR:  Uh-huh.

25             THE COURT:  Okay.  And do you know what their

1    beliefs are or what they stand for other than I guess -- you

2    said maybe being antifascist --

3            PROSPECTIVE JUROR:  Antifascist.

4            THE COURT:  -- whatever that might mean?

5            PROSPECTIVE JUROR:  I don't really know.

6            THE COURT:  Okay.  All right.  Anything -- and,

7    again, anything about Antifa that you think -- or whatever

8    you know about Antifa, that would affect your ability to be

9    a fair and impartial juror here?

10           PROSPECTIVE JUROR:  No.

11           THE COURT:  Now, we talked about the Oath Keepers.

12   You said you remembered the name Stewart -- I think

13   that's -- I want to make sure I get this right.

14           PROSPECTIVE JUROR:  Stewart Rhodes.

15           THE COURT:  Yes.  Mr. Rhodes.

16           This indicates -- first of all, tell us again what

17   you have read, seen or heard about the Oath Keepers.

18           PROSPECTIVE JUROR:  In general, that they were

19   involved in the January 6th episode on the Mall, at the

20   Capitol, and that Mr. Rhodes was tried and convicted

21   recently.

22           THE COURT:  Okay.  And -- well, let me just say

23   this:  Obviously, this case -- the Defendants in this case,

24   they're not members of the Oath Keepers.

25           PROSPECTIVE JUROR:  Right.

1          THE COURT:  And they are being -- the evidence

2     will be -- that's presented will be evidence against them.

3     You would have to put whatever you know about that Oath

4     Keepers verdict, about Mr. Rhodes, whatever your perceptions

5     are about what happened in that case, this is a totally

6     separate case.

7          So do you think you can set that aside and judge

8     this case only on the evidence in this case and not concern

9     yourself and not take into account whatever happened in

10    another case?

11         PROSPECTIVE JUROR:  I can do that.

12         THE COURT:  Because, obviously, every Defendant is

13    presumed to be innocent unless the Government proves its

14    case.

15         PROSPECTIVE JUROR:  Of course.

16         THE COURT:  And so again, anything about -- well,

17    I think we asked that question.

18         Anything -- you would stand by your answer, then,

19    that whatever you've heard about the Oath Keepers, it

20    wouldn't affect your ability to be a fair and impartial

21    juror here?

22         PROSPECTIVE JUROR:  No, it wouldn't.

23         THE COURT:  What about -- so skipping ahead to

24    Question 58, you or a close friend or family member has been

25    involved in the legal profession in some -- some way.  Who's

1    that person to you?

2                PROSPECTIVE JUROR:  My goddaughter.  She's an

3    attorney.

4                THE COURT:  Okay.  Does she practice criminal law?

5                PROSPECTIVE JUROR:  No.  I think she practices

6    real estate law.

7                THE COURT:  Okay.  Does anything about her being a

8    lawyer make you think you couldn't be fair?

9                PROSPECTIVE JUROR:  No.

10                THE COURT:  You also indicated, on 62 and 63, that

11   you or a close friend or family member had ever been the

12   victim of a crime.  And you checked yes for 62.

13                So who is that person?

14                PROSPECTIVE JUROR:  Myself.  For a crime.

15                THE COURT:  What --

16                PROSPECTIVE JUROR:  Well, I've had my house broken

17   into, my car broken into.

18                THE COURT:  I'm sorry to hear all that.

19                PROSPECTIVE JUROR:  But other than that, that's

20   the extent of my involvement.  You know, the same kind of

21   things have happened to people that I know.

22                THE COURT:  And is 63 -- did you check yes for the

23   same reason or a slightly different reason?

24                PROSPECTIVE JUROR:  The more I thought about

25   domestic violence in that case.  Yeah.

1              THE COURT:  Okay.  You've been a witness to that?

2              PROSPECTIVE JUROR:  Witness to a domestic violence

3      situation.  Yes.

4              THE COURT:  Okay.  And on that occasion -- again,

5      if you can just tell us the relationship to you, who the

6      parties were, their relationship to you.

7              PROSPECTIVE JUROR:  Well, it wasn't just one time.

8      But I could go back to when I was a kid.

9              THE COURT:  Well -- okay.  Give us an overview.

10             PROSPECTIVE JUROR:  My mother and stepfather.

11             THE COURT:  Okay.  Anything about either the

12     reason you checked 62, the reason you checked 63, that makes

13     you think you couldn't be a fair and impartial juror in a

14     case like this?

15             PROSPECTIVE JUROR:  Huh-uh.

16             THE COURT REPORTER:  I'm sorry?

17             PROSPECTIVE JUROR:  No.  Sorry.

18             THE COURT:  And just to be clear, on 63, you

19     started with way back with -- a long time ago.  What's the

20     more recent -- were there more recent incidents?

21             PROSPECTIVE JUROR:  Neighbors,

22     boyfriend/girlfriend, violence -- domestic situation.

23             THE COURT:  Okay.  That you've been a witness to?

24             PROSPECTIVE JUROR:  Uh-huh.

25             THE COURT:  All right.  Let me ask you a few --

```
 1    just a few more questions.  A similar question about -- we
 2    asked about Antifa; we asked about the Oath Keepers.  Have
 3    you read, seen or heard anything about the Black Lives
 4    Matter organization?
 5              PROSPECTIVE JUROR:  BLM.  Well, yeah.
 6              THE COURT:  Okay.  Tell us what you know about
 7    that organization.
 8              PROSPECTIVE JUROR:  As an organization, I don't
 9    know much.
10              THE COURT:  Okay.
11              PROSPECTIVE JUROR:  Just that, you know, that's
12    their motto, is Black Lives Matter.  As a black man I guess,
13    you know, I have some interest in that.
14              THE COURT:  This case could involve evidence that
15    the Defendants opposed the Black Lives Matter organization.
16              PROSPECTIVE JUROR:  Was that on here?
17              THE COURT:  Say again.  No, no.  I'm asking --
18              PROSPECTIVE JUROR:  That wasn't -- oh.
19              THE COURT:  No.  We're now off the sheet.
20              PROSPECTIVE JUROR:  Okay.
21              THE COURT:  But thank you for being attentive.
22              So this case could involve evidence that the
23    Defendant opposed the -- that the Defendants opposed the
24    Black Lives Matter organization.  So I have to ask you --
25    you mentioned it a moment ago.  You are African-American.
```

1    Do you have any strong beliefs about that organization that

2    would affect your ability, you think, to be fair and

3    impartial to these Defendants?

4              PROSPECTIVE JUROR:  No.  I really don't know much

5    about the organization.

6              THE COURT:  Okay.  Well, even the movement.  You

7    said --

8              PROSPECTIVE JUROR:  Or the movement in particular.

9    I don't know a whole lot about it.

10             THE COURT:  Okay.  Other than --

11             PROSPECTIVE JUROR:  I don't think it's a bad

12   thing.  Maybe it is, but I don't think it's a bad thing.

13             THE COURT:  Okay.  It's not -- is it offensive to

14   you if someone is against the Black Lives Matter movement?

15             PROSPECTIVE JUROR:  No.  I don't take it

16   personally.

17             THE COURT:  Okay.  This case could also involve

18   evidence that a defendant unlawfully possessed a

19   high-capacity magazine.  Even though none of the Defendants

20   are charged with that crime in this case, but there could be

21   evidence along those lines.

22             Do you have any strong feelings about firearms or

23   ammunition or related laws that would affect your ability to

24   be fair and impartial?

25             PROSPECTIVE JUROR:  No.

1          THE COURT:  Sir, I'm going to have you, if you

2     would -- Ms. Franklin is just going to put you through the

3     two double doors where you were waiting, and we'll have --

4     we may have further questions for you in a moment.

5          Thank you.

6          (Thereupon, Prospective Juror No. 0732 retired

7     from the courtroom and the following proceedings were had:)

8          THE COURT:  So further areas of questioning or, if

9     not, I'll hear from the parties on whether they think he

10    should be struck.  But I don't see a reason to do that.

11         MR. JAUREGUI:  Judge, Jauregui for Tarrio.

12         My only question is he says he's retired.  I would

13    just like to know what he did for a living.

14         THE COURT:  Okay.

15         MR. HULL:  And Mr. Biggs would like to know the

16    same.

17         MS. HERNANDEZ:  You know, in the persons he

18    recognized, the names he recognized, he mentioned Officer

19    Hodges, who is listed as a Government witness in this case.

20    So I would, I guess, explore somewhat what he knows or how

21    that he recognizes that name.  I'm assuming Officer Hodges

22    was all over TV -- or the incident involving Officer Hodges

23    was all over TV.

24         THE COURT:  I did ask him those questions.  And he

25    said, I remember him being involved in the Capitol in some

1    way, but I don't remember anything further.

2         And that he may have gotten -- think he lumped him

3    in with Goodman and said he might have gotten an award, but

4    he didn't have any other specific memory.

5         MS. HERNANDEZ:  Well, Officer -- I don't think

6    Officer Goodman is going to be a witness -- or hasn't been

7    listed as a witness in this case, but he also was all over

8    the news.

9         But the concern is, even though he doesn't have

10   specifics about what he remembers, that once we're in trial

11   and he sees the video, which I believe the Government will

12   seek to introduce, perhaps over our objection, that that's

13   going to trigger -- I just wanted to explore that a little

14   bit more.

15        He also mentioned -- seemed to recognize

16   Mr. Rhodes quite a bit.  And, of course, I believe the

17   Government plans to introduce a meeting -- a video of a

18   meeting between Mr. Tarrio and Mr. Rhodes.  I don't know if

19   that's on the -- I think that's on the exhibit list.

20        So -- you know, he obviously followed the notion

21   that Rhodes was recently convicted.  So I don't know if you

22   could explore that also a bit.

23        THE COURT:  Okay.

24        MR. HULL:  Your Honor, for Mr. Biggs, if I can add

25   one -- maybe I didn't hear him say this correctly, but I

1    thought he said he knew something about communications

2    between the Oath Keepers and Proud Boys.

3            And there is an alleged phone call at one point, I

4    think, between one of -- maybe Mr. Meggs and Mr. Tarrio at

5    some point, which people have argued about.  Could you ask

6    him about that as well, or what he meant?

7            THE COURT:  Again, I think he said, I vaguely

8    remember hearing about some kind of communication.

9            I can ask him again.  But --

10           MR. HULL:  It's all --

11           THE COURT:  -- he answered that question.

12           MR. HULL:  -- speculated fact in the scheme of

13   things.  I just wondered -- if he knew about it at all, it

14   seems to me he'd know --

15           THE COURT:  He did say he knew.

16           MR. HULL:  Well, if you could press him on

17   specifics, I'd appreciate it.

18           MR. JAUREGUI:  Judge, Jauregui again for Tarrio.

19           He did mention something about him thinking that

20   the Proud Boys were a paramilitary group.

21           THE COURT:  He did.

22           MR. JAUREGUI:  If you could explore that a little

23   bit.

24           THE COURT:  I asked him that question.  I don't

25   know if you remember.  I said:  Why do you say -- I

 1    literally asked:  Why did you say that?

 2              He said:  Because I think they're all ex-military.

 3              So I -- I asked him the question.  It was -- I

 4    mean, I think it's a fair question.

 5              I'll ask him about employment.  I mean, I don't

 6    think there's more to ask about Hodges.  I -- I'll ask him

 7    again, just to confirm everything he knows about Hodges.

 8              MR. PATTIS:  The only question I would consider is

 9    if he knows him personally and if Hodges testifies, would

10    that affect his evaluation of his credibility?

11              THE COURT:  If he knows Hodges personally?

12              MR. PATTIS:  Personally.

13              THE COURT:  No, I think that's a fair -- I mean,

14    just to close that off.  Sure.

15              Let's --

16              MR. JAUREGUI:  Judge, I'm sorry.  Again, Jauregui

17    for Tarrio.

18              What we wanted to go into is, you know, what's his

19    definition of paramilitary?  What does it mean to him?

20              THE COURT:  That's why I asked him the question:

21    Why did you say paramilitary?  I'll ask him again.

22              MR. JAUREGUI:  Thank you, your Honor.

23              THE COURT:  I'll just confirm that what he meant

24    by paramilitary was ex-military, which -- I think that's

25    what it was.

1              MR. JAUREGUI:  Thank you.

2              THE COURT:  All right.  Let's bring in the

3       witness -- the juror.

4              (Thereupon, Prospective Juror No. 0732 entered the

5       courtroom and the following proceedings were had:)

6              THE COURT:  Sir, welcome back.  Have a seat.  Just

7       a few more questions.

8              Tell us what you do for a living.

9              PROSPECTIVE JUROR:  I'm retired.

10             THE COURT:  Okay.  What did you do before you

11      retired?

12             PROSPECTIVE JUROR:  I was with Verizon for 31

13      years.

14             THE COURT:  With Verizon?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  What type of work did you do for

17      Verizon?

18             PROSPECTIVE JUROR:  I was a supervisor when I

19      retired.  I was an installer, a technician for the first

20      half of my career with them.

21             THE COURT:  And then became a supervisor?

22             PROSPECTIVE JUROR:  And then I was a supervisor,

23      yeah, over a group of knucklehead technicians.

24             THE COURT:  Great.  Thank you.

25             I just want to make sure -- you mentioned Daniel

1    Hodges and Officer Goodman.  You don't know either --

2             PROSPECTIVE JUROR:  I don't know them personally,

3    no.

4             THE COURT:  Okay.  Just if you could wait till

5    I --

6             PROSPECTIVE JUROR:  Okay.

7             THE COURT:  I know you want to -- wait till I ask

8    the question, because the court reporter is going to be mad

9    at us for talking over each other.

10            All right.  And again, what do you remember about

11   Officer Hodges from the news media surrounding January 6th?

12            PROSPECTIVE JUROR:  I don't -- was he -- well, I

13   think he was caught in the door.  Was he the one?  I don't

14   know.  I don't remember anything specific about him.

15            THE COURT:  Okay.  Fair enough.

16            And one other thing.  You described before -- I

17   think you described the Proud Boys as -- well, two other

18   things.  Do you have -- you mentioned, I think, before that

19   you were -- among the things you had heard, read or seen

20   about Mr. Rhodes, or the Oath Keepers, was that there had

21   been some communications between the Oath Keepers and

22   Mr. Tarrio.

23            PROSPECTIVE JUROR:  Right.

24            THE COURT:  Do you have any more specifics about

25   that?  Or that's all you remember reading or hearing?

```
1              PROSPECTIVE JUROR:  There was a video of them

2    meeting, I think, in a parking lot --

3              THE COURT:  Okay.

4              PROSPECTIVE JUROR:  -- prior to January 6th.

5              THE COURT:  Okay.  Anything further?

6              PROSPECTIVE JUROR:  No.  I don't know what they

7    discussed.  I don't know.

8              THE COURT:  Okay.  All right.  And you also

9    described the Proud Boys as paramilitary and then, when I

10   asked you, why did you say that, you said, because I think

11   they were all ex --

12             PROSPECTIVE JUROR:  I should have probably said

13   ex-military.

14             THE COURT:  Okay.  Is that -- what did you mean

15   by -- did you mean anything by paramilitary other than

16   ex-military?  Or why did you use that word?

17             PROSPECTIVE JUROR:  Well, comfortable with guns

18   and, you know, body armor.

19             THE COURT:  Okay.  That's what paramilitary meant

20   to you?

21             PROSPECTIVE JUROR:  Right.

22             THE COURT:  Okay.  I don't have any further

23   questions.

24             Ms. Franklin will give you further instructions

25   on --
```

```
1              MS. HERNANDEZ:  I'm sorry, your Honor.
2              THE COURT:  Yes.
3              MS. HERNANDEZ:  Just one question.
4              (Whereupon, the following proceedings were had at
5    sidebar:)
6              MS. HERNANDEZ:  I'm sorry.  Your Honor.  I meant
7    to ask, he recalled, as to Antifa, something about riots
8    over the summer a couple years ago.
9              THE COURT:  Ms. Hernández, hold on.  The
10   Government -- for some reason, their phones are not working.
11             Now we're good.
12             MS. HERNANDEZ:  I forgot to mention, he had
13   mentioned he remembered Antifa, some riots over the summer a
14   couple of years ago.  And I was wondering if you could
15   explore that further.  Is that something, like -- did the
16   Proud Boys have anything to do with that?  You know, is he
17   recalling the November-December incidents, is what I'm
18   trying to get at.
19             THE COURT:  All right.
20             (Whereupon, the following proceedings were had in
21   open court:)
22             THE COURT:  Sir, one final question.  You had
23   mentioned, when we talked about Antifa -- you had said you
24   recall their being associated with some kind of rioting or
25   something like that, I believe you said.
```

1              Do you recall, in your mind, were the Proud Boys

2       linked to that?  Or was that just something only about

3       Antifa that's --

4              PROSPECTIVE JUROR:  I think that was only Antifa.

5              THE COURT:  All right.  Do you recall --

6              PROSPECTIVE JUROR:  That's my association.

7              THE COURT:  Do you recall when or where the things

8       you're remembering took place?

9              PROSPECTIVE JUROR:  I want to say Detroit, but

10      maybe not.  I don't know.

11             THE COURT:  Okay.  Fair enough.

12             Thank you.  Ms. Franklin will give you further

13      instructions.

14             (Thereupon, Prospective Juror No. 0732 retired

15      from the courtroom and the following proceedings were had:)

16             THE COURT:  Before we move on, is there any motion

17      regarding this Defendant -- I mean this witness -- or

18      potential juror?  No?

19             All right.  He'll be qualified.  Let's bring in

20      our --

21             THE COURTROOM DEPUTY:  Your Honor, we have a

22      representative from the Marshals Service here now, your

23      Honor.

24             THE U.S. MARSHAL:  Good evening, sir.

25             THE COURT:  Good evening.

```
 1              If you could just put your name -- your names for
 2      the record, or your name for the record.
 3              THE U.S. MARSHAL:  Damian Roberts from the
 4      Marshals Service.
 5              THE COURT:  Okay.  So I have a request that if
 6      I -- that -- I have a request that I orally permit or order
 7      Mr. Hull to be able to provide his client with a Tylenol, I
 8      think it is.  And he thought that was permissible under the
 9      marshals' guidelines.  But I wanted to check with you before
10      I go ahead and allowed that.
11              THE U.S. MARSHAL:  Actually, your Honor, it's not.
12      I've talked to them and told them to get a court order from
13      you.
14              THE COURT:  Well -- right.  An order?
15              THE U.S. MARSHAL:  We have a medical facility.  It
16      has to be a doctor or a nurse that provides that medicine.
17      It cannot come from attorneys.  While they're here, we have
18      a nurse downstairs.  So right in his cell block during lunch
19      break, a nurse can come down and provide him with Tylenol,
20      Advil, whatever it may be, or in the morning.  But it cannot
21      come from the attorney.
22              THE COURT:  Okay.  Unless I order it?  I'm just --
23      I got it.  I got it.  But your policies are it should not
24      come from anyone but your folks?
25              THE U.S. MARSHAL:  Somebody from the medical
```

```
 1    field.  There's actually a nurse in the courthouse.
 2              THE COURT:  Okay.
 3              Mr. Hull, is there any reason why -- first of all,
 4    number one, why did you represent to me that this was
 5    consistent with the marshals' policies?  And you said three
 6    people told you that.  And now I'm hearing actually it's not
 7    at all consistent with the marshals' policy.
 8              MR. HULL:  Because I was told that, your Honor.
 9    And I may have misinterpreted it, but I did hear that, if
10    you gave an order, that I would be permitted to dispense it
11    to him.  I may have misunderstood.  But I think that was
12    pretty clear to me.
13              THE COURT:  Okay.  So I'm not going to do anything
14    that's outside their policy and guidelines.  It sounds like
15    there is someone here on a daily basis, maybe not at this
16    moment, but there is someone on a daily basis that can get
17    him what he needs.
18              Is that correct, sir?
19              THE U.S. MARSHAL:  Yes, sir.  All he has to do,
20    when he comes down, is to notify the deputy down there.
21    They'll have the nurse come downstairs.
22              THE COURT:  Okay.  So now you know -- your client
23    knows what to do.  He should be able to get this.  You can
24    tell me tomorrow if something goes awry, but it sounds like
25    there's a policy in place to get him what he needs.
```

1          MR. HULL:  I apologize if I misinterpreted that.

2          THE COURT:  You should be apologizing to me,

3     Mr. Hull, because you misrepresented the policy to me.

4          All right.  Thank you, sir.

5          THE U.S. MARSHAL:  You're welcome, sir.

6          MS. HERNANDEZ:  Your Honor, while we have the

7     marshals here, can we discuss the time when they have to

8     leave so they can get dinner tonight?  Because yesterday,

9     when I made the request, my understanding was none of the

10    marshals in the room were local marshals, so they weren't

11    aware of the times.

12         THE COURT:  While we have you, can you explain the

13    policy on the --

14         MS. HERNANDEZ:  Thank you.

15         THE COURT:  -- the dinner policy that

16    Ms. Hernández has brought to my attention?

17         THE U.S. MARSHAL:  The --

18         THE COURT:  And if you don't know it or need time

19    to kind of get your ducks in order, that's perfectly fine,

20    too.  You didn't know I was going to be asking you about

21    that.

22         THE U.S. MARSHAL:  So, your Honor, usually, from

23    what -- I talked to the ADC guys yesterday.  They said that

24    they will have trays set aside.  They don't know what the

25    food would be specifically, whether it's -- one day it could

1    be a sandwich; the next day it could be something they can

2    heat up.  But they would have it for them.  And I know that

3    the time that the trays come out is between, I believe, 4:30

4    and 5:30.

5            THE COURT:  I'm sorry.  What was the last point

6    you made?

7            THE U.S. MARSHAL:  When they usually have, like,

8    dinner assigned, it's between 4:30 and 5:30.

9            THE COURT:  Okay.  So typically trials last well

10    past 4:30 in the afternoon, though.  So your policy is -- I

11    mean, you're not doing anything outside the normal marshals'

12    policy here, are you?

13            THE U.S. MARSHAL:  Sir, it's not our policy.  The

14    jail is actually setting the meals aside for them.  So what

15    time they get back, they'll have meals.  It's just not the

16    meals they'd probably choose to have.

17            THE COURT:  Okay.  Fair enough.  It's not your

18    policy; it's the policy of the jails --

19            THE U.S. MARSHAL:  Yes, sir.

20            THE COURT:  -- or wherever they're being held.

21            THE U.S. MARSHAL:  Yes, sir.

22            THE COURT:  All right.  Ms. Hernández, it's not

23    even their policy, so I'm not even sure what I'm being asked

24    to -- and we're burning time with potential jurors.

25            MS. HERNANDEZ:  I'm sorry.  What I understand is,

1    if they don't leave here in time to get to the jail,

2    whichever facility they're at, by the time dinner is

3    served -- they will get meals that evening.  But what they

4    often get, if it's late, if it's beyond that time, is some

5    cold sandwich, which is the same thing that they received

6    for lunch here, because that -- they do get a meal, but the

7    meal is worse than usual.  Let's put it that way.  Or not

8    very --

9              THE COURT:  But I'm not sure -- what are you

10   asking of me?

11             MS. HERNANDEZ:  At least while we're not in trial,

12   to get them out of here by 5:00 so that they can get to

13   their facility by 5:30 or -- I don't know.  I'm trying to

14   determine what time they have to leave here so that they can

15   get the regular meal at the facility.  I'm hoping that that

16   will happen.  If not, maybe we can come back to the Court

17   with some request for some supplemental meals while they're

18   in trial.

19             THE COURT:  Gentlemen, we don't need anything

20   further from you.  I know this isn't your policy.  Thank you

21   much.

22             THE U.S. MARSHAL:  Thank you.

23             THE COURT:  Ms. Hernández, to your question, you

24   know, I've been trying my best to speed our proceedings

25   along here and find -- not shortcut the questioning, but to

1    have shortcuts regarding objections and things like that.

2    It hasn't gone so well.

3              MS. HERNANDEZ:  I understand.

4              THE COURT:  So -- so, you know, I can't tell you I

5    can get them out of here at 4:30 today.  I can't do it.  I'd

6    like to do it.  And I'm not -- this isn't punitive in any

7    way.  Right?  But we've got a ship to run here.

8              MS. HERNANDEZ:  I understand, your Honor.  And

9    I --

10             THE COURT:  And we are --

11             MS. HERNANDEZ:  I appreciate the Court's -- the

12   time the Court is taking.  If I didn't -- I want to

13   recognize -- no, I'm -- I'm not being gratuitous.  I want to

14   recognize that -- I appreciate -- I think we all appreciate

15   the time the Court is taking with the jurors.  I just --

16             THE COURT:  And I'm not asking for accolades for

17   doing my job.  But my point is, if we can all work together

18   to try to find ways to cut out dead time and things that --

19   shortcuts that don't prejudice your clients, that don't

20   prejudice the Government, then maybe we will be able to get

21   out of here earlier some days.  But it hasn't happened

22   today.  So we are where we are.

23             MS. HERNANDEZ:  I understand.  And I may file

24   something to try to get them some meals in some way.  I've

25   done it in other cases.

```
 1                    THE COURT:  All right.

 2                    MR. McCULLOUGH:  Your Honor, Jason McCullough for

 3     the Government.

 4                    We have jurors waiting.  I think we should just

 5     press forward and try to stay on task and do these

 6     colloquies after the day is over.

 7                    THE COURT:  Mr. Pattis?

 8                    MR. PATTIS:  Briefly.  In defense of Mr. Hull, I

 9     was standing with him physically and heard a marshal with my

10     own ears say something that was inconsistent that -- that

11     was inconsistent with what he said.  Because you've

12     questioned his integrity or suggested that he may have been

13     less than candid, or made a mistake.  He didn't.  He

14     reported what he heard.

15                    THE COURT:  Very well.

16                    THE COURTROOM DEPUTY:  The last one was approved.

17     Right?

18                    THE COURT:  Right.  To be clear, the prior

19     juror -- well, actually, hold on.

20                    There was no objection.  That juror was qualified.

21                    THE COURTROOM DEPUTY:  All right.  The next juror

22     will be 1268, Line 27.

23                    (Thereupon, Prospective Juror No. 1268 entered the

24     courtroom and the following proceedings were had:)

25                    THE COURT:  All right, sir.  Sir, thank you --
```

1      first of all, thank you for your patience.

2              You are Juror 1268; is that correct?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Okay.  First, if you could, just while

5      you're answering our questions here today, if you could take

6      off your mask.

7              PROSPECTIVE JUROR:  Okay.

8              THE COURT:  Thank you, sir.

9              First of all, let me ask you this:  You indicated

10     you had been a juror before.  And -- in fact, in a

11     particular case in which no verdict happened to be reached.

12     I don't want you to tell me anything further.

13             But does anything about that service and the fact

14     that no verdict was reached suggest to you that you couldn't

15     be a fair and impartial juror again?

16             PROSPECTIVE JUROR:  No.  It wouldn't affect me.

17             THE COURT:  Okay.  Let's see.  We've got -- you

18     indicated -- well, let's see.  Question 42, you actually

19     said you have not watched or read news coverage about

20     January 6th.  You haven't really taken in much of the media

21     and stories about that at all.  Is that fair to say?

22             PROSPECTIVE JUROR:  No.  I'm more a sports person.

23     Movies.  No.  Initially, yes, I watched it when it first

24     happened.  But after that, I'm too busy.

25             THE COURT:  Okay.  Any -- what can you tell us

1    about -- so back when it happened almost two years ago, what

2    can you recall, if you would -- what can you recall sort of

3    consuming about that day?

4          PROSPECTIVE JUROR:  I saw camera footage of

5    rioters climbing the stairs, climbing the walls of the

6    Capitol all day.  I actually seen one person shot.  After

7    that, I stopped watching it.

8          THE COURT:  Okay.  You stick to sports?

9          PROSPECTIVE JUROR:  Yeah.  Sports, football.

10          THE COURT:  Commanders?

11          PROSPECTIVE JUROR:  Yeah.  Netflix, *Walking Dead*.

12    Yeah.

13          THE COURT:  All right.  So -- for some people,

14    this is a different kind of question than for you.  You

15    indicated you could set aside what little you'd seen and

16    heard -- this is Question 47 in your questionnaire, just so

17    you can follow along -- you can set aside those things

18    you've seen and heard about January 6th and decide a case

19    like this only on the evidence that's admitted in this

20    courtroom and nothing else.  Is that still your view?

21          PROSPECTIVE JUROR:  Absolutely.  Yes, sir.  Yes,

22    your Honor.

23          THE COURT:  You also indicated -- Question 49:

24    Have you read, seen or heard anything about the Proud Boys?

25    You said no.  Is that still your answer?

```
 1              PROSPECTIVE JUROR:  Yes.  I never heard of them.
 2              THE COURT:  Okay.  So then -- and let me just also
 3     ask this, before I forget.  Did you see any news coverage
 4     over the last 24 hours about January 6th or anything like
 5     that?
 6              PROSPECTIVE JUROR:  No.
 7              THE COURT:  Okay.  Do you have any -- okay.  So
 8     nothing about the Proud Boys.
 9              Same question about the group -- well, let me ask
10     it, just to be sure.  Again, you also indicated you hadn't
11     read, seen or heard about any allegations regarding the
12     Defendants in this case, Enrique Tarrio, Ethan Nordean,
13     Joseph Biggs, Zachary Rehl or Dominic Pezzola.  Is that
14     still the same?
15              PROSPECTIVE JUROR:  Yes, sir.
16              THE COURT:  And again, have you -- one of the
17     questions was, have you read, seen or heard anything about
18     Antifa?  And you checked no.
19              Same answer today?
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  Okay.  And same question about the
22     Oath Keepers.  You checked you have not read, seen or heard
23     anything about that group.  Is that still true today?
24              PROSPECTIVE JUROR:  Yes.
25              THE COURT:  Okay.  Let me ask you just -- another
```

1    question similar to those.  Have you read, seen or heard

2    anything about the Black Lives Matter organization?

3            PROSPECTIVE JUROR:  In the beginning.  But I

4    stopped reading that also.

5            THE COURT:  Okay.

6            PROSPECTIVE JUROR:  Yeah.

7            THE COURT:  Tell me what you mean by "in the

8    beginning."

9            PROSPECTIVE JUROR:  When the gentleman who was in

10   Minnesota who died, and they started a Black Lives Matter.

11   Then when the mayor had the street painted Black Lives

12   Matter.  That was it.

13           THE COURT:  Okay.

14           PROSPECTIVE JUROR:  That was it.

15           THE COURT:  After that, you stopped following it?

16           PROSPECTIVE JUROR:  Yeah.  I stopped following it.

17   Yeah.

18           THE COURT:  Do you have any -- well, what, in your

19   view, does the Black Lives Matter organization stand for?

20   Or do you have an understanding of what they do stand for?

21           PROSPECTIVE JUROR:  I do.  It means that, you

22   know, Black lives matter.  We matter, you know.  But -- you

23   know.  For me, all lives matter, you know.

24           THE COURT:  Fair enough.

25           Do you have any strong beliefs about Black Lives

1    Matter or the Black Lives Matter organization -- I mean,

2    well, let me preface my question.  This case could involve

3    evidence that the Defendants opposed the Black Lives Matter

4    organization.  Do you have any strong feelings about the

5    Black Lives Matter organization or the movement that would

6    affect your ability, you think, to be fair and impartial

7    toward them?

8                PROSPECTIVE JUROR:  No.

9                THE COURT:  Okay.  Even though, just for the

10   record, you are an African-American person, you don't feel

11   that you have any strong beliefs relating to that

12   organization that would -- brings into -- raises a question

13   about whether you can be fair and impartial?

14               PROSPECTIVE JUROR:  No.

15               THE COURT:  This case may also involve evidence

16   that a Defendant unlawfully possessed a high-capacity

17   magazine, even though no Defendant is charged with that

18   crime in this case.  Do you have any strong feelings about

19   firearms, ammunition or laws surrounding those things,

20   again, that you think could affect your ability to be fair

21   and impartial?

22               PROSPECTIVE JUROR:  No.

23               THE COURT:  All right, sir.  Why don't I have you

24   wait outside just for one moment.  Ms. Franklin will put

25   you -- sit you back down, and we'll see if we have more

```
 1    questions for you.  Thank you, sir.
 2              (Thereupon, Prospective Juror No. 1268 retired
 3    from the courtroom and the following proceedings were had:)
 4              THE COURT:  Any followup from the Defendants?
 5              Any objection to qualifying him?
 6              All right.  He'll be qualified.
 7              Ms. Franklin, you can tell him -- well, give him
 8    the appropriate instruction.
 9              THE COURTROOM DEPUTY:  Just for the record, your
10    Honor, it's me, Katrina.
11              Line 29, which would have been the next line,
12    Juror No. 0010, was a no-show today.  The next juror will be
13    Juror No. 1072.
14              THE COURT:  And that prior juror was 1268.
15              THE COURTROOM DEPUTY:  Ready, your Honor?
16              THE COURT:  If you would give us one moment.
17              THE COURTROOM DEPUTY:  Yes.  1268 was the --
18              THE COURT:  That was 1268.
19              THE COURTROOM DEPUTY:  That we just qualified.
20              THE COURT:  Correct.  The prior -- and just for my
21    housekeeping, too, the prior juror we qualified was 0732?
22              THE COURTROOM DEPUTY:  Correct.
23              THE COURT:  And again, just for the record, 0306
24    was struck for cause?
25              THE COURTROOM DEPUTY:  Correct.
```

```
 1                    THE COURT:  And what happened with 1461?
 2                    THE COURTROOM DEPUTY:  1461 was not here today.  I
 3      believe they're traveling.
 4                    THE COURT:  Okay.
 5                    THE COURTROOM DEPUTY:  They were not called in for
 6      today.
 7                    THE COURT:  Okay.  Very well.
 8                    And our next --
 9                    THE COURTROOM DEPUTY:  Yes.  They're traveling.
10                    THE COURT:  And our next juror is 1 --
11                    THE COURTROOM DEPUTY:  1072.
12                    THE COURT:  1072.
13                    THE COURTROOM DEPUTY:  1072.
14                    (Thereupon, Prospective Juror No. 1072 entered the
15      courtroom and the following proceedings were had:)
16                    THE COURT:  All right, sir.  Thank you for your
17      patience.
18                    First, you are Juror 1072.  Correct?
19                    PROSPECTIVE JUROR:  Yes.  That's correct, your
20      Honor.
21                    THE COURT:  Okay.  So let me start out with
22      Question 1 that you -- how you answered it.
23                    You know, extreme hardship is something --
24                    PROSPECTIVE JUROR:  It's all relative, isn't it?
25                    THE COURT:  Say again.
```

```
 1            PROSPECTIVE JUROR:  It's all relative.  Right?

 2            THE COURT:  Well, it is.  But I mean, I -- you

 3    know, it's -- so let me get more details here.

 4            PROSPECTIVE JUROR:  Sure.

 5            THE COURT:  Do you think -- let me put it this

 6    way:  I see you've answered in a very -- just to be clear,

 7    you said, in my current employment, I hold a Q/SCI

 8    clearance, manage U.S. Government programs no one else does,

 9    and that you -- you said you may be changing jobs in the

10    next four to six weeks.

11            There's really no one who can step in and do --

12    what would really happen if you were called to serve?  We

13    don't -- you know, it really does have to be an extreme

14    hardship.

15            PROSPECTIVE JUROR:  Others would look after my

16    programs while I was serving jury duty.

17            THE COURT:  Okay.  And the question about changing

18    jobs, do you know how likely that really is?

19            PROSPECTIVE JUROR:  It's very likely.  I have

20    accepted the employment.

21            THE COURT:  Okay.

22            PROSPECTIVE JUROR:  And so we're just waiting for

23    this to come to some sort of resolution before I have a

24    start date.

25            THE COURT:  Okay.  But they're willing to move
```

1    your -- you're not going to lose that job because of jury

2    service?

3                PROSPECTIVE JUROR:  No, I will not, your Honor.

4                THE COURT:  All right.  And they can push that

5    start date in a way that, you know, won't affect you?

6                PROSPECTIVE JUROR:  Yes.  Correct.

7                THE COURT:  All right.  I think, all in all, it

8    sounds like we don't -- I'm sorry to say, or maybe --

9                PROSPECTIVE JUROR:  No, it's fine.  I understand.

10               THE COURT:  It sounds like we don't have an

11   extreme hardship.  All right.

12               So let me -- the next question I wanted to ask you

13   about is Question 21 on your -- well, 19 and 21.  You did

14   serve before on a jury.

15               PROSPECTIVE JUROR:  Yes.

16               THE COURT:  And Question 21 was, was there

17   anything about your service that left you disappointed or

18   dissatisfied with the Court or the criminal justice system?

19   So tell me what that was.

20               PROSPECTIVE JUROR:  To be completely candid, it

21   was the quality of jurors that I had to serve with, problems

22   with the English language, using incorrect standards of law.

23               THE COURT:  Okay.  Fair enough.

24               Do you think -- well, then my question is a

25   forward-looking one.  Sometimes people have experiences

1       being a juror that makes them think they wouldn't be able to

2       function on a jury going forward because they're so down on

3       the system, they're so down on their experience or whatever.

4              The question then is:  Is there anything about

5       that experience that makes you think you wouldn't be able to

6       follow the law, interact with your fellow jurors, deliberate

7       as a juror has to, and all the rest in this case?

8              PROSPECTIVE JUROR:  No, your Honor.

9              THE COURT:  Okay.  Just out of curiosity, was that

10      service in this courthouse or somewhere else?

11             PROSPECTIVE JUROR:  It was in the D.C. regular

12      court, Superior Court.

13             THE COURT:  All right.  Well -- all right.  My

14      next question to you is going to be about -- let's see.

15      The -- January 6th and the like.

16             You indicated sort of -- I guess I'm looking at,

17      you know, Questions, sort of, 40 through, you know, the top

18      of the next page, some that you'd watched, you know --

19      watched or read news coverage, not that often, of the events

20      at the Capitol on January 6th.

21             And in light of all that, you answered Question

22      47, that you thought you could set aside whatever you've

23      seen and heard about that day and decide the case only on

24      the evidence presented.

25             First, let me just ask, what do you kind of in a

1    general way remember -- what have you heard or read or seen

2    related to January 6th, 2021?

3                PROSPECTIVE JUROR:  Basically, there was the -- it

4    was the Electoral College certification that day at the

5    Congress.  There was apparently some sort of rally

6    beforehand and, at some point, it appears some of the

7    participants marched towards the Capitol, and we all know

8    what happened after that.

9                THE COURT:  Okay.  Well, put it in your own words.

10   What have you read or heard?

11               PROSPECTIVE JUROR:  That some people entered the

12   Capitol and at least one person was killed by a U.S. Capitol

13   Police officer.

14               THE COURT:  So let me just ask, then, that

15   question again today on 47.  Any reason to doubt that answer

16   today, that you can set aside whatever you've seen and heard

17   about that, and decide a case only on the evidence presented

18   in the courtroom and the law as I instruct you?

19               PROSPECTIVE JUROR:  No.  My answer would not

20   change.

21               THE COURT:  Okay.  Why do you say you know your

22   answer won't change?  I mean, you -- is that what you -- oh,

23   you said, no, comma, my answer --

24               PROSPECTIVE JUROR:  My answer would not change.

25   Correct.

1          THE COURT:  Understood.  All right.  And while I'm

2     thinking about it, have you seen any news related to

3     January 6th over the past 24 hours?

4          PROSPECTIVE JUROR:  Inadvertently, yes.

5          THE COURT:  Okay.  What did you see?

6          PROSPECTIVE JUROR:  Just scrolling -- pick up my

7     iPhone, and you have the Apple News articles there, and I

8     saw one headline regarding the referrals from the committee

9     to the Department of Justice.

10          THE COURT:  Okay.  Anything beyond that headline?

11          PROSPECTIVE JUROR:  No.  I couldn't have missed

12     it.  It was literally just there when I opened up my phone.

13          THE COURT:  Okay.  So the next question I'm going

14     to focus in on is 49:  Have you read, seen or heard anything

15     about the Proud Boys?

16          So you checked yes.  And then you checked the next

17     question as -- that you thought you could set aside whatever

18     you had read, seen or heard.

19          But before we get to that, what have you read,

20     seen or heard about the Proud Boys?

21          PROSPECTIVE JUROR:  The only thing, for the most

22     part, was I think there was a statement at some point by

23     former President Trump, then-President Trump, about the

24     Proud Boys to stand back and be ready, or something to that

25     effect.  I can't even remember what it was in reference to.

 1     But that's pretty much the extent of it.

 2             THE COURT:  Okay.  Apart from that, do you have

 3     any sense of what the Proud Boys sort of stand for or

 4     represent?

 5             PROSPECTIVE JUROR:  Honestly, no.  I mean, I

 6     think -- I have an inkling of their political leanings, but

 7     I couldn't tell you if they have certain philosophies that

 8     they believe in or not.

 9             THE COURT:  Okay.  And what is the inkling of

10     their political leanings?

11             PROSPECTIVE JUROR:  That they lean somehow to what

12     we would describe as to the right.

13             THE COURT:  Okay.  Anything further in your mind

14     about what they stand for or what they advocate for, you

15     know, that kind of thing?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  Okay.  And anything -- have any --

18     have you heard or read anything about a connection between

19     the Proud Boys -- other than you mentioned -- I mean, not

20     other than, but you mentioned this thing that the

21     president -- former president --

22             PROSPECTIVE JUROR:  The statement, yes.

23             THE COURT:  -- stated.  Anything -- have you heard

24     or read anything else linking -- or at least -- anything

25     related to the Proud Boys and January 6th?

1              PROSPECTIVE JUROR:  I might have seen something

2      that indicated some members were there.  But I'm just kind

3      of reaching.  I can't say for certain that I definitely read

4      this or that.

5              THE COURT:  Okay.  So you don't have any specific

6      memory other than what you just said?

7              PROSPECTIVE JUROR:  Correct.

8              THE COURT:  We have some -- so again, just to

9      circle back, given what you've articulated, you believe you

10     can set that aside and be fair and impartial -- a fair and

11     impartial juror in this case?

12             PROSPECTIVE JUROR:  Yes.  Correct.

13             THE COURT:  You also indicated that you had read,

14     seen or heard something about Antifa.  Can you tell us what

15     you have read, seen or heard?

16             PROSPECTIVE JUROR:  To that statement that it is

17     an antifascist group that, from what I can tell, seems to

18     have what would be characterized as left-leaning values.

19             THE COURT:  Okay.  Anything further -- anything

20     more in your mind about what Antifa stands for or what

21     they've done or not done as far as activity in the past?

22             PROSPECTIVE JUROR:  Not solidly.  I think that

23     they might have had some demonstrations in the past, but I

24     couldn't say with certainty.

25             THE COURT:  Okay.  And again, given that you don't

 1    think -- you don't have any strong beliefs about Antifa that

 2    would affect your ability to be fair and impartial?

 3                PROSPECTIVE JUROR:  I do not.

 4                THE COURT:  Same question about the Oath Keepers.

 5    You indicated you've read, seen or heard things about the

 6    Oath Keepers.  What have you read, seen or heard about that

 7    group?

 8                PROSPECTIVE JUROR:  Probably even less than the

 9    other two.  Just that it's some type of group that would

10    have what would be described as potentially a, you know,

11    right ideology, leanings.

12                THE COURT:  All right.  And anything more about

13    what they stand for or what they have done or not done in

14    the past?

15                PROSPECTIVE JUROR:  No.  I would just be guessing.

16    No.

17                THE COURT:  No.  I don't want you to do that.

18                All right.  Very well.  You also indicated that

19    you or someone close to you is involved, broadly speaking --

20    this is Question 58 -- in the legal profession.  Who is that

21    person?

22                PROSPECTIVE JUROR:  Myself.  I'm a lawyer.

23                THE COURT:  Okay.  What kind of law do you

24    practice?

25                PROSPECTIVE JUROR:  I do not practice.  I'm a

1    nonpracticing lawyer, the best kind.

2                THE COURT:  Have you ever practiced -- well, did

3    you ever practice or have any involvement in criminal law

4    matters?

5                PROSPECTIVE JUROR:  No.  I've never practiced.

6                THE COURT:  Okay.  Any close friend of yours --

7    anyone close to you involved in criminal law?

8                PROSPECTIVE JUROR:  No.

9                THE COURT:  You also checked 62 and 63 yes, that a

10   close friend or family member had ever been the victim of a

11   crime and then, 63, someone had been the witness to the

12   crime.

13               Tell us why you checked 62 and 63.

14               PROSPECTIVE JUROR:  Recently my car was stolen, so

15   I was the victim of a crime, and I did report it.

16               THE COURT:  All right.  And what about 63?

17               PROSPECTIVE JUROR:  A friend of mine was with me

18   at the time and witnessed that crime.

19               THE COURT:  Okay.  Anything about either of those

20   experiences -- anybody -- no one was hurt in this incident,

21   I assume.

22               PROSPECTIVE JUROR:  No.  That's correct.

23               THE COURT:  Anything about any of that that makes

24   you question whether you could be fair and impartial?

25               PROSPECTIVE JUROR:  No.

1            THE COURT:  All right.  Now, as to Question 75,

2       you indicated -- I think you indicated 73 lacked

3       specificity.  So I -- I applaud you for challenging the

4       question.

5            Tell me what you meant just by -- you didn't -- I

6       guess you're saying you didn't understand 73.

7            PROSPECTIVE JUROR:  It was unclear to me if this

8       went beyond just if jurors had different types of views on

9       the case at hand or if it was something even further.  I

10      mean, because I think that it is natural that folks are

11      going to have different viewpoints in the jury room.  And

12      that's all I was getting at.  I mean, not a problem, but if

13      there was something else, I wasn't really sure what the

14      Court was trying to get at here.

15           THE COURT:  Okay.  It sounds like maybe your prior

16      juror service is playing a role in this.

17           PROSPECTIVE JUROR:  Could be.  Could be.

18           THE COURT:  Maybe not.

19           But, yes, I think, you know, the answer -- the

20      question there was designed to make sure that -- it doesn't

21      mean you have to adopt the other person's view, of course,

22      but we want jurors who are going to be able to deliberate

23      respectfully between each other and, you know, be able to

24      share your view in a -- in a respectful way.  I don't think

25      it means --

1          PROSPECTIVE JUROR:  Understood.

2          THE COURT:  It did not mean to mean anything more

3     than that.

4          All right.  There's just a couple of other

5     questions I want to ask you as well.  Similar to the

6     question on some of the other groups we mentioned, have you

7     read, seen or heard anything about the Black Lives Matter

8     organization?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Okay.  Tell me what you have read,

11    seen or heard about that organization.

12         PROSPECTIVE JUROR:  There have been demonstrations

13    in the past by individuals associated with the group.  The

14    mayor turned part of 16th Street into Black Lives Matter

15    Plaza.  They seem to have liberal leanings.  And they've

16    called for the equal value of African-American lives.

17         THE COURT:  Okay.  So this case could involve

18    evidence that the Defendants opposed the Black Lives Matter

19    organization.  So my question is whether you have any

20    beliefs about Black Lives Matter that are so strong that it

21    would affect your ability to be fair and impartial towards

22    them.

23         PROSPECTIVE JUROR:  No, I do not.

24         THE COURT:  This case also could involve evidence

25    that a defendant unlawfully possessed a high-capacity

1    magazine even though none of the Defendants are charged with

2    a crime for that in this case.

3           So do you have any strong feelings about firearms,

4    ammunition, or related laws that would affect your ability

5    to be a fair and impartial juror in this case?

6           PROSPECTIVE JUROR:  No, I do not.

7           THE COURT:  Okay.  The last few you -- you

8    answered the question very quickly.  It sounds like you're

9    very sure that you can set these things aside or that you

10   just don't have views that are so strong that are concerning

11   to you.

12          PROSPECTIVE JUROR:  I am pretty much, based on my

13   previous experience, able to distinguish opinions from fact.

14          THE COURT:  Well, distinguishing opinions from

15   facts is important.  But -- I see.  You're saying you could

16   distinguish whatever opinions you have and feelings you have

17   from what the evidence is, what the facts are and --

18          PROSPECTIVE JUROR:  And I also do not have any

19   that are currently extremely strong towards the -- what in

20   this case would be Second Amendment rights.

21          THE COURT:  Okay.  All right.  Very well.

22          Sir, I'm going to ask Ms. Franklin to just have

23   you wait one more moment.  I'm going to talk to the lawyers.

24   We may have some additional questions for you.  But thank

25   you for being down here.  Thank you for your patience today.

1          PROSPECTIVE JUROR:  Thank you.

2          (Thereupon, Prospective Juror No. 1072 retired

3    from the courtroom and the following proceedings were had:)

4          THE COURT:  Any followup or objections?

5          MR. JAUREGUI:  Jauregui for Tarrio, Judge.

6          Judge, when he filled out his jury form, he said

7    he was an energy security analyst for the U.S. Department of

8    Energy.

9          THE COURT:  Yes.

10          MR. JAUREGUI:  He's actually the acting deputy

11    assistant secretary of transmission, permitting and

12    technical assistance for the Department of Energy.

13          I don't know what that is.  I don't know if he's a

14    political appointee.  And I'd like to know what this new job

15    that he's going to -- and to see if that's also some kind of

16    political appointment.

17          THE COURT:  Okay.

18          MR. JAUREGUI:  Thank you.

19          MR. SMITH:  A related question, Judge, is why he's

20    leaving his current employment.

21          THE COURT:  Okay.

22          MR. McCULLOUGH:  Your Honor, the Government is

23    also interested in just his employment history.  I think we

24    would just like to kind of understand kind of how long he

25    held the previous job, what he's heading to.  I think it's

```
1    just kind of an interesting area to explore.

2               THE COURT:  Fair.

3               I'm not even going to comment on he holds a Q

4    clearance.  All right.

5               (Thereupon, Prospective Juror No. 1072 entered the

6    courtroom and the following proceedings were had:)

7               THE COURT:  Just a few more questions --

8               PROSPECTIVE JUROR:  Sure.

9               THE COURT:  -- sir, so bear with us.

10              First, can you tell us -- you indicated your

11   employment was at DOE, and program manager.  Can you tell

12   us, to the extent you can, what -- describe your job, your

13   current job, anyway, more robustly.

14              PROSPECTIVE JUROR:  Sure.  Of course.  Currently,

15   I am the manager and the director for the defense critical

16   energy infrastructure program, where we look at risks to the

17   electric system for those companies and utilities that

18   supply energy to critical defense facilities as decided by

19   DOD and the Department of Energy.

20              THE COURT:  Okay.  How long have you had your

21   current job?

22              PROSPECTIVE JUROR:  For approximately a year and a

23   half, this position.

24              THE COURT:  Okay.  And is it a political

25   appointment or a --
```

1    PROSPECTIVE JUROR:  No.  I am a civil servant.

2    THE COURT:  You are a civil servant.  Okay.

3    What job did you do before you had your current

4    job?

5    PROSPECTIVE JUROR:  So prior to that position, I

6    was in another position at the Department of Energy.  And I

7    was a team lead for energy security policy.

8    THE COURT:  For energy security policy.  Give

9    us -- what does that mean in layman's terms?

10    PROSPECTIVE JUROR:  Basically, we took a look at

11    ways that we could increase the resilience of the energy

12    sector through technical assistance to utilities and other

13    energy stakeholders.

14    THE COURT:  To make them more robust from attack

15    from the outside?

16    PROSPECTIVE JUROR:  Sure.

17    THE COURT:  What's your educational background?

18    Just the type of degree.

19    PROSPECTIVE JUROR:  I have a BA in political

20    science and a juris doctor from the University of Baltimore.

21    THE COURT:  Okay.  And your job that you're

22    looking at switching to, how is that different from your

23    current job?

24    PROSPECTIVE JUROR:  It's with a trade association

25    where I'll also be focused on energy security and

529

1    resilience.

2              THE COURT:  Okay.  So it would be with the private

3    sector?

4              PROSPECTIVE JUROR:  It is.  Yes, sir.

5              THE COURT:  All right.  Thank you very much.  Oh,

6    and why -- could you give us why you're switching from --

7    why you're looking to make this switch?

8              PROSPECTIVE JUROR:  Pay increase.

9              THE COURT:  Okay.  I thought you would answer

10   that.  But we'll go ahead and make sure we nailed that down.

11             All right.  Thank you, sir.

12             PROSPECTIVE JUROR:  Thanks.

13             THE COURT:  Ms. Franklin will give you next steps.

14             (Thereupon, Prospective Juror No. 1072 retired

15   from the courtroom and the following proceedings were had:)

16             PROSPECTIVE JUROR:  Any objection to qualifying

17   him?

18             MR. JAUREGUI:  No.

19             THE COURT:  All right.  Let's bring in our next

20   potential juror.

21             THE COURTROOM DEPUTY:  Okay.

22             MR. HULL:  Your Honor, can the court reporter read

23   back his answer as to why he was switching jobs?  I don't

24   think many of us --

25             THE COURT REPORTER:  As to what?

1          MR. HULL:  As to why -- why he was switching jobs.
2     We didn't hear his answer.
3          THE COURT:  Money.
4          MR. HULL:  He just said money?
5          THE COURT:  Money.
6          THE COURTROOM DEPUTY:  1585.
7          (Thereupon, Prospective Juror No. 1585 entered the
8     courtroom and the following proceedings were had:)
9          THE COURT:  Well, good afternoon.
10         PROSPECTIVE JUROR:  Good afternoon.
11         THE COURT:  Thank you so much for your patience.
12         You are -- first of all, you are Juror 1585.
13    Correct?
14         PROSPECTIVE JUROR:  Correct.
15         THE COURT:  Okay.  A couple of things.  Thank you.
16    You already pulled your mask down.  Thank you.  If you could
17    just bend the microphone -- make sure you speak right into
18    it when you speak --
19         PROSPECTIVE JUROR:  Okay.
20         THE COURT:  -- I'd sure appreciate it.
21         Okay.  So let me start with following up on your
22    questionnaire that you asked -- that you answered.
23         You indicated you'd seen a lot of videos of
24    January 6th.  You've seen --
25         PROSPECTIVE JUROR:  I think everybody in the whole

1    world saw that.

2              THE COURT:  No, you're right about that.  That

3    doesn't --

4              PROSPECTIVE JUROR:  That's the only part that I'm

5    talking about.

6              THE COURT:  That doesn't distinguish you.  I

7    agree.  And you've seen a lot of the other coverage of that.

8              Can you give us a sense -- you indicated on

9    Question 47 that you thought -- and it's very important that

10   you can do this -- is set aside whatever you've seen about

11   the events of January 6th, whatever you've read about it,

12   and only judge this case based on the evidence that's

13   admitted in this courtroom.  If you can't do that, then, you

14   know, we couldn't have you as a juror.

15             So you indicated, on 47, that you thought you

16   could do that.  Let me just get a sense from you of what you

17   have seen and heard about -- what you recall seeing and

18   hearing about January 6th.

19             PROSPECTIVE JUROR:  Well, what I seen was a bunch

20   of people acting like they ain't had no home training.  They

21   knew better -- I know they was raised better than that.

22   They was just out of control.  It was -- it's something that

23   you probably would see -- would be used to if you was in

24   another country, that they did stuff like that.  But it was

25   just too much for me.

1          THE COURT:  Okay.  You said a bunch of people

2     acting like they what?

3          PROSPECTIVE JUROR:  They ain't had no home

4     training.  Home training.

5          THE COURT:  A hung train?

6          PROSPECTIVE JUROR:  Home training.

7          THE COURT:  Home training.  Okay.

8          PROSPECTIVE JUROR:  Like you wasn't raised right.

9          THE COURT:  Oh, that you didn't have any home

10    training.

11         PROSPECTIVE JUROR:  Training.

12         THE COURT:  I understand.  I understand.

13         Okay.  Anything more specific?  Or is that your --

14    that's your overall --

15         PROSPECTIVE JUROR:  That's my overall answer with

16    it.

17         THE COURT:  Okay.  Now, you did answer the next

18    question.  The question was:  Do you have any strong

19    opinions about any aspect of the events that occurred at the

20    Capitol on the 6th that would affect your ability to be a

21    fair and impartial juror in this case?

22         So it's closely related to 47 in a way.  You have

23    these opinions.  Let me first ask you, what are those

24    opinions?

25         PROSPECTIVE JUROR:  Honestly?

```
 1                    THE COURT:  Let me just tell you, ma'am, that's --
 2                    PROSPECTIVE JUROR:  They need to be put --
 3                    THE COURT:  -- honesty is the name of the game
 4       here.
 5                    PROSPECTIVE JUROR:  They need to be put under the
 6       jail.
 7                    THE COURT:  The people who are involved there?
 8                    PROSPECTIVE JUROR:  Yes, they do.  That's my
 9       opinion.
10                    THE COURT:  You feel strongly about that?
11                    PROSPECTIVE JUROR:  I do.
12                    THE COURT:  And you don't think you can set that
13       aside and be fair --
14                    PROSPECTIVE JUROR:  I can set that aside, but I
15       still -- it is what it is.  You have to be honest about it.
16                    THE COURT:  Right.  Right.
17                    And that's why you checked, though, yes, it would
18       affect your ability to be fair and impartial?
19                    PROSPECTIVE JUROR:  Yeah.  But if -- I can do what
20       I've got to do.  But still, it is what it is.
21                    THE COURT:  All right.  Any objection from the
22       Government?
23                    MR. McCULLOUGH:  Your Honor, please.
24                    THE COURT:  I'll hear you, but I won't speak.
25                    (Whereupon, the following proceedings were had at
```

1    sidebar:)

2           MR. McCULLOUGH:  Your Honor, I mean, this, again,

3    is kind of the very basic kind of premise these people did

4    something wrong.  They were in there.  I think it's

5    appropriate to ask her what she believes they did that

6    either would compel her to that conclusion why it is she

7    believes that someone at the Capitol would need to go to

8    jail.  I think this is appropriate to explore.

9           MR. SMITH:  Judge, I think it's -- when a juror

10   equivocates more than once on whether they can set aside

11   their prejudices -- I think that means she's equivocated

12   more than once on whether she can set aside her beliefs, so

13   you'd be asking for a third time.

14          THE COURT:  Actually -- I'll just say this.  I

15   actually don't think that's what she did.  In fact, she --

16   unless you count the paper, I think she actually did not

17   equivocate.

18          But that's not -- I don't think that's really the

19   objection, or that's not the thing that is concerning me.

20   Let me put it that way.

21          MR. SMITH:  She believed that they should -- they

22   should be put in jail; and then, when your Honor asked

23   something to the effect of would she be able to set that

24   aside and follow the law, she initially indicated, yes, but

25   it is what it is.

1          That's certainly -- we see that as an equivocation

2     about whether or not she's certain she can set aside her

3     belief that all the Defendants should immediately be put in

4     jail.

5          THE COURT:  I'm going to inquire further.  I'm

6     going to inquire further.

7          MR. McCULLOUGH:  Your Honor, I think the idea

8     about making individualized assessments to -- the person

9     that was from --

10          THE COURT:  Understood.

11          (Whereupon, the following proceedings were had in

12     open court:)

13          PROSPECTIVE JUROR:  I was told that I had to let

14     the judge know that I have four appointments in January, on

15     the 9th, the 10th, the 24th and the 25th of January, and I

16     cannot miss them because I missed them during COVID-19, and

17     they had just got me into the --

18          THE COURT:  Okay.  So let's talk about -- let's

19     pivot to that for a moment.

20          What -- you have doctors' appointments during the

21     day?

22          PROSPECTIVE JUROR:  Yes.  All of them in the

23     morning time.

24          THE COURT:  Say again.

25          PROSPECTIVE JUROR:  All of them are in the

1   morning.

2          THE COURT:  And can you -- I mean, as much as -- I

3   don't want to pry here, but what types of appointments are

4   they, or what, generally speaking, are they for?

5          PROSPECTIVE JUROR:  Eyes, sugar, my hypertension,

6   and I have to go see a psych about all that.

7          THE COURT:  All right.  And these are appointments

8   that you think you cannot reschedule?

9          PROSPECTIVE JUROR:  They have been rescheduled so

10  many times.  I rescheduled them one time, and then the

11  doctors had to reschedule, and we finally got them all

12  together, and they all happen in January.

13         THE COURT:  Okay.  Well, normally -- and you

14  really don't -- you don't think they can reschedule?

15         PROSPECTIVE JUROR:  You know how long I've been

16  waiting to get the CDs out?  Since the day he canceled on

17  me.  I had to cancel on me once or twice, and they've been

18  canceling -- and the doctor finally got me the go-ahead.  I

19  need to get my eyes -- I need to find out if I've got

20  glaucoma.  I need to find out how my sugar level is doing.

21         THE COURT:  Okay.

22         PROSPECTIVE JUROR:  That's more important to me

23  than this case, for real.  My body -- my life is more

24  important.

25         THE COURT:  No, I believe you there, ma'am, but

1    the question is -- for me to determine is whether it's an

2    extreme hardship for you to come to court.

3                PROSPECTIVE JUROR:  If I have to come here, I'll

4    come.  Whatever happens, happens.

5                THE COURT:  Okay.

6                PROSPECTIVE JUROR:  That's my opinion.

7                THE COURT:  Ma'am, I'm going to have you --

8                Ms. Franklin, can you -- can we excuse the juror?

9    I mean, not excuse her, but have her wait outside while I

10   talk to the attorneys.

11               (Thereupon, Prospective Juror No. 1585 retired

12   from the courtroom and the following proceedings were had:)

13               THE COURT:  So ordinarily, I don't think a medical

14   appointment is something that would warrant excusing a

15   juror.

16               But I think it seems pretty clear that her mind is

17   going to be very strongly on her appointments and not on the

18   trial, given that she's been waiting to have these

19   appointments and that she feels they're important for her

20   health.

21               Is there any objection if I excuse her for cause?

22               MR. PATTIS:  None.

23               MR. HULL:  No, sir.

24               MR. McCULLOUGH:  No objection.

25               THE COURT:  All right.  She'll be excused.

```
1              THE COURTROOM DEPUTY:  And that was 1585.
2    Correct?
3              THE COURT:  Correct.
4              THE COURTROOM DEPUTY:  Just for the record, your
5    Honor, the next line would be Line 32, Juror No. 0319.  And
6    that juror did not show today.
7              THE COURT:  It's a shame the lawyers won't hear
8    you, because they're talking.
9              Go ahead, Ms. Harris.
10             PROSPECTIVE JUROR:  Juror 0319 did not appear
11   today, so -- they did not show up today.  So that's Line 32.
12   And then we've already had Line 33, 0105, this morning.
13   That was the young lady who needed to leave by 2:00.  We did
14   her right after lunch.
15             THE COURT:  Right.  So she was --
16             THE COURTROOM DEPUTY:  She was struck for cause.
17             THE COURT:  She was struck for cause.
18             THE COURTROOM DEPUTY:  So our next juror is 1038,
19   which is Line 35.
20             (Thereupon, Prospective Juror No. 1038 entered the
21   courtroom and the following proceedings were had:)
22             THE COURT:  All right, sir.  Thank you for your
23   patience today.
24             PROSPECTIVE JUROR:  Hello.
25             THE COURT:  You are Juror 1038, correct?
```

1           PROSPECTIVE JUROR:  Yes.  Yes.

2           THE COURT:  I'm going to just ask you some

3    questions building on your juror sheet.

4           First, Questions 15 and 16, you indicated that --

5    well, can you tell us why you checked yes for Questions 15

6    and 16?

7           PROSPECTIVE JUROR:  Yes.  On Question 15, I have

8    family members that were employed by the Federal Government.

9           THE COURT:  Okay.  Who are the family members to

10   you?  What's their relationship to you?

11          PROSPECTIVE JUROR:  Cousins.

12          THE COURT:  Okay.  And what types of employment

13   with the Federal Government did or do they have?

14          PROSPECTIVE JUROR:  I have no idea.

15          THE COURT:  Okay.  And what about Question 16?

16          PROSPECTIVE JUROR:  16, yes.  My son served in the

17   Navy.

18          THE COURT:  All right.  So one of the allegations

19   in this case is that the Defendants opposed the authority of

20   the United States Government by force.

21          So you have -- 15 and 16 are designed to get

22   information about your connections to the Federal

23   Government, as you indicated already.  The question is:

24   Merely just by the fact of those associations that you have

25   through other people with the Federal Government, do you

1    think any of that calls into question your ability to be a

2    fair and impartial juror in this case?

3                PROSPECTIVE JUROR:  No, it doesn't.

4                THE COURT:  You also indicated that you had served

5    on -- you have prior jury service, I see, and in a number of

6    cases -- well, verdict reached, yes, no.  You wrote, not

7    applicable.

8           So that might mean that your service was grand

9    jury service.  I don't know.  But you checked no for that.

10   So explain, if you could -- well, I don't want to know the

11   verdict, so I don't want to know if it was guilty, if it was

12   not guilty, guilty, liable, not liable.  Well, they're all

13   criminal.

14          Why did you put N/A after each of them?

15               PROSPECTIVE JUROR:  And this is referring to

16   Question 19?

17               THE COURT:  Yes, sir.  I'm sorry.  I should have

18   oriented you that way.  In other words, either a verdict had

19   to be -- either a verdict was reached or it was not reached.

20               PROSPECTIVE JUROR:  Oh, yes.  I see.

21               THE COURT:  Right?

22               PROSPECTIVE JUROR:  Yes.  I see.

23               THE COURT:  Again, I don't want to know what the

24   verdicts were.  But was a verdict reached?  Yes or no.

25               PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Okay.  So verdicts were reached in
2    those cases?
3          PROSPECTIVE JUROR:  Verdicts were reached in each
4    one of these questions [sic].
5          THE COURT:  So anything about, then, your prior
6    jury service that leads you to believe that you couldn't be
7    a juror, serve as a juror once again?
8          PROSPECTIVE JUROR:  No.  No, with that -- but I
9    have the exception of a medical issue since that time.
10          THE COURT:  Okay.
11          PROSPECTIVE JUROR:  And that refers back to
12    Question No. 6.
13          THE COURT:  Oh, I missed something, then.
14          PROSPECTIVE JUROR:  No, no.  I missed it.  I put
15    no, but it should have been yes.
16          THE COURT:  Okay.  Well, tell us what the issue
17    is.
18          PROSPECTIVE JUROR:  Okay.  I have a medical
19    condition where my -- I have a weak bladder.  So since I've
20    been here today -- I've counted -- I've been to the restroom
21    like 12 times.
22          THE COURT:  Okay.
23          PROSPECTIVE JUROR:  Just sitting back there, I've
24    been three times.
25          THE COURT:  Okay.

```
1              PROSPECTIVE JUROR:  So that's the issue that I
2       have.
3              THE COURT:  12 times in one day.
4              Okay.  You know, we do take -- so here's the way
5       the trial:  If you were to serve as a juror, we would work.
6       We do take breaks, you know, every -- I have to take a break
7       for the court reporter.  In fact, we're maybe even -- we
8       took one already, but for the court reporter's sake, who's
9       writing down our words, we do have to take one, you know,
10      every hour and a half -- every hour and a half to two hours,
11      in there.  Hour and half to two.  So I think that's the
12      question, is, do you think -- is an hour and a half to two
13      hours enough?  Or do you think it's not enough?
14             PROSPECTIVE JUROR:  I don't think it's enough.  I
15      did three within an hour this morning.
16             THE COURT:  Okay.
17             PROSPECTIVE JUROR:  I had three bathroom visits.
18             THE COURT:  Okay.
19             PROSPECTIVE JUROR:  So and anytime I -- I did it
20      after I had an orange juice this morning.
21             THE COURT:  Right.
22             PROSPECTIVE JUROR:  Then, after lunch, I had soda
23      and water.  And then I had water while I was waiting in the
24      other room.
25             THE COURT:  Is it something about being here for
```

1    service or this is just your life these days?

2        PROSPECTIVE JUROR:  This is my life,

3    unfortunately.

4        THE COURT:  Well, I'm sorry you have to share this

5    with us, but it is an important thing.

6        And if -- so how often -- what does that work out

7    to be?  So every -- less than every hour, it sounds like.

8        PROSPECTIVE JUROR:  I would say at least two to

9    three times an hour every day.

10        THE COURT:  Okay.

11        Any objection?

12        MR. JAUREGUI:  None, your Honor.

13        THE COURT:  All right.  Sir, thank you for coming

14    down here.  Thank you for being willing to serve.  But we'll

15    excuse you on that basis.

16        PROSPECTIVE JUROR:  Okay.  Thank you.

17        THE COURT:  Thank you.

18        (Thereupon, Prospective Juror No. 1038 retired

19    from the courtroom and the following proceedings were had:)

20        (Thereupon, Prospective Juror No. 0578 entered the

21    courtroom and the following proceedings were had:)

22        THE COURT:  Ma'am, good afternoon.

23        PROSPECTIVE JUROR:  Good afternoon.

24        THE COURT:  Thank you for your patience today.

25        First of all, you are Juror 0578.  Correct?

```
 1              PROSPECTIVE JUROR:  Yes.
 2              THE COURT:  So I'm going to start, ma'am, with the
 3     last question on your -- well, the kind of catch-all
 4     question we have here.  And it kind of links back to some of
 5     the other questions, too.  But a lot of our questions are
 6     designed to try to figure out what kind of media people have
 7     watched, what kind of conclusions they've formed or if they
 8     have formed any, and whether they have -- they can set aside
 9     a lot of things and be a fair and impartial juror.
10              And you indicated you thought the Proud Boys and
11     the Oath Keepers are guilty in attacking the Capitol and
12     you've watched a lot of the hearings, et cetera.
13              So that's a firm view you've come to.  Is that
14     fair to say?
15              PROSPECTIVE JUROR:  Well, it was clearly evident
16     on video, on TV.
17              THE COURT:  Okay.
18              PROSPECTIVE JUROR:  The January 6 hearing was
19     quite clear on who did what.
20              THE COURT:  You --
21              PROSPECTIVE JUROR:  I also have the opinion that
22     everybody has a right to their fair chance in a trial.  And
23     that's the American way.
24              THE COURT:  Sure.  That's the American way.  It's
25     also -- on Question 48, the question was:  Do you have any
```

1    strong opinions about the events that happened on

2    January 6th that would affect your ability to be fair and

3    impartial?  You checked yes.

4           I assume considering these views that you've

5    later -- that you just articulated for us.

6           PROSPECTIVE JUROR:  Yeah.  I mean, I feel

7    opinionated about my own beliefs based on what I've taken in

8    in information.  But I also feel like, you know, I could

9    hear the evidence and make a judgment on that.

10          THE COURT:  Here's why I'm -- here's what I'll

11   just point out:  You used the word "guilty" in 76 when you

12   wrote that.  And, look, I think it's one thing to have seen

13   or heard certain things.  Right?  And it's also one thing to

14   have seen and heard things about all sorts of -- what all

15   sorts of people did that day.  Of course, one person and

16   another -- you know, people -- the Defendants in this case

17   are not charged with, like, the overall event.  They're only

18   charged with what they're charged with.

19          But you both indicated -- you called out -- you've

20   heard of the Proud Boys; you called them out and listed them

21   directly and referred to them as guilty.

22          And so --

23          PROSPECTIVE JUROR:  Well, guilty -- what I said

24   was guilty in attacking the Capitol.

25          THE COURT:  Right.

1          PROSPECTIVE JUROR:  I don't know what else they're

2     guilty of, if anything.  So they may not be guilty of

3     anything.  I don't even know what the case is about.

4          THE COURT:  That's fair.

5          But I think I'd be concerned -- and it's no fault

6     of yours for watching TV, and everyone's entitled to their

7     opinion.  But the question is whether you feel you can set

8     aside -- I mean, to be honest, when you checked that box on

9     the questionnaire, you did say you thought it would affect

10    your ability.  And it seems like such a strong view that you

11    thought you wanted to put it out there that you would have

12    trouble setting that aside and approaching a case like this

13    and setting it aside and approaching it and being able to

14    consider only the evidence in the case and not the things

15    you've heard and seen and opinions you might have already

16    reached.

17         Is that fair?  I mean, that's the question.

18         PROSPECTIVE JUROR:  Yes.  That's fair.

19         THE COURT:  That that would be a problem?

20         PROSPECTIVE JUROR:  Well, I don't know that it's a

21    problem.  But --

22         THE COURT:  But it could be?

23         PROSPECTIVE JUROR:  It could be.

24         THE COURT:  Any objection from the Government?

25         MR. McCULLOUGH:  No, your Honor.

1           THE COURT:  Ma'am, we're going to excuse you from

2    further service.  There may be other cases that you'll be

3    able to serve on.  Ms. Franklin will give you that -- those

4    instructions.  Thank you for your honesty.  Thank you for

5    your patience today.

6           PROSPECTIVE JUROR:  Okay.  Yes.  Thanks.

7           (Thereupon, Prospective Juror 0578 retired from

8    the courtroom and the following proceedings were had:)

9           THE COURT:  0578, struck for cause.

10           MS. HERNANDEZ:  Thank you, your Honor.

11           THE COURT:  Guilty.

12           MS. HERNANDEZ:  I was just saying thank you.  It

13    wasn't sarcastic.

14           THE COURT:  I'm just explaining.

15           THE COURTROOM DEPUTY:  Juror 735.

16           (Thereupon, Prospective Juror No. 735 entered the

17    courtroom and the following proceedings were had:)

18           THE COURT:  Well, it's been a long day.  Thank you

19    for your patience, first of all.

20           You are Juror No. 0735.  Correct?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  I have to say one thing.  If you can

23    move the microphone close to your mouth just so the court

24    reporter can hear you.

25           PROSPECTIVE JUROR:  Sure.

1              THE COURT:  Thank you.

2              So I'm just going to ask a bunch of questions

3     jumping off your answers here on your questionnaire.

4              15 and 16, you indicated yes to.  Can you just

5     explain -- it's Page 5.  Can you explain why you answered

6     yes to those questions?

7              PROSPECTIVE JUROR:  I have a family member who

8     worked for -- sorry --

9              THE COURT:  That's okay.

10              PROSPECTIVE JUROR:  -- like OMB and members of

11     Congress.

12              THE COURT:  You have a family member that worked

13     for OMB and members of Congress?

14              PROSPECTIVE JUROR:  I have two family members who

15     have -- one has worked for OMB and one for a member of

16     Congress.

17              THE COURT:  Okay.  Let me jump right to -- that

18     person who works for the member of Congress was not present

19     at the Capitol on January 6th.  Correct?

20              PROSPECTIVE JUROR:  Correct.

21              THE COURT:  We'll circle back to that.  I just

22     wanted to make sure.

23              Then what about 16?

24              PROSPECTIVE JUROR:  My grandfather was in the

25     Navy.

1          THE COURT:  So one of the allegations in this case

2    is that the Defendants opposed the authority of the United

3    States Government by force.  And the reason we ask those

4    questions is because for people who have ties to the Federal

5    Government, if they have friends, whether they have a parent

6    who served in the Armed Forces, I want to make sure that

7    none of those ties to the Federal Government make you think

8    you couldn't be fair and impartial in a case like that.

9          Any reason to doubt that?

10         PROSPECTIVE JUROR:  I don't think so.

11         THE COURT:  You also indicated that you had -- you

12   or a close friend or family member -- you answered Question

13   24 yes, which is on Page 6.  Is that you or the family

14   member?

15         PROSPECTIVE JUROR:  Both.

16         THE COURT:  So let's talk about -- and is that the

17   same rallies or different ones?

18         PROSPECTIVE JUROR:  The same ones.

19         THE COURT:  So tell me, what rallies are we

20   talking about?

21         PROSPECTIVE JUROR:  Black Lives Matter and some

22   rallies for abortion rights.  Yeah.

23         THE COURT:  Got it.

24         The Black Lives Matter rally, do you remember when

25   that was, roughly?

```
1            PROSPECTIVE JUROR:  In 2020.

2            THE COURT:  Before or after the election?  In the

3     summer or after the election in November?

4            PROSPECTIVE JUROR:  In the summer.

5            THE COURT:  So, look, it may be that the

6     Defendants in this case, you know, have political views

7     different from the ones you were supporting when you went to

8     these rallies.

9            Again, any reason to think that you couldn't be --

10    sort of take that and set it aside and still be fair and

11    impartial in assessing the evidence?

12           PROSPECTIVE JUROR:  No.  That seems fine to me.

13           THE COURT:  Then we have a bunch of questions

14    about people living or working or being around the Capitol

15    on January 6th.  You answered Question 28 as a yes.  So I

16    want to find out why you answered that yes.

17           PROSPECTIVE JUROR:  I have a family member who

18    lives in the Capitol Hill neighborhood and I think there was

19    just a lot going on that day.  Yeah.  Yeah.

20           THE COURT:  So it's a family member who lives on

21    Capitol Hill?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  Do you know how close the family

24    member lived to Capitol Hill on that day?

25           PROSPECTIVE JUROR:  Not right on top of it, but
```

```
 1    like a good walk.
 2              THE COURT:  Say it again.
 3              PROSPECTIVE JUROR:  A good walk.
 4              THE COURT:  If you were going to walk it, how long
 5    would it take?
 6              PROSPECTIVE JUROR:  I haven't done the walk.  But
 7    I would guess like 20 minutes.
 8              THE COURT:  20 minutes?
 9              PROSPECTIVE JUROR:  Yeah.
10              THE COURT:  Did it turn out the person was fine?
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  You know, the question there is trying
13    to get at whether you had any sort of strong feelings on
14    that day that again would call into question whether you
15    could be fair and impartial; and you can imagine scenarios
16    and very extreme scenarios in which it might.  So do you
17    think that having that experience makes you think you
18    couldn't be fair and impartial here today?  Not here today,
19    but in a trial about what happened that day?
20              PROSPECTIVE JUROR:  No.
21              THE COURT:  Were you able to get in touch with
22    that family member pretty quick to say, Are you okay?
23              PROSPECTIVE JUROR:  Yeah.  Yeah.
24              THE COURT:  Let's see.  Question 37, you answered
25    that.  It's not John Stewart, the comedian.  So you don't
```

1    have to worry about that, just to let you know about that.

2          Question 45, you answered yes to.  I think maybe

3    you already mentioned you had someone you knew who worked

4    for a member of Congress.  First of all, do you have

5    anybody -- did you check yes because you know anybody who

6    worked for the January 6th committee?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  And the person that you know, was that

9    person even working for the member of Congress on

10   January 6th?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Now, you did indicate like many people

13   that you'd seen some coverage of January 6th.  You've seen

14   some videos about that, et cetera.

15         In Question 47, you indicated that you thought you

16   could set that aside.  And obviously, people have seen

17   snippets of what happened; they've read accounts of it.

18   That's all fine.  But you need to be able to set that -- all

19   that aside and just judge the evidence in this case, not

20   worry about all that.

21         So can you give us a sense just of the things you

22   have seen or heard about January 6th writ large?

23         PROSPECTIVE JUROR:  Sure.  I think I saw videos

24   sort of back closer to when it actually happened, and I'm

25   sure I've heard things on the news.  But it has been a

1    while, honestly.  I don't know what else to say.

2         THE COURT:  If you can't remember anything more

3    specific, that's fine.

4         PROSPECTIVE JUROR:  Yeah.

5         THE COURT:  Okay.  So again, Question 49, you

6    indicated you -- well, 49 and 50 kind of go together.  You

7    indicated that whatever you read, saw or heard about the

8    Proud Boys, you didn't think it would affect your ability to

9    be fair and impartial.  But let me back up and ask:  You

10   checked yes for you had read, seen or heard something about

11   that.  Can you tell us what you have read, seen or heard

12   about them?

13        PROSPECTIVE JUROR:  I --

14        THE COURT:  To the best of your recollection.  I'm

15   looking at your face.  It's a face where you seem to be

16   searching.

17        PROSPECTIVE JUROR:  Yeah.  I mean, I know that

18   they're an organization that I think has, like, expressed

19   some views that I disagree with.

20        THE COURT:  Okay.  Well, before -- we'll get to

21   those views.

22        PROSPECTIVE JUROR:  Okay.

23        THE COURT:  Well, let's just do it.  What views do

24   you associate with them?

25        PROSPECTIVE JUROR:  Sort of like things that I

1    would think of as more racist or not feminist views.

2              THE COURT:  Racist and not feminist.  Is that what

3    you said?

4              PROSPECTIVE JUROR:  Yeah.

5              THE COURT:  And can you describe why you think you

6    feel that way or what -- is there anything specific that you

7    heard or read about it or is that just a generalized feeling

8    based on nothing you can really point to?

9              PROSPECTIVE JUROR:  I don't remember specifics of

10   why I think that.  Yeah.

11             THE COURT:  Fair.

12             So I guess anything more you can remember than

13   what you said about what you perceive them to sort of stand

14   for or stand against, for that matter?

15             PROSPECTIVE JUROR:  I mean, I think -- are they,

16   like for men's rights?  Is that it maybe?  I'm not sure.

17   Yeah.

18             THE COURT:  Fair enough.

19             So from what you know about what they do stand

20   for, what you've said already --

21             PROSPECTIVE JUROR:  Right.

22             THE COURT:  -- you already said you don't agree

23   with it.  Is it something you find offensive?

24             PROSPECTIVE JUROR:  I think in some contexts,

25   yeah.

1          THE COURT:  So what do you mean by that, by "in

2    some contexts"?  Just explain what you mean.

3          PROSPECTIVE JUROR:  I think in the aggregate or

4    like if -- like if I know about something offensive

5    happening.  But not necessarily individuals.  But I don't

6    know.

7          THE COURT:  I'm not sure I understand.

8          PROSPECTIVE JUROR:  I'm not sure I understand

9    myself.

10          THE COURT:  But you have a sense that at least in

11    some ways you would find -- you find some of the things you

12    associate with them offensive in some way?

13          PROSPECTIVE JUROR:  Sure.  Yeah.

14          THE COURT:  So, look, hey, everyone's entitled to

15    their opinion.  I'm not suggesting there's anything wrong

16    with their views, your views, anybody's views.  But what we

17    do have to do is make sure that you don't have such strong

18    opinions that you can't set those aside and be fair and --

19    you know, be fair and judge the case solely on the basis of

20    the evidence and the law.

21          You did indicate in Question 50 that you thought,

22    you know, whatever you read and heard about the Proud Boys,

23    you could set that aside and be fair.  Is that your view

24    still today?

25          PROSPECTIVE JUROR:  Yes.  I think so.

1          THE COURT:  Anything you have read, seen or heard

2     relating the Proud Boys to January 6th?  Or --

3          PROSPECTIVE JUROR:  Not that I remember.

4          THE COURT:  You would not have a problem -- it's

5     the Government's burden to prove this case beyond a

6     reasonable doubt.

7          PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  Every element of whatever particular

9     offense we're talking about.

10          Would you have any qualms based on, you know, your

11     work, your work friends, your friends' friends, the social

12     circles you run in -- if the Government didn't prove their

13     case, would you have any problem acquitting these

14     Defendants, these gentlemen, and rendering a not guilty

15     verdict if that's what the evidence and the law was to

16     you -- if that's what you thought the evidence and the law

17     demanded?

18          PROSPECTIVE JUROR:  I would not have a problem

19     with that.

20          THE COURT:  You also indicated in your

21     questionnaire that you had read, heard or seen something

22     about Antifa.  So tell me what your general view of -- what

23     you have read, seen or heard about Antifa.

24          PROSPECTIVE JUROR:  I mean...

25          THE COURT:  It's not a trick question.  To be

1    clear, some people think this is a pop quiz that you need to

2    know stuff about.  It's whatever you have read, seen or

3    heard.  So the fact that you -- if your answer is "not a

4    lot" or -- like it's not a quiz.  It's an open-book question

5    based on what's in your brain.  Okay?  So don't be concerned

6    that you should know more or something.

7                 PROSPECTIVE JUROR:  Right.

8                 THE COURT:  So what have you read, seen or heard

9    again to the best of your memory about Antifa?

10                PROSPECTIVE JUROR:  Just like a lot of protests,

11   like I know that it's like a shortened form of antifascist

12   or antifascism and there were like a lot of -- I remember

13   there was some, like, violence between them and, like, other

14   groups that I think of as more hateful.

15                THE COURT:  Other groups that you think of as more

16   hateful?

17                PROSPECTIVE JUROR:  Yes.

18                THE COURT:  Do you lump the Proud Boys in with

19   that or you have an idea that there were other groups?

20                PROSPECTIVE JUROR:  An idea of other groups.

21                THE COURT:  Okay.

22                PROSPECTIVE JUROR:  Yeah.

23                THE COURT:  Do you have any other sense of what

24   Antifa stands for one way or the other?

25                PROSPECTIVE JUROR:  Not really.

1          THE COURT:  Again, you don't have such strong

2     beliefs about them that you think it would be -- it would

3     affect your ability to be fair and impartial in a trial like

4     this?

5          PROSPECTIVE JUROR:  That's correct.

6          THE COURT:  The same question about the Oath

7     Keepers.  What have you read -- this is Question 55.  What

8     have you read, seen or heard about the Oath Keepers?

9          PROSPECTIVE JUROR:  I don't know who that is.

10          THE COURT:  Oh, that's right.  You checked no.

11     Fair enough.  The answer is nothing.

12          Question 58:  You indicated that you or a close

13     friend or family member --

14          Ms. Hernández, please.

15          MS. HERNANDEZ:  Sorry, your Honor.

16          THE COURT:  On Question 58, you indicated that you

17     had -- you or a close friend -- you know someone who works

18     in the legal profession in some way.

19          PROSPECTIVE JUROR:  Uh-huh.

20          THE COURT:  Who is that person to you?

21          PROSPECTIVE JUROR:  My aunt.

22          THE COURT:  What does she do?

23          PROSPECTIVE JUROR:  She's a prosecutor.

24          THE COURT:  Did you ever discuss her work in

25     detail with her?

```
 1                    PROSPECTIVE JUROR:  No.

 2                    THE COURT:  In criminal case, obviously, there are

 3      prosecutors, criminal lawyers.  Are you very close to your

 4      aunt?

 5                    PROSPECTIVE JUROR:  Not especially close, but I

 6      know her.

 7                    THE COURT:  Anything about your relationship with

 8      her and the fact that she's a prosecutor that makes you

 9      think you couldn't be fair in a case like this?

10                    PROSPECTIVE JUROR:  No.

11                    THE COURT:  A couple other questions about another

12      organization.  You've heard these words before.  Have you

13      read, heard or seen anything about the Black Lives Matter

14      organization?

15                    PROSPECTIVE JUROR:  Yes.

16                    THE COURT:  I think you said you attended one of

17      the rallies.  Tell me what you have head, seen or heard

18      about that organization.

19                    PROSPECTIVE JUROR:  It's an antiracist

20      organization.  I've just associated it with, like, equal

21      rights to safety and -- yeah.  That's it.

22                    MR. HULL:  Your Honor, may she keep her voice up?

23                    THE COURT:  Sure.

24                    Also, close to the mic will help a lot.  You won't

25      have to shout.
```

1          So obviously, that's a cause you support.  Is that

2     fair to say?  You went to the rally.  I don't want to put

3     words in your mouth, but is that true?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  So this case could involve evidence

6     that the Defendants opposed the Black Lives Matter

7     organization.  So I guess my question is like a lot of the

8     others:  Do you have such strong beliefs about the Black

9     Lives Matter organization that the fact that there may be

10    evidence that these gentlemen opposed that would affect your

11    ability to be fair and impartial?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  This case could also involve evidence

14    that one of the Defendants unlawfully possessed a

15    high-capacity magazine, although none of the Defendants are

16    charged with a crime related to that in this case.

17         Do you have any strong feelings about firearms or

18    ammunition or the laws governing firearms and ammunition

19    that you think would affect your ability to be fair and

20    impartial, given what I represented about the evidence?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Ma'am, can I ask one other -- no.  All

23    right.

24         If I can have Ms. Franklin just put you back

25    outside for a moment.  I'm going to talk to the lawyers.  We

1    may have some followup questions for you.  So hang on for

2    one second.  Thank you.

3              (Thereupon, Prospective Juror No. 735 retired from

4    the courtroom and the following proceedings were had:)

5              MR. HULL:  Dan Hull for Mr. Biggs, your Honor.

6              She mentioned about midway through that she

7    understood an organization -- I think it was the Proud

8    Boys -- to be racist and not feminist.  I think that was her

9    nomenclature.  That could mean a lot of things.  I'm just

10   focusing on not feminist.  Does that mean antifeminist?

11   There is a big difference between not feminist and a scale

12   there.

13             And she also talked about men's rights groups,

14   which isn't something you hear every day in terms of a label

15   put on an organization or a characterization made.  What

16   does she mean by that?

17             And my favorite followup question to that would

18   be:  Does she have a problem with all male groups, "male" as

19   that has been traditionally thought of in terms of

20   anatomical correctness?

21             And the last thing that I have is she apparently

22   works at an NGO or nonprofit.  It's called -- well, you can

23   see what it's called.

24             THE COURT:  Right.

25             MR. HULL:  What does she do?  What is that about?

1    Those would be my followup questions.

2            THE COURT:  It says what -- her position seems to

3    suggest what it does.  But I'll ask what the mission of the

4    organization is, if you'd like.

5            MR. HULL:  Thank you, sir.

6            MR. JAUREGUI:  Jauregui for Tarrio.

7            I think she marked in the questionnaire she

8    discussed this thing with her family.  And I think you asked

9    her if she knew some members of Congress or something to

10   that effect.

11           If I could proffer to your Honor that her father

12   actually has worked for the Democratic Party for more than

13   30 years in politics and fundraising.  Her father and mother

14   run -- I think it's a nonprofit called Zen Politics; and as

15   we speak, they've been doing tweets about Trump's referral

16   by the Committee.

17           They've also been published.  Earthworks, if you

18   could please ask her about that.  Mr. Hall is correct.  She

19   seems to be an activist for Earthworks, which -- and if her

20   aunt is a prosecutor, where is her aunt a prosecutor?  I'd

21   like to know that, Judge.  And if she knows any actual

22   politicians in the Democratic Party.

23           THE COURT:  Well, I mean, look, given what you've

24   said, I'll ask her to reaffirm -- I don't think -- I'll ask

25   her a question.  We don't have a question in here about:

1      Are you a Republican or are you a Democrat?

2             MR. JAUREGUI:  Judge, my concern is that her

3      father was the senior advisor to Donna Shalala, the Health

4      and Human Services secretary.  She's deeply embedded.  The

5      entire family is deeply embedded in the Democratic Party.

6      My concern is that even if the Government fails to prove

7      their case against my client, if she faces her family, her

8      mother, her entire family saying that she acquitted.

9             THE COURT:  Except I asked her that question.  I

10     asked her.  I mean, I take your point.  I think that links

11     back to her partisan views, which I don't mind asking her.

12            MR. JAUREGUI:  Judge, one small thing that was

13     whispered to me in my ear:  My client actually ran against

14     Donna Shalala.  So that's very concerning.

15            THE COURT:  She said no.  I'll ask her the

16     request.

17            MR. JAUREGUI:  Judge, one last point.  And I

18     honestly think that this young lady's being evasive.  She's

19     playing dumb.  This is a Stanford-educated person, and she's

20     not behaving in that fashion.  I really think she's looking

21     up into the space trying to figure out how to answer the

22     question.  I really think she's being evasive.

23            THE COURT:  I think it's -- as I said to you, I

24     think sometimes people have impressions; and then when you

25     ask them, Well, why do you have that impression, they

1    realize actually, you know, I don't really know.  It's an

2    impression I have.

3         But I take your point.  I'll follow up on that

4    with her.

5         MR. JAUREGUI:  Thank you.

6         THE COURT:  So let me just summarize so far.  I'll

7    ask about the antifeminist.  On the question of racism, I

8    asked her, why do you think that?  What does that mean?  She

9    didn't really have a good answer.

10        But I mean, I'll follow up with her on what she

11   meant by antifeminist.  And I'll follow up on her with

12   whether -- about men's rights and whether she finds a

13   problem with that.  I'll ask her about Earthworks.

14        You know, I'm just going to ask an open-ended

15   question about Mr. Tarrio.  And she already said no, but

16   you're giving me reason to go back and just say:  Have you

17   ever heard of Mr. Tarrio?  The question actually says:  Have

18   you ever read, seen or heard anything about them that would

19   affect your ability to be fair?  I'll just ask her, have you

20   ever heard of him?  We'll see what she says.

21        And then, you know, the question about -- the

22   question about her partisan views.  Given what you've

23   proffered, I suppose I can just say -- I mean, I've also

24   already asked her, look, because she said she went to

25   rallies.  Look, they're going to have different political

1  views than you, I said.  Is that going to be a problem?  I

2  don't know what more I can ask her.

3       I mean, I'll ask her about Tarrio.  I think that's

4  fair.  And I'll ask her about -- I did ask her about whether

5  she could go back to her social circles.  I'll ask that

6  question about her family.

7       MR. JAUREGUI:  Thank you, your Honor.  I

8  appreciate it.

9       THE COURT:  I'll specifically mention her family.

10       MR. SMITH:  Judge, just three more questions.

11       THE COURT:  Yes.  I'm not closing you off.

12       MR. SMITH:  I think your Honor wanted to close the

13  loop on this first one, that she said she has a family

14  member that works for Congress.

15       THE COURT:  Used to.

16       MR. SMITH:  But did your Honor follow up on when

17  that was?

18       THE COURT:  I know it wasn't during January 6th.

19       MR. HULL:  So the followup would be whether she --

20  the family member who worked for a member of Congress who's

21  involved in the investigation on January 6th.

22       THE COURT:  Do we know the answer to that

23  question?

24       MR. SMITH:  No, your Honor.  No.

25       The second question is, when she participated in

1    the BLM rallies, did she witness property destruction?  And

2    when those rallies occurred.

3              THE COURT:  I asked her the question, the latter.

4    She said it was in the summer.  It was not the rallies we're

5    talking about.

6              MR. SMITH:  Your Honor, it would be whether she

7    witnessed or participated in property destruction.

8              MS. HERNANDEZ:  There was a July 4th rally

9    involving Black Lives Matter, I think.

10             MR. SMITH:  It's not timing.  Did she view or

11   participate in property destruction at the rally that she

12   attended?

13             THE COURT:  What does it matter whether she viewed

14   property damage at an Antifa or a BLM rally?

15             MR. SMITH:  Well, because there are going to be

16   scenes of violence played at BLM rallies, if not necessarily

17   the same one, or BLM connection-related rallies of the

18   Defendants.  I think having kind of personal knowledge about

19   those events is relevant.

20             Your Honor, the second thing is, Mr. Tarrio's

21   counsel mentioned the Earthworks organization the juror

22   works for.

23             Can the Court please ask whether her employer has

24   ever taken a public stance on January 6th?  We've seen some

25   statements in the record saying that her employer was saying

1    that January 6th was caused by a white supremacist

2    insurrection.  The concern here would be again running into

3    conflict with her employer if she were to acquit on a

4    charge.

5            THE COURT:  I'm going to ask the same question

6    about without implanting that, whether she could go back to

7    her employer having acquitted.

8            MR. SMITH:  Judge, one other point is it looks

9    like leaders of the organization she worked for were

10   recently arrested for protesting at the Capitol in 2022.  I

11   think asking her about whether that could impact her --

12           MS. HERNANDEZ:  Were they charged with seditions

13   conspiracy?

14           THE COURT:  I'm not going to ask that.

15           MR. SMITH:  Not about seditions conspiracy, your

16   Honor.  But I think the fact that her employers or

17   colleagues at work were arrested for protests at the

18   Capitol, it could possibly have some impact on her judgment

19   in the case.  This looks to be like a small organization;

20   and if the press releases are correct from recently, they

21   were -- some of her colleagues were arrested for protesting

22   at the Capitol.

23           THE COURT:  What's the Government's view on that

24   last question?

25           MR. McCULLOUGH:  It would seem the more neutral

1   question with respect to that would be whether members of

2   her organization were involved in protests.

3          MR. SMITH:  If she's aware that members of her

4   organization were arrested for protesting at the Capitol and

5   whether that would have any effect on her judgment in the

6   case.

7          MS. HERNANDEZ:  What were they protesting is a key

8   question, too.

9          MR. SMITH:  Your Honor, we're happy to leave it as

10   generally, Is she aware her colleagues were recently

11   arrested for protests at the Capitol and whether that would

12   have an effect on her ability to serve.

13          MR. McCULLOUGH:  Again, your Honor, I think that

14   is implanting.  If she is not aware of the members of the

15   organization were arrested, I think the question as to

16   whether --

17          THE COURT:  I'm going to ask her about whether her

18   employment -- anything about her employment gives her cause

19   to believe that she couldn't be fair and impartial here or

20   that she couldn't render a verdict of not guilty if that's

21   what was called for.

22          This is also kind of bleeding into like the

23   Democratic issue.  But all right.  I'll cover these.

24          MR. SMITH:  Thank you, your Honor.  We also think

25   it's a veracity issue.  If she's not -- if -- I mean, this

1    is published on the front of the -- the face of the website,

2    that there were these arrests; and also, that January 6th

3    was caused by a white supremacist organization.  It's the

4    first thing you see when you open this site.

5            So, your Honor, I think if she were to answer no

6    to that question, that I'm not aware of my organization

7    taking a public stance on January 6th, I think that would

8    pose a serious concern here.

9            THE COURT:  Let's just see what she says to the

10   question.  I don't think it's -- let me put it this way:  It

11   also could really spook someone to ask them a question like

12   this based on information they didn't provide and all of a

13   sudden they're thinking, I'm being -- you know, all of a

14   sudden someone's got a private investigator on me.

15           So I mean, don't you think that --

16           MR. SMITH:  I think the technology allows us to do

17   things these days they wouldn't be able to do in the 1970s.

18   But the question has always been the same, as to whether

19   they have any priors that need to be discovered to determine

20   whether they can fairly judge the case.

21           THE COURT:  The fact that some folks -- I take the

22   point that it's a left-leaning organization and there's a

23   concern that she can go back and say, Hey, I acquitted these

24   Defendants.  Fair.  I'm going to ask that question.

25           It's not clear to me what the protest and arrest

1    part of it really has to do with it.  I mean, explain that

2    to me.

3            MR. SMITH:  Some of the charges at issue here

4    concern the legal boundary between unlawful protests and

5    lawful protests at the Capitol.

6            If she has some colleagues who were arrested for

7    apparently unlawful -- allegedly unlawful protests at the

8    Capitol and have been having conversations with them about

9    what the implications are for them, what the laws are, what

10   the implications are, that's going to inform her judgment

11   about the charges in the case.  Can she set that aside?

12   She's been having these conversations with -- possibly with

13   colleagues about it.  And what -- is she going to bring that

14   information to bear on applying the law in this case?

15           Your Honor, if it was just protests anywhere, I

16   could see the point your Honor is making.  But if we're

17   talking about protests at the Capitol, I --

18           THE COURT:  I'll ask if she has information about

19   the laws and protests outside the Capitol and if she has any

20   specialized information about that that would cause her to

21   think that she might not -- well, that she wouldn't be able

22   to set -- does she have any?  And could she set it aside?

23   I'll ask that question.

24           MS. HERNANDEZ:  Your Honor, just going back to

25   what Mr. Smith stated, I think it's appropriate to ask

1  whether she knew what the -- her co-workers were protesting.

2  What was the subject matter?  Were they protesting

3  reproductive rights?  Were they protesting -- whatever it

4  was.

5          THE COURT:  I'm going to ask her about her

6  organization.

7          MS. HERNANDEZ:  Well, if they were arrested -- my

8  request would be that the Court ask her whether she's aware

9  of what the issue they were protesting was.  That's what I

10  would ask.

11          With respect to her ties to the Democratic Party,

12  ███████████ is a famous Democrat.  She's the first -- I

13  believe the first female chair of the Office of Management

14  and Budget appointed to that seat by President Clinton.  I

15  mean, ████████████ is a name in Democratic Party -- in the

16  Democratic Party.  She was --

17          THE COURT:  I know who she is.

18          MS. HERNANDEZ:  So I think if that's --

19          THE COURT:  What does that have to do with --

20          MS. HERNANDEZ:  I'm just -- I said with respect to

21  her ties to the Democratic Party.  Is that -- is she related

22  to ███████████?

23          MR. JAUREGUI:  She is.

24          MS. HERNANDEZ:  So for the ties to the Democratic

25  Party that --

```
1            MR. McCULLOUGH:  Hold on.  We --

2            MS. HERNANDEZ:  Excuse me.

3            -- that Sabino -- that Mr. Jauregui brought up.

4    If the Court is going to go there, I just think that, again,

5    ███████████ is a --

6            THE COURT:  Ms. Hernández, Ms. Hernández,

7    approach.  Approach right now.

8            (Whereupon, the following proceedings were had at

9    sidebar.  Present were Ms. Hernández and Mr. McCullough

10   only:)

11           THE COURT:  Ms. Hernández, are you referencing the

12   name of this juror in open court?  Because there's not any

13   reason why ████████████ has anything to do with this.

14           MS. HERNANDEZ:  Well, they just talked about who

15   her mother and father were.

16           THE COURT:  I understand.  I understand that.  But

17   it's not --

18           MS. HERNANDEZ:  I'm sorry, Judge.  I apologize.  I

19   wasn't planning -- I wasn't doing it to bring it out in open

20   court.

21           THE COURT:  It's not appropriate to mention

22   potential jurors' names in court.  And it only dawned on me

23   at the end that that's what you were doing, because you're

24   mentioning her name.  I thought:  What the hell does her

25   name have to do with this?
```

1          MS. HERNANDEZ:  I apologize.  I apologize.  But I

2     thought that Mr. -- counsel for Mr. Tarrio had already

3     mentioned names.  That's why --

4          THE COURT:  He did not mention names.

5          MS. HERNANDEZ:  I thought they had.  I thought

6     they had.  I thought they had.  I don't know how you ask it.

7     But as the Court noted, this woman is a giant in the

8     Democratic Party.

9          THE COURT:  I know who she is.  But I'll ask

10    her -- I'm going to ask her about her ties to -- I think --

11    given what everyone has mentioned, I will reference -- I'll

12    say -- I'm going to ask her a question about whether, you

13    know, it's fair to say that, given her leftist views, that

14    she's a Democrat and ask her if, given her -- given that

15    leaning -- I wouldn't ask this generally, but given all of

16    the things, she may have ties to the Democratic Party one

17    way or the other.  I think it's fair game.

18         MS. HERNANDEZ:  There's another issue I wanted to

19    raise.

20         MR. McCULLOUGH:  Your Honor --

21         THE COURT:  I'll hear you on this.

22         MR. McCULLOUGH:  I was just going to ask -- I was

23    only going to move to seal the last name of the juror from

24    the public transcript.

25         THE COURT:  Yes.  That motion will be granted.

1          THE COURT REPORTER:  Would that name include ███████
2    ██████?
3          THE COURT:  It kind of has to.  Yes.  I think so.
4    First name and last name.
5          (Whereupon, the following proceedings were had in
6    open court:)
7          THE COURT:  Ms. Franklin, I know we're late and we
8    wanted to wrap up at 6:00.  Are you okay on the time?
9          THE COURTROOM DEPUTY:  Yeah.  I just need to know.
10   We have a whole other panel.  23 we need excused.
11         THE COURT:  As soon as we're -- actually, yes.
12   Why don't you go excuse anyone but this one last lady who's
13   here.  Excuse them all.
14         THE COURTROOM DEPUTY:  What time do you want them
15   in court tomorrow morning?
16         THE COURT:  I want them to report at 9:00.
17         THE COURTROOM DEPUTY:  9:00?
18         THE COURT:  Yes, ma'am.
19         MS. HERNANDEZ:  Your Honor, my primary objection
20   is the juror's response or description of the Proud Boys as
21   racist and the fact that she really wasn't able to
22   explain -- the Court tried to follow up.
23         THE COURT:  If you want to object, I can hear you
24   afterward.  Right now I'm trying to field questions you'd
25   like me to ask.  I'm going to bring her back in.  I'll ask

1    those questions.  We can release her and then you can all --

2    we can all argue about it.

3              MS. HERNANDEZ:  Okay.  Thank you.

4              MR. JAUREGUI:  Your Honor, Jauregui for Tarrio.

5              If you could please ask her, your Honor, if she

6    knew about the statement released by her company or her NGO

7    regarding January 6th.  They actually -- if I may proffer,

8    on January 7th, they released a statement saying that the

9    white supremacists who stormed the U.S. Capitol Building

10   violently assaulted American democracy and provided a

11   shameful, shameful culmination to the Trump presidency.  It

12   goes on for paragraphs and paragraphs.  If you can just ask

13   her if she's aware of that statement and if she adopts that

14   statement.

15             THE COURT:  I'm going to ask her if she's aware of

16   it.  I'll ask her in connection with the broader question

17   about her employment.

18             MR. PATTIS:  Does she have concerns about sitting

19   on this jury for her safety?  I noted throughout her entire

20   thing she was very stiff, rigid and wouldn't look in our

21   direction once.  With all those pauses, I have doubts about

22   her candor and ability to serve.

23             THE COURT:  So I think it's fair -- we have a

24   question on that.  She did not answer it.

25             Just to be clear, I think she's -- at a minimum,

1    she's nervous.  She had long pauses.  No question.  They're

2    just as consistent with searching her memory to be accurate.

3    And I definitely don't think there's an issue about her

4    safety at this point or that she feels that way.  I'm not

5    going to inject that into that without her mentioning it

6    first.

7            MR. McCULLOUGH:  For the record, your Honor, the

8    Government's observation of this juror is exactly that, that

9    she has at times been nervous and searched her memory.  But

10   has not been in the Government's view evasive of your

11   Honor's questions.  In fact, she has offered kind of a

12   consistent approach when she's been asked about various

13   things.

14           So I think her response to being asked about the

15   details of Antifa was somewhat similar to the response to

16   being asked about details of the Proud Boys.

17           THE COURTROOM DEPUTY:  Are you ready for the

18   juror?

19           THE COURT:  Yes.  I thought Ms. Franklin was

20   getting the juror.

21           THE COURTROOM DEPUTY:  She's giving the jurors

22   instructions.  I'll get her.

23           THE COURT:  Please.

24           (Thereupon, Prospective Juror No. 735 entered the

25   courtroom and the following proceedings were had:)

1            THE COURT:  All right, ma'am.  Let me just wait

2      for my courtroom deputy to come around.

3            Once again, a couple followup questions from what

4      you told me before.  Let me just stress again a couple

5      things:  No reason to be nervous.  You're under oath.

6      You've got to tell the truth.  But this isn't -- this is

7      only questions about what you know, what you believe.  So in

8      that sense, it's not -- you don't have to be searching for

9      an encyclopedia answer or an answer from a textbook.  The

10     only rule is you tell the truth.

11           So a couple things on the Proud Boys.  You used a

12     couple of terms that I just want to hone in on for a moment.

13     I think one of them, you described them as antifeminist.  Do

14     I remember that right?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  What did you mean by that?

17           PROSPECTIVE JUROR:  I don't remember specifics,

18     but I have the impression that -- I associate them with some

19     misogynistic views.  I don't know if that's true.

20           THE COURT:  You don't know anything more specific

21     than that?

22           PROSPECTIVE JUROR:  No.

23           THE COURT:  You also referred to them as -- I

24     think you used the phrase "men's rights."  Do I remember

25     that right?

1          PROSPECTIVE JUROR:  Yeah.

2          THE COURT:  Tell me what you meant by that.

3          PROSPECTIVE JUROR:  I think that maybe they

4    believe that men are oppressed in our society and that women

5    are not.  And that's -- yeah.  That's what I meant.  I'm not

6    sure.

7          THE COURT:  Fair enough.

8          Is it fair to say misogyny offends you?

9          PROSPECTIVE JUROR:  Yeah.

10         THE COURT:  I'm not sure if it's in the same way,

11   but as you describe men's rights, is that something you find

12   offensive, too?

13         PROSPECTIVE JUROR:  I mean, not offensive.  Just

14   it seems a little confused to me.

15         THE COURT:  Not something you agree with, but not

16   offensive?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  I mean, I asked you this question

19   before when we were talking about other things that you

20   described about your views, things that you associated with

21   the Proud Boys.  And at the time you said:  Yes.  Some of

22   this stuff I find offensive.  I think that's what you said.

23         So now, having kind of poked a little bit at what

24   antifeminism means and in your mind what men's rights means,

25   can you set those things aside and give these men a fair and

1    impartial trial if you happen to be selected for the jury?

2            PROSPECTIVE JUROR:  I think so.

3            THE COURT:  Now, it's funny.  I was going to -- I

4    almost asked you this on the first round, the first time we

5    had you here.  Tell me about your job.  Tell me about what

6    you do and the organization you work for.

7            PROSPECTIVE JUROR:  I work at an environmental

8    nonprofit.  We focus on the oil and gas industry and the

9    harms of pollution in that industry.  My job is a little

10    technical, sort of providing, like, data support for a team

11    that uses technology to show that emissions are occurring.

12            THE COURT:  Show that emissions are occurring?

13            PROSPECTIVE JUROR:  Of greenhouse gases.

14            THE COURT:  Okay.

15            PROSPECTIVE JUROR:  Yeah.

16            THE COURT:  I'm not sure -- can you in more

17    layman's terms describe what that really means?  What are

18    you doing all day?

19            PROSPECTIVE JUROR:  I work in our database, sort

20    of analyzing our field data and managing our video editor.

21    Yeah.

22            THE COURT:  When you say managing, what kind of

23    data are we talking about?

24            PROSPECTIVE JUROR:  Like -- how do I describe it?

25    We -- like -- weather and temperature and sort of our

1    findings -- my team's findings in the field.  They work all

2    over the country.

3            THE COURT:  So climate change stuff, measuring

4    temperatures to make the point that climate change is

5    happening?

6            PROSPECTIVE JUROR:  We're more concerned with,

7    like, the methane releases and measuring those.  Temperature

8    is relevant to our data collection.

9            THE COURT:  So measuring methane releases from

10   what?

11           PROSPECTIVE JUROR:  From oil and gas production

12   sites, like wells.  Yeah.

13           THE COURT:  And trying to make the argument that

14   that is bad for the environment?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  All right.  So given how you've

17   described it, is it fair to say it's a left-leaning

18   organization?

19           PROSPECTIVE JUROR:  Sure.

20           THE COURT:  And is it fair to say -- do you know

21   whether your employer has ever taken a stand to the extent

22   it's a political organization on some level -- has it ever

23   taken a stand or has sort of a corporate view, corporate

24   view of January 6th?  Do you know whether it has issued

25   statements on that or taken a view on what happened on --

1    actually, before I ask that, how many people work there?

2            PROSPECTIVE JUROR:  I believe 45 or 50.

3            THE COURT:  So do you know whether it's ever taken

4    a stand on -- or issued a statement about January 6th?  It

5    sounds like it's to some degree a political organization.

6            PROSPECTIVE JUROR:  It seems likely, but I don't

7    remember if we did.  Yeah.

8            THE COURT:  But it seems likely to you?

9            PROSPECTIVE JUROR:  Yeah.

10            THE COURT:  So I'm going to just ask you a version

11    of what -- a version of the question I asked before.  You're

12    working in this organization.  It leans the way it does.

13    Are you comfortable you could go back to that organization

14    after service as a juror in this case and if the evidence

15    required it, having rendered a verdict of not guilty, are

16    you confident you could do that without feeling social

17    pressure or -- are you comfortable you could do that given

18    where you'd have to return to work?  I mean, you know, this

19    is -- it's not -- let me put it this way:  It's nothing --

20    it's not a bad reflection on you if you feel you couldn't.

21    But you do need to be able to say that you could because,

22    you know, you have to enter a trial with an open mind about

23    whether the Government's going to meet their burden or not

24    meet their burden.

25            PROSPECTIVE JUROR:  I think where the question

```
 1    started, the answer is yes.  I think I could do that.  Yeah.
 2              THE COURT:  You could do that?
 3              PROSPECTIVE JUROR:  Uh-huh.
 4              THE COURT:  Let me ask also about -- I think we
 5    had talked about someone -- you had checked the box about
 6    someone close to you had been employed in Congress.  Yes?
 7    This is Question 45.
 8              PROSPECTIVE JUROR:  Yeah.
 9              THE COURT:  I can't remember.  Maybe you said it;
10    maybe you didn't.  Who was that person?
11              PROSPECTIVE JUROR:  My uncle.
12              THE COURT:  Your uncle.  Okay.
13              And he was -- did he -- was he a staffer or what
14    was his position in Congress?
15              PROSPECTIVE JUROR:  He was in communications.
16              THE COURT:  A communications staffer?
17              PROSPECTIVE JUROR:  For a congressmen.
18              THE COURT:  Say it again.
19              PROSPECTIVE JUROR:  For a congressmen.
20              THE COURT:  For a congressmen.  Okay.
21              How long ago -- I think you had said he wasn't
22    there on January 6th.
23              PROSPECTIVE JUROR:  Correct.
24              THE COURT:  How long ago did he work for that
25    Congressman?
```

1              PROSPECTIVE JUROR:  I believe until 2019.

2              THE COURT:  Okay.

3              PROSPECTIVE JUROR:  Yeah.

4              THE COURT:  So 2019?

5              PROSPECTIVE JUROR:  Yeah.

6              THE COURT:  And again, let me ask it this way:

7    Given -- let me ask, was that member of Congress he happened

8    to work for on the Democratic side of the aisle?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Fair to say -- I mean, I'm hearing

11   about your work; I'm hearing about this person.  Fair to say

12   that your personal and professional contacts are toward the

13   Democratic side of things?  Is that fair?

14             PROSPECTIVE JUROR:  That is fair.  Yes.

15             THE COURT:  So, you know, again, I guess I have

16   to -- well, let me ask you this:  Are there friends or

17   family of yours who are strong partisan Democrats?

18             PROSPECTIVE JUROR:  Yeah.

19             THE COURT:  Okay.  So again, I've got to ask the

20   same question I asked about your work.  Now we have your

21   work.  Now we have your family.  Do you think again you

22   could go back to those friends or at least friends and

23   family -- do you think you could go back to these people

24   again in a case like this and -- having rendered a verdict

25   of not guilty if that's what the evidence required?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  You also had indicated on -- one of

3     the questions was about whether you had heard about the

4     allegations against these Defendants.  You said no.  The

5     other question I had was:  Have you heard -- so these

6     Defendants are, to be clear, just to read the names, Enrique

7     Tarrio, Ethan Nordean, Joseph Biggs, Zachary Rehl and

8     Dominic Pezzola.

9          Putting aside the issue of the allegations in the

10    case, are you -- had you heard before reading this

11    questionnaire of any of those Defendants even apart from --

12    even apart from the allegations in this case?

13         PROSPECTIVE JUROR:  I don't think so.

14         THE COURT:  Did you associate any of those people

15    with the Proud Boys, again, before reading -- before

16    becoming aware of this case?

17         PROSPECTIVE JUROR:  I did not.

18         THE COURT:  Last, you said you went to I think a

19    couple of different Black Lives Matter protests or rallies

20    or whatever you had said.  While at those rallies, did you

21    witness any property destruction or anything like that?

22         PROSPECTIVE JUROR:  I did not.

23         THE COURT:  And when you -- okay.  Do you have any

24    specialized -- let me ask this.  It's -- you work for a

25    nongovernmental organization.  Do you have any -- are there

1    times when your NGO engages in protests?

2                PROSPECTIVE JUROR:  Yes.

3                THE COURT:  And as a result of that -- first of

4    all, do you have in your job -- I don't know how this works,

5    but in your job at the NGO, do you play a role in that or is

6    that something other people do?

7                PROSPECTIVE JUROR:  That's the role of other

8    people in my team.

9                THE COURT:  That sort of plan that or engage in

10   that?

11               PROSPECTIVE JUROR:  Yes.

12               THE COURT:  Do you have any sort of specialized

13   knowledge -- one of the things -- some of the evidence in

14   this case is -- and some parts of January 6th -- relate to

15   some people protesting.  Right?  There were aspects of that

16   day that were protests.

17               Do you have any particular knowledge about the law

18   or any particularized knowledge relating to protesting or

19   the law surrounding protesting that you think -- well, let

20   me just ask that question.  Do you have any particularized

21   knowledge of the law surrounding protesting and the right to

22   protest?

23               PROSPECTIVE JUROR:  Not -- no.  I don't know what

24   you mean by "particularized."

25               THE COURT:  Well, okay.  Any knowledge about, you

 1    know, sort of where it's lawful to protest, where it's not

 2    lawful to protest, anything like that?

 3         PROSPECTIVE JUROR:  No.  I don't think I have that

 4    level of specificity.  Yeah.

 5         THE COURT:  Do you have any knowledge about it at

 6    all?  I guess because you're saying "I don't have that level

 7    specificity" I should ask it that way.  Do you have any

 8    knowledge about those kinds of topics at all?

 9         PROSPECTIVE JUROR:  I mean, no.  I don't think so.

10    No.

11         THE COURT:  We don't have any further questions.

12         Ms. -- we'll give you further instructions about

13    where things go from here.  Ms. Franklin will give that to

14    you.  Thank you for your patience today.

15         (Thereupon, Prospective Juror No. 735 retired from

16    the courtroom and the following proceedings were had:)

17         THE COURT:  Why don't -- I'll hear from you all.

18         MR. JAUREGUI:  Judge, Jauregui for Tarrio.

19         We move for cause, Judge.  This is a young lady

20    that both in her professional life and in her personal life

21    is an activist, Judge.  That's what she is.  She's an

22    activist by another name.  She has deep connections to the

23    Democratic Party.  Her family has been in the Democratic

24    Party for more than 30 years.  Her organization is an arm of

25    the Democratic Party.

1          I mean, I don't know of any real company that

2     stages protests, that gets their members arrested, that then

3     releases a statement where they call people white

4     supremacists the way they're doing it here.

5          I think that she is not being truthful with your

6     Honor.  I continue to think she's lying.  She answers

7     certain questions in milliseconds:  Can you be fair?  Yes.

8     I mean, she's waiting to say yes.  Any kind of difficult

9     question or any kind of question, she looks away; she takes

10    pauses for 30 seconds; and then she decides to answer.

11         I think she wants on this jury.  This is exactly

12    the kind of sleeper cell juror that I'm afraid of.  She

13    wants to be on this jury.  She's an activist.  And I think

14    your Honor should strike her for cause.

15         THE COURT:  Does any other Defendant want to be

16    heard?

17         MR. SMITH:  Yeah, Judge.  I think the juror's last

18    response to the Court's questions about protests at the

19    Capitol were probably not completely candid if you just

20    consider the context because the Court had asked how many

21    members are on -- how many people are employed at her NGO.

22    She said about 45.  Then she indicated members of her team,

23    her team itself, are engaged in protests.  It looks like the

24    arrests at the Capitol for protests occurred two months ago,

25    a couple of months ago.

1          So to say -- to indicate, your Honor, that she has

2     no knowledge at all about where or not it's appropriate to

3     protest would I think seem implausible unless she had had no

4     communication with members of her team who were involved in

5     those protests.

6          THE COURT:  It's tough because I also -- well,

7     fair.  I also think -- again, I think her -- I know

8     Mr. Jauregui said she answered quickly and there were

9     questions she didn't answer quickly at all.  Sometimes you

10    wonder whether people are just overthinking things, trying

11    to make sure they're not missing something.  And so you

12    noticed when I was asking her things that really were not

13    sensitive at all, sort of like, What do you do for a job,

14    you know, it was like:  All right.  How do I -- so --

15         MR. SMITH:  True.

16         THE COURT:  Some of the things she was saying, I

17    wonder if that's in her nature.  But look, these are only

18    arguments.

19         Mr. Hull.

20         MR. HULL:  Biggs joins for all those reasons,

21    given -- we think she was being evasive.  Not all the time,

22    but a substantial amount of the time.

23         THE COURT:  Government?

24         MS. HERNANDEZ:  Your Honor, may I?

25         THE COURT:  You know, we'll do -- Ms. Hernández,

1    we'll do our best to try to get a mic out to you here

2    somehow because that will save a lot of time.

3         MS. HERNANDEZ:  The statement on Earthworks is

4    troubling for multiple reasons.  She calls -- the woman --

5    the executive director calls him racist.

6         But this is another bigger problem.  The

7    statement -- and we will make it a part of the record --

8    juxtaposes the treatment of white -- the racism played out

9    shamelessly yesterday in the disparity between how violent

10   white extremists were treated in comparison to Black Lives

11   Matter protesters at the same building.  Freedom to -- so

12   that creates a problem for someone sitting on the jury if

13   they're thinking that there has to be some balance or has

14   been some imbalance.  I think that's a very problematic

15   issue.

16        Her statement that they were -- that the Proud

17   Boys were racist when the Court asked why or what she -- she

18   had no explanation, which is the definition of prejudice.

19   Right?  If you cannot explain why you think something is

20   that way, that means it's a bias.

21        THE COURT:  Can I just say, Ms. Hernández, again,

22   for your purposes, it would be better -- if someone has low

23   information and says, Yeah, I have this vague idea that

24   they're racist, but I couldn't really tell you why, so

25   you're saying it would be better if they said, No, no, I

1  know they're resist because -- and here's Reasons 1 through

2  10:  I've researched it.  I've gone through the Southern

3  Poverty Law Center manual and they give me 500 reasons why.

4  Is that better?  I mean --

5          MS. HERNANDEZ:  Yeah, because it's based on reason

6  rather than bias --

7          THE COURT:  Well --

8          MS. HERNANDEZ:  -- in my opinion.

9          THE COURT:  For purposes of our jury selection, I

10  realize you'd rather have a juror that said, No, I don't

11  know anything about them.  I don't think that, but I get

12  that.

13          But I actually don't think it's better for someone

14  to say that.

15          MS. HERNANDEZ:  Here's my view:  If you say, I

16  think they're resist because I watched a rally where they

17  had anti-Black signs or something, that's a reason.  If you

18  say, I think they're racist but can't explain why, I think

19  that's bias.  I think -- that's the definition of bias.  You

20  have an opinion that is based not on reason, but on --

21          THE COURT:  I guess my point ultimately is that

22  someone who doesn't really have a very good reason for it is

23  more likely to say -- maybe they won't -- to say, I have

24  this vague impression, but it's something I can easily set

25  aside, as opposed to someone who said, Oh, I saw these

1    things.  I can't unsee them.  That's my reason.  I can't set

2    that aside.

3              MS. HERNANDEZ:  I get it.

4              THE COURT:  Ultimately, the juror will tell us.

5              MS. HERNANDEZ:  The other thing is she referred to

6    the Proud Boys as antifeminists.  That doesn't -- I don't

7    know where that comes from.  You sort of have to do a dig

8    deep into the Proud Boys to come away with that sort of

9    description, and she's telling us she knows very little

10    about the Proud Boys.

11              But frankly, after reading this thing on her

12    website and -- where it's juxtaposing the unfairness of the

13    system, I think --

14              THE COURT:  The organization.

15              MS. HERNANDEZ:  I think that alone is very

16    problematic for somebody sitting on a jury who may want to

17    balance out how white extremists are treated versus how the

18    Black extremists are treated or however she used it.  And

19    she -- and that followed through in her description of her

20    support for BLM and her antagonism toward the Proud Boys.

21              THE COURT:  Let me hear from the Government on

22    this.  I'll just tell if you -- well, let me hear from the

23    Government.

24              MR. McCULLOUGH:  So, your Honor, you explored in

25    great detail her experience at work, her experience in her

1    personal life.  You explored in great detail the question as
2    to whether she could return to work, she could return to her
3    social circle without effectively any fear of retaliation or
4    any concern about rendering a verdict of not guilty if
5    that's what the evidence required.

6           She was very clear about that in all of her
7    answers to you.  She didn't equivocate at any point.

8           This concept of her being evasive, your Honor, I
9    think you picked up on this as well.  But when you asked her
10   about her work, she paused and she waited and she tried to
11   give you a thoughtful answer.  And, look, we could
12   assassinate that as part of her character.  But I think that
13   is just the nature of the way that she answers questions and
14   I think it is reflective of the way that she was answering
15   those questions thoughtfully.

16          And so the other thing I'd mention is that with
17   respect to kind of this entire side of activism that is
18   attributed to this organization based on the internet
19   research of our opponents here, she said, look, the job is a
20   little technical.  I provide data support for a team that
21   uses technology to show emissions.

22          So, you know, she works by her own kind of
23   explanation on the data side.  This is what she does.  The
24   fact that she might believe in the cause that the earth is a
25   place to save, if you call that activism, fine.  I think

1    that she gave you time and time again answers that she could

2    be fair and impartial, she was not being evasive.  And kind

3    of the suggestion that she was is I think misplaced.

4          Finally, this last thing about kind of how does an

5    idea come into your mind and then you're truthful and honest

6    and kind of sharing something.  Right?  I do not watch

7    basketball.  I just don't.  I haven't watched it since the

8    '90s.

9          James Harden?  A reputation for not playing a lot

10   of defense.  How do I know that?  Right?  Like I don't know.

11   Right?

12         THE COURT:  Right.

13         MR. McCULLOUGH:  Someone mentioned it to me at

14   some point.  Could I sit on a panel and decide whether he

15   does?  Sure.

16         THE COURT:  I think --

17         MR. PATTIS:  It wouldn't take you five minutes to

18   give that answer.

19         THE COURT:  For some people, this is about

20   separating this out.  I think there are people that have a

21   very loose, inchoate view or kind of knee-jerk reaction to

22   some of the concepts in this trial, and it's not really

23   based on anything.  And, you know, poking through that is,

24   you know, part of the issue.

25         I appreciate all the suggestions.  It's your job

1    to do it.  But I think you all have helped hone the type of

2    questioning I'm doing.  Look, that's why I asked her those

3    mundane questions about her job, quite frankly, because I

4    wanted to see:  Would she sit there and wait 45 seconds

5    before answering a question, like, do you work on Floor 3 or

6    Floor 4?  And she did.

7             And that makes me wonder.

8             Ms. Franklin, you'll give her the instructions you

9    would give someone who has not been struck.  I'm going to

10   reserve on the question and think about it overnight.  I'll

11   let you know tomorrow morning.  For the meantime, let's let

12   her know she's still in play.  I'll resolve it tomorrow

13   morning.

14             THE COURTROOM DEPUTY:  So come back tomorrow?

15             THE COURT:  She wouldn't have to come back

16   tomorrow.  I think it's for anyone who's been qualified,

17   whatever we're telling them.  And we'll -- I'll rule on it

18   tomorrow.

19             Anything further before we break, given that it's

20   6:24?

21             MR. HASSAN:  Judge, real briefly.

22             I know we inquired last week regarding the ruling.

23   We're inquiring as far as when the Court is going to be

24   ruling on that.

25             THE COURT:  I'm working on it.  You asked:  Would

 1    it be before opening?  I said:  Yes.  Well before opening.

 2    It's going to be well before the jury is -- I mean, I have

 3    to give you an answer before the jury is sworn.  And my hope

 4    is well before then.

 5              MR. HASSAN:  I appreciate it.

 6              MR. PATTIS:  Is it possible to get a hard time

 7    stop tomorrow?  I have a family event for a new grandchild

 8    to attend by Zoom.

 9              THE COURT:  What time are you looking for?

10              MR. PATTIS:  So 20 to 6:00.  That would give me

11    time to get back to the hotel room.

12              THE COURT:  I think that's fine.  I wanted to

13    hard-stop at 5:30 today.  We made better progress in the

14    second half of the day.

15              MR. HULL:  Thank you.

16              UNIDENTIFIED ATTORNEY:  Judge, yesterday --

17              THE COURT REPORTER:  Who's speaking, please?

18              THE COURT:  All counsel, please, for the court

19    reporter's benefit, I know who's speaking.  But she does

20    need to know who's speaking.  Please identify yourselves.

21              MR. SMITH:  Mr. Smith for Defendant Nordean.

22              Yesterday, Ms. Harris helpfully went through all

23    of the qualified jurors numbers.  Would that be acceptable

24    to the Court to do today as well?

25              THE COURT:  It would be.  It would be acceptable

1    if Ms. Harris can do that.

2            THE COURTROOM DEPUTY:  Your Honor, the qualified

3    line numbers are 75, which is Juror 1456; 25, which is Juror

4    0732; 27, 1268; Line 30, Juror 1072; and we just had Line

5    37, 0735.

6            MR. HULL:  Ms. Harris, do you have the total for

7    the two days then?

8            THE COURTROOM DEPUTY:  We're at 13, including the

9    lady who just left.  That may change tomorrow.

10            THE COURT:  See everyone tomorrow.  We're starting

11    at 9:00.  9:00.  We'll get an early start.  Have a good

12    night.

13            (Proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>**CERTIFICATE**</u>

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 20th day of December, 2022.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25

598

**'**

**'90s** [1] - 593:8

**/**

**/s** [1] - 597:12

**0**

**0010** [1] - 512:12
**0105** [4] - 409:7, 409:24, 411:14, 538:12
**0237** [4] - 411:19, 411:20, 412:2, 413:4
**03** [1] - 467:21
**0306** [5] - 464:3, 467:19, 467:24, 471:25, 512:23
**0319** [2] - 538:5, 538:10
**0342** [4] - 449:2, 449:3, 449:8, 460:6
**0363** [5] - 413:7, 413:8, 425:24, 438:8, 442:8
**0578** [4] - 543:20, 543:25, 547:7, 547:9
**06511** [1] - 407:6
**0732** [8] - 473:24, 473:25, 474:10, 491:6, 495:4, 499:14, 512:21, 596:4
**0735** [2] - 547:20, 596:5

**1**

**1** [9] - 409:9, 409:12, 410:7, 412:5, 413:14, 448:4, 513:10, 513:22, 590:1
**10** [2] - 478:22, 590:2
**10010** [1] - 406:23
**10016** [1] - 407:18
**1014** [1] - 407:14
**1015** [1] - 446:18, 446:20, 446:21
**1038** [4] - 538:18, 538:20, 538:25, 543:18
**1072** [10] - 512:13, 513:11, 513:12, 513:13, 513:14, 513:18, 526:2, 527:5, 529:14, 596:4

**10th** [1] - 535:15
**11** [1] - 409:9
**1123** [1] - 406:22
**12** [3] - 469:1, 541:21, 542:3
**1268** [8] - 506:22, 506:23, 507:2, 512:2, 512:14, 512:17, 512:18, 596:4
**13** [1] - 596:8
**1327** [6] - 446:24, 447:12, 447:19, 447:20, 447:23, 448:25
**1420** [1] - 407:3
**1456** [1] - 596:3
**1461** [2] - 513:1, 513:2
**15** [9] - 414:2, 449:11, 474:12, 474:14, 539:4, 539:5, 539:7, 539:21, 548:4
**153rd** [1] - 407:11
**1585** [5] - 530:6, 530:7, 530:12, 537:11, 538:1
**16** [8] - 449:11, 539:4, 539:6, 539:15, 539:16, 539:21, 548:4, 548:23
**16th** [1] - 524:14
**19** [2] - 515:13, 540:16
**1970s** [1] - 569:17
**1992** [1] - 414:8
**1:39** [1] - 406:7

**2**

**2** [1] - 406:11
**20** [5] - 406:6, 446:18, 551:7, 551:8, 595:10
**20001** [2] - 407:23, 597:14
**20005** [1] - 407:3
**2019** [2] - 583:1, 583:4
**202** [2] - 407:23, 597:15
**2020** [2] - 444:21, 550:1
**2021** [1] - 517:2
**2022** [3] - 406:6, 567:10, 597:10
**20530** [1] - 406:19
**20777** [1] - 407:9
**209** [1] - 407:12
**20th** [1] - 597:10

**21** [3] - 515:13, 515:16
**21-00175** [1] - 406:3
**21-175** [2] - 409:2, 472:8
**21-year-old** [2] - 448:8, 448:12
**22** [2] - 446:17, 447:1
**23** [1] - 574:10
**24** [7] - 426:10, 430:7, 438:17, 450:16, 509:4, 518:3, 549:13
**24th** [1] - 535:15
**25** [2] - 473:24, 596:3
**25th** [1] - 535:15
**26** [1] - 451:17
**27** [3] - 451:11, 506:22, 596:4
**28** [2] - 452:12, 550:15
**29** [1] - 512:11
**2:00** [1] - 538:13

**3**

**3** [1] - 594:5
**30** [4] - 562:13, 586:24, 587:10, 596:4
**31** [1] - 495:12
**32** [5] - 465:2, 465:5, 468:7, 538:5, 538:11
**33** [1] - 538:12
**33012** [1] - 407:15
**33014** [1] - 407:12
**333** [2] - 407:22, 597:14
**35** [1] - 538:19
**354-3269** [2] - 407:23, 597:15
**37** [3] - 475:19, 551:24, 596:5
**383** [1] - 407:5
**3:30** [1] - 410:13

**4**

**4** [1] - 594:6
**40** [1] - 516:17
**409** [1] - 408:3
**42** [1] - 507:18
**45** [6] - 415:11, 552:2, 581:2, 582:7, 587:22, 594:4
**47** [12] - 416:17, 419:25, 456:8, 456:11, 479:1, 508:16, 516:22,

517:15, 531:9, 531:15, 532:22, 552:15
**48** [4] - 416:23, 416:25, 457:11, 544:25
**49** [6] - 458:17, 458:18, 508:23, 518:14, 553:5, 553:6
**49th** [1] - 407:14
**4:30** [4] - 503:3, 503:8, 503:10, 505:5
**4th** [1] - 566:8

**5**

**5** [2] - 474:15, 548:5
**50** [5] - 419:24, 458:18, 553:6, 555:21, 581:2
**500** [1] - 590:3
**51** [1] - 482:11
**52** [2] - 484:5, 484:8
**53** [1] - 484:13
**55** [1] - 558:7
**555** [1] - 406:18
**58** [5] - 422:10, 486:24, 521:20, 558:12, 558:16
**5:00** [1] - 504:12
**5:30** [4] - 503:4, 503:8, 504:13, 595:13
**5th** [1] - 416:5

**6**

**6** [3] - 541:12, 544:18, 549:13
**6175** [1] - 407:11
**62** [6] - 423:2, 487:10, 487:12, 488:12, 522:9, 522:13
**63** [8] - 487:10, 487:22, 488:12, 488:18, 522:9, 522:11, 522:13, 522:16
**6706** [1] - 407:22
**6:00** [2] - 574:8, 595:10
**6:24** [1] - 594:20
**6th** [55] - 415:21, 415:24, 417:3, 438:18, 438:19, 440:12, 451:12, 454:23, 455:4, 455:13, 456:10, 459:2, 459:4, 470:18, 477:16, 478:10,

478:11, 478:25, 479:2, 479:10, 483:19, 485:19, 496:11, 497:4, 507:20, 508:18, 509:4, 516:15, 516:20, 517:2, 518:3, 519:25, 530:24, 531:11, 531:18, 532:20, 545:2, 548:19, 550:15, 552:6, 552:10, 552:13, 552:22, 556:2, 565:18, 565:21, 566:24, 567:1, 569:2, 569:7, 575:7, 580:24, 581:4, 582:22, 585:14

**7**

**70** [2] - 409:9, 466:14
**71** [4] - 409:9, 464:10, 464:15, 464:23
**7166** [1] - 407:8
**72** [5] - 464:10, 464:15, 464:23, 465:5, 469:1
**73** [2] - 523:2, 523:6
**735** [5] - 547:15, 547:16, 561:3, 576:24, 586:15
**75** [2] - 523:1, 596:3
**76** [1] - 545:11
**7th** [1] - 575:8

**8**

**8:30** [1] - 410:12

**9**

**9** [1] - 475:20
**9-year-old** [1] - 410:11
**909** [1] - 406:22
**99** [1] - 407:17
**9:00** [4] - 574:16, 574:17, 596:11
**9th** [1] - 535:15

**A**

**ability** [34] - 410:9, 417:2, 420:3, 424:25, 425:14, 425:16,

450:6, 450:7, 457:13,
458:22, 480:7,
484:10, 485:8,
486:20, 490:2,
490:23, 511:6,
511:20, 521:2,
524:21, 525:4,
532:20, 533:18,
540:1, 545:2, 546:10,
553:8, 558:3, 560:11,
560:19, 564:19,
568:12, 575:22, 597:7
**able** [33] - 410:17,
417:5, 417:9, 417:11,
419:16, 421:24,
421:25, 423:6,
452:20, 464:10,
464:25, 465:1, 465:3,
468:8, 468:10, 470:5,
500:7, 501:23,
505:20, 516:1, 516:5,
523:22, 523:23,
525:13, 534:23,
546:13, 547:3,
551:21, 552:18,
569:17, 570:21,
574:21, 581:21
**abortion** [1] - 549:22
**absolutely** [4] -
411:11, 420:9, 470:4,
508:21
**accept** [1] - 443:16
**acceptable** [2] -
595:23, 595:25
**accepted** [1] -
514:20
**accolades** [1] -
505:16
**account** [1] - 486:9
**accountability** [1] -
471:1
**accounts** [1] -
552:17
**accurate** [2] - 576:2,
597:4
**accused** [1] - 426:18
**acknowledge** [1] -
469:14
**acquit** [1] - 567:3
**acquittal** [1] - 419:19
**acquitted** [3] - 563:8,
567:7, 569:23
**acquitting** [2] -
482:8, 556:13
**acting** [3] - 526:10,
531:20, 532:2
**action** [1] - 454:10
**Action** [1] - 406:3
**active** [2] - 422:17,
446:8

**actively** [1] - 468:17
**activism** [2] -
592:17, 592:25
**activist** [4] - 562:19,
586:21, 586:22,
587:13
**activities** [1] -
483:19
**activity** [1] - 520:21
**actual** [1] - 562:21
**ADC** [1] - 502:23
**add** [1] - 492:24
**addition** [1] - 431:9
**additional** [2] -
446:9, 525:24
**address** [2] - 447:5,
458:6
**addressing** [1] -
413:13
**adequate** [1] -
459:17
**admitted** [3] -
460:11, 508:19,
531:13
**adopt** [1] - 523:21
**adopts** [1] - 575:13
**adult** [1] - 448:6
**adverse** [1] - 444:15
**Advil** [1] - 500:20
**advised** [1] - 447:16
**advisor** [1] - 563:3
**advocate** [1] -
519:14
**affect** [32] - 417:2,
420:3, 424:25,
425:13, 425:15,
450:6, 450:7, 457:13,
458:22, 480:6, 484:9,
485:8, 486:20, 490:2,
490:23, 494:10,
507:16, 511:6,
511:20, 515:5, 521:2,
524:21, 525:4,
532:20, 533:18,
545:2, 546:9, 553:8,
558:3, 560:10,
560:19, 564:19
**affirmed** [1] - 467:10
**afraid** [1] - 587:12
**African** [3] - 489:25,
511:10, 524:16
**African-American**
[3] - 489:25, 511:10,
524:16
**aftermath** [1] - 416:4
**afternoon** [12] -
409:4, 410:1, 410:2,
411:22, 413:10,
413:12, 447:22,
503:10, 530:9,

530:10, 543:22,
543:23
**AFTERNOON** [1] -
406:11
**agenda** [1] - 432:21
**aggregate** [1] - 555:3
**ago** [14] - 414:7,
414:13, 423:23,
451:1, 484:22,
488:19, 489:25,
498:8, 498:14, 508:1,
582:21, 582:24,
587:24, 587:25
**agree** [4] - 427:25,
531:7, 554:22, 578:15
**agreed** [1] - 463:14
**agreement** [2] -
412:22, 443:23
**ahead** [5] - 486:23,
500:10, 529:10,
536:18, 538:9
**ahold** [1] - 453:20
**ain't** [2] - 531:20,
532:3
**airlines** [3] - 439:2,
439:4, 439:5
**aisle** [1] - 583:8
**al** [2] - 409:3, 472:9
**alert** [1] - 454:13
**allegations** [17] -
414:20, 418:9, 439:8,
449:25, 474:24,
481:12, 482:12,
482:16, 482:24,
483:10, 484:2,
509:11, 539:18,
549:1, 584:4, 584:9,
584:12
**alleged** [3] - 450:1,
474:25, 493:3
**allegedly** [1] - 570:7
**allow** [1] - 443:12
**allowed** [1] - 500:10
**allows** [1] - 569:16
**almost** [2] - 508:1,
579:4
**alone** [1] - 591:15
**alternative** [1] -
410:21
**amalgamation** [1] -
421:6
**Amendment** [1] -
525:20
**America** [3] - 409:3,
423:24, 472:9
**AMERICA** [1] - 406:3
**American** [6] -
489:25, 511:10,
524:16, 544:23,
544:24, 575:10

**Americans** [1] -
416:2
**ammunition** [6] -
425:13, 490:23,
511:19, 525:4, 560:18
**amount** [2] - 455:1,
588:22
**analyst** [1] - 526:7
**analyzing** [1] -
579:20
**anatomical** [1] -
561:20
**animus** [1] - 436:13
**answer** [47] - 409:8,
412:5, 413:14,
413:16, 415:12,
416:16, 417:10,
417:13, 419:23,
426:22, 434:12,
440:25, 449:15,
459:17, 464:9,
465:22, 469:7, 484:8,
486:18, 508:25,
509:19, 517:15,
517:19, 517:22,
517:23, 517:24,
523:19, 529:9,
529:23, 530:2,
532:15, 532:17,
557:3, 558:11,
563:21, 564:9,
565:22, 569:5,
575:24, 577:9, 582:1,
587:10, 588:9,
592:11, 593:18, 595:3
**answered** [21] -
410:7, 412:19,
416:16, 427:12,
451:17, 452:12,
478:25, 480:4,
493:11, 513:22,
514:6, 516:21, 525:8,
530:22, 548:5,
549:12, 550:15,
550:16, 551:24,
552:2, 588:8
**answering** [6] -
410:4, 411:25, 468:2,
507:5, 592:14, 594:5
**answers** [9] - 430:1,
430:4, 431:1, 468:6,
548:3, 587:6, 592:7,
592:13, 593:1
**antagonism** [1] -
591:20
**antagonists** [1] -
420:20
**anti** [2] - 460:17,
590:17
**anti-Black** [1] -

590:17
**anti-Christian** [1] -
460:17
**anticipate** [1] -
437:10
**Antifa** [31] - 420:13,
420:15, 420:22,
420:23, 421:1, 421:6,
421:8, 421:11,
423:10, 423:11,
423:12, 484:14,
484:17, 485:7, 485:8,
489:2, 498:7, 498:13,
498:23, 499:3, 499:4,
509:18, 520:14,
520:20, 521:1,
556:22, 556:23,
557:9, 557:24,
566:14, 576:15
**antifascism** [1] -
557:12
**antifascist** [5] -
484:18, 485:2, 485:3,
520:17, 557:11
**antifascists** [1] -
421:6
**antifeminism** [1] -
578:24
**antifeminist** [4] -
561:10, 564:7,
564:11, 577:13
**antifeminists** [1] -
591:6
**antiracist** [1] -
559:19
**anytime** [1] - 542:19
**anyway** [1] - 527:13
**apart** [6] - 439:10,
469:18, 480:18,
519:2, 584:11, 584:12
**apologize** [4] -
502:1, 572:18, 573:1
**apologizing** [1] -
502:2
**appeal** [1] - 467:14
**appear** [3] - 447:8,
447:9, 538:10
**APPEARANCES** [1] -
407:1
**aPPEARANCES** [1] -
406:14
**appeared** [1] -
455:17
**applaud** [1] - 523:3
**Apple** [1] - 518:7
**applicable** [1] -
540:7
**apply** [1] - 437:7
**applying** [2] -
469:22, 570:14

600

**appoint** [1] - 462:6
**appointed** [1] -
571:14
**appointee** [1] -
526:14
**appointment** [4] -
462:8, 526:16,
527:25, 537:14
**appointments** [6] -
535:14, 535:20,
536:3, 536:7, 537:17,
537:19
**appreciate** [12] -
411:10, 431:12,
460:4, 473:18,
493:17, 505:11,
505:14, 530:20,
565:8, 593:25, 595:5
**approach** [3] - 572:7,
576:12
**approaching** [2] -
546:12, 546:13
**appropriate** [8] -
431:8, 473:14, 512:8,
534:5, 534:8, 570:25,
572:21, 588:2
**approved** [1] -
506:16
**area** [5] - 417:22,
434:25, 444:16,
453:9, 527:1
**areas** [2] - 438:4,
491:8
**argue** [1] - 575:2
**argued** [1] - 493:5
**argument** [6] -
428:3, 430:12, 443:5,
464:12, 580:13
**arguments** [2] -
432:6, 588:18
**arises** [1] - 466:25
**Arkansas** [3] -
422:15, 427:3, 427:4
**arm** [1] - 586:24
**Armed** [3] - 449:12,
450:5, 549:6
**armed** [3] - 435:18,
436:2, 459:4
**armor** [1] - 497:14
**arrest** [2] - 424:15,
569:25
**arrested** [9] - 567:10,
567:17, 567:21,
568:4, 568:11,
568:15, 570:6, 571:7,
587:2
**arrests** [2] - 569:2,
587:24
**arriving** [1] - 436:23
**arson** [1] - 444:21

**art** [1] - 429:1
**article** [2] - 442:25
**articles** [1] - 518:7
**articulated** [2] -
520:9, 545:5
**ascribes** [1] - 446:11
**aside** [56] - 416:18,
417:5, 417:11, 418:4,
418:14, 419:9, 420:4,
422:1, 427:14, 429:9,
437:5, 437:15,
441:16, 453:5,
453:21, 454:8,
454:18, 456:11,
456:22, 466:11,
470:6, 478:17, 479:1,
482:1, 486:7, 502:24,
503:14, 508:15,
508:17, 516:22,
517:16, 518:17,
520:10, 525:9,
531:10, 533:13,
533:14, 534:10,
534:12, 534:24,
535:2, 544:8, 546:8,
546:12, 546:13,
550:10, 552:16,
552:19, 555:18,
555:23, 570:11,
570:22, 578:25,
584:9, 590:25, 591:2
**aspect** [3] - 417:1,
457:12, 532:19
**aspects** [2] - 460:11,
585:15
**assassinate** [1] -
592:12
**assaulted** [1] -
575:10
**assembling** [1] -
436:22
**assembly** [1] -
417:18
**assess** [1] - 437:6
**assessing** [1] -
550:11
**assessments** [1] -
535:8
**assigned** [1] - 503:8
**assistance** [3] -
448:6, 526:12, 528:12
**assistant** [2] - 414:6,
526:11
**associate** [8] -
434:16, 441:7,
441:10, 484:23,
553:24, 555:12,
577:18, 584:14
**associated** [4] -
498:24, 524:13,

559:20, 578:20
**association** [2] -
499:6, 528:24
**associations** [1] -
539:24
**assume** [4] - 415:12,
452:14, 522:21, 545:4
**assumed** [1] -
420:11
**assumes** [1] - 433:9
**assuming** [1] -
491:21
**attack** [1] - 528:14
**attacking** [1] -
544:11, 545:24
**attend** [1] - 595:8
**attended** [3] -
450:17, 559:16,
566:12
**attention** [2] - 426:6,
502:16
**attentive** [1] - 489:21
**attenuated** [1] -
414:24
**attorney** [4] - 422:16,
435:23, 487:3, 500:21
**ATTORNEY** [1] -
595:16
**attorney's** [1] -
422:14
**ATTORNEY'S** [1] -
406:17
**attorneys** [5] -
422:18, 422:19,
422:24, 500:17,
537:10
**attributed** [1] -
592:18
**aunt** [4] - 558:21,
559:4, 562:20
**authority** [4] - 450:2,
474:25, 539:19, 549:2
**Avenue** [1] - 407:17,
407:22, 423:22,
597:14
**avoid** [3] - 438:16,
468:15, 468:19
**avoidable** [2] -
468:20, 468:21
**award** [1] - 492:3
**aware** [9] - 502:11,
568:3, 568:10,
568:14, 569:6, 571:8,
575:13, 575:15,
584:16
**awareness** [1] -
431:13
**awry** [1] - 501:24

**B**

**B.A** [1] - 406:15
**BA** [1] - 528:19
**background** [1] -
528:17
**bad** [4] - 490:11,
490:12, 580:14,
581:20
**badge** [1] - 477:9
**balance** [2] - 589:13,
591:17
**Baltimore** [1] -
528:20
**bandied** [1] - 434:15
**Bar** [1] - 427:3
**bar** [1] - 427:4
**barricades** [2] -
417:21, 436:25
**barroom** [1] - 434:6
**base** [1] - 416:19
**based** [21] - 419:10,
422:5, 422:6, 436:6,
440:11, 441:16,
451:8, 460:9, 465:5,
525:12, 531:12,
545:7, 554:8, 556:10,
557:5, 569:12, 590:5,
590:20, 592:18,
593:23
**basic** [1] - 534:3
**basis** [10] - 414:1,
431:6, 463:24,
465:14, 465:16,
466:22, 501:15,
501:16, 543:15,
555:19
**basketball** [1] -
593:7
**bathroom** [1] -
542:17
**bear** [2] - 527:9,
570:14
**became** [1] - 495:21
**become** [1] - 434:1
**becoming** [1] -
584:16
**BEFORE** [1] - 406:12
**beforehand** [1] -
517:6
**begin** [2] - 432:3,
445:10
**beginning** [3] -
460:14, 510:3, 510:8
**behalf** [4] - 426:13,
471:7, 471:8, 471:10
**behaving** [1] -
563:20
**behind** [2] - 424:19,

462:9
**belief** [3] - 456:17,
457:8, 535:3
**beliefs** [14] - 427:9,
464:16, 466:12,
469:3, 485:1, 490:1,
510:25, 511:11,
521:1, 524:20,
534:12, 545:7, 558:2,
560:8
**believes** [4] - 428:13,
442:11, 534:5, 534:7
**bells** [1] - 434:5
**bench** [1] - 473:2
**bend** [1] - 530:17
**benefit** [1] - 595:19
**best** [8] - 439:18,
453:19, 504:24,
522:1, 553:14, 557:9,
589:1, 597:7
**better** [9] - 448:1,
449:6, 531:21,
589:22, 589:25,
590:4, 590:13, 595:13
**between** [14] -
440:14, 441:22,
492:18, 493:2, 493:4,
496:21, 503:3, 503:8,
519:18, 523:23,
557:13, 561:11,
570:4, 589:9
**beyond** [11] - 417:20,
417:21, 417:22,
418:9, 434:20,
438:23, 482:6, 504:4,
518:10, 523:8, 556:5
**bias** [5] - 460:17,
589:20, 590:6, 590:19
**biases** [1] - 437:5
**big** [1] - 561:11
**bigger** [3] - 455:24,
456:1, 589:6
**BIGGS** [2] - 406:6,
407:2
**Biggs** [13] - 461:19,
461:23, 471:7,
472:22, 472:25,
473:18, 482:13,
491:15, 492:24,
509:13, 561:5, 584:7,
588:20
**bigoted** [1] - 441:14,
442:3
**bigotry** [3] - 441:9,
441:14, 444:10
**bit** [9] - 435:9, 440:2,
448:7, 469:9, 492:14,
492:16, 492:22,
493:23, 578:23
**black** [2] - 443:9,

601

489:12

**Black** [37] - 423:14, 423:21, 424:13, 424:22, 424:23, 444:20, 459:12, 461:1, 461:25, 489:3, 489:12, 489:15, 489:24, 490:14, 510:2, 510:10, 510:11, 510:19, 510:22, 510:25, 511:1, 511:3, 511:5, 524:7, 524:14, 524:18, 524:20, 549:21, 549:24, 559:13, 560:6, 560:8, 566:9, 584:19, 589:10, 590:17, 591:18

**bladder** [1] - 541:19
**bleeding** [1] - 568:22
**BLM** [10] - 444:8, 444:12, 445:2, 489:5, 566:1, 566:14, 566:16, 566:17, 591:20
**block** [1] - 500:18
**blocks** [1] - 452:1
**blur** [1] - 445:11
**body** [2] - 497:18, 536:23
**bold** [1] - 445:1
**book** [1] - 557:4
**boundary** [1] - 570:4
**box** [6] - 415:10, 416:24, 416:25, 465:4, 546:8, 582:5
**boxes** [2] - 415:19, 465:23
**boyfriend/girlfriend** [1] - 488:22
**Boys** [83] - 418:18, 418:20, 418:21, 419:3, 420:17, 420:19, 420:21, 421:3, 421:17, 427:7, 427:21, 428:1, 428:8, 428:10, 428:12, 428:24, 429:11, 430:19, 432:3, 432:8, 433:11, 434:17, 436:21, 437:20, 437:23, 437:24, 437:25, 438:19, 439:25, 440:15, 441:5, 441:10, 442:11, 444:10, 444:12, 445:3, 445:23, 458:20, 458:24, 460:25,

480:2, 480:10, 480:18, 481:16, 483:1, 483:3, 483:5, 493:2, 493:20, 496:17, 497:9, 498:16, 499:1, 508:24, 509:8, 518:15, 518:20, 518:24, 519:3, 519:19, 519:25, 544:10, 545:20, 553:8, 555:22, 556:2, 557:18, 561:8, 574:20, 576:16, 577:11, 578:21, 584:15, 589:17, 591:6, 591:8, 591:10, 591:20
**Boys'** [1] - 427:9
**brain** [2] - 448:13, 557:5
**brawl** [1] - 434:6
**breach** [1] - 443:19
**break** [7] - 443:19, 459:20, 472:3, 500:19, 542:6, 594:19
**breaking** [2] - 457:24, 463:16
**breaks** [1] - 542:6
**briefly** [2] - 506:8, 594:21
**bring** [15] - 409:7, 409:11, 438:5, 447:17, 461:7, 464:1, 467:17, 473:20, 473:21, 495:2, 499:19, 529:19, 570:13, 572:19, 574:25
**brings** [1] - 511:12
**broad** [1] - 433:25
**broad-scale** [1] - 433:25
**broader** [1] - 575:16
**broadly** [2] - 433:21, 521:19
**Broadway** [1] - 406:22
**broke** [2] - 459:5, 459:8
**broken** [2] - 487:16, 487:17
**brought** [5] - 420:25, 470:19, 470:20, 502:16, 572:3
**Budget** [1] - 571:14
**building** [2] - 539:3, 589:11
**Building** [1] - 575:9
**buildup** [1] - 416:7

**bunch** [5] - 415:19, 531:19, 532:1, 548:2, 550:13
**burden** [9] - 419:18, 442:15, 442:16, 458:14, 482:4, 482:8, 556:5, 581:23, 581:24
**burned** [1] - 442:22
**burning** [4] - 444:22, 459:12, 462:1, 503:24
**busy** [1] - 507:24
**BY** [1] - 407:20

# C

**camera** [1] - 508:4
**cancel** [1] - 536:17
**canceled** [1] - 536:16
**canceling** [1] - 536:18
**candid** [3] - 506:13, 515:20, 587:19
**candidly** [1] - 433:17
**candor** [1] - 575:22
**cannot** [9] - 428:9, 442:11, 445:10, 466:22, 500:17, 500:20, 535:16, 536:8, 589:19
**capacity** [6] - 422:19, 425:9, 490:19, 511:16, 524:25, 560:15
**capital** [1] - 467:2
**Capitol** [51] - 436:23, 451:12, 451:16, 451:18, 451:20, 451:23, 452:10, 452:24, 453:19, 454:2, 454:22, 454:23, 457:13, 457:24, 459:5, 459:9, 463:17, 477:6, 477:22, 477:25, 479:2, 479:22, 479:23, 485:20, 491:25, 508:6, 516:20, 517:7, 517:12, 532:20, 534:7, 544:11, 545:24, 548:19, 550:14, 550:18, 550:21, 550:24, 567:10, 567:18, 567:22, 568:4, 568:11, 570:5, 570:8, 570:17, 570:19, 575:9, 587:19, 587:24

**captivated** [1] - 436:10
**car** [3] - 423:4, 487:17, 522:14
**care** [3] - 410:21, 442:13, 448:17
**career** [1] - 495:20
**careful** [1] - 432:14
**caregiver** [1] - 448:13
**CARMEN** [1] - 407:8
**case** [126] - 412:6, 414:20, 416:19, 417:3, 418:6, 418:9, 419:10, 419:20, 420:25, 421:20, 421:24, 421:25, 422:5, 422:6, 424:21, 424:24, 425:1, 425:7, 425:10, 426:18, 435:24, 436:8, 436:9, 437:7, 439:9, 441:16, 443:21, 443:22, 444:1, 444:4, 444:5, 444:7, 445:1, 445:24, 446:3, 448:5, 450:1, 451:3, 451:8, 453:5, 453:25, 456:12, 458:8, 463:12, 463:23, 467:1, 467:2, 467:5, 469:14, 471:21, 474:24, 478:10, 478:17, 479:3, 482:2, 482:5, 482:6, 482:24, 483:11, 484:10, 485:23, 486:5, 486:6, 486:8, 486:10, 486:14, 487:25, 488:14, 489:14, 489:22, 490:17, 490:20, 491:19, 492:7, 507:11, 508:18, 509:12, 511:2, 511:15, 511:18, 516:7, 516:23, 517:17, 520:11, 523:9, 524:17, 524:24, 525:2, 525:5, 525:20, 531:12, 532:21, 536:23, 539:19, 540:2, 545:16, 546:3, 546:12, 546:14, 549:1, 549:8, 550:6, 552:19, 555:19, 556:5, 556:13, 559:2, 559:9, 560:5, 560:13, 560:16, 563:7, 567:19, 568:6,

569:20, 570:11, 570:14, 581:14, 583:24, 584:10, 584:12, 584:16, 585:14
**cases** [6] - 422:3, 450:14, 505:25, 540:6, 541:2, 547:2
**catch** [1] - 544:3
**catch-all** [1] - 544:3
**categorical** [2] - 445:1, 445:25
**categorically** [2] - 445:7, 445:15
**categorize** [2] - 414:17, 418:25
**categorized** [1] - 440:17
**caught** [1] - 496:13
**caused** [2] - 567:1, 569:3
**causing** [1] - 481:9
**CDs** [1] - 536:16
**cell** [2] - 500:18, 587:12
**Center** [4] - 440:7, 442:18, 445:21, 590:3
**certain** [7] - 443:23, 445:8, 519:7, 520:3, 535:2, 545:13, 587:7
**certainly** [18] - 414:11, 416:1, 416:7, 417:17, 417:22, 421:7, 421:19, 422:4, 423:16, 423:25, 424:11, 424:12, 424:19, 425:2, 438:12, 441:3, 445:15, 535:1
**certainty** [1] - 520:24
**CERTIFICATE** [1] - 597:1
**certification** [2] - 436:24, 517:4
**certify** [1] - 597:4
**cetera** [3] - 478:25, 544:12, 552:14
**chair** [1] - 571:13
**challenging** [1] - 523:3
**chance** [1] - 544:22
**change** [8] - 430:25, 469:13, 517:20, 517:22, 517:24, 580:3, 580:4, 596:9
**changing** [2] - 514:9, 514:17
**character** [1] - 592:12
**characterization** [1]

602

- 561:15
**characterizations**
[1] - 439:15
**characterized** [2] -
439:25, 520:18
**charge** [1] - 567:4
**charged** [21] - 418:7,
425:10, 434:3,
436:21, 436:22,
437:16, 437:19,
458:9, 458:10,
478:11, 478:12,
478:13, 490:20,
511:17, 525:1,
545:17, 545:18,
560:16, 567:12
**charges** [7] - 414:19,
439:17, 458:11,
478:10, 482:5, 570:3,
570:11
**charging** [1] - 436:24
**Charlottesville** [2] -
441:4, 445:22
**check** [3] - 487:22,
500:9, 552:5
**checked** [36] -
415:10, 415:11,
415:14, 415:19,
416:24, 416:25,
418:13, 418:19,
419:24, 420:12,
423:1, 458:20, 465:4,
465:23, 468:9, 473:4,
482:14, 483:24,
484:14, 487:12,
488:12, 509:18,
509:22, 518:16,
522:9, 522:13,
533:17, 539:5, 540:9,
545:3, 546:8, 553:10,
558:10, 582:5
**child** [1] - 410:10
**childcare** [3] -
409:12, 409:20, 410:8
**choose** [1] - 503:16
**chosen** [1] - 444:15
**Christian** [1] -
460:17
**circle** [3] - 520:9,
548:21, 592:3
**circles** [2] - 556:12,
565:5
**circumstantial** [2] -
443:22, 444:17
**city** [1] - 422:14
**civil** [3] - 470:23,
528:1, 528:2
**clear** [20] - 418:3,
426:20, 429:19,
452:23, 460:19,

463:15, 463:18,
481:11, 483:25,
488:18, 501:12,
506:18, 514:6,
537:16, 544:19,
557:1, 569:25,
575:25, 584:6, 592:6
**clearance** [2] -
514:8, 527:4
**clearly** [1] - 544:15
**client** [9] - 426:23,
432:16, 443:9,
444:16, 444:18,
500:7, 501:22, 563:7,
563:13
**clients** [4] - 426:17,
435:12, 443:3, 505:19
**climate** [2] - 580:3,
580:4
**climbing** [3] -
479:22, 508:5
**Clinton** [1] - 571:14
**close** [36] - 414:2,
414:15, 414:18,
422:11, 422:23,
433:18, 444:1,
449:18, 449:19,
450:16, 450:18,
451:12, 451:22,
452:14, 453:23,
467:11, 474:13,
474:18, 483:25,
486:24, 487:11,
494:14, 521:19,
522:6, 522:7, 522:10,
547:23, 549:12,
550:23, 558:12,
558:17, 559:3, 559:5,
559:24, 565:12, 582:6
**closely** [2] - 415:23,
532:22
**closer** [5] - 445:24,
446:2, 448:10,
448:11, 552:24
**closing** [1] - 565:11
**cloth** [1] - 467:8
**co** [1] - 571:1
**co-workers** [1] -
571:1
**coins** [4] - 437:24,
437:25
**cold** [1] - 504:5
**colleagues** [7] -
419:22, 462:9,
567:17, 567:21,
568:10, 570:6, 570:13
**collected** [1] - 446:9
**collection** [1] - 580:8
**College** [1] - 517:4
**colloquies** [2] -

433:5, 506:6
**color** [1] - 444:2
**Columbia** [2] -
407:21, 597:13
**COLUMBIA** [2] -
406:1, 406:18
**comedian** [3] -
476:22, 477:2, 551:25
**comfortable** [3] -
497:17, 581:13,
581:17
**coming** [11] -
411:11, 411:23,
412:23, 416:4, 416:6,
420:17, 442:7,
448:22, 459:16,
471:20, 543:13
**comma** [1] - 517:23
**commanders** [1] -
508:10
**comment** [3] - 461:5,
461:9, 527:3
**comments** [2] -
420:21, 460:15
**commission** [1] -
455:4
**committed** [4] -
431:23, 435:15,
435:21, 441:24
**Committee** [1] -
562:16
**committee** [2] -
518:8, 552:6
**committing** [1] -
444:21
**communication** [2] -
493:8, 588:4
**communications** [4]
- 493:1, 496:21,
582:15, 582:16
**community** [2] -
427:8, 427:9
**companies** [1] -
527:17
**company** [2] - 575:6,
587:1
**comparison** [1] -
589:10
**compel** [1] - 534:6
**competing** [1] -
409:13
**complete** [2] -
466:10, 597:6
**completely** [4] -
453:13, 454:15,
515:20, 587:19
**complicated** [1] -
455:17
**comply** [1] - 466:13
**comports** [1] - 473:9

**conceded** [1] - 429:8
**concept** [1] - 592:8
**concepts** [1] -
593:22
**concern** [12] - 429:4,
452:13, 453:4, 486:8,
492:9, 563:2, 563:6,
567:2, 569:8, 569:23,
570:4, 592:4
**concerned** [7] -
432:3, 453:2, 453:10,
469:21, 546:5, 557:5,
580:6
**concerning** [3] -
525:10, 534:19,
563:14
**concerns** [2] -
433:19, 575:18
**concluded** [1] -
596:13
**conclusion** [1] -
534:6
**conclusions** [1] -
544:7
**condition** [1] -
541:19
**conduct** [2] - 431:23,
433:20
**confident** [2] - 457:4,
581:16
**confirm** [5] - 431:16,
439:7, 473:11, 494:7,
494:23
**conflict** [1] - 567:3
**conflicts** [1] - 441:9
**confused** [1] -
578:14
**Congress** [15] -
415:1, 456:3, 517:5,
548:11, 548:13,
548:16, 548:18,
552:4, 552:9, 562:9,
565:14, 565:20,
582:6, 582:14, 583:7
**Congressman** [1] -
582:25
**congressmen** [3] -
582:17, 582:19,
582:20
**Connecticut** [1] -
407:6
**connection** [6] -
414:23, 414:25,
475:3, 519:18,
566:17, 575:16
**connection-related**
[1] - 566:17
**connections** [3] -
450:4, 539:22, 586:22
**CONOR** [1] - 406:16

**consequences** [1] -
467:12
**consider** [4] - 440:3,
494:8, 546:14, 587:20
**considering** [1] -
545:4
**consistent** [4] -
501:5, 501:7, 576:2,
576:12
**conspiracy** [3] -
444:4, 567:13, 567:15
**constant** [1] - 454:13
**constantly** [1] -
420:17
**constitutes** [1] -
597:4
**Constitution** [2] -
407:22, 597:14
**construction** [2] -
412:9, 412:10
**consultant** [1] -
439:3
**consultant/self** [1] -
427:1
**consultant/self-
employed** [1] - 427:1
**consumed** [8] -
415:24, 437:12,
438:19, 455:1, 455:2,
456:9, 479:13, 479:14
**consumer** [3] -
431:7, 431:13, 446:8
**consumers** [1] -
444:6
**consuming** [1] -
508:3
**CONT'D** [1] - 407:1
**contact** [1] - 447:15
**contacts** [1] - 583:12
**contained** [1] -
454:11
**context** [3] - 420:25,
421:16, 587:20
**contexts** [2] -
554:24, 555:2
**continue** [2] - 472:4,
587:6
**continued** [1] -
416:11
**control** [2] - 424:19,
531:22
**conversations** [3] -
468:16, 570:8, 570:12
**convicted** [3] -
476:11, 485:20,
492:21
**convictions** [1] -
421:21
**core** [1] - 427:9
**corporate** [2] -

580:23
   **correct** [46] - 412:2,
412:16, 419:7, 430:3,
434:9, 438:24, 439:9,
442:4, 447:23, 449:8,
452:24, 462:3,
462:13, 463:24,
464:3, 467:24,
469:23, 469:24,
474:10, 474:11,
501:18, 507:2,
512:20, 512:22,
512:25, 513:18,
513:19, 515:6,
517:25, 520:7,
520:12, 522:22,
530:13, 530:14,
538:2, 538:3, 538:25,
543:25, 547:20,
548:19, 548:20,
558:5, 562:18,
567:20, 582:23
   **correctly** [3] -
421:22, 427:8, 492:25
   **correctness** [1] -
561:20
   **counsel** [5] - 409:8,
409:14, 566:21,
573:2, 595:18
   **count** [1] - 534:16
   **counted** [1] - 541:20
   **country** [9] - 432:10,
433:2, 433:25,
436:10, 444:14,
455:7, 470:22,
531:24, 580:2
   **couple** [19] - 418:23,
423:9, 429:25, 430:4,
430:18, 438:13,
468:6, 484:22, 498:8,
498:14, 524:4,
530:15, 559:11,
577:3, 577:4, 577:11,
577:12, 584:19,
587:25
   **course** [9] - 420:18,
434:8, 441:1, 451:5,
486:15, 492:16,
523:21, 527:14,
545:15
   **court** [21] - 421:20,
421:24, 422:3, 462:4,
475:9, 496:8, 498:21,
500:12, 516:12,
529:22, 535:12,
537:2, 542:7, 542:8,
547:23, 572:12,
572:20, 572:22,
574:6, 574:15, 595:18
   **COURT** [738] - 406:1,

409:4, 409:21,
409:23, 410:1, 410:3,
410:6, 410:15,
410:18, 410:22,
411:2, 411:6, 411:8,
411:11, 411:18,
411:22, 412:4, 412:8,
412:10, 412:12,
412:15, 412:18,
413:1, 413:10,
413:13, 413:21,
414:7, 414:9, 414:12,
414:15, 414:19,
415:6, 415:10,
415:17, 416:12,
416:23, 417:16,
418:2, 418:17, 419:4,
419:8, 419:13,
419:23, 420:9,
420:12, 421:1,
421:10, 421:13,
421:23, 422:5,
422:10, 422:20,
422:23, 423:1, 423:5,
423:9, 423:19, 424:1,
424:5, 424:8, 424:21,
425:7, 425:17,
425:22, 426:1,
426:10, 426:12,
426:20, 427:11,
427:22, 428:3,
428:14, 428:21,
429:5, 429:15,
429:18, 429:20,
430:5, 430:20,
431:18, 432:18,
432:22, 432:24,
433:6, 434:8, 435:2,
435:7, 436:17, 438:1,
438:10, 438:13,
438:23, 438:25,
439:6, 439:12,
439:14, 439:17,
439:24, 440:24,
441:13, 442:2, 442:5,
442:20, 443:4,
443:14, 445:6,
446:12, 446:19,
446:21, 446:23,
446:25, 447:4,
447:10, 447:13,
447:25, 448:3, 448:9,
448:14, 448:16,
448:19, 448:21,
449:5, 449:10,
449:15, 449:18,
449:23, 449:25,
450:10, 450:16,
450:21, 450:25,
451:2, 451:6, 451:10,
451:14, 451:20,

451:22, 452:1, 452:4,
452:7, 452:9, 452:12,
452:16, 452:20,
452:23, 453:1,
453:11, 453:16,
454:3, 454:5, 454:17,
454:20, 455:10,
455:15, 455:20,
456:1, 456:4, 456:7,
456:20, 457:1, 457:3,
457:10, 457:20,
457:22, 458:2, 458:8,
458:16, 459:1, 459:6,
459:14, 459:19,
459:24, 460:4, 460:8,
460:19, 460:22,
461:7, 461:13,
461:15, 461:22,
462:2, 462:11,
462:20, 462:23,
463:24, 464:6,
464:23, 465:11,
465:14, 465:18,
466:1, 466:17, 467:3,
467:15, 467:21,
468:1, 468:5, 468:18,
468:21, 468:24,
469:17, 469:25,
470:5, 470:9, 470:15,
471:3, 471:6, 471:14,
471:17, 471:19,
471:23, 472:2,
472:10, 472:13,
472:16, 473:10,
473:19, 474:2, 474:6,
474:12, 474:17,
474:20, 474:23,
475:8, 475:12,
475:15, 475:19,
476:2, 476:5, 476:7,
476:10, 476:12,
476:15, 476:20,
476:22, 476:24,
477:4, 477:7, 477:11,
477:14, 477:17,
477:20, 477:24,
478:3, 478:6, 478:21,
479:7, 479:12,
479:19, 479:25,
480:4, 480:15,
480:21, 480:25,
481:5, 481:8, 481:15,
481:21, 481:24,
482:4, 482:11,
482:20, 482:23,
483:2, 483:6, 483:9,
483:14, 483:18,
483:23, 484:5,
484:13, 484:23,
484:25, 485:4, 485:6,
485:11, 485:15,

485:22, 486:1,
486:12, 486:16,
486:23, 487:4, 487:7,
487:10, 487:15,
487:18, 487:22,
488:1, 488:4, 488:9,
488:11, 488:16,
488:18, 488:23,
488:25, 489:6,
489:10, 489:14,
489:17, 489:19,
489:21, 490:6,
490:10, 490:13,
490:17, 491:1, 491:8,
491:14, 491:24,
492:23, 493:7,
493:11, 493:15,
493:21, 493:24,
494:11, 494:13,
494:20, 494:23,
495:2, 495:6, 495:10,
495:14, 495:16,
495:21, 495:24,
496:4, 496:7, 496:15,
496:24, 497:3, 497:5,
497:8, 497:14,
497:19, 497:22,
498:2, 498:9, 498:19,
498:22, 499:5, 499:7,
499:11, 499:16,
499:25, 500:5,
500:14, 500:22,
501:2, 501:13,
501:22, 502:2,
502:12, 502:15,
502:18, 503:5, 503:9,
503:17, 503:20,
503:22, 504:9,
504:19, 504:23,
505:4, 505:10,
505:16, 506:1, 506:7,
506:15, 506:18,
506:25, 507:4, 507:8,
507:17, 507:25,
508:8, 508:10,
508:13, 508:23,
509:2, 509:7, 509:16,
509:21, 509:25,
510:5, 510:7, 510:13,
510:15, 510:18,
510:24, 511:9,
511:15, 511:23,
512:4, 512:14,
512:16, 512:18,
512:20, 512:23,
513:1, 513:4, 513:7,
513:10, 513:12,
513:16, 513:21,
513:25, 514:2, 514:5,
514:17, 514:21,
514:25, 515:4, 515:7,

515:10, 515:16,
515:23, 516:9,
516:13, 517:9,
517:14, 517:21,
518:1, 518:5, 518:10,
518:13, 519:2, 519:9,
519:13, 519:17,
519:23, 520:5, 520:8,
520:13, 520:19,
520:25, 521:4,
521:12, 521:17,
521:23, 522:2, 522:6,
522:9, 522:16,
522:19, 522:23,
523:1, 523:15,
523:18, 524:2,
524:10, 524:17,
524:24, 525:7,
525:14, 525:21,
526:4, 526:9, 526:17,
526:21, 527:2, 527:7,
527:9, 527:20,
527:24, 528:2, 528:8,
528:14, 528:17,
528:21, 529:2, 529:5,
529:9, 529:13,
529:19, 529:25,
530:3, 530:5, 530:9,
530:11, 530:15,
530:20, 531:2, 531:6,
532:1, 532:5, 532:7,
532:9, 532:12,
532:17, 533:1, 533:3,
533:7, 533:10,
533:12, 533:16,
533:21, 533:24,
534:14, 535:5,
535:10, 535:18,
535:24, 536:2, 536:7,
536:13, 536:21,
536:25, 537:5, 537:7,
537:13, 537:25,
538:3, 538:7, 538:15,
538:17, 538:22,
538:25, 539:2, 539:9,
539:12, 539:15,
539:18, 540:4,
540:17, 540:21,
540:23, 541:1, 541:5,
541:10, 541:13,
541:16, 541:22,
541:25, 542:3,
542:16, 542:18,
542:21, 542:25,
543:4, 543:10,
543:13, 543:17,
543:22, 543:24,
544:2, 544:17,
544:20, 544:24,
545:10, 545:25,
546:4, 546:19,

546:22, 546:24,
547:1, 547:9, 547:11,
547:14, 547:18,
547:22, 548:1, 548:9,
548:12, 548:17,
548:21, 549:1,
549:11, 549:16,
549:19, 549:23,
550:2, 550:5, 550:13,
550:20, 550:23,
551:2, 551:4, 551:8,
551:10, 551:12,
551:21, 551:24,
552:8, 552:12, 553:2,
553:5, 553:14,
553:20, 553:23,
554:2, 554:5, 554:11,
554:18, 554:22,
555:1, 555:7, 555:10,
555:14, 556:1, 556:4,
556:8, 556:20,
556:25, 557:8,
557:15, 557:18,
557:21, 557:23,
558:1, 558:6, 558:10,
558:16, 558:20,
558:22, 558:24,
559:2, 559:7, 559:11,
559:16, 559:23,
560:5, 560:13,
560:22, 561:24,
562:2, 562:23, 563:9,
563:15, 563:23,
564:6, 565:9, 565:11,
565:15, 565:18,
565:22, 566:3,
566:13, 567:5,
567:14, 567:23,
568:17, 569:9,
569:21, 570:18,
571:5, 571:17,
571:19, 572:6,
572:11, 572:16,
572:21, 573:4, 573:9,
573:21, 573:25,
574:1, 574:3, 574:7,
574:11, 574:16,
574:18, 574:23,
575:15, 575:23,
576:19, 576:23,
577:1, 577:16,
577:20, 577:23,
578:2, 578:7, 578:10,
578:15, 578:18,
579:3, 579:12,
579:14, 579:16,
579:22, 580:3, 580:9,
580:13, 580:16,
580:20, 581:3, 581:8,
581:10, 582:2, 582:4,
582:9, 582:12,

582:16, 582:18,
582:20, 582:24,
583:2, 583:4, 583:6,
583:10, 583:15,
583:19, 584:2,
584:14, 584:18,
584:23, 585:3, 585:9,
585:12, 585:25,
586:5, 586:11,
586:17, 587:15,
588:6, 588:16,
588:23, 588:25,
589:21, 590:7, 590:9,
590:21, 591:4,
591:14, 591:21,
593:12, 593:16,
593:19, 594:15,
594:25, 595:9,
595:12, 595:17,
595:18, 595:25,
596:10
    **Court** [36] - 407:20,
407:21, 417:25,
420:8, 428:11,
430:18, 437:9,
437:19, 437:21,
456:13, 460:13,
461:10, 462:6,
462:15, 464:22,
465:22, 467:6,
467:10, 472:18,
504:16, 505:12,
505:15, 515:18,
516:12, 523:14,
566:23, 571:8, 572:4,
573:7, 574:22,
587:20, 589:17,
594:23, 595:24,
597:12, 597:13
    **Court's** [7] - 435:6,
463:2, 466:24, 467:7,
469:4, 505:11, 587:18
    **courthouse** [2] -
501:1, 516:10
    **courtroom** [41] -
409:25, 411:15,
411:21, 413:2, 413:5,
413:9, 425:25, 438:9,
442:9, 447:21, 449:1,
449:4, 460:7, 467:20,
467:23, 472:1, 474:1,
479:3, 491:7, 495:5,
499:15, 506:24,
508:20, 512:3,
513:15, 517:18,
526:3, 527:6, 529:15,
530:8, 531:13,
537:12, 538:21,
543:19, 543:21,
547:8, 547:17, 561:4,
576:25, 577:2, 586:16

    **COURTROOM** [47] -
409:1, 409:22,
411:16, 411:19,
413:6, 425:21, 438:7,
446:16, 446:20,
446:22, 447:1,
447:11, 447:19,
447:22, 449:2, 464:4,
472:7, 473:24,
499:21, 506:16,
506:21, 512:9,
512:15, 512:17,
512:19, 512:22,
512:25, 513:2, 513:5,
513:9, 513:11,
513:13, 529:21,
530:6, 538:1, 538:4,
538:16, 538:18,
547:15, 574:9,
574:14, 574:17,
576:17, 576:21,
594:14, 596:2, 596:8
    **cousins** [1] - 539:11
    **cover** [1] - 568:23
    **coverage** [10] -
415:21, 454:22,
468:9, 478:24,
479:16, 507:19,
509:3, 516:19, 531:7,
552:13
    **COVID-19** [1] -
535:16
    **creates** [1] - 589:12
    **credibility** [1] -
494:10
    **credit** [1] - 430:3
    **crime** [17] - 423:2,
423:4, 425:10,
435:21, 441:22,
441:24, 444:4,
487:12, 487:14,
490:20, 511:18,
522:11, 522:12,
522:15, 522:18,
525:2, 560:16
    **crimes** [1] - 435:16
    **Criminal** [3] - 406:3,
409:2, 472:8
    **criminal** [12] -
422:21, 422:24,
437:2, 458:11, 482:6,
487:4, 515:18, 522:3,
522:7, 540:13, 559:2,
559:3
    **crisis** [1] - 433:25
    **critical** [2] - 527:15,
527:18
    **criticizes** [1] -
432:20
    **CRR** [3] - 407:20,

597:3, 597:12
    **culmination** [1] -
575:11
    **curiosity** [1] - 516:9
    **curious** [1] - 460:15
    **current** [6] - 514:7,
526:20, 527:13,
527:21, 528:3, 528:23
    **cut** [1] - 505:18

# D

    **D.C** [12] - 406:6,
406:19, 407:3,
407:23, 416:5, 416:6,
423:25, 444:22,
459:12, 470:17,
516:11, 597:14
    **daily** [2] - 501:15,
501:16
    **damage** [1] - 566:14
    **Damian** [1] - 500:3
    **Dan** [2] - 472:22,
561:5
    **Daniel** [3] - 477:20,
478:16, 495:25
    **data** [6] - 579:10,
579:20, 579:23,
580:8, 592:20, 592:23
    **database** [1] -
579:19
    **date** [2] - 514:24,
515:5
    **Dated** [1] - 597:10
    **daughter** [6] -
410:12, 449:21,
450:5, 450:20,
451:18, 453:23
    **DAVID** [1] - 406:21
    **dawned** [1] - 572:22
    **DAY** [1] - 406:11
    **days** [6] - 426:21,
450:14, 505:21,
543:1, 569:17, 596:7
    **dead** [1] - 505:18
    **Dead** [1] - 508:11
    **dealt** [1] - 467:12
    **death** [1] - 424:13
    **debating** [1] - 431:20
    **December** [3] -
406:6, 498:17, 597:10
    **decide** [10] - 431:21,
456:12, 458:13,
466:24, 479:2,
508:18, 516:23,
517:17, 593:14
    **decided** [1] - 527:18
    **decides** [1] - 587:10
    **deep** [3] - 434:14,

586:22, 591:8
    **deeply** [2] - 563:4,
563:5
    **defendant** [3] -
436:14, 490:18,
524:25
    **DEFENDANT** [5] -
406:21, 407:2, 407:8,
407:10, 407:16
    **Defendant** [9] -
460:23, 465:12,
486:12, 489:23,
499:17, 511:16,
511:17, 587:15,
595:21
    **Defendants** [59] -
406:8, 414:21, 418:6,
419:19, 424:22,
425:8, 425:9, 431:11,
431:17, 431:22,
431:23, 435:22,
436:21, 437:15,
439:9, 439:19,
441:15, 445:9,
445:14, 450:1, 451:2,
458:8, 460:17,
460:25, 463:11,
463:13, 463:21,
470:3, 474:25, 478:9,
478:11, 482:2,
482:13, 482:16,
484:1, 485:23,
489:15, 489:23,
490:3, 490:19,
509:12, 511:3, 512:4,
524:18, 525:1, 535:3,
539:19, 545:16,
549:2, 550:6, 556:14,
560:6, 560:14,
560:15, 566:18,
569:24, 584:4, 584:6,
584:11
    **defense** [13] -
409:18, 431:10,
433:10, 435:23,
460:13, 461:5,
461:11, 472:12,
472:20, 506:8,
527:15, 527:18,
593:10
    **defer** [1] - 446:6
    **definitely** [4] - 454:4,
455:3, 520:3, 576:3
    **definition** [3] -
494:19, 589:18,
590:19
    **degree** [2] - 528:18,
581:5
    **degrees** [1] - 416:13
    **deliberate** [2] -

516:6, 523:22
**demanded** [1] -
556:17
**democracy** [1] -
575:10
**Democrat** [3] -
563:1, 571:12, 573:14
**Democratic** [16] -
562:12, 562:22,
563:5, 568:23,
571:11, 571:15,
571:16, 571:21,
571:24, 573:8,
573:16, 583:8,
583:13, 586:23,
586:25
**Democrats** [1] -
583:17
**demonstrations** [6] -
423:24, 424:17,
424:18, 440:13,
520:23, 524:12
**Department** [5] -
518:9, 526:7, 526:12,
527:19, 528:6
**deputy** [4] - 413:2,
501:20, 526:10, 577:2
**DEPUTY** [47] - 409:1,
409:22, 411:16,
411:19, 413:6,
425:21, 438:7,
446:16, 446:20,
446:22, 447:1,
447:11, 447:19,
447:22, 449:2, 464:4,
472:7, 473:24,
499:21, 506:16,
506:21, 512:9,
512:15, 512:17,
512:19, 512:22,
512:25, 513:2, 513:5,
513:9, 513:11,
513:13, 529:21,
530:6, 538:1, 538:4,
538:16, 538:18,
547:15, 574:9,
574:14, 574:17,
576:17, 576:21,
594:14, 596:2, 596:8
**describe** [12] -
420:14, 440:7,
440:24, 445:18,
448:7, 470:9, 519:12,
527:12, 554:5,
578:11, 579:17,
579:24
**described** [10] -
445:8, 446:8, 481:25,
496:16, 496:17,
497:9, 521:10,

577:13, 578:20,
580:17
**describing** [1] -
434:10
**description** [3] -
574:20, 591:9, 591:19
**deserved** [1] -
455:19
**designed** [3] -
523:20, 539:21, 546:6
**despite** [3] - 415:5,
419:8, 441:13
**destabilizes** [1] -
470:23
**destruction** [4] -
566:1, 566:7, 566:11,
584:21
**detail** [4] - 478:5,
558:25, 591:25, 592:1
**details** [8] - 420:24,
440:16, 459:16,
461:2, 478:4, 514:3,
576:15, 576:16
**determine** [5] -
435:14, 435:15,
504:14, 537:1, 569:19
**Detroit** [1] - 499:9
**dicta** [2] - 466:25,
467:6
**dictatorship** [3] -
460:17, 460:19,
460:21
**died** [1] - 510:10
**difference** [4] -
440:14, 441:21,
460:18, 561:11
**different** [18] -
430:22, 434:2,
434:23, 443:16,
450:14, 453:15,
454:15, 476:20,
476:21, 487:23,
508:14, 523:8,
523:11, 528:22,
549:17, 550:7,
564:25, 584:19
**differing** [1] - 425:6
**difficult** [5] - 411:1,
428:6, 464:16, 469:4,
587:8
**dig** [1] - 591:7
**dilemma** [1] - 410:13
**dinner** [4] - 502:8,
502:15, 503:8, 504:2
**dire** [1] - 435:24
**direction** [1] - 575:21
**directives** [1] - 473:9
**directly** [3] - 436:23,
474:7, 545:21
**director** [2] - 527:15,

589:5
**disabled** [2] - 448:6,
448:12
**disagree** [8] - 425:4,
430:15, 441:19,
441:21, 441:23,
445:12, 469:22,
553:19
**disagreeable** [1] -
441:22
**disagreeing** [1] -
430:21
**disagreement** [1] -
462:10
**disappointed** [1] -
515:17
**disbelief** [1] - 454:11
**discharging** [1] -
466:21
**disclose** [3] - 418:1,
420:2, 420:6
**discovered** [2] -
455:6, 569:19
**discuss** [2] - 502:7,
558:24
**discussed** [2] -
497:7, 562:8
**discusses** [1] -
468:14
**dismissing** [1] -
409:15
**disparity** [1] - 589:9
**dispense** [1] -
501:10
**disruption** [1] -
458:4
**dissatisfied** [1] -
515:18
**distinction** [1] -
445:10
**distinguish** [4] -
460:16, 525:13,
525:16, 531:6
**distinguished** [1] -
461:3
**distinguishing** [1] -
525:14
**distortions** [1] -
456:19
**DISTRICT** [4] -
406:1, 406:1, 406:12,
406:18
**District** [6] - 407:21,
407:21, 416:3, 416:4,
472:18, 597:13
**district** [1] - 597:13
**diversity** [1] - 432:21
**doctor** [3] - 500:16,
528:20, 536:18
**doctors** [1] - 536:11

**doctors'** [1] - 535:20
**DOD** [1] - 527:19
**DOE** [1] - 527:11
**domestic** [3] -
487:25, 488:2, 488:22
**Dominic** [2] - 509:13,
584:8
**DOMINIC** [1] - 406:7
**done** [8] - 411:2,
428:4, 505:25,
520:21, 521:13, 551:6
**Donna** [2] - 563:3,
563:14
**door** [3] - 433:21,
435:8, 496:13
**doors** [2] - 425:20,
491:3
**double** [2] - 425:19,
491:3
**doubt** [6] - 418:10,
466:14, 482:6,
517:15, 549:9, 556:6
**doubts** [2] - 444:24,
575:21
**down** [26] - 411:12,
411:23, 412:24,
423:22, 438:14,
442:7, 444:22,
448:22, 470:20,
471:20, 472:13,
475:22, 479:16,
480:13, 483:21,
500:19, 501:20,
511:25, 516:2, 516:3,
525:25, 529:10,
530:16, 542:9, 543:14
**downstairs** [2] -
500:18, 501:21
**doxology** [1] - 440:9
**draw** [3] - 443:25,
444:18, 444:23
**drawing** [1] - 445:19
**dropped** [1] - 410:12
**drug** [1] - 435:24
**ducks** [1] - 502:19
**dumb** [1] - 563:19
**during** [5] - 416:6,
500:18, 535:16,
535:20, 565:18
**duty** [2] - 458:13,
514:16

## E

**ear** [1] - 563:13
**early** [1] - 596:11
**ears** [1] - 506:10
**earth** [1] - 592:24
**Earthworks** [5] -

562:17, 562:19,
564:13, 566:21, 589:3
**easier** [1] - 452:2
**easily** [1] - 590:24
**editor** [1] - 579:20
**educated** [1] -
563:19
**educational** [1] -
528:17
**EDWARDS** [2] -
407:20, 597:3
**Edwards** [1] - 597:12
**effect** [5] - 518:25,
534:23, 562:10,
568:5, 568:12
**effectively** [1] -
592:3
**efficient** [1] - 462:24
**either** [14] - 419:15,
426:4, 448:19, 450:6,
450:8, 454:25,
458:12, 482:16,
488:11, 496:1,
522:19, 534:6,
540:18, 540:19
**election** [2] - 550:2,
550:3
**Electoral** [1] - 517:4
**electric** [1] - 527:17
**element** [4] - 418:10,
428:25, 433:23, 556:8
**elements** [1] -
431:23
**Eleventh** [1] - 406:19
**embedded** [2] -
563:4, 563:5
**emissions** [3] -
579:11, 579:12,
592:21
**emotion** [1] - 453:21
**emotional** [1] -
470:18
**employed** [10] -
414:3, 414:16, 427:1,
449:18, 449:19,
449:22, 474:14,
539:8, 582:6, 587:21
**employer** [2] -
566:23, 566:25,
567:3, 567:7, 580:21
**employers** [1] -
567:16
**employment** [10] -
494:5, 514:7, 514:20,
526:20, 526:23,
527:11, 539:12,
568:18, 575:17
**encyclopedia** [1] -
577:9
**end** [1] - 572:23

606

**ended** [1] - 564:14
**energy** [8] - 526:7,
527:16, 527:18,
528:7, 528:8, 528:11,
528:13, 528:25
**Energy** [4] - 526:8,
526:12, 527:19, 528:6
**engage** [1] - 585:9
**engaged** [1] - 587:23
**engages** [1] - 585:1
**English** [1] - 515:22
**ENRIQUE** [1] - 406:6
**Enrique** [5] - 426:17,
459:11, 482:22,
509:12, 584:6
**enter** [1] - 581:22
**entered** [18] -
409:24, 411:20,
413:8, 438:8, 447:20,
449:3, 467:19,
473:25, 495:4,
506:23, 513:14,
517:11, 527:5, 530:7,
538:20, 543:20,
547:16, 576:24
**entire** [5] - 436:10,
563:5, 563:8, 575:19,
592:17
**entitled** [2] - 546:6,
555:14
**environment** [1] -
580:14
**environmental** [1] -
579:7
**episode** [1] - 485:19
**equal** [2] - 524:16,
559:20
**equation** [1] - 420:19
**equivocate** [2] -
534:17, 592:7
**equivocated** [1] -
534:11
**equivocates** [1] -
534:10
**equivocation** [1] -
535:1
**ERIK** [1] - 406:16
**especially** [4] -
418:12, 421:23,
427:16, 559:5
**ESQ** [11] - 406:15,
406:16, 406:16,
406:17, 406:21,
407:2, 407:4, 407:8,
407:10, 407:13,
407:16
**established** [1] -
443:24
**estate** [1] - 487:6
**et** [5] - 409:3, 472:9,

478:25, 544:12,
552:14
**ETHAN** [1] - 406:6
**Ethan** [4] - 409:3,
472:9, 509:12, 584:7
**Eugene** [2] - 477:4,
478:15
**evaluate** [1] - 433:20
**evaluation** [1] -
494:10
**evasive** [7] - 430:3,
563:18, 563:22,
576:10, 588:21,
592:8, 593:2
**evening** [3] - 499:24,
499:25, 504:3
**event** [10] - 416:8,
455:7, 455:13, 458:9,
461:1, 461:2, 463:19,
478:14, 545:17, 595:7
**events** [16] - 417:1,
417:19, 418:7, 423:4,
423:16, 423:18,
423:19, 440:18,
441:3, 457:12,
479:18, 516:19,
531:11, 532:19,
545:1, 566:19
**evidence** [51] -
418:8, 418:15,
419:10, 419:17,
422:6, 424:21, 425:7,
425:11, 437:6,
441:16, 444:17,
451:8, 453:5, 453:14,
456:12, 458:7,
458:11, 463:22,
478:18, 479:3, 486:1,
486:2, 486:8, 489:14,
489:22, 490:18,
490:21, 508:19,
511:3, 511:15,
516:24, 517:17,
524:18, 524:24,
525:17, 531:12,
545:9, 546:14,
550:11, 552:19,
555:20, 556:15,
556:16, 560:5,
560:10, 560:13,
560:20, 581:14,
583:25, 585:13, 592:5
**evident** [1] - 544:15
**ex** [7] - 480:23,
481:4, 494:2, 494:24,
497:11, 497:13,
497:16
**ex-military** [6] -
480:23, 481:4, 494:2,
494:24, 497:13,

497:16
**exactly** [4] - 417:12,
468:24, 576:8, 587:11
**exaggerations** [1] -
456:19
**example** [3] -
453:18, 460:16, 464:8
**except** [4] - 436:15,
459:17, 482:22, 563:9
**exception** [1] - 541:9
**excuse** [16] - 409:10,
411:8, 413:25,
443:19, 448:21,
459:25, 462:18,
463:13, 537:8, 537:9,
537:21, 543:15,
547:1, 572:2, 574:12,
574:13
**excused** [4] -
411:12, 412:23,
537:25, 574:10
**excusing** [2] -
412:21, 537:14
**executive** [1] - 589:5
**exhibit** [2] - 437:22,
492:19
**expect** [3] - 437:10,
442:12, 443:1
**expelled** [1] - 459:12
**experience** [7] -
415:7, 516:3, 516:5,
525:13, 551:17,
591:25
**experienced** [2] -
416:3, 454:7
**experiences** [3] -
423:6, 515:25, 522:20
**explain** [10] - 437:14,
502:12, 540:10,
548:5, 555:2, 570:1,
574:22, 589:19,
590:18
**explained** [1] -
430:10
**explaining** [1] -
547:14
**explanation** [2] -
589:18, 592:23
**explore** [12] - 428:11,
429:3, 429:10,
429:12, 461:25,
491:20, 492:13,
492:22, 493:22,
498:15, 527:1, 534:8
**explored** [2] -
591:24, 592:1
**exploring** [1] - 431:5
**expressed** [2] -
436:12, 553:18
**expression** [1] -

436:4
**extent** [6] - 421:10,
481:10, 487:20,
519:1, 527:12, 580:21
**extra** [1] - 430:23
**extreme** [8] - 413:22,
448:5, 453:18,
513:23, 514:13,
515:11, 537:2, 551:16
**extremely** [1] -
525:19
**extremism** [3] -
432:3, 433:19, 434:5
**extremist** [3] -
432:11, 432:17,
434:15
**extremists** [3] -
589:10, 591:17,
591:18
**eyes** [3] - 470:20,
536:5, 536:19

# F

**face** [3] - 553:15,
569:1
**faces** [1] - 563:7
**facilities** [1] - 527:18
**facility** [4] - 500:15,
504:2, 504:13, 504:15
**facing** [1] - 435:13
**fact** [29] - 413:24,
414:25, 431:6, 436:4,
441:13, 445:20,
445:21, 454:6,
455:12, 460:14,
466:24, 475:4,
493:12, 507:10,
507:13, 525:13,
534:15, 539:24,
542:7, 557:3, 559:8,
560:9, 567:16,
569:21, 574:21,
576:11, 592:24
**facts** [13] - 416:20,
417:5, 419:11, 422:6,
436:7, 437:7, 443:23,
443:25, 445:19,
463:11, 467:7,
525:15, 525:17
**failed** [3] - 419:18,
447:8, 447:9
**fails** [1] - 563:6
**fair** [103] - 415:3,
415:4, 417:2, 419:6,
423:7, 425:1, 425:14,
425:16, 429:18,
429:20, 429:25,
433:6, 436:4, 442:14,

443:1, 444:19, 446:4,
450:7, 451:7, 457:14,
458:22, 468:24,
475:6, 476:24, 480:7,
482:1, 484:3, 484:4,
484:10, 485:9,
486:20, 487:8,
488:13, 490:2,
490:24, 494:4,
494:13, 496:15,
499:11, 503:17,
507:15, 507:21,
510:24, 511:6,
511:13, 511:20,
515:23, 520:10,
521:2, 522:24,
524:21, 525:5, 527:2,
532:21, 533:13,
533:18, 540:2, 544:9,
544:14, 544:22,
545:2, 546:4, 546:17,
546:18, 549:8,
550:10, 551:15,
551:18, 553:9,
554:11, 554:18,
555:18, 555:19,
555:23, 558:3,
558:11, 559:9, 560:2,
560:11, 560:19,
564:19, 565:4,
568:19, 569:24,
573:13, 573:17,
575:23, 578:7, 578:8,
578:25, 580:17,
580:20, 583:10,
583:11, 583:13,
583:14, 587:7, 588:7,
593:2
**fairly** [1] - 569:20
**faithful** [1] - 421:25
**familiar** [3] - 431:16,
445:20, 445:21
**family** [38] - 414:16,
422:11, 449:18,
449:19, 450:17,
451:12, 451:15,
452:14, 468:13,
474:13, 486:24,
487:11, 522:10,
539:8, 539:9, 548:7,
548:12, 548:14,
549:12, 549:13,
550:17, 550:20,
550:23, 551:22,
558:13, 562:8, 563:5,
563:7, 563:8, 565:6,
565:9, 565:13,
565:20, 583:17,
583:21, 583:23,
586:23, 595:7

607

**famous** [1] - 571:12
**far** [6] - 410:25, 466:11, 483:5, 520:21, 564:6, 594:23
**fascist** [1] - 421:7
**fashion** [1] - 563:20
**father** [6] - 410:20, 449:14, 562:11, 562:13, 563:3, 572:15
**fault** [1] - 546:5
**favor** [1] - 444:23
**favorite** [1] - 561:17
**fear** [3] - 444:16, 454:13, 592:3
**federal** [1] - 474:22
**Federal** [17] - 414:3, 414:16, 414:23, 415:1, 449:12, 449:20, 449:22, 450:2, 450:4, 474:14, 475:3, 539:8, 539:13, 539:22, 539:25, 549:4, 549:7
**feed** [2] - 468:16, 473:2
**feelings** [21] - 417:7, 417:13, 418:14, 420:6, 424:19, 424:23, 424:25, 425:12, 444:2, 445:2, 445:3, 458:5, 481:17, 481:19, 490:22, 511:4, 511:18, 525:3, 525:16, 551:13, 560:17
**fellow** [1] - 516:6
**felt** [1] - 417:19
**female** [1] - 571:13
**feminist** [5] - 554:1, 554:2, 561:8, 561:10, 561:11
**few** [12] - 426:21, 433:5, 433:10, 439:14, 449:6, 451:1, 461:24, 488:25, 489:1, 495:7, 525:7, 527:7
**field** [5] - 439:4, 501:1, 574:24, 579:20, 580:1
**Fifth** [1] - 462:14
**fight** [1] - 462:10
**figure** [2] - 544:6, 563:21
**file** [1] - 505:23
**fill** [1] - 448:17
**filled** [1] - 526:6
**final** [2] - 469:9, 498:22
**finally** [3] - 536:11,

536:18, 593:4
**findings** [2] - 580:1
**fine** [8] - 502:19, 515:9, 550:12, 551:10, 552:18, 553:3, 592:25, 595:12
**fire** [1] - 453:7
**firearms** [6] - 425:12, 490:22, 511:19, 525:3, 560:17, 560:18
**firm** [5] - 413:15, 413:16, 413:18, 413:23, 544:13
**First** [1] - 407:6
**first** [48] - 412:2, 414:22, 417:16, 420:6, 422:15, 422:20, 427:17, 437:21, 438:14, 439:11, 454:10, 457:15, 457:16, 457:22, 461:10, 464:18, 464:24, 465:4, 468:7, 474:9, 475:23, 475:24, 485:16, 495:19, 501:3, 507:1, 507:4, 507:9, 507:23, 513:18, 516:25, 527:10, 530:12, 532:23, 539:4, 543:25, 547:19, 552:4, 565:13, 569:4, 571:12, 571:13, 574:4, 576:6, 579:4, 585:3
**five** [4] - 437:22, 450:17, 472:3, 593:17
**five-minute** [1] - 472:3
**flag** [4] - 437:23, 459:13, 461:2, 462:1
**fleshed** [1] - 484:6
**flew** [1] - 416:5
**flexibility** [1] - 411:1
**Floor** [5] - 406:19, 407:6, 407:18, 594:5, 594:6
**Florida** [2] - 407:12, 407:15
**focus** [2] - 518:14, 579:8
**focused** [1] - 528:25
**focusing** [1] - 561:10
**folks** [1] - 415:20, 419:14, 427:17, 432:7, 433:8, 434:13, 443:18, 444:10, 500:24, 523:10, 569:21

**follow** [23] - 416:9, 419:1, 420:7, 438:22, 444:5, 460:2, 464:11, 464:16, 464:25, 465:3, 465:19, 466:22, 468:8, 468:11, 469:4, 508:17, 516:6, 534:24, 564:3, 564:10, 564:11, 565:16, 574:22
**followed** [4] - 415:23, 421:19, 492:20, 591:19
**following** [45] - 409:25, 411:15, 411:21, 413:5, 413:9, 418:22, 425:25, 438:9, 442:9, 447:21, 449:1, 449:4, 460:7, 467:20, 472:1, 472:6, 474:1, 491:7, 495:5, 498:4, 498:20, 499:15, 506:24, 510:15, 510:16, 512:3, 513:15, 526:3, 527:6, 529:15, 530:8, 530:21, 533:25, 535:11, 537:12, 538:21, 543:19, 543:21, 547:8, 547:17, 561:4, 572:8, 574:5, 576:25, 586:16
**followup** [11] - 426:1, 426:5, 438:3, 438:13, 512:4, 526:4, 561:1, 561:17, 562:1, 565:19, 577:3
**food** [1] - 502:25
**foot** [1] - 455:23
**footage** [1] - 508:4
**football** [1] - 508:9
**FOR** [8] - 406:1, 406:15, 406:18, 406:21, 407:2, 407:8, 407:10, 407:16
**force** [6] - 414:22, 424:15, 450:2, 475:1, 539:20, 549:3
**Forces** [3] - 449:13, 450:5, 549:6
**forces** [1] - 417:22
**foregoing** [1] - 597:4
**forget** [4] - 433:13, 442:22, 481:2, 509:3
**forgive** [1] - 440:13
**forgot** [1] - 498:12
**form** [2] - 526:6, 557:11
**formally** [1] - 472:20

**formed** [2] - 544:7, 544:8
**former** [3] - 460:24, 518:23, 519:21
**forward** [4] - 442:1, 506:5, 515:25, 516:2
**forward-looking** [1] - 515:25
**four** [4] - 432:8, 437:21, 514:10, 535:14
**Fourth** [1] - 406:18
**fourths** [1] - 451:25
**Franklin** [23] - 425:18, 438:5, 442:6, 446:15, 460:1, 464:3, 467:17, 473:20, 473:22, 491:2, 497:24, 499:12, 511:24, 512:7, 525:22, 529:13, 537:8, 547:3, 560:24, 574:7, 576:19, 586:13, 594:8
**frankly** [4] - 413:17, 445:25, 591:11, 594:3
**freedom** [1] - 589:11
**friend** [20] - 414:3, 414:15, 414:18, 422:11, 449:19, 450:17, 451:12, 451:15, 452:14, 453:19, 474:13, 486:24, 487:11, 522:6, 522:10, 522:17, 549:12, 558:13, 558:17
**friends** [9] - 419:22, 422:18, 422:23, 549:5, 556:11, 583:16, 583:22
**friends'** [1] - 556:11
**front** [3] - 450:22, 453:17, 569:1
**frustrated** [2] - 444:12, 444:13
**frustration** [2] - 441:9, 444:11
**fulfilled** [1] - 444:14
**full** [1] - 597:5
**function** [1] - 516:2
**fundraising** [1] - 562:13
**funny** [1] - 579:3
**future** [1] - 438:4

**G**

**game** [2] - 533:3,

573:17
**gang** [1] - 436:1
**gas** [2] - 579:8, 580:11
**gases** [1] - 579:13
**gay** [4] - 427:8, 427:10, 428:19, 428:23
**general** [5] - 434:22, 485:18, 517:1, 556:22
**generalized** [1] - 554:7
**generally** [8] - 415:25, 424:17, 459:1, 459:3, 482:24, 536:4, 568:10, 573:15
**generations** [1] - 470:24
**gentleman** [4] - 424:14, 426:25, 438:5, 510:9
**gentlemen** [4] - 437:19, 504:19, 556:14, 560:10
**genuinely** [1] - 444:24
**gestured** [1] - 462:9
**giant** [1] - 573:7
**given** [34] - 413:21, 413:23, 418:12, 419:4, 419:13, 419:14, 431:6, 431:13, 432:7, 442:6, 443:24, 446:12, 454:5, 454:6, 468:21, 481:15, 484:6, 520:9, 520:25, 537:18, 560:20, 562:23, 564:22, 573:11, 573:13, 573:14, 573:15, 580:16, 581:17, 583:7, 588:21, 594:19
**glad** [2] - 470:15, 471:1
**glaucoma** [1] - 536:20
**go-ahead** [1] - 536:18
**goddaughter** [1] - 487:2
**Goodman** [5] - 477:4, 478:16, 492:3, 492:6, 496:1
**governing** [1] - 560:18
**GOVERNMENT** [1] - 406:15
**government** [3] - 414:21, 445:6, 588:23

608

**Government** [58] - 409:18, 414:4, 414:16, 414:23, 415:1, 418:9, 419:18, 419:20, 431:22, 433:21, 436:17, 437:19, 442:15, 446:6, 449:12, 449:20, 449:22, 450:2, 450:4, 458:10, 458:13, 459:22, 463:14, 463:20, 465:8, 465:9, 471:17, 473:6, 474:14, 475:1, 475:2, 475:4, 482:4, 482:7, 486:13, 491:19, 492:11, 492:17, 498:10, 505:20, 506:3, 514:8, 526:22, 533:22, 539:8, 539:13, 539:20, 539:23, 539:25, 546:24, 549:3, 549:5, 549:7, 556:12, 563:6, 591:21, 591:23

**Government's** [8] - 436:9, 437:22, 443:21, 556:5, 567:23, 576:8, 576:10, 581:23

**grand** [1] - 540:8

**grandchild** [1] - 595:7

**grandfather** [1] - 548:24

**granted** [1] - 573:25

**gratuitous** [1] - 505:13

**great** [4] - 442:23, 495:24, 591:25, 592:1

**greenhouse** [1] - 579:13

**grievances** [1] - 458:6

**group** [41] - 418:25, 419:5, 427:21, 427:22, 428:1, 428:13, 428:16, 429:22, 430:21, 431:6, 434:4, 434:19, 435:14, 435:18, 436:2, 436:13, 440:1, 440:3, 440:17, 440:22, 440:23, 441:14, 441:23, 442:16, 442:17, 480:2, 480:12, 480:13, 481:18, 482:19, 484:16,

484:18, 493:20, 495:23, 509:9, 509:23, 520:17, 521:7, 521:9, 524:13

**groups** [13] - 430:15, 430:16, 432:9, 440:7, 441:6, 446:10, 524:6, 557:14, 557:15, 557:19, 557:20, 561:13, 561:18

**Guard** [1] - 416:4

**guess** [19] - 424:4, 451:11, 451:25, 461:16, 474:22, 478:25, 483:24, 484:19, 485:1, 489:12, 491:20, 516:16, 523:6, 551:7, 554:12, 560:7, 583:15, 586:6, 590:21

**guessing** [1] - 521:15

**guidelines** [2] - 500:9, 501:14

**guilty** [20] - 419:19, 431:15, 482:9, 540:11, 540:12, 544:11, 545:11, 545:21, 545:23, 545:24, 546:2, 547:11, 556:14, 568:20, 581:15, 583:25, 592:4

**guns** [1] - 497:17

**guys** [1] - 502:23

---

# H

**half** [9] - 422:18, 463:1, 495:20, 527:23, 542:10, 542:11, 542:12, 595:14

**half-joking** [1] - 463:1

**hall** [1] - 562:18

**halls** [1] - 479:23

**hand** [1] - 523:9

**handed** [1] - 439:11

**hang** [1] - 561:1

**happy** [1] - 568:9

**hard** [6] - 453:21, 459:16, 469:15, 469:22, 595:6, 595:13

**hard-stop** [1] - 595:13

**Harden** [1] - 593:9

**hardest** [1] - 455:18

**hardship** [6] -

413:22, 448:5, 513:23, 514:14, 515:11, 537:2

**harms** [1] - 579:9

**Harris** [4] - 538:9, 595:22, 596:1, 596:6

**HASSAN** [5] - 407:10, 407:11, 447:7, 594:21, 595:5

**hate** [23] - 418:25, 419:5, 427:21, 427:22, 428:1, 428:13, 428:16, 429:22, 431:6, 432:2, 432:3, 432:9, 432:10, 434:4, 435:14, 435:18, 440:1, 440:3, 440:23, 442:16, 442:17, 446:10, 465:21

**hateful** [3] - 433:1, 557:14, 557:16

**Haven** [1] - 407:6

**head** [6] - 411:7, 459:23, 461:16, 461:17, 559:17

**headaches** [1] - 473:1

**heading** [1] - 526:25

**headline** [3] - 438:23, 518:8, 518:10

**headlines** [3] - 421:20, 422:2, 438:20

**health** [1] - 537:20

**Health** [1] - 563:3

**hear** [32] - 411:25, 414:10, 426:3, 426:4, 434:4, 435:3, 437:12, 448:1, 449:6, 460:12, 460:13, 468:3, 472:15, 473:14, 474:4, 479:8, 479:9, 487:18, 491:9, 492:25, 501:9, 530:2, 533:24, 538:7, 545:9, 547:24, 561:14, 573:21, 574:23, 586:17, 591:21, 591:22

**heard** [110] - 416:7, 416:13, 417:6, 418:19, 418:20, 420:13, 420:14, 421:14, 422:2, 423:12, 423:13, 426:16, 426:22, 428:8, 428:12, 437:6, 437:13, 437:17, 438:17, 439:8, 439:19, 456:12,

458:19, 458:24, 462:15, 462:16, 473:16, 475:21, 475:24, 476:1, 476:2, 477:1, 479:1, 480:1, 480:6, 480:9, 480:17, 481:2, 481:11, 481:16, 482:12, 482:15, 482:22, 482:23, 483:7, 483:9, 483:16, 484:2, 484:7, 484:9, 484:14, 484:15, 485:17, 486:19, 489:3, 496:19, 506:9, 506:14, 508:16, 508:18, 508:24, 509:1, 509:11, 509:17, 509:22, 510:1, 516:23, 517:1, 517:10, 517:16, 518:14, 518:18, 518:20, 519:18, 519:23, 520:14, 520:15, 521:5, 521:6, 524:7, 524:11, 531:17, 545:13, 545:14, 545:20, 546:15, 552:22, 552:25, 553:7, 553:10, 553:11, 554:7, 555:22, 556:1, 556:21, 556:23, 557:3, 557:8, 558:8, 559:12, 559:13, 559:17, 564:17, 564:18, 564:20, 584:3, 584:5, 584:10, 587:16

**hearing** [11] - 420:25, 432:6, 433:12, 477:12, 493:8, 496:25, 501:6, 531:18, 544:18, 583:10, 583:11

**hearings** [2] - 438:22, 544:12

**heat** [1] - 503:2

**held** [2] - 503:20, 526:25

**hell** [1] - 572:24

**hello** [1] - 538:24

**help** [1] - 559:24

**helped** [1] - 594:1

**helpful** [1] - 432:15

**helpfully** [1] - 595:22

**hereby** [1] - 597:3

**Hernandez** [1] - 461:17

**HERNANDEZ** [58] -

407:8, 427:25, 428:5, 428:15, 428:22, 429:10, 430:15, 435:10, 437:18, 442:10, 442:22, 443:6, 447:2, 462:14, 462:21, 463:1, 471:12, 491:17, 492:5, 498:1, 498:3, 498:6, 498:12, 502:6, 502:14, 503:25, 504:11, 505:3, 505:8, 505:11, 505:23, 547:10, 547:12, 558:15, 566:8, 567:12, 568:7, 570:24, 571:7, 571:18, 571:20, 571:24, 572:2, 572:14, 572:18, 573:1, 573:5, 573:18, 574:19, 575:3, 588:24, 589:3, 590:5, 590:8, 590:15, 591:3, 591:5, 591:15

**Hernández** [19] - 427:24, 428:21, 438:1, 442:21, 444:25, 462:12, 472:11, 472:19, 498:9, 502:16, 503:22, 504:23, 558:14, 572:6, 572:9, 572:11, 588:25, 589:21

**Hernández's** [1] - 443:15

**Hialeah** [1] - 407:15

**high** [6] - 415:22, 425:9, 490:19, 511:16, 524:25, 560:15

**high-capacity** [5] - 425:9, 490:19, 511:16, 524:25, 560:15

**high-level** [1] - 415:22

**higher** [1] - 456:5

**Highland** [1] - 407:9

**Hill** [6] - 451:16, 451:19, 451:20, 550:18, 550:21, 550:24

**hinky** [1] - 434:25

**historical** [2] - 424:12, 444:9

**historically** [1] - 424:15

**history** [1] - 526:23

609

**hit** [1] - 455:18
**Hodges** [11] -
477:20, 478:16,
491:19, 491:21,
491:22, 494:6, 494:7,
494:9, 494:11, 496:1,
496:11
**hold** [11] - 409:13,
422:16, 445:12,
447:13, 464:6,
465:18, 467:21,
498:9, 506:19, 514:7,
572:1
  **holding** [1] - 467:9
  **holds** [1] - 527:3
**Hollow** [1] - 407:8
**home** [8] - 468:15,
470:19, 531:20,
532:3, 532:4, 532:6,
532:7, 532:9
**hone** [2] - 577:12,
594:1
**honest** [3] - 533:15,
546:8, 593:5
**honestly** [6] -
418:25, 440:14,
519:5, 532:25, 553:1,
563:18
**honesty** [2] - 533:3,
547:4
**Honor** [100] - 409:1,
409:19, 411:16,
413:6, 426:16,
427:25, 429:21,
431:5, 435:11,
436:14, 436:20,
437:18, 438:7,
442:10, 445:7,
445:24, 446:3, 446:6,
446:16, 447:11,
449:2, 461:21,
461:23, 462:15,
463:8, 463:12, 464:5,
465:10, 465:17,
465:21, 466:9,
467:18, 467:25,
469:8, 470:7, 470:12,
471:18, 471:24,
472:7, 472:22, 473:8,
492:24, 494:22,
498:1, 498:6, 499:21,
499:23, 500:11,
501:8, 502:6, 502:22,
505:8, 506:2, 508:22,
512:10, 512:15,
513:20, 515:3, 516:8,
526:22, 529:22,
533:23, 534:2,
534:22, 535:7, 538:5,
543:12, 546:25,

547:10, 558:15,
559:22, 561:5,
562:11, 565:7,
565:12, 565:16,
565:24, 566:6,
566:20, 567:16,
568:9, 568:13,
568:24, 569:5,
570:15, 570:16,
570:24, 573:20,
574:19, 575:4, 575:5,
576:7, 587:6, 587:14,
588:1, 588:24,
591:24, 592:8, 596:2
  **honor** [3] - 470:13,
477:10
  **Honor's** [1] - 576:11
  **HONORABLE** [1] -
406:12
  **hope** [1] - 595:3
  **hoping** [1] - 504:15
  **hotel** [1] - 595:11
  **hour** [8] - 412:13,
542:10, 542:11,
542:12, 542:15,
543:7, 543:9
  **hours** [7] - 426:10,
430:7, 438:17, 509:4,
518:3, 542:10, 542:13
  **House** [1] - 414:6
  **house** [2] - 470:20,
487:16
  **housekeeping** [1] -
512:21
  **HULL** [25] - 407:2,
407:2, 429:21,
461:23, 472:22,
473:16, 491:15,
492:24, 493:10,
493:12, 493:16,
501:8, 502:1, 529:22,
530:1, 530:4, 537:23,
559:22, 561:5,
561:25, 562:5,
565:19, 588:20,
595:15, 596:6
  **Hull** [9] - 462:2,
472:22, 473:13,
500:7, 501:3, 502:3,
506:8, 561:5, 588:19
  **Human** [1] - 563:4
  **hung** [1] - 532:5
  **hurt** [2] - 458:4,
522:20
  **husband** [3] -
429:14, 429:16,
468:14
  **hypertension** [1] -
536:5

## I

**idea** [8] - 426:25,
457:23, 535:7,
539:14, 557:19,
557:20, 589:23, 593:5
**ideals** [1] - 427:8
**identified** [2] -
431:11, 475:20
**identifies** [2] - 432:2,
435:18
**identify** [1] - 435:12,
595:20
**identity** [2] - 432:21,
433:1
**ideology** [1] - 521:11
**II** [1] - 407:12
**illegal** [1] - 425:6
**imagine** [2] - 453:16,
551:15
**imbalance** [1] -
589:14
**immediately** [1] -
535:3
**immigrant** [1] -
470:13
**immutable** [1] -
428:25
**impact** [2] - 567:11,
567:18
**impartial** [47] -
415:3, 415:5, 417:2,
425:1, 425:14,
425:16, 429:25,
444:20, 446:5, 450:7,
451:7, 457:14,
458:22, 475:6, 480:7,
484:10, 485:9,
486:20, 488:13,
490:3, 490:24,
507:15, 511:6,
511:13, 511:21,
520:10, 520:11,
521:2, 522:24,
524:21, 525:5,
532:21, 533:18,
534:24, 539:4,
539:23, 540:4,
544:10, 545:19,
548:4, 549:11,
552:15, 553:6, 553:7,
556:20, 558:12,
558:16, 584:2, 587:22
  **implanting** [2] -
567:6, 568:14
  **implausible** [1] -
588:3
  **implications** [2] -
570:9, 570:10
  **important** [10] -

427:5, 427:21,
445:10, 455:7,
525:15, 531:9,
536:22, 536:24,
537:19, 543:5
**impression** [4] -
563:25, 564:2,
577:18, 590:24
**impressions** [1] -
563:24
**impugned** [1] -
445:13
**inadvertently** [1] -
518:4
**inchoate** [1] - 444:4,
593:21
**incident** [2] - 491:22,
522:20
**incidents** [2] -
488:20, 498:17
**inclined** [4] - 409:12,
444:18, 444:23,
463:13
**include** [1] - 574:1
**included** [1] - 467:6
**including** [3] - 422:2,
460:10, 596:8
**inconsistent** [2] -
506:10, 506:11
**incorrect** [1] -
515:22
**increase** [2] -
528:11, 529:8
**indicate** [4] - 414:2,
552:12, 555:21, 588:1
**indicated** [48] -
422:10, 439:7,
446:14, 448:4,
449:11, 451:10,
454:21, 456:8,
457:11, 466:11,
474:12, 475:19,
475:21, 478:23,
482:11, 487:10,
507:9, 507:18,
508:15, 508:23,
509:10, 516:16,
520:2, 520:13, 521:5,
521:18, 523:2,
527:10, 530:23,
531:8, 531:15,
534:24, 539:4,
539:23, 540:4,
544:10, 545:19,
548:4, 549:11,
552:15, 553:6, 553:7,
556:20, 558:12,
558:16, 584:2, 587:22
  **indicates** [1] -
485:16

**indifferent** [2] -
455:8, 457:25
**individual** [4] -
431:17, 436:21,
441:15, 445:9
**individualized** [1] -
535:8
**individuals** [2] -
524:13, 555:5
**industry** [2] - 579:8,
579:9
**inference** [1] -
444:23
**inferences** [3] -
443:25, 444:17,
444:18
**inform** [1] - 570:10
**information** [18] -
433:12, 435:4, 437:6,
437:11, 446:7, 446:9,
456:10, 463:10,
463:20, 463:21,
463:22, 539:22,
545:8, 569:12,
570:14, 570:18,
570:20, 589:23
**informed** [2] - 419:2,
437:10
**infrastructure** [1] -
527:16
**inimical** [1] - 467:9
**inject** [1] - 576:5
**injury** [1] - 448:13
**injustice** [3] -
424:12, 444:9
**inkling** [2] - 519:6,
519:9
**innocent** [1] - 486:13
**inquire** [2] - 535:5,
535:6
**inquired** [1] - 594:22
**inquiring** [1] -
594:23
**inquiry** [1] - 445:18
**installer** [1] - 495:19
**instead** [1] - 442:17
**instruct** [6] - 416:21,
422:7, 469:23,
478:18, 479:5, 517:18
**instructed** [2] -
456:13, 468:18
**instruction** [1] -
512:8
**instructions** [22] -
413:1, 417:25, 419:2,
420:8, 442:6, 460:1,
464:11, 464:17,
465:1, 465:3, 465:19,
468:9, 468:11, 469:4,
469:11, 471:20,

610

497:24, 499:13,
547:4, 576:22,
586:12, 594:8
  **insurrection** [1] -
567:2
  **integrity** [1] - 506:12
  **interact** [2] - 419:14,
516:6
  **interest** [1] - 489:13
  **interested** [1] -
526:23
  **interesting** [1] -
527:1
  **internet** [1] - 592:18
  **interpret** [1] - 463:2
  **interpreted** [4] -
462:17, 462:19,
462:22, 463:4
  **introduce** [2] -
492:12, 492:17
  **introduced** [1] -
422:6
  **introduction** [1] -
469:3
  **investigation** [1] -
565:21
  **investigator** [1] -
569:14
  **invitation** [1] -
443:25
  **involve** [11] - 424:21,
425:7, 489:14,
489:22, 490:17,
511:2, 511:15,
524:17, 524:24,
560:5, 560:13
  **involved** [14] -
410:20, 445:23,
456:3, 475:3, 484:20,
485:19, 486:25,
491:25, 521:19,
522:7, 533:7, 565:21,
568:2, 588:4
  **involvement** [2] -
487:20, 522:3
  **involving** [4] -
443:22, 467:5,
491:22, 566:9
  **iPhone** [1] - 518:7
  **issue** [25] - 409:6,
409:20, 428:16,
434:11, 434:12,
437:4, 446:1, 448:6,
466:20, 466:23,
467:14, 469:21,
473:12, 541:9,
541:16, 542:1,
568:23, 568:25,
570:3, 571:9, 573:18,
576:3, 584:9, 589:15,

593:24
  **issued** [2] - 580:24,
581:4
  **issues** [3] - 410:8,
436:10, 445:8
  **itself** [6] - 415:2,
423:15, 424:4, 424:6,
469:12, 587:23
  **IV** [1] - 407:2

## J

  **jail** [6] - 503:14,
504:1, 533:6, 534:8,
534:22, 535:4
  **jails** [1] - 503:18
  **James** [1] - 593:9
  **Jan** [1] - 470:17
  **January** [59] -
415:21, 415:24,
416:5, 417:3, 438:18,
438:19, 440:12,
451:12, 454:23,
455:4, 455:13,
456:10, 459:2, 459:4,
477:16, 478:10,
478:11, 478:25,
479:2, 479:10,
483:19, 485:19,
496:11, 497:4,
507:20, 508:18,
509:4, 516:15,
516:20, 517:2, 518:3,
519:25, 530:24,
531:11, 531:18,
535:14, 535:15,
536:12, 544:18,
545:2, 548:19,
550:15, 552:6,
552:10, 552:13,
552:22, 556:2,
565:18, 565:21,
566:24, 567:1, 569:2,
569:7, 575:7, 575:8,
580:24, 581:4,
582:22, 585:14
  **JASON** [1] - 406:15
  **Jason** [2] - 463:8,
506:2
  **Jauregui** [11] -
426:13, 471:10,
491:11, 493:18,
494:16, 526:5, 562:6,
572:3, 575:4, 586:18,
588:8
  **JAUREGUI** [30] -
407:13, 407:14,
426:13, 426:24,
427:20, 429:13,
429:16, 429:19,

463:5, 471:10,
491:11, 493:18,
493:22, 494:16,
494:22, 495:1, 526:5,
526:10, 526:18,
529:18, 543:12,
562:6, 563:2, 563:12,
563:17, 564:5, 565:7,
571:23, 575:4, 586:18
  **Jeez** [1] - 453:24
  **jerk** [1] - 593:21
  **job** [26] - 414:6,
422:15, 431:21,
448:23, 467:7,
505:17, 515:1,
526:14, 526:25,
527:12, 527:13,
527:21, 528:3, 528:4,
528:21, 528:23,
579:5, 579:9, 585:4,
585:5, 588:13,
592:19, 593:25, 594:3
  **jobs** [4] - 514:9,
514:18, 529:23, 530:1
  **John** [5] - 476:17,
476:20, 476:21,
477:1, 551:25
  **JOHN** [1] - 407:2
  **join** [2] - 436:3,
443:15
  **joins** [1] - 588:20
  **joking** [1] - 463:1
  **Joseph** [2] - 509:13,
584:7
  **JOSEPH** [1] - 406:6
  **Judge** [12] - 409:22,
426:13, 427:21,
460:12, 463:2, 526:5,
526:19, 562:21,
572:18, 586:19,
586:21, 587:17
  **judge** [35] - 419:10,
422:5, 426:24,
429:13, 431:19,
437:15, 441:16,
443:12, 447:7, 451:8,
453:5, 461:4, 462:16,
463:5, 464:21,
478:17, 486:7,
491:11, 493:18,
494:16, 526:6,
531:12, 534:9,
535:14, 552:19,
555:19, 563:2,
563:12, 563:17,
565:10, 567:8,
569:20, 586:18,
594:21, 595:16
  **JUDGE** [1] - 406:12
  **judgment** [7] -

419:18, 421:18,
435:20, 545:9,
567:18, 568:5, 570:10
  **juice** [1] - 542:20
  **July** [1] - 566:8
  **jump** [1] - 548:17
  **jumping** [1] - 548:3
  **June** [1] - 423:23
  **junkie** [1] - 426:15
  **juris** [1] - 528:20
  **JUROR** [508] - 410:2,
410:5, 410:11,
410:16, 410:19,
410:24, 411:5,
411:10, 411:13,
412:3, 412:7, 412:9,
412:11, 412:14,
412:17, 412:25,
413:3, 413:12,
413:19, 414:5, 414:8,
414:11, 414:14,
414:17, 415:4, 415:9,
415:15, 416:1,
416:22, 417:12,
417:17, 418:16,
418:22, 419:7,
419:12, 419:21,
420:5, 420:11,
420:16, 421:5,
421:12, 421:16,
422:4, 422:9, 422:13,
422:22, 422:25,
423:3, 423:8, 423:15,
423:21, 424:3, 424:7,
424:11, 425:2,
425:15, 438:12,
438:20, 438:24,
439:2, 439:10,
439:13, 439:16,
439:20, 440:5, 441:3,
441:18, 442:4,
446:24, 447:24,
448:2, 448:8, 448:12,
448:15, 448:18,
448:24, 449:9,
449:14, 449:17,
449:21, 449:24,
450:8, 450:13,
450:19, 450:22,
451:1, 451:5, 451:9,
451:13, 451:18,
451:21, 451:24,
452:3, 452:5, 452:8,
452:11, 452:15,
452:18, 452:22,
452:25, 453:7,
453:12, 454:1, 454:4,
454:9, 454:19, 455:3,
455:14, 455:16,
455:22, 456:2, 456:5,

456:15, 456:24,
457:2, 457:7, 457:18,
457:21, 457:23,
458:3, 458:15,
458:25, 459:3, 459:8,
459:15, 460:3, 460:5,
467:18, 467:25,
468:4, 468:12,
468:20, 468:22,
469:8, 469:24, 470:4,
470:7, 470:12,
470:16, 471:22,
471:24, 474:5,
474:11, 474:16,
474:19, 474:21,
475:7, 475:11,
475:14, 475:18,
476:1, 476:4, 476:6,
476:9, 476:11,
476:14, 476:18,
476:21, 476:23,
477:3, 477:6, 477:9,
477:13, 477:15,
477:19, 477:22,
478:1, 478:5, 478:19,
479:6, 479:11,
479:15, 479:21,
480:3, 480:11,
480:20, 480:23,
481:3, 481:6, 481:14,
481:19, 481:23,
482:3, 482:10,
482:18, 482:21,
482:25, 483:4, 483:8,
483:12, 483:16,
483:20, 484:4,
484:12, 484:17,
484:24, 485:3, 485:5,
485:10, 485:14,
485:18, 485:25,
486:11, 486:15,
486:22, 487:2, 487:5,
487:9, 487:14,
487:16, 487:19,
487:24, 488:2, 488:7,
488:10, 488:15,
488:17, 488:21,
488:24, 489:5, 489:8,
489:11, 489:16,
489:18, 489:20,
490:4, 490:8, 490:11,
490:15, 490:25,
495:9, 495:12,
495:15, 495:18,
495:22, 496:2, 496:6,
496:12, 496:23,
497:1, 497:4, 497:6,
497:12, 497:17,
497:21, 499:4, 499:6,
499:9, 507:3, 507:7,
507:16, 507:22,

611

508:4, 508:9, 508:11,
508:21, 509:1, 509:6,
509:15, 509:20,
509:24, 510:3, 510:6,
510:9, 510:14,
510:16, 510:21,
511:8, 511:14,
511:22, 513:19,
513:24, 514:1, 514:4,
514:15, 514:19,
514:22, 515:3, 515:6,
515:9, 515:15,
515:20, 516:8,
516:11, 517:3,
517:11, 517:19,
517:24, 518:4, 518:6,
518:11, 518:21,
519:5, 519:11,
519:16, 519:22,
520:1, 520:7, 520:12,
520:16, 520:22,
521:3, 521:8, 521:15,
521:22, 521:25,
522:5, 522:8, 522:14,
522:17, 522:22,
522:25, 523:7,
523:17, 524:1, 524:9,
524:12, 524:23,
525:6, 525:12,
525:18, 526:1, 527:8,
527:14, 527:22,
528:1, 528:5, 528:10,
528:16, 528:19,
528:24, 529:4, 529:8,
529:12, 529:16,
530:10, 530:14,
530:19, 530:25,
531:4, 531:19, 532:3,
532:6, 532:8, 532:11,
532:15, 532:25,
533:2, 533:5, 533:8,
533:11, 533:14,
533:19, 535:13,
535:22, 535:25,
536:5, 536:9, 536:15,
536:22, 537:3, 537:6,
538:10, 538:24,
539:1, 539:7, 539:11,
539:14, 539:16,
540:3, 540:15,
540:20, 540:22,
540:25, 541:3, 541:8,
541:11, 541:14,
541:18, 541:23,
542:1, 542:14,
542:17, 542:19,
542:22, 543:2, 543:8,
543:16, 543:23,
544:1, 544:15,
544:18, 544:21,
545:6, 545:23, 546:1,

546:18, 546:20,
546:23, 547:6,
547:21, 547:25,
548:7, 548:10,
548:14, 548:20,
548:24, 549:10,
549:15, 549:18,
549:21, 550:1, 550:4,
550:12, 550:17,
550:22, 550:25,
551:3, 551:6, 551:9,
551:11, 551:20,
551:23, 552:7,
552:11, 552:23,
553:4, 553:13,
553:17, 553:22,
553:25, 554:4, 554:9,
554:15, 554:21,
554:24, 555:3, 555:8,
555:13, 555:25,
556:3, 556:7, 556:18,
556:24, 557:7,
557:10, 557:17,
557:20, 557:22,
557:25, 558:5, 558:9,
558:19, 558:21,
558:23, 559:1, 559:5,
559:10, 559:15,
559:19, 560:4,
560:12, 560:21,
577:15, 577:17,
577:22, 578:1, 578:3,
578:9, 578:13,
578:17, 579:2, 579:7,
579:13, 579:15,
579:19, 579:24,
580:6, 580:11,
580:15, 580:19,
581:2, 581:6, 581:9,
581:25, 582:3, 582:8,
582:11, 582:15,
582:17, 582:19,
582:23, 583:1, 583:3,
583:5, 583:9, 583:14,
583:18, 584:1,
584:13, 584:17,
584:22, 585:2, 585:7,
585:11, 585:23,
586:3, 586:9

Juror [56] - 409:6,
409:24, 411:14,
411:20, 412:2, 413:4,
413:8, 425:24, 438:8,
442:8, 446:18,
447:20, 447:23,
448:25, 449:3, 449:8,
460:6, 464:2, 467:19,
467:21, 467:24,
471:25, 473:25,
474:9, 491:6, 495:4,
499:14, 506:23,

507:2, 512:2, 512:12,
512:13, 513:14,
513:18, 526:2, 527:5,
529:14, 530:7,
530:12, 537:11,
538:5, 538:20,
538:25, 543:18,
543:20, 543:25,
547:7, 547:15,
547:16, 547:20,
561:3, 576:24,
586:15, 596:3, 596:4
juror [78] - 409:8,
411:17, 411:19,
412:21, 413:6, 415:8,
416:20, 417:2, 417:4,
423:7, 425:19, 437:4,
444:12, 445:8,
445:17, 447:7, 447:8,
447:9, 447:19, 448:5,
449:2, 451:7, 457:14,
458:22, 460:16,
461:9, 461:10,
463:10, 463:13,
464:4, 466:11,
467:17, 473:21,
475:6, 485:9, 486:21,
488:13, 495:3,
499:18, 506:19,
506:20, 506:21,
507:10, 507:15,
512:12, 512:14,
512:21, 513:10,
516:1, 516:7, 520:11,
523:16, 525:5,
529:20, 531:14,
532:21, 534:9, 537:8,
537:15, 538:6,
538:10, 538:18,
539:3, 540:2, 541:7,
542:5, 544:9, 566:21,
572:12, 573:23,
576:8, 576:18,
576:20, 581:14,
587:12, 590:10, 591:4
juror's [2] - 574:20,
587:17
jurors [15] - 443:24,
444:4, 465:19,
465:23, 465:25,
466:23, 503:24,
505:15, 506:4,
515:21, 516:6, 523:8,
523:22, 576:21,
595:23
jurors' [1] - 572:22
jury [28] - 415:6,
437:11, 443:2, 445:5,
450:10, 450:12,
466:25, 467:9,

475:13, 475:16,
514:16, 515:1,
515:14, 516:2,
523:11, 526:6, 540:5,
540:9, 541:6, 575:19,
579:1, 587:11,
587:13, 589:12,
590:9, 591:16, 595:2,
595:3
JURY [1] - 406:11
Jury [1] - 408:3
jury's [2] - 431:21,
467:7
Justice [1] - 518:9
justice [2] - 444:13,
515:18
juxtaposes [1] -
589:8
juxtaposing [1] -
591:12

## K

Katrina [1] - 512:10
keep [3] - 447:3,
460:20, 559:22
Keeper [2] - 476:4,
476:5
Keepers [29] -
421:14, 421:15,
421:19, 422:2,
431:14, 440:15,
441:6, 445:3, 445:4,
476:16, 478:8,
480:12, 483:13,
485:11, 485:17,
485:24, 486:4,
486:19, 489:2, 493:2,
496:20, 496:21,
509:22, 521:4, 521:6,
544:11, 558:7, 558:8
KELLY [1] - 406:12
KENERSON [1] -
406:16
key [2] - 418:5, 568:7
kid [1] - 488:8
killed [1] - 517:12
kind [61] - 412:8,
414:23, 415:11,
424:12, 429:22,
431:5, 433:9, 433:15,
436:13, 440:22,
441:8, 445:13,
445:19, 445:22,
446:10, 451:24,
453:20, 454:8,
454:10, 463:15,
463:18, 463:19,
470:9, 470:10,

487:20, 493:8,
498:24, 502:19,
508:14, 516:25,
519:15, 520:2,
521:23, 522:1,
526:15, 526:24,
527:1, 534:3, 544:3,
544:4, 544:6, 544:7,
553:6, 566:18,
568:22, 574:3,
576:11, 578:23,
579:22, 587:8, 587:9,
587:12, 592:17,
592:22, 593:2, 593:4,
593:6, 593:21
kinds [2] - 415:24,
586:8
knee [1] - 593:21
knee-jerk [1] -
593:21
knowing [1] - 476:8
knowledge [12] -
421:11, 439:18,
481:10, 566:18,
585:13, 585:17,
585:18, 585:21,
585:25, 586:5, 586:8,
588:2
known [1] - 466:5
knows [8] - 428:12,
491:20, 494:7, 494:9,
494:11, 501:23,
562:21, 591:9
knucklehead [1] -
495:23

## L

label [1] - 561:14
labeled [1] - 432:11
lacked [1] - 523:2
lady [4] - 538:13,
574:12, 586:19, 596:9
lady's [1] - 563:18
Lakes [1] - 407:12
land [1] - 432:12
language [1] -
515:22
lapsed [1] - 426:6
large [4] - 418:8,
458:9, 478:12, 552:22
largely [1] - 443:21
last [26] - 426:10,
426:21, 430:7, 432:8,
433:5, 435:10,
438:17, 441:1,
442:23, 450:17,
503:5, 503:9, 506:16,
509:4, 525:7, 544:3,

561:21, 563:17,
567:24, 573:23,
574:4, 574:12,
584:18, 587:17,
593:4, 594:22
**late** [2] - 504:4, 574:7
**lately** [1] - 484:20
**Latino** [1] - 443:11
**latter** [1] - 566:3
**Law** [4] - 440:7,
442:18, 445:21, 590:3
**law** [34] - 416:20,
418:15, 422:7,
422:13, 422:21,
422:24, 437:7,
443:18, 443:19,
443:20, 445:16,
456:13, 466:22,
466:24, 467:7,
469:23, 478:18,
479:4, 487:4, 487:6,
515:22, 516:6,
517:18, 521:23,
522:3, 522:7, 534:24,
555:20, 556:15,
556:16, 570:14,
585:17, 585:19,
585:21
**LAW** [2] - 407:11,
407:14
**lawful** [4] - 469:13,
570:5, 586:1, 586:2
**laws** [10] - 425:13,
469:11, 469:13,
469:21, 490:23,
511:19, 525:4,
560:18, 570:9, 570:19
**lawyer** [5] - 442:23,
461:23, 487:8,
521:22, 522:1
**lawyers** [9] - 425:23,
444:5, 459:21,
461:18, 461:19,
525:23, 538:7, 559:3,
560:25
**layman's** [2] - 528:9,
579:17
**lead** [1] - 528:7
**leader** [4] - 482:25,
483:3, 483:4, 483:13
**leaders** [1] - 567:9
**leads** [2] - 423:6,
541:6
**lean** [1] - 519:11
**leaning** [5] - 484:19,
520:18, 569:22,
573:15, 580:17
**leanings** [4] - 519:6,
519:10, 521:11,
524:15

**leans** [1] - 581:12
**learned** [1] - 416:15
**learning** [3] - 455:12,
455:14, 455:16
**least** [8] - 417:10,
422:18, 504:11,
517:12, 519:24,
543:8, 555:10, 583:22
**leave** [5] - 502:8,
504:1, 504:14,
538:13, 568:9
**leaving** [1] - 526:20
**led** [1] - 424:16
**left** [6] - 484:19,
515:17, 520:18,
569:22, 580:17, 596:9
**left-leaning** [4] -
484:19, 520:18,
569:22, 580:17
**leftist** [1] - 573:13
**legal** [6] - 422:11,
464:17, 486:25,
521:20, 558:18, 570:4
**legislative** [1] -
414:5
**legitimacy** [1] -
434:1
**legitimately** [1] -
472:25
**less** [3] - 506:13,
521:8, 543:7
**lesser** [1] - 467:5
**level** [5] - 415:22,
536:20, 580:22,
586:4, 586:6
**LGBT** [1] - 427:8
**liable** [2] - 540:12
**liberal** [1] - 524:15
**license** [2] - 422:17,
427:4
**life** [9] - 419:15,
419:16, 419:17,
536:23, 543:1, 543:2,
586:20, 592:1
**lifestyle** [3] - 428:18,
428:20, 428:23
**light** [1] - 516:21
**lights** [1] - 473:3
**likely** [7] - 433:15,
444:2, 514:18,
514:19, 581:6, 581:8,
590:23
**limited** [1] - 410:19
**Line** [12] - 446:17,
447:1, 473:24,
506:22, 512:11,
538:5, 538:11,
538:12, 538:19, 596:4
**line** [3] - 512:11,
538:5, 596:3

**lines** [3] - 426:15,
445:11, 490:21
**linked** [2] - 460:24,
499:2
**linking** [1] - 519:24
**links** [2] - 544:4,
563:10
**LISA** [2] - 407:20,
597:3
**Lisa** [1] - 597:12
**list** [3] - 437:22,
447:3, 492:19
**listed** [4] - 459:10,
491:19, 492:7, 545:20
**listen** [6] - 417:24,
453:14, 456:16,
456:17, 456:18, 458:7
**listeners** [1] - 444:6
**listening** [2] - 466:2,
466:5
**listens** [1] - 468:13
**literally** [2] - 494:1,
518:12
**live** [3] - 416:2,
468:12
**lived** [2] - 470:22,
550:24
**Lives** [33] - 423:14,
423:21, 424:13,
424:22, 424:23,
444:20, 459:12,
461:2, 489:3, 489:12,
489:15, 489:24,
490:14, 510:2,
510:10, 510:11,
510:19, 510:25,
511:1, 511:3, 511:5,
524:7, 524:14,
524:18, 524:20,
549:21, 549:24,
559:13, 560:6, 560:9,
566:9, 584:19, 589:10
**lives** [11] - 451:18,
451:20, 452:9, 453:9,
454:6, 454:7, 510:22,
510:23, 524:16,
550:18, 550:20
**living** [8] - 426:25,
427:15, 430:8, 439:1,
451:15, 491:13,
495:8, 550:14
**LLC** [1] - 407:5
**local** [1] - 502:10
**look** [22] - 416:12,
430:9, 447:10,
454:20, 460:23,
461:15, 464:8, 464:9,
514:15, 527:16,
528:10, 545:12,
550:5, 555:14,

562:23, 564:24,
564:25, 575:20,
588:17, 592:11,
592:19, 594:2
**looked** [3] - 439:21,
463:13, 463:14
**looking** [10] -
410:13, 435:5,
461:11, 515:25,
516:16, 528:22,
529:7, 553:15,
563:20, 595:9
**looks** [4] - 567:8,
567:19, 587:9, 587:23
**loop** [1] - 565:13
**loose** [1] - 593:21
**lose** [1] - 515:1
**loud** [1] - 416:6
**love** [1] - 444:3
**low** [1] - 589:22
**loyalty** [2] - 472:12,
472:19
**luck** [1] - 448:23
**lump** [1] - 557:18
**lumped** [1] - 492:2
**lunch** [5] - 426:8,
500:18, 504:6,
538:14, 542:22
**lying** [1] - 587:6

## M

**ma'am** [20] - 409:23,
410:1, 411:8, 447:22,
448:21, 449:5, 459:6,
459:24, 467:22,
467:24, 471:19,
533:1, 536:25, 537:7,
543:22, 544:2, 547:1,
560:22, 574:18, 577:1
**mad** [1] - 496:8
**magazine** [5] -
425:9, 490:19,
511:17, 525:1, 560:15
**mainstream** [1] -
432:8
**maintain** [1] - 469:16
**maintains** [3] -
465:6, 466:3, 466:7
**male** [3] - 432:20,
561:18
**Mall** [6] - 417:21,
436:22, 479:16,
480:13, 483:22,
485:19
**man** [5] - 427:10,
443:9, 444:3, 444:15,
489:12
**manage** [1] - 514:8

**Management** [1] -
571:13
**manager** [2] -
527:11, 527:15
**managing** [2] -
579:20, 579:22
**manual** [1] - 590:3
**march** [1] - 423:17
**marched** [1] - 517:7
**maritime** [1] - 467:1
**marked** [1] - 562:7
**MARSHAL** [14] -
499:24, 500:3,
500:11, 500:15,
500:25, 501:19,
502:5, 502:17,
502:22, 503:7,
503:13, 503:19,
503:21, 504:22
**marshal** [1] - 506:9
**marshal's** [1] - 473:9
**Marshals** [2] -
499:22, 500:4
**marshals** [5] -
473:11, 473:13,
502:7, 502:10
**marshals'** [4] -
500:9, 501:5, 501:7,
503:11
**Maryland** [1] - 407:9
**mask** [9] - 410:3,
411:24, 414:10,
447:25, 449:5, 468:2,
474:3, 507:6, 530:16
**materials** [1] -
439:11
**Matter** [35] - 409:2,
423:14, 423:21,
424:13, 424:22,
424:24, 444:20,
459:13, 461:2, 472:8,
489:4, 489:12,
489:15, 489:24,
490:14, 510:2,
510:10, 510:12,
510:19, 511:1, 511:3,
511:5, 524:7, 524:14,
524:18, 524:20,
549:21, 549:24,
559:13, 560:6, 560:9,
566:9, 584:19, 589:11
**matter** [10] - 443:18,
455:10, 455:12,
457:9, 510:22,
510:23, 554:14,
566:13, 571:2
**matters** [4] - 427:12,
427:23, 443:17, 522:4
**mayor** [2] - 510:11,
524:14

613

**McCullough** [33] -
406:15, 409:19,
411:7, 431:2, 431:4,
436:20, 445:7,
448:20, 459:23,
462:7, 463:8, 465:9,
471:18, 472:21,
473:8, 506:2, 526:22,
533:23, 534:2, 535:7,
537:24, 546:25,
567:25, 568:13,
572:1, 572:9, 573:20,
573:22, 576:7,
591:24, 593:13
**mcCullough** [1] -
443:17
**McGUIRE** [1] - 407:2
**meal** [3] - 504:6,
504:7, 504:15
**meals** [6] - 503:14,
503:15, 503:16,
504:3, 504:17, 505:24
**mean** [86] - 410:13,
410:24, 418:2,
419:25, 421:5,
423:19, 426:10,
426:20, 426:21,
427:11, 428:9,
428:18, 431:20,
433:6, 434:18,
434:23, 435:13,
441:18, 447:4,
450:14, 453:12,
453:13, 453:16,
454:12, 454:14,
455:15, 456:1, 457:7,
462:17, 479:12,
485:4, 494:4, 494:5,
494:13, 494:19,
497:14, 497:15,
499:17, 503:11,
510:7, 511:1, 514:2,
517:22, 519:5,
519:19, 523:10,
523:12, 523:21,
524:2, 528:9, 534:2,
536:2, 537:9, 540:8,
545:6, 546:8, 546:17,
553:17, 554:15,
555:1, 555:2, 561:9,
561:10, 561:16,
562:23, 563:10,
564:8, 564:10,
564:23, 565:3,
568:25, 569:15,
570:1, 571:15,
577:16, 578:13,
578:18, 581:18,
583:10, 585:24,
586:9, 587:1, 587:8,

590:4, 595:2
**mean..** [1] - 556:24
**means** [7] - 510:21,
523:25, 534:11,
578:24, 579:17,
589:20
**meant** [9] - 469:6,
493:6, 494:23,
497:19, 498:6, 523:5,
564:11, 578:2, 578:5
**meantime** [1] -
594:11
**measuring** [3] -
580:3, 580:7, 580:9
**medal** [1] - 477:10
**media** [14] - 415:24,
426:17, 437:11,
438:16, 438:19,
455:1, 456:10,
456:19, 465:3,
465:20, 468:9,
496:11, 507:20, 544:6
**medical** [5] - 500:15,
500:25, 537:13,
541:9, 541:18
**medicine** [1] -
500:16
**meet** [4] - 419:18,
482:8, 581:23, 581:24
**meeting** [3] - 492:17,
492:18, 497:2
**Meggs** [1] - 493:4
**member** [29] -
414:16, 422:11,
449:18, 449:19,
450:17, 451:12,
451:15, 452:14,
474:13, 486:24,
487:11, 522:10,
548:7, 548:12,
548:15, 548:18,
549:12, 549:14,
550:17, 550:20,
550:24, 551:22,
552:4, 552:9, 558:13,
565:14, 565:20, 583:7
**members** [18] -
436:1, 442:18, 456:2,
485:24, 520:2, 539:8,
539:9, 548:10,
548:13, 548:14,
562:9, 568:1, 568:3,
568:14, 587:2,
587:21, 587:22, 588:4
**memory** [5] - 492:4,
520:6, 557:9, 576:2,
576:9
**men** [2] - 578:4,
578:25
**men's** [6] - 554:16,

561:13, 564:12,
577:24, 578:11,
578:24
**mention** [6] - 493:19,
498:12, 565:9,
572:21, 573:4, 592:16
**mentioned** [19] -
409:5, 421:24,
428:16, 489:25,
491:18, 492:15,
495:25, 496:18,
498:13, 498:23,
519:19, 519:20,
524:6, 552:3, 561:6,
566:21, 573:3,
573:11, 593:13
**mentioning** [2] -
572:24, 576:5
**merely** [1] - 539:24
**met** [1] - 458:13
**Metcalf** [1] - 471:8
**METCALF** [5] -
407:16, 407:17,
471:4, 471:8
**methane** [2] - 580:7,
580:9
**Miami** [1] - 407:12
**mic** [2] - 559:24,
589:1
**microphone** [8] -
428:21, 448:10,
459:7, 462:5, 472:14,
474:4, 530:17, 547:23
**midway** [1] - 561:6
**might** [21] - 417:10,
422:1, 424:21, 425:7,
433:9, 433:17,
445:12, 445:13,
453:24, 479:4,
480:18, 484:21,
485:4, 492:3, 520:1,
520:23, 540:8,
546:15, 551:16,
570:21, 592:24
**migraine** [1] - 472:25
**migraines** [1] - 473:3
**mile** [3] - 430:23,
451:25, 452:10
**military** [6] - 480:23,
481:4, 494:2, 494:24,
497:13, 497:16
**militia** [1] - 435:19
**milliseconds** [1] -
587:7
**mind** [15] - 410:22,
420:22, 439:23,
441:8, 441:22,
443:22, 480:22,
499:1, 519:13,
520:20, 537:16,

563:11, 578:24,
581:22, 593:5
**mine** [1] - 522:17
**minimum** [1] -
575:25
**Mink** [1] - 407:8
**Minneapolis** [1] -
424:14
**Minnesota** [1] -
510:10
**minute** [2] - 472:3
**minutes** [5] - 436:23,
449:6, 551:7, 551:8,
593:17
**misconduct** [1] -
427:3
**misinterpreted** [2] -
501:9, 502:1
**misogynistic** [1] -
577:19
**misogyny** [1] - 578:8
**misplaced** [1] -
593:3
**misrepresented** [1] -
502:3
**miss** [1] - 535:16
**missed** [6] - 426:9,
518:11, 535:16,
541:13, 541:14
**missing** [1] - 588:11
**mission** [2] - 440:9,
562:3
**mistake** [1] - 506:13
**mistook** [1] - 476:18
**misunderstood** [1] -
501:11
**mom** [1] - 475:5
**moment** [13] -
425:23, 464:6,
476:16, 478:7,
489:25, 491:4,
501:16, 511:24,
512:16, 525:23,
535:19, 560:25,
577:12
**money** [3] - 530:3,
530:4, 530:5
**month** [1] - 413:20
**months** [5] - 420:18,
451:1, 454:25,
587:24, 587:25
**Monument** [1] -
450:23
**MOORE** [1] - 406:17
**moral** [1] - 470:18
**morning** [9] -
500:20, 535:23,
536:1, 538:12,
542:15, 542:20,
574:15, 594:11,

594:13
**most** [3] - 416:2,
462:24, 518:21
**mostly** [2] - 468:12,
481:4
**mother** [6] - 474:19,
474:20, 488:10,
562:13, 563:8, 572:15
**motion** [3] - 472:24,
499:16, 573:25
**motive** [2] - 433:22
**motto** [1] - 489:12
**mouth** [7] - 420:1,
448:10, 448:11,
457:4, 469:20,
547:23, 560:3
**move** [8] - 442:10,
448:9, 478:21,
499:16, 514:25,
547:23, 573:23,
586:19
**movement** [9] -
424:4, 424:8, 424:20,
441:6, 441:8, 490:6,
490:8, 490:14, 511:5
**movies** [1] - 507:23
**moving** [1] - 460:13
**MR** [141] - 409:19,
411:7, 426:6, 426:11,
426:13, 426:24,
427:20, 429:13,
429:16, 429:19,
429:21, 431:4,
431:19, 432:19,
432:23, 432:25,
433:16, 434:25,
435:3, 436:20,
443:15, 445:7, 447:7,
448:20, 459:23,
460:12, 460:21,
461:4, 461:8, 461:14,
461:21, 461:23,
462:6, 463:5, 463:8,
464:21, 465:9,
465:13, 465:16,
465:21, 466:9,
466:19, 467:4, 471:4,
471:5, 471:7, 471:8,
471:10, 471:13,
471:16, 471:18,
472:11, 472:15,
472:17, 472:22,
473:16, 473:16,
491:11, 491:15,
492:24, 493:10,
493:12, 493:16,
493:18, 493:22,
494:8, 494:12,
494:16, 494:22,
495:1, 501:8, 502:1,

614

506:2, 506:8, 526:5,
526:10, 526:18,
526:19, 526:22,
529:18, 529:22,
530:1, 530:4, 533:23,
534:2, 534:9, 534:21,
535:7, 537:22,
537:23, 537:24,
543:12, 546:25,
559:22, 561:5,
561:25, 562:5, 562:6,
563:2, 563:12,
563:17, 564:5, 565:7,
565:10, 565:12,
565:16, 565:19,
565:24, 566:6,
566:10, 566:15,
567:8, 567:15,
567:25, 568:3, 568:9,
568:13, 568:24,
569:16, 570:3,
571:23, 572:1,
573:20, 573:22,
575:4, 575:18, 576:7,
586:18, 587:17,
588:15, 588:20,
591:24, 593:13,
593:17, 594:21,
595:5, 595:6, 595:10,
595:15, 595:21, 596:6
**MS** [57] - 427:25,
428:5, 428:15,
428:22, 429:10,
430:15, 435:10,
437:18, 442:10,
442:22, 443:6, 447:2,
462:14, 462:21,
463:1, 471:12,
491:17, 492:5, 498:1,
498:3, 498:6, 498:12,
502:6, 502:14,
503:25, 504:11,
505:3, 505:8, 505:11,
505:23, 547:10,
547:12, 558:15,
566:8, 567:12, 568:7,
570:24, 571:7,
571:18, 571:20,
571:24, 572:2,
572:14, 572:18,
573:1, 573:5, 573:18,
574:19, 575:3,
588:24, 589:3, 590:5,
590:8, 590:15, 591:3,
591:5, 591:15
**MS-13** [1] - 443:11
**MSNBC** [3] - 428:6,
428:7, 428:9
**MULROE** [1] -
406:16

**multiple** [1] - 589:4
**mundane** [1] - 594:3
**murder** [1] - 463:17

## N

**N/A** [1] - 540:14
**NADIA** [1] - 406:17
**nailed** [1] - 529:10
**name** [16] - 428:9,
442:23, 485:12,
491:21, 500:1, 500:2,
533:3, 571:15,
572:12, 572:24,
572:25, 573:23,
574:1, 574:4, 586:22
**namely** [1] - 461:25
**names** [13] - 439:19,
439:21, 440:15,
459:9, 475:22,
479:24, 491:18,
500:1, 572:22, 573:3,
573:4, 584:6
**narrow** [1] - 434:3
**National** [2] - 416:4,
436:22
**nations** [1] - 470:23
**natural** [2] - 453:13,
523:10
**naturalized** [1] -
470:13
**nature** [3] - 413:24,
588:17, 592:13
**Navy** [2] - 539:17,
548:25
**NAYIB** [2] - 407:10,
407:11
**necessarily** [4] -
430:16, 455:19,
555:5, 566:16
**necessary** [2] -
433:23, 461:9
**need** [25] - 418:13,
421:24, 422:1,
430:13, 446:2, 450:3,
450:20, 456:21,
457:4, 473:4, 502:18,
504:19, 533:2, 533:5,
534:7, 536:19,
536:20, 552:18,
557:1, 569:19, 574:9,
574:10, 581:21,
595:20
**needed** [1] - 538:13
**needing** [1] - 448:6
**needs** [3] - 448:15,
501:17, 501:25
**negative** [2] - 411:7,
459:23

**neighborhood** [1] -
550:18
**neighbors** [1] -
488:21
**nervous** [3] - 576:1,
576:9, 577:5
**Netflix** [1] - 508:11
**neutral** [1] - 567:25
**neutrality** [1] -
469:16
**never** [1] - 443:7,
509:1, 522:5
**New** [5] - 406:23,
407:6, 407:18
**new** [3] - 433:2,
526:14, 595:7
**news** [32] - 415:21,
415:24, 416:9,
416:10, 418:23,
420:17, 421:18,
426:15, 428:6, 430:6,
431:7, 431:13,
438:22, 440:11,
440:20, 441:1, 441:2,
441:4, 446:8, 454:21,
455:1, 468:14,
468:15, 478:24,
479:17, 492:8,
496:11, 507:19,
509:3, 516:19, 518:2,
552:25
**News** [1] - 518:7
**next** [27] - 411:17,
413:6, 418:18,
446:17, 446:24,
447:19, 464:1, 464:4,
473:21, 478:22,
503:1, 506:21,
512:11, 512:12,
513:8, 513:10,
514:10, 515:12,
516:14, 516:18,
518:13, 518:16,
529:13, 529:19,
532:17, 538:5, 538:18
**NGO** [5] - 561:22,
575:6, 585:1, 585:5,
587:21
**NICHOLAS** [1] -
406:21
**night** [2] - 452:5,
596:12
**no-show** [1] - 512:12
**noise** [1] - 416:3
**nomenclature** [1] -
561:9
**nonconvictions** [1] -
421:21
**none** [14] - 425:9,
436:2, 439:22,

441:17, 448:20,
471:5, 473:17,
490:19, 502:9, 525:1,
537:22, 543:12,
549:7, 560:15
**nongovernmental**
[1] - 584:25
**nonpracticing** [1] -
522:1
**nonprofit** [3] -
561:22, 562:14, 579:8
**noon** [1] - 473:3
**NORDEAN** [1] -
406:6
**Nordean** [6] - 409:3,
472:9, 482:13,
509:12, 584:7, 595:21
**nORDEAN** [1] -
406:21
**normal** [1] - 503:11
**normally** [1] - 536:13
**Norman** [1] - 471:7
**NORMAN** [1] - 407:4
**Northwest** [5] -
406:18, 407:3,
407:11, 407:22,
597:14
**note** [1] - 431:15
**noted** [3] - 467:16,
573:7, 575:19
**notes** [1] - 597:5
**nothing** [12] - 429:5,
438:23, 464:24,
478:5, 478:19,
481:14, 481:21,
508:20, 509:8, 554:8,
558:11, 581:19
**noticed** [1] - 588:12
**notify** [1] - 501:20
**noting** [1] - 461:14
**notion** [1] - 492:20
**novel** [1] - 436:9
**November** [2] -
498:17, 550:3
**November-
December** [1] - 498:17
**NPR** [1] - 468:13
**nullification** [3] -
433:18, 466:25, 467:9
**number** [11] -
411:19, 412:18,
412:19, 422:17,
433:8, 438:2, 473:22,
473:23, 475:21,
501:4, 540:5
**numbers** [2] -
595:23, 596:3
**nurse** [5] - 500:16,
500:18, 500:19,
501:1, 501:21

## O

**oath** [3] - 457:5,
470:14, 577:5
**Oath** [31] - 421:13,
421:15, 421:19,
422:2, 431:14,
440:15, 441:5, 445:3,
445:4, 476:4, 476:5,
476:16, 478:8,
480:12, 483:13,
485:11, 485:17,
485:24, 486:3,
486:19, 489:2, 493:2,
496:20, 496:21,
509:22, 521:4, 521:6,
544:11, 558:6, 558:8
**object** [7] - 461:4,
461:21, 465:13,
466:15, 466:21,
473:6, 574:23
**objected** [3] -
462:13, 462:18, 463:3
**objection** [35] -
409:17, 409:19,
411:6, 412:20,
448:19, 459:22,
461:12, 462:13,
463:6, 464:20,
464:21, 465:8, 465:9,
465:11, 465:15,
465:16, 466:8,
467:15, 471:3,
471:12, 471:13,
471:14, 471:16,
471:18, 492:12,
506:20, 512:5,
529:16, 533:21,
534:19, 537:21,
537:24, 543:11,
546:24, 574:19
**objections** [4] -
462:16, 462:17,
505:1, 526:4
**objective** [1] - 437:2
**observation** [1] -
576:8
**obviously** [11] -
416:12, 418:6, 419:4,
447:15, 457:24,
485:23, 486:12,
492:20, 552:16,
559:2, 560:1
**occasion** [1] - 488:4
**occasionally** [1] -
478:24
**occur** [1] - 440:13
**occurred** [12] -
417:1, 417:3, 418:11,

423:18, 423:20,
423:24, 426:8,
457:13, 458:5,
532:19, 566:2, 587:24
  **occurrence** [1] -
424:13
  **occurring** [2] -
579:11, 579:12
  **OF** [5] - 406:1, 406:3,
406:11, 406:18,
407:11
  **offend** [2] - 430:16,
481:22
  **offended** [10] -
426:2, 427:11,
427:13, 429:8,
430:10, 430:14,
430:22, 430:25, 440:1
  **offends** [7] - 427:7,
427:10, 428:17,
429:1, 429:11,
430:19, 578:8
  **offense** [4] - 428:24,
431:24, 434:3, 556:9
  **offenses** [3] -
418:10, 458:16, 467:6
  **offensive** [11] -
419:5, 435:19, 440:4,
490:13, 554:23,
555:4, 555:12,
578:12, 578:13,
578:16, 578:22
  **offer** [1] - 472:20
  **offered** [1] - 576:11
  **office** [3] - 422:14,
474:22, 475:5
  **OFFICE** [1] - 406:17
  **Office** [1] - 571:13
  **officer** [4] - 477:6,
477:22, 477:25,
517:13
  **Officer** [7] - 491:18,
491:21, 491:22,
492:5, 492:6, 496:1,
496:11
  **OFFICES** [1] -
407:11
  **Official** [1] - 407:20
  **official** [2] - 440:8,
597:12
  **officially** [1] - 440:16
  **often** [5] - 413:15,
468:16, 504:4,
516:19, 543:6
  **oil** [2] - 579:8, 580:11
  **OMB** [3] - 548:10,
548:13, 548:15
  **once** [10] - 414:25,
415:1, 428:4, 492:10,
534:10, 534:12,

536:17, 541:7,
575:21, 577:3
  **one** [78] - 414:19,
414:20, 414:24,
422:19, 425:8, 431:9,
435:10, 435:12,
435:14, 440:16,
441:10, 442:12,
446:17, 447:13,
448:16, 449:25,
453:18, 454:10,
454:13, 455:24,
464:6, 467:21,
469:15, 469:18,
469:20, 469:25,
474:24, 475:23,
488:7, 492:25, 493:3,
493:4, 496:13,
496:16, 498:3,
498:22, 501:4,
502:25, 506:16,
508:6, 509:16,
511:24, 512:16,
514:8, 514:11,
515:25, 517:12,
518:8, 522:20,
525:23, 536:10,
539:18, 541:4, 542:3,
542:8, 542:9, 545:12,
545:13, 545:15,
547:22, 548:15,
549:1, 557:24,
559:16, 560:14,
560:22, 561:2,
563:12, 563:17,
565:13, 566:17,
567:8, 573:16,
574:12, 577:13,
584:2, 585:13
  **ones** [7] - 447:2,
455:19, 459:5, 459:8,
549:17, 549:18, 550:7
  **open** [13] - 433:11,
435:7, 435:8, 442:23,
498:21, 535:12,
557:4, 564:14, 569:4,
572:12, 572:19,
574:6, 581:22
  **open-book** [1] -
557:4
  **open-ended** [1] -
564:14
  **opened** [1] - 518:12
  **opening** [2] - 595:1
  **opens** [1] - 433:21
  **opinion** [13] -
417:23, 418:24,
419:2, 419:9, 436:6,
445:20, 533:9, 537:6,
544:21, 546:7,

555:15, 590:8, 590:20
  **opinionated** [1] -
545:7
  **opinions** [23] -
416:24, 417:1, 417:8,
425:3, 425:6, 441:25,
442:2, 445:11,
457:12, 457:16,
457:18, 457:22,
463:16, 463:17,
525:13, 525:14,
525:16, 532:19,
532:23, 532:24,
545:1, 546:15, 555:18
  **opponents** [1] -
592:19
  **opportunity** [3] -
436:18, 461:5, 466:21
  **opposed** [18] -
414:21, 424:22,
445:8, 445:9, 446:11,
450:1, 474:25,
475:25, 489:15,
489:23, 511:3,
524:18, 539:19,
549:2, 560:6, 560:10,
590:25
  **opposite** [2] -
420:19, 421:3
  **opposition** [1] -
440:18
  **oppositions** [1] -
440:18
  **oppressed** [1] -
578:4
  **orally** [1] - 500:6
  **orange** [1] - 542:20
  **Orange** [1] - 407:5
  **order** [12] - 409:6,
417:4, 467:23, 473:1,
473:15, 500:6,
500:12, 500:14,
500:22, 501:10,
502:19
  **ordinarily** [1] -
537:13
  **organization** [53] -
423:14, 423:15,
424:4, 424:6, 424:22,
428:17, 440:10,
489:4, 489:7, 489:8,
489:15, 489:24,
490:1, 490:5, 510:2,
510:19, 511:1, 511:4,
511:5, 511:12, 524:8,
524:11, 524:19,
553:18, 559:12,
559:14, 559:18,
559:20, 560:7, 560:9,
561:7, 561:15, 562:4,

566:21, 567:9,
567:19, 568:2, 568:4,
568:15, 569:3, 569:6,
569:22, 571:6, 579:6,
580:18, 580:22,
581:5, 581:12,
581:13, 584:25,
586:24, 591:14,
592:18
  **organizations** [1] -
441:7
  **organized** [1] - 440:8
  **orient** [2] - 415:11,
468:7
  **oriented** [1] - 540:18
  **originally** [1] -
438:15
  **outrage** [1] - 424:16
  **outset** [1] - 437:3
  **outside** [8] - 425:19,
501:14, 503:11,
511:24, 528:15,
537:9, 560:25, 570:19
  **overall** [3] - 532:14,
532:15, 545:17
  **overdue** [1] - 424:15
  **overlay** [1] - 431:25
  **overnight** [1] -
594:10
  **overthinking** [1] -
588:10
  **overtly** [1] - 432:5
  **overview** [1] - 488:9
  **own** [5] - 432:12,
506:10, 517:9, 545:7,
592:22

## P

  **P.A** [2] - 407:11,
407:14
  **P.C** [2] - 407:2,
407:17
  **p.m** [1] - 406:7
  **page** [3] - 469:10,
478:22, 516:18
  **Page** [6] - 408:3,
469:1, 474:14,
478:22, 548:5, 549:13
  **pages** [2] - 437:21,
437:22
  **paid** [2] - 412:12,
412:16
  **painted** [1] - 510:11
  **panel** [2] - 574:10,
593:14
  **panicked** [1] -
453:20
  **paper** [1] - 534:16

  **parading** [1] - 479:23
  **paragraphs** [2] -
575:12
  **paramilitary** [9] -
480:12, 480:22,
493:20, 494:19,
494:21, 494:24,
497:9, 497:15, 497:19
  **paraphrasing** [1] -
458:21
  **parent** [1] - 549:5
  **Park** [1] - 407:17
  **parking** [1] - 497:2
  **part** [15] - 416:10,
420:7, 428:18,
433:14, 434:11,
434:12, 457:16,
480:8, 518:22,
524:14, 531:4, 570:1,
589:7, 592:12, 593:24
  **participants** [1] -
517:7
  **participate** [1] -
566:11
  **participated** [2] -
565:25, 566:7
  **particular** [9] -
434:19, 458:11,
460:9, 463:21,
464:22, 490:8,
507:11, 556:8, 585:17
  **particularized** [5] -
463:10, 463:20,
585:18, 585:20,
585:24
  **particularly** [2] -
477:19, 480:20
  **parties** [8] - 412:20,
437:14, 438:3,
441:20, 461:9, 488:6,
491:9
  **partisan** [3] - 563:11,
564:22, 583:17
  **parts** [1] - 585:14
  **Party** [1] - 562:12,
562:22, 563:5,
571:11, 571:15,
571:16, 571:21,
571:25, 573:8,
573:16, 586:23,
586:24, 586:25
  **past** [8] - 418:23,
420:18, 503:10,
518:3, 520:21,
520:23, 521:14,
524:13
  **patience** [11] -
438:11, 474:3, 507:1,
513:17, 525:25,
530:11, 538:23,

543:24, 547:5,
547:19, 586:14
**Pattis** [7] - 429:22,
433:7, 443:14, 462:3,
471:7, 472:10, 506:7
**PATTIS** [28] - 407:4,
407:5, 426:6, 426:11,
431:19, 432:19,
432:23, 432:25,
433:16, 434:25,
435:3, 443:15, 462:6,
466:19, 467:4, 471:5,
471:7, 472:11,
472:15, 472:17,
494:8, 494:12, 506:8,
537:22, 575:18,
593:17, 595:6, 595:10
**paused** [1] - 592:10
**pauses** [3] - 575:21,
576:1, 587:10
**pay** [1] - 529:8
**payment** [1] - 439:3
**peaceful** [1] - 417:18
**Pennsylvania** [1] -
423:22
**people** [61] - 416:6,
416:12, 417:20,
423:22, 425:3, 425:5,
426:18, 431:14,
432:9, 433:10,
433:19, 434:2,
435:20, 436:16,
441:19, 443:2,
445:15, 446:10,
454:21, 455:18,
455:20, 457:23,
458:3, 463:16,
463:17, 473:16,
475:24, 479:21,
479:22, 487:21,
493:5, 501:6, 508:13,
515:25, 517:11,
531:20, 532:1, 533:7,
534:3, 539:25, 544:6,
545:15, 545:16,
549:4, 550:14,
552:12, 552:16,
557:1, 563:24, 581:1,
583:23, 584:14,
585:6, 585:8, 585:15,
587:3, 587:21,
588:10, 593:19,
593:20
**peoples** [1] - 470:24
**perceive** [2] -
441:12, 554:13
**perception** [4] -
424:9, 433:11, 481:3,
481:18
**perceptions** [2] -

481:1, 486:4
**perfect** [2] - 474:8,
474:23
**perfectly** [1] - 502:19
**perhaps** [1] - 492:12
**period** [2] - 428:9,
453:2
**periphery** [1] -
468:17
**permissible** [1] -
500:8
**permission** [1] -
435:6
**permissive** [1] -
444:16
**permit** [1] - 433:17,
500:6
**permitted** [1] -
501:10
**permitting** [1] -
526:11
**person** [45] - 414:4,
422:12, 428:19,
432:2, 432:16,
435:17, 435:18,
435:25, 444:7, 445:2,
447:13, 447:16,
447:17, 449:11,
451:16, 460:22,
461:1, 464:7, 464:8,
464:10, 464:24,
465:2, 465:4, 465:6,
474:17, 477:21,
487:1, 487:13,
507:22, 508:6,
511:10, 517:12,
521:21, 535:8,
545:15, 548:18,
551:10, 552:8, 552:9,
558:20, 563:19,
582:10, 583:11
**person's** [2] -
444:23, 523:21
**personal** [11] -
413:24, 419:15,
419:17, 423:3,
430:17, 464:16,
469:3, 566:18,
583:12, 586:20, 592:1
**personally** [8] -
425:4, 435:22,
475:25, 490:16,
491:4, 491:22,
494:12, 496:2
**persons** [1] - 491:17
**perspective** [3] -
435:4, 443:16, 453:15
**PEZZOLA** [2] -
406:7, 407:17
**Pezzola** [4] - 471:9,

482:14, 509:13, 584:8
**philosophies** [1] -
519:7
**phone** [3] - 452:19,
493:3, 518:12
**phones** [1] - 498:10
**phrase** [3] - 420:21,
440:23, 577:24
**phrased** [1] - 433:13
**physical** [1] - 453:8
**physically** [1] - 506:9
**pick** [3] - 410:10,
434:18, 518:6
**picked** [2] - 410:12,
592:9
**pickups** [1] - 410:14
**pilfering** [1] - 462:1
**pivot** [1] - 535:19
**place** [5] - 431:25,
442:1, 499:8, 501:25,
592:25
**Plaintiff** [1] - 406:4
**plan** [3] - 409:15,
413:23, 585:9
**plane** [1] - 416:5
**planned** [1] - 437:1
**planning** [1] - 572:19
**plans** [3] - 413:17,
413:18, 492:17
**play** [3] - 453:24,
585:5, 594:12
**played** [2] - 566:16,
589:8
**playing** [1] - 523:16,
563:19, 593:9
**plays** [2] - 409:13,
409:15
**Plaza** [1] - 524:15
**plead** [1] - 462:14
**plenty** [1] - 444:3
**PLLC** [1] - 406:21
**point** [32] - 409:8,
417:19, 429:20,
430:21, 435:10,
438:1, 438:2, 439:21,
444:25, 457:10,
466:16, 473:17,
493:3, 493:5, 503:5,
505:17, 517:6,
518:22, 545:11,
554:8, 563:10,
563:17, 564:3, 567:8,
569:22, 570:16,
576:4, 580:4, 590:21,
592:7, 593:14
**poke** [1] - 434:20
**poked** [1] - 578:23
**poking** [1] - 593:23
**Police** [4] - 477:6,
477:22, 477:25,

517:13
**police** [1] - 424:15
**policies** [2] - 500:23,
501:5
**policy** [17] - 466:25,
467:8, 501:7, 501:14,
501:25, 502:3,
502:13, 502:15,
503:10, 503:12,
503:13, 503:18,
503:23, 504:20,
528:7, 528:8
**political** [12] - 432:5,
441:20, 519:6,
519:10, 526:14,
526:16, 527:24,
528:19, 550:6,
564:25, 580:22, 581:5
**politicians** [2] -
479:24, 562:22
**politics** [2] - 432:21,
562:13
**Politics** [1] - 562:14
**pollution** [1] - 579:9
**polo** [1] - 437:25
**ponder** [1] - 462:8
**pool** [1] - 437:11
**pop** [1] - 557:1
**population** [1] -
432:20
**pose** [1] - 569:8
**position** [5] - 527:23,
528:5, 528:6, 562:2,
582:14
**positive** [1] - 418:24
**possessed** [5] -
425:8, 490:18,
511:16, 524:25,
560:14
**possible** [2] -
415:18, 595:6
**possibly** [2] -
567:18, 570:12
**post** [2] - 474:21,
475:5
**Post** [2] - 434:18,
468:15
**potential** [5] - 409:7,
499:18, 503:24,
529:20, 572:22
**potentially** [2] -
432:1, 521:10
**Poverty** [5] - 440:7,
440:23, 442:18,
445:21, 590:3
**practice** [6] - 422:21,
422:24, 487:4,
521:24, 521:25, 522:3
**practiced** [2] - 522:2,
522:5

**practices** [1] - 487:5
**pre** [1] - 436:4
**precedent** [1] -
470:25
**preceding** [1] -
440:12
**preface** [1] - 511:2
**prejudice** [9] - 436:6,
465:24, 470:2, 470:6,
470:10, 505:19,
505:20, 589:18
**prejudiced** [1] -
469:15
**prejudices** [1] -
534:11
**premise** [1] - 534:3
**prepared** [1] - 437:5
**presence** [1] -
423:17
**present** [3] - 437:7,
446:2, 548:18
**Present** [1] - 572:9
**presented** [8] -
441:17, 456:13,
463:12, 463:23,
479:3, 486:2, 516:24,
517:17
**presently** [1] -
449:21
**preservation** [1] -
466:19
**preserve** [2] -
466:23, 467:14
**presidency** [1] -
575:11
**president** [3] -
438:21, 519:21
**President** [4] -
460:24, 518:23,
571:14
**press** [5] - 434:16,
444:25, 493:16,
506:5, 567:20
**pressed** [1] - 461:24
**pressure** [1] - 581:17
**presumably** [1] -
473:2
**presumed** [1] -
486:13
**pretty** [9] - 409:16,
410:19, 478:1,
480:11, 501:12,
519:1, 525:12,
537:16, 551:22
**previous** [2] -
525:13, 526:25
**primary** [2] - 428:5,
574:19
**priors** [1] - 569:19
**private** [2] - 529:2,

617

569:14
**pro** [1] - 421:7
**pro-fascist** [1] -
421:7
**probe** [1] - 430:13
**problem** [15] -
419:21, 445:4,
478:20, 482:7,
523:12, 546:19,
546:21, 556:4,
556:13, 556:18,
561:18, 564:13,
565:1, 589:6, 589:12
**problematic** [2] -
589:14, 591:16
**problems** [1] -
515:21
**proceed** [1] - 462:24
**proceeding** [1] -
462:24
**Proceedings** [1] -
596:13
**proceedings** [43] -
409:25, 411:15,
411:21, 413:5, 413:9,
425:25, 438:9, 442:9,
447:21, 449:1, 449:4,
460:7, 467:20, 472:1,
472:6, 474:1, 491:7,
495:5, 498:4, 498:20,
499:15, 504:24,
506:24, 512:3,
513:15, 526:3, 527:6,
529:15, 530:8,
533:25, 535:11,
537:12, 538:21,
543:19, 543:21,
547:8, 547:17, 561:4,
572:8, 574:5, 576:25,
586:16, 597:6
**produced** [1] - 597:6
**production** [1] -
580:11
**profession** [4] -
422:12, 486:25,
521:20, 558:18
**professional** [2] -
583:12, 586:20
**proffer** [2] - 562:11,
575:7
**proffered** [1] -
564:23
**program** [2] -
527:11, 527:16
**programs** [3] -
479:17, 514:8, 514:16
**progress** [1] -
595:13
**properly** [1] - 412:1
**property** [5] - 566:1,

566:7, 566:11,
566:14, 584:21
**proposition** [3] -
435:21, 435:22, 436:8
**prosecutor** [4] -
558:23, 559:8, 562:20
**prosecutors** [1] -
559:3
**Prospective** [34] -
409:24, 411:14,
411:20, 413:4, 413:8,
425:24, 438:8, 442:8,
447:20, 448:25,
449:3, 460:6, 467:19,
471:25, 473:25,
491:6, 495:4, 499:14,
506:23, 512:2,
513:14, 526:2, 527:5,
529:14, 530:7,
537:11, 538:20,
543:18, 543:20,
547:7, 547:16, 561:3,
576:24, 586:15
**PROSPECTIVE** [508]
- 410:2, 410:5,
410:11, 410:16,
410:19, 410:24,
411:5, 411:10,
411:13, 412:3, 412:7,
412:9, 412:11,
412:14, 412:17,
412:25, 413:3,
413:12, 413:19,
414:5, 414:8, 414:11,
414:14, 414:17,
415:4, 415:9, 415:15,
416:1, 416:22,
417:12, 417:17,
418:16, 418:22,
419:7, 419:12,
419:21, 420:5,
420:11, 420:16,
421:5, 421:12,
421:16, 422:4, 422:9,
422:13, 422:22,
422:25, 423:3, 423:8,
423:15, 423:21,
424:3, 424:7, 424:11,
425:2, 425:15,
438:12, 438:20,
438:24, 439:2,
439:10, 439:13,
439:16, 439:20,
440:5, 441:3, 441:18,
442:4, 446:24,
447:24, 448:2, 448:8,
448:12, 448:15,
448:18, 448:24,
449:9, 449:14,
449:17, 449:21,

449:24, 450:8,
450:13, 450:19,
450:22, 451:1, 451:5,
451:9, 451:13,
451:18, 451:21,
451:24, 452:3, 452:5,
452:8, 452:11,
452:15, 452:18,
452:22, 452:25,
453:7, 453:12, 454:1,
454:4, 454:9, 454:19,
455:3, 455:14,
455:16, 455:22,
456:2, 456:5, 456:15,
456:24, 457:2, 457:7,
457:18, 457:21,
457:23, 458:3,
458:15, 458:25,
459:3, 459:8, 459:15,
460:3, 460:5, 467:18,
467:25, 468:4,
468:12, 468:20,
468:22, 469:8,
469:24, 470:4, 470:7,
470:12, 470:16,
471:22, 471:24,
474:5, 474:11,
474:16, 474:19,
474:21, 475:7,
475:11, 475:14,
475:18, 476:1, 476:4,
476:6, 476:9, 476:11,
476:14, 476:18,
476:21, 476:23,
477:3, 477:6, 477:9,
477:13, 477:15,
477:19, 477:22,
478:1, 478:5, 478:19,
479:6, 479:11,
479:15, 479:21,
480:3, 480:11,
480:20, 480:23,
481:3, 481:6, 481:14,
481:19, 481:23,
482:3, 482:10,
482:18, 482:21,
482:25, 483:4, 483:8,
483:12, 483:16,
483:20, 484:4,
484:12, 484:17,
484:24, 485:3, 485:5,
485:10, 485:14,
485:18, 485:25,
486:11, 486:15,
486:22, 487:2, 487:5,
487:9, 487:14,
487:16, 487:19,
487:24, 488:2, 488:7,
488:10, 488:15,
488:17, 488:21,
488:24, 489:5, 489:8,

489:11, 489:16,
489:18, 489:20,
490:4, 490:8, 490:11,
490:15, 490:25,
495:9, 495:12,
495:15, 495:18,
495:22, 496:2, 496:6,
496:12, 496:23,
497:1, 497:4, 497:6,
497:12, 497:17,
497:21, 499:4, 499:6,
499:9, 507:3, 507:7,
507:16, 507:22,
508:4, 508:9, 508:11,
508:21, 509:1, 509:6,
509:15, 509:20,
509:24, 510:3, 510:6,
510:9, 510:14,
510:16, 510:21,
511:8, 511:14,
511:22, 513:19,
513:24, 514:1, 514:4,
514:15, 514:19,
514:22, 515:3, 515:6,
515:9, 515:15,
515:20, 516:8,
516:11, 517:3,
517:11, 517:19,
517:24, 518:4, 518:6,
518:11, 518:21,
519:5, 519:11,
519:16, 519:22,
520:1, 520:7, 520:12,
520:16, 520:22,
521:3, 521:8, 521:15,
521:22, 521:25,
522:5, 522:8, 522:14,
522:17, 522:22,
522:25, 523:7,
523:17, 524:1, 524:9,
524:12, 524:23,
525:6, 525:12,
525:18, 526:1, 527:8,
527:14, 527:22,
528:1, 528:5, 528:10,
528:16, 528:19,
528:24, 529:4, 529:8,
529:12, 529:16,
530:10, 530:14,
530:19, 530:25,
531:4, 531:19, 532:3,
532:6, 532:8, 532:11,
532:15, 532:25,
533:2, 533:5, 533:8,
533:11, 533:14,
533:19, 535:13,
535:22, 535:25,
536:5, 536:9, 536:15,
536:22, 537:3, 537:6,
538:10, 538:24,
539:1, 539:7, 539:11,

539:14, 539:16,
540:3, 540:15,
540:20, 540:22,
540:25, 541:3, 541:8,
541:11, 541:14,
541:18, 541:23,
542:1, 542:14,
542:17, 542:19,
542:22, 543:2, 543:8,
543:16, 543:23,
544:1, 544:15,
544:18, 544:21,
545:6, 545:23, 546:1,
546:18, 546:20,
546:23, 547:6,
547:21, 547:25,
548:7, 548:10,
548:14, 548:20,
548:24, 549:10,
549:15, 549:18,
549:21, 550:1, 550:4,
550:12, 550:17,
550:22, 550:25,
551:3, 551:6, 551:9,
551:11, 551:20,
551:23, 552:7,
552:11, 552:23,
553:4, 553:13,
553:17, 553:22,
553:25, 554:4, 554:9,
554:15, 554:21,
554:24, 555:3, 555:8,
555:13, 555:25,
556:3, 556:7, 556:18,
556:24, 557:7,
557:10, 557:17,
557:20, 557:22,
557:25, 558:5, 558:9,
558:19, 558:21,
558:23, 559:1, 559:5,
559:10, 559:15,
559:19, 560:4,
560:12, 560:21,
577:15, 577:17,
577:22, 578:1, 578:3,
578:9, 578:13,
578:17, 579:2, 579:7,
579:13, 579:15,
579:19, 579:24,
580:6, 580:11,
580:15, 580:19,
581:2, 581:6, 581:9,
581:25, 582:3, 582:8,
582:11, 582:15,
582:17, 582:19,
582:23, 583:1, 583:3,
583:5, 583:9, 583:14,
583:18, 584:1,
584:13, 584:17,
584:22, 585:2, 585:7,
585:11, 585:23,

586:3, 586:9
  **protective** [1] -
437:23
  **protest** [6] - 417:18,
569:25, 585:22,
586:1, 586:2, 588:3
  **protesters** [1] -
589:11
  **protesting** [12] -
567:10, 567:21,
568:4, 568:7, 571:1,
571:2, 571:3, 571:9,
585:15, 585:18,
585:19, 585:21
  **protests** [18] -
557:10, 567:17,
568:2, 568:11, 570:4,
570:5, 570:7, 570:15,
570:17, 570:19,
584:19, 585:1,
585:16, 587:2,
587:18, 587:23,
587:24, 588:5
  **protocol** [2] -
472:24, 473:5
  **Proud** [84] - 418:18,
418:20, 418:21,
419:3, 420:16,
420:19, 420:21,
421:3, 421:17, 427:7,
427:9, 427:20, 428:1,
428:8, 428:10,
428:12, 428:24,
429:11, 430:19,
432:2, 432:8, 433:11,
434:16, 436:21,
437:20, 437:23,
437:24, 437:25,
438:19, 439:25,
440:14, 441:5,
441:10, 442:11,
445:3, 445:23,
458:20, 458:24,
460:25, 480:2,
480:10, 480:17,
481:16, 483:1, 483:3,
483:4, 493:2, 493:20,
496:17, 497:9,
498:16, 499:1,
508:24, 509:8,
518:15, 518:20,
518:24, 519:3,
519:19, 519:25,
544:10, 545:20,
553:8, 555:22, 556:2,
557:18, 561:7,
574:20, 576:16,
577:11, 578:21,
584:15, 589:16,

591:6, 591:8, 591:10,
591:20
  **prove** [5] - 418:9,
419:20, 556:5,
556:12, 563:6
  **proven** [2] - 431:22,
469:12
  **proves** [1] - 486:13
  **provide** [5] - 448:17,
500:7, 500:19,
569:12, 592:20
  **provided** [1] - 575:10
  **providers** [1] - 439:5
  **provides** [1] - 500:16
  **providing** [1] -
579:10
  **proving** [1] - 482:5
  **pry** [1] - 536:3
  **psych** [1] - 536:6
  **public** [4] - 440:18,
566:24, 569:7, 573:24
  **publicity** [2] - 426:7,
427:16
  **published** [2] -
562:17, 569:1
  **pull** [2] - 469:18,
472:13
  **pulled** [1] - 530:16
  **punitive** [1] - 505:6
  **purposes** [4] - 462:4,
466:19, 589:22, 590:9
  **push** [2] - 438:4,
515:4
  **put** [38] - 412:19,
413:23, 418:14,
419:14, 419:25,
426:3, 427:1, 433:15,
444:19, 453:21,
457:3, 461:20, 469:9,
469:20, 478:13,
480:16, 480:22,
481:17, 486:3, 491:2,
500:1, 504:7, 511:24,
514:5, 517:9, 533:2,
533:5, 534:20,
534:22, 535:3,
540:14, 541:14,
546:11, 560:2,
560:24, 561:15,
569:10, 581:19
  **putting** [1] - 584:9

## Q

  **Q/SCI** [1] - 514:7
  **qualified** [11] -
426:3, 426:5, 446:5,
499:19, 506:20,
512:6, 512:19,

512:21, 594:16,
595:23, 596:2
  **qualify** [1] - 413:22
  **qualifying** [2] -
512:5, 529:16
  **quality** [1] - 515:21
  **qualms** [1] - 556:10
  **quarters** [1] - 452:10
  **questioned** [3] -
472:11, 472:19,
506:12
  **questioning** [3] -
491:8, 504:25, 594:2
  **questionnaire** [10] -
429:14, 429:17,
431:12, 508:16,
530:22, 546:9, 548:3,
556:21, 562:7, 584:11
  **Questions** [6] -
409:9, 449:11,
464:10, 516:17,
539:4, 539:5
  **questions** [58] -
410:4, 411:25, 418:3,
418:18, 423:10,
425:22, 430:1,
430:18, 433:2, 438:3,
438:13, 449:16,
458:19, 461:25,
466:5, 466:14,
466:24, 468:2,
476:15, 478:22,
481:1, 489:1, 491:4,
491:24, 495:7,
497:23, 507:5,
509:17, 512:1, 524:5,
525:24, 527:7, 539:3,
541:4, 544:5, 548:2,
548:6, 549:4, 550:13,
559:11, 561:1, 562:1,
565:10, 574:24,
575:1, 576:11, 577:3,
577:7, 584:3, 586:11,
587:7, 587:18, 588:9,
592:13, 592:15, 594:3
  **quick** [2] - 459:20,
551:22
  **quickly** [6] - 409:16,
427:24, 452:21,
525:8, 588:8, 588:9
  **quite** [6] - 414:13,
418:25, 445:24,
492:16, 544:19, 594:3
  **quiz** [2] - 557:1,
557:4

## R

  **racism** [2] - 564:7,
589:8

  **racist** [8] - 554:1,
554:2, 561:8, 574:21,
589:5, 589:17,
589:24, 590:18
  **raise** [5] - 431:20,
433:19, 435:5,
466:20, 573:19
  **raised** [5] - 413:14,
431:10, 432:4,
531:21, 532:8
  **raises** [2] - 444:25,
511:12
  **rallies** [13] - 549:17,
549:19, 549:22,
550:8, 559:17,
564:25, 566:1, 566:2,
566:4, 566:16,
566:17, 584:19,
584:20
  **rally** [9] - 450:18,
450:20, 517:5,
549:24, 560:2, 566:8,
566:11, 566:14,
590:16
  **ran** [1] - 563:13
  **rather** [2] - 590:6,
590:10
  **RDR** [3] - 407:20,
597:3, 597:12
  **reached** [9] - 507:11,
507:14, 540:6,
540:19, 540:24,
541:1, 541:3, 546:16
  **reaching** [1] - 520:3
  **reaction** [2] - 454:14,
593:21
  **read** [71] - 416:11,
418:19, 418:21,
420:13, 420:14,
421:14, 423:11,
423:13, 438:18,
439:8, 458:19,
458:23, 459:3, 479:8,
479:9, 480:1, 480:5,
480:9, 480:17,
481:10, 481:16,
482:12, 482:15,
483:15, 483:16,
484:1, 484:9, 484:14,
484:15, 485:17,
489:3, 496:19,
507:19, 508:24,
509:11, 509:17,
509:22, 510:1,
516:19, 517:1,
517:10, 518:14,
518:18, 518:19,
519:18, 519:24,
520:3, 520:13,
520:15, 521:5, 521:6,

524:7, 524:10,
529:22, 531:11,
552:17, 553:7,
553:10, 553:11,
554:7, 555:22, 556:1,
556:21, 556:23,
557:2, 557:8, 558:7,
558:8, 559:13,
564:18, 584:6
  **reading** [7] - 459:10,
481:11, 496:25,
510:4, 584:10,
584:15, 591:11
  **ready** [6] - 409:22,
411:16, 447:11,
512:15, 518:24,
576:17
  **reaffirm** [1] - 562:24
  **real** [5] - 484:20,
487:6, 536:23, 587:1,
594:21
  **reality** [1] - 483:7
  **realize** [2] - 564:1,
590:10
  **really** [42] - 410:20,
410:21, 420:24,
427:12, 427:23,
452:2, 452:3, 454:15,
456:18, 456:21,
457:25, 459:16,
470:25, 479:9,
480:24, 481:23,
482:22, 483:21,
485:5, 490:4, 507:20,
514:11, 514:12,
514:13, 514:18,
523:13, 534:18,
536:14, 554:8,
557:25, 563:20,
563:22, 564:1, 564:9,
569:11, 570:1,
574:21, 579:17,
588:12, 589:24,
590:22, 593:22
  **reason** [26] - 415:14,
426:2, 427:12, 451:6,
451:7, 473:21, 484:7,
487:23, 488:12,
491:10, 498:10,
501:3, 517:15, 549:3,
549:9, 550:9, 564:16,
572:13, 577:5, 590:5,
590:17, 590:20,
590:22, 591:1
  **reasonable** [5] -
418:10, 443:25,
466:13, 482:6, 556:6
  **reasons** [6] - 409:9,
430:14, 436:5,
588:20, 589:4, 590:3

619

**Reasons** [1] - 590:1
**rebroadcast** [1] - 479:18
**recalled** [1] - 498:7
**recalling** [1] - 498:17
**received** [1] - 504:5
**recent** [6] - 426:7, 427:16, 430:6, 470:12, 488:20
**recently** [8] - 470:13, 476:9, 485:21, 492:21, 522:14, 567:10, 567:20, 568:10
**recess** [1] - 472:5
**recognize** [4] - 477:21, 492:15, 505:13, 505:14
**recognized** [3] - 459:9, 491:18
**recognizes** [1] - 491:21
**recollection** [1] - 553:14
**record** [20] - 409:2, 429:5, 429:13, 460:8, 461:20, 462:11, 462:12, 463:5, 470:10, 472:8, 475:9, 500:2, 511:10, 512:9, 512:23, 538:4, 566:25, 576:7, 589:7
**refer** [2] - 428:22, 437:21
**reference** [2] - 518:25, 573:11
**referencing** [1] - 572:11
**referral** [1] - 562:15
**referrals** [1] - 518:8
**referred** [4] - 455:23, 545:21, 577:23, 591:5
**referring** [2] - 464:22, 540:15
**refers** [2] - 432:16, 541:11
**reflect** [1] - 430:2
**reflection** [1] - 581:20
**reflective** [1] - 592:14
**refresh** [1] - 473:22
**regard** [2] - 465:20, 484:1
**regarding** [9] - 438:21, 468:9, 482:12, 499:17, 505:1, 509:11, 518:8, 575:7, 594:22
**regardless** [1] -

458:1
**regular** [3] - 416:10, 504:15, 516:11
**rehabilitated** [1] - 465:24
**Rehl** [3] - 482:14, 509:13, 584:7
**REHL** [2] - 406:6, 407:8
**relate** [2] - 463:22, 585:14
**related** [17] - 425:13, 453:9, 463:11, 478:10, 478:12, 481:13, 483:10, 490:23, 517:2, 518:2, 519:25, 525:4, 526:19, 532:22, 560:16, 566:17, 571:21
**relates** [1] - 428:24
**relating** [5] - 422:3, 483:18, 511:11, 556:2, 585:18
**relation** [1] - 459:1
**relationship** [4] - 488:5, 488:6, 539:10, 559:7
**relative** - 513:24, 514:1
**release** [1] - 575:1
**released** [2] - 575:6, 575:8
**releases** [4] - 567:20, 580:7, 580:9, 587:3
**relevant** [3] - 463:22, 566:19, 580:8
**reluctant** [1] - 433:8
**remains** [1] - 464:17
**remarks** [1] - 443:15
**remember** [27] - 421:21, 459:10, 459:16, 477:11, 477:12, 479:19, 479:21, 491:25, 492:1, 493:8, 493:25, 496:10, 496:14, 496:25, 517:1, 518:25, 549:24, 553:2, 554:9, 554:12, 556:3, 557:12, 577:14, 577:17, 577:24, 581:7, 582:9
**remembered** [3] - 460:10, 485:12, 498:13
**remembering** [1] - 499:8
**remembers** [1] -

492:10
**remove** [8] - 410:3, 411:24, 414:9, 447:25, 449:5, 468:1, 468:22, 474:3
**render** [4] - 415:8, 416:19, 418:14, 568:20
**rendered** [2] - 581:15, 583:24
**rendering** [3] - 419:18, 556:14, 592:4
**report** [2] - 522:15, 574:16
**REPORTED** [1] - 407:20
**reported** [1] - 506:14
**REPORTER** [8] - 467:3, 471:6, 472:13, 472:16, 488:16, 529:25, 574:1, 595:17
**reporter** [6] - 462:4, 475:9, 496:8, 529:22, 542:7, 547:24
**Reporter** [2] - 407:20, 597:12
**reporter's** [2] - 542:8, 595:19
**reports** [1] - 440:11
**represent** [5] - 444:10, 462:7, 472:21, 501:4, 519:4
**representative** [2] - 473:11, 499:22
**Representatives** [1] - 414:6
**represented** [1] - 560:20
**representing** [1] - 432:7
**represents** [1] - 421:2
**reproductive** [1] - 571:3
**Republican** [1] - 563:1
**reputation** [1] - 593:9
**request** [6] - 500:5, 500:6, 502:9, 504:17, 563:16, 571:8
**required** [3] - 581:15, 583:25, 592:5
**requires** [1] - 445:16
**reschedule** [3] - 536:8, 536:11, 536:14
**rescheduled** [2] - 536:9, 536:10
**research** [1] - 592:19
**researched** [2] -

420:23, 590:2
**reserve** [1] - 594:10
**resilience** [2] - 528:11, 529:1
**resist** [2] - 590:1, 590:16
**resolution** [1] - 514:23
**resolve** [1] - 594:12
**respect** [8] - 437:4, 442:19, 442:22, 445:17, 568:1, 571:11, 571:20, 592:17
**respectful** [1] - 523:24
**respectfully** [1] - 523:23
**respond** [3] - 436:18, 466:12
**response** [8] - 424:14, 430:17, 454:15, 469:9, 574:20, 576:14, 576:15, 587:18
**rest** [2] - 459:15, 516:7
**restroom** [1] - 541:20
**result** [1] - 585:3
**retaliation** [1] - 592:3
**retired** [21] - 411:14, 413:4, 425:24, 442:8, 448:25, 460:6, 471:25, 491:6, 491:12, 495:9, 495:11, 495:19, 499:14, 512:2, 526:2, 529:14, 537:11, 543:18, 547:7, 561:3, 586:15
**return** [4] - 419:16, 581:18, 592:2
**reveal** [1] - 445:18
**rhetoric** [2] - 441:21, 441:22
**Rhodes** [11] - 475:23, 476:3, 478:7, 485:14, 485:15, 485:20, 486:4, 492:16, 492:18, 492:21, 496:20
**rights** [10] - 525:20, 549:22, 554:16, 559:21, 561:13, 564:12, 571:3, 577:24, 578:11, 578:24
**rigid** [1] - 575:20
**rioters** [1] - 508:5

**rioting** [1] - 498:24
**riots** [3] - 484:21, 498:7, 498:13
**risks** [1] - 527:16
**Road** [1] - 407:8
**Roberts** [1] - 500:3
**robust** [1] - 528:14
**robustly** [1] - 527:13
**role** [4] - 453:24, 523:16, 585:5, 585:7
**room** [5] - 473:17, 502:10, 523:11, 542:24, 595:11
**Room** [1] - 407:22
**roughly** [3] - 451:22, 451:23, 549:25
**round** [1] - 579:4
**routinely** [1] - 413:25
**rowdy** [1] - 416:6
**rule** [4] - 445:1, 446:1, 577:10, 594:17
**ruled** [1] - 460:11
**ruling** [3] - 463:25, 594:22, 594:24
**run** [3] - 505:7, 556:12, 562:14
**running** [1] - 567:2

## S

**SABINO** [1] - 407:13
**Sabino** [3] - 426:13, 471:10, 572:3
**sadly** [2] - 466:1
**safely** [1] - 433:3
**safety** [4] - 452:13, 559:21, 575:19, 576:4
**sake** [1] - 542:8
**sandwich** [2] - 503:1, 504:5
**sarcastic** [1] - 547:13
**save** [2] - 589:2, 592:25
**saw** [11] - 421:20, 438:20, 454:21, 454:22, 478:24, 508:4, 518:8, 531:1, 552:23, 553:7, 590:25
**scale** [2] - 433:25, 561:11
**scary** [3] - 435:21, 435:22, 436:8
**scenarios** [2] - 551:15, 551:16
**scenes** [1] - 566:16
**schedule** [1] - 416:10
**scheme** - 493:12

**school** [2] - 422:13, 450:24
**science** [1] - 528:20
**scrolling** [1] - 518:6
**seal** [1] - 573:23
**searched** [1] - 576:9
**searching** [3] - 553:16, 576:2, 577:8
**seat** [4] - 465:18, 465:23, 495:6, 571:14
**seated** [1] - 465:25
**Second** [1] - 525:20
**second** [9] - 422:15, 447:14, 467:22, 468:25, 480:8, 561:2, 565:25, 566:20, 595:14
**seconds** [2] - 587:10, 594:4
**secretary** [2] - 526:11, 563:4
**sector** [2] - 528:12, 529:3
**security** [4] - 526:7, 528:7, 528:8, 528:25
**seditions** [2] - 567:12, 567:15
**see** [51] - 409:17, 412:22, 416:11, 425:17, 426:2, 434:14, 434:23, 443:1, 443:2, 443:12, 444:2, 444:14, 447:5, 450:10, 450:16, 453:14, 453:17, 457:25, 458:3, 469:1, 470:24, 475:13, 479:8, 479:9, 479:25, 481:5, 483:23, 491:10, 507:17, 507:18, 509:3, 511:25, 514:6, 516:14, 518:5, 525:15, 526:15, 531:23, 535:1, 536:6, 540:5, 540:20, 540:22, 551:24, 561:23, 564:20, 569:4, 569:9, 570:16, 594:4, 596:10
**seeing** [5] - 477:12, 479:20, 479:21, 481:11, 531:17
**seek** [1] - 492:12
**seeking** [1] - 468:17
**seem** [6] - 420:20, 433:4, 524:15, 553:15, 567:25, 588:3
**sees** [1] - 492:11
**segment** [1] - 432:19

**selected** [2] - 416:20, 579:1
**Selection** [1] - 408:3
**selection** [1] - 590:9
**semantics** [1] - 457:9
**senior** [1] - 563:3
**sense** [16] - 409:10, 415:22, 415:23, 421:1, 436:7, 441:1, 454:24, 479:7, 479:8, 519:3, 531:8, 531:16, 552:21, 555:10, 557:23, 577:8
**sensitive** [2] - 429:3, 588:13
**sentence** [1] - 420:7
**sentencing** [1] - 467:12
**separate** [7] - 417:24, 419:1, 424:2, 441:23, 469:18, 470:1, 486:6
**separating** [1] - 593:20
**series** [1] - 466:14
**serious** [1] - 569:8
**seriously** [1] - 470:14
**servant** [2] - 528:1, 528:2
**serve** [15] - 411:23, 442:7, 450:12, 458:13, 471:21, 475:16, 514:12, 515:14, 515:21, 541:7, 542:5, 543:14, 547:3, 568:12, 575:22
**served** [6] - 415:6, 449:12, 504:3, 539:16, 540:4, 549:6
**Service** [2] - 499:22, 500:4
**service** [26] - 415:8, 415:13, 415:15, 416:19, 421:25, 450:5, 450:11, 460:2, 471:21, 475:13, 475:15, 477:15, 477:18, 507:13, 515:2, 515:17, 516:10, 523:16, 540:5, 540:8, 540:9, 541:6, 543:1, 547:2, 581:14
**Services** [1] - 563:4
**serving** [2] - 448:4, 514:16
**SESSION** [1] - 406:11

**set** [53] - 416:18, 417:5, 417:11, 418:4, 418:18, 419:9, 420:4, 422:1, 427:14, 427:17, 429:9, 437:5, 437:15, 441:15, 453:4, 454:8, 454:17, 456:11, 456:22, 466:11, 470:5, 470:25, 478:17, 479:1, 486:7, 502:24, 508:15, 508:17, 516:22, 517:16, 518:17, 520:10, 525:9, 531:10, 533:12, 533:14, 534:10, 534:12, 534:23, 535:2, 544:8, 546:7, 550:10, 552:16, 552:18, 555:18, 555:23, 570:11, 570:22, 578:25, 590:24, 591:1
**sets** [1] - 425:19
**setting** [4] - 482:1, 503:14, 546:12, 546:13
**Shakes** [2] - 411:7, 459:23
**Shalala** [2] - 563:3, 563:14
**shame** [1] - 538:7
**shameful** [2] - 575:11
**shamelessly** [1] - 589:9
**Shannon** [1] - 467:11
**share** [5] - 430:11, 437:13, 451:3, 523:24, 543:4
**sharing** [1] - 593:6
**sheet** [3] - 439:22, 489:19, 539:3
**ship** [1] - 505:7
**shirt** [2] - 437:24, 437:25
**shootings** [1] - 450:24
**shortcut** [1] - 504:25
**shortcuts** [2] - 505:1, 505:19
**shortened** [1] - 557:11
**shot** [1] - 508:6
**shout** [1] - 559:25
**show** [12] - 425:11, 446:18, 446:22, 447:3, 458:10, 465:24, 512:12,

538:6, 538:11, 579:11, 579:12, 592:21
**showing** [1] - 455:6
**shows** [1] - 416:10
**siblings** [1] - 410:24
**sic** [3] - 457:19, 462:1, 475:20
**sic]** [1] - 541:4
**side** [21] - 409:18, 420:19, 439:3, 440:21, 441:11, 442:12, 443:3, 443:8, 443:10, 443:12, 444:8, 445:12, 446:1, 448:19, 458:1, 583:8, 583:13, 592:17, 592:23
**sidebar** [3] - 498:5, 534:1, 572:9
**sides** [1] - 444:15
**significant** [1] - 432:1
**signs** [1] - 590:17
**similar** [9] - 418:17, 421:16, 423:10, 426:7, 458:18, 489:1, 510:1, 524:5, 576:15
**simple** [1] - 450:14
**simply** [1] - 433:1
**sit** [3] - 511:25, 593:14, 594:4
**site** [1] - 569:4
**sites** [1] - 580:12
**sitting** [5] - 420:3, 541:23, 575:18, 589:12, 591:16
**situation** [5] - 424:16, 437:17, 456:22, 488:3, 488:22
**six** [1] - 514:10
**Sixth** [1] - 407:18
**skipping** [2] - 429:25, 486:23
**sleeper** [1] - 587:12
**slightly** [2] - 443:16, 487:23
**small** [2] - 563:12, 567:19
**Smith** [4] - 466:1, 471:14, 570:25, 595:21
**SMITH** [36] - 406:21, 406:21, 407:5, 460:12, 460:21, 461:4, 461:8, 461:14, 461:21, 464:21, 465:13, 465:16, 465:21, 466:9, 471:13, 471:16,

526:19, 534:9, 534:21, 565:10, 565:12, 565:16, 565:24, 566:6, 566:10, 566:15, 567:8, 567:15, 568:3, 568:9, 568:24, 569:16, 570:3, 587:17, 588:15, 595:21
**snippets** [1] - 552:17
**so..** [1] - 422:19
**social** [4] - 556:11, 565:5, 581:16, 592:3
**society** [1] - 578:4
**soda** [1] - 542:22
**soldiers** [1] - 455:23
**solely** [1] - 555:19
**solidly** [1] - 520:22
**someone** [27] - 409:6, 423:1, 423:2, 436:12, 450:18, 453:9, 462:25, 464:19, 474:18, 490:14, 501:15, 501:16, 521:19, 522:11, 534:7, 552:3, 558:17, 569:11, 582:5, 582:6, 589:12, 589:22, 590:13, 590:22, 590:25, 593:13, 594:9
**sometimes** [3] - 515:25, 563:24, 588:9
**somewhat** [2] - 491:20, 576:15
**somewhere** [2] - 483:15, 516:10
**son** [1] - 539:16
**soon** [1] - 574:11
**sophisticated** [1] - 444:6
**sorry** [20] - 416:25, 428:15, 429:15, 431:19, 448:9, 455:20, 487:18, 488:16, 488:17, 494:16, 498:1, 498:6, 503:5, 503:25, 515:8, 540:17, 543:4, 548:8, 558:15, 572:18
**sort** [31] - 413:24, 419:24, 421:2, 428:15, 429:25, 454:10, 455:1, 458:9, 458:17, 508:2, 514:23, 516:16, 516:17, 517:5, 519:3, 550:10, 551:13, 552:24, 553:25,

554:13, 579:10, 579:19, 579:25, 580:23, 585:9, 585:12, 586:1, 588:13, 591:7, 591:8

**sorts** [2] - 545:14, 545:15

**sounds** [12] - 410:7, 413:15, 420:1, 456:9, 501:14, 501:24, 515:8, 515:10, 523:15, 525:8, 543:7, 581:5

**source** [1] - 428:6

**Southern** [5] - 440:6, 440:23, 442:18, 445:21, 590:2

**space** [1] - 563:21

**spaces** [1] - 468:23

**Sparf** [3] - 467:1, 467:3, 467:5

**SPARF** [1] - 467:4

**speaking** [5] - 521:19, 536:4, 595:17, 595:19, 595:20

**special** [1] - 448:15

**specialized** [3] - 570:20, 584:24, 585:12

**specific** [13] - 445:19, 446:7, 460:15, 478:12, 481:14, 482:13, 492:4, 496:14, 520:5, 532:13, 553:3, 554:6, 577:20

**specifically** [8] - 420:24, 426:17, 426:18, 439:4, 440:6, 440:8, 502:25, 565:9

**specificity** [3] - 523:3, 586:4, 586:7

**specifics** [7] - 446:13, 492:10, 493:17, 496:24, 554:9, 577:17

**specify** [1] - 482:21

**speculated** [1] - 493:12

**speed** [1] - 504:24

**spend** [1] - 455:5

**spook** [1] - 569:11

**sports** [3] - 507:22, 508:8, 508:9

**Springdale** [1] - 422:14

**spun** [1] - 467:8

**staffer** [4] - 415:13, 415:16, 582:13,

582:16

**stages** [1] - 587:2

**stairs** [1] - 508:5

**stakeholders** [1] - 528:13

**stance** [2] - 566:24, 569:7

**stand** [20] - 421:3, 424:9, 424:10, 425:19, 436:15, 480:18, 485:1, 486:18, 510:19, 510:20, 518:24, 519:3, 519:14, 521:13, 554:13, 554:14, 554:19, 580:21, 580:23, 581:4

**standard** [1] - 466:14

**standards** [1] - 515:22

**standing** [2] - 435:20, 506:9

**stands** [5] - 421:2, 421:9, 440:16, 520:20, 557:24

**Stanford** [1] - 563:19

**Stanford-educated** [1] - 563:19

**start** [19] - 409:5, 409:12, 409:20, 410:6, 412:4, 413:13, 436:24, 449:10, 451:11, 458:23, 468:5, 473:3, 513:21, 514:24, 515:5, 530:21, 544:2, 596:11

**started** [1] - 488:19, 510:10, 582:1

**starting** [3] - 432:12, 442:15, 596:10

**State** [1] - 427:4

**state** [2] - 454:11, 454:13

**statement** [13] - 440:9, 518:22, 519:22, 520:16, 575:6, 575:8, 575:13, 575:14, 581:4, 587:3, 589:3, 589:7, 589:16

**statements** [2] - 566:25, 580:25

**states** [1] - 443:22

**STATES** [4] - 406:1, 406:3, 406:12, 406:17

**States** [18] - 407:21, 409:2, 414:21, 463:9, 467:1, 467:4, 467:11, 469:12, 470:14, 470:20, 471:1, 472:8, 472:17, 475:1, 475:2,

539:20, 549:3, 597:13

**stay** [1] - 506:5

**stenographic** [1] - 597:5

**step** [3] - 410:9, 417:16, 514:11

**stepfather** [1] - 488:10

**steps** [1] - 529:13

**Steve** [1] - 442:22

**STEVEN** [1] - 407:16

**Steven** [1] - 471:8

**Stewart** [9] - 475:23, 476:3, 476:17, 476:20, 476:21, 477:1, 485:12, 485:14, 551:25

**stick** [1] - 508:8

**stiff** [1] - 575:20

**still** [16] - 415:4, 417:9, 419:16, 452:6, 456:14, 479:5, 479:6, 508:20, 508:25, 509:14, 509:23, 533:15, 533:20, 550:10, 555:24, 594:12

**stolen** [2] - 423:4, 522:14

**stood** [2] - 439:22, 443:7

**stop** [2] - 595:7, 595:13

**stopped** [4] - 508:7, 510:4, 510:15, 510:16

**stories** [3] - 438:18, 441:2, 507:21

**stormed** [1] - 575:9

**story** [1] - 479:13

**stranger** [1] - 432:12

**Street** [6] - 406:18, 407:3, 407:5, 407:11, 407:14, 524:14

**street** [1] - 510:11

**stress** [1] - 577:4

**stretches** [1] - 411:3

**strike** [11] - 428:2, 430:12, 442:10, 445:14, 446:13, 460:14, 461:6, 464:18, 465:6, 465:7, 587:14

**strong** [38] - 416:24, 416:25, 417:8, 417:13, 418:14, 424:23, 424:25, 425:12, 429:23, 444:1, 445:2, 445:3, 457:12, 457:16, 457:18, 458:4,

463:16, 463:17, 490:1, 490:22, 510:25, 511:4, 511:11, 511:18, 521:1, 524:20, 525:3, 525:10, 525:19, 532:18, 545:1, 546:10, 551:13, 555:17, 558:1, 560:8, 560:17, 583:17

**strongly** [3] - 425:5, 533:10, 537:17

**struck** [15] - 436:16, 444:11, 446:2, 460:8, 461:11, 463:3, 463:6, 464:13, 466:15, 491:10, 512:24, 538:16, 538:17, 547:9, 594:9

**struggle** [1] - 469:10

**students** [1] - 450:23

**studied** [1] - 434:24

**stuff** [5] - 479:22, 531:24, 557:2, 578:22, 580:3

**subject** [3] - 451:3, 451:4, 571:2

**substantial** [1] - 588:22

**sudden** [2] - 569:13, 569:14

**suffer** [1] - 472:25

**suffered** [1] - 448:13

**sugar** [2] - 536:5, 536:20

**suggest** [3] - 432:15, 507:14, 562:3

**suggested** [2] - 450:4, 506:12

**suggesting** [2] - 415:20, 555:15

**suggestion** [2] - 431:6, 593:3

**suggestions** [1] - 593:25

**suggests** [4] - 415:2, 417:10, 475:5, 475:16

**suitable** [1] - 445:5

**Suite** [2] - 406:22, 407:12

**summarize** [1] - 564:6

**summer** [7] - 444:21, 484:22, 498:8, 498:13, 550:3, 550:4, 566:4

**super** [1] - 414:12

**Superior** [1] - 516:12

**supervisor** [3] - 495:18, 495:21,

495:22

**supplemental** [1] - 504:17

**supply** [1] - 527:18

**support** [6] - 460:17, 460:21, 560:1, 579:10, 591:20, 592:20

**supporting** [1] - 550:7

**supportive** [4] - 421:8, 424:17, 424:18, 424:20

**suppose** [1] - 564:23

**supremacist** [3] - 432:23, 567:1, 569:3

**supremacists** [2] - 575:9, 587:4

**Supreme** [2] - 437:9, 467:10

**surrounding** [6] - 461:2, 483:14, 496:11, 511:19, 585:19, 585:21

**suspect** [1] - 434:13

**suspended** [1] - 427:2

**switch** [1] - 529:7

**switching** [4] - 528:22, 529:6, 529:23, 530:1

**sworn** [1] - 595:3

**sympathized** [1] - 440:21

**system** [4] - 515:18, 516:3, 527:17, 591:13

---

# T

**T-shirt** [1] - 437:24

**tag** [1] - 429:21

**tag-team** [1] - 429:21

**TARRIO** [2] - 406:6, 407:11

**Tarrio** [25] - 426:14, 426:17, 459:11, 461:18, 463:7, 471:11, 482:13, 482:22, 484:7, 491:11, 492:18, 493:4, 493:18, 494:17, 496:22, 509:12, 526:5, 562:6, 564:15, 564:17, 565:3, 573:2, 575:4, 584:7, 586:18

**Tarrio's** [2] - 428:8, 566:20

**task** [1] - 506:5

622

**team** [10] - 429:21, 472:12, 472:20, 528:7, 579:10, 585:8, 587:22, 587:23, 588:4, 592:20

**team's** [1] - 580:1

**technical** [5] - 456:20, 526:12, 528:12, 579:10, 592:20

**technicality** [1] - 456:21

**technician** [1] - 495:19

**technicians** [1] - 495:23

**technology** [5] - 439:3, 439:4, 569:16, 579:11, 592:21

**television** [2] - 479:17, 483:17

**temperature** [2] - 579:25, 580:7

**temperatures** [1] - 580:4

**ten** [2] - 436:23, 472:3

**ten-minute** [1] - 472:3

**tend** [1] - 413:19

**terminology** [1] - 440:5

**terms** [5] - 528:9, 561:14, 561:19, 577:12, 579:17

**terrible** [2] - 451:24, 470:25

**terrorism** [1] - 442:24

**terrorist** [1] - 440:22

**terrorists** [1] - 442:17

**testifies** [1] - 494:9

**testimony** [1] - 457:5

**textbook** [1] - 577:9

**THE** [807] - 406:1, 406:12, 406:15, 406:18, 406:21, 407:2, 407:8, 407:10, 407:16, 409:1, 409:4, 409:21, 409:22, 409:23, 410:1, 410:3, 410:6, 410:15, 410:18, 410:22, 411:2, 411:6, 411:8, 411:11, 411:16, 411:18, 411:19, 411:22, 412:4, 412:8, 412:10, 412:12, 412:15, 412:18,

413:1, 413:6, 413:10, 413:13, 413:21, 414:7, 414:9, 414:12, 414:15, 414:19, 415:6, 415:10, 415:17, 416:12, 416:23, 417:16, 418:2, 418:17, 419:4, 419:8, 419:13, 419:23, 420:9, 420:12, 421:1, 421:10, 421:13, 421:23, 422:5, 422:10, 422:20, 422:23, 423:1, 423:5, 423:9, 423:19, 424:1, 424:5, 424:8, 424:21, 425:7, 425:17, 425:21, 425:22, 426:1, 426:10, 426:12, 426:20, 427:11, 427:22, 428:3, 428:14, 428:21, 429:5, 429:15, 429:18, 429:20, 430:5, 430:20, 431:18, 432:18, 432:22, 432:24, 433:6, 434:8, 435:2, 435:7, 436:17, 438:1, 438:7, 438:10, 438:13, 438:23, 438:25, 439:6, 439:12, 439:14, 439:17, 439:24, 440:24, 441:13, 442:2, 442:5, 442:20, 443:4, 443:14, 445:6, 446:12, 446:16, 446:19, 446:20, 446:21, 446:22, 446:23, 446:25, 447:1, 447:4, 447:10, 447:11, 447:13, 447:19, 447:22, 447:25, 448:3, 448:9, 448:14, 448:16, 448:19, 448:21, 449:2, 449:5, 449:10, 449:15, 449:18, 449:23, 449:25, 450:10, 450:16, 450:21, 450:25, 451:2, 451:6, 451:10, 451:14, 451:20, 451:22, 452:1, 452:4, 452:7, 452:9, 452:12, 452:16, 452:20, 452:23, 453:1, 453:11, 453:16, 454:3, 454:5, 454:17,

454:20, 455:10, 455:15, 455:20, 456:1, 456:4, 456:7, 456:20, 457:1, 457:3, 457:10, 457:20, 457:22, 458:2, 458:8, 458:16, 459:1, 459:6, 459:14, 459:19, 459:24, 460:4, 460:8, 460:19, 460:22, 461:7, 461:13, 461:15, 461:22, 462:2, 462:11, 462:20, 462:23, 463:24, 464:4, 464:6, 464:23, 465:11, 465:14, 465:18, 466:1, 466:17, 467:3, 467:15, 467:21, 468:1, 468:5, 468:18, 468:21, 468:24, 469:17, 469:25, 470:5, 470:9, 470:15, 471:3, 471:6, 471:14, 471:17, 471:19, 471:23, 472:2, 472:7, 472:10, 472:13, 472:16, 473:10, 473:19, 473:24, 474:2, 474:6, 474:12, 474:17, 474:20, 474:23, 475:8, 475:12, 475:15, 475:19, 476:2, 476:5, 476:7, 476:10, 476:12, 476:15, 476:20, 476:22, 476:24, 477:4, 477:7, 477:11, 477:14, 477:17, 477:20, 477:24, 478:3, 478:6, 478:21, 479:7, 479:12, 479:19, 479:25, 480:4, 480:15, 480:21, 480:25, 481:5, 481:8, 481:15, 481:21, 481:24, 482:4, 482:11, 482:20, 482:23, 483:2, 483:6, 483:9, 483:14, 483:18, 483:23, 484:5, 484:13, 484:23, 484:25, 485:4, 485:6, 485:11, 485:15, 485:22, 486:1, 486:12, 486:16, 486:23, 487:4, 487:7, 487:10, 487:15, 487:18, 487:22, 488:1, 488:4,

488:9, 488:11, 488:16, 488:18, 488:23, 488:25, 489:6, 489:10, 489:14, 489:17, 489:19, 489:21, 490:6, 490:10, 490:13, 490:17, 491:1, 491:8, 491:14, 491:24, 492:23, 493:7, 493:11, 493:15, 493:21, 493:24, 494:11, 494:13, 494:20, 494:23, 495:2, 495:6, 495:10, 495:14, 495:16, 495:21, 495:24, 496:4, 496:7, 496:15, 496:24, 497:3, 497:5, 497:8, 497:14, 497:19, 497:22, 498:2, 498:9, 498:19, 498:22, 499:5, 499:7, 499:11, 499:16, 499:21, 499:24, 499:25, 500:3, 500:5, 500:11, 500:14, 500:15, 500:22, 500:25, 501:2, 501:13, 501:19, 501:22, 502:2, 502:5, 502:12, 502:15, 502:17, 502:18, 502:22, 503:5, 503:7, 503:9, 503:13, 503:17, 503:19, 503:20, 503:21, 503:22, 504:9, 504:19, 504:22, 504:23, 505:4, 505:10, 505:16, 506:1, 506:7, 506:15, 506:16, 506:18, 506:21, 506:25, 507:4, 507:8, 507:17, 507:25, 508:8, 508:10, 508:13, 508:23, 509:2, 509:7, 509:16, 509:21, 509:25, 510:5, 510:7, 510:13, 510:15, 510:18, 510:24, 511:9, 511:15, 511:23, 512:4, 512:9, 512:14, 512:15, 512:16, 512:17, 512:18, 512:19, 512:20, 512:22, 512:23, 512:25, 513:1, 513:2, 513:4, 513:5, 513:7,

513:9, 513:10, 513:11, 513:12, 513:13, 513:16, 513:21, 513:25, 514:2, 514:5, 514:17, 514:21, 514:25, 515:4, 515:7, 515:10, 515:16, 515:23, 516:9, 516:13, 517:9, 517:14, 517:21, 518:1, 518:5, 518:10, 518:13, 519:2, 519:9, 519:13, 519:17, 519:23, 520:5, 520:8, 520:13, 520:19, 520:25, 521:4, 521:12, 521:17, 521:23, 522:2, 522:6, 522:9, 522:16, 522:19, 522:23, 523:1, 523:15, 523:18, 524:2, 524:10, 524:17, 524:24, 525:7, 525:14, 525:21, 526:4, 526:9, 526:17, 526:21, 527:2, 527:7, 527:9, 527:20, 527:24, 528:2, 528:8, 528:14, 528:17, 528:21, 529:2, 529:5, 529:9, 529:13, 529:19, 529:21, 529:25, 530:3, 530:5, 530:6, 530:9, 530:11, 530:15, 530:20, 531:2, 531:6, 532:1, 532:5, 532:7, 532:9, 532:12, 532:17, 533:1, 533:3, 533:7, 533:10, 533:12, 533:16, 533:21, 533:24, 534:14, 535:5, 535:10, 535:18, 535:24, 536:2, 536:7, 536:13, 536:21, 536:25, 537:5, 537:7, 537:13, 537:25, 538:1, 538:3, 538:4, 538:7, 538:15, 538:16, 538:17, 538:18, 538:22, 538:25, 539:2, 539:9, 539:12, 539:15, 539:18, 540:4, 540:17, 540:21, 540:23, 541:1, 541:5, 541:10, 541:13, 541:16, 541:22, 541:25, 542:3, 542:16, 542:18,

623

542:21, 542:25,
543:4, 543:10,
543:13, 543:17,
543:22, 543:24,
544:2, 544:17,
544:20, 544:24,
545:10, 545:25,
546:4, 546:19,
546:22, 546:24,
547:1, 547:9, 547:11,
547:14, 547:15,
547:18, 547:22,
548:1, 548:9, 548:12,
548:17, 548:21,
549:1, 549:11,
549:16, 549:19,
549:23, 550:2, 550:5,
550:13, 550:20,
550:23, 551:2, 551:4,
551:8, 551:10,
551:12, 551:21,
551:24, 552:8,
552:12, 553:2, 553:5,
553:14, 553:20,
553:23, 554:2, 554:5,
554:11, 554:18,
554:22, 555:1, 555:7,
555:10, 555:14,
556:1, 556:4, 556:8,
556:20, 556:25,
557:8, 557:15,
557:18, 557:21,
557:23, 558:1, 558:6,
558:10, 558:16,
558:20, 558:22,
558:24, 559:2, 559:7,
559:11, 559:16,
559:23, 560:5,
560:13, 560:22,
561:24, 562:2,
562:23, 563:9,
563:15, 563:23,
564:6, 565:9, 565:11,
565:15, 565:18,
565:22, 566:3,
566:13, 567:5,
567:14, 567:23,
568:17, 569:9,
569:21, 570:18,
571:5, 571:17,
571:19, 572:6,
572:11, 572:16,
572:21, 573:4, 573:9,
573:21, 573:25,
574:1, 574:3, 574:7,
574:9, 574:11,
574:14, 574:16,
574:17, 574:18,
574:23, 575:15,
575:23, 576:7,
576:19, 576:21,

576:23, 577:1,
577:16, 577:20,
577:23, 578:2, 578:7,
578:10, 578:15,
578:18, 579:3,
579:12, 579:14,
579:16, 579:22,
580:3, 580:9, 580:13,
580:16, 580:20,
581:3, 581:8, 581:10,
582:2, 582:4, 582:9,
582:12, 582:16,
582:18, 582:20,
582:24, 583:2, 583:4,
583:6, 583:10,
583:15, 583:19,
584:2, 584:14,
584:18, 584:23,
585:3, 585:9, 585:12,
585:25, 586:5,
586:11, 586:17,
587:15, 588:6,
588:16, 588:23,
588:25, 589:21,
590:7, 590:9, 590:21,
591:4, 591:14,
591:21, 593:12,
593:16, 593:19,
594:14, 594:15,
594:25, 595:9,
595:12, 595:17,
595:18, 595:25,
596:2, 596:8, 596:10
**themselves** [1] -
443:2
**then-President** [1] -
518:23
**theory** [1] - 436:9
**Thereupon** [35] -
409:24, 411:14,
411:20, 413:4, 413:8,
425:24, 438:8, 442:8,
447:20, 448:25,
449:3, 460:6, 467:19,
471:25, 472:5,
473:25, 491:6, 495:4,
499:14, 506:23,
512:2, 513:14, 526:2,
527:5, 529:14, 530:7,
537:11, 538:20,
543:18, 543:20,
547:7, 547:16, 561:3,
576:24, 586:15
**they've** [12] - 418:23,
437:13, 440:19,
455:23, 484:19,
520:21, 524:15,
536:17, 544:7,
552:17, 562:15,
562:17

**thinking** [5] - 476:22,
493:19, 518:2,
569:13, 589:13
**thinks** [2] - 427:20,
444:8
**third** [1] - 534:13
**thoughtful** [1] -
592:11
**thoughtfully** [1] -
592:15
**three** [11] - 432:8,
451:25, 452:10,
459:10, 473:16,
501:5, 541:24,
542:15, 542:17,
543:9, 565:10
**three-fourths** [1] -
451:25
**three-quarters** [1] -
452:10
**throughout** [1] -
575:19
**thugs** [1] - 436:1
**tie** [1] - 438:14
**ties** [7] - 549:4,
549:7, 571:11,
571:21, 571:24,
573:10, 573:14
**timeline** [1] - 410:14
**timing** [1] - 566:10
**TIMOTHY** [1] -
406:12
**today** [29] - 420:3,
446:18, 446:22,
447:5, 456:14, 505:5,
505:22, 507:5,
509:19, 509:23,
512:12, 513:2, 513:6,
517:15, 517:16,
525:25, 538:6,
538:11, 538:23,
541:20, 543:24,
547:5, 551:18,
555:24, 586:14,
595:13, 595:24
**together** [3] -
505:17, 536:12, 553:6
**tomorrow** [10] -
501:24, 574:15,
594:11, 594:12,
594:14, 594:16,
594:18, 595:7, 596:9,
596:10
**tonight** [1] - 502:8
**took** [4] - 452:22,
499:8, 528:10, 542:8
**top** [3] - 459:9,
516:17, 550:25
**topic** [2] - 429:3,
433:5

**topics** [1] - 586:8
**total** [1] - 596:6
**totally** [1] - 486:5
**touch** [2] - 452:20,
551:21
**tough** [1] - 588:6
**toward** [4] - 484:10,
511:7, 583:12, 591:20
**towards** [4] - 436:13,
517:7, 524:21, 525:19
**trade** [1] - 528:24
**traditionally** [1] -
561:19
**train** [1] - 532:5
**training** [7] - 531:20,
532:4, 532:6, 532:7,
532:10, 532:11
**TRANSCRIPT** [1] -
406:11
**transcript** [5] -
430:2, 460:23,
573:24, 597:5, 597:6
**transmission** [1] -
526:11
**traveling** [2] - 513:3,
513:9
**trays** [2] - 502:24,
503:3
**treated** [3] - 589:10,
591:17, 591:18
**treatment** [1] - 589:8
**trial** [25] - 432:1,
432:5, 433:4, 434:1,
434:9, 435:14,
435:15, 443:2, 443:7,
444:20, 460:11,
466:20, 476:9,
492:10, 504:11,
504:18, 537:18,
542:5, 544:22,
551:19, 558:3, 579:1,
581:22, 593:22
**TRIAL** [1] - 406:11
**trials** [2] - 435:13,
503:9
**trick** [1] - 556:25
**tried** [3] - 485:20,
574:22, 592:10
**trigger** [1] - 492:13
**triggering** [1] -
463:19
**trouble** [4] - 480:14,
481:9, 482:1, 546:12
**troubling** [1] - 589:4
**true** [6] - 509:23,
560:3, 577:19,
588:15, 597:4, 597:5
**Trump** [4] - 460:24,
518:23, 575:11
**Trump's** [1] - 562:15

**truth** [2] - 577:6,
577:10
**truthful** [2] - 587:5,
593:5
**try** [12] - 417:24,
438:16, 442:13,
453:14, 456:16,
468:15, 505:18,
505:24, 506:5, 544:6,
589:1
**trying** [12] - 424:11,
444:9, 452:19,
498:18, 504:13,
504:24, 523:14,
551:12, 563:21,
574:24, 580:13,
588:10
**turn** [2] - 410:23,
551:10
**turned** [3] - 452:16,
452:18, 524:14
**TV** [6] - 416:2,
416:11, 491:22,
491:23, 544:16, 546:6
**tweets** [1] - 562:15
**twice** [2] - 429:22,
536:17
**two** [21] - 413:20,
428:5, 435:13,
436:11, 440:12,
441:1, 450:14,
466:18, 469:18,
491:3, 496:17, 508:1,
521:9, 542:10,
542:11, 542:12,
543:8, 548:14,
587:24, 596:7
**Tylenol** [4] - 472:23,
472:24, 500:7, 500:19
**type** [6] - 441:6,
441:7, 495:16, 521:9,
528:18, 594:1
**types** [4] - 458:18,
523:8, 536:3, 539:12
**typically** [1] - 503:9

# U

**U.K** [1] - 413:15
**U.S** [18] - 499:24,
500:3, 500:11,
500:15, 500:25,
501:19, 502:5,
502:17, 502:22,
503:7, 503:13,
503:19, 503:21,
504:22, 514:8,
517:12, 526:7, 575:9
**ultimately** [2] -

624

590:21, 591:4
**unavoidable** [1] - 432:6
**uncle** [2] - 582:11, 582:12
**unclear** [1] - 523:7
**under** [4] - 457:5, 500:8, 533:5, 577:5
**understood** [6] - 473:19, 518:1, 524:1, 535:10, 561:7
**unfairness** [1] - 591:12
**unfortunately** [2] - 480:25, 543:3
**UNIDENTIFIED** [1] - 595:16
**united** [1] - 407:21
**UNITED** [4] - 406:1, 406:3, 406:12, 406:17
**United** [17] - 409:2, 414:21, 463:9, 467:1, 467:4, 467:11, 469:12, 470:14, 470:20, 471:1, 472:8, 472:17, 475:1, 475:2, 539:20, 549:2, 597:13
**unites** [1] - 432:13
**University** [1] - 528:20
**unlawful** [3] - 570:4, 570:7
**unlawfully** [5] - 425:8, 490:18, 511:16, 524:25, 560:14
**unless** [5] - 453:13, 486:13, 500:22, 534:16, 588:3
**unsee** [1] - 591:1
**up** [31] - 410:10, 410:13, 418:23, 420:17, 420:25, 428:3, 435:25, 436:12, 446:22, 447:3, 456:5, 460:2, 463:4, 473:3, 475:8, 503:2, 518:6, 518:12, 530:21, 538:11, 553:9, 559:22, 563:21, 564:3, 564:10, 564:11, 565:16, 572:3, 574:8, 574:22, 592:9
**Urban** [1] - 435:25
**urban** [2] - 436:1
**USAID** [1] - 449:24
**useful** [1] - 431:15
**uses** [3] - 440:7, 579:11, 592:21

**usual** [1] - 504:7
**utilities** [2] - 527:17, 528:12

## V

**vague** [2] - 589:23, 590:24
**vaguely** [1] - 493:7
**value** [1] - 524:16
**values** [1] - 520:18
**variety** [1] - 409:9
**various** [3] - 420:17, 461:17, 576:12
**varying** [1] - 416:13
**veracity** [1] - 568:25
**verdict** [4] - 416:19, 418:15, 431:14, 486:4, 507:11, 507:14, 540:6, 540:11, 540:18, 540:19, 540:24, 556:15, 568:20, 581:15, 583:24, 592:4
**verdicts** [3] - 540:24, 541:1, 541:3
**Verizon** [4] - 472:18, 495:12, 495:14, 495:17
**version** [2] - 581:10, 581:11
**versus** [8] - 409:3, 440:16, 467:1, 467:4, 467:11, 472:9, 479:13, 591:17
**vest** [1] - 437:23
**victim** [4] - 423:2, 487:12, 522:10, 522:15
**victims** [1] - 450:24
**video** [6] - 454:22, 492:11, 492:17, 497:1, 544:16, 579:20
**videos** [4] - 455:4, 530:23, 552:14, 552:23
**view** [21] - 441:12, 453:25, 464:18, 479:5, 479:6, 508:20, 510:19, 523:21, 523:24, 544:13, 546:10, 555:23, 556:22, 566:10, 567:23, 576:10, 580:23, 580:24, 580:25, 590:15, 593:21
**viewed** [1] - 566:13
**viewpoints** [1] -

523:11
**views** [23] - 429:23, 430:11, 451:3, 465:6, 466:3, 466:7, 523:8, 525:10, 545:4, 550:6, 553:19, 553:21, 553:23, 554:1, 555:16, 563:11, 564:22, 565:1, 573:13, 577:19, 578:20
**violated** [1] - 417:22
**violates** [1] - 431:23
**violence** [7] - 470:19, 484:20, 487:25, 488:2, 488:22, 557:13, 566:16
**violent** [2] - 436:2, 589:9
**violently** [1] - 575:10
**Virginia** [1] - 441:4
**virtue** [2] - 414:24, 450:3
**vision** [1] - 444:13
**visits** [1] - 542:17
**voice** [1] - 559:22
**voir** [1] - 435:24
**voracious** [2] - 431:7, 431:13
**vs** [1] - 406:5

## W

**wait** [7] - 496:4, 496:7, 511:24, 525:23, 537:9, 577:1, 594:4
**waited** [1] - 592:10
**waiting** [7] - 491:3, 506:4, 514:22, 536:16, 537:18, 542:23, 587:8
**walk** [5] - 433:22, 551:1, 551:3, 551:4, 551:6
**Walking** [1] - 508:11
**walking** [1] - 436:23
**walls** [2] - 479:22, 508:5
**wants** [2] - 587:11, 587:13
**war** [1] - 470:23
**warrant** [1] - 537:14
**Washington** [11] - 406:6, 406:19, 407:3, 407:23, 423:17, 434:17, 450:23, 468:14, 470:17,

597:14
**watch** [5] - 416:9, 428:7, 428:9, 438:22, 593:6
**watched** [14] - 416:1, 455:3, 455:4, 479:15, 479:16, 479:17, 507:19, 507:23, 516:18, 516:19, 544:7, 544:12, 590:16, 593:7
**watching** [4] - 455:9, 455:11, 508:7, 546:6
**water** [2] - 542:23
**ways** [5] - 458:6, 469:13, 505:18, 528:11, 555:11
**weak** [1] - 541:19
**weather** [1] - 579:25
**website** [3] - 442:23, 569:1, 591:12
**week** [2] - 447:5, 594:22
**weeks** [3] - 413:20, 514:10
**weigh** [1] - 431:5
**welcome** [2] - 495:6, 502:5
**wells** [1] - 580:12
**West** [1] - 407:14
**whichever** [2] - 448:11, 504:2
**whispered** [1] - 563:13
**white** [8] - 432:20, 567:1, 569:3, 575:9, 587:3, 589:8, 589:10, 591:17
**whole** [6] - 461:2, 467:8, 478:14, 490:9, 530:25, 574:10
**willing** [4] - 411:23, 466:11, 514:25, 543:14
**willingness** [1] - 442:7
**withdraw** [1] - 472:20
**witness** [13] - 460:20, 461:8, 488:1, 488:2, 488:23, 491:19, 492:6, 492:7, 495:3, 499:17, 522:11, 566:1, 584:21
**witnessed** [2] - 522:18, 566:7
**witnesses** [2] - 438:4, 475:21
**woman** [2] - 573:7, 589:4

**women** [1] - 578:4
**wonder** [4] - 469:10, 588:10, 588:17, 594:7
**wondered** [1] - 493:13
**wondering** [2] - 442:20, 498:14
**word** [5] - 434:14, 440:9, 480:22, 497:16, 545:11
**wording** [1] - 418:3
**words** [10] - 420:1, 430:21, 457:3, 469:20, 475:10, 517:9, 540:18, 542:9, 559:12, 560:3
**workers** [1] - 571:1
**works** [16] - 449:24, 474:21, 480:25, 548:18, 558:17, 561:22, 565:14, 566:22, 585:4, 592:22
**world** [3] - 432:9, 470:21, 531:1
**worry** [2] - 552:1, 552:20
**worse** [2] - 436:5, 504:7
**wrap** [1] - 574:8
**writ** [4] - 418:8, 458:9, 478:11, 552:22
**writing** [1] - 542:9
**wrote** [6] - 458:20, 469:2, 469:5, 475:22, 540:6, 545:12

## Y

**year** [4] - 420:18, 440:12, 442:24, 527:22
**years** [13] - 418:23, 432:8, 436:11, 440:12, 441:1, 450:17, 484:22, 495:13, 498:8, 498:14, 508:1, 562:13, 586:24
**yes/no** [1] - 458:1
**yesterday** [8] - 427:17, 438:21, 447:7, 502:8, 502:23, 589:9, 595:16, 595:22
**York** [4] - 406:23, 407:18
**young** [4] - 443:9, 538:13, 563:18, 586:19
**yourself** [4] - 452:13,

453:22, 456:17, 486:9
  **yourselves** [1] - 595:20
  **youth** [3] - 435:25, 436:1

## Z

  **ZACHARY** [1] - 406:6
  **Zachary** [2] - 509:13, 584:7
  **Zen** [1] - 562:14
  **Zoom** [1] - 595:8