```
                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
     - - - - - - - - - - - - - - - - x
     UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                                1:21-cr-00175-TJK-2
     v.                                         1:21-cr-00175-TJK-3
                                                1:21-cr-00175-TJK-5
     1-ETHAN NORDEAN                             1:21-cr-00175-TJK-6
     2-JOSEPH R. BIGGS
     3-ZACHARY REHL                      Washington, D.C.
     5-ENRIQUE TARRIO                    Tuesday, January 17, 2023
     6-DOMINIC J. PEZZOLA,               9:00 a.m.
                              Defendants.
     - - - - - - - - - - - - - - - - x
```

---

```
                    TRANSCRIPT OF JURY TRIAL - DAY 15
                         *** MORNING SESSION ***
              HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                       UNITED STATES DISTRICT JUDGE
```

---

**APPEARANCES:**

```
For the United States:    Jason B.A. McCullough, Esq.
                          Erik M. Kenerson, Esq.
                          Conor Mulroe, Esq.
                          Nadia Moore, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

                          Norman A. Pattis, Esq.
                          PATTIS & SMITH, LLC
                          383 Orange Street
                          1st Floor
                          New Haven, CT 06511
                          (203) 393-3017
```

APPEARANCES CONTINUED:

For the Defendants:        Carmen D. Hernandez, Esq.
                           7166 Mink Hollow Road
                           Highland, MD 20777
                           (240) 472-3391

                           Nayib Hassan, Esq.
                           LAW OFFICES OF NAYIB HASSAN, P.A.
                           6175 NW 153 Street
                           Suite 209
                           Miami Lakes, FL 33014
                           (305) 403-7323

                           Sabino Jauregui, Esq.
                           JAUREGUI LAW, P.A.
                           1014 West 49 Street
                           Hialeah, FL 33012
                           (305) 822-2901

                           Steven A. Metcalf, II, Esq.
                           Roger Roots, Esq.
                           METCALF & METCALF, P.C.
                           99 Park Avenue
                           6th Floor
                           New York, NY 10016
                           (646) 253-0514

Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

# C O N T E N T S

**WITNESS:**                                                    **PAGE:**

THOMAS LOYD:
Direct Examination by Mr. Mulroe ................3618
Cross-Examination by Mr. Hassan.................3691
Cross-Examination by Mr. Roots...................3703

1              **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Your Honor, this is Criminal

3    Matter 21-175, United States of America v. Defendant 1,

4    Ethan Nordean; Defendant 2, Joseph R. Biggs; Defendant 3,

5    Zachary Rehl; Defendant 5, Enrique Tarrio; and Defendant 6,

6    Dominic J. Pezzola.

7              Present for the Government are Jason McCullough,

8    Erik Kenerson, Conor Mulroe, and Nadia Moore; present for

9    Defendant 1 is Nicholas Smith; present for Defendant 2 are

10   John Hull and Norman Pattis; present for Defendant 3 is

11   Carmen Hernandez; present for Defendant 5 are Nayib Hassan

12   and Sabino Jauregui; present for Defendant 6 are Steven

13   Metcalf and Roger Roots.  Also present are Defendant 1,

14   Mr. Nordean; Defendant 2, Mr. Biggs; Defendant 3, Mr. Rehl;

15   Defendant 5, Mr. Tarrio; and Defendant 6, Mr. Pezzola.

16             THE COURT:  All right.  Good morning to everyone.

17             The reason I was a few minutes -- thank you for --

18   everyone, for being on time this morning.

19             The reason I was a few minutes late taking the

20   bench was I did receive, sort of, late -- or early in the

21   morning the Government's email, it sounds like, that they

22   sent to defense counsel laying out some potential things

23   that we might be arguing about as far as objections go.

24   Should we -- that was forwarded to chambers, I guess, by

25   Ms. Hernandez.

 1             Is the net-net of all of that that the parties --

 2    what the parties disagree on at this point is just that one

 3    particular video that Ms. Hernandez has identified?

 4    Ms. Hernandez, is that -- I mean, well, let's put it this

 5    way.  Mr. McCullough or whoever -- yeah.  Mr. McCullough,

 6    you had sent the email saying, Here are a bunch of things

 7    that we think we've -- it sounds like most of them, you had,

 8    sort of, adjusted your presentation to my pretrial rulings.

 9    So it sounds like there wouldn't be an objection to that,

10    unless there was some lingering objection.

11             And then the other -- and then the one issue you

12    highlighted, and that Ms. Hernandez has highlighted before

13    to me, has been this one other video.  So maybe, my question

14    is best directed to Ms. Hernandez.  Is that the -- I'm happy

15    to, sort of, hear you on this briefly right now.  Is that

16    the one thing net-net that we're talking about that is --

17    remains an objection on your end?

18             MS. HERNANDEZ:  I believe that's the one thing

19    that may need argument.  There are other objections which

20    the Court, I think, could probably rule as a matter of

21    course in two minutes or whatever.  And I don't believe that

22    witness who -- through whom they would introduce that is the

23    next -- we still have Inspector Loyd and it's not coming in

24    through him, but Mr. -- the Government should be able to

25    tell you more precisely when that issue will arise.

1          THE COURT:  I say that only because Mr. Loyd -- or

2     Inspector Loyd -- I think the Government had represented

3     they only had 20 more minutes.  So we might, at the end

4     of -- at -- toward the close of our -- the presentation on

5     Friday.  So it may come up relatively quickly.

6          MS. HERNANDEZ:  And I don't believe I'm the only

7     one who has objections to some of the Parler posts, but I

8     think that's -- the one I've pointed out is the most

9     objectionable.

10          THE COURT:  All right.  I, you know -- on that, I

11     don't -- I'd rather -- well, let me put it this way.  The

12     other reason -- the reason I was late taking the bench was I

13     was trying to get, technologically, the ability to see that

14     post and I -- or the video in question and, one reason or

15     another, we weren't able to make that happen.  So I think,

16     on that, I'm -- let's put it this way.  If the Government

17     would like to play that for me now, I'll -- I can view it

18     and I can hear you on argument about it and -- if that's the

19     way you think the best way to proceed is, and then

20     everything else, we'll just take up as it comes.

21          MS. HERNANDEZ:  Whatever the Court wants.  I mean,

22     I think it's so prejudicial that it ought not to be played

23     in open court until the Court decides it's admissible.

24          THE COURT:  Well, it could simply be played on

25     my -- let's put it this way.  I would -- what I would

```
 1        propose to do is have the Government simply play it --
 2                    MS. HERNANDEZ:  Sure, as if it had not been
 3        admitted --
 4                    THE COURT:  Correct.
 5                    MS. HERNANDEZ:  -- an exhibit that had not been --
 6                    THE COURT:  Correct.
 7                    MS. HERNANDEZ:  Yes, that makes sense, Your Honor.
 8        They should have access to it however they do their thing.
 9                    Your Honor, I also wanted to put something on the
10        record.  When I came in this morning --
11                    THE COURT:  Hold on one second.
12                    Counsel, I need -- if Ms. Hernandez is addressing
13        me, I need everyone else to be quiet.
14                    MS. HERNANDEZ:  So this is just for the record.
15        I'll -- I take Mr. Mulroe's explanation at his word.  When I
16        came in this morning, he was -- he and the case agent were
17        speaking to Inspector Loyd.  There's a rule of
18        sequestration.  Usually, you don't get to talk to your
19        witness while they're on the stand.  Mr. Mulroe said it was
20        just pleasantries.  I'll take him at his word.  I'm not
21        making an issue of it.  I just think we should -- it's
22        unfortunate that we can't be pleasant, I guess.
23                    THE COURT:  All right.  Mr. Mulroe, do you want to
24        just -- because Ms. Hernandez has raised this, I think you
25        should just put on the record whatever you think appropriate
```

1    regarding that interaction.

2              MR. MULROE:  Yes, Your Honor.  At about five

3    minutes before 9:00 o'clock this morning, Special Agent

4    Hanak and I were walking to the courtroom.  Inspector Loyd

5    was outside on the bench.  Agent Hanak and I said, Good

6    morning.  We told him that we regretted that he wasn't able

7    to go on his family vacation that he had to cancel because

8    of his testimony and asked him, was he well?  And, at that

9    point, Ms. Hernandez came over and said we shouldn't be

10   talking and that was the end.

11             THE COURT:  All right.  Very well.  It, you

12   know -- while the witness is on the stand, obviously, the --

13   well, the parties are well aware of the rule.  So I don't

14   think there's anything more for me to mention there.

15             MR. MCCULLOUGH:  (Indicating.)

16             THE COURT:  Mr. McCullough?

17             MR. MCCULLOUGH:  Your Honor, I would also like to

18   put on the record that I entered the courtroom probably five

19   minutes before Mr. Mulroe.  I saw Inspector Loyd sitting on

20   the bench.  I said, Good morning.  Thank you for being here.

21   Mr. Mulroe was right behind me, and I walked into the

22   courtroom.  So I just wanted to have that on the record, as

23   well.

24             THE COURT:  All right.  So does the Government

25   think -- let me just ask in terms of timing.  How quickly

1    are we going to have the issue of this disputed video ripen

2    after Inspector Loyd is -- his testimony is complete?

3         MR. MCCULLOUGH:  So Your Honor, we have two

4    witnesses that will follow Inspector Loyd.  So we'll have

5    the cross of Inspector Loyd and then two additional

6    witnesses.  We have instructed Special Agent Camiliere, who

7    will be presenting the Parler data, to arrive shortly before

8    lunch.  So I anticipate that she'll be here at probably

9    about 11:30 or 12:00.  And depending on the speed, it's

10   possible that -- not knowing the way that this will proceed,

11   it's possible that we would get to her before lunch, but I

12   would anticipate we would have the lunch break to possibly

13   address this, as well.

14        THE COURT:  All right.  So why don't we --

15   Ms. Hernandez, given that representation, what I'll do is

16   just -- and then I can do my best over lunch to review the

17   video myself, won't have to chew up time playing it for me

18   here.  I can -- we can, perhaps on the other side of lunch,

19   have this argument.  Mr. McCullough thinks we -- that

20   probably won't ripen until after lunch.  So I'll have the

21   lunch break to look at it and then to hear you on the other

22   side and we can go from there.

23        MS. HERNANDEZ:  That's fine, Your Honor.  And I

24   don't know whether the Government can produce for you the

25   video in a more user-friendly version so you can have it

1    rather than I -- how I sent it to the -- to chambers.

2        THE COURT:  It may be that it's not anyone's fault

3    that I couldn't view it this morning.  It may have been

4    just -- it may have been for some other reason.  And I don't

5    think we looked at the version you sent.  So I have a -- I

6    have -- let me put it this way.  I have confidence that

7    given an entire lunch break, we'll be able to get it up and

8    I'll be able to view it.

9        MR. MCCULLOUGH:  And, Your Honor, we do have it.

10   It is relatively short.  We do have it up.  If you'd like

11   Ms. Rohde to play it for Your Honor, we -- it's available.

12   Your decision.  We can also tell you that it is

13   Exhibit-602-19 which, I think, is also referenced in the --

14   in my email, but --

15       THE COURT:  Right.

16       MR. MCCULLOUGH:  -- to the extent that it's --

17   you're unable to pull it up from Ms. --

18       THE COURT:  If -- well, then, fine.  If it's short

19   and there's a way for me to view it right now, I won't hear

20   argument on it, we won't make it -- it will -- if it can

21   only come up on the screens that are available to counsel

22   and no one has an objection, I'll quickly view it here.  Is

23   there an objection?

24       MR. PATTIS:  There's not, Judge.  I -- but while

25   we're on that vein, Mr. Biggs will be objecting to 603-15.

```
 1    And I don't know if you want to look at that, as well.  It
 2    will be a brief 403 objection.
 3              MR. HASSAN:  Judge, my apologies.  Nayib Hassan on
 4    behalf of Mr. Tarrio, Judge.
 5              We received an email at 9:54 p.m. last night.  No
 6    fault to Mr. McCullough, Judge, but we were informed that
 7    Ms. Camiliere would not take the stand until Wednesday.  So
 8    we did not file objections, as required by the pretrial
 9    order, regarding the exhibits that were -- the exhibits that
10    they anticipate introducing through Camiliere.  So we would
11    also have objections to certain exhibits that are on there.
12    We saw them last night; however, we didn't emphasize as far
13    as the numbers --
14              THE COURT:  Who did you receive the email from?
15              MR. HASSAN:  From the Government, Judge.  From
16    Mr. McCullough at 9:54 p.m. last night that Camiliere would
17    be testifying on Wednesday.  There was a plethora of emails,
18    Judge.  There was, like -- I want to say there was at least
19    30 --
20              THE COURT:  All right.
21              MR. HASSAN:  -- emails that were sent at night.
22              THE COURT:  All right.
23              MR. MCCULLOUGH:  Your Honor, in compliance with
24    Your Honor's order for trial procedures, we have been
25    providing a -- so we provide on Friday an order of call.  We
```

 1    did that for the coming week.  Your Honor has ordered us to

 2    provide on a rolling 36-hour basis which we interpret to be

 3    effectively 9:00 o'clock at night, 9:30 at night, 1.5 days

 4    before the testimony.  So last night, we updated our order

 5    of call for Wednesday to indicate that we anticipated -- and

 6    there was no indication in that email that Special Agent

 7    Camiliere would not be hitting the stand on Tuesday.  We

 8    were presenting the fact that we expected her to continue on

 9    on Wednesday.  So I do apologize for any kind of confusion

10    here, but that was certainly not the intent.  And just -- I

11    do want to make it clear that as we provide the -- kind of,

12    that running order of call, to the extent we anticipate

13    someone to carry over, we will continue to list them.

14              THE COURT:  All right.  And is there a --

15              MS. HERNANDEZ:  Your Honor --

16              THE COURT:  Just to be -- Mr. McCullough, just so

17    I understand, is there a witness in between Inspector Loyd

18    and this other witness?

19              MR. MCCULLOUGH:  Yes, Your Honor.  Two witnesses.

20              THE COURT:  Two witnesses in between that won't

21    relate to -- will -- that -- won't tee up these videos in

22    the same way?

23              MR. MCCULLOUGH:  Correct.  And we would anticipate

24    both of those witnesses being relatively short, but, you

25    know, nonetheless, there are two witnesses in between.

1          THE COURT:  All right.

2          MS. HERNANDEZ:  So Your Honor, I think we've

3    resolved the issue with the Government.  The issue has been

4    that while the Government has in advance identified the

5    witnesses with sufficient -- more than sufficient time,

6    there's -- there was no way for us to know which exhibits a

7    particular witness was going to be introducing.  So we're,

8    kind of, blind to what it is.  And, in fact, the Government

9    yesterday sent a list, not just the ones in the email that

10   the Court has that I forwarded -- those were the ones they

11   highlighted -- but they also sent a list -- I don't know --

12   more than two dozen, three dozen of the exhibits that would

13   be coming in and I spent -- while I watched Tom Brady lose,

14   I also spent the time looking at these exhibits.  They're --

15   it's not an easy task.  So I think we've resolved it with

16   the Government.  They're going to alert us at the same time

17   that they identify the witnesses, although we certainly

18   would like it to be at least two days in advance because

19   this isn't just one -- especially in a witness that's going

20   to have 20, 30 exhibits.  So that's part of the problem that

21   we're having coming up with objections in time -- in a

22   timely fashion.

23          THE COURT:  And, look, all of this, I hope both

24   sides understand, is, you know, subject to both sides

25   proceeding in good faith.  Of course, there's -- and the

 1    idea -- the whole purpose behind it is to minimize the

 2    objections for both sides in the middle of the witness's

 3    testimony.  So you know, for -- both sides are incentivized

 4    to try to hash these things out ahead of time -- maybe, not

 5    hash them out, but at least identify what's coming down the

 6    pike and so I -- we can address these things when we don't

 7    have the witness on the stand.

 8              MS. HERNANDEZ:  And I would say two things.  I

 9    understand from counsel in the Oath Keepers case that Judge

10    Mehta had, sort of, a standing procedure.  Every evening

11    before they left the courtroom, the Government would say,

12    These are the exhibits, and every morning before the jury

13    came in, he had -- Judge Mehta had set aside some time -- I

14    don't know if that would require us to come in earlier or

15    whatever -- had set aside some time so that --

16              THE COURT:  Well --

17              MS. HERNANDEZ:  -- these issues could be hashed

18    out --

19              THE COURT:  -- the time for us is 9:00 o'clock to

20    9:30.  That was the whole --

21              MS. HERNANDEZ:  I see.

22              THE COURT:  -- point of --

23              MS. HERNANDEZ:  And then they --

24              THE COURT:  -- having all you all here at 9:00

25    o'clock and having the jury come in at 9:30.  So look, I

 1   think -- here's what I think we'll do today, because it is
 2   9:25.  I have a good sense now of -- it sounds like the
 3   different -- I mean, let's put it this way.  The
 4   Government -- I have that email that was forwarded on with
 5   regard to these different images and postings, including the
 6   one you've identified.  Mr. Pattis identified one.  There
 7   may be other objections.  I'll look at them over -- as best
 8   I can over the lunch break.
 9              MS. HERNANDEZ:  And just to alert you to a
10   problem.  So this exhibit that's on your screen, I believe,
11   right now, it's got this little -- the photograph of
12   Mr. Rehl that the Government has used for their exhibits.
13   That is not -- that was -- it could appear as if that's his
14   picture that he posted on Parler.  That is not his picture
15   on Parler.  So the Government has taken away whatever --
16   deleted the picture that he had on Parler and put this up,
17   and that's my -- again, my -- I know the Court already ruled
18   on that for opening statement, but I think that's
19   problematic throughout the things because this is not a
20   Parler exhibit.  In other words, it's got some items that
21   would make it appear as if this is the way it came out of
22   Parler.  This is something they superimposed which, I think,
23   is not appropriate.  Even if it were a beautiful picture of
24   him, I don't think it's appropriate for them to superimpose
25   items like that.

1          THE COURT:  All right.

2          MR. MCCULLOUGH:  Your Honor, I know we want to get

3     started.  Just a couple of things on just their series of

4     representations there.

5          First, just going in reverse order, this -- the

6     reason that we produced all of these slides ahead of time,

7     months ago, was to address any issues that the parties might

8     have with the way that we're presenting this.  This is -- we

9     are identifying this as Zachary Rehl's Parler.  We took what

10    we believed to be an unoffensive photo of Zach Rehl at the

11    time.  It's color-coded yellow which is a consistent color

12    that we have that runs throughout the presentation.  It runs

13    throughout on Telegram and otherwise.  It is to assist the

14    jury.  We have -- the data, as it's produced from Parler, is

15    in an unwieldy Excel spreadsheet.  We believe that this is

16    the way to basically present it and we've teed that issue

17    up.

18         Second, with respect to the relationship to the

19    Oath Keepers trial, it is my understanding that Judge Mehta

20    did not order any such procedure and that this is just a --

21    frankly, a fundamentally different case in the way that the

22    Government has organized its evidence.  We have organized

23    our evidence by category and we intend to present our

24    evidence by category.  So to the extent that we are, kind

25    of, putting on evidence with respect to Parler, we're

1    presenting the Parler slides.  To the extent we're

2    presenting evidence about Telegram, we will put on the

3    Telegram slides.  My understanding of the Oath Keepers is

4    that they were, kind of, doing, kind of, pockets in time

5    which would cross-pollinate across all sorts of things.

6          Nonetheless, the Government has -- this is the

7    third item -- the Government has agreed to attempt to work

8    in good faith with the defense to provide categories of

9    exhibits and the exhibits themselves that we intend to

10   introduce ahead of time so that we can avoid wasting time

11   and keeping the jury waiting.  And we have -- we do that

12   without -- with the reservation that we may, in the course

13   of a direct examination, introduce other things.  And

14   that's -- we're doing this all in good faith to try to

15   resolve any issues ahead of time which was precisely why,

16   Your Honor, I sent the email early in the day yesterday,

17   kind of, identifying, Look, here's the, kind of, subset of

18   things.  And, frankly, Your Honor, I've -- that was done in

19   that way to ensure that those 8, 12 items did not get

20   drowned out by the list of other things; wanted to make sure

21   that the parties had an opportunity to, kind of, resolve

22   that.  It's unfortunate that we're not able to, but

23   nonetheless, I think we've teed it up for Your Honor.

24          With respect to this -- I know Your Honor said

25   we'll hear argument after.  I just wanted to point out that

1    in Ms. Hernandez's opening statement, she made a point to

2    say that Zach Rehl has relationships with a number of people

3    of various races and she said specifically, Zach Rehl is not

4    a racist.  I -- the Government did not open on any of that.

5    The Government did not present any information on race in

6    its opening --

7         THE COURT:  All right.  We're going to hear

8    argument on it later.

9         If there's no further thing we need to discuss

10   with regard to Inspector Loyd --

11        MR. SMITH:  Your Honor -- Judge --

12        THE COURT:  Oh, I have the Government at the

13   podium.  One second.

14        MR. MULROE:  Your Honor, on Inspector Loyd's

15   testimony, I would just briefly note there was an exhibit --

16   a video exhibit that we played on Friday that had some

17   corruption or colorful artifacts on the screen for part of

18   it and we received some questions about that from counsel

19   over the weekend.  We intend, at the very beginning of

20   Inspector Loyd's testimony today, to just put in a cleaner

21   version of that same exhibit.  I just note it so that the

22   Court and counsel don't think we are rehashing something

23   from last time.  It's just to put the new exhibit in.

24        THE COURT:  All right.

25        MR. SMITH:  Thank you, Judge.

1    We would just like to note to the Government and
2    the Court that we would like to have the visual map
3    demonstrative left up on -- during Mr. -- Inspector Loyd's
4    cross-examination.
5    THE COURT:  Okay.  No objection, I presume.
6    MR. MULROE:  (Indicates negatively.)
7    THE COURT:  All right.  So let's bring in the
8    ladies and gentlemen of the jury.
9    (Brief pause.)
10    (Jury returned to jury box.)
11    THE COURT:  You may be seated.
12    Ladies and gentlemen, welcome back.  I hope your
13    weekend was refreshing.  And we'll resume with the
14    Government's direct examination of Inspector Loyd.
15    Government, you may recall your witness.
16    MR. MULROE:  Government calls Inspector Thomas
17    Loyd.
18    (Thomas Loyd resumes the stand.)
19    THE WITNESS:  Good morning.
20    THE COURT:  Good morning, sir.
21    MR. MULROE:  And apologies, Your Honor.  Does the
22    witness need to be re-sworn or is he still under oath from
23    Friday?
24    THE COURT:  I don't believe he does.
25    Sir, you understand you're -- you remain under

```
1    oath?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  All right.

4                        DIRECT EXAMINATION

5    BY MR. MULROE:

6    Q.  Good morning, Inspector Loyd.

7    A.  Good morning.

8    Q.  When we spoke on Friday, you were walking us through

9    some of the major breaches that took place in the Capitol on

10   January 6th.  I want to just start by going back to Breach

11   No. 2 with the black metal fence.  Do you remember watching

12   a video from the Capitol Police surveillance, sort of, taken

13   from the top of the dome viewing down onto that breach?

14   A.  Yes.

15             MR. MULROE:  Ms. Rohde, if you would pull that

16   video up for just a moment for us, Exhibit-160, beginning at

17   the 8-minute-30-second mark.  And let's play about 10 or 15

18   seconds of that video.

19             Apologies.  May I have the screen for the jury,

20   please?

21             (Brief pause.)

22             All right.

23             (Video played.)

24             MR. MULROE:  We can pause it there at 8:43.

25   BY MR. MULROE:
```

1    Q.  Inspector Loyd, the colorful artifacts that appeared on

2    the screen there, do you have any idea what those are?

3    A.  No, it just seems like it's some kind of interference,

4    but I have no idea what that's about.

5            MR. MULROE:  All right.  If we can turn the

6    screens off for the jury, please, and put up what's marked

7    for identification as Government 160E.

8            MR. PATTIS:  E as in Edward?

9            MR. MULROE:  E as in Edward.

10   BY MR. MULROE:

11   Q.  Inspector Loyd, looking at the screen in front of you,

12   does that appear to be the same camera at around the same

13   time?

14   A.  Yes.

15   Q.  Depicting the same events just as fairly and accurately

16   as Exhibit-160 did?

17   A.  Yes.

18           MR. MULROE:  Move to admit 160E.

19           THE COURT:  Without objection, it will be

20   admitted.

21           MR. MULROE:  And, Ms. Rohde, let's -- if we could

22   publish that to the jury and play 160E, please.

23           (Video played.)

24   BY MR. MULROE:

25   Q.  And so as we see the breach occur on this version of the

1    video, is this mostly lacking the colorful corruption that

2    we saw on the other?

3    A.  Yes.

4                MR. MULROE:  All right.  Thank you, Ms. Rohde.  We

5    can stop that at 37 seconds.

6    BY MR. MULROE:

7    Q.  Inspector Loyd, you told us on Friday about the breach

8    of the stairs under the scaffolding and the breach of the

9    window.  And I neglected to ask you to put a sticker up on

10   the map for the window breach.  So do you see a sticker

11   there with a 4 on the back?

12   A.  Mm-hmm.

13   Q.  If you would, step up to the demonstrative and place

14   Sticker No. 4 where the breach of that window in the Senate

15   wing occurred.

16   A.  (Indicating.)  That is the Senate wing door, the site of

17   the breach.

18   Q.  That's where the window was smashed?

19   A.  Yes.

20   Q.  Thank you.  You can take your seat.

21                MR. MULROE:  Just to pick up where we left off

22   around lunchtime on Friday, Ms. Rohde, would you put 499B up

23   on the screen.

24   BY MR. MULROE:

25   Q.  Now, remind us, Inspector Loyd.  Where did this photo

1   take place and what was happening at the time we see here?

2   A.   This is the Ohio Clock area, and this is shortly after

3   Eugene Goodman had confronted the lead of the crowd on the

4   first floor after coming in through the Senate wing door.

5   He led them up the stairs and led them into the Ohio Clock

6   area where myself and, I believe, three other officers were

7   lined up.

8   Q.   And were you able to stop the rioters there?

9   A.   Temporarily.

10  Q.   Inspector Loyd, while you were confronting these members

11  of the crowd here, did other members of the crowd get into

12  other parts of the building?

13  A.   At this particular point, I'm only aware of this

14  specific breach through the Senate wing door up to the Ohio

15  Clock area, but after this, yes, multiple people made it in

16  through multiple doors and windows throughout the Capitol

17  Building.

18          MR. MULROE:   Ms. Rohde, if we could play

19  Exhibit-390, please.

20          (Audio played.)

21          MS. HERNANDEZ:   I have an objection, Your Honor.

22  Objection on relevance grounds.

23          THE COURT:   Overruled.

24          (Brief pause.)

25  BY MR. MULROE:

1    Q.  Inspector Loyd, how would you characterize the overall

2    state of affairs at the Capitol at this point?

3    A.  At this point, there's multiple breaches on both the

4    east side and the west side.  And you, obviously, heard the

5    call for help.  There was 200 individuals in the Rotunda at

6    that point.

7    Q.  Based on the circumstances, in your view, was it safe

8    for the proceedings inside the chambers to continue at that

9    point?

10             MR. PATTIS:  Objection.  Relevance.

11             THE COURT:  Overruled.

12             MS. HERNANDEZ:  Objection.  He's not been offered

13   as an expert.

14             THE COURT:  Overruled.  The witness can answer.

15             MR. METCALF:  Objection as to speculation.

16             THE COURT:  Overruled.

17   BY MR. MULROE:

18   Q.  Inspector Loyd, was it safe for the proceedings in the

19   chambers to go on?

20   A.  No.

21   Q.  Why not?

22   A.  Because we had mobsters in the building at that point.

23   Q.  Was anything done to the people in the chambers

24   regarding their safety?

25   A.  Yes.  While this is going on, both the House and the

1    Senate chambers locked down their respective chambers and,

2    when that occurs, the officers and the doorkeepers outside

3    each one of those doors actually go into the chamber and

4    they lock themselves inside to do a shelter in place.

5    Q.  Was the Vice President still in the Capitol at this

6    point?

7    A.  Yes, the Senate chamber.

8    Q.  Was anything done with the Vice President?

9    A.  He initially sheltered with the Congress -- with the

10   Senate, but he eventually was evacuated.

11              MR. MULROE:  Ms. Rohde, if we could play

12   Government-111, please.

13              (Brief pause.)

14              And just pause at the beginning.

15              (Video played.)

16   BY MR. MULROE:

17   Q.  Do you recognize this clip, Inspector?

18   A.  Yes.

19   Q.  What are we seeing here?

20   A.  That is the east side of the Senate lobby.  The Senate

21   lobby is the rear of the Senate floor, and this is the east

22   entrance into that lobby.

23   Q.  The glass doors on the right of the screen, where do

24   those lead?

25   A.  I'm sorry?

1    Q.  The glass doors that we see on the right side of the

2    screen, where do those doors lead?

3    A.  Into the Senate chamber.

4              MR. MULROE:  All right.  Let's play the video.

5              (Video played.)

6    BY MR. MULROE:

7    Q.  What did we just see there?

8    A.  That was the Secret Service and my team evacuating the

9    Vice President from the Senate chamber to his secure

10   location.

11   Q.  Now, at the beginning, when we saw the photo of you in

12   Ohio Clock Corridor, that was outside the Senate chamber, as

13   well; is that right?

14   A.  That was on the south side.  What we just saw was on the

15   east side.

16   Q.  Did you stay on the Senate side of the Capitol or did

17   you, at any time, move to another part of the Capitol?

18   A.  No.  After leaving the Ohio Clock area -- well, before I

19   left, Deputy Chief Waldow met me in the Ohio Clock area.  We

20   had a conversation.  I told him I was satisfied with what I

21   had seen around the Senate chamber, because everybody had

22   done exactly what they were supposed to do with locking down

23   the chamber and sheltering in place.  And so then I asked

24   for permission to leave the Senate chamber and go check on

25   the status of the House chamber and I was granted that

 1    permission.

 2    Q.  And if you would just remind us, on the demonstrative,

 3    which side is the House side and which side is the Senate

 4    side?

 5    A.  This is the Senate side over here, (indicating) which is

 6    north; and this is the House side over here, (indicating)

 7    which is south.

 8    Q.  Thank you.  You can return to your seat.

 9            What, if anything, did you find when you reached

10    the House side of the Capitol?

11    A.  When I reached the House side, it was relatively calm

12    for about 10 minutes because the rioters had not made their

13    way down to the House chamber at that point.

14    Q.  Did things remain calm?

15    A.  No.  The rioters eventually made it from the north side

16    of the building.  They came right down the main corridor on

17    the second floor into the House main door where I had

18    myself, Sergeant Vargas [ph], and a few officers, once

19    again, trying to set up a police line.

20    Q.  How many doors separate the House chamber from the

21    public corridors in the Capitol --

22    A.  Oh, one --

23    Q.  -- if you know?

24    A.  I'm estimating 8 to 10.

25    Q.  And did all those doors hold?

1    A.  Yes -- well, no, not all the doors hold [sic].  No, they

2    did not.

3    Q.  And tell us what happened to the doors.

4    A.  Initially, the rioters made their way to the House main

5    door which is the door that leads right to the House chamber

6    and it faces -- you can actually see all the way down the

7    hallway to the Senate main door.  The rioters initially went

8    to the House main door.  There's three sets of doors.

9    There's the ceremonial glass doors that are first.  They

10   just pushed through those.  There's a second set of wooden

11   doors.  Those were breached.  And they got to the third and

12   final set of wooden doors made of wood and steel.  There

13   were 150-year-old original doors with the old locks, and

14   that final set of doors actually held at that point.

15   Q.  Those old locks held?

16   A.  Yes.

17   Q.  What, if anything, did you do in response to the actions

18   of the rioters?

19   A.  When I saw that they pushed through our police line and

20   were going to the House main door, the overflow from that

21   surge went east to the east side of the Speaker's Lobby.  So

22   I decided to go west to the west side of the Speaker's

23   Lobby.  When I got there, I noticed that the -- my team had

24   done exactly what they had -- were trained to do.  They had

25   locked down the House chamber, and everybody went inside and

1    sheltered in place.

2            The officers in the rear of the Speaker's Lobby,

3    both sides, they had actually locked the doors and stacked

4    furniture on both sides to help barricade the doors because

5    the doors are made of mostly glass.  So when I got to the

6    west side, I could see the rioters had made their way to the

7    east side of the Speaker's Lobby and were attempting to

8    breach that side.  So that's when I determined that I had to

9    evacuate the members of Congress out of the west side.

10   Q.  Did you have a particular route in mind for the

11   evacuation of the members?

12   A.  No.  I grabbed a couple of officers who were free

13   adjacent to me.  We ran a very quick evacuation route

14   through back stairwells and hallways that are rarely used,

15   found that the route was clear, went back to the west side

16   of the Speaker's Lobby.  I told my officers to unbarricade

17   the west Speaker Lobby doors.  I entered the House floor and

18   told the members of Congress, We are leaving.

19   Q.  Before we continue, Inspector Loyd --

20            MR. MULROE:  Ms. Rohde, would you play 394 for us.

21            (Audio played.)

22   BY MR. MULROE:

23   Q.  Is that you?

24   A.  Yes.

25   Q.  Why did you have to tell them to open the doors?

1    A.  Well, this was actually the second part of the

2    evacuation.  The original -- the first part of the

3    evacuation was on the second floor, the main level of the

4    House floor.  And once I evacuated all the members over to

5    the House office buildings -- because of the COVID, the

6    third floor galleries where the public usually sits was

7    actually part of the House floor on this particular date.

8    So I had to repeat the evacuation I had done on the second

9    floor up on the third floor.  The problem with the third

10   floor is you have the old wooden doors with the locks.

11   It's -- the only way to open them and lock them is with a

12   key.  There's no -- no glass.  And so when I went up to the

13   third floor to start the evacuation, initially, my officers

14   would not let me into the chamber because they were

15   concerned I may have been under duress.  So I had to get on

16   the radio --

17   Q.  What do you mean by under duress?

18   A.  Just -- I could have been held hostage or had a gun to

19   my head -- that's what the concern was -- and I was being

20   forced to open the door.  That was the concern from the

21   officers on the other side.  So that's why I got on the

22   radio to tell them everything was good; we were secured on

23   the west side of the third floor; and to open the doors.

24   And eventually they did open the doors on the third floor.

25   Q.  And so when we talk about the second floor and third

1    floor, this is inside the chamber, one big room with two

2    levels; is that about right?

3    A.  Yes.

4    Q.  What did you see when you got inside the House chamber

5    on the gallery level?

6    A.  It's -- it was, you know, very chaotic.  There were --

7    several members, they had the quick mask over their heads

8    which is designed to help evacuate people out of an area

9    which could be contaminated with any kind of aerosol like

10    pepper spray or anything else.  So several members had their

11    escape hoods on, you know?  Many were very upset.  There was

12    a struggle to get everybody on -- throughout the galleries

13    over to the west side, because it's designed -- people --

14    it's designed to evacuate via individual galleries and not

15    everybody move.  So members of Congress had to climb over

16    bannisters -- railings to get over to the west side to

17    eventually get out the door.  So that was a little chaotic.

18              MR. MULROE:  Ms. Rohde, 477, please.

19    BY MR. MULROE:

20    Q.  Do you recognize this scene, Inspector?

21    A.  Yes.

22    Q.  What do we see here?

23    A.  That's members of Congress lying on the floor in the

24    House galleries on the third floor.

25    Q.  And I think you testified about hoods.  What do we have

1    circled on the screen there?

2    A.  Yes.  That is an escape hood designed to give somebody

3    temporarily fresh air when they're trying to escape an area

4    which is contaminated.

5    Q.  Did you succeed in getting all the members out of the

6    House chamber?

7    A.  Yes.

8    Q.  And other than the Senate chamber and the House chamber,

9    were there members of Congress in other locations throughout

10    the Capitol?

11    A.  Yes.

12            MR. MULROE:  393, please.

13            (Audio played.)

14    BY MR. MULROE:

15    Q.  Did you personally take any part in extracting the

16    members who were barricaded?

17    A.  Not at that particular moment.  Immediately after the

18    House floor, the second and third floors were evacuated, I

19    received another call from Assistant Chief Chad Thomas that

20    handled the shooting at the east side of the Speaker's

21    Lobby.

22    Q.  And what did you do, then?

23    A.  I had to go secure the crime scene and I also had to

24    coordinate with the Metropolitan -- D.C. Metropolitan

25    police.  The D.C. Metropolitan police has the lead on any

1    homicide or sexual assault investigation on Capitol grounds.

2    That's just our protocol.

3    Q.  Now, Inspector, when we walked through the breaches

4    yesterday [sic], those were all on the west side of the

5    Capitol; is that right?

6    A.  Yes.

7    Q.  Were there, at any point, breaches on the east side of

8    the Capitol?

9    A.  Yes.

10              MR. MULROE:  Ms. Rohde, 454, please.

11              (Video played.)

12              MR. MULROE:  You can pause it.  So stopping at --

13              MS. HERNANDEZ:  Objection, Your Honor.  Relevance.

14              THE COURT:  All right.  Can I have counsel pick up

15    the phone for one moment.

16              (Bench conference:)

17              THE COURT:  All right.  I've already indicated

18    that I'm going to give the Government -- let me just -- I've

19    already indicated I'm going to give the Government some

20    leeway to describe the overall scene and the -- because they

21    do have to make out the civil disorder charges.  Obviously,

22    Ms. Hernandez, on cross-examination, I'm sure you're going

23    to point out that the -- this witness at least has no

24    evidence to link your client to anything that happened on

25    this side, but I think I'm going to give them some, you

1    know, small leeway to just, sort of, paint the entire scene

2    that happened there.

3        MR. SMITH:  Your Honor, this is Mr. Smith for

4    Mr. Nordean.

5        We would just note that in other civil disorder

6    trials in this court, the Government has been given far less

7    leeway to paint the scene for a civil disorder where the

8    defense -- we, again, are willing to stipulate to the civil

9    disorder at this point which requires --

10       THE COURT:  Right.  There's, obviously, a lot of

11   case law -- their stipulating to something like that does

12   not rob the Government of their right to prove their case by

13   whatever evidence they would like subject, of course, to

14   rulings of the Court regarding 403 and the rest of it.  So

15   I'm going to give the Government some leeway, but I'm

16   sure --

17       How much more do you have on these, Mr. Mulroe, on

18   these scenes that are, sort of, from other parts of the

19   Capitol?

20       MR. MULROE:  Your Honor, Conor Mulroe for the

21   Government.

22       We don't have a great deal more about other parts

23   of the Capitol.  I do want to just emphasize for the record,

24   though, that virtually all of the videos that we've shown so

25   far have involved the defendants themselves or a small

1    percentage of the members of the defendants' marching group.

2    And so in this set of videos in particular on the east side,

3    Defendant Biggs entered through the west side, but then he

4    re-entered the Capitol again on the east side.  So -- civil

5    disorder was not charged -- all of these are directly

6    relevant to the defendants' activities on the --

7            THE COURT:  Well, he wasn't -- the group we're

8    looking at on the screen, he wasn't -- do you have any

9    information that any of the tools were part of this group?

10           MR. MULROE:  No, Your Honor.  This was on the east

11   side that allowed Mr. Biggs to get through that door --

12           THE COURT:  Mr. Mulroe, you get a little bit of

13   leeway, but a few minutes and then we have to move on.

14           MR. HULL:  Your Honor, Hull for Biggs.  This is

15   extraordinarily cumulative.

16           MS. HERNANDEZ:  I made the objection.  I haven't

17   been able to speak yet.

18           THE COURT:  Please, Ms. Hernandez.  Please.  Go

19   ahead.

20           MS. HERNANDEZ:  So Your Honor, my objection is I

21   understand the Court's ruling, but I think I have to protect

22   the record, so I'm making the objection.  I'm not arguing --

23   I understand what the Court is going to say.  I just made

24   the objection for the record.

25           THE COURT:  Very well.

1          So as I said, you have a few more minutes on this,

2     Mr. Mulroe, and then particularly given this scene, there's

3     no tools; there's no --

4          MR. MULROE:  I'm sorry, Your Honor.  My co-counsel

5     reminded me that one of the -- I just wanted to note that my

6     co-counsel had reminded me that Ronald Loehrke was one of

7     the tools.  He's a member of the marching group who was

8     personally invited by Ethan Nordean and he's a member of

9     this crowd.

10          MR. SMITH:  Your Honor, again, on the tools

11     theory, which we think is without any foundation, the

12     parties agreed before this proceeding that the Government

13     would need to make a showing of some sort of connection

14     between the defendants beyond saying "tools."  And so here,

15     we would protest that the Government cannot merely say the

16     word "tools" and then show inflammatory videos.

17          THE COURT:  Mr. Smith, they did more than that.

18     If you had listened to them, what they said was he was a

19     part of the marching group.  And so that, I think -- it

20     doesn't change the overall point here.

21          You get a little bit of more time on this.  You do

22     have someone who is part of the marching group.  So that

23     gives you a little more leeway, but let's move on quickly.

24          MR. SMITH:  Your Honor, we would -- the

25     Government -- a preliminary relevance finding -- and so when

1    the Government represents that they're part of the marching

2    group, we would -- we believe the Government needs to

3    establish that with the Court.  What does "the marching

4    group" mean?  There's a long trail of people walking towards

5    the Capitol.  How is the Government determining that they're

6    associated with these defendants; that these defendants

7    caused them to walk towards the Capitol?  We would just

8    submit that it's not sufficient for the Government to merely

9    say "the marching groups" or "tools" and show whatever these

10    people are doing.

11           THE COURT:  My ruling on this particular point

12    doesn't turn on the "tools" part.  So again, the Government

13    has a little more leeway here, but not too much more.

14           You may proceed, Mr. Mulroe.

15           MR. MULROE:  Thank you, Your Honor.

16           (Return from bench conference.)

17           MR. MULROE:  Ms. Rohde, let's let that video play

18    just a bit longer while I ask Inspector Loyd a couple of

19    questions.

20           (Video played.)

21           MR. MULROE:  And could we turn the volume down.

22    BY MR. MULROE:

23    Q.  So what part of the Capitol grounds are we seeing here,

24    Inspector Loyd?

25    A.  This is the east side.

```
1    Q.  And were there barricades also on the east side?

2    A.  Yes.

3    Q.  Did the crowd go through those barricades?

4    A.  Yes.

5    Q.  Did they reach the building?

6    A.  Yes.

7    Q.  Did they reach a door of the building?

8    A.  Yes.

9              MR. MULROE:  We can stop that at 50 -- stop there,

10   59 seconds.  And go to Exhibit-165A, please.  Ms. Rohde, if

11   you would just pause at the beginning.  We're at 4 seconds.

12             (Video played.)

13   BY MR. MULROE:

14   Q.  Do you recognize this part of the Capitol, Inspector?

15   A.  Yes.

16   Q.  Where are we here?

17   A.  That is the main --

18             MR. SMITH:  Objection, Your Honor.  May we have a

19   sidebar?

20             (Bench conference:)

21             MR. SMITH:  Again, Your Honor, what the Government

22   is attempting to show is another piece of property

23   destruction that has no relevance to this case.  This is

24   not, we would submit, merely more leeway to paint the scene

25   in the civil disorder.  The Government is attempting to
```

1    insinuate to the jury that the defendants had some role in

2    another scene of property destruction similar to the window

3    breaking at the west front.  It is false.  And so this

4    has -- this is just not appropriate evidence.  It's

5    irrelevant and it's 403 material.

6          THE COURT:  Mr. -- it's not 403 material.  It has

7    nothing to do with any of the defendants which, I think, is

8    what you're arguing.

9          MR. SMITH:  Well, to the extent it has some

10   relevance --

11         THE COURT:  Mr. Mulroe, why don't you respond to

12   that.

13         MR. MULROE:  Your Honor, this is the door through

14   which Defendant Biggs made the second entrance to the

15   Capitol shortly after it was breached.

16         THE COURT:  All right.  But does it have -- all

17   right.  He's -- they're going to later explain how Mr. Biggs

18   went through the Capitol and came back in.  Mr. Mulroe, I

19   give you, again -- I don't see how the Government is going

20   to be insinuating that somehow -- let me put it this way.

21   Mr. Mulroe, you're not going to be arguing from any of this

22   that these defendants were responsible for this destruction

23   of property; correct?

24         MR. MULROE:  No, Your Honor.  That's not how we

25   charged the case.  We don't --

1          THE COURT:  All right.  Again, you get a little

2    bit of leeway to talk about these other scenes around the

3    Capitol and then I need you to move on.

4          MR. MULROE:  Thank you, Your Honor.

5          (Return from bench conference.)

6    BY MR. MULROE:

7    Q.  Inspector, what part of the Capitol are we in here?

8    A.  You're looking -- the doors at the top of the screen are

9    the main Rotunda doors that lead out to the east front.

10   Q.  Would you show us, if you can reach it on the

11   demonstrative, where these doors are located.

12   A.  That's the east side at the very top of the very middle.

13   And those are the steps that lead up to the main Rotunda

14   doors at the very top and in the middle.

15   Q.  So you're pointing to the top of the demonstrative just

16   a couple inches below where it says, "Ground - Level One"?

17   A.  Yes.

18   Q.  Thank you.  You can take your seat.

19          Did rioters get into the building in this place?

20   A.  Yes.

21          MR. MULROE:  Ms. Rohde, if you would play the

22   exhibit.

23          MS. HERNANDEZ:  What exhibit number?

24          MR. MULROE:  165A is playing.

25          MS. HERNANDEZ:  Thank you.

```
 1                    (Video played.)
 2    BY MR. MULROE:
 3    Q.  As this plays, Inspector, what are the officers doing
 4    here?
 5    A.  The officers are -- lined up against the door are
 6    preventing the rioters from opening up the fire door from
 7    the inside.
 8                    (Brief pause.)
 9    Q.  Were they able to hold it?
10    A.  No.
11              MR. MULROE:  All right.  Ms. Rohde, we can stop
12    there at 2:46.
13    BY MR. MULROE:
14    Q.  Inspector Loyd, other than the breaches that you walked
15    us through on Friday on the west side of the Capitol, did
16    the crowd attempt any further breaches on the west side?
17    A.  On the west side?  Yes.
18    Q.  Are you familiar with a part of the Capitol that is
19    sometimes referred to as the tunnel?
20    A.  Yes.
21    Q.  What happened at the tunnel?
22    A.  The tunnel --
23              MR. SMITH:  Objection, Your Honor.  Can we ask for
24    a sidebar?
25                    (Bench conference:)
```

1            THE COURT:  Go ahead, Mr. Smith.  Mr. Smith,

2    you --

3            MR. SMITH:  So Your Honor, objection to relevance

4    and 403.  What the Government is attempting to do is lay

5    blame and responsibility for this group of defendants at

6    every breach at the Capitol when there's no evidence

7    suggesting any causation.  The Government is now attempting

8    to bring the jury into a tour of a medieval-style battle at

9    the tunnel at the Capitol in which these defendants played

10   no role.  This is becoming extremely inflammatory and,

11   frankly, misleading to the jury.

12           THE COURT:  I understand your objection.

13           Mr. Mulroe?

14           MR. MULROE:  Your Honor, the scene at the tunnel

15   is actually one of those that we specifically highlighted

16   and described in our motion in limine briefing on the tools

17   issue.  And so we have proffered and we would, again,

18   proffer that among the participants in this medieval battle,

19   as Mr. Smith called it, at the tunnel are at least five

20   members of the defendants' marching group, sometimes

21   referred --

22           MR. SMITH:  Your Honor --

23           THE COURT:  Mr. Smith, I need you -- okay.

24           Mr. Mulroe, you were cut off there at the end.

25   Just finish your sentence.  I couldn't hear you.

1           MR. MULROE:  I was just naming some of the Proud

2     Boys from the marching group who were part of that scene and

3     those included Alan Fischer and Dion Rajewski and several

4     others.

5           MR. SMITH:  So Your Honor, our response to that is

6     the Government has neither defined what it means by

7     "marching group" -- it has not given the Court any basis for

8     concluding that these defendants caused the so-called

9     Fischer Five, whatever that may mean, to engage in violence.

10    The Government has not shown any communications between

11    Mr. Nordean and the Fischer Five.  It has not given the

12    Court any reason to believe there is some sort of

13    responsibility on these defendants except saying the word

14    "Proud Boys" and "marching group."  It's incredibly

15    inflammatory, it deceives the jury, and we think that this

16    is beyond -- the Government has some leeway in presenting

17    its case, yes, but when the defendants have stipulated a

18    civil disorder, this is cumulative.  It's -- it causes jury

19    confusion.

20          MR. HULL:  Biggs joins.

21          THE COURT:  Well -- go ahead, Mr. Mulroe.

22          MR. MULROE:  That was Mr. Hull.

23          MR. HULL:  Biggs joins, Your Honor.

24          MS. HERNANDEZ:  Your Honor, Carmen Hernandez,

25    also.  There is no relationship or evidence that Mr. Rehl

1    had any contact with the, quote-unquote, Fischer Five or

2    anyone of that medieval battle, as Mr. Smith --

3             MR. SMITH:  The Government hasn't shown you a

4    single communication connecting these Fischer Five.

5             THE COURT:  All right.  Here's what we're going to

6    do.  This sounds like it's -- I'm going to want to hear from

7    you all a little bit more on this.  So I'm going to -- even

8    though it's about a half an hour -- we have to take a break

9    at some point this morning for the court reporter sometime

10   over the next hour.  If we take one early now, we'll be able

11   to come back and I'll just hear from you in open court on

12   this instead of on the phone.  So we'll take a quick break,

13   take 10 minutes for the court reporter.  That will be the

14   morning break.  We'll come back without the jury and I'll

15   hear from you on this in open court.

16             (Return from bench conference.)

17             THE COURT:  All right.  Ladies and gentlemen, we

18   have to take a break at some point during the morning for

19   the court reporter.  I would have held off a little bit

20   longer, but it's a convenient time to take one now.  So

21   we're going to take a 10-minute break.  I'll talk to the

22   lawyers about a few matters and then we'll bring you back.

23             (Jury returned to jury room.)

24             MR. PATTIS:  Judge, may Officer Loyd be excused

25   from the courtroom during argument?

```
1                THE COURT:  Absolutely.  Although I'm going to
2      take the 10 minutes now for our court reporter which is part
3      of what we're going to do and I'm going to re- -- it's now
4      10:15.  I'm going to retake the bench at 10:25 and I'll hear
5      you on this matter in open court.
6                THE DEPUTY CLERK:  All rise.  This Honorable Court
7      stands in recess.
8                (Brief recess taken.)
9                THE DEPUTY CLERK:  Your Honor, we're back on the
10     record in Criminal Matter 21-175, United States of
11     America v. Ethan Nordean, et al.
12               THE COURT:  Okay.  Welcome back, everyone.
13               Look, I'll hear from both sides on this issue.  I
14     don't know that this plows any new ground from the rulings
15     I've already made on the tools evidence.  I -- it would be
16     strange, I think, if the Government didn't ultimately plan
17     on providing evidence that some of the people they're going
18     to be showing engaged in this next set of scenes were
19     marching around with the defendants or have some evidence
20     that these folks were part of the group that were marching
21     around with the defendants.  Otherwise, the evidence is,
22     kind of, just, sort of, sticking out there without any
23     obvious connection.
24               I know, Mr. Smith, you've argued in the past you
25     thought -- I had to, you know -- that they had to prove it
```

1    was causal and all like that, and I resisted that because I

2    don't think they have to.  I think they have to show it's

3    relevant, and relevance could be at least some nexus that

4    they can argue is causal and you may -- or some -- or that

5    it advanced the conspiracy in some way and, of course, you

6    can argue that, No, no, no, that's not the case.

7          So I -- but let me just hear from the Government

8    first; then I will hear from -- or I guess it's the defense

9    objection.  So let me hear from the defense first.

10          MR. SMITH:  Thank you, Your Honor.

11          THE COURT:  Mr. Smith, it's at least --

12          MR. SMITH:  Mr. --

13          THE COURT:  -- your objection --

14          MR. SMITH:  Mr. Hull, can I just make an argument

15    really quickly about this --

16          THE COURT:  You --

17          MR. SMITH:  -- because it's our -- thank you.

18    Yeah.

19          So Judge, we're not going to relitigate the

20    "tools" point, but just in summary, for the record, the

21    Government has created a concept that has no precedent in

22    the law.  They're arguing that the actions of individuals

23    who they have not proven are co-conspirators of the

24    defendants are relevant in a case.  The defense argued that

25    relevance in this context can only make sense in the context

1  of responsibility.  If the actions of others who are not

2  co-defendants or co-conspirators in this case are deemed

3  relevant, we don't understand how -- what the argument would

4  be if the defendants are not responsible.

5      Now, we're not asking the Court to reconsider that

6  right now, but effectively, what the Government is arguing

7  is guilt by association if there's no causal element.  And

8  this is what I mean by that.  If the Government merely shows

9  that a group of people engaged in violence know Mr. Nordean

10 or have spoken to him and associated with him in the past,

11 what you're arguing is guilt by association.  That is a

12 fundamental no-no in the American justice system, and that's

13 why we would submit there is no precedent supporting the

14 concept of the relevance of bad acts by non-defendants and

15 not co-conspirators being shown to a jury.

16     So we would argue, Judge, that the Government has

17 to show something more than that Mr. Nordean had a

18 conversation with an individual who committed acts of

19 violence or Mr. Nordean was seen in the presence of someone

20 who committed an act of violence.  Now, the Government has

21 just been saying, Your Honor, tools and march.  That's what

22 they're saying.  Tools, march.  So what they're saying is

23 that because an individual was in the presence -- that's an

24 associational right.  Mr. Nordean has a right to associate

25 with individuals.  So they're saying because of that

1    exercise of a right, this individual's bad acts can now be

2    shown to the jury with the suggestion that Mr. Nordean is

3    responsible.

4            Now, the Court might say, Well, the Government's

5    not saying -- the witness is not saying Mr. Nordean caused

6    this individual, the Fischer Five, to commit acts of

7    violence.  But if he didn't cause it, again, what is the

8    relevance?  It -- and we've been pushing this causal angle

9    because it doesn't seem -- relevance doesn't seem to make

10   any sense outside of causation and responsibility.  Why

11   would a jury be shown the acts of violence of non-parties if

12   the defendant is not somehow responsible for it?  It

13   certainly implies that to the jury.  So what we have here is

14   the jury being educated on this, kind of, implicit

15   suggestion the defendants are responsible, and yet the

16   Government is backing away from -- is not taking a -- is not

17   owning that implicit argument.  It's deceptive to the jury.

18   We're sitting here watching the jury be misled by this,

19   frankly -- Judge, I -- this is beneath the Government, there

20   is no precedent for this, and it's -- I would just ask that

21   the Government attempt to win the case fairly and with

22   evidence that shows the defendants.  And, Judge, this is

23   verging on territory of outside of American law.  This is

24   something you -- we would see in a --

25           THE COURT:  All right.  All right.

 1                MR. SMITH:  -- court of law in another country --

 2                THE COURT:  Please, please, Mr. Smith.  Why don't

 3       you leave the issues about other legal systems and all the

 4       rest to those other legal systems.  We have a framework here

 5       for you to argue relevance or -- that I should exclude the

 6       evidence either because of relevance or because of 403.

 7       Those tools are available to you, and I'd ask you to use

 8       those traditional concepts, because I think they account for

 9       your concern and I -- so please.

10                MR. SMITH:  Thank you, Your Honor.

11                THE COURT:  All right.

12                MR. HULL:  Good morning, Your Honor.  Hull for

13       Biggs.  May I use the podium?

14                THE COURT:  Yes, sir.

15                MR. HULL:  And we'll talk about podiums and

16       microphones and phones in just a second.

17                But, Your Honor, objection both on -- and I think

18       that we're getting through to the Court and coming to some

19       agreement on what's going on here, but Mr. Biggs was not

20       anywhere near tunnels.  He was not anywhere near -- what's

21       next?  The Crypt?  I mean, it's getting to the point where

22       we're going a little far afield.  We have asked for the

23       stipulation with respect to a civil disorder.  I think the

24       Government is allowed to set the stage a little bit and get

25       a little bit of leeway, but implicitly hooking up my client

```
 1    to tunnels -- and I assume the Crypt is next -- that's
 2    just -- that's not -- I don't think that's proper.  If it is
 3    relevant, I think we've just got a classic 403, wasting
 4    time, causing confusion, and cumulative evidence especially.
 5    So I would also join in on the remarks of Mr. Smith at least
 6    up until the last 30 seconds of his remarks.  I agree
 7    completely.
 8              One other issue.  We're having, as you might know,
 9    kind of, a phone and microphone crisis over here in terms
10    of, you know, talking, especially at the sidebars.  We're
11    not sure -- we understand how the phones work, but we're not
12    sure that we're always getting through to you or who's
13    saying what.  So we'd like, if we could, have the greatest
14    government in the world provide us with -- each one of the,
15    if we can, lawyers with a defendant attorney's phone, if
16    it's possible, and it sounds like the regular live mic
17    problem has been solved for now, but we do need that.  And
18    Mr. Pattis and I, of course, want to get along.  So --
19              THE COURT:  All right.  We --
20              MR. HULL:  Thank you.
21              THE COURT:  We've done -- on the issue with the
22    phones, we've done everything we can to get you all that we
23    can.  So I don't know that the situation is going to improve
24    itself.  The courthouse only has a certain number of the
25    phones and the microphones.  We have at least, I think, two
```

1    or three other trials going on right now in the courthouse.

2    So we've done everything we can do on that front.

3                MR. HASSAN:  (Indicating.)

4                THE COURT:  Yes, sir.

5                MR. HASSAN:  Judge, I'll try to be as loud as

6    possible for the court reporter.  Hassan on behalf of

7    Tarrio, Judge.

8                We would join in.  Judge, although myself and my

9    colleague have not stood up with all the objections, Judge,

10   I would just ask the Court take notice that, although

11   we don't make a representation, we are adopting the

12   motion -- the --

13               THE COURT:  All right.

14               MR. HASSAN:  -- objections made by the defense,

15   Judge.

16               THE COURT:  And I've already said --

17               MR. HASSAN:  Correct, Judge.

18               THE COURT:  -- on Friday that if one defendant

19   objects, you all don't have to stand up and object further

20   and I'll accept that as an objection on behalf of all of

21   you.

22               MR. HASSAN:  Judge, the one thing I -- the one

23   caveat I'll add to that, Judge, is, as the Court's well

24   aware, Mr. Tarrio was not present on January 6th and nowhere

25   around the Capitol, not on the march, nowhere around

 1    Washington, D.C.  So what we would request is a limiting

 2    instruction to the jury to that effect, Judge.

 3              THE COURT:  I don't -- well, I -- we can take that

 4    up later, but I don't think -- let's put it this way.  The

 5    question is whether they are relevant to the conspiracy.  He

 6    is a charged co-conspirator.  So I don't think there --

 7    unlike 404(b) evidence, for example, I don't think there is

 8    a basis for a limiting instruction here.  It's -- the

 9    question is, is it evidence that's relevant to the

10    conspiracy charge?  And he's charged with conspiracy,

11    whether he was there or not there.

12              MS. HERNANDEZ:  (Indicating.)

13              THE COURT:  Ms. Hernandez?

14              MS. HERNANDEZ:  Good morning, Your Honor.

15              So I adopt the statements of my co-counsel,

16    including the last three minutes of Mr. Smith's argument.

17    But I -- as I understand the law and what the Court is

18    ruling, I objected -- I filed a pretrial motion on multiple

19    conspiracies and for severance.  And I understand, to some

20    extent, that motion is premature in terms of the Court's

21    ruling.  You have to hear the evidence before you can make a

22    final decision.  But the point, as I understand the law, is

23    the Government -- the Court, in part, is allowing the

24    Government to introduce all of this with the understanding

25    at -- that, at some point, they will have to link it up to

```
 1        the defendants.
 2                    THE COURT:  Well --
 3                    MS. HERNANDEZ:  And my --
 4                    THE COURT:  Yeah.  I mean, I'm going to hear them
 5        on that, but without -- and I -- let's put aside the fact
 6        that I -- for the moment that I think Mr. -- in Mr. Smith's
 7        view, it's not enough to have them marching behind the
 8        defendants.
 9                    MS. HERNANDEZ:  And --
10                    THE COURT:  I --
11                    MS. HERNANDEZ:  -- I agree with Mr. Smith's view.
12                    THE COURT:  I'm sure you do.  I disagree with
13        that.  I think that is enough of a nexus to the conspiracy,
14        whether -- and a -- whether you call it a causal nexus or a
15        nexus that these folks were used to advance the conspiracy,
16        however you want to phrase it -- I mean, I think probably
17        either way, it's enough evidence of causation for the
18        Government to -- for the evidence to be admissible.  You can
19        argue, No, there's no causation.  They'll argue, There is a
20        causal -- a connection that these, you know -- on their
21        theory that these folks were used by the defendants as part
22        of the conspiracy.
23                    But putting that aside, I agree with you.  They
24        have -- it seems to me that there has to be evidence coming
25        that would connect, like -- let's talk about it in the very
```

1    particular -- the scene we're talking about.  I haven't seen

2    this, but it's some sort of battle back and forth, you know?

3    Without that later connection -- without the Government

4    later introducing some kind of evidence -- video evidence,

5    testimonial evidence -- that, in fact, these folks were --

6    some people involved here were marching behind them around

7    the Capitol that day, it's just, kind of, hanging out there;

8    right?  It -- the jury is left to wonder, Well, what is the

9    connection here?  So I guess I agree with you that they're

10   going to have to tie it together, even if we may disagree on

11   the threshold of evidence that is --

12              MS. HERNANDEZ:  But here's --

13              THE COURT:  -- makes it relevant.

14              MS. HERNANDEZ:  -- the argument I made pretrial

15   and I'm making again.  At some point, if they fail to link

16   it up -- and it is problematic in particular in this case

17   because we've got this novel theory of tools which there's

18   no case law or very little case law.  If they fail to link

19   it up, the defense will have a right to ask the Court to

20   strike that evidence; however, the problem in this case with

21   the introduction of this boatload of what I think the

22   defense all believe is unduly prejudicial -- and we have yet

23   to hit the really nasty stuff, because I believe the

24   Government -- this medieval fight, as Mr. Smith refers --

25   and the Government has also identified Officer Hodges,

1  the -- that's the MPD officer who was stuck in the door,

2  famous, you know, videos all over the place.  I don't

3  believe, Your Honor, that they're going to be able to link

4  any of that to my client.  So at the end, I will be asking

5  the Court to tell the jury, I'm going to strike that

6  evidence, either as to everyone or as to some -- and my

7  concern that I've always expressed to the Court in pretrial

8  is that it is going to be un- -- too late.  It will have

9  tainted the trial.  It will not, you know -- ordinarily,

10  yes, the Government introduces this, that, and you can

11  strike a piece of evidence here and there.  I don't believe

12  the volume of evidence, the quality of evidence that the --

13  the video nature of the evidence is going to allow the Court

14  to strike and still have a trial -- a fair trial under our

15  rules.  And I guess I'm putting the Government on notice.

16  If, at the end, striking will not accomplish that -- will

17  not accomplish [sic] the taint of prejudice, what we've got

18  is a mistrial, a mistrial brought about by the Government's

19  theory and strategy and, therefore, you know, jeopardy will

20  have attached and double jeopardy would prohibit.  So I'm

21  just concerned, in addition to the legal ramifications, as

22  we go along, it is unfair for defendants to have to sit

23  there.

24          And let me add one more point.  It is my

25  understanding that Officer Loyd will not be able to -- if we

1    cross-examine him, will not be able to say, That's right; I

2    didn't see your client.  He's just describing --

3              THE COURT:  Sure.

4              MS. HERNANDEZ:  -- which makes it worse because I

5    don't know when it is that we will be able to point out that

6    all this evidence that came in does not involve my client.

7    So it makes it worse.  It's, sort of -- the taint and the

8    prejudice makes it worse --

9              THE COURT:  Well --

10             MS. HERNANDEZ:  -- and I'm really concerned, Your

11   Honor --

12             THE COURT:  Yeah.

13             MS. HERNANDEZ:  -- and I agree with all my

14   co-counsel on this.

15             THE COURT:  Well, I, you know -- this isn't, like,

16   the first time we've talked about this.  And I -- so let me

17   just -- let me hear from the Government.  Again, I accept

18   the theory that if -- as a -- if the Government can tie --

19   and I know -- I -- your objections are well noted on the

20   theory, but I accept the theory that if they can -- that it

21   is more than simply saying, Well, we once talked; or, We

22   knew each other.  If these -- given the Government's theory

23   of what the conspiracy was here, that if these individuals

24   were marching around the Capitol with them that day or

25   marching with some of the defendants as -- at the front of

1    that marching, you know -- whatever you want to call it --

2    group, that that's enough to suggest, sort of, relevance

3    and, really, causation; that they were -- that the

4    defendants used them to advance the conspiracy.  So I accept

5    that.  I know you don't.  But I do think, look, this isn't

6    the first time we've discussed this.  Either they have that

7    evidence or they don't.  And if they don't, I agree.  It's

8    going to be a big problem.  This -- again, this shouldn't

9    be the -- I, you know -- we're not talking about this for

10   the first time.  The -- what happened that day is captured

11   20 ways to Sunday on video, as we all know.  If there's not

12   either a witness or a piece of video that shows that, well,

13   that's going to be a big problem.

14           So I'm going to ask the Government about that

15   right now.  And if those things don't exist, the safest -- I

16   mean, if they don't exist, they shouldn't attempt to -- the

17   evidence shouldn't come in, number one.  But if they do

18   exist, you know, it might even be the safer course to just

19   wait until you have a witness who can identify them.  But I

20   hear what your point is.  I -- it's, sort of, a strange

21   thing to have this stuff be, sort of, summarized and not

22   immediately -- but I mean, that's true with regard to the

23   Ohio Clock Corridor scene, as well.  Whether this witness

24   can say, Oh, there was Mr. Pezzola right there, or not, a

25   little bit -- the relevance of it is going to be a little

1   bit murky in the beginning.  I assume the Government's going

2   to have, you know, more specific evidence tying --

3           MS. HERNANDEZ:  I just think the --

4           THE COURT:  -- some of these incidents to the

5   conspiracy.

6           MS. HERNANDEZ:  I just think the Court -- I just

7   think the law requires the Court to serve a -- more of a

8   gatekeeper situation.  I mean, Rule 104(b) requires --

9   104(a) and (b) requires the Court to make some conditional

10  findings.  And I think, for example, in the Oath Keepers

11  case -- which is, I guess, the one that was tried with the

12  seditious conspiracy count which, I guess, the Government

13  has often cited and is probably the most parallel -- Judge

14  Mehta, my understanding -- and I've spoken to two lawyers

15  about it -- two defense lawyers, and I'm waiting for

16  transcripts so I can submit them to the Court -- but Judge

17  Mehta was much more active in that gatekeeping function of

18  prohibiting the Government from introducing this evidence

19  that was not relevant to the -- directly relevant to the

20  defendants.  And I think Mr. Smith also pointed to the Court

21  that other civil disorder cases have the courts -- the

22  judges have imposed a more strict gatekeeping standard.  So

23  I would ask the Court to not allow this -- and it's not even

24  as bad -- what's come in isn't half as bad as what we

25  anticipate is about to come in with the tunnel --

```
1              THE COURT:  Right.

2              MS. HERNANDEZ:  -- and the -- Hodges.

3              THE COURT:  So let me just respond -- I'm going to

4    hear the Government, but let me just respond to that.  The

5    Oath Keepers case, the -- there was no similar allegation

6    and argument on behalf of the Government that the

7    defendants, kind of -- that made a broader group of evidence

8    admissible.  So --

9              MS. HERNANDEZ:  I have a client in the Oath

10   Keepers case, not the --

11             THE COURT:  Okay.

12             MS. HERNANDEZ:  -- one that was tried, but I --

13             THE COURT:  Right.

14             MS. HERNANDEZ:  -- know the Government's --

15             THE COURT:  Well, the --

16             MS. HERNANDEZ:  -- theory.

17             THE COURT:  There was no -- right -- there was no

18   theory that -- of this -- like, this tools theory --

19             MS. HERNANDEZ:  Well --

20             THE COURT:  -- right?

21             MS. HERNANDEZ:  -- my view is that the tools

22   theory came up when they realized they had no weapons.

23             THE COURT:  Well --

24             MS. HERNANDEZ:  The -- in the --

25             THE COURT:  -- look --
```

```
 1          MS. HERNANDEZ:  -- Oath Keepers, they had weapons,
 2    but they did have this notion that -- the notion was that
 3    the Oath Keepers were wearing military garb and that gave --
 4    that whipped up the crowd in its own way --
 5          THE COURT:  Okay.
 6          MS. HERNANDEZ:  -- and that Mr. Rhodes had posted
 7    all this stuff on his website that also whipped --
 8    they didn't use the term "tools" because they had the
 9    weapons, but I believe it was -- it was a similar argument,
10    although I understand what the Court is --
11          THE COURT:  Right.  I think that's the difference,
12    is they're not saying -- they don't say in that case that
13    the Oath Keepers, sort of, purposely engaged in a conspiracy
14    to, you know --
15          MS. HERNANDEZ:  Well --
16          THE COURT:  -- assemble a large group of people
17    and aim them at the Capitol as a weapon --
18          MS. HERNANDEZ:  I will --
19          THE COURT:  -- right?
20          MS. HERNANDEZ:  -- tell you what the
21    Government's --
22          THE COURT:  And so --
23          MS. HERNANDEZ:  -- theory on the destruction of
24    property was which was not committed by any defenses --
25    defendant.  It was that their garb, walking up, gave --
```

```
 1    aided and abetted or --
 2              THE COURT:  No --
 3              MS. HERNANDEZ:  -- gave some strength to the
 4    people who actually broke the windows 15 minutes before
 5    they -- the Oath Keepers arrived.  So it was always that
 6    kind of notion.
 7              THE COURT:  Okay.
 8              MS. HERNANDEZ:  Anyway, I --
 9              THE COURT:  But I -- anyway, it's a different -- I
10    think it's -- even if there were some other things that were
11    a little bit close, it is a -- here, it's a broader theory.
12    It doesn't make the theory right or wrong.  I'm just saying
13    it's different.  And so that's, I think, why they get leeway
14    if they can show me that it's not just -- and it's not -- I
15    guess the point I want to make before I hear from the
16    Government, it's not just that they have the -- that they
17    have a video of the person that they see engaged -- that
18    this video is going to show engaging in these -- this combat
19    and all the rest.  It's that they're -- that it exists and
20    they're going to play it in their case because, again, if
21    they don't, then, definitely, the jury is left with, Well,
22    what am I hearing about the -- why am I seeing these other
23    scenes?  I don't even have a theory of why it's, you know --
24              MS. HERNANDEZ:  Yeah.  I guess --
25              THE COURT:  -- it's relevant --
```

1          MS. HERNANDEZ:  -- our concern is the jury's not

2     going to ask that question.  The jury's going to meld it all

3     into one glob of, All these defendants did this.  And I will

4     say, with this AJ Fischer argument, I have looked at the AJ

5     Fischer complaint and all the information.  It never says

6     anything about my client or any of the other Proud Boys, to

7     my recollection.  So again, the -- again, we're walking

8     blind into this stuff because -- where's the link?  Where's

9     the evidence?

10          I guess the Court is aware of our objections which

11     are strenuous.  We're trying to get a fair trial for these

12     defendants in an atmosphere that the Court has recognized,

13     as shown by the extensive voir dire that the Court

14     conducted, that this is a very difficult situation to be

15     trying these defendants and get a fair trial for them.

16     That's all we're looking for.

17          THE COURT:  I understand.  And I -- again, I think

18     if the Government can't -- well, why don't I -- why don't

19     we -- why don't I stop dancing around -- and I guess I'm --

20     one of the things I was not aware of that could play -- that

21     I'd be interested in hearing from the Government is, how

22     many different scenes are we really talking about?  I think

23     this is the first, it sounds like -- first scene where the

24     Government's previewing tools evidence.  You tell me.  That

25     sounds like what you're doing.  And how many different, you

1    know -- and, obviously, there are -- there -- it seems to me

2    the Government's -- this kind of evidence is also relevant

3    to things that were happening right around the defendants

4    physically, maybe, right to the left or right to the right

5    or behind or ahead of the defendants.  Here, this is a

6    situation, as I understand it, which is, you know,

7    physically separated, I think, from all the defendants.

8    Again, doesn't mean you couldn't hook it all together, but

9    it's a little bit of a different nature in that regard.

10           So Mr. -- after all that, Mr. Mulroe?

11           MR. MULROE:  Thank you, Your Honor.

12           Just to, maybe, make things short, the Government

13   certainly does plan to, and will, tie all of this up by

14   making the requisite factual showing that each of the

15   individuals in question, whether they're tools or

16   conspirators, was, in fact, connected with the defendants

17   through the marching group and many other means.  And in the

18   case of Mr. Fischer, you know, I think he would probably

19   qualify as a co-conspirator at the end of the day based on

20   all of the links between him and these defendants,

21   including, but not limited to, his presence in the marching

22   group.  I can proffer and march through those now, but -- I

23   mean, we're going to be presenting this to the jury in a

24   very direct and very structured way later in the case.

25           We've structured our trial a little bit

1    differently so that the jurors, at the very beginning, would

2    get the overall picture, kind of, the framework that they're

3    later going to be able to slot every piece of particularized

4    information into, but we're not just putting these things

5    out there and letting them hang and making insinuations.

6    We're going to wed it all up to these defendants and their

7    conduct, and that's certainly coming down the pike.

8         I don't think that there's any valid claim of

9    surprise on the part of defense counsel.  The Court well

10   recalls the extent to which this was all litigated pretrial,

11   weeks of motions in limine, and in those motions, Your

12   Honor, briefing included a bulleted list right up at the

13   front of the examples of the types of tools conduct and

14   tools evidence and the linkages that we plan to introduce.

15   Fischer and the other people in this tunnel were at or near

16   the top of that list.  So this is something that's been on

17   the table for a long time and it's something that we have

18   always planned and still plan to link up for the jury's

19   benefit as well as for the benefit of just establishing the

20   relevance.

21        Your Honor asked approximately how many different

22   scenes we're going to introduce in this fashion, and I just

23   have been handed a list by co-counsel.  It's less than 10.

24   It's not extensive.  Your Honor was right to note that, in

25   some cases, the action is a bit more proximate to the

1    defendants than in others.  This is a case in the tunnel

2    where there wasn't one of these trial defendants very

3    nearby, but other cases, there will be.

4         And so unless the Court has questions, I do think

5    that we're relitigating here something that's been settled;

6    something that, I think, Your Honor found was not a very

7    novel or controversial theory.  And so we'd ask to press

8    forward.

9         THE COURT:  But only if -- and so you're telling

10   me there's evidence -- let's just take the Fischer example.

11   Again, I -- maybe, you did mention Fischer as an example

12   here when we litigated it.  I don't remember it

13   specifically.  But the point is, you have video and evidence

14   of him marching with the defendants on that day.  You have

15   other evidence that are going to connect him up as someone

16   who was there in coordination with the defendants.  And your

17   argument is that that's -- that is exactly -- well, for lack

18   of a better way to put it, that the defendants used

19   Mr. Fischer and others as implements of their conspiracy?

20        MR. MULROE:  Correct, Your Honor, and -- I mean,

21   maybe, it's useful just to use Mr. Fischer as an example.

22   There will be social media evidence showing that he was at

23   the December 12th rally with the defendants wearing tactical

24   gear and celebrating with them afterward.  There will be

25   evidence that he was a member of all of the main Ministry of

1    Self-Defense membership chats.  So he wasn't in the

2    leadership chat, but he was in all the various iterations of

3    the membership chats as well as the Boots on Ground chat.  I

4    expect there will be evidence that he was physically present

5    at the Airbnb on the night of January 5th with Biggs and

6    Nordean.  As the Court mentioned, there will be evidence

7    that he marched with the group.  He and the others in his

8    small group, the Fischer Five, amassed at the Washington

9    Monument at the appointed time of 10:00 a.m.  There will be

10   evidence that they celebrated together on the west front

11   while the riot was in progress with Biggs and with Mr. Rehl

12   right nearby.  And then on the point of the chats, there

13   will be evidence that -- I expect the evidence will show

14   that even after January 6th, he was added to the new

15   post-riot iteration of the Ministry of Self-Defense that

16   opened on January 9th.  So still well within the fold after

17   everything he did at the Capitol and in the tunnel.

18           THE COURT:  And are you going to go through each

19   of these -- you said less than 10.  Are you going to go

20   through each of these, for lack of a better way to put it,

21   scenes with Inspector Loyd now?

22           MR. MULROE:  No, Your Honor.  I think there may be

23   one other I'll preview which is in the, kind of -- in the

24   Capitol on the way down to the Capitol Visitor Center.

25   There were fire doors -- kind of, like garage doors -- that

1    were closing and some members of the marching group blocked

2    those using podiums.  I expect we'll show that, but other

3    than that, I think -- just consult my outline --

4              THE COURT:  All right.

5              (Brief pause.)

6              MR. MULROE:  No, I think that will about do it,

7    you know?  Inspector Loyd is an overview witness.  So to the

8    extent that the places where the tools were were significant

9    in the overall course of the day, we're showing it through

10   Inspector Loyd, but most of that stuff we're going to be

11   doing in a little bit of a more zoomed-in fashion through

12   the testimony of the case agent later in the case.

13             THE COURT:  Right, later on.  All right.  So

14   look --

15             MR. PATTIS:  (Indicating.)

16             THE COURT:  Mr. Pattis, I can see you --

17             MR. PATTIS:  Only --

18             THE COURT:  -- wanting to be heard.

19             MR. PATTIS:  I did -- I had intended to raise this

20   later, but given Mr. Mulroe's use of social media as a means

21   of proving this, you know, I'm going to request an

22   adjournment of trial until such time as the defense has full

23   and complete access to the 122-page report on the use of

24   social media in bringing people to the Capitol.  The

25   Government is persisting here in a highly attenuated theory

1    of tools that is going -- and we believe there are other

2    superseding and potentially intervening causes that would

3    eliminate that from the case.  And I read this morning in

4    the Washington Post that there's a 122-page social media

5    report that didn't make the report.  I don't know if it's

6    found its way to the executive branch yet, but I reiterate

7    the remarks I made earlier.  This is the case of the United

8    States of America v. Joe Biggs and others.  I speak on

9    behalf of Mr. Biggs.  If our government can't get its

10   collective psyche together and we've got the executive

11   branch trying a case against our government [sic] while the

12   legislative branch is withholding evidence that may be

13   material, we're prejudiced.  And we know this report exists.

14   We know it's not been sent to the National Archives.  We

15   don't have it.  And now, we've got the Government talking

16   about extensive use of social media while there's a 122-page

17   report of a congressional committee that we don't have

18   access to.  I believe it's unfair to proceed to trial on

19   this matter.  The caption in this case isn't the executive

20   branch or the Justice Department v. Joe Biggs.  It's United

21   States of America.  And if we've got a schizophrenic

22   government that can't get its two lobes together, we come to

23   the judiciary to ask for protection.

24             THE COURT:  All right.

25             MR. PATTIS:  We have a right to a fair trial and

1    we want that information and we need it, and this argument

2    has demonstrated why we need it.

3              THE COURT:  All right.  Mr. Smith, do you want to

4    add anything else?

5              MR. SMITH:  Yes, Your Honor.

6              I just wanted to note that after Mr. Mulroe's

7    presentation of the -- previewing a proffer of the linking

8    evidence he would show, he did not mention any content of

9    communications.  He said that the Government would link up

10   Fischer -- the Fischer group to Mr. Nordean with -- by

11   the -- by virtue of the fact that Fischer was a member of

12   the same Telegram chat groups and he was a part of the

13   march.  Your Honor, this is all surface.  This doesn't show

14   why Mr. Nordean would be responsible in any way, would have

15   caused Fischer's violent conduct in any way.  So it cannot

16   be enough, again, to merely say a defendant is associating

17   with someone either virtually or in person through march

18   and, therefore, a jury can be led to believe relevance can

19   rest on -- can be led to believe that the defendant has some

20   sort of responsibility for violence caused by that person.

21   There has to be -- the Court hasn't seen any communication

22   showing that Mr. Nordean wanted to use tools such as Fischer

23   to commit acts of violence.  The Court hasn't seen any

24   communications showing these defendants wanted, aimed to use

25   these people to commit acts of violence.  There's been none,

```
 1    Your Honor.  And it would be one thing if we had
 2    communications shown to the Court saying -- from Nordean or
 3    Biggs or anyone, Mr. Tarrio, saying, These people are going
 4    to be committing acts of violence.  That would be one thing,
 5    but we're bereft of anything in the record.  We just have
 6    these, sort of, superficial statements from the Government
 7    saying they marched together or they had communicated at
 8    some point, but we don't know what it's about.  There's been
 9    no proffer that -- so this is totally inappropriate --
10            THE COURT:  Okay.  All right.  I understand your
11    argument.  I understand your argument, and I simply disagree
12    with it.
13            Mr. Pat- --
14            So here's where we're going to proceed right now.
15    The Government -- I -- look, this is a summary witness.
16    Fine.  I think you've laid out for me at least by proffer
17    the many ways in which this Fischer person can be connected
18    in -- on your theory.  And so I'm going to let you do that
19    and -- but let me just say this.  I think it makes sense as
20    we come up to these witnesses that are going to be -- let's
21    put it this way.  As we come up to the tools of the
22    conspiracy evidence as we go forward, it makes sense for the
23    Government to be prepared with laying out, Here -- before
24    the evidence comes in to me, Here's the -- here's, you
25    know -- we have video, well, connecting them through
```

```
 1    marching; we have this; we have that; we have that.  Lay --
 2    just -- you don't, you know -- lay it out to me.  Be
 3    prepared to present it to me before it comes in, and I'll
 4    rule.
 5              I do think Mr. Smith is confused about the layer
 6    of -- or the quantum of evidence that is needed to be
 7    relevant here.  I do think, for example, the way in which --
 8    the jury may or may not agree with the Government's argument
 9    here -- the evidence that -- the argument they'll make from
10    this evidence or they may agree with the defense argument
11    about it, but I do think they have enough to show that these
12    witnesses, at least for -- with -- regarding Fischer -- just
13    conceptually, that they have enough to have the evidence be
14    admitted and for, again, both sides to argue about what the
15    jury should infer from that evidence.
16              I do think Ms. Hernandez makes a good point.  I
17    think it's going to get -- I think it would be the safer and
18    more prudent way to proceed once we get past the summary
19    witness for the Government to be, you know -- to have those
20    concrete things you can show me or tell me about each of
21    these tools and how they connect in.  And, again, if it is
22    as you say, Mr. Mulroe, I will likely agree with the
23    Government's theory and allow the Government to proceed, but
24    I think, out of an abundance of caution, that probably does
25    make sense.
```

```
1            Mr. Pattis, on your objection, this is a --
2    certainly, it's noted for the record and, certainly, we'd
3    been -- this is something we've talked about a lot in the
4    past.  I -- I'll just say, the report you mentioned is not
5    available -- I know your feelings about this and your
6    objection, but it's not available to the Government.  It's
7    not available to the -- well, let me be very clear.  It's
8    not available to the Department of Justice or to these
9    prosecutors.  It's not -- and it's not available to you all.
10   And so I don't think it warrants an adjournment.  As you all
11   know, I have a standing order that if any January 6th
12   material comes into the Government's possession -- well,
13   I -- you all know if there's something that is relevant,
14   they have to provide it to you immediately, and we don't
15   have any suggestion that this report is in the hands of the
16   Government, but even so, we're -- but let me just say, even
17   so, the social media they're talking about using as evidence
18   has been produced in the case.  I mean --
19            MR. PATTIS:  We don't know that any more than --
20   with the Bertino transcript.  We just don't -- I don't know
21   what I don't know.
22            THE COURT:  Well, they can't -- they're not using
23   as evidence --
24            Mr. Mulroe, are you planning to use any social
25   media evidence in this case that hasn't been produced to the
```

1    defense?

2         MR. MULROE:  No, Your Honor.

3         THE COURT:  All right.  There we go.

4         So we're going to bring in the jury.  We're going

5    to continue.  I suggest, Mr. Mulroe, you go light on some of

6    these summary issues for now, again, because I think you've

7    given me a good-faith basis to believe you're going to be

8    able to admit it, but it is -- the -- I think the more --

9    the more focused way to go forward would be to present it to

10   the jury along with your information that will connect these

11   people to the defendants --

12        MR. SMITH:  Your Honor, just before we bring them

13   in, we just want to make a -- we understand that it might be

14   premature to do this, but to avoid any more delay, we're

15   moving for a mistrial on the condition that this evidence is

16   admitted.  So rather than do it when the jury's out, we're

17   now -- to the extent this tunnel scene is being admitted, we

18   move for a mistrial.

19        THE COURT:  All right.

20        MS. HERNANDEZ:  Join.

21        THE COURT:  All right.

22        MS. HERNANDEZ:  Your Honor, I think --

23        THE COURT:  The motion's denied.

24        MS. HERNANDEZ:  I think this is a good place to

25   ask the Court to direct the Government to produce for the

1    defense a list of who they believe are the tools and the

2    co-conspirators in this case.  I sent an email to them long

3    ago.  We had a status hearing where I mentioned it and the

4    Court said, Oh, wait.  When I rule, it -- you might see the

5    parameters.  But I think this might be -- I think -- we're

6    in trial already.  Maybe they could just give us a list of

7    whom they consider to be tools.

8                THE COURT:  Here's what I think makes sense for

9    them to do, and we can talk about it before the end of the

10   day if you all don't reach an accommodation.  Mr. McCullough

11   was up here earlier today talking about how he's previewing

12   to some degree in good faith for you all what's coming up in

13   terms of witnesses and exhibits, consistent with -- and,

14   maybe, even going beyond my orders.  It seems to me that

15   part of that -- and given what I've, sort of, laid out

16   here -- should be the same -- I mean, if he's provide- -- if

17   he's previewing the witnesses and the exhibits, that part of

18   that would be previewing, Okay.  Here's -- we're -- the --

19   today or tomorrow or the next day, we're going to be talking

20   about Tool X.  And Tool X is this person and they operated

21   with these other people.  Here is going to be our evidence

22   that connects them back in to the defendants.  Here's what

23   the person purportedly did that day.  So we're not doing

24   this -- you're not, the day of, learning, Oh, okay.  Now,

25   we're talking about this particular person.

 1           MS. HERNANDEZ:  I'm a broken record, I know.  The

 2   Court I don't think understands the volume of materials

 3   we're dealing with.  So even though we have a huge amount of

 4   discovery, you add these additional tools.  There's now

 5   another mound of materials out there.  And it just -- I'm

 6   just telling the Court, even the day -- even, like, just the

 7   list of items that they gave us last night of, Here are the

 8   exhibits, even just those -- the Parler exhibits referencing

 9   these defendants -- I think there were more than 30 -- that

10   takes hours.  So I'm just asking as early -- if they just

11   give us -- I agree that what the Court -- what they're going

12   to produce is terrific.  But can they just give us a list of

13   who these people are?  I mean, we can start working on it.

14           THE COURT:  Or at least people who -- I don't

15   think the co-conspirators is something -- but I don't think

16   it's unreasonable -- let me ask the parties --

17           MS. HERNANDEZ:  Thank you.

18           THE COURT:  -- to talk about it going forward.  I

19   don't think, Ms. Hernandez, it's unreasonable for the

20   Government to be able to say, Here are the list of tools at

21   least we plan to present evidence at the -- as you say,

22   we're in the middle of the trial.  Here's what -- here are

23   the tools we plan to present evidence related to, so that

24   can potentially help your issue about being prepared to

25   argue whatever you would like to --

1              MR. SMITH:  And, Your Honor, we would just note on

2     that point that sometimes when the Court encourages the

3     parties to speak, the defense will send emails proposing

4     agreements on discovery to the Government and the Government

5     simply doesn't respond.  Just yesterday, Ms. Hernandez

6     proposed an exchange on authenticity and some -- in exchange

7     for the Government alerting the defense in advance to

8     certain exhibits the Government -- Mr. -- the Government

9     doesn't respond to these communications.  So we would prefer

10    to, kind of, work it out in court, because otherwise it

11    doesn't get done.

12             Thank you, Judge.

13             MR. MCCULLOUGH:  Your Honor, as to that last

14    representation, the Government proposed stipulations on the

15    authenticity of Telegram and Parler in --

16             MS. HERNANDEZ:  December.

17             MR. MCCULLOUGH:  -- at least December, if not

18    earlier in November.  We have raised this issue repeatedly

19    with the defendants and we raised it, again, last week.  We

20    raised it on a -- verbally by email.  We received an email

21    yesterday with a proposal.  We're considering it.  I mean,

22    this -- the prospect that the Government did not respond is

23    inaccurate.

24             THE COURT:  All right.  Mr. McCullough, what

25    about -- just before I have you leave the podium, do you

1    think it is reasonable for the Government to try to work out

2    a system on the tools evidence so that the defendants aren't

3    in the dark the day of what -- or even, you know, if --

4    consistent with what I've ordered with regard to other

5    materials?  That they be -- that they know, Okay.  We're

6    going to have this -- this is the tools evidence that's

7    coming up.  So we can have a -- if we need to, to have a

8    further discussion about it ahead of time.

9            MR. MCCULLOUGH:  Yes, Your Honor.  I mean, in

10    terms of, kind of, previewing, kind of, what we're expecting

11    to come on the following day and making sure that we're --

12    kind of, previewed that evidence and we've, kind of, teed up

13    the issues, absolutely, Your Honor.  The Government's

14    prepared to do that.  I think the -- frankly, the issue is

15    that even when we tee these issues up, it doesn't seem to,

16    kind of, clear away the underbrush.  I mean, we felt like

17    we, kind of, teed this one up in the motion in limine and,

18    kind of, here we are.  But, you know --

19            THE COURT:  Well --

20            MR. MCCULLOUGH:  -- Your Honor, we will continue

21    to attempt to do this.  I'm hopeful that the parties can get

22    to a place where, at minimum, we can streamline the

23    arguments for you.

24            THE COURT:  Right.  It does.  It does help me, I

25    will say.  And if -- believe me, if the parties hadn't teed

1     this issue up through the motions in limine, we'd be in a

2     very different place right now.  I, you know -- in any

3     event, so, again, I think it's -- so because you have a

4     good-faith basis that you're going to be able to tie this

5     scene up later on, I think you get a little leeway to show

6     it now, but, again, I think it's really ultimately just

7     going to be background for the jury.  They're not going to

8     have a sense of who was responsible for what.  They may even

9     think this is -- even though it's really not -- sort of,

10    just overall, you know -- evidence about the overall event.

11    You all are going to be able to, you know -- let me put it

12    this way.  This isn't going to be the end of, Well, my

13    client wasn't there and wasn't responsible for that and --

14    or at least the Government's evidence that my client was

15    responsible for that is very, very thin.  We all know -- or

16    that's -- the argument's going to be.  So I don't think

17    we've -- the question of what exactly within the day's

18    events the defendants are or are not responsible for, I

19    expect, is going to be the subject of lots of argument

20    before the jury.  Nothing I've heard today changes that.

21    But in any event, I think the Government does have a

22    good-faith basis to go forward with this witness as they

23    have indicated.  And, as I said, going forward, it will help

24    me, just because I do think the downside -- I think it will

25    help me and help streamline the proceedings if the

```
 1    defendants know in advance, Here is the, you know -- for
 2    lack of a better way to put it, Here is the tool we're going
 3    to be talking about the next day, the next day, and here's
 4    the evidence we have to tie that in to the defendants.
 5            All right.  Very well.  Thank you.
 6            So if there's nothing further, we'll bring in, I
 7    guess, first -- well, would you like to bring in Officer
 8    Loyd -- Inspector Loyd and put him on the stand?  That's
 9    fine.  And at the same time, we'll go get the jury.
10            MR. MCCULLOUGH:  And, Your Honor, it's our
11    understanding that when we return from breaks, as long as
12    we're not talking about anything, you would prefer that the
13    Government get its witness on the stand; is that --
14            THE COURT:  Yes.
15            MR. MCCULLOUGH:  -- correct in terms of your --
16            THE COURT:  Yeah.  You --
17            MR. MCCULLOUGH:  -- preference?
18            THE COURT:  You have my imprimatur to do that
19    going forward.
20            MR. MCCULLOUGH:  Thank you, Your Honor.
21            THE COURT:  Yes.
22            (Brief pause.)
23            All right.  You may retake the stand, sir.
24            (Thomas Loyd resumed the stand.)
25            THE COURT:  While Ms. Harris is getting the jury,
```

1    she very astutely reminded me of an email she sent me

2    earlier that she wanted me to pass on to counsel which is --

3    ah, okay.  So there are phones, I guess, at defense counsel

4    table, some of which are marked "attorney."  Those can be

5    used for attorneys speaking.  There are, apparently, other

6    phones -- we're not talking about microphones now.  The --

7    these phones.  Others, if they do not have "attorney," they

8    are only for the defendants to listen.  So maybe, that --

9    I -- she may have observed something that may have given her

10    a reason to think there was confusion about that.  So I just

11    reiterate that.

12            MS. HERNANDEZ:  Your Honor, the problem with the

13    phones is there aren't enough phones for all counsel and all

14    defense -- defendants.  And I, you know -- I think the

15    defendants are entitled to listen in on what's going on.

16    They've been sharing, but it's, kind of, hard with the

17    husher and stuff.  And I understand the -- what's going on

18    in this courthouse, but I guess unless --

19            THE COURT:  Well, as far as the attorneys go,

20    again, I've -- I haven't -- look, I've given you, you

21    know -- I'm not rushing everyone.  I've told you all one

22    objection counts for all.  And if somebody has, you know --

23    if a defense counsel feels they have a unique point they

24    have to make, you know, raise your hand and let me know

25    before I move on and I'll -- I have to account for the fact

1    that we have that -- those limited number of phones.

2         MS. HERNANDEZ:  I just think the defendants have a

3    right to hear what's going on and it's -- right now, we

4    don't have enough phones for that to happen.

5         THE COURT:  All right.  We're --

6         MR. HULL:  Just to make it clear, Your Honor, we

7    understand the difference between the defendants' phones

8    where they cannot speak and the defendants' attorneys'

9    phones.  We just need three or four more of each, it would

10   seem.

11        THE DEPUTY CLERK:  Jury panel.

12        (Jury returned to jury box.)

13        THE COURT:  All right.  You all may be seated.

14        Mr. Mulroe, you may proceed.

15        MR. MULROE:  Thank you, Your Honor.

16   BY MR. MULROE:

17   Q.  Inspector Loyd, before we took a break, I had just asked

18   you about the tunnel.  So let's pick up right where we left

19   off.  What is the tunnel?

20   A.  The tunnel is the lower west terrace door on the west

21   front of the Capitol that enters -- on that particular day,

22   if you exit the lower west terrace door, it puts you right

23   on the inauguration stage.  Because of all the publicity

24   after January 6th, it became known as the tunnel entrance.

25   Q.  The, kind of, official term of it is the --

1    A.  Lower west terrace door.

2    Q.  -- lower west terrace door?

3    A.  Yes.

4    Q.  Using the demonstrative -- and I know it's two

5    dimensions, but can you point out to the jury where that is.

6    A.  Right in this area, (indicating) going onto the stage.

7    Q.  Thank you.  You can take a seat.

8            Inspector Loyd, what happened at the lower west

9    terrace door or the tunnel on January 6th?

10   A.  Eventually, it became completely overrun, and the

11   Metropolitan police who had come to assist us and were out

12   on the west front on the stage and who had set up a police

13   line, they were eventually overrun and eventually had to

14   evacuate and pull back into the lower west terrace door or

15   the tunnel.  And there was a brutal battle there for a

16   while.

17           MR. MULROE:  Ms. Rohde, could we play Exhibit-434,

18   starting at the beginning.

19           (Video played.)

20           MR. MULROE:  Pause for one moment.

21           And I believe this has been admitted, so I'd ask

22   the screens for the jury to be turned on.

23           THE COURT:  All right.  Permission to publish.

24           MR. MULROE:  Thank you, Your Honor.

25           (Video played.)

1    BY MR. MULROE:

2    Q.  So Inspector Loyd, at 15 seconds -- we've turned the

3    volume down and I'll ask you a few questions.

4           What are we looking at on the screen here?

5    A.  You're on the outside looking in to the lower west

6    terrace door, also known as the tunnel.

7    Q.  And where do those doors head if one were to go through

8    them?

9    A.  Into the United States Capitol.

10   Q.  What's going on in the scene that we see on the screen?

11   A.  There's protesters attempting to enter into the building

12   at that point.

13   Q.  How long did this go on?

14   A.  A few hours.

15   Q.  A few hours?

16   A.  Yes.

17           MR. MULROE:  Ms. Rohde, if you could turn the

18   sound on and then skip to 25 minutes and 40 seconds.

19           (Video played.)

20   BY MR. MULROE:

21   Q.  Are we still in the tunnel here?

22   A.  I'm sorry?

23   Q.  Are we still in the tunnel here?

24   A.  Yes.

25   Q.  What is the crowd doing?

1    A.  The crowd is surging forward, attempting to enter the

2    building.

3              MR. HASSAN:  Objection, Your Honor.

4              THE COURT:  What's the objection?

5              MR. HASSAN:  Speculation.

6              THE COURT:  Overruled.

7    BY MR. MULROE:

8    Q.  And who are the people we see in helmets, Inspector?

9    A.  The officers you see, from the uniforms, is Metropolitan

10    Police.

11              MR. MULROE:  Ms. Rohde, we can stop the video

12    there.

13    BY MR. MULROE:

14    Q.  Inspector Loyd, did the crowd ever make its way through

15    the tunnel and into the door?

16    A.  I do not believe so.  I believe Metropolitan held that

17    door.

18    Q.  And what, if any, effect did that have on the overall

19    circumstances of the day?

20    A.  It prevented at least hundreds of people not to enter

21    the building through that specific entrance.

22    Q.  Inspector, I'll take you to some other parts of the

23    Capitol starting with the Rotunda.  Did we hear the word

24    "Rotunda" in one of the radio clips earlier?

25    A.  Yes.

1    Q.  And remind the jury.  Where is the Rotunda in the

2    Capitol?  You can use the demonstrative.

3    A.  This is the Rotunda, the circle in the middle, and the

4    Rotunda door goes out onto the east front which is the

5    center portion at the very top.

6    Q.  Thank you.  You can take a seat.

7            Is the Rotunda where the large dome is that you

8    can see from the outside of the building?

9    A.  Yes.

10   Q.  Did rioters enter the Rotunda on January 6th?

11   A.  Yes.

12           MR. MULROE:  168, please.

13           (Video played.)

14   BY MR. MULROE:

15   Q.  What do we see on the screen?

16   A.  That's the Rotunda on the second floor filled with the

17   rioters and some cops.

18           MR. MULROE:  We can stop the video at about 20

19   seconds.

20   BY MR. MULROE:

21   Q.  And, Inspector Loyd, you were describing to us earlier

22   today the layout of the House chamber with the gallery

23   upstairs and the floor on the lower level.  Is the Senate

24   chamber structured in, kind of, the same way?

25   A.  Yes.

1    Q.  And it was outside the Senate chamber that you were in

2    the Ohio Clock Corridor that we saw earlier?

3    A.  Yes.

4    Q.  Did rioters ever get into the Senate chamber?

5    A.  Yes.

6    Q.  How did that happen?

7    A.  On the third floor -- we had secured all the doors on

8    the second floor after the evacuation.  My officers were in

9    the process of securing the doors on the third floor, which

10   is labor-intensive because it -- it's the old school with

11   the key and the wooden door.  And I believe they got to the

12   last door and they were getting ready to lock it, and then

13   they were overwhelmed by the rioters.  And then once the

14   rioters got into the gallery, one person made a jump from

15   the third floor to the second floor to open up the rest of

16   the doors.

17            MR. MULROE:  Ms. Rohde, 455A, please.

18   BY MR. MULROE:

19   Q.  Do you recognize that location, Inspector Loyd?

20   A.  Yes.

21   Q.  What do we see on the screen?

22   A.  That's a view from the third floor Senate gallery.

23   Q.  So it was down from here that somebody jumped to gain

24   access to the --

25   A.  Yes, somebody jumped from this location down one flight

1    onto the Senate floor.

2    Q.  Apart from the galleries, Inspector Loyd, what about

3    offices?  Does the Capitol Building have various offices

4    inside of it?

5    A.  Yes.

6    Q.  Are those offices generally open to members of the

7    public coming in?

8    A.  Only if they're invited.

9    Q.  Did rioters enter any of the offices in the Capitol?

10            MS. HERNANDEZ:  Objection as to the

11    characterization, Your Honor.

12            THE COURT:  Inspector Loyd, what did you mean by

13    "invited"?

14            THE WITNESS:  As far as the Capitol Building

15    itself, no offices are open to the public.  You need -- if

16    you're going to enter in the office, you have to be invited

17    by a member of Congress or a staff member and your name has

18    to be on a list to enter that specific office.  You just

19    can't walk into the Capitol like in -- you can do with the

20    House office buildings or the Senate office buildings.  You

21    have to have an appointment or be escorted by somebody, a

22    staffer.

23            THE COURT:  All right.  The objection is

24    overruled.

25            Mr. Mulroe, you may proceed.

1   BY MR. MULROE:

2   Q.  On January 6th, did members of the crowd enter any

3   offices within the Capitol Building?

4   A.  Yes.

5          MR. MULROE:  456, please.

6   BY MR. MULROE:

7   Q.  Based on the furniture and decoration, do you recognize

8   generally what we see here?

9   A.  Yes, that's an office within the Capitol.

10          MR. MULROE:  And 415, please.

11          (Video played.)

12   BY MR. MULROE:

13   Q.  Do you recognize that location in 415?

14   A.  Yes, somewhere in the Capitol.

15   Q.  Does that appear to be an office?

16   A.  Yes.

17   Q.  Are you aware of whether any members of Congress invited

18   any members of the crowd into their offices that day?

19   A.  Not members of the riot or the mob, no.

20   Q.  Inspector Loyd, did there come a time when police were

21   able to successfully get the rioters out of the building?

22   A.  Yes.

23   Q.  Tell us how that happened.

24   A.  As more mutual support arrived throughout the afternoon,

25   eventually, we had enough cops who showed up that we

1    outnumbered the protesters in the building and eventually,

2    we pushed all the protesters out so we could start the

3    ballot process over again.

4              MR. MULROE:  Ms. Rohde, 395, please.

5              (Audio played.)

6    BY MR. MULROE:

7    Q.  Why did you tell them that everyone needs to mask up?

8    A.  At one point, after I cleared the shooting at the

9    Speaker's Lobby, I went down a hallway and got completely

10   overwhelmed with pepper spray inside the building.

11             MR. MULROE:  396, please.

12             (Audio played.)

13   BY MR. MULROE:

14   Q.  Did the spray make it difficult to do your job?

15   A.  Yes.

16   Q.  Did you keep working?

17   A.  Yes.

18             MR. MULROE:  397, please.

19             (Audio played.)

20   BY MR. MULROE:

21   Q.  The timestamp on the clip was 4:29.  So tell the jury,

22   if you would, Inspector Loyd, what was the overall state of

23   affairs at approximately 4:30 on the 6th?

24   A.  We had gotten a basic handle on the inside of the

25   building where we could clear people out.  We had enough

1    mutual support at that point that we could retake the

2    building and push everybody on the outside and eventually

3    set up a perimeter on the outside.

4    Q.  Eventually, were you able to get the building completely

5    secured?

6    A.  Yes.

7    Q.  Earlier, you told us about evacuating the members of

8    Congress from the chambers.  Did there come a time when the

9    members came back into the chambers?

10   A.  Yes.

11   Q.  Why was that?

12   A.  To restart the presidential ballot process that had been

13   interrupted.

14   Q.  About what time did they come back in the chambers?

15   A.  Approximately 8:00 in the evening.

16   Q.  And did they, in fact, resume the proceedings?

17   A.  Yes.

18   Q.  Do you know how long the proceedings went that night?

19   A.  It went to the early morning of January 7th.

20   Q.  And what about you?  When did your day end on

21   January 6th?

22   A.  Approximately 10:00 or 11:00 in the evening.  I turned

23   it over to my midnight captain.

24   Q.  Were things pretty well in hand by that point as far as

25   you could tell?

```
 1    A.  Much better, yes.

 2    Q.  Did you go back to the Capitol the next day?

 3    A.  Yes.

 4    Q.  Why did you go back?

 5    A.  Just to, number one, make sure everybody who was able,

 6    with my team, came back, which they did, and we had roll

 7    call and, you know, went back to work.

 8    Q.  Did you observe the state of the grounds and building

 9    when you went back to work?

10    A.  Yes.

11    Q.  Tell the jury about that.

12    A.  Very bad.  We had multiple windows that were broken out.

13    We had multiple fire doors that were inoperable and had to

14    be repaired.

15    Q.  What did you think when you saw the Capitol that way?

16    A.  It --

17             MR. HASSAN:  Objection.  Speculation.

18             MS. HERNANDEZ:  Objection.  Relevance.

19             THE COURT:  Objection sustained.

20    BY MR. MULROE:

21    Q.  Inspector Loyd, based on the way that you saw the

22    Capitol when you returned to it on January 7th, in your

23    professional opinion, was anything going to be necessary in

24    terms of response or repair?

25    A.  Yes.
```

1    Q.  Why was that?

2    A.  Windows had to be boarded up or replaced and doors had

3    to be boarded up or replaced.

4    Q.  How would you rate the extent of the damage?

5    A.  Significant.

6    Q.  The repairs that would follow, was Capitol Police in

7    charge of repairs?

8    A.  No, that's the Architect of the Capitol.

9    Q.  Is that a special office that is responsible for

10   maintenance, upkeep, and building, essentially?

11   A.  Yes.

12   Q.  Did Capitol Police have any role consulting or working

13   with the Architect of the Capitol on the repairs?

14   A.  Yes.

15   Q.  And on Friday, Inspector Loyd, at the beginning of your

16   testimony, you told us about the mission of the Capitol

17   Police.  In your view, based on what you saw that day, did

18   your officers carry out the mission?

19   A.  Yes.

20   Q.  How so?

21   A.  Protect the Congress.  Despite all the chaos that we

22   were involved with, none of the members of Congress

23   sustained physical injuries.

24             MR. MULROE:  Nothing further.

25             THE COURT:  All right.  Cross-examination?

```
 1                        CROSS-EXAMINATION

 2    BY MR. HASSAN:

 3    Q.  Good morning, Inspector Loyd.

 4    A.  Good morning.

 5              MR. HASSAN:  Judge, may I proceed?

 6              THE COURT:  You may, sir.

 7    BY MR. HASSAN:

 8    Q.  Inspector Loyd, you talked about the different levels

 9    of -- within the Capitol Police; correct?  You talked about

10    first-line officers.  Then there are sergeants; lieutenants;

11    correct?

12    A.  Correct.

13    Q.  And then, above that, is captains.  And you're directly

14    above that; correct?

15    A.  Correct.

16    Q.  Approximately how many officers are below you?  You

17    stated 1,800 in total.  But how many officers are

18    directly --

19    A.  Below me, if you include the officers and the captains,

20    the sergeants and lieutenants, approximately 350 total.

21    Q.  Okay.  And -- but you stated, in total, there were 1,800

22    officers that work with Capitol Police; is that correct?

23    A.  Yeah, that's how many are assigned.  Correct.  Yes.

24    Q.  Are assigned?

25    A.  Yes.
```

1    Q.  And all 1,800 officers were in some law enforcement

2    capacity; correct?

3    A.  Yes.

4    Q.  Law enforcement and security; correct?

5    A.  Yes.

6    Q.  In regards to January 6th, is it your testimony that

7    approximately 335 officers were on duty on January 6th, or

8    is it more?

9    A.  Under me?

10   Q.  Well, in the Capitol on January 6th.

11   A.  Yes, I'm not sure exactly how many people were on duty

12   on the 6th.  And the main reason for that is we were told in

13   advance -- the Congress told us in advance that this was

14   only the second time in our history where they knew in

15   advance that there would be a formal objection to the

16   presidential ballots.  And they told us to prepare for a

17   24-hour operation over multiple days.  So our manpower was

18   spread out over different shifts over multiple days.  So my

19   entire team was not on duty, you know, on the morning or the

20   day of January 6th, because we had to fulfill an obligation

21   beyond an 8- or 16-hour tour.

22   Q.  It's your statement today that you don't know how many

23   officers were on duty on January 6th; is that fair to say?

24   A.  Yes -- no, I don't have a number.

25   Q.  Okay.  In regards to January 6th in and of itself, and

1    your superiors, to your knowledge, is the chief of police

2    still -- the chief of police that was employed on

3    January 6th, is he still the chief of police?

4    A.  No.

5    Q.  Okay.  And that would be Steven Sund; correct?

6    A.  Correct.

7    Q.  And Steven Sund, as -- as a result of January 6th, was

8    asked to resign from his post; correct?

9    A.  Correct.

10   Q.  And he did, in fact, resign from his post as a result of

11   what transpired on January 6th; correct?

12   A.  Correct.

13   Q.  And part of the reasoning that Mr. Sund gave during his

14   resignation was a result of --

15                 MR. MULROE:  Objection.  Hearsay and relevance.

16                 THE COURT:  I'll allow the question.

17   BY MR. HASSAN:

18   Q.  Part of the reasoning as far as why Captain Sund

19   resigned from his position, it was stated that better

20   training, updated policies, and accountability were part of

21   the reasoning that he gave for a resignation; is that

22   correct?

23   A.  I'm not sure.

24   Q.  You never had the opportunity to read his resignation

25   letter?

1    A.  I may have read it.  I don't remember that particular

2    part of it.

3    Q.  Well, what did you read?  What did you recall reading

4    from --

5    A.  That he was resigning.  That was -- that's about the end

6    of my concern, that he was leaving the police department.

7    Q.  You chose to read whatever portions complied with

8    what --

9    A.  No, I just don't remember that portion you just

10    mentioned.

11    Q.  Has an investigation been conducted to assess the

12    security failures on that day?

13    A.  The only one that I'm aware of is the Senate bipartisan

14    report that was done by the Committee -- the Senate

15    Committee on the Rules Committee and Homeland Security.

16    They had a joint committee investigation and I testified

17    during that investigation.

18    Q.  So it was a bipartisan committee that requested to

19    investigate the security failures that transpired on

20    January 6th; is that correct?

21    A.  On the Senate side.  Yes.

22    Q.  On the Senate side.

23         In regards to the gear that was provided to the

24    officers, who's in charge of knowing the gear that the

25    officers are supposed to have on January 6th?

1   A.  Are you talking about routine gear or the civil
2   disturbance gear?
3   Q.  Civil disturbance gear or gear that you were -- that you
4   provided to the officers on January 6th.
5   A.  Yeah, the civil disturbance gear is controlled by the
6   operational services bureau.
7   Q.  Okay.  So you wouldn't be in charge of that?
8   A.  No, I'm with the uniformed services bureau.  And the way
9   our civil disturbance unit functions is our civil
10  disturbance unit is a collateral assignment.  So my people
11  will be activated, as they were on January 6th, for a civil
12  disturbance activation, but that falls under the operational
13  services bureau.  I don't have any control over that.
14  Q.  You were aware on January 6th that there was various
15  demonstrations that were going to transpire on January 6th
16  in regards to what was going on; correct?
17  A.  I'm sorry.  I missed part of that.
18  Q.  You were aware that on January 6th, there was various
19  demonstrations that were going to go on; correct?
20  A.  Yes.
21  Q.  And I would imagine, as part of Capitol Police and your
22  position as inspector, that you have communications with
23  your intelligence department within the Capitol Police.
24  A.  Yes.
25  Q.  Okay.  And as a basis -- as far -- do you have an -- an

1    intelligence team within Capitol Police?

2    A.  Yes, we have an intelligence team.

3    Q.  And does that intelligence team work with Metropolitan

4    Police Department?

5    A.  I believe they do.

6    Q.  Are you the one that communicates with Metropolitan

7    Police Department regarding the intelligence?

8    A.  No.

9    Q.  Would you know of an individual named -- by the name of

10   Lieutenant Shane Lamond --

11   A.  I'm not familiar with that person.

12   Q.  -- with Metropolitan Police Department?  You're not

13   aware of that individual?

14   A.  No.

15   Q.  Was that individual ever brought to your attention?

16   A.  Not that I'm aware of.

17   Q.  Okay.  Was an individual by the name of Jack Donohue

18   ever brought to your attention?

19   A.  Jack Donohue at the time was the director of our

20   intelligence office.

21   Q.  And he's no longer working with Capitol Police either;

22   correct?

23   A.  No.

24   Q.  And he was working with your department on January 6th?

25   A.  Yes.

1    Q.  Did he inform you regarding any intelligence that he

2    became aware of leading up to January 6th?

3    A.  Yes.

4    Q.  Okay.  And did he inform you regarding any

5    communications with any individuals with the Proud Boys?

6    A.  Not that I recall.

7    Q.  Were you ever made aware that he became aware of

8    information regarding the Proud Boys?

9    A.  I don't recall.

10   Q.  Would you feel that was important had he become aware of

11   some information that was not relayed to you?  Would you

12   consider that important, that he became aware of some

13   information regarding the Proud Boys and he failed to share

14   that with you?

15           MR. MULROE:  Your Honor, I object to the

16   foundation.

17           THE COURT:  Sustained.

18   BY MR. HASSAN:

19   Q.  You met with the Secret Service; correct?

20   A.  Yes, the team that's assigned to the Capitol Building on

21   a daily basis.  Yes.

22   Q.  In regards to your communication with the Secret

23   Service, did you become aware of any intelligence regarding

24   January 6th?

25   A.  With him?  With the Secret Service team?

1   Q.  Correct.  With any of the --

2   A.  I did not discuss any intelligence with the Secret

3   Service team that morning.

4            MR. HASSAN:  If I can have a minute, Judge.

5            (Brief pause.)

6            Inspector, I'm going to play an audio that was

7   earlier played to you by the Government.

8            THE COURT:  For the record, what's --

9            THE DEPUTY CLERK:  Which exhibit number?

10           MR. HASSAN:  Exhibit-354.

11           THE DEPUTY CLERK:  Thank you.

12           MR. HASSAN:  If we can have --

13           THE DEPUTY CLERK:  Which connection is he --

14           MR. JAUREGUI:  It's hooked up to the HDMI.

15           (Audio played.)

16  BY MR. HASSAN:

17  Q.  Officer, the timestamp on that is 10:57; correct?

18  A.  Correct.

19  Q.  And at 10:57, there was no breach of the Capitol;

20  correct?

21  A.  No.

22  Q.  And are these observations that you made regarding the

23  Proud Boys coming up on -- at 10:57 onto the Capitol?

24  A.  No.

25  Q.  These are other individuals that made these

1    observations?

2    A.  Yeah, observations of other police officers in the

3    field.  Yes.

4    Q.  And are you aware how they identified the Proud Boys as

5    the individuals that are walking up towards the Capitol at

6    10:57?

7    A.  I did hear of the radio communication they were

8    identified as Proud Boys.

9    Q.  And do you know how they made those identifications?

10   A.  No.

11   Q.  Are you aware whether there were any government

12   informants within the Proud Boys at 10:57?

13   A.  I'm not aware.

14            MR. HASSAN:  If we could play the next one.  This

15   will be Exhibit-359 that the Government previously played.

16            (Audio played.)

17            MR. HASSAN:  All right.  If you can stop that

18   there.

19   BY MR. HASSAN:

20   Q.  Officer, is that fair to say that the timestamp on this

21   is 12:53 p.m.; correct?

22   A.  Correct.

23   Q.  And this is the first breach that transpired on the

24   Capitol grounds, is that correct?

25   A.  Correct.

1    Q.  So within a two-hour window between 10:47 and 12:53 --
2             MR. HASSAN:  And I appreciate that; thank you so
3    much.
4    BY MR. HASSAN:
5    Q.  Between 10:47 to 12:53, there's no breach of the Capitol
6    grounds; is that fair?
7    A.  Fair.
8    Q.  But yet, there were -- the Proud Boys and some
9    individuals were observed approaching the Capitol grounds;
10   is that fair to say?
11   A.  Fair.
12   Q.  Based upon the demonstrations that were going on, were
13   you aware of some of the demonstrations that were going on
14   that day?
15   A.  Yeah, some, I'm aware of.
16   Q.  In regards to permits that were submitted or authorized,
17   are you aware of those permits that were authorized?
18   A.  Not specifically.  I were [sic] aware there were permits
19   authorized, but I don't remember specifically who they were
20   or what they were demonstrating for.
21   Q.  You were aware that the president at the time, President
22   Trump, was making a speech; correct?
23   A.  Yes.
24   Q.  And I would imagine that you had -- you -- some
25   individuals were giving some commentary regarding the

1    speech, is that fair to say?

2    A.  Some individuals -- I'm --

3    Q.  Did you ever hear of anything that transpired within the

4    speech?

5    A.  I may have.  I don't recall anything.

6    Q.  President Trump's speech concluded at 12:16 p.m. on

7    January 6th.  Approximately -- from Washington Monument or

8    the Ellipse by the White House to the Capitol, it takes

9    approximately 30 minutes to walk that --

10              MR. MULROE:  Your Honor --

11   BY MR. HASSAN:

12   Q.  -- correct?

13              MR. MULROE:  Your Honor, counsel is testifying.

14              THE COURT:  Sustained.

15   BY MR. HASSAN:

16   Q.  Approximately how much of a distance [sic] does it take

17   to walk from the Washington -- from the White House -- the

18   Ellipse over to the United States Capitol?

19   A.  30 minutes is a good estimate.

20   Q.  So if he concluded at 12:16, the individuals could have

21   made it to the Capitol by 12:47; correct?

22   A.  Correct.

23   Q.  You are aware that Trump made various statements;

24   correct?  And he worked up his crowd into a frenzy?

25   A.  I'm not -- I don't know about the frenzy part.  I know

1    he gave a speech.

2    Q.  And when he gave a speech, his last statements were, We

3    fight.  We fight like hell.  And if you don't like hell,

4    you're going to have -- you're not going to have a country

5    anymore.  [sic]

6    A.  If that's what he said, I'm not going to dispute that.

7    Q.  The individuals approximately at 12:47 that -- or 12:53,

8    as the video states, where the breach transpired, those

9    individuals had been worked up into a large, angry mob; is

10   that fair?

11   A.  Yeah.  My officers at Peace Circle?  Yes.

12           MR. HASSAN:  Give me just one second, Judge.  If I

13   can just have one --

14           THE COURT:  One moment?

15           MR. HASSAN:  Yes.

16           (Brief pause.)

17           Nothing else, Judge.  Thank you so much.

18           THE COURT:  All right.  Cross-examination from any

19   other defendant -- the next defendant.

20           MR. ROOTS:  Okay.  I want to plug in my -- from

21   my -- for one video.

22           (Brief pause.)

23           Let me -- okay.  Here we go.  I'm a little bit --

24   not the best at tech, but let's just see if I can get this

25   into full screen here.  Let's see.

1            (Brief pause.)

2            I just want to play this video which was played in

3    direct examination.

4            THE DEPUTY CLERK:  Exhibit number, Mr. Roots?

5            MR. ROOTS:  I believe it's 425 --

6            THE DEPUTY CLERK:  Thank you.

7            MR. ROOTS:  -- I believe.

8                         CROSS-EXAMINATION

9    BY MR. ROOTS:

10   Q.  Okay.  Let's just play this.

11           (Video played.)

12           This was played during your direct examination.

13   And this is the approach of these initial demonstrators or

14   protesters -- you've called them rioters -- as they approach

15   the building from the west side; correct?

16   A.  Yes, that's the Senate wing door on the west side.

17   Q.  And the -- some of these people are pounding on the

18   doors; correct?

19   A.  Yes.

20   Q.  Let me stop right here, if I can.  Let me figure out how

21   to stop this.  Hmm.

22           Well, let's just let it roll.  Would you agree

23   that the man in red there -- the man pictured in red has

24   damaged that window on -- the windowpane on the right side?

25   A.  Yes, with the two-by-four.

1    Q.  I need some help with some technology here.  I'm trying

2    to stop it at different times and just have you -- first of

3    all, let me ask, you did not personally witness this or did

4    you?

5    A.  No.

6    Q.  You -- but you've seen this video?

7    A.  Yes.

8    Q.  You were nowhere -- were you close to this at the time?

9    A.  When this was going on, I was on the phone with my

10   assistant chief who was ordering me to leave the west front

11   and head towards the east front.

12   Q.  Well, let me -- I want to have -- I want to stop this

13   here.  Oh, I see.  Okay.  There's a stop sign there.  Okay.

14          I apologize.  I'm a little bit -- a technical

15   Neanderthal.  So let's get back to where we started here, if

16   we could.  Okay.

17          (Brief pause.)

18          Okay.  Let me -- okay.  I'm going to see if I can

19   get back to that set of questions, but let me first -- okay.

20          (Brief pause.)

21          All right.  I'm just going to go through that real

22   quick and, maybe, we'll return to the video about the window

23   there.

24          MR. MULROE:  Your Honor, could I be heard on the

25   phone briefly?

 1                    (Bench conference:)

 2              MR. MULROE:  Conor Mulroe for the United States.

 3              Can you hear me?

 4              THE COURT:  Yes, I can.

 5              MR. MULROE:  I'm not volunteering first to do this

 6    every day, but in the interest of helping things move along,

 7    I think the Government would be willing to pull up the

 8    exhibits for Mr. Roots, if that would help.

 9              THE COURT:  Mr. Roots -- you have to press the

10    phone, Mr. Roots.  Yeah, exactly.

11              MR. ROOTS:  Yeah, that would help greatly.

12              THE COURT:  All right.  So counsel may -- I'll

13    give you two a moment to confer, and if the Government can

14    help, I think that makes sense.

15              (Return from bench conference.)

16              MR. ROOTS:  Okay.  The U.S. Attorneys have

17    volunteered to help out the defense.  We're going to play

18    Exhibit-425, if you would, that same video.  Yeah, let's see

19    it.

20              (Video played.)

21              MR. ROOTS:  And I greatly appreciate that.  Thank

22    you, Mr. Monroe [sic].

23    BY MR. ROOTS:

24    Q.  Officer Loyd, here we are at this video of these

25    demonstrators approaching the building.  This would be as

1    they first approached; correct?

2    A.  Correct.

3    Q.  And you see they are -- some of -- okay.

4         MR. ROOTS:  Okay.  Let's stop right here, if you

5    could.

6    BY MR. ROOTS:

7    Q.  Okay.  Do you see that window that is already -- that

8    is -- appears to be shattered there?

9    A.  Yes.

10    Q.  The window on the right?

11         MR. ROOTS:  Could you back that up and --

12    BY MR. ROOTS:

13    Q.  So it appears that this individual dressed in red --

14    let's just play it a little bit.

15         (Video played.)

16         This individual dressed in red appears to be using

17    a two-by-four, a piece of lumber, and he is breaking the

18    windowpane on the right; correct?

19    A.  Correct.

20    Q.  Would you agree that that windowpane on the right is a

21    total loss in this scene?

22    A.  Yes.

23    Q.  It needs to be replaced?

24    A.  Correct.

25         MR. ROOTS:  Okay.  Please keep rolling, if you

1    could.

2                    (Video played.)

3    BY MR. ROOTS:

4    Q.  I think we're rolling a little bit in slow motion, but

5    we'll just stop it at points and have a discussion here.

6    Okay.  So --

7                    MR. ROOTS:  Actually, could you back up just a

8    little bit.

9    BY MR. ROOTS:

10   Q.  Then the camera pans to the left, correct, after we saw

11   that window busted on the right?

12   A.  Correct.

13   Q.  The camera pans to the left.  First of all, it appears

14   that that camera is a handheld phone or someone taking video

15   along with the demonstrators; correct?

16   A.  Correct.

17   Q.  Someone who is, maybe, one of them or, maybe, following

18   closely behind them?

19   A.  Correct.

20   Q.  It could be a reporter.  It could also be just a

21   demonstrator --

22   A.  Correct.

23   Q.  -- filming it from behind?  Okay.  And you agree that

24   several seconds have passed as the -- a couple of seconds at

25   least have passed since that window on the right was

 1    shattered.  And then the video pans somewhat over to the

 2    left toward this glass door; correct?

 3    A.  Correct.

 4    Q.  All right.

 5            MR. ROOTS:  Now, let me -- if you could just roll

 6    until we see in the foreground a figure -- okay.  Right

 7    there.  Stop.  If we could -- maybe, roll back to get that

 8    figure in the foreground there.

 9            (Video played.)

10    BY MR. ROOTS:

11    Q.  Do you see, if you could, that -- do you see the -- it

12    looks like there's an individual facing away from the

13    camera, darker hair, maybe, longer -- long hair -- dark

14    haired.  Do you see that individual?

15    A.  Yes.

16    Q.  So -- and you agree that he's in the -- to the left and

17    it's -- a little bit of time -- some seconds have passed

18    since that window was initially shattered over there on the

19    right?

20    A.  Correct.

21    Q.  Wouldn't you say that?

22    A.  Yes.

23            MR. ROOTS:  Okay.  Let's roll it a little bit.  I

24    want to stop it right where the video first pans over to the

25    window on the right.  If you could stop it at the very

1    moment -- right there.

2              (Video played.)

3    BY MR. ROOTS:

4    Q.  Okay.  Would you agree that the video appeared to pan to

5    the right?

6    A.  Correct.

7    Q.  And at the initial moment when the video, once again,

8    opens on those -- those pair of windows on the right, it

9    appears that that second window is also shattered; correct?

10   A.  Correct.

11   Q.  And at least in this video, for the record, do you see

12   that darker-haired individual that appears to be the same

13   individual that we saw before?

14   A.  Yes.

15   Q.  Would you agree in this video that it appears that the

16   window on the left was also previously busted before the

17   video got to it?

18   A.  It definitely has some damage.  I can't see the extent

19   because his head's blocking it, but it's definitely damaged.

20   Q.  And you would agree that this window is a total loss at

21   this moment?

22   A.  Correct.

23   Q.  It needs to be replaced?

24   A.  Correct.

25              MR. ROOTS:  Okay.  Go ahead and keep rolling, if

1        you would.

2                    (Video played.)

3        BY MR. ROOTS:

4        Q.  And you see this individual with the darker hair, and

5        he's smashing against both windowpanes; is that right?

6        A.  Correct.

7                    MR. ROOTS:  Okay.  That's all I want for this

8        video.  Thank you.  Thank you so much, by the way.

9        BY MR. ROOTS:

10       Q.  Okay.  Just a few discussions about the chemicals that

11       were being sprayed, the CS gas that was being sprayed.  You

12       talked about the need, at one point, for a HazMat team; is

13       that correct?

14       A.  Yes.

15       Q.  And you didn't have a HazMat team?

16       A.  We had a HazMat team working that day.  The original

17       request was for them to set up a decon tent on the west

18       front, but that -- we eventually got overwhelmed and that

19       was not possible.

20       Q.  Okay.  So you were not able to establish a HazMat tent

21       or a decontamination area?

22       A.  On the west front.  No.

23       Q.  Is it safe to say that the use of these gases -- I

24       believe you called them irritants -- cause behavior

25       problems?

1    A.  Yes.

2    Q.  Aggression at times?

3    A.  Possibly.

4    Q.  Confusion at times?

5    A.  Possibly.

6    Q.  Anxiety?

7    A.  Possibly.

8    Q.  Panic?

9    A.  Possibly.

10   Q.  And did you observe that in your own officers that day?

11   A.  Yes.

12   Q.  Have you observed that when someone is sometimes sprayed

13   with these irritants, they can become more aggressive?

14   A.  Yes.

15   Q.  You observed these kinds of sprays were being sprayed by

16   different parties; right?

17   A.  Correct.

18   Q.  So there was some pepper -- in all of your observations,

19   you saw some pepper spray by demonstrators; correct?

20   A.  Correct.

21   Q.  But for the most part, these spray -- these gases and

22   irritants were coming from the police side; correct?

23   A.  No, I would not say that we did most of the spraying,

24   no.

25   Q.  Okay.  Let's -- not just Capitol Police, but Metro

1     Police.  We recognize you are with Capitol Police; correct?

2     You're not with Metro Police.

3     A.  Correct.

4     Q.  Metro Police was spraying copious amounts of these

5     chemical agents?

6     A.  They were spraying agents, yes.

7     Q.  Okay.  I wouldn't mind showing a picture.  Let me --

8     this is, once again, not in my -- well, let's just go from

9     memory.

10              The Capitol -- we saw many images of the inside of

11     the Capitol; correct?

12     A.  Correct.

13     Q.  Many great paintings are inside the Capitol?

14     A.  Yes.

15     Q.  Beautiful works of art?

16     A.  Yes.

17     Q.  Suffice it to say that some of those paintings are worth

18     many thousands of dollars?

19     A.  Yes.

20     Q.  Would you say some of them might be worth millions of

21     dollars?

22     A.  Some of them are priceless.

23     Q.  Some of those works of art on the walls inside the

24     Capitol are some of the most famous paintings in American

25     history?

1    A.  Yes.

2    Q.  You didn't see any of those paintings damaged during

3    those events, did you?

4    A.  No, just -- the only issue that we had with the

5    paintings that was brought to our attention was the chemical

6    sprays that made it into the building did get onto some of

7    the artwork, to include the paintings, and that's never

8    good.  That's -- but no physical damage.  It was -- the main

9    problem was the spray in the air.

10   Q.  Okay.  You mentioned some property damage and, when you

11   came back the next day, there were doors and windows

12   damaged?

13   A.  Yes.

14   Q.  But there -- as far as these priceless works of art,

15   none of them were damaged other than what you said; there

16   was some -- maybe, some spray residue?

17   A.  Correct.

18   Q.  Let me ask you this.  At no time on January 6th was any

19   member of Congress in the same room as any demonstrator; is

20   that right?

21   A.  Not that I'm aware of, no.

22   Q.  There was that one slide, which was a radio

23   communication indicating that -- I believe it was Senator

24   Patty Murray was -- I believe it said there was a doorway

25   between her and a demonstrator?

1    A.   Yes.

2    Q.   So that might have been, as far as you know, about the

3    closest that any member of Congress got to a demonstrator?

4    A.   That was -- that was pretty common.  I mean, the Senate

5    and the House side, the -- what -- for a while, what only

6    separated the demonstrators from the senators and the House

7    of Representatives was a door.  You know, you had the

8    members of Congress sheltering in place within the

9    respective chambers, and right outside the doors were the

10   demonstrators.  So that was pretty common for a while.

11   Q.   But as far as you know, never was any senator ever

12   touched or approached ever in the same room as any

13   demonstrator?

14   A.   No.  The closest I saw was during the evacuation, when I

15   evacuated the House from the House chamber, the members of

16   Congress could physically see the -- some of the

17   demonstrators that we were keeping back as they evacuated

18   down the stairs.

19   Q.   Okay.  Congress went into recess at what time?

20   A.   Which -- I mean, in reference to the riot?

21   Q.   In reference to the -- what you -- the riot.

22   A.   Okay.

23   Q.   At -- what time did the Senate go into recess?

24   A.   It was 2:00-something.  Both of them was, like, 2:19,

25   somewhere in that area.

3715

1    Q.  And what about the House?

2    A.  Shortly after that.

3    Q.  And what time did the first demonstrator get into the

4    building?

5    A.  Probably, I believe, around 2:10, 2:12, and I'm

6    estimating.

7    Q.  So do you know which chamber went into recess first, if

8    one did?

9    A.  I believe the Senate went first because the rioters came

10   in the Senate side via the Senate wing door.  I believe the

11   Senate went into recess first.

12   Q.  And that was, you said, around 2:00- -- what did you say

13   that time was?

14   A.  2:15, 2:19, somewhere in that area.

15   Q.  So that would have been just two or three or four

16   minutes after the first demonstrator entered the building?

17   A.  Yes.

18   Q.  Could it have been one minute?

19   A.  It could possibly.

20   Q.  That would have been -- so that would have been when the

21   demonstrators were how far away from the closest senator?

22   A.  When the demonstrators got to the second floor of the

23   Senate, they're just on the other side of the doorways.

24   Q.  Okay.  Now, we heard those frantic radio calls.  One of

25   them indicated 100 demonstrators were in the building.

1    Another said 200.  Is that about your estimation of the

2    largest size that was ever in the building at once?

3    A.  No, I believe it's several hundred.  If you're looking

4    for the maximum amount of number, it wasn't 1- or 200.  I

5    would say closer to 7- or 800 at least.

6    Q.  Inside the building at one time?

7    A.  Yes.

8    Q.  How many members of Congress are there?

9    A.  535.

10   Q.  Okay.  So about the same number or would you say there

11   were more -- the Congress was outnumbered by the --

12   A.  I would say, you know, 535 members of Congress and, at

13   the peak, you have 7- or 800 people in the building.

14   Q.  Okay.  I understand you to say that the House chamber

15   was never breached; is that true?

16   A.  Correct.

17   Q.  The Senate chamber was breached?

18   A.  Yes.

19   Q.  And that was by someone leaping from the balcony down to

20   the first -- down to the floor?

21   A.  Yes, from the third floor to the second floor.

22   Q.  But that never happened in the House chamber?

23   A.  Not that I'm aware of.

24   Q.  And I understand that you indicated that all protesters

25   or rioters or demonstrators had been cleared from the upper

1    floors by -- was it 3:30?

2    A.  I'm not sure if it was that early.  I -- from my

3    recollection, around 4:00 or 4:30.

4    Q.  The radio exchanges we heard seemed to indicate that the

5    building was mostly secure by 4:30, even the main floors.

6    A.  Yes, I do remember hearing that.  Yes.

7    Q.  So just for purposes of the math, so realistically, that

8    was -- so the first rioter entered the building around 2 --

9    you said 2:15-ish, something like that?

10   A.  Yep.

11   Q.  And then all demonstrators were mostly out of the

12   building by 4:30-ish --

13   A.  Yes.

14   Q.  -- correct?  So that would be about two hours and about

15   15 minutes --

16   A.  Yes.

17   Q.  -- that -- that there were demonstrators inside the

18   Capitol?

19   A.  Yes.

20   Q.  You said there was a particular moment when Officer

21   Eugene Goodman, sort of, directed demonstrators in one

22   direction.  And if the demonstrators had gone another

23   direction, the demonstrators might have breached a

24   particular door; is that what you said?

25   A.  Yes.

1    Q.  And you indicated that they would breach a door and then

2    be in the Senate lobby?

3    A.  Yes.

4    Q.  I'm a little bit confused.  Is the Senate lobby the

5    Senate chamber?

6    A.  Yes, it's part of the Senate chamber.  It's the rear

7    portion of the Senate chamber.

8    Q.  Is there any door separating?

9    A.  From the lobby to the actual floor, yes.

10   Q.  So there -- it's -- so when Officer Eugene Goodman

11   directed these demonstrators in another direction, they were

12   two doors away from the Senate chamber?

13   A.  No, not necessarily.  The inner doors that go from the

14   Senate lobby on to the floor aren't necessarily locked down.

15   Those doors separate senators who want to leave the floor,

16   go back into the lobby to perform any personal business,

17   without disturbing the rest of the members within the

18   Senate.  That's -- those doors are not part of the lockdown.

19   The interior doors are not part of the lockdown, only the

20   exterior doors.

21   Q.  Okay.  So there was just one door separating --

22   A.  Yes.

23   Q.  -- the chamber of the Senate and these demonstrators?

24   A.  Yes.

25   Q.  You indicated that Officer Goodman was able to, sort of,

1    mislead these demonstrators away from the senators and then

2    up the stairway?

3    A.   Yeah.  When they got to the stairwell from the east

4    grand staircase, he diverted them -- or he prevented them

5    from going to the rear of the Speaker's Lobby and directed

6    them towards me in the Ohio Clock area.

7    Q.   One thing you said really struck -- stuck out.  You said

8    that had the demonstrators gone the opposite direction, more

9    than likely, there would have been gunfire; is that what you

10   said?

11   A.   Yes.

12   Q.   Would you clarify?  Who would have caused the gunfire?

13   Who would have opened fire?

14   A.   It would have been the -- if those doors were breached,

15   it would have been -- it could have been either my officers

16   or the Vice President's detail.

17   Q.   No -- you never saw any demonstrator with a firearm;

18   correct?

19   A.   I did not.  No.

20   Q.   No one has been charged with having a firearm inside the

21   Capitol?

22   A.   I'm not aware.

23   Q.   So when you said that more than likely there would have

24   been gunfire, you meant that the police would open fire on

25   the demonstrators?

3720

1    A.  If they breached those doors, that was a very good

2    possibility.

3    Q.  So it's your testimony that the Capitol Police would

4    have opened fire on demonstrators just for entering the

5    room?

6    A.  For -- to protect the Vice President and the U.S. Senate

7    at that point.  That is a possibility.  Yes.

8    Q.  You're aware that members of Congress have been shot

9    inside the Capitol in the past?

10   A.  Yes.

11   Q.  In 1954, a group of terrorists shot five congressmen?

12   A.  Yes.

13   Q.  Then they unfurled the flag of Puerto Rico?

14   A.  Yes.

15   Q.  Capitol Police did not open fire on those individuals,

16   did they?

17              MR. MULROE:  Your Honor, I'll object to relevance.

18              MR. ROOTS:  It goes to training.

19              THE COURT:  I mean, it was 19- -- sustained.  The

20   objection is sustained.

21   BY MR. ROOTS:

22   Q.  Your testimony is that on January 6th, 2021, Capitol

23   Police are trained to open fire on unarmed demonstrators

24   inside the Capitol?

25   A.  No.

1  Q.  You just -- didn't you just say that they would have

2  opened fire on the demonstrators?

3  A.  If -- it's -- the use of force -- the use of deadly

4  force is a personal decision.  I can't give, you know,

5  guidance or advice as a supervisor to one of my subordinates

6  to use deadly force in any circumstance.  That is a personal

7  decision.  If you have police officers who have retreated as

8  far as they can retreat, which they did, to the House and

9  Senate chambers -- the initial breach started at Peace

10  Circle at 12:53, and starting at 12:53, it was nothing but

11  retreat, retreat, retreat.  Police line after police line

12  was breached.  The rioters actually broke into the building.

13  They came up to the U.S. Senate floor.  And if they had

14  to -- if they attempted to breach into the Senate chamber,

15  which was the final stand where all the members of the

16  Senate and the Vice President were sheltered down -- if the

17  rioters had breached those doors, there's a very good

18  possibility that one of those officers took that as a deadly

19  force situation.  I can't speak for those individual

20  officers, but it was definitely a possibility.

21  Q.  Is it their training to open fire if anyone enters the

22  Senate chamber?

23  A.  No.

24  Q.  In the scenario that you painted -- the entry into

25  broken windows, the riotous situation -- is it your training

1    that officers should open fire on demonstrators in those

2    circumstances if they enter --

3    A.  No --

4    Q.  -- the Senate --

5    A.  -- only if the officer feels that using deadly force is

6    the last option to protect a member of Congress or the Vice

7    President or whoever else.

8    Q.  So you do not train them -- you do not train your

9    officers to open fire on demonstrators if they happen to

10   enter the Senate chamber?

11   A.  No, it's a personal decision based on a particular

12   situation.

13   Q.  Do you train them not to do so or to use less than

14   lethal force?

15   A.  Less than lethal is always an option.

16   Q.  Would you open fire in those circumstances?

17   A.  I was not there.  I was not in the position of being in

18   either one of the chambers when they were locked down.

19   Q.  You're aware of the general, I'm sure, principles of

20   rules of conduct -- or rules of use of deadly force;

21   correct?

22   A.  Yes.

23   Q.  You're aware of the Tennessee v. Garner decision --

24   A.  Yes.

25   Q.  -- where the U.S. Supreme Court essentially outlawed

1    shooting fleeing felons in the back?

2    A.   Correct.

3    Q.   The Supreme Court in that decision ruled that law

4    enforcement must only use deadly force in defense of life or

5    to prevent serious bodily harm; correct?

6    A.   Yes.

7              MR. MULROE:   Object to relevance.

8              THE COURT:   Counsel pick up the telephone, please.

9              (Bench conference:)

10             THE COURT:   Mr. Roots, I'm struggling to see the

11   relevance here.

12             MR. ROOTS:   Well, the relevance is that the

13   officer just -- has testified that his men would defy the

14   law and break the law and would open fire, basically,

15   without a self-defense or defense-of-others scenario.

16             THE COURT:   Well, he didn't -- number one, he

17   didn't testify as to that.  But, number two, what do these

18   hypotheticals have to do with the case at hand?

19             MR. ROOTS:   Well, they certainly lead to the

20   overall misunderstanding of this high level of Capitol

21   Police officer who is clearly not grasping the situation

22   legally.

23             THE COURT:   What does that have to do with the

24   case at hand?  It doesn't.  There's nothing -- I gave you

25   some leeway to talk about trainings and he did testify --

1   well, as you pointed out, they had gone into the chamber,

2   what might have happened, but this overall question of what

3   they -- the use of deadly force is not -- it's not part of

4   any defense -- or it's not part of the Government's case.

5   It's not part of any defense you can put on.  I don't

6   understand what it has to do with the case.

7            MR. ROOTS:  Well, it misleads the jury into

8   thinking this scenario was more hectic and scary and violent

9   than it really was.

10           THE COURT:  Well, but you're asking now, Would

11  you -- in a hypothetical.  I think he -- let's move on.

12  You've got him to talk about the comment he made about,

13  Well, it's -- people had turned the corner, what might have

14  happened.  I don't think him speculating about what he would

15  have done advances that one way or the other.

16           MR. SMITH:  Your Honor, while we have you,

17  assuming Mr. Roots wraps up in a couple of minutes,

18  Mr. Nordean will -- I can begin for a couple of minutes, but

19  if you just want -- whether we should start --

20           THE COURT:  I don't know how long it's going to

21  be.  Unfortunately, they're -- so I don't know the -- I

22  don't know.

23           Mr. Roots, why don't you move on, sir.  Okay?

24           MR. ROOTS:  Okay.

25           (Return from bench conference.)

1          THE COURT:  All right.  The objection is

2     sustained.

3     BY MR. ROOTS:

4     Q.  Okay.  Your testimony is that the senators had nowhere

5     to go; they couldn't flee anywhere?

6     A.  Once they were locked down in the chamber, that is the

7     last stand.  At that point, you have to wait for an

8     evacuation.

9     Q.  There are no secret passages, like many people believe,

10    that they can be -- escape -- that they can escape into?

11          MR. MULROE:  Your Honor, I'd object and ask to be

12    heard on the phone.

13          (Bench conference:)

14          MR. MULROE:  Conor Mulroe for the United States.

15          Your Honor, this was a topic that we specifically

16    raised in the motions in limine in this case.  I don't see

17    any relevance.  So we ask the Court to preclude this.

18          THE COURT:  So I mean, it was --

19          MR. ROOTS:  I'm willing to --

20          THE COURT:  All right.

21          MR. ROOTS:  -- end it there.

22          THE COURT:  All right.  Very well.

23          (Return from bench conference.)

24          THE COURT:  The objection is sustained.

25    BY MR. ROOTS:

1    Q.   Okay.  Just a final couple of questions.  In your

2    knowledge and experience, if demonstrators had a

3    well-prepared plan to disrupt congressional hearings,

4    wouldn't they know which way to go?

5    A.   I mean, it was successful to the point where the

6    demonstrators made it to the House and the Senate chambers

7    respectively, so that was a success, forcing the members of

8    Congress to shelter in place.

9    Q.   If Officer Goodman was able to lead the demonstrators

10   away from the Senate chamber so easily, wouldn't you suggest

11   that the demonstrators didn't know very much about the

12   layout of the Capitol?

13   A.   I can't speak for the demonstrators.

14             MR. ROOTS:  Thank you very much.  Nothing further.

15             THE COURT:  All right.  We have more

16   cross-examination of this witness to do, but this is a

17   reasonable place to pause and begin the lunch hour,

18   especially since I do want to discuss one further thing with

19   counsel.  So why don't we excuse the ladies and gentlemen of

20   the jury for lunch.  We'll see you hopefully in about an

21   hour.

22             (Jury returned to jury room.)

23             THE COURT:  You may be seated.

24             All right.  So let me --

25             MR. PATTIS:  Judge, if the topic is going to be

```
 1    treatment of the witness, may he be excused during argument?
 2              THE COURT:  It's not going to be --
 3              MR. PATTIS:  Okay.
 4              THE COURT:  We're not going to discuss anything
 5    about the witness's testimony.
 6              So -- well, let me ask the parties, the exhibits
 7    from this morning's earlier discussion that you want me to
 8    look at over the lunch break, can you identify those, not --
 9    exhibits not having to do with this witness that we talked
10    about that will be for a subsequent witness.  Can the
11    parties identify those for me for the record?  I'll just
12    start with the Government, if you all can.
13              MS. HERNANDEZ:  Are we --
14              THE COURT:  We're not arguing anything.  I just
15    want to know the exhibits at issue so I can look at them
16    over the lunch hour.
17              (Brief pause.)
18              MR. MCCULLOUGH:  Pardon me, Your Honor.
19              THE COURT:  It's all right.
20              MR. MCCULLOUGH:  So Your Honor, I believe that you
21    have the email from Ms. Hernandez that --
22              THE COURT:  I do.
23              MR. MCCULLOUGH:  -- lists the exhibits.  I believe
24    that the exhibits -- and I have them probably in a different
25    order, but I -- I think I have the same exhibits.  So I
```

```
 1    don't want to confuse Your Honor.  If you want to read the
 2    list, I can tell you whether that is -- what I understand to
 3    be the list of approximately 10 to 12 is the list that the
 4    Government had identified and --
 5              THE COURT:  Well, some of these -- some of the
 6    exhibits in your email seem to suggest simply, We've adapted
 7    the exhibit to meet Your Honor's -- my pretrial rulings.  I
 8    don't expect we'll have to discuss all of those.  But I
 9    guess -- and so, maybe, I should ask -- this should be
10    directed to the defendants.  What -- so I do have that
11    email.  Again, it strikes me that part of this email is the
12    Government simply saying, We've -- we've adapted the exhibit
13    to meet my pretrial rulings.
14              Are there, on top of things I've already ruled on
15    or what the Government has already related here, exhibits
16    that the defendants want me to look at because you're going
17    to make an additional argument on top of these that it
18    should be excluded?  And, maybe, I should have had the
19    Government -- had the defendants lead on this.
20              MR. MCCULLOUGH:  Sure, Your Honor.  And I will
21    cede to Mr. Pattis, who is on his way over here.  I think
22    just one thing here is that we have identified 600-38,
23    600-41, and 600-45.  Your Honor had ruled on 600-38 in
24    connection with opening statements.
25              THE COURT:  Okay.
```

1    MR. MCCULLOUGH:  And, Your Honor, as you had

2    explained at that time, you believed that it was subject to

3    potential misuse by the jury when compressed into -- my --

4    the Government's understanding of it was, when compressed

5    into a one-hour opening statement where it would be

6    juxtaposed with another statement by Mr. Tarrio in which he

7    says, Make no mistake.  We did this.  Your Honor, the

8    Government's position is that the -- Mr. Jauregui had opened

9    on the prospect that Mr. Tarrio led his group away from

10   Black Lives Matter, led his group away from Antifa, did not

11   want any kind of engagement.  Your Honor, I think that opens

12   the door, frankly, kind of, quite broadly to the, kind of,

13   aggressive conduct, celebration of lawless conduct in the

14   street, but -- I mean, we have -- even with -- taking that

15   in mind, Your Honor, we have removed references to the Black

16   Lives Matter flag.  We have redacted the Black Lives Matter

17   flag itself.  We have removed references to this being a

18   hate crime.  We have removed references to this being a BLM

19   banner.  We have removed references to this being connected

20   to a church.  So in many ways, we have sanitized this.

21            THE COURT:  All right.  The --

22            MS. HERNANDEZ:  I'm sorry, Your Honor.  Do you

23   want the witness still sitting here?

24            THE COURT:  Well, this doesn't -- you may step

25   down, sir.

1        He doesn't need to be -- this is irrelevant for

2    his purposes, but -- yes, he does not need to remain there.

3    In fact, he may want to get a jump on lunch, as well.

4        Thank you, Inspector.

5        (Witness steps down.)

6        THE COURT:  Okay.  So --

7        MR. MCCULLOUGH:  And --

8        THE COURT:  Go ahead.

9        MR. MCCULLOUGH:  And so, Your Honor, this -- so

10   this case is about the Government's ability to prove that

11   there was a conspiracy formed among this group of

12   defendants.  It is important for the Government to be able

13   to show that -- what the state of mind was, the knowledge

14   was, motive, intent of the various defendants as well as --

15   so -- with respect to Mr. Tarrio, as well as those

16   individuals who followed him on social media, which the

17   evidence will show was all four of these defendants, the --

18   four of the other defendants.  And so his -- the

19   potential -- Your Honor, the --

20       THE COURT:  And this is your argument about why

21   the statement should come in, as well?

22       MR. MCCULLOUGH:  Why --

23       THE COURT:  Is that what -- I mean, I've ruled

24   that the burning of the banner comes in, and I've

25   articulated a basis for that ruling; right?  I -- that it

1    does reflect -- that, plus the Bertino stabbing, are

2    admissible to show the state of mind, broadly speaking, of

3    these defendants in the sense that they're -- these things

4    prompted them, the Government purports, to, sort of, change

5    their behavior vis-à-vis the police.  But I don't know what

6    the statement -- are you arguing to me that the statement

7    advances that?

8            MR. MCCULLOUGH:  So Your Honor, it does.  And let

9    me explain why.  The -- this -- the question as to knowledge

10   and state of mind of not only Mr. Tarrio but the other

11   defendants -- and we've heard this idea that, Well, the

12   Government has no evidence to show that, you know, any of

13   these other defendants would have understood what was

14   expected of them on January 6th and what they were joining

15   when they were to join a group that was returning to

16   Washington, D.C., on January 6th and, more importantly,

17   returning to marching to the Capitol on January 6th.

18           It is relevant to their knowledge and state of

19   mind with respect to understanding that Mr. Tarrio, the

20   leader of the Ministry of Self-Defense, was not only

21   engaging in an act of vandalism or, frankly, a -- some sort

22   of statement against their perceived adversary, but also

23   encouraging it.  If one looks at the statements, 600.40 --

24   600-41:  I'll say it again.  I'll say it loud for the people

25   in the back.  I'm damn proud I did it.

```
 1              600-45.  FBI says, No, you can't ban -- and it
 2   actually says in the original, you can't burn a BLM banner.
 3   That's a hate crime.  We've removed that.  It says, No, you
 4   can't burn a banner.  And he says, Ayo, pass me the lighter.
 5              Your Honor, when --
 6              THE COURT:  This is in the moment it's going on?
 7   I just haven't looked at these exhibits.
 8              MR. MCCULLOUGH:  These are -- this is
 9   December 19th.  So the first statement is made on
10   December 17th and 18th, kind of, right on -- straddling both
11   sides of midnight.  The second one is made on December 19th.
12   The third one is made on December 22nd.  And so this is as
13   people are actually coming together to, kind of, join
14   Enrique Tarrio's new chapter to return to Washington, D.C.
15   on January 6th.  Enrique Tarrio is not only advocating for
16   this kind of act -- kind of conduct, but also completely
17   unapologetic for it and, in fact -- I mean, I think that
18   the --
19              THE COURT:  All right.  All right.  All right.
20   All right.  I want you all to get to -- let me -- I
21   didn't -- okay.  Are there any -- is this -- let me just ask
22   this.  Does this subset -- in this email, does this subset
23   include all the materials that the defense would like me to
24   review in preparation for hearing you on this?  No.  If
25   there -- is there any other exhibit, Mr. Pattis, you want to
```

1    raise?  Just tell me the exhibit.  I'll look at them over

2    lunch and we'll come back and discuss it.

3                MR. PATTIS:  603-15.

4                THE COURT:  600-15.

5                MR. PATTIS:  603-15.

6                THE COURT:  All right.

7                MR. JAUREGUI:  Judge, do you want to hear argument

8    now?

9                THE COURT:  No, I don't, which is why I told

10   Mr. McCullough he didn't need to continue.  I just want the

11   materials at issue and we can pick it up on the other side.

12               MS. HERNANDEZ:  I emailed a second list to the

13   Court this morning, not with the -- not with an argument,

14   but just the list that the -- which is just a long list of

15   exhibits that the Government identified.  You may not -- I

16   sent it to you while I was sitting back there.  They're

17   Parler exhibits.  They --

18               THE COURT:  Do they have to do with the BLM

19   burning issue --

20               MS. HERNANDEZ:  No, but they have --

21               THE COURT:  -- or a witness that's coming up?

22               MS. HERNANDEZ:  No, but they have to do with --

23   they're the Parler exhibits that --

24               Not the afternoon witness or tomorrow's witness?

25   The 603 exhibit -- 601, 602, 603 --

1          MR. MCCULLOUGH:  Your Honor, after the --

2     Inspector Loyd, there will be two witnesses, and then the

3     third witness would be the special agent who would testify

4     to Parler.

5          THE COURT:  All right.  And that --

6          MS. HERNANDEZ:  So we're not going to take that

7     up --

8          THE COURT:  -- these additional -- Mr. McCullough,

9     these additional exhibits that Ms. Hernandez has emailed are

10    for this third witness, as well as the ones you've laid out?

11         MR. MCCULLOUGH:  That's correct, Your Honor.

12         THE COURT:  All right.  And, Ms. Hernandez, how

13    many of them are there?

14         MS. HERNANDEZ:  It's a long list.  They are Parler

15    exhibits for each of the defendants, and then -- and with --

16    you'll see.  It's just a number.  Just, like, a long list of

17    numbers.  Like, 601 is one defendant; 602 is another

18    defendant; 603 refers to another defendant.  There's just a

19    number of exhibits there which are -- predate the

20    conspiracy, just the same type of cumulative evidence.

21         THE COURT:  All right.

22         MS. HERNANDEZ:  And those are mostly just

23    pictures -- or I'm sorry, not pictures -- statements, like,

24    Parler statements as opposed to the video that --

25         THE COURT:  All right.  I'll do my best to look at

1    them.  Maybe we won't even get to this witness today.  But

2    let me let you go -- let me let you all go to lunch with

3    this one caveat.  Mr. Jauregui knows what I'm about to say

4    because he saw me -- we looked at each other.  There was

5    confusion on the cross-examine order -- cross-examination

6    order with regard to this witness.  There was -- the --

7    after -- Mr. Tarrio's lawyer went first and, after that,

8    there was, Oh, is it you?  Who goes next?  The next person

9    did not know which person they were -- going first.

10          MR. JAUREGUI:  I can tell Your Honor, we had a

11    list and everything.

12          THE COURT:  Yeah, I -- you tried.  You tried.

13          MR. PATTIS:  Mr. Metcalf's fault, Judge.

14          (Laughter.)

15          MS. HERNANDEZ:  We'll beat him up.

16          THE COURT:  So starting -- you all discuss it over

17    lunch.  Starting with the next witness, the defense will go

18    in a particular order and that particular order will hold

19    throughout the rest of the trial.

20          MS. HERNANDEZ:  My understanding --

21          THE COURT:  See you all at 1:30.

22          THE DEPUTY CLERK:  All rise.  This Honorable Court

23    stands in recess.

24          (Luncheon recess taken at 12:35 p.m.)

25              * * * * * * * * * * * *

1        <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2    I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

3    that the above and foregoing constitutes a true and accurate

4    transcript of my stenographic notes and is a full, true and

5    complete transcript of the proceedings to the best of my

6    ability, dated this 17th day of January 2023.

7                          <u>/s/Timothy R. Miller, RPR, CRR, NJ-CCR</u>
                          Official Court Reporter
8                          United States Courthouse
                          Room 6722
9                          333 Constitution Avenue, NW
                          Washington, DC 20001

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s/Timothy** [1] - 3736:7

## 0

**06511** - 3599:25

## 1

**1** [4] - 3602:3, 3602:9, 3602:13, 3716:4
**1,800** [3] - 3691:17, 3691:21, 3692:1
**1-ETHAN** [1] - 3599:4
**1.5** [1] - 3610:3
**10** [8] - 3618:17, 3625:12, 3625:24, 3642:13, 3643:2, 3662:23, 3664:19, 3728:3
**10-minute** [1] - 3642:21
**100** [1] - 3715:25
**10003** [1] - 3599:18
**10016** [1] - 3600:13
**1014** [1] - 3600:9
**104(a** [1] - 3656:9
**104(b** [1] - 3656:8
**10:00** [2] - 3664:9, 3688:22
**10:15** [1] - 3643:4
**10:25** [1] - 3643:4
**10:47** [2] - 3700:1, 3700:5
**10:57** [5] - 3698:17, 3698:19, 3698:23, 3699:6, 3699:12
**11:00** [1] - 3688:22
**11:30** [1] - 3607:9
**12** [2] - 3615:19, 3728:3
**122-page** [3] - 3665:23, 3666:4, 3666:16
**12:00** [1] - 3607:9
**12:16** [2] - 3701:6, 3701:20
**12:35** [1] - 3735:24
**12:47** [2] - 3701:21, 3702:7
**12:53** [6] - 3699:21, 3700:1, 3700:5, 3702:7, 3721:10
**12th** [1] - 3663:23
**1420** [1] - 3599:21
**15** [5] - 3599:8, 3618:17, 3659:4, 3681:2, 3717:15

## 150-year-old - 3626:13

**153** [1] - 3600:5
**16-hour** [1] - 3692:21
**160E** [3] - 3619:7, 3619:18, 3619:22
**165A** [1] - 3638:24
**168** [1] - 3683:12
**17** [1] - 3599:6
**17th** [2] - 3732:10, 3736:6
**18th** [1] - 3732:10
**19** [1] - 3720:19
**1954** [1] - 3720:11
**19th** [2] - 3732:9, 3732:11
**1:21-cr-00175-TJK-1** [1] - 3599:2
**1:21-cr-00175-TJK-2** [1] - 3599:3
**1:21-cr-00175-TJK-3** [1] - 3599:3
**1:21-cr-00175-TJK-5** [1] - 3599:4
**1:21-cr-00175-TJK-6** [1] - 3599:4
**1:30** [1] - 3735:21
**1st** [1] - 3599:24

## 2

**2** [5] - 3602:4, 3602:9, 3602:14, 3618:11, 3717:8
**2-JOSEPH** [1] - 3599:5
**20** [4] - 3604:3, 3611:20, 3655:11, 3683:18
**200** [3] - 3622:5, 3716:1, 3716:4
**20001** [2] - 3600:17, 3736:9
**20005** [1] - 3599:21
**202** [3] - 3599:15, 3599:22, 3600:17
**2021** [1] - 3720:22
**2023** [2] - 3599:6, 3736:6
**203** [1] - 3599:25
**20530** [1] - 3599:15
**20777** [1] - 3600:3
**209** [1] - 3600:6
**20th** [1] - 3599:17
**21-175** [2] - 3602:3, 3643:10
**22nd** [1] - 3732:12
**24-hour** [1] - 3692:17
**240** [1] - 3600:3
**25** [1] - 3681:18

## 252-7233 [1] - 3599:15

**253-0514** [1] - 3600:14
**2:00** [1] - 3715:12
**2:00-something** [1] - 3714:24
**2:10** [1] - 3715:5
**2:12** [1] - 3715:5
**2:15** [1] - 3715:14
**2:15-ish** [1] - 3717:9
**2:19** [2] - 3714:24, 3715:14
**2:46** [1] - 3639:12

## 3

**3** [3] - 3602:4, 3602:10, 3602:14
**3-ZACHARY** [1] - 3599:5
**30** [6] - 3609:19, 3611:20, 3648:6, 3673:9, 3701:9, 3701:19
**305** [2] - 3600:7, 3600:10
**33012** [1] - 3600:9
**33014** [1] - 3600:6
**333** [2] - 3600:16, 3736:9
**335** [1] - 3692:7
**350** [1] - 3691:20
**354-3111** [1] - 3600:17
**36-hour** [1] - 3610:2
**3618** [1] - 3601:3
**37** [1] - 3620:5
**383** [1] - 3599:24
**393** [1] - 3630:12
**393-3017** [1] - 3599:25
**394** [1] - 3627:20
**395** [1] - 3687:4
**396** [1] - 3687:11
**397** [1] - 3687:18
**3:30** [1] - 3717:1

## 4

**4** [3] - 3620:11, 3620:14, 3636:11
**40** [1] - 3681:18
**403** [7] - 3609:2, 3632:14, 3637:5, 3637:6, 3640:4, 3647:6, 3648:3
**403-7323** [1] - 3600:7
**404(b** [1] - 3650:7
**415** [2] - 3686:10, 3686:13
**425** [1] - 3703:5
**429-6520** [1] - 3599:22
**454** [1] - 3631:10

## 455A [1] - 3684:17

**456** [1] - 3686:5
**472-3391** [1] - 3600:3
**477** [1] - 3629:18
**49** [1] - 3600:9
**499B** [1] - 3620:22
**4:00** [1] - 3717:3
**4:29** [1] - 3687:21
**4:30** [3] - 3687:23, 3717:3, 3717:5
**4:30-ish** [1] - 3717:12
**4r** [1] - 3599:18
**4th** [1] - 3599:14

## 5

**5** [3] - 3602:5, 3602:11, 3602:15
**5-ENRIQUE** [1] - 3599:6
**50** [1] - 3636:9
**535** [2] - 3716:9, 3716:12
**555** [1] - 3599:14
**59** [1] - 3636:10
**5th** [1] - 3664:5

## 6

**6** [3] - 3602:5, 3602:12, 3602:15
**6-DOMINIC** [1] - 3599:6
**600-15** [1] - 3733:4
**600-38** [2] - 3728:22, 3728:23
**600-41** [2] - 3728:23, 3731:24
**600-45** [2] - 3728:23, 3732:1
**600.40** [1] - 3731:23
**601** [2] - 3733:25, 3734:17
**602** [2] - 3733:25, 3734:17
**603** [2] - 3733:25, 3734:18
**603-15** [3] - 3608:25, 3733:3, 3733:5
**6175** [1] - 3600:5
**646** [1] - 3600:14
**6722** [2] - 3600:16, 3736:8
**6th** [38] - 3600:13, 3618:10, 3649:24, 3664:14, 3670:11, 3679:24, 3680:9, 3683:10, 3686:2, 3687:23, 3688:21, 3692:6, 3692:7,

## 7

**7** [3] - 3599:17, 3716:5, 3716:13
**7166** [1] - 3600:2
**7th** [2] - 3688:19, 3689:22

## 8

**8** [3] - 3615:19, 3625:24, 3692:21
**8-minute-30-second** [1] - 3618:17
**800** [2] - 3716:5, 3716:13
**822-2901** [1] - 3600:10
**8:00** [1] - 3688:15
**8:43** [1] - 3618:24

## 9

**902-3869** [1] - 3599:19
**917** [1] - 3599:19
**99** [1] - 3600:12
**9:00** [5] - 3599:6, 3606:3, 3610:3, 3612:19, 3612:24
**9:25** [1] - 3613:2
**9:30** [3] - 3610:3, 3612:20, 3612:25
**9:54** [2] - 3609:5, 3609:16
**9th** [1] - 3664:16

## A

**a.m** [2] - 3599:6, 3664:9
**abetted** [1] - 3659:1
**ability** [3] - 3604:13, 3730:10, 3736:6
**able** [26] - 3603:24, 3604:15, 3606:6, 3608:7, 3608:8, 3615:22, 3621:8,

3692:10, 3692:12, 3692:20, 3692:23, 3692:25, 3693:3, 3693:7, 3693:11, 3694:20, 3694:25, 3695:4, 3695:11, 3695:14, 3695:15, 3695:18, 3696:24, 3697:2, 3697:24, 3701:7, 3713:18, 3720:22, 3731:14, 3731:16, 3731:17, 3732:15

3738

3633:17, 3639:9,
3642:10, 3653:3,
3653:25, 3654:1,
3654:5, 3662:3,
3671:8, 3673:20,
3676:4, 3676:11,
3686:21, 3688:4,
3689:5, 3710:20,
3718:25, 3726:9,
3730:12
**absolutely** [2] -
3643:1, 3675:13
**abundance** [1] -
3669:24
**accept** [4] - 3649:20,
3654:17, 3654:20,
3655:4
**access** [4] - 3605:8,
3665:23, 3666:18,
3684:24
**accommodation** [1] -
3672:10
**accomplish** [2] -
3653:16, 3653:17
**account** [2] - 3647:8,
3678:25
**accountability** [1] -
3693:20
**accurate** [1] - 3736:3
**accurately** [1] -
3619:15
**act** [3] - 3645:20,
3731:21, 3732:16
**action** [1] - 3662:25
**actions** [3] - 3626:17,
3644:22, 3645:1
**activated** [1] - 3695:11
**activation** [1] -
3695:12
**active** [1] - 3656:17
**activities** [1] - 3633:6
**acts** [8] - 3645:14,
3645:18, 3646:1,
3646:6, 3646:11,
3667:23, 3667:25,
3668:4
**actual** [1] - 3718:9
**adapted** [2] - 3728:6,
3728:12
**add** [4] - 3649:23,
3653:24, 3667:4,
3673:4
**added** [1] - 3664:14
**addition** [1] - 3653:21
**additional** [5] -
3607:5, 3673:4,
3728:17, 3734:8,
3734:9
**address** [3] - 3607:13,
3612:6, 3614:7

**addressing** [1] -
3605:12
**adjacent** [1] - 3627:13
**adjournment** [2] -
3665:22, 3670:10
**adjusted** [1] - 3603:8
**admissible** [4] -
3604:23, 3651:18,
3657:8, 3731:2
**admit** [2] - 3619:18,
3671:8
**admitted** [6] - 3605:3,
3619:20, 3669:14,
3671:16, 3671:17,
3680:21
**adopt** [1] - 3650:15
**adopting** [1] - 3649:11
**advance** [9] - 3611:4,
3611:18, 3651:15,
3655:4, 3674:7,
3677:1, 3692:13,
3692:15
**advanced** [1] - 3644:5
**advances** [2] -
3724:15, 3731:7
**adversary** [1] -
3731:22
**advice** [1] - 3721:5
**advocating** [1] -
3732:15
**aerosol** [1] - 3629:9
**affairs** [2] - 3622:2,
3687:23
**afield** [1] - 3647:22
**afternoon** [2] -
3686:24, 3733:24
**agent** [4] - 3605:16,
3606:5, 3665:12,
3734:3
**Agent** [2] - 3606:3,
3607:6, 3610:6
**agents** [2] - 3712:5,
3712:6
**aggression** [1] -
3711:2
**aggressive** [2] -
3711:13, 3729:13
**ago** [2] - 3614:7,
3672:3
**agree** [17] - 3648:6,
3651:11, 3651:23,
3652:9, 3654:13,
3655:7, 3669:8,
3669:10, 3669:22,
3673:11, 3703:22,
3706:20, 3707:23,
3708:16, 3709:4,
3709:15, 3709:20
**agreed** [2] - 3615:7,
3634:12

**agreement** [1] -
3647:19
**agreements** [1] -
3674:4
**ahead** [11] - 3612:4,
3614:6, 3615:10,
3615:15, 3633:19,
3640:1, 3641:21,
3661:5, 3675:8,
3709:25, 3730:8
**aided** [2] - 3600:19,
3659:1
**aim** [1] - 3658:17
**aimed** [1] - 3667:24
**air** [2] - 3630:3, 3713:9
**Airbnb** [1] - 3664:5
**AJ** [2] - 3660:4
**al** [1] - 3643:11
**Alan** [1] - 3641:3
**alert** [2] - 3611:16,
3613:9
**alerting** [1] - 3674:7
**allegation** [1] - 3657:5
**allow** [4] - 3653:13,
3656:23, 3669:23,
3693:16
**allowed** [2] - 3633:11,
3647:24
**allowing** [1] - 3650:23
**amassed** [1] - 3664:8
**AMERICA** [1] - 3599:2
**America** [4] - 3602:3,
3643:11, 3666:8,
3666:21
**American** [3] -
3645:12, 3646:23,
3712:24
**amount** [2] - 3673:3,
3716:4
**amounts** [1] - 3712:4
**angle** [1] - 3646:8
**angry** [1] - 3702:9
**answer** [1] - 3622:14
**anticipate** [6] -
3607:8, 3607:12,
3609:10, 3610:12,
3610:23, 3656:25
**anticipated** [1] -
3610:5
**Antifa** [1] - 3729:10
**anxiety** [1] - 3711:6
**anyway** [2] - 3659:8,
3659:9
**apart** [1] - 3685:2
**apologies** [3] -
3609:3, 3617:21,
3618:19
**apologize** [2] -
3610:9, 3704:14
**appear** [4] - 3613:13,

3613:21, 3619:12,
2686:15
**APPEARANCES** [2] -
3599:11, 3600:1
**appeared** [2] - 3619:1,
3709:4
**appointed** [1] - 3664:9
**appointment** [1] -
3685:21
**appreciate** [2] -
3700:2, 3705:21
**approach** [2] -
3703:13, 3703:14
**approached** [2] -
3706:1, 3714:12
**approaching** [2] -
3700:9, 3705:25
**appropriate** [4] -
3605:25, 3613:23,
3613:24, 3637:4
**Architect** [2] - 3690:8,
3690:13
**Archives** [1] - 3666:14
**area** [12] - 3621:2,
3621:6, 3621:15,
3624:18, 3624:19,
3629:8, 3630:3,
3680:6, 3710:21,
3714:25, 3715:14,
3719:6
**argue** [3] - 3644:4,
3644:6, 3645:16,
3647:5, 3651:19,
3669:14, 3673:25
**argued** [2] - 3643:24,
3644:24
**arguing** [9] - 3602:23,
3633:22, 3637:8,
3637:21, 3644:22,
3645:6, 3645:11,
3727:14, 3731:6
**argument** [28] -
3603:19, 3604:18,
3607:19, 3608:20,
3615:25, 3616:8,
3642:25, 3644:14,
3645:3, 3646:17,
3650:16, 3652:14,
3657:6, 3658:9,
3660:4, 3663:17,
3667:1, 3668:11,
3669:8, 3669:9,
3669:10, 3676:19,
3727:1, 3728:17,
3730:20, 3733:7,
3733:13
**argument's** [1] -
3676:16
**arguments** [1] -
3675:23

**arise** [1] - 3603:25
**arrive** [1] - 3607:7
**arrived** [2] - 3659:5,
3686:24
**art** [3] - 3712:15,
3712:23, 3713:14
**articulated** [1] -
3730:25
**artifacts** [2] - 3616:17,
3619:1
**artwork** [1] - 3713:7
**aside** [4] - 3612:13,
3612:15, 3651:5,
3651:23
**assault** [1] - 3631:1
**assemble** [1] -
3658:16
**assess** [1] - 3694:11
**assigned** [3] -
3691:23, 3691:24,
3697:20
**assignment** [1] -
3695:10
**assist** [2] - 3614:13,
3680:11
**assistant** [1] - 3704:10
**Assistant** [1] -
3630:19
**associate** [1] -
3645:24
**associated** [2] -
3635:6, 3645:10
**associating** [1] -
3667:16
**association** [2] -
3645:7, 3645:11
**associational** [1] -
3645:24
**assume** [2] - 3648:1,
3656:1
**assuming** [1] -
3724:17
**astutely** [1] - 3678:1
**atmosphere** [1] -
3660:12
**attached** [1] - 3653:20
**attempt** [5] - 3615:7,
3639:16, 3646:21,
3655:16, 3675:21
**attempted** [1] -
3721:14
**attempting** [7] -
3627:7, 3636:22,
3636:25, 3640:4,
3640:7, 3681:11,
3682:1
**attention** [3] -
3696:15, 3696:18,
3713:5
**attenuated** [1] -

3739

3665:25
**attorney** [2] - 3678:4, 3678:7
**ATTORNEY'S** [1] - 3599:14
**attorney's** [1] - 3648:15
**attorneys** [2] - 3678:5, 3678:19
**Attorneys** [1] - 3705:16
**attorneys'** [1] - 3679:8
**audio** [9] - 3621:20, 3627:21, 3630:13, 3687:5, 3687:12, 3687:19, 3698:6, 3698:15, 3699:16
**authenticity** [2] - 3674:6, 3674:15
**authorized** [3] - 3700:16, 3700:17, 3700:19
**available** [8] - 3608:11, 3608:21, 3647:7, 3670:5, 3670:6, 3670:7, 3670:8, 3670:9
**Avenue** [3] - 3600:12, 3600:16, 3736:9
**avoid** [2] - 3615:10, 3671:14
**aware** [32] - 3606:13, 3621:13, 3649:24, 3660:10, 3660:20, 3686:17, 3694:13, 3695:14, 3695:18, 3696:13, 3696:16, 3697:2, 3697:7, 3697:10, 3697:12, 3697:23, 3699:4, 3699:11, 3699:13, 3700:13, 3700:15, 3700:17, 3700:18, 3700:21, 3701:23, 3713:21, 3716:23, 3719:22, 3720:8, 3722:19, 3722:23
**Ayo** [1] - 3732:4

## B

**B.A** [1] - 3599:12
**background** [1] - 3676:7
**backing** [1] - 3646:16
**bad** [5] - 3645:14, 3646:1, 3656:24, 3689:12
**balcony** [1] - 3716:19
**ballot** [2] - 3687:3,

3688:12
**ballots** [1] - 3692:16
**ban** [1] - 3732:1
**banner** [4] - 3729:19, 3730:24, 3732:2, 3732:4
**bannisters** [1] - 3629:16
**barricade** [1] - 3627:4
**barricaded** [1] - 3630:16
**barricades** [2] - 3636:1, 3636:3
**based** [7] - 3622:7, 3661:19, 3686:7, 3689:21, 3690:17, 3700:12, 3722:11
**basic** [1] - 3687:24
**basis** [9] - 3610:2, 3641:7, 3650:8, 3671:7, 3676:4, 3676:22, 3695:25, 3697:21, 3730:25
**battle** [5] - 3640:8, 3640:18, 3642:2, 3652:2, 3680:15
**beat** [1] - 3735:15
**beautiful** [2] - 3613:23, 3712:15
**became** [5] - 3679:24, 3680:10, 3697:2, 3697:7, 3697:12
**become** [3] - 3697:10, 3697:23, 3711:13
**becoming** [1] - 3640:10
**BEFORE** [1] - 3599:9
**begin** [2] - 3724:18, 3726:17
**beginning** [9] - 3616:19, 3618:16, 3623:14, 3624:11, 3636:11, 3656:1, 3662:1, 3680:18, 3690:15
**behalf** [5] - 3609:4, 3649:6, 3649:20, 3657:6, 3666:9
**behavior** [2] - 3710:24, 3731:5
**behind** [7] - 3606:21, 3612:1, 3651:7, 3652:6, 3661:5, 3707:18, 3707:23
**below** [3] - 3638:16, 3691:16, 3691:19
**Bench** [6] - 3631:16, 3636:20, 3639:25, 3705:1, 3723:9, 3725:13

**bench** [11] - 3602:20, 3604:12, 3606:5, 3606:20, 3635:16, 3638:5, 3642:16, 3643:4, 3705:15, 3724:25, 3725:23
**beneath** [1] - 3646:19
**benefit** [2] - 3662:19
**bereft** [1] - 3668:5
**Bertino** [2] - 3670:20, 3731:1
**best** [7] - 3603:14, 3604:19, 3607:16, 3613:7, 3702:24, 3734:25, 3736:5
**better** [5] - 3663:18, 3664:20, 3677:2, 3689:1, 3693:19
**between** [10] - 3610:17, 3610:20, 3610:25, 3634:14, 3641:10, 3661:20, 3679:7, 3700:1, 3700:5, 3713:25
**beyond** [4] - 3634:14, 3641:16, 3672:14, 3692:21
**big** [3] - 3629:1, 3655:8, 3655:13
**Biggs** [18] - 3602:4, 3602:14, 3608:25, 3633:3, 3633:11, 3633:14, 3637:14, 3637:17, 3641:20, 3641:23, 3647:13, 3647:19, 3664:5, 3664:11, 3666:8, 3666:9, 3666:20, 3668:3
**BIGGS** [1] - 3599:5
**bipartisan** [2] - 3694:13, 3694:18
**bit** [23] - 3633:12, 3634:21, 3635:18, 3638:2, 3642:7, 3642:19, 3647:24, 3647:25, 3655:25, 3656:1, 3659:1, 3661:9, 3661:25, 3662:25, 3665:11, 3702:23, 3704:14, 3706:14, 3707:4, 3707:8, 3708:17, 3708:23, 3718:4
**Black** [3] - 3729:10, 3729:15, 3729:16
**black** [1] - 3618:11
**blame** [1] - 3640:5
**blind** [2] - 3611:8, 3660:8

**BLM** [3] - 3729:18, 3732:2, 3733:18
**blocked** [1] - 3665:1
**blocking** [1] - 3709:19
**boarded** [2] - 3690:2, 3690:3
**boatload** [1] - 3652:21
**bodily** [1] - 3723:5
**Boots** [1] - 3664:3
**box** [2] - 3617:10, 3679:12
**Boys** [11] - 3641:2, 3641:14, 3660:6, 3697:5, 3697:8, 3697:13, 3698:23, 3699:4, 3699:8, 3699:12, 3700:8
**Brady** [1] - 3611:13
**branch** [4] - 3666:6, 3666:11, 3666:12, 3666:20
**breach** [17] - 3618:13, 3619:25, 3620:7, 3620:8, 3620:10, 3620:14, 3620:17, 3621:14, 3627:8, 3640:6, 3698:19, 3699:23, 3700:5, 3702:8, 3718:1, 3721:9, 3721:14
**Breach** [1] - 3618:10
**breached** [9] - 3626:11, 3637:15, 3716:15, 3716:17, 3717:23, 3719:14, 3720:1, 3721:12, 3721:17
**breaches** [6] - 3618:9, 3622:3, 3631:3, 3631:7, 3639:14, 3639:16
**break** [12] - 3607:12, 3607:21, 3608:7, 3613:8, 3642:8, 3642:12, 3642:14, 3642:18, 3642:21, 3679:17, 3723:14, 3727:8
**breaking** [2] - 3637:3, 3706:17
**breaks** [1] - 3677:11
**Brief** [10] - 3617:9, 3621:24, 3639:8, 3643:8, 3698:5, 3702:22, 3703:1, 3704:17, 3704:20, 3727:17
**brief** [6] - 3609:2, 3618:21, 3623:13, 3665:5, 3677:22,

3702:16
**briefing** [2] - 3640:16, 3662:12
**briefly** [3] - 3603:15, 3616:15, 3704:25
**bring** [7] - 3617:7, 3640:8, 3642:22, 3671:4, 3671:12, 3677:6, 3677:7
**bringing** [1] - 3665:24
**broader** [2] - 3657:7, 3659:11
**broadly** [2] - 3729:12, 3731:2
**broke** [2] - 3659:4, 3721:12
**broken** [3] - 3673:1, 3689:12, 3721:25
**brought** [4] - 3653:18, 3696:15, 3696:18, 3713:5
**brutal** [1] - 3680:15
**building** [31] - 3621:12, 3622:22, 3625:16, 3636:5, 3636:7, 3638:19, 3681:11, 3682:2, 3682:21, 3683:8, 3686:21, 3687:1, 3687:10, 3687:25, 3688:2, 3688:4, 3689:8, 3690:10, 3703:15, 3705:25, 3713:6, 3715:4, 3715:16, 3715:25, 3716:2, 3716:6, 3716:13, 3717:5, 3717:8, 3717:12, 3721:12
**Building** [5] - 3621:17, 3685:3, 3685:14, 3686:3, 3697:20
**buildings** [3] - 3628:5, 3685:20
**bulleted** [1] - 3662:12
**bunch** [1] - 3603:6
**bureau** [3] - 3695:6, 3695:8, 3695:13
**burn** [2] - 3732:2, 3732:4
**burning** [2] - 3730:24, 3733:19
**business** [1] - 3718:16
**busted** [2] - 3707:11, 3709:16
**BY** [55] - 3618:5, 3618:25, 3619:10, 3619:24, 3620:6, 3620:24, 3621:25,

3622:17, 3623:16,
3624:6, 3627:22,
3629:19, 3630:14,
3635:22, 3636:13,
3638:6, 3639:2,
3639:13, 3679:16,
3681:1, 3681:20,
3682:7, 3682:13,
3683:14, 3683:20,
3684:18, 3686:1,
3686:6, 3686:12,
3687:6, 3687:13,
3687:20, 3689:20,
3691:2, 3691:7,
3693:17, 3697:18,
3698:16, 3699:19,
3700:4, 3701:11,
3701:15, 3703:9,
3705:23, 3706:6,
3706:12, 3707:3,
3707:9, 3708:10,
3709:3, 3710:3,
3710:9, 3720:21,
3725:3, 3725:25

## C

**calm** [2] - 3625:11,
3625:14
**camera** [5] - 3619:12,
3707:10, 3707:13,
3707:14, 3708:13
**Camiliere** [5] - 3607:6,
3609:7, 3609:10,
3609:16, 3610:7
**cancel** [1] - 3606:7
**cannot** [3] - 3634:15,
3667:15, 3679:8
**capacity** [1] - 3692:2
**Capitol** [88] - 3618:9,
3618:12, 3621:16,
3622:2, 3623:5,
3624:16, 3624:17,
3625:10, 3625:21,
3630:10, 3631:1,
3631:5, 3631:8,
3632:19, 3632:23,
3633:4, 3635:5,
3635:7, 3635:23,
3636:14, 3637:15,
3637:18, 3638:3,
3638:7, 3639:15,
3639:18, 3640:6,
3640:9, 3649:25,
3652:7, 3654:24,
3658:17, 3664:17,
3664:24, 3665:24,
3679:21, 3681:9,
3682:23, 3683:2,
3685:3, 3685:9,
3685:14, 3685:19,

3686:3, 3686:9,
3686:14, 3689:2,
3689:15, 3689:22,
3690:6, 3690:8,
3690:12, 3690:13,
3690:16, 3691:9,
3691:22, 3692:10,
3695:21, 3695:23,
3696:1, 3696:21,
3697:20, 3698:19,
3698:23, 3699:5,
3699:24, 3700:5,
3700:9, 3701:8,
3701:18, 3701:21,
3711:25, 3712:1,
3712:10, 3712:11,
3712:13, 3712:24,
3717:18, 3719:21,
3720:3, 3720:9,
3720:15, 3720:22,
3720:24, 3723:20,
3726:12, 3731:17
**captain** [1] - 3688:23
**Captain** [1] - 3693:18
**captains** [2] -
3691:13, 3691:19
**caption** [1] - 3666:19
**captured** [1] - 3655:10
**Carmen** [3] - 3600:2,
3602:11, 3641:24
**carry** [2] - 3610:13,
3690:18
**case** [39] - 3605:16,
3612:9, 3614:21,
3632:11, 3632:12,
3636:23, 3637:25,
3641:17, 3644:6,
3644:24, 3645:2,
3646:21, 3652:16,
3652:18, 3652:20,
3656:11, 3657:5,
3657:10, 3658:12,
3659:20, 3661:18,
3661:24, 3663:1,
3665:12, 3666:3,
3666:7, 3666:11,
3666:19, 3670:18,
3670:25, 3672:2,
3723:18, 3723:24,
3724:4, 3724:6,
3725:16, 3730:10
**cases** [3] - 3656:21,
3662:25, 3663:3
**categories** [1] -
3615:8
**category** [2] -
3614:23, 3614:24
**causal** [6] - 3644:1,
3644:4, 3645:7,
3646:8, 3651:14,

3651:20
**causation** [5] -
3640:7, 3646:10,
3651:17, 3651:19,
3655:3
**caused** [6] - 3635:7,
3641:8, 3646:5,
3667:15, 3667:20,
3719:12
**causes** [2] - 3641:18,
3666:2
**causing** [1] - 3648:4
**caution** [1] - 3669:24
**caveat** [2] - 3649:23,
3735:3
**CCR** [3] - 3600:15,
3736:2, 3736:7
**cede** [1] - 3728:21
**celebrated** [1] -
3664:10
**celebrating** [1] -
3663:24
**celebration** [1] -
3729:13
**Center** [1] - 3664:24
**center** [1] - 3683:5
**ceremonial** [1] -
3626:9
**certain** [3] - 3609:11,
3648:24, 3674:8
**certainly** [8] -
3610:10, 3611:17,
3646:13, 3661:13,
3662:7, 3670:2,
3723:19
**CERTIFICATE** [1] -
3736:1
**certify** [1] - 3736:2
**Chad** [1] - 3630:19
**chamber** [39] - 3623:3,
3623:7, 3624:3,
3624:9, 3624:12,
3624:21, 3624:23,
3624:24, 3624:25,
3625:13, 3625:20,
3626:5, 3626:25,
3628:14, 3629:1,
3629:4, 3630:6,
3630:8, 3683:22,
3683:24, 3684:1,
3684:4, 3714:15,
3715:7, 3716:14,
3716:17, 3716:22,
3718:5, 3718:6,
3718:7, 3718:12,
3718:23, 3721:14,
3721:22, 3722:10,
3724:1, 3725:6,
3726:10
**chambers** [14] -

3602:24, 3608:1,
3622:8, 3622:19,
3622:23, 3623:1,
3688:8, 3688:9,
3688:14, 3714:9,
3721:9, 3722:18,
3726:6
**change** [2] - 3634:20,
3731:4
**changes** [1] - 3676:20
**chaos** [1] - 3690:21
**chaotic** [2] - 3629:6,
3629:17
**chapter** [1] - 3732:14
**characterization** [1] -
3685:11
**characterize** [1] -
3622:1
**charge** [4] - 3650:10,
3690:7, 3694:24,
3695:7
**charged** [5] - 3633:5,
3637:25, 3650:6,
3650:10, 3719:20
**charges** [1] - 3631:21
**chat** [3] - 3664:2,
3664:3, 3667:12
**chats** [3] - 3664:1,
3664:3, 3664:12
**check** [1] - 3624:24
**chemical** [2] - 3712:5,
3713:5
**chemicals** [1] -
3710:10
**chew** [1] - 3607:17
**Chief** [2] - 3624:19,
3630:19
**chief** [4] - 3693:1,
3693:2, 3693:3,
3704:10
**chose** [1] - 3694:7
**church** [1] - 3729:20
**circle** [1] - 3683:3
**Circle** [2] - 3702:11,
3721:10
**circled** [1] - 3630:1
**circumstance** [1] -
3721:6
**circumstances** [4] -
3622:7, 3682:19,
3722:2, 3722:16
**cited** [1] - 3656:13
**civil** [15] - 3631:21,
3632:5, 3632:7,
3632:8, 3633:4,
3636:25, 3641:18,
3647:23, 3656:21,
3695:1, 3695:3,
3695:5, 3695:9,
3695:11

**claim** [1] - 3662:8
**clarify** [1] - 3719:12
**classic** [1] - 3648:3
**cleaner** [1] - 3616:20
**clear** [6] - 3610:11,
3627:15, 3670:7,
3675:16, 3679:6,
3687:25
**cleared** [2] - 3687:8,
3716:25
**clearly** [1] - 3723:21
**CLERK** [10] - 3602:2,
3643:6, 3643:9,
3679:11, 3698:9,
3698:11, 3698:13,
3703:4, 3703:6,
3735:22
**client** [2] - 3631:24,
3647:25, 3653:4,
3654:2, 3654:6,
3657:9, 3660:6,
3676:13, 3676:14
**climb** [1] - 3629:15
**clip** [2] - 3623:17,
3687:21
**clips** [1] - 3682:24
**Clock** [9] - 3621:2,
3621:5, 3621:15,
3624:12, 3624:18,
3624:19, 3655:23,
3684:2, 3719:6
**close** [3] - 3604:4,
3659:11, 3704:8
**closely** [1] - 3707:18
**closer** [1] - 3716:5
**closest** [3] - 3714:3,
3714:14, 3715:21
**closing** [1] - 3665:1
**co** [13] - 3634:4,
3634:6, 3644:23,
3645:2, 3645:15,
3650:6, 3650:15,
3654:14, 3661:19,
3662:23, 3672:2,
3673:15
**co-conspirator** [2] -
3650:6, 3661:19
**co-conspirators** [5] -
3644:23, 3645:2,
3645:15, 3672:2,
3673:15
**co-counsel** [5] -
3634:4, 3634:6,
3650:15, 3654:14,
3662:23
**co-defendants** [1] -
3645:2
**coded** [1] - 3614:11
**collateral** [1] -
3695:10

3741

**colleague** [1] - 3649:9
**collective** [1] -
3666:10
**color** [2] - 3614:11
**color-coded** [1] -
3614:11
**colorful** [3] - 3616:17,
3619:1, 3620:1
**COLUMBIA** [1] -
3599:1
**combat** [1] - 3659:18
**coming** [16] - 3603:23,
3610:1, 3611:13,
3611:21, 3612:5,
3621:4, 3647:18,
3651:24, 3662:7,
3672:12, 3675:7,
3685:7, 3698:23,
3711:22, 3732:13,
3733:21
**comment** [1] -
3724:12
**commentary** [1] -
3700:25
**commit** [3] - 3646:6,
3667:23, 3667:25
**committed** [3] -
3645:18, 3645:20,
3658:24
**committee** [3] -
3666:17, 3694:16,
3694:18
**Committee** [3] -
3694:14, 3694:15
**committing** [1] -
3668:4
**common** [2] - 3714:4,
3714:10
**communicated** [1] -
3668:7
**communicates** [1] -
3696:6
**communication** [5] -
3642:4, 3667:21,
3697:22, 3699:7,
3713:23
**communications** [7] -
3641:10, 3667:9,
3667:24, 3668:2,
3674:9, 3695:22,
3697:5
**complaint** [1] - 3660:5
**complete** [3] - 3607:2,
3665:23, 3736:5
**completely** [5] -
3648:7, 3680:10,
3687:9, 3688:4,
3732:16
**compliance** [1] -
3609:23

**complied** [1] - 3694:7
**compressed** [2] -
3729:3, 3729:4
**computer** [1] -
3600:19
**computer-aided** [1] -
3600:19
**concept** [2] - 3644:21,
3645:14
**concepts** [1] - 3647:8
**conceptually** [1] -
3669:13
**concern** [5] - 3628:19,
3628:20, 3647:9,
3653:7, 3660:1,
3694:6
**concerned** [3] -
3628:15, 3653:21,
3654:10
**concluded** [2] -
3701:6, 3701:20
**concluding** [1] -
3641:8
**concrete** [1] - 3669:20
**condition** [1] -
3671:15
**conditional** [1] -
3656:9
**conduct** [7] - 3662:7,
3662:13, 3667:15,
3722:20, 3729:13,
3732:16
**conducted** [2] -
3660:14, 3694:11
**confer** [1] - 3705:13
**conference** [12] -
3631:16, 3635:16,
3636:20, 3638:5,
3639:25, 3642:16,
3705:1, 3705:15,
3723:9, 3724:25,
3725:13, 3725:23
**confidence** [1] -
3608:6
**confronted** [1] -
3621:3
**confronting** [1] -
3621:10
**confuse** [1] - 3728:1
**confused** [2] - 3669:5,
3718:4
**confusion** [6] -
3610:9, 3641:19,
3648:4, 3678:10,
3711:4, 3735:5
**Congress** [23] -
3623:9, 3627:9,
3627:18, 3629:15,
3629:23, 3630:9,
3685:17, 3686:17,

3688:8, 3690:21,
3690:22, 3692:13,
3713:19, 3714:3,
3714:8, 3714:16,
3714:19, 3716:8,
3716:11, 3716:12,
3720:8, 3722:6,
3726:8
**congressional** [2] -
3666:17, 3726:3
**congressmen** [1] -
3720:11
**connect** [4] - 3651:25,
3663:15, 3669:21,
3671:10
**connected** [3] -
3661:16, 3668:17,
3729:19
**connecting** [2] -
3642:4, 3668:25
**connection** [7] -
3634:13, 3643:23,
3651:20, 3652:3,
3652:9, 3698:13,
3728:24
**connects** [1] -
3672:22
**Conor** [5] - 3599:13,
3602:8, 3632:20,
3705:2, 3725:14
**consider** [2] - 3672:7,
3697:12
**considering** [1] -
3674:21
**consistent** [3] -
3614:11, 3672:13,
3675:4
**conspiracies** [1] -
3650:19
**conspiracy** [16] -
3644:5, 3650:5,
3650:10, 3651:13,
3651:15, 3651:22,
3654:23, 3655:4,
3656:5, 3656:12,
3658:13, 3663:19,
3668:22, 3730:11,
3734:20
**conspirator** [2] -
3650:6, 3661:19
**conspirators** [6] -
3644:23, 3645:2,
3645:15, 3661:16,
3672:2, 3673:15
**constitutes** [1] -
3736:3
**Constitution** [2] -
3600:16, 3736:9
**consult** [1] - 3665:3
**consulting** [1] -

3690:12
**contact** [1] - 3642:1
**contaminated** [2] -
3629:9, 3630:4
**content** [1] - 3667:8
**context** [2] - 3644:25
**continue** [7] - 3610:8,
3610:13, 3622:8,
3627:19, 3671:5,
3675:20, 3733:10
**CONTINUED** [1] -
3600:1
**control** [1] - 3695:13
**controlled** [1] - 3695:5
**controversial** [1] -
3663:7
**convenient** [1] -
3642:20
**conversation** [2] -
3624:20, 3645:18
**coordinate** [1] -
3630:24
**coordination** [1] -
3663:16
**copious** [1] - 3712:4
**cops** [2] - 3683:17,
3686:25
**corner** [1] - 3724:13
**correct** [80] - 3605:4,
3605:6, 3610:23,
3637:23, 3649:17,
3663:20, 3677:15,
3691:9, 3691:11,
3691:12, 3691:14,
3691:15, 3691:22,
3691:23, 3692:2,
3692:4, 3693:5,
3693:6, 3693:8,
3693:9, 3693:11,
3693:12, 3693:22,
3694:20, 3695:16,
3695:19, 3696:22,
3697:19, 3698:1,
3698:17, 3698:18,
3698:20, 3699:21,
3699:22, 3699:24,
3699:25, 3700:22,
3701:12, 3701:21,
3701:22, 3701:24,
3703:15, 3703:18,
3706:1, 3706:2,
3706:18, 3706:19,
3706:24, 3707:10,
3707:12, 3707:15,
3707:16, 3707:19,
3707:22, 3708:2,
3708:3, 3708:20,
3709:6, 3709:9,
3709:10, 3709:22,
3709:24, 3710:6,

3710:13, 3711:17,
3711:19, 3711:20,
3711:22, 3712:1,
3712:3, 3712:11,
3712:12, 3713:17,
3716:16, 3717:14,
3719:18, 3722:21,
3723:2, 3723:5,
3734:11
**Corridor** [3] - 3624:12,
3655:23, 3684:2
**corridor** [1] - 3625:16
**corridors** [1] -
3625:21
**corruption** [2] -
3616:17, 3620:1
**counsel** [21] -
3602:22, 3605:12,
3608:21, 3612:9,
3616:18, 3616:22,
3631:14, 3634:4,
3634:6, 3650:15,
3654:14, 3662:9,
3662:23, 3678:2,
3678:3, 3678:13,
3678:23, 3701:13,
3705:12, 3723:8,
3726:19
**count** [1] - 3656:12
**country** [2] - 3647:1,
3702:4
**counts** [1] - 3678:22
**couple** [8] - 3614:3,
3627:12, 3635:18,
3638:16, 3707:24,
3724:17, 3724:18,
3726:1
**course** [8] - 3603:21,
3611:25, 3615:12,
3632:13, 3644:5,
3648:18, 3655:18,
3665:9
**COURT** [196] - 3599:1,
3602:16, 3604:1,
3604:10, 3604:24,
3605:4, 3605:6,
3605:11, 3605:23,
3606:11, 3606:16,
3606:24, 3607:14,
3608:2, 3608:15,
3608:18, 3609:14,
3609:20, 3609:22,
3610:14, 3610:16,
3610:20, 3611:1,
3611:23, 3612:16,
3612:19, 3612:22,
3612:24, 3614:1,
3616:7, 3616:12,
3616:24, 3617:5,
3617:7, 3617:11,

3617:20, 3617:24,
3618:3, 3619:19,
3621:23, 3622:11,
3622:14, 3622:16,
3631:14, 3631:17,
3632:10, 3633:7,
3633:12, 3633:18,
3633:25, 3634:17,
3635:11, 3637:6,
3637:11, 3637:16,
3638:1, 3640:1,
3640:12, 3640:23,
3641:21, 3642:5,
3642:17, 3643:1,
3643:12, 3644:11,
3644:13, 3644:16,
3646:25, 3647:2,
3647:11, 3647:14,
3648:19, 3648:21,
3649:4, 3649:13,
3649:16, 3649:18,
3650:3, 3650:13,
3651:2, 3651:4,
3651:10, 3651:12,
3652:13, 3654:3,
3654:9, 3654:12,
3654:15, 3656:4,
3657:1, 3657:3,
3657:11, 3657:13,
3657:15, 3657:17,
3657:20, 3657:23,
3657:25, 3658:5,
3658:11, 3658:16,
3658:19, 3658:22,
3659:2, 3659:7,
3659:9, 3659:25,
3660:17, 3663:9,
3664:18, 3665:4,
3665:13, 3665:16,
3665:18, 3666:24,
3667:3, 3668:10,
3670:22, 3671:3,
3671:19, 3671:21,
3671:23, 3672:8,
3673:14, 3673:18,
3674:24, 3675:19,
3675:24, 3677:14,
3677:16, 3677:18,
3677:21, 3677:25,
3678:19, 3679:5,
3679:13, 3680:23,
3682:4, 3682:6,
3685:12, 3685:23,
3689:19, 3690:25,
3691:6, 3693:16,
3697:17, 3698:8,
3701:14, 3702:14,
3702:18, 3705:4,
3705:9, 3705:12,
3720:19, 3723:8,
3723:10, 3723:16,

3723:23, 3724:10,
3724:20, 3725:1,
3725:18, 3725:20,
3725:22, 3725:24,
3726:15, 3726:23,
3727:2, 3727:4,
3727:14, 3727:19,
3727:22, 3728:5,
3728:25, 3729:21,
3729:24, 3730:6,
3730:8, 3730:20,
3730:23, 3732:6,
3732:19, 3733:4,
3733:6, 3733:9,
3733:18, 3733:21,
3734:5, 3734:8,
3734:12, 3734:21,
3734:25, 3735:12,
3735:16, 3735:21,
3736:1
**Court** [15] - 3600:15,
3600:15, 3616:22,
3633:23, 3641:7,
3643:6, 3646:4,
3647:18, 3656:9,
3658:10, 3672:4,
3722:25, 3723:3,
3735:22, 3736:7
**court** [50] - 3603:20,
3604:21, 3604:23,
3611:10, 3613:17,
3617:2, 3632:6,
3632:14, 3635:3,
3641:12, 3642:9,
3642:11, 3642:13,
3642:15, 3642:19,
3643:2, 3643:5,
3645:5, 3647:1,
3649:6, 3649:10,
3650:17, 3650:23,
3652:19, 3653:5,
3653:7, 3653:13,
3656:6, 3656:7,
3656:16, 3656:20,
3656:23, 3660:10,
3660:12, 3660:13,
3662:9, 3663:4,
3664:6, 3667:21,
3667:23, 3668:2,
3671:25, 3673:2,
3673:6, 3673:11,
3674:2, 3674:10,
3725:17, 3733:13
**court's** [1] - 3649:23
**Court's** [2] - 3633:21,
3650:20
**Courthouse** [2] -
3600:16, 3736:8
**courthouse** [3] -
3648:24, 3649:1,

3678:18
**courtroom** [5] -
3606:4, 3606:18,
3606:22, 3612:11,
3642:25
**courts** [1] - 3656:21
**COVID** [1] - 3628:5
**CR** [1] - 3599:2
**created** [1] - 3644:21
**crime** [3] - 3630:23,
3729:18, 3732:3
**Criminal** [2] - 3602:2,
3643:10
**crisis** [1] - 3648:9
**Cross** [2] - 3601:4,
3601:4
**CROSS** [2] - 3691:1,
3703:8
**cross** [10] - 3607:5,
3615:5, 3617:4,
3631:22, 3654:1,
3690:25, 3702:18,
3726:16, 3735:5
**cross-examination** [6]
- 3617:4, 3631:22,
3690:25, 3702:18,
3726:16, 3735:5
**Cross-Examination**
[2] - 3601:4, 3601:4
**CROSS-
EXAMINATION** [2] -
3691:1, 3703:8
**cross-examine** [2] -
3654:1, 3735:5
**cross-pollinate** [1] -
3615:5
**crowd** [13] - 3621:3,
3621:11, 3634:9,
3636:3, 3639:16,
3658:4, 3681:25,
3682:1, 3682:14,
3686:2, 3686:18,
3701:24
**CRR** [3] - 3600:15,
3736:2, 3736:7
**Crypt** [2] - 3647:21,
3648:1
**CS** [1] - 3710:11
**CT** [1] - 3599:25
**cumulative** [4] -
3633:15, 3641:18,
3648:4, 3734:20
**cut** [1] - 3640:24

**D**

**D.C** [6] - 3599:5,
3630:24, 3630:25,
3650:1, 3731:16,
3732:14

**daily** [1] - 3697:21
**damage** [4] - 3690:4,
3709:18, 3713:8,
3713:10
**damaged** [5] -
3703:24, 3709:19,
3713:2, 3713:12,
3713:15
**damn** [1] - 3731:25
**dancing** [1] - 3660:19
**dark** [2] - 3675:3,
3708:13
**darker** [3] - 3708:13,
3709:12, 3710:4
**darker-haired** [1] -
3709:12
**data** [2] - 3607:7,
3614:14
**date** [1] - 3628:7
**dated** [1] - 3736:6
**DAVID** [1] - 3599:17
**DAY** [1] - 3599:8
**day's** [1] - 3676:17
**days** [4] - 3610:3,
3611:18, 3692:17,
3692:18
**DC** [4] - 3599:15,
3599:21, 3600:17,
3736:9
**deadly** [7] - 3721:3,
3721:6, 3721:18,
3722:5, 3722:20,
3723:4, 3724:3
**deal** [1] - 3632:22
**dealing** [1] - 3673:3
**deceives** [1] - 3641:15
**December** [7] -
3663:23, 3674:16,
3674:17, 3732:9,
3732:10, 3732:11,
3732:12
**deceptive** [1] -
3646:17
**decided** [1] - 3626:22
**decides** [1] - 3604:23
**decision** [7] -
3608:12, 3650:22,
3721:4, 3721:7,
3722:11, 3722:23,
3723:3
**decon** [1] - 3710:17
**decontamination** [1] -
3710:21
**decoration** [1] -
3686:7
**deemed** [1] - 3645:2
**defendant** [12] -
3633:3, 3646:12,
3648:15, 3649:18,
3658:25, 3667:16,

3667:19, 3702:19,
3734:17, 3734:18
**Defendant** [16] -
3602:3, 3602:4,
3602:5, 3602:9,
3602:10, 3602:11,
3602:12, 3602:13,
3602:14, 3602:15,
3637:14
**defendants** [67] -
3632:25, 3634:14,
3635:6, 3637:1,
3637:7, 3637:22,
3640:5, 3640:9,
3641:8, 3641:13,
3641:17, 3643:19,
3643:21, 3644:24,
3645:2, 3645:4,
3645:14, 3646:15,
3646:22, 3651:1,
3651:8, 3651:21,
3653:22, 3654:25,
3655:4, 3656:20,
3657:7, 3660:3,
3660:12, 3660:15,
3661:3, 3661:5,
3661:7, 3661:16,
3661:20, 3662:6,
3663:1, 3663:2,
3663:14, 3663:16,
3663:18, 3663:23,
3667:24, 3671:11,
3672:22, 3673:9,
3674:19, 3675:2,
3676:18, 3677:1,
3677:4, 3678:8,
3678:14, 3678:15,
3679:2, 3728:10,
3728:16, 3728:19,
3730:12, 3730:14,
3730:17, 3730:18,
3731:3, 3731:11,
3731:13, 3734:15
**Defendants** [3] -
3599:7, 3599:16,
3600:2
**defendants'** [5] -
3633:1, 3633:6,
3640:20, 3679:7,
3679:8
**Defense** [3] - 3664:1,
3664:15, 3731:20
**defense** [28] -
3602:22, 3615:8,
3632:8, 3644:8,
3644:9, 3644:24,
3649:14, 3652:19,
3652:22, 3656:15,
3662:9, 3665:22,
3669:10, 3671:1,

3743

3672:1, 3674:3, 3674:7, 3678:3, 3678:14, 3678:23, 3705:17, 3723:4, 3723:15, 3724:4, 3724:5, 3732:23, 3735:17
**defense-of-others** [1] - 3723:15
**defenses** [1] - 3658:24
**defined** [1] - 3641:6
**definitely** [4] - 3659:21, 3709:18, 3709:19, 3721:20
**defy** [1] - 3723:13
**degree** [1] - 3672:12
**delay** [1] - 3671:14
**deleted** [1] - 3613:16
**demonstrated** [1] - 3667:2
**demonstrating** [1] - 3700:20
**demonstrations** [4] - 3695:15, 3695:19, 3700:12, 3700:13
**demonstrative** [7] - 3617:3, 3620:13, 3625:2, 3638:11, 3638:15, 3680:4, 3683:2
**demonstrator** [8] - 3707:21, 3713:19, 3713:25, 3714:3, 3714:13, 3715:3, 3715:16, 3719:17
**demonstrators** [31] - 3703:13, 3705:25, 3707:15, 3711:19, 3714:6, 3714:10, 3714:17, 3715:21, 3715:22, 3715:25, 3716:25, 3717:11, 3717:17, 3717:21, 3717:22, 3717:23, 3718:11, 3718:23, 3719:1, 3719:8, 3719:25, 3720:4, 3720:23, 3721:2, 3722:1, 3722:9, 3726:2, 3726:6, 3726:9, 3726:11, 3726:13
**denied** [1] - 3671:23
**department** [3] - 3694:6, 3695:23, 3696:24
**Department** [5] - 3666:20, 3670:8, 3696:4, 3696:7, 3696:12

**depicting** [1] - 3619:15
**DEPUTY** [10] - 3602:2, 3643:6, 3643:9, 3679:11, 3698:9, 3698:11, 3698:13, 3703:4, 3703:6, 3735:22
**Deputy** [1] - 3624:19
**describe** [1] - 3631:20
**described** [1] - 3640:16
**describing** [2] - 3654:2, 3683:21
**designed** [4] - 3629:8, 3629:13, 3629:14, 3630:2
**despite** [1] - 3690:21
**destruction** [4] - 3636:23, 3637:2, 3637:22, 3658:23
**detail** [1] - 3719:16
**determined** [1] - 3627:8
**determining** [1] - 3635:5
**difference** [2] - 3658:11, 3679:7
**different** [15] - 3613:3, 3613:5, 3614:21, 3659:9, 3659:13, 3660:22, 3660:25, 3661:9, 3662:21, 3676:2, 3691:8, 3692:18, 3704:2, 3711:16, 3727:24
**differently** [1] - 3662:1
**difficult** [2] - 3660:14, 3687:14
**dimensions** [1] - 3680:5
**Dion** [1] - 3641:3
**dire** [1] - 3660:13
**direct** [6] - 3615:13, 3617:14, 3661:24, 3671:25, 3703:3, 3703:12
**Direct** [1] - 3601:3
**DIRECT** [1] - 3618:4
**directed** [5] - 3603:14, 3717:21, 3718:11, 3719:5, 3728:10
**direction** [4] - 3717:22, 3717:23, 3718:11, 3719:8
**directly** [4] - 3633:5, 3656:19, 3691:13, 3691:18
**director** [1] - 3696:19
**disagree** [4] - 3603:2,

3651:12, 3652:10, 3668:11
**discovery** [2] - 3673:4, 3674:4
**discuss** [7] - 3616:9, 3698:2, 3716:18, 3727:4, 3728:8, 3733:2, 3735:16
**discussed** [1] - 3655:6
**discussion** [3] - 3675:8, 3707:5, 3727:7
**discussions** [1] - 3710:10
**disorder** [9] - 3631:21, 3632:5, 3632:7, 3632:9, 3633:5, 3636:25, 3641:18, 3647:23, 3656:21
**dispute** [1] - 3702:6
**disputed** [1] - 3607:1
**disrupt** [1] - 3726:3
**distance** [1] - 3701:16
**DISTRICT** [3] - 3599:1, 3599:1, 3599:10
**disturbance** [6] - 3695:2, 3695:3, 3695:5, 3695:9, 3695:10, 3695:12
**disturbing** [1] - 3718:17
**diverted** [1] - 3719:4
**dollars** [2] - 3712:18, 3712:21
**dome** [2] - 3618:13, 3683:7
**Dominic** [1] - 3602:6
**done** [12] - 3615:18, 3622:23, 3623:8, 3624:22, 3626:24, 3628:8, 3648:21, 3648:22, 3649:2, 3674:11, 3694:14, 3724:15
**Donohue** [2] - 3696:17, 3696:19
**door** [38] - 3620:16, 3621:4, 3621:14, 3625:17, 3626:5, 3626:7, 3626:8, 3626:20, 3628:20, 3629:17, 3633:11, 3636:7, 3637:13, 3639:5, 3639:6, 3653:1, 3679:20, 3679:22, 3680:1, 3680:2, 3680:9, 3680:14, 3681:6, 3682:15, 3682:17,

3683:4, 3684:11, 3684:12, 3703:16, 3708:2, 3714:7, 3715:10, 3717:24, 3718:1, 3718:8, 3718:21, 3729:12
**doorkeepers** [1] - 3623:2
**doors** [47] - 3621:16, 3623:3, 3623:23, 3624:1, 3624:2, 3625:20, 3625:25, 3626:1, 3626:3, 3626:8, 3626:9, 3626:11, 3626:12, 3626:13, 3626:14, 3627:3, 3627:4, 3627:5, 3627:17, 3627:25, 3628:10, 3628:23, 3628:24, 3638:8, 3638:9, 3638:11, 3638:14, 3664:25, 3681:7, 3684:7, 3684:9, 3684:16, 3689:13, 3690:2, 3703:18, 3713:11, 3714:9, 3718:12, 3718:13, 3718:15, 3718:18, 3718:19, 3718:20, 3719:14, 3720:1, 3721:17
**doorway** [1] - 3713:24
**doorways** [1] - 3715:23
**double** [1] - 3653:20
**down** [24] - 3612:5, 3618:13, 3623:1, 3624:22, 3625:13, 3625:16, 3626:6, 3626:25, 3635:21, 3662:7, 3664:24, 3681:3, 3684:23, 3684:25, 3687:9, 3714:18, 3716:19, 3716:20, 3718:14, 3721:16, 3722:18, 3725:6, 3729:25, 3730:5
**downside** [1] - 3676:24
**dozen** [2] - 3611:12
**dressed** [2] - 3706:13, 3706:16
**drowned** [1] - 3615:20
**duress** [2] - 3628:15, 3628:17
**during** [9] - 3617:3, 3642:18, 3642:25, 3693:13, 3694:17,

3703:12, 3713:2, 3714:14, 3727:1
**duty** [4] - 3692:7, 3692:11, 3692:19, 3692:23

**E**

**early** [6] - 3602:20, 3615:16, 3642:10, 3673:10, 3688:19, 3717:2
**easily** [1] - 3726:10
**East** [1] - 3599:17
**east** [19] - 3622:4, 3623:20, 3623:21, 3624:15, 3626:21, 3627:7, 3630:20, 3631:7, 3633:2, 3633:4, 3633:10, 3635:25, 3636:1, 3638:9, 3638:12, 3683:4, 3704:11, 3719:3
**easy** [1] - 3611:15
**educated** [1] - 3646:14
**Edward** [2] - 3619:8, 3619:9
**effect** [2] - 3650:2, 3682:18
**effectively** [2] - 3610:3, 3645:6
**either** [9] - 3647:6, 3651:17, 3653:6, 3655:6, 3655:12, 3667:17, 3696:21, 3719:15, 3722:18
**element** [1] - 3645:7
**eliminate** [1] - 3666:3
**Ellipse** [2] - 3701:8, 3701:18
**email** [18] - 3602:21, 3603:6, 3608:14, 3609:5, 3609:14, 3610:6, 3611:9, 3613:4, 3615:16, 3672:2, 3674:20, 3678:1, 3727:21, 3728:6, 3728:11, 3732:22
**emailed** [2] - 3733:12, 3734:9
**emails** [3] - 3609:17, 3609:21, 3674:3
**emphasize** [2] - 3609:12, 3632:23
**employed** [1] - 3693:2
**encourages** [1] - 3674:2

**encouraging** [1] -
3731:23
**end** [12] - 3603:17,
3604:3, 3606:10,
3640:24, 3653:4,
3653:16, 3661:19,
3672:9, 3676:12,
3688:20, 3694:5,
3725:21
**enforcement** [3] -
3692:1, 3692:4,
3723:4
**engage** [1] - 3641:9
**engaged** [4] -
3643:18, 3645:9,
3658:13, 3659:17
**engagement** [1] -
3729:11
**engaging** [2] -
3659:18, 3731:21
**Enrique** [3] - 3602:5,
3732:14, 3732:15
**ensure** [1] - 3615:19
**enter** [10] - 3681:11,
3682:1, 3682:20,
3683:10, 3685:9,
3685:16, 3685:18,
3686:2, 3722:2,
3722:10
**entered** [6] - 3606:18,
3627:17, 3633:3,
3633:4, 3715:16,
3717:8
**entering** [1] - 3720:4
**enters** [2] - 3679:21,
3721:21
**entire** [3] - 3608:7,
3632:1, 3692:19
**entitled** [1] - 3678:15
**entrance** [4] -
3623:22, 3637:14,
3679:24, 3682:21
**entry** [1] - 3721:24
**Erik** [2] - 3599:12,
3602:8
**escape** [5] - 3629:11,
3630:2, 3630:3,
3725:10
**escorted** [1] - 3685:21
**especially** [4] -
3611:19, 3648:4,
3648:10, 3726:18
**Esq** [12] - 3599:12,
3599:12, 3599:13,
3599:13, 3599:16,
3599:20, 3599:23,
3600:2, 3600:4,
3600:8, 3600:11,
3600:11
**essentially** [2] -

3690:10, 3722:25
**establish** [2] - 3635:3,
3710:20
**establishing** [1] -
3662:19
**estimate** [1] - 3701:19
**estimating** [2] -
3625:24, 3715:6
**estimation** [1] -
3716:1
**et** [1] - 3643:11
**Ethan** [3] - 3602:4,
3634:8, 3643:11
**Eugene** [3] - 3621:3,
3717:21, 3718:10
**evacuate** [4] - 3627:9,
3629:8, 3629:14,
3680:14
**evacuated** [5] -
3623:10, 3628:4,
3630:18, 3714:15,
3714:17
**evacuating** [2] -
3624:8, 3688:7
**evacuation** [9] -
3627:11, 3627:13,
3628:2, 3628:3,
3628:8, 3628:13,
3684:8, 3714:14,
3725:8
**evening** [3] - 3612:10,
3688:15, 3688:22
**event** [3] - 3676:3,
3676:10, 3676:21
**events** [3] - 3619:15,
3676:18, 3713:3
**eventually** [12] -
3623:10, 3625:15,
3628:24, 3629:17,
3680:10, 3680:13,
3686:25, 3687:1,
3688:2, 3688:4,
3710:18
**evidence** [78] -
3614:22, 3614:23,
3614:24, 3614:25,
3615:2, 3631:24,
3632:13, 3637:4,
3640:6, 3641:25,
3643:15, 3643:17,
3643:19, 3643:21,
3646:22, 3647:6,
3648:4, 3650:7,
3650:9, 3650:21,
3651:17, 3651:18,
3651:24, 3652:4,
3652:5, 3652:11,
3652:20, 3653:6,
3653:11, 3653:12,
3653:13, 3654:6,

3655:7, 3655:17,
3656:2, 3656:18,
3657:7, 3660:9,
3660:24, 3661:2,
3662:14, 3663:10,
3663:13, 3663:15,
3663:22, 3663:25,
3664:4, 3664:6,
3664:10, 3664:13,
3666:12, 3667:8,
3668:22, 3668:24,
3669:6, 3669:9,
3669:10, 3669:13,
3669:15, 3670:17,
3670:23, 3670:25,
3671:15, 3672:21,
3673:21, 3673:23,
3675:2, 3675:6,
3675:12, 3676:10,
3676:14, 3677:4,
3730:17, 3731:12,
3734:20
**exactly** [6] - 3624:22,
3626:24, 3663:17,
3676:17, 3692:11,
3705:10
**EXAMINATION** [3] -
3618:4, 3691:1,
3703:8
**Examination** [3] -
3601:3, 3601:4,
3601:4
**examination** [10] -
3615:13, 3617:4,
3617:14, 3631:22,
3690:25, 3702:18,
3703:3, 3703:12,
3726:16, 3735:5
**examine** [2] - 3654:1,
3735:5
**example** [6] - 3650:7,
3656:10, 3663:10,
3663:11, 3663:21,
3669:7
**examples** [1] -
3662:13
**Excel** [1] - 3614:15
**except** [1] - 3641:13
**exchange** [2] - 3674:6
**exchanges** [1] -
3717:4
**exclude** [1] - 3647:5
**excluded** [1] -
3728:18
**excuse** [1] - 3726:19
**excused** [2] - 3642:24,
3727:1
**executive** [3] - 3666:6,
3666:10, 3666:19
**exercise** [1] - 3646:1

**exhibit** [16] - 3605:5,
3613:10, 3613:20,
3616:15, 3616:16,
3616:21, 3616:23,
3638:22, 3638:23,
3698:9, 3703:4,
3728:7, 3728:12,
3732:25, 3733:1,
3733:25
**Exhibit-160** [2] -
3618:16, 3619:16
**Exhibit-165A** [1] -
3636:10
**Exhibit-354** [1] -
3698:10
**Exhibit-359** [1] -
3699:15
**Exhibit-390** [1] -
3621:19
**Exhibit-425** [1] -
3705:18
**Exhibit-434** [1] -
3680:17
**Exhibit-602-19** [1] -
3608:13
**exhibits** [32] - 3609:9,
3609:11, 3611:6,
3611:12, 3611:14,
3611:20, 3612:12,
3613:12, 3615:9,
3672:13, 3672:17,
3673:8, 3674:8,
3705:8, 3727:6,
3727:9, 3727:15,
3727:23, 3727:24,
3727:25, 3728:6,
3728:15, 3732:7,
3733:15, 3733:17,
3733:23, 3734:9,
3734:15, 3734:19
**exist** [3] - 3655:15,
3655:16, 3655:18
**exists** [2] - 3659:19,
3666:13
**exit** [1] - 3679:22
**expect** [5] - 3664:4,
3664:13, 3665:2,
3676:19, 3728:8
**expected** [2] - 3610:8,
3731:14
**expecting** [1] -
3675:10
**experience** [1] -
3726:2
**expert** [1] - 3622:13
**explain** [2] - 3637:17,
3731:9
**explained** [1] - 3729:2
**explanation** [1] -
3605:15

**expressed** [1] -
3653:7
**extensive** [3] -
3660:13, 3662:24,
3666:16
**extent** [11] - 3608:16,
3610:12, 3614:24,
3615:1, 3637:9,
3650:20, 3662:10,
3665:8, 3671:17,
3690:4, 3709:18
**exterior** [1] - 3718:20
**extracting** [1] -
3630:15
**extraordinarily** [1] -
3633:15
**extremely** [1] -
3640:10

---

## F

**faces** [1] - 3626:6
**facing** [1] - 3708:12
**fact** [11] - 3610:8,
3611:8, 3651:5,
3652:5, 3661:16,
3667:11, 3678:25,
3688:16, 3693:10,
3730:3, 3732:17
**factual** [1] - 3661:14
**fail** [2] - 3652:15,
3652:18
**failed** [1] - 3697:13
**failures** [2] - 3694:12,
3694:19
**fair** [12] - 3653:14,
3660:11, 3660:15,
3666:25, 3692:23,
3699:20, 3700:6,
3700:7, 3700:10,
3700:11, 3701:1,
3702:10
**fairly** [2] - 3619:15,
3646:21
**faith** [7] - 3611:25,
3615:8, 3615:14,
3671:7, 3672:12,
3676:4, 3676:22
**falls** [1] - 3695:12
**false** [1] - 3637:3
**familiar** [2] - 3639:18,
3696:11
**family** [1] - 3606:7
**famous** [2] - 3653:2,
3712:24
**far** [15] - 3602:23,
3609:12, 3632:6,
3632:25, 3647:22,
3678:19, 3685:14,
3688:24, 3693:18,

3695:25, 3713:14,
3714:2, 3714:11,
3715:21, 3721:8
**fashion** [3] - 3611:22,
3662:22, 3665:11
**fault** [3] - 3608:2,
3609:6, 3735:13
**FBI** [1] - 3732:1
**feelings** [1] - 3670:5
**felons** [1] - 3723:1
**felt** [1] - 3675:16
**fence** [1] - 3618:11
**few** [10] - 3602:17,
3602:19, 3625:18,
3633:13, 3634:1,
3642:22, 3681:3,
3681:14, 3681:15,
3710:10
**field** [1] - 3699:3
**fight** [3] - 3652:24,
3702:3
**figure** [3] - 3703:20,
3708:6, 3708:8
**file** [1] - 3609:8
**filed** [1] - 3650:18
**filled** [1] - 3683:16
**filming** [1] - 3707:23
**final** [5] - 3626:12,
3626:14, 3650:22,
3721:15, 3726:1
**findings** [1] - 3656:10
**fine** [4] - 3607:23,
3608:18, 3668:16,
3677:9
**finish** [1] - 3640:25
**fire** [14] - 3639:6,
3664:25, 3689:13,
3719:13, 3719:24,
3720:4, 3720:15,
3720:23, 3721:2,
3721:21, 3722:1,
3722:9, 3722:16,
3723:14
**firearm** [2] - 3719:17,
3719:20
**first** [30] - 3614:5,
3621:4, 3626:9,
3628:2, 3644:8,
3644:9, 3654:16,
3655:6, 3655:10,
3660:23, 3677:7,
3691:10, 3699:23,
3704:2, 3704:19,
3705:5, 3706:1,
3707:13, 3708:24,
3715:3, 3715:7,
3715:9, 3715:11,
3715:16, 3716:20,
3717:8, 3732:9,
3735:7, 3735:9

**first-line** [1] - 3691:10
**Fischer** [21] - 3641:3,
3641:9, 3641:11,
3642:1, 3642:4,
3646:6, 3660:4,
3660:5, 3661:18,
3662:15, 3663:10,
3663:11, 3663:19,
3663:21, 3664:8,
3667:10, 3667:11,
3667:22, 3668:17,
3669:12
**Fischer's** [1] -
3667:15
**five** [4] - 3606:2,
3606:18, 3640:19,
3720:11
**Five** [6] - 3641:9,
3641:11, 3642:1,
3642:4, 3646:6,
3664:8
**FL** [2] - 3600:6, 3600:9
**flag** [3] - 3720:13,
3729:16, 3729:17
**flee** [1] - 3725:5
**fleeing** [1] - 3723:1
**flight** [1] - 3684:25
**floor** [8] - 3621:4,
3623:21, 3625:17,
3627:17, 3628:3,
3628:4, 3628:6,
3628:7, 3628:9,
3628:10, 3628:13,
3628:23, 3628:24,
3628:25, 3629:1,
3629:23, 3629:24,
3630:18, 3683:16,
3683:23, 3684:7,
3684:8, 3684:9,
3684:15, 3684:22,
3685:1, 3715:22,
3716:20, 3716:21,
3718:9, 3718:14,
3718:15, 3721:13
**Floor** [2] - 3599:24,
3600:13
**floors** [3] - 3630:18,
3717:1, 3717:5
**focused** [1] - 3671:9
**fold** [1] - 3664:16
**folks** [4] - 3643:20,
3651:15, 3651:21,
3652:5
**follow** [2] - 3607:4,
3690:6
**followed** [1] - 3730:16
**following** [2] -
3675:11, 3707:17
**FOR** [1] - 3599:1
**force** [9] - 3721:3,

3721:4, 3721:6,
3721:19, 3722:5,
3722:14, 3722:20,
3723:4, 3724:3
**forced** [1] - 3628:20
**forcing** [1] - 3726:7
**foregoing** [1] - 3736:3
**foreground** [2] -
3708:6, 3708:8
**formal** [1] - 3692:15
**formed** [1] - 3730:11
**forth** [1] - 3652:2
**forward** [8] - 3663:8,
3668:22, 3671:9,
3673:18, 3676:22,
3676:23, 3677:19,
3682:1
**forwarded** [3] -
3602:24, 3611:10,
3613:4
**foundation** [2] -
3634:11, 3697:16
**four** [6] - 3679:9,
3703:25, 3706:17,
3715:15, 3730:17,
3730:18
**framework** [2] -
3647:4, 3662:2
**frankly** [7] - 3614:21,
3615:18, 3640:11,
3646:19, 3675:14,
3729:12, 3731:21
**frantic** [1] - 3715:24
**free** [1] - 3627:12
**frenzy** [2] - 3701:24,
3701:25
**fresh** [1] - 3630:3
**Friday** [10] - 3604:5,
3609:25, 3616:16,
3617:23, 3618:8,
3620:7, 3620:22,
3639:15, 3649:18,
3690:15
**friendly** [1] - 3607:25
**front** [14] - 3619:11,
3637:3, 3638:9,
3649:2, 3654:25,
3662:13, 3664:10,
3679:21, 3680:12,
3683:4, 3704:10,
3704:11, 3710:18,
3710:22
**fulfill** [1] - 3692:20
**full** [3] - 3665:22,
3702:25, 3736:4
**function** [1] - 3656:17
**functions** [1] - 3695:9
**fundamental** [1] -
3645:12
**fundamentally** [1] -

3614:21
**furniture** [2] - 3627:4,
3686:7

---

## G

**gain** [1] - 3684:23
**galleries** [5] - 3628:6,
3629:12, 3629:14,
3629:24, 3685:2
**gallery** [4] - 3629:5,
3683:22, 3684:14,
3684:22
**garage** [1] - 3664:25
**garb** [2] - 3658:3,
3658:25
**Garner** [1] - 3722:23
**gas** [1] - 3710:11
**gases** [2] - 3710:23,
3711:21
**gatekeeper** [1] -
3656:8
**gatekeeping** [2] -
3656:17, 3656:22
**gear** [8] - 3663:24,
3694:23, 3694:24,
3695:1, 3695:2,
3695:3, 3695:5
**general** [1] - 3722:19
**generally** [2] - 3685:6,
3686:8
**gentlemen** [4] -
3617:8, 3617:12,
3642:17, 3726:19
**given** [12] - 3607:15,
3608:7, 3632:6,
3634:2, 3641:7,
3641:11, 3654:22,
3665:20, 3671:7,
3672:15, 3678:9,
3678:20
**glass** [6] - 3623:23,
3624:1, 3626:9,
3627:5, 3628:12,
3708:2
**glob** [1] - 3660:3
**good-faith** [3] -
3671:7, 3676:4,
3676:22
**Goodman** [5] -
3621:3, 3717:21,
3718:10, 3718:25,
3726:9
**Government** [8] -
3613:15, 3632:21,
3635:8, 3641:6,
3645:20, 3646:21,
3669:19, 3670:16
**government** [111] -
3602:7, 3603:24,

3614:21
**furniture** [2] - 3627:4,
3686:7

3604:2, 3604:16,
3605:1, 3606:24,
3607:24, 3609:15,
3611:3, 3611:4,
3611:8, 3611:16,
3612:11, 3613:4,
3613:12, 3614:22,
3615:6, 3615:7,
3616:4, 3616:5,
3616:12, 3617:1,
3617:15, 3617:16,
3619:7, 3631:18,
3631:19, 3632:6,
3632:12, 3632:15,
3634:12, 3634:15,
3634:25, 3635:1,
3635:2, 3635:5,
3635:12, 3636:21,
3636:25, 3637:19,
3640:4, 3640:7,
3641:10, 3641:16,
3642:3, 3643:16,
3644:7, 3644:21,
3645:6, 3645:8,
3645:16, 3646:16,
3646:19, 3647:24,
3648:14, 3650:23,
3650:24, 3651:18,
3652:3, 3652:24,
3652:25, 3653:10,
3653:15, 3654:17,
3654:18, 3655:14,
3656:12, 3656:18,
3657:4, 3657:6,
3659:16, 3660:18,
3660:21, 3661:12,
3665:25, 3666:9,
3666:11, 3666:15,
3666:22, 3667:9,
3668:6, 3668:15,
3668:23, 3669:23,
3670:6, 3671:25,
3673:20, 3674:4,
3674:7, 3674:8,
3674:14, 3674:22,
3675:1, 3676:21,
3677:13, 3698:7,
3699:11, 3699:15,
3705:7, 3705:13,
3727:12, 3728:4,
3728:12, 3728:15,
3728:19, 3730:12,
3731:4, 3731:12,
3733:15
**Government's** [2] -
3675:13, 3729:8
**government's** [17] -
3602:21, 3617:14,
3646:4, 3653:18,
3654:22, 3656:1,
3657:14, 3658:21,

3660:24, 3661:2, 3669:8, 3669:23, 3670:12, 3676:14, 3724:4, 3729:4, 3730:10
**government-111** [1] - 3623:12
**grabbed** [1] - 3627:12
**grand** [1] - 3719:4
**granted** [1] - 3624:25
**grasping** [1] - 3723:21
**great** [2] - 3632:22, 3712:13
**greatest** [1] - 3648:13
**greatly** [2] - 3705:11, 3705:21
**Ground** [2] - 3638:16, 3664:3
**ground** [1] - 3643:14
**grounds** [7] - 3621:22, 3631:1, 3635:23, 3689:8, 3699:24, 3700:6, 3700:9
**group** [29] - 3633:1, 3633:7, 3633:9, 3634:7, 3634:19, 3634:22, 3635:2, 3635:4, 3640:5, 3640:20, 3641:2, 3641:7, 3641:14, 3643:20, 3645:9, 3655:2, 3657:7, 3658:16, 3661:17, 3661:22, 3664:7, 3664:8, 3665:1, 3667:10, 3720:11, 3729:9, 3729:10, 3730:11, 3731:15
**groups** [2] - 3635:9, 3667:12
**guess** [15] - 3602:24, 3605:22, 3644:8, 3652:9, 3653:15, 3656:11, 3656:12, 3659:15, 3659:24, 3660:10, 3660:19, 3677:7, 3678:3, 3678:18, 3728:9
**guidance** [1] - 3721:5
**guilt** [2] - 3645:7, 3645:11
**gun** [1] - 3628:18
**gunfire** [3] - 3719:9, 3719:12, 3719:24

---

**H**

---

**hair** [3] - 3708:13, 3710:4
**haired** [2] - 3708:14,

---

3709:12
**half** [2] - 3642:8, 3656:24
**hallway** [2] - 3626:7, 3687:9
**hallways** [1] - 3627:14
**Hanak** [2] - 3606:4, 3606:5
**hand** [4] - 3678:24, 3688:24, 3723:18, 3723:24
**handed** [1] - 3662:23
**handheld** [1] - 3707:14
**handle** [1] - 3687:24
**handled** [1] - 3630:20
**hands** [1] - 3670:15
**hang** [1] - 3662:5
**hanging** [1] - 3652:7
**happy** [1] - 3603:14
**hard** [1] - 3678:16
**harm** [1] - 3723:5
**Harris** [1] - 3677:25
**hash** [2] - 3612:4, 3612:5
**hashed** [1] - 3612:17
**Hassan** [4] - 3600:4, 3602:11, 3609:3, 3649:6
**HASSAN** [30] - 3600:5, 3609:3, 3609:15, 3609:21, 3649:3, 3649:5, 3649:14, 3649:17, 3649:22, 3682:3, 3682:5, 3689:17, 3691:2, 3691:5, 3691:7, 3693:17, 3697:18, 3698:4, 3698:10, 3698:12, 3698:16, 3699:14, 3699:17, 3699:19, 3700:2, 3700:4, 3701:11, 3701:15, 3702:12, 3702:15
**Hassan.................. 3691** [1] - 3601:4
**hate** [2] - 3729:18, 3732:3
**Haven** [1] - 3599:25
**HazMat** [4] - 3710:12, 3710:15, 3710:16, 3710:20
**HDMI** [1] - 3698:14
**head** [3] - 3628:19, 3681:7, 3704:11
**head's** [1] - 3709:19
**heads** [1] - 3629:7
**hear** [27] - 3603:15, 3604:18, 3607:21,

---

3608:19, 3615:25, 3616:7, 3640:25, 3642:6, 3642:11, 3642:15, 3643:4, 3643:13, 3644:7, 3644:8, 3644:9, 3650:21, 3651:4, 3654:17, 3655:20, 3657:4, 3659:15, 3679:3, 3682:23, 3699:7, 3701:3, 3705:3, 3733:7
**heard** [8] - 3622:4, 3665:18, 3676:20, 3704:24, 3715:24, 3717:4, 3725:12, 3731:11
**hearing** [5] - 3659:22, 3660:21, 3672:3, 3717:6, 3732:24
**hearings** [1] - 3726:3
**hearsay** [1] - 3693:15
**hectic** [1] - 3724:8
**held** [5] - 3626:14, 3626:15, 3628:18, 3642:19, 3682:16
**HELD** [1] - 3599:9
**hell** [2] - 3702:3
**helmets** [1] - 3682:8
**help** [13] - 3622:5, 3627:4, 3629:8, 3673:24, 3675:24, 3676:23, 3676:25, 3704:1, 3705:8, 3705:11, 3705:14, 3705:17
**helping** [1] - 3705:6
**hereby** [1] - 3736:2
**HERNANDEZ** [73] - 3603:18, 3604:6, 3604:21, 3605:2, 3605:5, 3605:7, 3605:14, 3607:23, 3610:15, 3611:2, 3612:8, 3612:17, 3612:21, 3612:23, 3613:9, 3621:21, 3622:12, 3631:13, 3633:16, 3633:20, 3638:23, 3638:25, 3641:24, 3650:12, 3650:14, 3651:3, 3651:9, 3651:11, 3652:12, 3652:14, 3654:4, 3654:10, 3654:13, 3656:3, 3656:6, 3657:2, 3657:9, 3657:12, 3657:14, 3657:16, 3657:19, 3657:21,

---

3657:24, 3658:1, 3658:6, 3658:15, 3658:18, 3658:20, 3658:23, 3659:3, 3659:8, 3659:24, 3660:1, 3671:20, 3671:22, 3671:24, 3673:1, 3673:17, 3674:16, 3678:12, 3679:2, 3685:10, 3689:18, 3727:13, 3729:22, 3733:12, 3733:20, 3733:22, 3734:6, 3734:14, 3734:22, 3735:15, 3735:20
**Hernandez** [21] - 3600:2, 3602:11, 3602:25, 3603:3, 3603:4, 3603:12, 3603:14, 3605:12, 3605:24, 3606:9, 3607:15, 3631:22, 3633:18, 3641:24, 3650:13, 3669:16, 3673:19, 3674:5, 3727:21, 3734:9, 3734:12
**Hernandez's** [1] - 3616:1
**Hialeah** [1] - 3600:9
**high** [1] - 3723:20
**Highland** [1] - 3600:3
**highlighted** [4] - 3603:12, 3611:11, 3640:15
**highly** [1] - 3665:25
**history** [2] - 3692:14, 3712:25
**hit** [1] - 3652:23
**hitting** [1] - 3610:7
**hmm** [2] - 3620:12, 3703:21
**Hodges** [2] - 3652:25, 3657:2
**hold** [5] - 3605:11, 3625:25, 3626:1, 3639:9, 3735:18
**Hollow** [1] - 3600:2
**Homeland** [1] - 3694:15
**homicide** [1] - 3631:1
**Honor** [105] - 3602:2, 3605:7, 3605:9, 3606:2, 3606:17, 3607:3, 3607:23, 3608:9, 3608:11, 3609:23, 3610:1, 3610:15, 3610:19, 3611:2, 3614:2,

---

3615:16, 3615:18, 3615:23, 3615:24, 3616:11, 3616:14, 3617:21, 3621:21, 3631:13, 3632:3, 3632:20, 3633:10, 3633:14, 3633:20, 3634:4, 3634:10, 3634:24, 3635:15, 3636:18, 3636:21, 3637:13, 3637:24, 3638:4, 3639:23, 3640:3, 3640:14, 3640:22, 3641:5, 3641:23, 3641:24, 3643:9, 3644:10, 3645:21, 3647:10, 3647:12, 3647:17, 3650:14, 3653:3, 3654:11, 3661:11, 3662:12, 3662:21, 3662:24, 3663:6, 3663:20, 3664:22, 3667:5, 3667:13, 3668:1, 3671:2, 3671:12, 3671:22, 3674:1, 3674:13, 3675:9, 3675:13, 3675:20, 3677:10, 3677:20, 3678:12, 3679:6, 3679:15, 3680:24, 3682:3, 3685:11, 3697:15, 3701:10, 3701:13, 3704:24, 3720:17, 3724:16, 3725:11, 3725:15, 3727:18, 3727:20, 3728:1, 3728:20, 3728:23, 3729:1, 3729:7, 3729:11, 3729:15, 3729:22, 3730:9, 3730:19, 3731:8, 3732:5, 3734:1, 3734:11, 3735:10
**Honor's** [2] - 3609:24, 3728:7
**HONORABLE** [1] - 3599:9
**Honorable** [2] - 3643:6, 3735:22
**hood** [1] - 3630:2
**hoods** [2] - 3629:11, 3629:25
**hook** [1] - 3661:8
**hooked** [1] - 3698:14
**hooking** [1] - 3647:25
**hope** [2] - 3611:23, 3617:12
**hopeful** [1] - 3675:21

hopefully [1] - 3726:20
hostage [1] - 3628:18
hour [7] - 3642:8, 3642:10, 3700:1, 3726:17, 3726:21, 3727:16, 3729:5
hours [4] - 3673:10, 3681:14, 3681:15, 3717:14
House [20] - 3622:25, 3624:25, 3625:3, 3625:6, 3625:20, 3626:5, 3626:25, 3629:4, 3630:6, 3630:8, 3683:22, 3701:8, 3701:17, 3714:6, 3714:15, 3716:14, 3716:22, 3721:8, 3726:6
house [16] - 3625:10, 3625:11, 3625:13, 3625:17, 3626:4, 3626:8, 3626:20, 3627:17, 3628:4, 3628:5, 3628:7, 3629:24, 3630:18, 3685:20, 3714:5, 3715:1
huge [1] - 3673:3
Hull [6] - 3599:20, 3602:10, 3633:14, 3641:22, 3644:14, 3647:12
HULL [8] - 3599:20, 3633:14, 3641:20, 3641:23, 3647:12, 3647:15, 3648:20, 3679:6
hundred [1] - 3716:3
hundreds [1] - 3682:20
husher [1] - 3678:17
hypothetical [1] - 3724:11
hypotheticals [1] - 3723:18

I

idea [4] - 3612:1, 3619:2, 3619:4, 3731:11
identification [1] - 3619:7
identifications [1] - 3699:9
identified [10] - 3603:3, 3611:4, 3613:6, 3652:25,

3699:4, 3699:8, 3728:4, 3728:22, 3733:15
identify [5] - 3611:17, 3612:5, 3655:19, 3727:8, 3727:11
identifying [2] - 3614:9, 3615:17
II [1] - 3600:11
images [2] - 3613:5, 3712:10
imagine [3] - 3695:21, 3700:24
immediately [3] - 3630:17, 3655:22, 3670:14
implements [1] - 3663:19
implicit [3] - 3646:14, 3646:17
implicitly [1] - 3647:25
implies [1] - 3646:13
important [3] - 3697:10, 3697:12, 3730:12
importantly [1] - 3731:16
imposed [1] - 3656:22
imprimatur [1] - 3677:18
improve [1] - 3648:23
IN [1] - 3599:1
inaccurate [1] - 3674:23
inappropriate [1] - 3668:9
inauguration [1] - 3679:23
incentivized [1] - 3612:3
inches [1] - 3638:16
incidents [1] - 3656:4
include [3] - 3691:19, 3713:7, 3732:23
included [2] - 3641:3, 3662:12
including [3] - 3613:5, 3650:16, 3661:21
incredibly [1] - 3641:14
indicate [2] - 3610:5, 3717:4
indicated [7] - 3631:17, 3631:19, 3676:23, 3715:25, 3716:24, 3718:1, 3718:25
indicates [1] - 3617:6
indicating [9] - 3606:15, 3620:16,

3625:5, 3625:6, 3649:3, 3650:12, 3665:15, 3680:6, 3713:23
indication [1] - 3610:6
individual [16] - 3629:14, 3645:18, 3645:23, 3646:6, 3696:9, 3696:13, 3696:15, 3696:17, 3706:13, 3706:16, 3708:12, 3708:14, 3709:12, 3709:13, 3710:4, 3721:19
individual's [1] - 3646:1
individuals [16] - 3622:5, 3644:22, 3645:25, 3654:23, 3661:15, 3697:5, 3698:25, 3699:5, 3700:9, 3700:25, 3701:2, 3701:20, 3702:7, 3702:9, 3720:15, 3730:16
infer [1] - 3669:15
inflammatory [3] - 3634:16, 3640:10, 3641:15
inform [2] - 3697:1, 3697:4
informants [1] - 3699:12
information [9] - 3616:5, 3633:9, 3660:5, 3662:4, 3667:1, 3671:10, 3697:8, 3697:11, 3697:13
informed [1] - 3609:6
initial [3] - 3703:13, 3709:7, 3721:9
injuries [1] - 3690:23
inner [1] - 3718:13
inoperable [1] - 3689:13
inside [17] - 3622:8, 3623:4, 3626:25, 3629:1, 3629:4, 3639:7, 3685:4, 3687:10, 3687:24, 3712:10, 3712:13, 3712:23, 3716:6, 3717:17, 3719:20, 3720:9, 3720:24
insinuate [1] - 3637:1
insinuating [1] - 3637:20
insinuations [1] - 3662:5

Inspector [52] - 3603:23, 3604:2, 3605:17, 3606:4, 3606:19, 3607:2, 3607:4, 3607:5, 3610:17, 3616:10, 3616:14, 3616:20, 3617:3, 3617:14, 3617:16, 3618:6, 3619:1, 3620:7, 3620:25, 3621:10, 3622:1, 3622:18, 3623:17, 3627:19, 3629:20, 3631:3, 3635:18, 3635:24, 3636:14, 3638:7, 3639:3, 3639:14, 3664:21, 3665:7, 3665:10, 3677:8, 3679:17, 3680:8, 3681:2, 3682:8, 3683:21, 3684:19, 3685:2, 3685:12, 3686:20, 3687:22, 3689:21, 3690:15, 3691:3, 3691:8, 3730:4, 3734:2
inspector [5] - 3619:11, 3682:14, 3682:22, 3695:22, 3698:6
instead [1] - 3642:12
instructed [1] - 3607:6
instruction [2] - 3650:2, 3650:8
intelligence [9] - 3695:23, 3696:1, 3696:2, 3696:3, 3696:7, 3696:20, 3697:1, 3697:23, 3698:2
intend [3] - 3614:23, 3615:9, 3616:19
intended [1] - 3665:19
intensive [1] - 3684:10
intent [2] - 3610:10, 3730:14
interaction [1] - 3606:1
interest [1] - 3705:6
interested [1] - 3660:21
interference [1] - 3619:3
interior [1] - 3718:19
interpret [1] - 3610:2
interrupted [1] - 3688:13
intervening [1] - 3666:2

introduce [6] - 3603:22, 3615:10, 3615:13, 3650:24, 3662:14, 3662:22
introduces [1] - 3653:10
introducing [4] - 3609:10, 3611:7, 3652:4, 3656:18
introduction [1] - 3652:21
investigate [1] - 3694:19
investigation [4] - 3631:1, 3694:11, 3694:16, 3694:17
invited [5] - 3634:8, 3685:8, 3685:13, 3685:16, 3686:17
involve [1] - 3654:6
involved [3] - 3632:25, 3652:6, 3690:22
irrelevant [2] - 3637:5, 3730:1
irritants [3] - 3710:24, 3711:13, 3711:22
issue [19] - 3603:11, 3603:25, 3605:21, 3607:1, 3611:3, 3614:16, 3640:17, 3643:13, 3648:8, 3648:21, 3673:24, 3674:18, 3675:14, 3676:1, 3713:4, 3727:15, 3733:11, 3733:19
issues [7] - 3612:17, 3614:7, 3615:15, 3647:3, 3671:6, 3675:13, 3675:15
item [1] - 3615:7
items [4] - 3613:20, 3613:25, 3615:19, 3673:7
iteration [1] - 3664:15
iterations [1] - 3664:2
itself [4] - 3648:24, 3685:15, 3692:25, 3729:17
IV [1] - 3599:20

J

Jack [2] - 3696:17, 3696:19
January [41] - 3599:6, 3618:10, 3649:24, 3664:5, 3664:14, 3664:16, 3670:11, 3679:24, 3680:9,

3748

3683:10, 3686:2, 3688:19, 3688:21, 3689:22, 3692:6, 3692:7, 3692:10, 3692:20, 3692:23, 3692:25, 3693:3, 3693:7, 3693:11, 3694:20, 3694:25, 3695:4, 3695:11, 3695:14, 3695:15, 3695:18, 3696:24, 3697:2, 3697:24, 3701:7, 3713:18, 3720:22, 3731:14, 3731:16, 3731:17, 3732:15, 3736:6

**Jason** [2] - 3599:12, 3602:7

**Jauregui** [4] - 3600:8, 3602:12, 3729:8, 3735:3

**JAUREGUI** [4] - 3600:8, 3698:14, 3733:7, 3735:10

**jeopardy** [2] - 3653:19, 3653:20

**job** [1] - 3687:14

**Joe** [2] - 3666:8, 3666:20

**John** [2] - 3599:20, 3602:10

**join** [5] - 3648:5, 3649:8, 3671:20, 3731:15, 3732:13

**joining** [1] - 3731:14

**joins** [2] - 3641:20, 3641:23

**joint** [1] - 3694:16

**Joseph** [1] - 3602:4

**Judge** [28] - 3608:24, 3609:4, 3609:6, 3609:15, 3609:18, 3612:9, 3612:13, 3614:19, 3616:11, 3616:25, 3642:24, 3644:19, 3645:16, 3646:19, 3646:22, 3649:7, 3649:9, 3649:15, 3649:17, 3649:23, 3650:2, 3656:13, 3656:16, 3674:12, 3698:4, 3702:12, 3702:17, 3735:13

**JUDGE** [1] - 3599:10

**judge** [7] - 3609:3, 3649:5, 3649:8, 3649:22, 3691:5, 3726:25, 3733:7

**judges** [1] - 3656:22

**judiciary** [1] - 3666:23

**jump** [2] - 3684:14, 3730:3

**jumped** [2] - 3684:23, 3684:25

**jurors** [1] - 3662:1

**Jury** [4] - 3617:10, 3642:23, 3679:12, 3726:22

**jury** [48] - 3612:12, 3612:25, 3614:14, 3615:11, 3617:8, 3617:10, 3618:19, 3619:6, 3619:22, 3637:1, 3640:8, 3640:11, 3641:15, 3641:18, 3642:14, 3642:23, 3645:15, 3646:2, 3646:11, 3646:13, 3646:14, 3646:17, 3646:18, 3650:2, 3652:8, 3653:5, 3659:21, 3661:23, 3667:18, 3669:8, 3669:15, 3671:4, 3671:10, 3676:7, 3676:20, 3677:9, 3677:25, 3679:11, 3679:12, 3680:5, 3680:22, 3683:1, 3687:21, 3689:11, 3724:7, 3726:20, 3726:22, 3729:3

**JURY** [1] - 3599:8

**jury's** [4] - 3660:1, 3660:2, 3662:18, 3671:16

**justice** [1] - 3645:12

**Justice** [2] - 3666:20, 3670:8

**juxtaposed** [1] - 3729:6

## K

**keep** [3] - 3687:16, 3706:25, 3709:25

**Keepers** [10] - 3612:9, 3614:19, 3615:3, 3656:10, 3657:5, 3657:10, 3658:1, 3658:3, 3658:13, 3659:5

**keeping** [2] - 3615:11, 3714:17

**KELLY** [1] - 3599:9

**Kenerson** [2] - 3599:12, 3602:8

**key** [2] - 3628:12,

3684:11

**kind** [40] - 3610:9, 3610:11, 3611:8, 3614:24, 3615:4, 3615:17, 3615:21, 3619:3, 3629:9, 3643:22, 3646:14, 3648:9, 3652:4, 3652:7, 3657:7, 3659:6, 3661:2, 3662:2, 3664:23, 3664:25, 3674:10, 3675:10, 3675:12, 3675:16, 3675:17, 3675:18, 3678:16, 3679:25, 3683:24, 3729:11, 3729:12, 3732:10, 3732:13, 3732:16

**kinds** [1] - 3711:15

**knowing** [2] - 3607:10, 3694:24

**knowledge** [5] - 3693:1, 3726:2, 3730:13, 3731:9, 3731:18

**known** [2] - 3679:24, 3681:6

**knows** [1] - 3735:3

## L

**labor** [1] - 3684:10

**labor-intensive** [1] - 3684:10

**lack** [3] - 3663:17, 3664:20, 3677:2

**lacking** [1] - 3620:1

**ladies** [4] - 3617:8, 3617:12, 3642:17, 3726:19

**laid** [3] - 3668:16, 3672:15, 3734:10

**Lakes** [1] - 3600:6

**Lamond** [1] - 3696:10

**large** [3] - 3658:16, 3683:7, 3702:9

**largest** [1] - 3716:2

**last** [14] - 3609:5, 3609:12, 3609:16, 3610:4, 3616:23, 3648:6, 3650:16, 3673:7, 3674:13, 3674:19, 3684:12, 3702:2, 3722:6, 3725:7

**late** [4] - 3602:19, 3602:20, 3604:12, 3653:8

**laughter** [1] - 3735:14

**law** [14] - 3632:11, 3644:22, 3646:23, 3647:1, 3650:17, 3650:22, 3652:18, 3656:7, 3692:1, 3692:4, 3723:3, 3723:14

**LAW** [2] - 3600:5, 3600:8

**lawless** [1] - 3729:13

**lawyer** [1] - 3735:7

**lawyers** [4] - 3642:22, 3648:15, 3656:14, 3656:15

**lay** [3] - 3640:4, 3669:1, 3669:2

**layer** [1] - 3669:5

**laying** [2] - 3602:22, 3668:23

**layout** [2] - 3683:22, 3726:12

**lead** [9] - 3621:3, 3623:24, 3624:2, 3630:25, 3638:9, 3638:13, 3723:19, 3726:9, 3728:19

**leader** [1] - 3731:20

**leadership** [1] - 3664:2

**leading** [1] - 3697:2

**leads** [1] - 3626:5

**leaping** [1] - 3716:19

**learning** [1] - 3672:24

**least** [19] - 3609:18, 3611:18, 3612:5, 3631:23, 3640:19, 3644:3, 3644:11, 3648:5, 3648:25, 3668:16, 3669:12, 3673:14, 3673:21, 3674:17, 3676:14, 3682:20, 3707:25, 3709:11, 3716:5

**leave** [5] - 3624:24, 3647:3, 3674:25, 3704:10, 3718:15

**leaving** [3] - 3624:18, 3627:18, 3694:6

**led** [6] - 3621:5, 3667:18, 3667:19, 3729:9, 3729:10

**leeway** [14] - 3631:20, 3632:1, 3632:7, 3632:15, 3633:13, 3634:23, 3635:13, 3636:24, 3638:2, 3641:16, 3647:25, 3659:13, 3676:5, 3723:25

**left** [13] - 3612:11,

3617:3, 3620:21, 3624:19, 3652:8, 3659:21, 3661:4, 3679:18, 3707:10, 3707:13, 3708:2, 3708:16, 3709:16

**legal** [3] - 3647:3, 3647:4, 3653:21

**legally** [1] - 3723:22

**legislative** [1] - 3666:12

**less** [5] - 3632:6, 3662:23, 3664:19, 3722:13, 3722:15

**lethal** [2] - 3722:14, 3722:15

**letter** [1] - 3693:25

**letting** [1] - 3662:5

**level** [4] - 3628:3, 3629:5, 3683:23, 3723:20

**Level** [1] - 3638:16

**levels** [2] - 3629:2, 3691:8

**Lieutenant** [1] - 3696:10

**lieutenants** [2] - 3691:10, 3691:20

**life** [1] - 3723:4

**light** [1] - 3671:5

**lighter** [1] - 3732:4

**likely** [3] - 3669:22, 3719:9, 3719:23

**limine** [5] - 3640:16, 3662:11, 3675:17, 3676:1, 3725:16

**limited** [2] - 3661:21, 3679:1

**limiting** [2] - 3650:1, 3650:8

**line** [6] - 3625:19, 3626:19, 3680:13, 3691:10, 3721:11

**lined** [2] - 3621:7, 3639:5

**lingering** [1] - 3603:10

**link** [8] - 3631:24, 3650:25, 3652:15, 3652:18, 3653:3, 3660:8, 3662:18, 3667:9

**linkages** [1] - 3662:14

**linking** [1] - 3667:7

**links** [1] - 3661:20

**list** [22] - 3610:13, 3611:9, 3611:11, 3615:20, 3662:12, 3662:16, 3662:23, 3672:1, 3672:6, 3673:7, 3673:12,

3673:20, 3685:18, 3728:2, 3728:3, 3733:12, 3733:14, 3734:14, 3734:16, 3735:11

**listen** [2] - 3678:8, 3678:15

**listened** [1] - 3634:18

**lists** [1] - 3727:23

**litigated** [2] - 3662:10, 3663:12

**live** [1] - 3648:16

**Lives** [3] - 3729:10, 3729:16

**LLC** [1] - 3599:23

**lobby** [8] - 3623:20, 3623:21, 3623:22, 3718:2, 3718:4, 3718:9, 3718:14, 3718:16

**Lobby** [9] - 3626:21, 3626:23, 3627:2, 3627:7, 3627:16, 3627:17, 3630:21, 3687:9, 3719:5

**lobes** [1] - 3666:22

**located** [1] - 3638:11

**location** [4] - 3624:10, 3684:19, 3684:25, 3686:13

**locations** [1] - 3630:9

**lock** [3] - 3623:4, 3628:11, 3684:12

**lockdown** [2] - 3718:18, 3718:19

**locked** [6] - 3623:1, 3626:25, 3627:3, 3718:14, 3722:18, 3725:6

**locking** [1] - 3624:22

**locks** [3] - 3626:13, 3626:15, 3628:10

**Loehrke** [1] - 3634:6

**look** [16] - 3607:21, 3609:1, 3611:23, 3612:25, 3613:7, 3643:13, 3655:5, 3657:25, 3665:14, 3668:15, 3678:20, 3727:8, 3727:15, 3728:16, 3733:1, 3734:25

**Look** [1] - 3615:17

**looked** [4] - 3608:5, 3660:4, 3732:7, 3735:4

**looking** [8] - 3611:14, 3619:11, 3633:8, 3638:8, 3660:16, 3681:4, 3681:5,

3716:3

**looks** [2] - 3708:12, 3731:23

**lose** [1] - 3611:13

**loss** [2] - 3706:21, 3709:20

**loud** [2] - 3649:5, 3731:24

**lower** [8] - 3679:20, 3679:22, 3680:1, 3680:2, 3680:8, 3680:14, 3681:5, 3683:23

**LOYD** [1] - 3601:3

**Loyd** [50] - 3603:23, 3604:1, 3604:2, 3605:17, 3606:4, 3606:19, 3607:2, 3607:4, 3607:5, 3610:17, 3616:10, 3617:14, 3617:17, 3617:18, 3618:6, 3619:1, 3619:11, 3620:7, 3620:25, 3621:10, 3622:1, 3622:18, 3627:19, 3635:18, 3635:24, 3639:14, 3642:24, 3653:25, 3664:21, 3665:7, 3665:10, 3677:8, 3677:24, 3679:17, 3680:8, 3681:2, 3682:14, 3683:21, 3684:19, 3685:2, 3685:12, 3686:20, 3687:22, 3689:21, 3690:15, 3691:3, 3691:8, 3705:24, 3734:2

**Loyd's** [3] - 3616:14, 3616:20, 3617:3

**lumber** [1] - 3706:17

**lunch** [17] - 3607:8, 3607:11, 3607:12, 3607:16, 3607:18, 3607:20, 3607:21, 3608:7, 3613:8, 3726:17, 3726:20, 3727:8, 3727:16, 3730:3, 3733:2, 3735:2, 3735:17

**Luncheon** [1] - 3735:24

**lunchtime** [1] - 3620:22

**lying** [1] - 3629:23

---

**M**

---

**machine** [1] - 3600:18

**main** [14] - 3625:16, 3625:17, 3626:4, 3626:7, 3626:8, 3626:20, 3628:3, 3636:17, 3638:9, 3638:13, 3663:25, 3692:12, 3713:8, 3717:5

**maintenance** [1] - 3690:10

**major** [1] - 3618:9

**man** [2] - 3703:23

**manpower** [1] - 3692:17

**map** [2] - 3617:2, 3620:10

**march** [6] - 3645:21, 3645:22, 3649:25, 3661:22, 3667:13, 3667:17

**marched** [2] - 3664:7, 3668:7

**marching** [24] - 3633:1, 3634:7, 3634:19, 3634:22, 3635:1, 3635:3, 3635:9, 3640:20, 3641:2, 3641:7, 3641:14, 3643:19, 3643:20, 3651:7, 3652:6, 3654:24, 3654:25, 3655:1, 3661:17, 3661:21, 3663:14, 3665:1, 3669:1, 3731:17

**mark** [1] - 3618:17

**marked** [2] - 3619:6, 3678:4

**mask** [2] - 3629:7, 3687:7

**material** [4] - 3637:5, 3637:6, 3666:13, 3670:12

**materials** [5] - 3673:2, 3673:5, 3675:5, 3732:23, 3733:11

**math** [1] - 3717:7

**matter** [3] - 3603:20, 3643:5, 3666:19

**Matter** [5] - 3602:3, 3643:10, 3729:10, 3729:16

**matters** [1] - 3642:22

**maximum** [1] - 3716:4

**MCCULLOUGH** [29] - 3606:15, 3606:17, 3607:3, 3608:9, 3608:16, 3609:23, 3610:19, 3610:23, 3614:2, 3674:13,

3674:17, 3675:9, 3675:20, 3677:10, 3677:15, 3677:17, 3677:20, 3727:18, 3727:20, 3727:23, 3728:20, 3729:1, 3730:7, 3730:9, 3730:22, 3731:8, 3732:8, 3734:1, 3734:11

**McCullough** [13] - 3599:12, 3602:7, 3603:5, 3606:16, 3607:19, 3609:6, 3609:16, 3610:16, 3672:10, 3674:24, 3733:10, 3734:8

**MCGUIRE** [1] - 3599:20

**MD** [1] - 3600:3

**mean** [31] - 3603:4, 3604:21, 3613:3, 3628:17, 3635:4, 3641:9, 3645:8, 3647:21, 3651:4, 3651:16, 3655:16, 3655:22, 3656:8, 3661:8, 3661:23, 3663:20, 3670:18, 3672:16, 3673:13, 3674:21, 3675:9, 3675:16, 3685:12, 3714:4, 3714:20, 3720:19, 3725:18, 3726:5, 3729:14, 3730:23, 3732:17

**means** [3] - 3641:6, 3661:17, 3665:20

**meant** [1] - 3719:24

**media** [8] - 3663:22, 3665:20, 3665:24, 3666:4, 3666:16, 3670:17, 3670:25, 3730:16

**medieval** [4] - 3640:8, 3640:18, 3642:2, 3652:24

**medieval-style** [1] - 3640:8

**meet** [2] - 3728:7, 3728:13

**Mehta** [5] - 3612:10, 3612:13, 3614:19, 3656:14, 3656:17

**meld** [1] - 3660:2

**member** [9] - 3634:7, 3634:8, 3663:25, 3667:11, 3685:17, 3713:19, 3714:3, 3722:6

**members** [32] - 3621:10, 3621:11, 3627:9, 3627:11, 3627:18, 3628:4, 3629:7, 3629:10, 3629:15, 3629:23, 3630:5, 3630:9, 3630:16, 3633:1, 3640:20, 3665:1, 3685:6, 3686:2, 3686:17, 3686:18, 3686:19, 3688:7, 3688:9, 3690:22, 3714:8, 3714:15, 3716:8, 3716:12, 3718:17, 3720:8, 3721:15, 3726:7

**membership** [2] - 3664:1, 3664:3

**memory** [1] - 3712:9

**men** [1] - 3723:13

**mention** [3] - 3606:14, 3663:11, 3667:8

**mentioned** [5] - 3664:6, 3670:4, 3672:3, 3694:10, 3713:10

**merely** [5] - 3634:15, 3635:8, 3636:24, 3645:8, 3667:16

**met** [2] - 3624:19, 3697:19

**metal** [1] - 3618:11

**Metcalf** [2] - 3600:11, 3602:13

**METCALF** [3] - 3600:12, 3622:15

**Metcalf's** [1] - 3735:13

**Metro** [3] - 3711:25, 3712:2, 3712:4

**Metropolitan** [9] - 3630:24, 3630:25, 3680:11, 3682:9, 3682:16, 3696:3, 3696:6, 3696:12

**Miami** [1] - 3600:6

**mic** [1] - 3648:16

**microphone** [1] - 3648:9

**microphones** [3] - 3647:16, 3648:25, 3678:6

**middle** [5] - 3612:2, 3638:12, 3638:14, 3673:22, 3683:3

**midnight** [2] - 3688:23, 3732:11

**might** [14] - 3602:23, 3604:3, 3614:7, 3646:4, 3648:8,

3655:18, 3671:13, 3672:4, 3672:5, 3712:20, 3714:2, 3717:23, 3724:2, 3724:13
**military** [1] - 3658:3
**MILLER** [1] - 3736:2
**Miller** [2] - 3600:15, 3736:7
**millions** [1] - 3712:20
**mind** [7] - 3627:10, 3712:7, 3729:15, 3730:13, 3731:2, 3731:10, 3731:19
**minimize** [1] - 3612:1
**minimum** [1] - 3675:22
**Ministry** [3] - 3663:25, 3664:15, 3731:20
**Mink** [1] - 3600:2
**minute** [2] - 3698:4, 3715:18
**minutes** [20] - 3602:17, 3602:19, 3603:21, 3604:3, 3606:3, 3606:19, 3625:12, 3633:13, 3634:1, 3642:13, 3643:2, 3650:16, 3659:4, 3681:18, 3701:9, 3701:19, 3715:16, 3717:15, 3724:17, 3724:18
**mislead** [1] - 3719:1
**misleading** [1] - 3640:11
**misleads** [1] - 3724:7
**misled** [1] - 3646:18
**missed** [1] - 3695:17
**mission** [2] - 3690:16, 3690:18
**mistake** [1] - 3729:7
**mistrial** [4] - 3653:18, 3671:15, 3671:18
**misunderstanding** [1] - 3723:20
**misuse** [1] - 3729:3
**mob** [2] - 3686:19, 3702:9
**mobsters** [1] - 3622:22
**moment** [12] - 3618:16, 3630:17, 3631:15, 3651:6, 3680:20, 3702:14, 3705:13, 3709:1, 3709:7, 3709:21, 3717:20, 3732:6
**Monroe** [1] - 3705:22
**months** [1] - 3614:7

**Monument** [2] - 3664:9, 3701:7
**Moore** [2] - 3599:13, 3602:8
**morning** [26] - 3602:16, 3602:18, 3602:21, 3605:10, 3605:16, 3606:3, 3606:6, 3606:20, 3608:3, 3612:12, 3617:19, 3617:20, 3618:6, 3618:7, 3642:9, 3642:14, 3642:18, 3647:12, 3650:14, 3666:3, 3688:19, 3691:3, 3691:4, 3692:19, 3698:3, 3733:13
**MORNING** [1] - 3599:9
**morning's** [1] - 3727:7
**most** [7] - 3603:7, 3604:8, 3656:13, 3665:10, 3711:21, 3711:23, 3712:24
**mostly** [5] - 3620:1, 3627:5, 3717:5, 3717:11, 3734:22
**motion** [6] - 3640:16, 3649:12, 3650:18, 3650:20, 3675:17, 3707:4
**motion's** [1] - 3671:23
**motions** [4] - 3662:11, 3676:1, 3725:16
**motive** [1] - 3730:14
**mound** [1] - 3673:5
**move** [11] - 3619:18, 3624:17, 3629:15, 3633:13, 3634:23, 3638:3, 3671:18, 3678:25, 3705:6, 3724:11, 3724:23
**moving** [1] - 3671:15
**MPD** [1] - 3653:1
**MR** [242] - 3606:2, 3606:15, 3606:17, 3607:3, 3608:9, 3608:16, 3608:24, 3609:3, 3609:15, 3609:21, 3609:23, 3610:19, 3610:23, 3614:2, 3616:11, 3616:14, 3616:25, 3617:6, 3617:16, 3617:21, 3618:5, 3618:15, 3618:24, 3618:25, 3619:5, 3619:8, 3619:9, 3619:10, 3619:18, 3619:21, 3619:24,

3620:4, 3620:6, 3620:21, 3620:24, 3621:18, 3621:25, 3622:10, 3622:15, 3622:17, 3623:11, 3623:16, 3624:4, 3624:6, 3627:20, 3627:22, 3629:18, 3629:19, 3630:12, 3630:14, 3631:10, 3631:12, 3632:3, 3632:20, 3633:10, 3633:14, 3634:4, 3634:10, 3634:24, 3635:15, 3635:17, 3635:21, 3635:22, 3636:9, 3636:13, 3636:18, 3636:21, 3637:9, 3637:13, 3637:24, 3638:4, 3638:6, 3638:21, 3638:24, 3639:2, 3639:11, 3639:13, 3639:23, 3640:3, 3640:14, 3640:22, 3641:1, 3641:5, 3641:20, 3641:22, 3641:23, 3642:3, 3642:24, 3644:10, 3644:12, 3644:14, 3644:17, 3647:1, 3647:10, 3647:12, 3647:15, 3648:20, 3649:3, 3649:5, 3649:14, 3649:17, 3649:22, 3661:11, 3663:20, 3664:22, 3665:6, 3665:15, 3665:17, 3665:19, 3666:25, 3667:5, 3670:19, 3671:2, 3671:12, 3674:1, 3674:13, 3674:17, 3675:9, 3675:20, 3677:10, 3677:15, 3677:17, 3677:20, 3679:6, 3679:15, 3679:16, 3680:17, 3680:20, 3680:24, 3681:1, 3681:17, 3681:20, 3682:3, 3682:5, 3682:7, 3682:11, 3682:13, 3683:12, 3683:14, 3683:18, 3683:20, 3684:17, 3684:18, 3686:1, 3686:5, 3686:6, 3686:10, 3686:12, 3687:4, 3687:6, 3687:11, 3687:13, 3687:18,

3687:20, 3689:17, 3689:20, 3690:24, 3691:2, 3691:5, 3691:7, 3693:15, 3693:17, 3697:15, 3697:18, 3698:4, 3698:10, 3698:12, 3698:14, 3698:16, 3699:14, 3699:17, 3699:19, 3700:2, 3700:4, 3701:10, 3701:11, 3701:13, 3701:15, 3702:12, 3702:15, 3702:20, 3703:5, 3703:7, 3703:9, 3704:24, 3705:2, 3705:5, 3705:11, 3705:16, 3705:21, 3705:23, 3706:4, 3706:6, 3706:11, 3706:12, 3706:25, 3707:3, 3707:7, 3707:9, 3708:5, 3708:10, 3708:23, 3709:3, 3709:25, 3710:3, 3710:7, 3710:9, 3720:17, 3720:18, 3720:21, 3723:7, 3723:12, 3723:19, 3724:7, 3724:16, 3724:24, 3725:3, 3725:11, 3725:14, 3725:19, 3725:21, 3725:25, 3726:14, 3726:25, 3727:3, 3727:18, 3727:20, 3727:23, 3728:20, 3729:1, 3730:7, 3730:9, 3730:22, 3731:8, 3732:8, 3733:3, 3733:5, 3733:7, 3734:1, 3734:11, 3735:10, 3735:13
**MS** [73] - 3603:18, 3604:6, 3604:21, 3605:2, 3605:5, 3605:7, 3605:14, 3607:23, 3610:15, 3611:2, 3612:8, 3612:17, 3612:21, 3612:23, 3613:9, 3621:21, 3622:12, 3631:13, 3633:16, 3633:20, 3638:23, 3638:25, 3641:24, 3650:12, 3650:14, 3651:3, 3651:9, 3651:11, 3652:12, 3652:14, 3654:4,

3654:10, 3654:13, 3656:3, 3656:6, 3657:2, 3657:9, 3657:12, 3657:14, 3657:16, 3657:19, 3657:21, 3657:24, 3658:1, 3658:6, 3658:15, 3658:18, 3658:20, 3658:23, 3659:3, 3659:8, 3659:24, 3660:1, 3671:20, 3671:22, 3671:24, 3673:1, 3673:17, 3674:16, 3678:12, 3679:2, 3685:10, 3689:18, 3727:13, 3729:22, 3733:12, 3733:20, 3733:22, 3734:6, 3734:14, 3734:22, 3735:15, 3735:20
**MULROE** [101] - 3606:2, 3616:14, 3617:6, 3617:16, 3617:21, 3618:5, 3618:15, 3618:24, 3618:25, 3619:5, 3619:9, 3619:10, 3619:18, 3619:21, 3619:24, 3620:4, 3620:6, 3620:21, 3620:24, 3621:18, 3621:25, 3622:17, 3623:11, 3623:16, 3624:4, 3624:6, 3627:20, 3627:22, 3629:18, 3629:19, 3630:12, 3630:14, 3631:10, 3631:12, 3632:20, 3633:10, 3634:4, 3635:15, 3635:17, 3635:21, 3635:22, 3636:9, 3636:13, 3637:13, 3637:24, 3638:4, 3638:6, 3638:21, 3638:24, 3639:2, 3639:11, 3639:13, 3640:14, 3641:1, 3641:22, 3661:11, 3663:20, 3664:22, 3665:6, 3671:2, 3679:15, 3679:16, 3680:17, 3680:20, 3680:24, 3681:1, 3681:17, 3681:20, 3682:7, 3682:11, 3682:13, 3683:12, 3683:14, 3683:18, 3683:20, 3684:17, 3684:18, 3686:1,

3686:5, 3686:6, 3686:10, 3686:12, 3687:4, 3687:6, 3687:11, 3687:13, 3687:18, 3687:20, 3689:20, 3690:24, 3693:15, 3697:15, 3701:10, 3701:13, 3704:24, 3705:2, 3705:5, 3720:17, 3723:7, 3725:11, 3725:14

**Mulroe** [26] - 3599:13, 3601:3, 3602:8, 3605:19, 3605:23, 3606:19, 3606:21, 3632:17, 3632:20, 3633:12, 3634:2, 3635:14, 3637:11, 3637:18, 3637:21, 3640:13, 3640:24, 3641:21, 3661:10, 3669:22, 3670:24, 3671:5, 3679:14, 3685:25, 3705:2, 3725:14

**Mulroe's** [3] - 3605:15, 3665:20, 3667:6

**multiple** [8] - 3621:15, 3621:16, 3622:3, 3650:18, 3689:12, 3689:13, 3692:17, 3692:18

**murky** [1] - 3656:1

**Murray** [1] - 3713:24

**must** [1] - 3723:4

**mutual** [2] - 3686:24, 3688:1

## N

**Nadia** [2] - 3599:13, 3602:8

**name** [3] - 3685:17, 3696:9, 3696:17

**named** [1] - 3696:9

**naming** [1] - 3641:1

**nasty** [1] - 3652:23

**National** [1] - 3666:14

**nature** [2] - 3653:13, 3661:9

**Nayib** [3] - 3600:4, 3602:11, 3609:3

**NAYIB** [1] - 3600:5

**Neanderthal** [1] - 3704:15

**near** [3] - 3647:20, 3662:15

**nearby** [2] - 3663:3,

3664:12

**necessarily** [2] - 3718:13, 3718:14

**necessary** [1] - 3689:23

**need** [19] - 3603:19, 3605:12, 3605:13, 3616:9, 3617:22, 3634:13, 3638:3, 3640:23, 3648:17, 3667:1, 3667:2, 3675:7, 3679:9, 3685:15, 3704:1, 3710:12, 3730:1, 3730:2, 3733:10

**needed** [1] - 3669:6

**needs** [4] - 3635:2, 3687:7, 3706:23, 3709:23

**negatively** [1] - 3617:6

**neglected** [1] - 3620:9

**net** [4] - 3603:1, 3603:16

**net-net** [2] - 3603:1, 3603:16

**never** [7] - 3660:5, 3693:24, 3713:7, 3714:11, 3716:15, 3716:22, 3719:17

**New** [3] - 3599:18, 3599:25, 3600:13

**new** [4] - 3616:23, 3643:14, 3664:14, 3732:14

**next** [15] - 3603:23, 3642:10, 3643:18, 3647:21, 3648:1, 3672:19, 3677:3, 3689:2, 3699:14, 3702:19, 3713:11, 3735:8, 3735:17

**nexus** [4] - 3644:3, 3651:13, 3651:14, 3651:15

**Nicholas** [2] - 3599:16, 3602:9

**night** [10] - 3609:5, 3609:12, 3609:16, 3609:21, 3610:3, 3610:4, 3664:5, 3673:7, 3688:18

**NJ** [3] - 3600:15, 3736:2, 3736:7

**NJ-CCR** [3] - 3600:15, 3736:2, 3736:7

**non** [2] - 3645:14, 3646:11

**non-defendants** [1] - 3645:14

**non-parties** [1] -

3646:11

**none** [3] - 3667:25, 3690:22, 3713:15

**nonetheless** [3] - 3610:25, 3615:6, 3615:23

**Nordean** [18] - 3602:4, 3602:14, 3632:4, 3634:8, 3641:11, 3643:11, 3645:9, 3645:17, 3645:19, 3645:24, 3646:2, 3646:5, 3664:6, 3667:10, 3667:14, 3667:22, 3668:2, 3724:18

**NORDEAN** [1] - 3599:4

**Norman** [2] - 3599:23, 3602:10

**north** [2] - 3625:6, 3625:15

**Nos** [1] - 3599:2

**note** [8] - 3616:15, 3616:21, 3617:1, 3632:5, 3634:5, 3662:24, 3667:6, 3674:1

**noted** [2] - 3654:19, 3670:2

**notes** [1] - 3736:4

**nothing** [8] - 3637:7, 3676:20, 3677:6, 3690:24, 3702:17, 3721:10, 3723:24, 3726:14

**notice** [2] - 3649:10, 3653:15

**noticed** [1] - 3626:23

**notion** [3] - 3658:2, 3659:6

**novel** [2] - 3652:17, 3663:7

**November** [1] - 3674:18

**nowhere** [4] - 3649:24, 3649:25, 3704:8, 3725:4

**number** [15] - 3616:2, 3638:23, 3648:24, 3655:17, 3679:1, 3689:5, 3692:24, 3698:9, 3703:4, 3716:4, 3716:10, 3723:16, 3723:17, 3734:16, 3734:19

**numbers** [2] - 3609:13, 3734:17

**NW** [5] - 3599:14, 3599:21, 3600:5,

3600:16, 3736:9

**NY** [2] - 3599:18, 3600:13

## O

**o'clock** [4] - 3606:3, 3610:3, 3612:19, 3612:25

**oath** [2] - 3617:22, 3618:1

**Oath** [10] - 3612:9, 3614:19, 3615:3, 3656:10, 3657:5, 3657:9, 3658:1, 3658:3, 3658:13, 3659:5

**object** [5] - 3649:19, 3697:15, 3720:17, 3723:7, 3725:11

**objected** [2] - 3650:18

**objecting** [1] - 3608:25

**objection** [41] - 3603:9, 3603:10, 3603:17, 3608:22, 3608:23, 3609:2, 3617:5, 3619:19, 3621:21, 3621:22, 3622:10, 3622:12, 3622:15, 3631:13, 3633:16, 3633:20, 3633:22, 3633:24, 3636:18, 3639:23, 3640:3, 3640:12, 3644:9, 3644:13, 3647:17, 3649:20, 3670:1, 3670:6, 3678:22, 3682:3, 3682:4, 3685:10, 3685:23, 3689:17, 3689:18, 3689:19, 3692:15, 3693:15, 3720:20, 3725:1, 3725:24

**objectionable** [1] - 3604:9

**objections** [12] - 3602:23, 3603:19, 3604:7, 3609:8, 3609:11, 3611:21, 3612:2, 3613:7, 3649:9, 3649:14, 3654:19, 3660:10

**objects** [1] - 3649:19

**obligation** [1] - 3692:20

**observations** [4] - 3698:22, 3699:1, 3699:2, 3711:18

**observe** [2] - 3689:8, 3711:10

**observed** [4] - 3678:9, 3700:9, 3711:12, 3711:15

**obvious** [1] - 3643:23

**obviously** [5] - 3606:12, 3622:4, 3631:21, 3632:10, 3661:1

**occur** [1] - 3619:25

**occurred** [1] - 3620:15

**occurs** [1] - 3623:2

**OF** [5] - 3599:1, 3599:2, 3599:8, 3600:5, 3736:1

**offered** [1] - 3622:12

**OFFICE** [1] - 3599:14

**office** [9] - 3628:5, 3685:16, 3685:18, 3685:20, 3686:9, 3686:15, 3690:9, 3696:20

**Officer** [9] - 3642:24, 3652:25, 3653:25, 3677:7, 3705:24, 3717:20, 3718:10, 3718:25, 3726:9

**officer** [6] - 3653:1, 3698:17, 3699:20, 3722:5, 3723:13, 3723:21

**officers** [33] - 3621:6, 3623:2, 3625:18, 3627:2, 3627:12, 3627:16, 3628:13, 3628:21, 3639:3, 3639:5, 3682:9, 3684:8, 3690:18, 3691:10, 3691:16, 3691:17, 3691:19, 3691:22, 3692:1, 3692:7, 3692:23, 3694:24, 3694:25, 3695:4, 3699:2, 3702:11, 3711:10, 3719:15, 3721:7, 3721:18, 3721:20, 3722:1, 3722:9

**offices** [7] - 3685:3, 3685:6, 3685:9, 3685:15, 3686:3, 3686:18

**OFFICES** [1] - 3600:5

**OFFICIAL** [1] - 3736:1

**Official** [2] - 3600:15, 3736:7

**official** [1] - 3679:25

**often** [1] - 3656:13

**Ohio** [9] - 3621:2,

3752

3621:5, 3621:14,
3624:12, 3624:18,
3624:19, 3655:23,
3684:2, 3719:6
**old** [4] - 3626:13,
3626:15, 3628:10,
3684:10
**once** [9] - 3625:18,
3628:4, 3654:21,
3669:18, 3684:13,
3709:7, 3712:8,
3716:2, 3725:6
**One** [1] - 3638:16
**one** [78] - 3603:2,
3603:11, 3603:13,
3603:16, 3603:18,
3604:7, 3604:8,
3604:14, 3605:11,
3608:22, 3611:19,
3613:6, 3616:13,
3623:3, 3625:22,
3629:1, 3631:15,
3634:5, 3634:6,
3640:15, 3642:10,
3642:20, 3648:8,
3648:14, 3649:18,
3649:22, 3653:24,
3655:17, 3656:11,
3657:12, 3660:3,
3660:20, 3663:2,
3664:23, 3668:1,
3668:4, 3675:17,
3678:21, 3680:20,
3681:7, 3682:24,
3684:14, 3684:25,
3687:8, 3689:5,
3694:13, 3696:6,
3699:14, 3702:12,
3702:13, 3702:14,
3702:21, 3707:17,
3710:12, 3713:22,
3715:8, 3715:18,
3715:24, 3716:6,
3717:21, 3718:21,
3719:7, 3719:20,
3721:5, 3721:18,
3722:18, 3723:16,
3724:15, 3726:18,
3728:22, 3729:5,
3731:23, 3732:11,
3732:12, 3734:17,
3735:3
**one-hour** [1] - 3729:5
**ones** [3] - 3611:9,
3611:10, 3734:10
**open** [21] - 3604:23,
3616:4, 3627:25,
3628:11, 3628:20,
3628:23, 3628:24,
3642:11, 3642:15,

3643:5, 3684:15,
3685:6, 3685:15,
3719:24, 3720:15,
3720:23, 3721:21,
3722:1, 3722:9,
3722:16, 3723:14
**opened** [5] - 3664:16,
3719:13, 3720:4,
3721:2, 3729:8
**opening** [6] - 3613:18,
3616:1, 3616:6,
3639:6, 3728:24,
3729:5
**opens** [2] - 3709:8,
3729:11
**operated** [1] - 3672:20
**operation** [1] -
3692:17
**operational** [2] -
3695:6, 3695:12
**opinion** [1] - 3689:23
**opportunity** [2] -
3615:21, 3693:24
**opposed** [1] - 3734:24
**opposite** [1] - 3719:8
**option** [2] - 3722:6,
3722:15
**Orange** [1] - 3599:24
**order** [13] - 3609:9,
3609:24, 3609:25,
3610:4, 3610:12,
3614:5, 3614:20,
3670:11, 3727:25,
3735:5, 3735:6,
3735:18
**ordered** [2] - 3610:1,
3675:4
**ordering** [1] - 3704:10
**orders** [1] - 3672:14
**ordinarily** [1] - 3653:9
**organized** [2] -
3614:22
**original** [4] - 3626:13,
3628:2, 3710:16,
3732:2
**otherwise** [3] -
3614:13, 3643:21,
3674:10
**ought** [1] - 3604:22
**outlawed** [1] -
3722:25
**outline** [1] - 3665:3
**outnumbered** [2] -
3687:1, 3716:11
**outside** [11] - 3606:5,
3623:2, 3624:12,
3646:10, 3646:23,
3681:5, 3683:8,
3684:1, 3688:2,
3688:3, 3714:9

**overall** [11] - 3622:1,
3631:20, 3634:20,
3662:2, 3665:9,
3676:10, 3682:18,
3687:22, 3723:20,
3724:2
**overflow** [1] - 3626:20
**overruled** [6] -
3621:23, 3622:11,
3622:14, 3622:16,
3682:6, 3685:24
**overrun** [2] - 3680:10,
3680:13
**overview** [1] - 3665:7
**overwhelmed** [3] -
3684:13, 3687:10,
3710:18
**own** [2] - 3658:4,
3711:10
**owning** [1] - 3646:17

## P

**P.A** [2] - 3600:5,
3600:8
**P.C** [1] - 3600:12
**p.m** [5] - 3609:5,
3609:16, 3699:21,
3701:6, 3735:24
**PAGE** [1] - 3601:2
**paint** [3] - 3632:1,
3632:7, 3636:24
**painted** [1] - 3721:24
**paintings** [6] -
3712:13, 3712:17,
3712:24, 3713:2,
3713:5, 3713:7
**pair** [1] - 3709:8
**pan** [1] - 3709:4
**panel** [1] - 3679:11
**panic** [1] - 3711:8
**pans** [4] - 3707:10,
3707:13, 3708:1,
3708:24
**parallel** [1] - 3656:13
**parameters** [1] -
3672:5
**pardon** [1] - 3727:18
**Park** [1] - 3600:12
**Parler** [18] - 3604:7,
3607:7, 3613:14,
3613:15, 3613:16,
3613:20, 3613:22,
3614:9, 3614:14,
3614:25, 3615:1,
3673:8, 3674:15,
3733:17, 3733:23,
3734:4, 3734:14,
3734:24
**part** [40] - 3611:20,

3616:17, 3624:17,
3628:1, 3628:2,
3628:7, 3630:15,
3633:9, 3634:19,
3634:22, 3635:1,
3635:12, 3635:23,
3636:14, 3638:7,
3639:18, 3641:2,
3643:2, 3643:20,
3650:23, 3651:21,
3662:9, 3667:12,
3672:15, 3672:17,
3693:13, 3693:18,
3693:20, 3694:2,
3695:17, 3695:21,
3701:25, 3711:21,
3718:6, 3718:18,
3718:19, 3724:3,
3724:4, 3724:5,
3728:11
**participants** [1] -
3640:18
**particular** [18] -
3603:3, 3611:7,
3621:13, 3627:10,
3628:7, 3630:17,
3633:2, 3635:11,
3652:1, 3652:16,
3672:25, 3679:21,
3694:1, 3717:20,
3717:24, 3722:11,
3735:18
**particularized** [1] -
3662:3
**particularly** [1] -
3634:2
**parties** [14] - 3603:1,
3603:2, 3606:13,
3614:7, 3615:21,
3634:12, 3646:11,
3673:16, 3674:3,
3675:21, 3675:25,
3711:16, 3727:6,
3727:11
**parts** [4] - 3621:12,
3632:18, 3632:22,
3682:22
**pass** [2] - 3678:2,
3732:4
**passages** [1] - 3725:9
**passed** [3] - 3707:24,
3707:25, 3708:17
**past** [5] - 3643:24,
3645:10, 3669:18,
3670:4, 3720:9
**Pat** [1] - 3668:13
**Pattis** [8] - 3599:23,
3602:10, 3613:6,
3648:18, 3665:16,
3670:1, 3728:21,

3732:25
**PATTIS** [15] - 3599:23,
3608:24, 3619:8,
3622:10, 3642:24,
3665:15, 3665:17,
3665:19, 3666:25,
3670:19, 3726:25,
3727:3, 3733:3,
3733:5, 3735:13
**Patty** [1] - 3713:24
**pause** [20] - 3617:9,
3618:21, 3618:24,
3621:24, 3623:13,
3623:14, 3631:12,
3636:11, 3639:8,
3665:5, 3677:22,
3680:20, 3698:5,
3702:16, 3702:22,
3703:1, 3704:17,
3704:20, 3726:17,
3727:17
**PC** [1] - 3599:20
**Peace** [2] - 3702:11,
3721:9
**peak** [1] - 3716:13
**people** [31] - 3616:2,
3621:15, 3622:23,
3629:8, 3629:13,
3635:4, 3635:10,
3643:17, 3645:9,
3652:6, 3658:16,
3659:4, 3662:15,
3665:24, 3667:25,
3668:3, 3671:11,
3672:21, 3673:13,
3673:14, 3682:8,
3682:20, 3687:25,
3692:11, 3695:10,
3703:17, 3716:13,
3724:13, 3725:9,
3731:24, 3732:13
**pepper** [4] - 3629:10,
3687:10, 3711:18,
3711:19
**perceived** [1] -
3731:22
**percentage** [1] -
3633:1
**perform** [1] - 3718:16
**perhaps** [1] - 3607:18
**perimeter** [1] - 3688:3
**permission** [3] -
3624:24, 3625:1,
3680:23
**permits** [3] - 3700:16,
3700:17, 3700:18
**persisting** [1] -
3665:25
**person** [11] - 3659:17,
3667:17, 3667:20,

3668:17, 3672:20, 3672:23, 3672:25, 3684:14, 3696:11, 3735:8, 3735:9
**personal** [4] - 3718:16, 3721:4, 3721:6, 3722:11
**personally** [3] - 3630:15, 3634:8, 3704:3
**Pezzola** [3] - 3602:6, 3602:15, 3655:24
**PEZZOLA** [1] - 3599:6
**ph** [1] - 3625:18
**phone** [9] - 3631:15, 3642:12, 3648:9, 3648:15, 3704:9, 3704:25, 3705:10, 3707:14, 3725:12
**phones** [13] - 3647:16, 3648:11, 3648:22, 3648:25, 3678:3, 3678:6, 3678:7, 3678:13, 3679:1, 3679:4, 3679:7, 3679:9
**photo** [3] - 3614:10, 3620:25, 3624:11
**photograph** [1] - 3613:11
**phrase** [1] - 3651:16
**physical** [2] - 3690:23, 3713:8
**physically** [4] - 3661:4, 3661:7, 3664:4, 3714:16
**pick** [5] - 3620:21, 3631:14, 3679:18, 3723:8, 3733:11
**picture** [6] - 3613:14, 3613:16, 3613:23, 3662:2, 3712:7
**pictured** [1] - 3703:23
**pictures** [2] - 3734:23
**piece** [5] - 3636:22, 3653:11, 3655:12, 3662:3, 3706:17
**pike** [2] - 3612:6, 3662:7
**place** [14] - 3618:9, 3620:13, 3621:1, 3623:4, 3624:23, 3627:1, 3638:19, 3653:2, 3671:24, 3675:22, 3676:2, 3714:8, 3726:8, 3726:17
**places** [1] - 3665:8
**plan** [7] - 3643:16, 3661:13, 3662:14,

3662:18, 3673:21, 3673:23, 3726:3
**planned** [1] - 3662:18
**planning** [1] - 3670:24
**play** [20] - 3604:17, 3605:1, 3608:11, 3618:17, 3619:22, 3621:18, 3623:11, 3624:4, 3627:20, 3635:17, 3638:21, 3659:20, 3660:20, 3680:17, 3698:6, 3699:14, 3703:2, 3703:10, 3705:17, 3706:14
**played** [36] - 3604:22, 3604:24, 3616:16, 3618:23, 3619:23, 3621:20, 3623:15, 3624:5, 3627:21, 3630:13, 3631:11, 3635:20, 3636:12, 3639:1, 3640:9, 3680:19, 3680:25, 3681:19, 3683:13, 3686:11, 3687:5, 3687:12, 3687:19, 3698:7, 3698:15, 3699:15, 3699:16, 3703:2, 3703:11, 3703:12, 3705:20, 3706:15, 3707:2, 3708:9, 3709:2, 3710:2
**playing** [2] - 3607:17, 3638:24
**plays** [1] - 3639:3
**pleasant** [1] - 3605:22
**pleasantries** [1] - 3605:20
**plethora** [1] - 3609:17
**PLLC** [1] - 3599:17
**plows** [1] - 3643:14
**plug** [1] - 3702:20
**plus** [1] - 3731:1
**pockets** [1] - 3615:4
**podium** [3] - 3616:13, 3647:13, 3674:25
**podiums** [2] - 3647:15, 3665:2
**point** [45] - 3603:2, 3606:9, 3612:22, 3615:25, 3616:1, 3621:13, 3622:2, 3622:3, 3622:6, 3622:9, 3622:22, 3623:6, 3625:13, 3626:14, 3631:7, 3631:23, 3632:9, 3634:20, 3635:11,

3642:9, 3642:18, 3644:20, 3647:21, 3650:22, 3650:25, 3652:15, 3653:24, 3654:5, 3655:20, 3659:15, 3663:13, 3664:12, 3668:8, 3669:16, 3674:2, 3678:23, 3680:5, 3681:12, 3687:8, 3688:1, 3688:24, 3710:12, 3720:7, 3725:7, 3726:5
**pointed** [3] - 3604:8, 3656:20, 3724:1
**pointing** [1] - 3638:15
**points** [1] - 3707:5
**police** [18] - 3625:19, 3626:19, 3630:25, 3680:11, 3680:12, 3686:20, 3693:1, 3693:2, 3693:3, 3694:6, 3699:2, 3711:22, 3719:24, 3721:7, 3721:11, 3731:5
**Police** [23] - 3618:12, 3682:10, 3690:6, 3690:12, 3690:17, 3691:9, 3691:22, 3695:21, 3695:23, 3696:1, 3696:4, 3696:7, 3696:12, 3696:21, 3711:25, 3712:1, 3712:2, 3712:4, 3720:3, 3720:15, 3720:23, 3723:21
**policies** [1] - 3693:20
**pollinate** [1] - 3615:5
**portion** [3] - 3683:5, 3694:9, 3718:7
**portions** [1] - 3694:7
**position** [4] - 3693:19, 3695:22, 3722:17, 3729:8
**possession** [1] - 3670:12
**possibility** [4] - 3720:2, 3720:7, 3721:18, 3721:20
**possible** [5] - 3607:10, 3607:11, 3648:16, 3649:6, 3710:19
**possibly** [6] - 3607:12, 3711:3, 3711:5, 3711:7, 3711:9, 3715:19
**Post** [1] - 3666:4

**post** [4] - 3604:14, 3664:15, 3693:8, 3693:10
**post-riot** [1] - 3664:15
**posted** [2] - 3613:14, 3658:6
**postings** [1] - 3613:5
**posts** [1] - 3604:7
**potential** [3] - 3602:22, 3729:3, 3730:19
**potentially** [2] - 3666:2, 3673:24
**pounding** [1] - 3703:17
**precedent** [3] - 3644:21, 3645:13, 3646:20
**precisely** [2] - 3603:25, 3615:15
**preclude** [1] - 3725:17
**predate** [1] - 3734:19
**prefer** [2] - 3674:9, 3677:12
**preference** [1] - 3677:17
**prejudice** [2] - 3653:17, 3654:8
**prejudiced** [1] - 3666:13
**prejudicial** [2] - 3604:22, 3652:22
**preliminary** [1] - 3634:25
**premature** [2] - 3650:20, 3671:14
**preparation** [1] - 3732:24
**prepare** [1] - 3692:16
**prepared** [5] - 3668:23, 3669:3, 3673:24, 3675:14, 3726:3
**presence** [3] - 3645:19, 3645:23, 3661:21
**present** [16] - 3602:7, 3602:8, 3602:9, 3602:10, 3602:11, 3602:12, 3602:13, 3614:16, 3614:23, 3616:5, 3649:24, 3664:4, 3669:3, 3671:9, 3673:21, 3673:23
**presentation** [4] - 3603:8, 3604:4, 3614:12, 3667:7
**presenting** [1] - 3607:7, 3610:8,

3614:8, 3615:1, 3615:2, 3641:16, 3661:23
**president** [1] - 3700:21
**President** [8] - 3623:5, 3623:8, 3624:9, 3700:21, 3701:6, 3720:6, 3721:16, 3722:7
**President's** [1] - 3719:16
**presidential** [2] - 3688:12, 3692:16
**press** [2] - 3663:7, 3705:9
**presume** [1] - 3617:5
**pretrial** [8] - 3603:8, 3609:8, 3650:18, 3652:14, 3653:7, 3662:10, 3728:7, 3728:13
**pretty** [3] - 3688:24, 3714:4, 3714:10
**prevent** [1] - 3723:5
**prevented** [2] - 3682:20, 3719:4
**preventing** [1] - 3639:6
**preview** [1] - 3664:23
**previewed** [1] - 3675:12
**previewing** [6] - 3660:24, 3667:7, 3672:11, 3672:17, 3672:18, 3675:10
**previously** [2] - 3699:15, 3709:16
**priceless** [2] - 3712:22, 3713:14
**principles** [1] - 3722:19
**problem** [9] - 3611:20, 3613:10, 3628:9, 3648:17, 3652:20, 3655:8, 3655:13, 3678:12, 3713:9
**problematic** [2] - 3613:19, 3652:16
**problems** [1] - 3710:25
**procedure** [2] - 3612:10, 3614:20
**procedures** [1] - 3609:24
**proceed** [10] - 3604:19, 3607:10, 3635:14, 3666:18, 3668:14, 3669:18, 3669:23, 3679:14,

3685:25, 3691:5
**proceeding** [2] -
3611:25, 3634:12
**Proceedings** [1] -
3600:18
**proceedings** [6] -
3622:8, 3622:18,
3676:25, 3688:16,
3688:18, 3736:5
**process** [3] - 3684:9,
3687:3, 3688:12
**produce** [3] - 3607:24,
3671:25, 3673:12
**produced** [5] -
3600:19, 3614:6,
3614:14, 3670:18,
3670:25
**professional** [1] -
3689:23
**proffer** [5] - 3640:18,
3661:22, 3667:7,
3668:9, 3668:16
**proffered** [1] -
3640:17
**progress** [1] - 3664:11
**prohibit** [1] - 3653:20
**prohibiting** [1] -
3656:18
**prompted** [1] - 3731:4
**proper** [1] - 3648:2
**property** [5] - 3636:22,
3637:2, 3637:23,
3658:24, 3713:10
**proposal** [1] - 3674:21
**propose** [1] - 3605:1
**proposed** [2] - 3674:6,
3674:14
**proposing** [1] -
3674:3
**prosecutors** [1] -
3670:9
**prospect** [2] -
3674:22, 3729:9
**protect** [4] - 3633:21,
3690:21, 3720:6,
3722:6
**protection** [1] -
3666:23
**protest** [1] - 3634:15
**protesters** [5] -
3681:11, 3687:1,
3687:2, 3703:14,
3716:24
**protocol** [1] - 3631:2
**proud** [1] - 3731:25
**Proud** [11] - 3641:1,
3641:14, 3660:6,
3697:5, 3697:8,
3697:13, 3698:23,
3699:4, 3699:8,

3699:12, 3700:8
**prove** [3] - 3632:12,
3643:25, 3730:10
**proven** [1] - 3644:23
**provide** [7] - 3609:25,
3610:2, 3610:11,
3615:8, 3648:14,
3670:14, 3672:16
**provided** [2] -
3694:23, 3695:4
**providing** [2] -
3609:25, 3643:17
**proving** [1] - 3665:21
**proximate** [1] -
3662:25
**prudent** [1] - 3669:18
**psyche** [1] - 3666:10
**public** [4] - 3625:21,
3628:6, 3685:7,
3685:15
**publicity** [1] - 3679:23
**publish** [2] - 3619:22,
3680:23
**Puerto** [1] - 3720:13
**pull** [4] - 3608:17,
3618:15, 3680:14,
3705:7
**purportedly** [1] -
3672:23
**purports** [1] - 3731:4
**purpose** [1] - 3612:1
**purposely** [1] -
3658:13
**purposes** [2] - 3717:7,
3730:2
**push** [1] - 3688:2
**pushed** [3] - 3626:10,
3626:19, 3687:2
**pushing** [1] - 3646:8
**put** [26] - 3603:4,
3604:11, 3604:16,
3604:25, 3605:9,
3605:25, 3606:18,
3608:6, 3613:3,
3613:16, 3615:2,
3616:20, 3616:23,
3619:6, 3620:9,
3620:22, 3637:20,
3650:4, 3651:5,
3663:18, 3664:20,
3668:21, 3676:11,
3677:2, 3677:8,
3724:5
**puts** [1] - 3679:22
**putting** [4] - 3614:25,
3651:23, 3653:15,
3662:4

## Q

**qualify** [1] - 3661:19
**quality** [1] - 3653:12
**quantum** [1] - 3669:6
**questions** [6] -
3616:18, 3635:19,
3663:4, 3681:3,
3704:19, 3726:1
**quick** [4] - 3627:13,
3629:7, 3642:12,
3704:22
**quickly** [5] - 3604:5,
3606:25, 3608:22,
3634:23, 3644:15
**quiet** [1] - 3605:13
**quite** [1] - 3729:12
**quote** [1] - 3642:1
**quote-unquote** [1] -
3642:1

## R

**race** [1] - 3616:5
**races** [1] - 3616:3
**racist** [1] - 3616:4
**radio** [7] - 3628:16,
3628:22, 3682:24,
3699:7, 3713:22,
3715:24, 3717:4
**railings** [1] - 3629:16
**raise** [3] - 3665:19,
3678:24, 3733:1
**raised** [5] - 3605:24,
3674:18, 3674:19,
3674:20, 3725:16
**Rajewski** [1] - 3641:3
**rally** [1] - 3663:23
**ramifications** [1] -
3653:21
**ran** [1] - 3627:13
**rarely** [1] - 3627:14
**rate** [1] - 3690:4
**rather** [3] - 3604:11,
3608:1, 3671:16
**re** [3] - 3617:22,
3633:4, 3643:3
**re-entered** [1] - 3633:4
**re-sworn** [1] - 3617:22
**reach** [4] - 3636:5,
3636:7, 3638:10,
3672:10
**reached** [2] - 3625:9,
3625:11
**read** [6] - 3666:3,
3693:24, 3694:1,
3694:3, 3694:7,
3728:1
**reading** [1] - 3694:3
**ready** [1] - 3684:12

**real** [1] - 3704:21
**realistically** [1] -
3717:7
**realized** [1] - 3657:22
**really** [9] - 3644:15,
3652:23, 3654:10,
3655:3, 3660:22,
3676:6, 3676:9,
3719:7, 3724:9
**rear** [4] - 3623:21,
3627:2, 3718:6,
3719:5
**reason** [10] - 3602:17,
3602:19, 3604:12,
3604:14, 3608:4,
3614:6, 3641:12,
3678:10, 3692:12
**reasonable** [2] -
3675:1, 3726:17
**reasoning** [3] -
3693:13, 3693:18,
3693:21
**receive** [2] - 3602:20,
3609:14
**received** [4] - 3609:5,
3616:18, 3630:19,
3674:20
**recess** [8] - 3643:7,
3643:8, 3714:19,
3714:23, 3715:7,
3715:11, 3735:23,
3735:24
**recognize** [7] -
3623:17, 3629:20,
3636:14, 3684:19,
3686:7, 3686:13,
3712:1
**recognized** [1] -
3660:12
**recollection** [2] -
3660:7, 3717:3
**reconsider** [1] -
3645:5
**record** [16] - 3605:10,
3605:14, 3605:25,
3606:18, 3606:22,
3632:23, 3633:22,
3633:24, 3643:10,
3644:20, 3668:5,
3670:2, 3673:1,
3698:8, 3709:11,
3727:11
**recorded** [1] - 3600:18
**red** [4] - 3703:23,
3706:13, 3706:16
**redacted** [1] - 3729:16
**reference** [2] -
3714:20, 3714:21
**referenced** [1] -
3608:13

**references** [4] -
3729:15, 3729:17,
3729:18, 3729:19
**referencing** [1] -
3673:8
**referred** [2] - 3639:19,
3640:21
**refers** [2] - 3652:24,
3734:18
**reflect** [1] - 3731:1
**refreshing** [1] -
3617:13
**regard** [6] - 3613:5,
3616:10, 3655:22,
3661:9, 3675:4,
3735:6
**regarding** [13] -
3606:1, 3600:9,
3622:24, 3632:14,
3669:12, 3696:7,
3697:1, 3697:4,
3697:8, 3697:13,
3697:23, 3698:22,
3700:25
**regards** [6] - 3692:6,
3692:25, 3694:23,
3695:16, 3697:22,
3700:16
**regretted** [1] - 3606:6
**regular** [1] - 3648:16
**rehashing** [1] -
3616:22
**Rehl** [8] - 3602:5,
3602:14, 3613:12,
3614:10, 3616:2,
3616:3, 3641:25,
3664:11
**REHL** [1] - 3599:5
**Rehl's** [1] - 3614:9
**reiterate** [2] - 3666:6,
3678:11
**relate** [1] - 3610:21
**related** [2] - 3673:23,
3728:15
**relationship** [2] -
3614:18, 3641:25
**relationships** [1] -
3616:2
**relatively** [4] - 3604:5,
3608:10, 3610:24,
3625:11
**relayed** [1] - 3697:11
**relevance** [25] -
3621:22, 3622:10,
3631:13, 3634:25,
3636:23, 3637:10,
3640:3, 3644:3,
3644:25, 3645:14,
3646:8, 3646:9,
3647:5, 3647:6,

3655:2, 3655:25, 3662:20, 3667:18, 3689:18, 3693:15, 3720:17, 3723:7, 3723:11, 3723:12, 3725:17

**relevant** [15] - 3633:6, 3644:3, 3644:24, 3645:3, 3648:3, 3650:5, 3650:9, 3652:13, 3656:19, 3659:25, 3661:2, 3669:7, 3670:13, 3731:18

**relitigate** [1] - 3644:19

**relitigating** [1] - 3663:5

**remain** [3] - 3617:25, 3625:14, 3730:2

**remains** [1] - 3603:17

**remarks** [3] - 3648:5, 3648:6, 3666:7

**remember** [6] - 3618:11, 3663:12, 3694:1, 3694:9, 3700:19, 3717:6

**remind** [3] - 3620:25, 3625:2, 3683:1

**reminded** [3] - 3634:5, 3634:6, 3678:1

**removed** [5] - 3729:15, 3729:17, 3729:18, 3729:19, 3732:3

**repair** [1] - 3689:24

**repaired** [1] - 3689:14

**repairs** [3] - 3690:6, 3690:7, 3690:13

**repeat** [1] - 3628:8

**repeatedly** [1] - 3674:18

**replaced** [4] - 3690:2, 3690:3, 3706:23, 3709:23

**report** [8] - 3665:23, 3666:5, 3666:13, 3666:17, 3670:4, 3670:15, 3694:14

**Reporter** [3] - 3600:15, 3600:15, 3736:7

**reporter** [6] - 3642:9, 3642:13, 3642:19, 3643:2, 3649:6, 3707:20

**REPORTER** [1] - 3736:1

**representation** [3] - 3607:15, 3649:11, 3674:14

**representations** [1] - 3614:4

**Representatives** [1] - 3714:7

**represented** [1] - 3604:2

**represents** [1] - 3635:1

**request** [3] - 3650:1, 3665:21, 3710:17

**requested** [1] - 3694:18

**require** [1] - 3612:14

**required** [1] - 3609:8

**requires** [4] - 3632:9, 3656:7, 3656:8, 3656:9

**requisite** [1] - 3661:14

**reservation** [1] - 3615:12

**residue** [1] - 3713:16

**resign** [2] - 3693:8, 3693:10

**resignation** [3] - 3693:14, 3693:21, 3693:24

**resigned** [1] - 3693:19

**resigning** [1] - 3694:5

**resisted** [1] - 3644:1

**resolve** [2] - 3615:15, 3615:21

**resolved** [2] - 3611:3, 3611:15

**respect** [6] - 3614:18, 3614:25, 3615:24, 3647:23, 3730:15, 3731:19

**respective** [2] - 3623:1, 3714:9

**respectively** [1] - 3726:7

**respond** [6] - 3637:11, 3657:3, 3657:4, 3674:5, 3674:9, 3674:22

**response** [3] - 3626:17, 3641:5, 3689:24

**responsibility** [5] - 3640:5, 3641:13, 3645:1, 3646:10, 3667:20

**responsible** [11] - 3637:22, 3645:4, 3646:3, 3646:12, 3646:15, 3667:14, 3676:8, 3676:13, 3676:15, 3676:18, 3690:9

**rest** [7] - 3632:14,

3647:4, 3659:19, 3667:19, 3684:15, 3718:17, 3735:19

**restart** [1] - 3688:12

**result** [3] - 3693:7, 3693:10, 3693:14

**resume** [2] - 3617:13, 3688:16

**resumed** [1] - 3677:24

**resumes** [1] - 3617:18

**retake** [3] - 3643:4, 3677:23, 3688:1

**retreat** [4] - 3721:8, 3721:11

**retreated** [1] - 3721:7

**Return** [6] - 3635:16, 3638:5, 3642:16, 3705:15, 3724:25, 3725:23

**return** [4] - 3625:8, 3677:11, 3704:22, 3732:14

**returned** [3] - 3617:10, 3642:23, 3679:12, 3689:22, 3726:22

**returning** [2] - 3731:15, 3731:17

**reverse** [1] - 3717:8

**review** [2] - 3607:16, 3732:24

**Rhodes** [1] - 3658:6

**Rico** [1] - 3720:13

**riot** [5] - 3664:11, 3664:15, 3686:19, 3714:20, 3714:21

**rioter** [1] - 3717:8

**rioters** [21] - 3621:8, 3625:12, 3625:15, 3626:4, 3626:7, 3626:18, 3627:6, 3638:19, 3639:6, 3683:10, 3683:17, 3684:4, 3684:13, 3684:14, 3685:9, 3686:21, 3703:14, 3715:9, 3716:25, 3721:12, 3721:17

**riotous** [1] - 3721:25

**ripen** [2] - 3607:1, 3607:20

**rise** [2] - 3643:6, 3735:22

**Road** [1] - 3600:2

**rob** [1] - 3632:12

**Roger** [2] - 3600:11, 3602:13

**Rohde** [19] - 3608:11, 3618:15, 3619:21, 3620:4, 3620:22, 3621:18, 3623:11,

3627:20, 3629:18, 3631:10, 3635:17, 3636:10, 3638:21, 3639:11, 3680:17, 3681:17, 3682:11, 3684:17, 3687:4

**role** [3] - 3637:1, 3640:10, 3690:12

**roll** [5] - 3689:6, 3703:22, 3708:5, 3708:7, 3708:23

**rolling** [4] - 3610:2, 3706:25, 3707:4, 3709:25

**Ronald** [1] - 3634:6

**Room** [2] - 3600:16, 3736:8

**room** [6] - 3629:1, 3642:23, 3713:19, 3714:12, 3720:5, 3726:22

**ROOTS** [35] - 3702:20, 3703:5, 3703:7, 3703:9, 3705:11, 3705:16, 3705:21, 3705:23, 3706:4, 3706:6, 3706:11, 3706:12, 3706:25, 3707:3, 3707:7, 3707:9, 3708:5, 3708:10, 3708:23, 3709:3, 3709:25, 3710:3, 3710:7, 3710:9, 3720:18, 3720:21, 3723:12, 3723:19, 3724:7, 3724:24, 3725:3, 3725:19, 3725:21, 3725:25, 3726:14

**Roots** [2] - 3600:11, 3602:13

**roots** [7] - 3703:4, 3705:8, 3705:9, 3705:10, 3723:10, 3724:17, 3724:23

**Roots...................
3703** [1] - 3601:4

**Rotunda** [31] - 3622:5, 3638:9, 3638:13, 3682:23, 3682:24, 3683:1, 3683:3, 3683:4, 3683:7, 3683:10, 3683:16

**route** [3] - 3627:10, 3627:13, 3627:15

**routine** [1] - 3695:1

**RPR** [3] - 3600:15, 3736:2, 3736:7

**Rule** [1] - 3656:8

**rule** [5] - 3603:20,

3605:17, 3606:13, 3669:4, 3672:4

**ruled** [5] - 3613:17, 3723:3, 3728:14, 3728:23, 3730:23

**rules** [3] - 3653:15, 3722:20

**Rules** [1] - 3694:15

**ruling** [5] - 3633:21, 3635:11, 3650:18, 3650:21, 3730:25

**rulings** [5] - 3603:8, 3632:14, 3643:14, 3728:7, 3728:13

**running** [1] - 3610:12

**runs** [2] - 3614:12

**rushing** [1] - 3678:21

## S

**Sabino** [2] - 3600:8, 3602:12

**safe** [3] - 3622:7, 3622:18, 3710:23

**safer** [2] - 3655:18, 3669:17

**safest** [1] - 3655:15

**safety** [1] - 3622:24

**sanitized** [1] - 3729:20

**satisfied** [1] - 3624:20

**saw** [17] - 3606:19, 3609:12, 3620:2, 3624:11, 3624:14, 3626:19, 3684:2, 3689:15, 3689:21, 3690:17, 3707:10, 3709:13, 3711:19, 3712:10, 3714:14, 3719:17, 3735:4

**scaffolding** [1] - 3620:8

**scary** [1] - 3724:8

**scenario** [3] - 3721:24, 3723:15, 3724:8

**scene** [17] - 3629:20, 3630:23, 3631:20, 3632:1, 3632:7, 3634:2, 3636:24, 3637:2, 3640:14, 3641:2, 3652:1, 3655:23, 3660:23, 3671:17, 3676:5, 3681:10, 3706:21

**scenes** [7] - 3632:18, 3638:2, 3643:18, 3659:23, 3660:22, 3662:22, 3664:21

**schizophrenic** [1] - 3666:21

3756

**school** [1] - 3684:10
**screen** [16] - 3613:10, 3616:17, 3618:19, 3619:2, 3619:11, 3620:23, 3623:23, 3624:2, 3630:1, 3633:8, 3638:8, 3681:4, 3681:10, 3683:15, 3684:21, 3702:25
**screens** [3] - 3608:21, 3619:6, 3680:22
**seat** [5] - 3620:20, 3625:8, 3638:18, 3680:7, 3683:6
**seated** [3] - 3617:11, 3679:13, 3726:23
**second** [22] - 3605:11, 3614:18, 3616:13, 3625:17, 3626:10, 3628:1, 3628:3, 3628:8, 3628:25, 3630:18, 3637:14, 3647:16, 3683:16, 3684:8, 3684:15, 3692:14, 3702:12, 3709:9, 3715:22, 3716:21, 3732:11, 3733:12
**seconds** [11] - 3618:18, 3620:5, 3636:10, 3636:11, 3648:6, 3681:2, 3681:18, 3683:19, 3707:24, 3708:17
**secret** [1] - 3725:9
**Secret** [5] - 3624:8, 3697:19, 3697:22, 3697:25, 3698:2
**secure** [3] - 3624:9, 3630:23, 3717:5
**secured** [3] - 3628:22, 3684:7, 3688:5
**securing** [1] - 3684:9
**security** [3] - 3692:4, 3694:12, 3694:19
**Security** [1] - 3694:15
**seditious** [1] - 3656:12
**see** [45] - 3604:13, 3612:21, 3619:25, 3620:10, 3621:1, 3624:1, 3624:7, 3626:6, 3627:6, 3629:4, 3629:22, 3637:19, 3646:24, 3654:2, 3659:17, 3665:16, 3672:4, 3681:10, 3682:8, 3682:9, 3683:8,

3683:15, 3684:21, 3686:8, 3702:24, 3702:25, 3704:13, 3704:18, 3705:18, 3706:3, 3706:7, 3708:6, 3708:11, 3708:14, 3709:11, 3709:18, 3710:4, 3713:2, 3714:16, 3723:10, 3725:16, 3726:20, 3734:16, 3735:21
**seeing** [3] - 3623:19, 3635:23, 3659:22
**seem** [5] - 3646:9, 3675:15, 3679:10, 3728:6
**Self** [3] - 3664:1, 3664:15, 3731:20
**self** [1] - 3723:15
**Self-Defense** [3] - 3664:1, 3664:15, 3731:20
**self-defense** [1] - 3723:15
**Senate** [58] - 3620:14, 3620:16, 3621:4, 3621:14, 3623:1, 3623:7, 3623:10, 3623:20, 3623:21, 3624:3, 3624:9, 3624:12, 3624:16, 3624:21, 3624:24, 3625:3, 3625:5, 3626:7, 3630:8, 3683:23, 3684:1, 3684:4, 3684:22, 3685:1, 3685:20, 3694:13, 3694:14, 3694:21, 3694:22, 3703:16, 3714:4, 3714:23, 3715:9, 3715:10, 3715:11, 3715:23, 3716:17, 3718:2, 3718:4, 3718:5, 3718:6, 3718:7, 3718:12, 3718:14, 3718:18, 3718:23, 3720:6, 3721:9, 3721:13, 3721:14, 3721:16, 3721:22, 3722:4, 3722:10, 3726:6, 3726:10
**Senator** [1] - 3713:23
**senator** [2] - 3714:11, 3715:21
**senators** [4] - 3714:6, 3718:15, 3719:1, 3725:4

**send** [1] - 3674:3
**sense** [11] - 3605:7, 3613:2, 3644:25, 3646:10, 3668:19, 3668:22, 3669:25, 3672:8, 3676:8, 3705:14, 3731:3
**sent** [12] - 3602:22, 3603:6, 3608:1, 3608:5, 3609:21, 3611:9, 3611:11, 3615:16, 3666:14, 3672:2, 3678:1, 3733:16
**sentence** [1] - 3640:25
**separate** [2] - 3625:20, 3718:15
**separated** [2] - 3661:7, 3714:6
**separating** [2] - 3718:8, 3718:21
**sequestration** [1] - 3605:18
**Sergeant** [1] - 3625:18
**sergeants** [2] - 3691:10, 3691:20
**series** [1] - 3614:3
**serious** [1] - 3723:5
**serve** [1] - 3656:7
**Service** [5] - 3624:8, 3697:19, 3697:23, 3697:25, 3698:3
**services** [2] - 3695:6, 3695:8, 3695:13
**SESSION** [1] - 3599:9
**set** [13] - 3612:13, 3612:15, 3625:19, 3626:10, 3626:12, 3626:14, 3633:2, 3643:18, 3647:24, 3680:12, 3688:3, 3704:19, 3710:17
**sets** [1] - 3626:8
**settled** [1] - 3663:5
**several** [5] - 3629:7, 3629:10, 3641:3, 3707:24, 3716:3
**severance** [1] - 3650:19
**sexual** [1] - 3631:1
**Shane** [1] - 3696:10
**share** [1] - 3697:13
**sharing** [1] - 3678:16
**shattered** [4] - 3706:8, 3708:1, 3708:18, 3708:19
**shelter** [2] - 3623:4, 3726:8
**sheltered** [3] - 3623:9, 3627:1, 3721:16

**sheltering** [2] - 3624:23, 3714:8
**shifts** [1] - 3692:18
**shooting** [3] - 3630:20, 3687:8, 3723:1
**short** [4] - 3608:10, 3608:18, 3610:24, 3661:12
**shorthand** [1] - 3600:18
**shortly** [4] - 3607:7, 3621:2, 3637:15, 3715:2
**shot** [2] - 3720:8, 3720:11
**show** [19] - 3634:16, 3635:9, 3636:22, 3638:10, 3644:2, 3645:17, 3659:14, 3659:18, 3664:13, 3665:2, 3667:8, 3667:13, 3669:11, 3669:20, 3676:5, 3730:13, 3730:17, 3731:2, 3731:12
**showed** [1] - 3686:25
**showing** [8] - 3634:13, 3643:18, 3661:14, 3663:22, 3665:9, 3667:22, 3667:24, 3712:7
**shown** [8] - 3632:24, 3641:10, 3642:3, 3645:15, 3646:2, 3646:11, 3660:13, 3668:2
**shows** [3] - 3645:8, 3646:22, 3655:12
**sic** [6] - 3631:4, 3653:17, 3666:11, 3700:18, 3701:16, 3702:5
**sic]** [2] - 3626:1, 3705:22
**side** [53] - 3607:18, 3607:22, 3622:4, 3623:20, 3624:1, 3624:14, 3624:15, 3624:16, 3625:3, 3625:4, 3625:5, 3625:6, 3625:10, 3625:11, 3625:15, 3626:21, 3626:22, 3627:6, 3627:7, 3627:8, 3627:9, 3627:15, 3628:21, 3628:23, 3629:13, 3629:16, 3630:20, 3631:4, 3631:7,

3631:25, 3633:2, 3633:3, 3633:4, 3633:11, 3635:25, 3636:1, 3638:12, 3639:15, 3639:16, 3639:17, 3694:21, 3694:22, 3703:15, 3703:16, 3703:24, 3711:22, 3714:5, 3715:10, 3715:23, 3733:11
**sidebar** [2] - 3636:19, 3639:24
**sidebars** [1] - 3648:10
**sides** [9] - 3611:24, 3612:2, 3612:3, 3627:3, 3627:4, 3643:13, 3669:14, 3732:11
**sign** [1] - 3704:13
**significant** [2] - 3665:8, 3690:5
**similar** [3] - 3637:2, 3657:5, 3658:9
**simply** [7] - 3604:24, 3605:1, 3654:21, 3668:11, 3674:5, 3728:6, 3728:12
**single** [1] - 3642:4
**sit** [1] - 3653:22
**site** [1] - 3620:16
**sits** [1] - 3628:6
**sitting** [4] - 3606:19, 3646:18, 3729:23, 3733:16
**situation** [8] - 3648:23, 3656:8, 3660:14, 3661:6, 3721:19, 3721:25, 3722:12, 3723:21
**size** [1] - 3716:2
**skip** [1] - 3681:18
**slide** [1] - 3713:22
**slides** [3] - 3614:6, 3615:1, 3615:3
**slot** [1] - 3662:3
**slow** [1] - 3707:4
**small** [3] - 3632:1, 3632:25, 3664:8
**smashed** [1] - 3620:18
**smashing** [1] - 3710:5
**Smith** [17] - 3599:16, 3602:9, 3632:3, 3634:17, 3640:1, 3640:19, 3640:23, 3642:2, 3643:24, 3644:11, 3647:2, 3648:5, 3652:24, 3656:20, 3667:3, 3669:5

3757

**SMITH** [25] - 3599:17, 3599:23, 3616:11, 3616:25, 3632:3, 3634:10, 3634:24, 3636:18, 3636:21, 3637:9, 3639:23, 3640:3, 3640:22, 3641:5, 3642:3, 3644:10, 3644:12, 3644:14, 3644:17, 3647:1, 3647:10, 3667:5, 3671:12, 3674:1, 3724:16
**Smith's** [3] - 3650:16, 3651:6, 3651:11
**so-called** [1] - 3641:8
**social** [8] - 3663:22, 3665:20, 3665:24, 3666:4, 3666:16, 3670:17, 3670:24, 3730:16
**solved** [1] - 3648:17
**someone** [9] - 3610:13, 3634:22, 3645:19, 3663:15, 3667:17, 3707:14, 3707:17, 3711:12, 3716:19
**sometime** [1] - 3642:9
**sometimes** [4] - 3639:19, 3640:20, 3674:2, 3711:12
**somewhat** [1] - 3708:1
**somewhere** [3] - 3686:14, 3714:25, 3715:14
**sorry** [6] - 3623:25, 3634:4, 3681:22, 3695:17, 3729:22, 3734:23
**sort** [24] - 3602:20, 3603:8, 3603:15, 3612:10, 3618:12, 3632:1, 3632:18, 3634:13, 3641:12, 3643:22, 3652:2, 3654:7, 3655:2, 3655:20, 3655:21, 3658:13, 3667:20, 3668:6, 3672:15, 3676:9, 3717:21, 3718:25, 3731:4, 3731:21
**sorts** [1] - 3615:5
**sound** [1] - 3681:18
**sounds** [8] - 3602:21, 3603:7, 3603:9, 3613:2, 3642:6, 3648:16, 3660:23,

3660:25
**south** [2] - 3624:14, 3625:7
**Speaker** [1] - 3627:17
**Speaker's** [8] - 3626:21, 3626:22, 3627:2, 3627:7, 3627:16, 3630:20, 3687:9, 3719:5
**speaking** [3] - 3605:17, 3678:5, 3731:2
**special** [2] - 3690:9, 3734:3
**Special** [3] - 3606:3, 3607:6, 3610:6
**specific** [4] - 3621:14, 3656:2, 3682:21, 3685:18
**specifically** [6] - 3616:3, 3640:15, 3663:13, 3700:18, 3700:19, 3725:15
**speculating** [1] - 3724:14
**speculation** [3] - 3622:15, 3682:5, 3687:9
**speech** [6] - 3700:22, 3701:1, 3701:4, 3701:6, 3702:1, 3702:2
**speed** [1] - 3607:9
**spent** [2] - 3611:13, 3611:14
**spoken** [2] - 3645:10, 3656:14
**spray** [7] - 3629:10, 3687:10, 3687:14, 3711:19, 3711:21, 3713:9, 3713:16
**sprayed** [4] - 3710:11, 3711:12, 3711:15
**spraying** [3] - 3711:23, 3712:4, 3712:6
**sprays** [2] - 3711:15, 3713:6
**spread** [1] - 3692:18
**spreadsheet** [1] - 3614:15
**stabbing** [1] - 3731:1
**stacked** [1] - 3627:3
**staff** [1] - 3685:17
**staffer** [1] - 3685:22
**stage** [4] - 3647:24, 3679:23, 3680:6, 3680:12
**staircase** [1] - 3719:4
**stairs** [3] - 3620:8,

3621:5, 3714:18
**stairway** [1] - 3719:2
**stairwell** [1] - 3719:3
**stairwells** [1] - 3627:14
**stand** [13] - 3605:19, 3606:12, 3609:7, 3610:7, 3612:7, 3617:18, 3649:19, 3677:8, 3677:13, 3677:23, 3677:24, 3721:15, 3725:7
**standard** [1] - 3656:22
**standing** [2] - 3612:10, 3670:11
**stands** [2] - 3643:7, 3735:23
**start** [6] - 3618:10, 3628:13, 3673:13, 3687:2, 3724:19, 3727:12
**started** [3] - 3614:3, 3704:15, 3721:9
**starting** [5] - 3680:18, 3682:23, 3721:10, 3735:16, 3735:17
**state** [7] - 3622:2, 3687:22, 3689:8, 3730:13, 3731:2, 3731:10, 3731:18
**statement** [10] - 3613:18, 3616:1, 3692:22, 3729:5, 3729:6, 3730:21, 3731:6, 3731:22, 3732:9
**statements** [8] - 3650:15, 3668:6, 3701:23, 3702:2, 3728:24, 3731:23, 3734:23, 3734:24
**STATES** [3] - 3599:1, 3599:2, 3599:10
**states** [1] - 3702:8
**States** [10] - 3599:12, 3602:3, 3643:10, 3666:8, 3666:21, 3681:9, 3701:18, 3705:2, 3725:14, 3736:8
**status** [2] - 3624:25, 3672:3
**stay** [1] - 3624:16
**steel** [1] - 3626:12
**stenographic** [1] - 3736:4
**step** [2] - 3620:13, 3729:24
**steps** [2] - 3638:13, 3730:5

**Steven** [4] - 3600:11, 3602:12, 3693:5, 3693:7
**sticker** [2] - 3620:9, 3620:10
**Sticker** [1] - 3620:14
**sticking** [1] - 3643:22
**still** [11] - 3603:23, 3617:22, 3623:5, 3653:14, 3662:18, 3664:16, 3681:21, 3681:23, 3693:2, 3693:3, 3729:23
**stipulate** [1] - 3632:8
**stipulated** [1] - 3641:17
**stipulating** [1] - 3632:11
**stipulation** [1] - 3647:23
**stipulations** [1] - 3674:14
**stood** [1] - 3649:9
**stop** [19] - 3620:5, 3621:8, 3636:9, 3639:11, 3660:19, 3682:11, 3683:18, 3699:17, 3703:20, 3703:21, 3704:2, 3704:12, 3704:13, 3706:4, 3707:5, 3708:7, 3708:24, 3708:25
**stopping** [1] - 3631:12
**straddling** [1] - 3732:10
**strange** [2] - 3643:16, 3655:20
**strategy** [1] - 3653:19
**streamline** [2] - 3675:22, 3676:25
**street** [1] - 3729:14
**Street** [6] - 3599:14, 3599:17, 3599:21, 3599:24, 3600:5, 3600:9
**strength** [1] - 3659:3
**strenuous** [1] - 3660:11
**strict** [1] - 3656:22
**strike** [4] - 3652:20, 3653:5, 3653:11, 3653:14
**strikes** [1] - 3728:11
**striking** [1] - 3653:16
**struck** [1] - 3719:7
**structured** [3] - 3661:24, 3661:25, 3683:24
**struggle** [1] - 3629:12

**struggling** [1] - 3723:10
**stuck** [2] - 3653:1, 3719:7
**stuff** [6] - 3652:23, 3655:21, 3658:7, 3660:8, 3665:10, 3678:17
**style** [1] - 3640:8
**subject** [4] - 3611:24, 3632:13, 3676:19, 3729:2
**submit** [4] - 3635:8, 3636:24, 3645:13, 3656:16
**submitted** [1] - 3700:16
**subordinates** [1] - 3721:5
**subsequent** [1] - 3727:10
**subset** [2] - 3615:17, 3732:22
**succeed** [1] - 3630:5
**success** [1] - 3726:7
**successful** [1] - 3726:5
**successfully** [1] - 3686:21
**suffice** [1] - 3712:17
**sufficient** [3] - 3611:5, 3635:8
**suggest** [4] - 3655:2, 3671:5, 3726:10, 3728:6
**suggesting** [1] - 3640:7
**suggestion** [3] - 3646:2, 3646:15, 3670:15
**Suite** [2] - 3599:18, 3600:6
**summarized** [1] - 3655:21
**summary** [4] - 3644:20, 3668:15, 3669:18, 3671:6
**Sund** [4] - 3693:5, 3693:7, 3693:13, 3693:18
**Sunday** [1] - 3655:11
**superficial** [1] - 3668:6
**superimpose** [1] - 3613:24
**superimposed** [1] - 3613:22
**superiors** [1] - 3693:1
**superseding** [1] - 3666:2

3758

**supervisor** [1] - 3721:5

**support** [2] - 3686:24, 3688:1

**supporting** [1] - 3645:13

**supposed** [2] - 3624:22, 3694:25

**Supreme** [2] - 3722:25, 3723:3

**surface** [1] - 3667:13

**surge** [1] - 3626:21

**surging** [1] - 3682:1

**surprise** [1] - 3662:9

**surveillance** [1] - 3618:12

**sustained** [8] - 3689:19, 3690:23, 3697:17, 3701:14, 3720:19, 3720:20, 3725:2, 3725:24

**sworn** [1] - 3617:22

**system** [2] - 3645:12, 3675:2

**systems** [2] - 3647:3, 3647:4

**T**

**table** [2] - 3662:17, 3678:4

**tactical** [1] - 3663:23

**taint** [2] - 3653:17, 3654:7

**tainted** [1] - 3653:9

**TARRIO** [1] - 3599:6

**Tarrio** [12] - 3602:5, 3602:15, 3609:4, 3649:7, 3649:24, 3668:3, 3729:6, 3729:9, 3730:15, 3731:10, 3731:19, 3732:15

**Tarrio's** [2] - 3732:14, 3735:7

**task** [1] - 3611:15

**team** [13] - 3624:8, 3626:23, 3689:6, 3692:19, 3696:1, 3696:2, 3696:3, 3697:20, 3697:25, 3698:3, 3710:12, 3710:15, 3710:16

**tech** [1] - 3702:24

**technical** [1] - 3704:14

**technologically** [1] - 3604:13

**technology** [1] - 3704:1

**tee** [2] - 3610:21, 3675:15

**teed** [5] - 3614:16, 3615:23, 3675:12, 3675:17, 3675:25

**Telegram** [5] - 3614:13, 3615:2, 3615:3, 3667:12, 3674:15

**telephone** [1] - 3723:8

**temporarily** [2] - 3621:9, 3630:3

**Tennessee** [1] - 3722:23

**tent** [2] - 3710:17, 3710:20

**term** [2] - 3658:8, 3679:25

**terms** [7] - 3606:25, 3648:9, 3650:20, 3672:13, 3675:10, 3677:15, 3689:24

**terrace** [7] - 3679:20, 3679:22, 3680:1, 3680:2, 3680:9, 3680:14, 3681:6

**terrific** [1] - 3673:12

**territory** [1] - 3646:23

**terrorists** [1] - 3720:11

**testified** [3] - 3629:25, 3694:16, 3723:13

**testify** [3] - 3723:17, 3723:25, 3734:3

**testifying** [2] - 3609:17, 3701:13

**testimonial** [1] - 3652:5

**testimony** [13] - 3606:8, 3607:2, 3610:4, 3612:3, 3616:15, 3616:20, 3665:12, 3690:16, 3692:6, 3720:3, 3720:22, 3725:4, 3727:5

**THE** [210] - 3599:1, 3599:1, 3599:9, 3602:2, 3602:16, 3604:1, 3604:10, 3604:24, 3605:4, 3605:6, 3605:11, 3605:23, 3606:11, 3606:16, 3606:24, 3607:14, 3608:2, 3608:15, 3608:18, 3609:14, 3609:20, 3609:22, 3610:14, 3610:16, 3610:20, 3611:1, 3611:23,

3612:16, 3612:19, 3612:22, 3612:24, 3614:1, 3616:7, 3616:12, 3616:24, 3617:5, 3617:7, 3617:11, 3617:19, 3617:20, 3617:24, 3618:2, 3618:3, 3619:19, 3621:23, 3622:11, 3622:14, 3622:16, 3631:14, 3631:17, 3632:10, 3633:7, 3633:12, 3633:18, 3633:25, 3634:17, 3635:11, 3637:6, 3637:11, 3637:16, 3638:1, 3640:1, 3640:12, 3640:23, 3641:21, 3642:5, 3642:17, 3643:1, 3643:6, 3643:9, 3643:12, 3644:11, 3644:13, 3644:16, 3646:25, 3647:2, 3647:11, 3647:14, 3648:19, 3648:21, 3649:4, 3649:13, 3649:16, 3649:18, 3650:3, 3650:13, 3651:2, 3651:4, 3651:10, 3651:12, 3652:13, 3654:3, 3654:9, 3654:12, 3654:15, 3656:4, 3657:1, 3657:3, 3657:11, 3657:13, 3657:15, 3657:17, 3657:20, 3657:23, 3657:25, 3658:5, 3658:11, 3658:16, 3658:19, 3658:22, 3659:2, 3659:7, 3659:9, 3659:25, 3660:17, 3663:9, 3664:18, 3665:4, 3665:13, 3665:16, 3665:18, 3666:24, 3667:3, 3668:10, 3670:22, 3671:3, 3671:19, 3671:21, 3671:23, 3672:8, 3673:14, 3673:18, 3674:24, 3675:19, 3675:24, 3677:14, 3677:16, 3677:18, 3677:21, 3677:25, 3678:19, 3679:5, 3679:11, 3679:13, 3680:23, 3682:4, 3682:6, 3685:12, 3685:14,

3685:23, 3689:19, 3690:25, 3691:6, 3693:16, 3697:17, 3698:8, 3698:9, 3698:11, 3698:13, 3701:14, 3702:14, 3702:18, 3703:4, 3703:6, 3705:4, 3705:9, 3705:12, 3720:19, 3723:8, 3723:10, 3723:16, 3723:23, 3724:10, 3724:20, 3725:1, 3725:18, 3725:20, 3725:22, 3725:24, 3726:15, 3726:23, 3727:2, 3727:4, 3727:14, 3727:19, 3727:22, 3728:5, 3728:25, 3729:21, 3729:24, 3730:6, 3730:8, 3730:20, 3730:23, 3732:6, 3732:19, 3733:4, 3733:6, 3733:9, 3733:18, 3733:21, 3734:5, 3734:8, 3734:12, 3734:21, 3734:25, 3735:12, 3735:16, 3735:21, 3735:22

**themselves** [3] - 3615:9, 3623:4, 3632:25

**theory** [20] - 3634:11, 3651:21, 3652:17, 3653:19, 3654:18, 3654:20, 3654:22, 3657:16, 3657:18, 3657:22, 3658:23, 3659:11, 3659:12, 3659:23, 3663:7, 3665:25, 3668:18, 3669:23

**therefore** [2] - 3653:19, 3667:18

**they've** [1] - 3678:16

**thin** [1] - 3676:15

**thinking** [1] - 3724:8

**thinks** [1] - 3607:19

**third** [19] - 3615:7, 3626:11, 3628:6, 3628:9, 3628:13, 3628:23, 3628:24, 3628:25, 3629:24, 3630:18, 3684:7, 3684:9, 3684:15, 3684:22, 3716:21, 3732:12, 3734:3, 3734:10

**THOMAS** [1] - 3601:3

**Thomas** [4] - 3617:16, 3617:18, 3630:19, 3677:24

**thousands** [1] - 3712:18

**three** [7] - 3611:12, 3621:6, 3626:8, 3649:1, 3650:16, 3679:9, 3715:15

**threshold** [1] - 3652:11

**throughout** [8] - 3613:19, 3614:12, 3614:13, 3621:16, 3629:12, 3630:9, 3686:24, 3735:19

**tie** [5] - 3652:10, 3654:18, 3661:13, 3676:4, 3677:4

**timely** [1] - 3611:22

**timestamp** [3] - 3687:21, 3698:17, 3699:20

**timing** [1] - 3606:25

**TIMOTHY** [2] - 3599:9, 3736:2

**Timothy** [1] - 3600:15

**today** [8] - 3613:1, 3616:20, 3672:11, 3672:19, 3676:20, 3683:22, 3692:22, 3735:1

**together** [7] - 3652:10, 3661:8, 3664:10, 3666:10, 3666:22, 3668:7, 3732:13

**Tom** [1] - 3611:13

**tomorrow** [1] - 3672:19

**tomorrow's** [1] - 3733:24

**took** [4] - 3614:9, 3618:9, 3679:17, 3721:18

**tool** [1] - 3677:2

**Tool** [2] - 3672:20

**tools** [34] - 3633:9, 3634:3, 3634:7, 3634:10, 3634:14, 3634:16, 3635:9, 3635:12, 3640:16, 3643:15, 3644:20, 3645:21, 3645:22, 3647:7, 3652:17, 3657:18, 3657:21, 3658:8, 3660:24, 3661:15, 3662:13, 3662:14, 3665:8, 3666:1, 3667:22,

3668:21, 3669:21, 3672:1, 3672:7, 3673:4, 3673:20, 3673:23, 3675:2, 3675:6

**top** [9] - 3618:13, 3638:8, 3638:12, 3638:14, 3638:15, 3662:16, 3683:5, 3728:14, 3728:17

**topic** [2] - 3725:15, 3726:25

**total** [5] - 3691:17, 3691:20, 3691:21, 3706:21, 3709:20

**totally** [1] - 3668:9

**touched** [1] - 3714:12

**tour** [2] - 3640:8, 3692:21

**toward** [2] - 3604:4, 3708:2

**towards** [5] - 3635:4, 3635:7, 3699:5, 3704:11, 3719:6

**traditional** [1] - 3647:8

**trail** [1] - 3635:4

**train** [3] - 3722:8, 3722:13

**trained** [2] - 3626:24, 3720:23

**training** [4] - 3693:20, 3720:18, 3721:21, 3721:25

**trainings** [1] - 3723:25

**TRANSCRIPT** [1] - 3599:8

**transcript** [4] - 3600:18, 3670:20, 3736:4, 3736:5

**transcription** [1] - 3600:19

**transcripts** [1] - 3656:16

**transpire** [1] - 3695:15

**transpired** [5] - 3693:11, 3694:19, 3699:23, 3701:3, 3702:8

**treatment** [1] - 3727:1

**trial** [15] - 3609:24, 3614:19, 3653:9, 3653:14, 3660:11, 3660:15, 3661:25, 3663:2, 3665:22, 3666:18, 3666:25, 3672:6, 3673:22, 3735:19

**TRIAL** [1] - 3599:8

**trials** [2] - 3632:6, 3649:1

**tried** [4] - 3656:11, 3657:12, 3735:12

**true** [4] - 3655:22, 3716:15, 3736:3, 3736:4

**Trump** [2] - 3700:22, 3701:23

**Trump's** [1] - 3701:6

**try** [4] - 3612:4, 3615:14, 3649:5, 3675:1

**trying** [7] - 3604:13, 3625:19, 3630:3, 3660:11, 3660:15, 3666:11, 3704:1

**Tuesday** [2] - 3599:6, 3610:7

**tunnel** [21] - 3639:19, 3639:21, 3639:22, 3640:9, 3640:14, 3640:19, 3656:25, 3662:15, 3663:1, 3664:17, 3671:17, 3679:18, 3679:19, 3679:20, 3679:24, 3680:9, 3680:15, 3681:6, 3681:21, 3681:23, 3682:15

**tunnels** [2] - 3647:20, 3648:1

**turn** [4] - 3619:5, 3635:12, 3635:21, 3681:17

**turned** [4] - 3680:22, 3681:2, 3688:22, 3724:13

**two** [24] - 3603:21, 3607:3, 3607:5, 3610:19, 3610:20, 3610:25, 3611:12, 3611:18, 3612:8, 3629:1, 3648:25, 3656:14, 3656:15, 3666:22, 3680:4, 3700:1, 3703:25, 3705:13, 3706:17, 3715:15, 3717:14, 3718:12, 3723:17, 3734:2

**two-by-four** [2] - 3703:25, 3706:17

**two-hour** [1] - 3700:1

**tying** [1] - 3656:2

**type** [1] - 3734:20

**types** [1] - 3662:13

## U

**U.S** [6] - 3599:14, 3600:16, 3705:16,

3720:6, 3721:13, 3722:25

**ultimately** [2] - 3643:16, 3676:6

**unable** [1] - 3608:17

**unapologetic** [1] - 3732:17

**unarmed** [1] - 3720:23

**unbarricade** [1] - 3627:16

**under** [8] - 3617:22, 3617:25, 3620:8, 3628:15, 3628:17, 3653:14, 3692:9, 3695:12

**underbrush** [1] - 3675:16

**understood** [1] - 3731:13

**unduly** [1] - 3652:22

**unfair** [2] - 3653:22, 3666:18

**unfortunate** [2] - 3605:22, 3615:22

**unfortunately** [1] - 3724:21

**unfurled** [1] - 3720:13

**uniformed** [1] - 3695:8

**uniforms** [1] - 3682:9

**unique** [1] - 3678:23

**unit** [2] - 3695:9, 3695:10

**UNITED** [3] - 3599:1, 3599:2, 3599:10

**United** [10] - 3599:12, 3602:3, 3643:10, 3666:7, 3666:20, 3681:9, 3701:18, 3705:2, 3725:14, 3736:8

**unless** [3] - 3603:10, 3663:4, 3678:18

**unlike** [1] - 3650:7

**unoffensive** [1] - 3614:10

**unquote** [1] - 3642:1

**unreasonable** [2] - 3673:16, 3673:19

**unwieldy** [1] - 3614:15

**up** [82] - 3604:5, 3604:20, 3607:17, 3608:7, 3608:10, 3608:17, 3608:21, 3610:21, 3611:21, 3613:16, 3614:17, 3615:23, 3617:3, 3618:16, 3619:6, 3620:9, 3620:13, 3620:21, 3620:22,

3621:5, 3621:7, 3621:14, 3625:19, 3628:9, 3628:12, 3631:14, 3638:13, 3639:5, 3639:6, 3647:25, 3648:6, 3649:9, 3649:19, 3650:4, 3650:25, 3652:16, 3652:19, 3657:22, 3658:4, 3658:25, 3661:13, 3662:6, 3662:12, 3662:18, 3663:15, 3667:9, 3668:20, 3668:21, 3672:11, 3672:12, 3675:7, 3675:12, 3675:15, 3675:17, 3676:1, 3676:5, 3679:18, 3680:12, 3684:15, 3686:25, 3687:7, 3688:3, 3690:2, 3690:3, 3697:2, 3698:14, 3698:23, 3699:5, 3701:24, 3702:9, 3705:7, 3706:11, 3707:7, 3710:17, 3719:2, 3721:13, 3723:8, 3724:17, 3733:11, 3733:21, 3734:7, 3735:15

**updated** [2] - 3610:4, 3693:20

**upkeep** [1] - 3690:10

**upper** [1] - 3716:25

**upset** [1] - 3629:11

**upstairs** [1] - 3683:23

**useful** [1] - 3663:21

**user** [1] - 3607:25

**user-friendly** [1] - 3607:25

## V

**vacation** [1] - 3606:7

**valid** [1] - 3662:8

**vandalism** [1] - 3731:21

**Vargas** [1] - 3625:18

**various** [7] - 3616:3, 3664:2, 3685:3, 3695:14, 3695:18, 3701:23, 3730:14

**vein** [1] - 3608:25

**verbally** [1] - 3674:20

**verging** [1] - 3646:23

**version** [4] - 3607:25, 3608:5, 3616:21, 3619:25

**via** [2] - 3629:14, 3715:10

**Vice** [7] - 3623:5, 3623:8, 3624:9, 3719:16, 3720:6, 3721:16, 3722:6

**Video** [20] - 3618:23, 3619:23, 3623:15, 3624:5, 3631:11, 3635:20, 3636:12, 3639:1, 3680:19, 3680:25, 3681:19, 3683:13, 3686:11, 3703:11, 3705:20, 3706:15, 3707:2, 3708:9, 3709:2, 3710:2

**video** [40] - 3603:3, 3603:13, 3604:14, 3607:1, 3607:17, 3607:25, 3616:16, 3618:12, 3618:16, 3618:18, 3620:1, 3624:4, 3635:17, 3652:4, 3653:13, 3655:11, 3655:12, 3659:17, 3659:18, 3663:13, 3668:25, 3682:11, 3683:18, 3702:8, 3702:21, 3703:2, 3704:6, 3704:22, 3705:18, 3705:24, 3707:14, 3708:1, 3708:24, 3709:4, 3709:7, 3709:11, 3709:15, 3709:17, 3710:8, 3734:24

**videos** [5] - 3610:21, 3632:24, 3633:2, 3634:16, 3653:2

**view** [11] - 3604:17, 3608:3, 3608:8, 3608:19, 3608:22, 3622:7, 3651:7, 3651:11, 3657:21, 3684:22, 3690:17

**viewing** [1] - 3618:13

**violence** [10] - 3641:9, 3645:9, 3645:19, 3645:20, 3646:7, 3646:11, 3667:20, 3667:23, 3667:25, 3668:4

**violent** [2] - 3667:15, 3724:8

**virtually** [2] - 3632:24, 3667:17

**virtue** [1] - 3667:11

**vis-à-vis** [1] - 3731:5

3760

**Visitor** [1] - 3664:24
**visual** [1] - 3617:2
**voir** [1] - 3660:13
**volume** [4] - 3635:21, 3653:12, 3673:2, 3681:3
**volunteered** [1] - 3705:17
**volunteering** [1] - 3705:5

## W

**wait** [3] - 3655:19, 3672:4, 3725:7
**waiting** [2] - 3615:11, 3656:15
**Waldow** [1] - 3624:19
**walk** [4] - 3635:7, 3685:19, 3701:9, 3701:17
**walked** [3] - 3606:21, 3631:3, 3639:14
**walking** [6] - 3606:4, 3618:8, 3635:4, 3658:25, 3660:7, 3699:5
**walls** [1] - 3712:23
**wants** [1] - 3604:21
**warrants** [1] - 3670:10
**Washington** [12] - 3599:5, 3599:15, 3599:21, 3600:17, 3650:1, 3664:8, 3666:4, 3701:7, 3701:17, 3731:16, 3732:14, 3736:9
**wasting** [2] - 3615:10, 3648:3
**watched** [1] - 3611:13
**watching** [2] - 3618:11, 3646:18
**ways** [3] - 3655:11, 3668:17, 3729:20
**weapon** [1] - 3658:17
**weapons** [3] - 3657:22, 3658:1, 3658:9
**wearing** [2] - 3658:3, 3663:23
**website** [1] - 3658:7
**wed** [1] - 3662:6
**Wednesday** [4] - 3609:7, 3609:17, 3610:5, 3610:9
**week** [2] - 3610:1, 3674:19
**weekend** [2] - 3616:19, 3617:13
**weeks** [1] - 3662:11

**welcome** [2] - 3617:12, 3643:12
**well-prepared** [1] - 3726:3
**West** [1] - 3600:9
**west** [31] - 3622:4, 3626:22, 3627:6, 3627:9, 3627:15, 3627:17, 3628:23, 3629:13, 3629:16, 3631:4, 3633:3, 3637:3, 3639:15, 3639:16, 3639:17, 3664:10, 3679:20, 3679:22, 3680:1, 3680:2, 3680:8, 3680:12, 3680:14, 3681:5, 3703:15, 3703:16, 3704:10, 3710:17, 3710:22
**whipped** [2] - 3658:4, 3658:7
**White** [2] - 3701:8, 3701:17
**whole** [2] - 3612:1, 3612:20
**willing** [3] - 3632:8, 3705:7, 3725:19
**win** [1] - 3646:21
**window** [17] - 3620:9, 3620:10, 3620:14, 3620:18, 3637:2, 3700:1, 3703:24, 3704:22, 3706:7, 3706:10, 3707:11, 3707:25, 3708:18, 3708:25, 3709:9, 3709:16, 3709:20
**windowpane** [3] - 3703:24, 3706:18, 3706:20
**windowpanes** [1] - 3710:5
**windows** [7] - 3621:16, 3659:4, 3689:12, 3690:2, 3709:8, 3713:11, 3721:25
**wing** [6] - 3620:15, 3620:16, 3621:4, 3621:14, 3703:16, 3715:10
**withholding** [1] - 3666:12
**witness** [35] - 3603:22, 3605:19, 3606:12, 3610:17, 3610:18, 3611:7, 3611:19, 3612:7, 3617:15, 3617:22,

3622:14, 3631:23, 3646:5, 3655:12, 3655:19, 3655:23, 3665:7, 3668:15, 3669:19, 3676:22, 3677:13, 3704:3, 3726:16, 3727:1, 3727:9, 3727:10, 3729:23, 3733:21, 3733:24, 3734:3, 3734:10, 3735:1, 3735:6, 3735:17
**WITNESS** [4] - 3601:2, 3617:19, 3618:2, 3685:14
**Witness** [1] - 3730:5
**witness's** [2] - 3612:2, 3727:5
**witnesses** [13] - 3607:4, 3607:6, 3610:19, 3610:20, 3610:24, 3610:25, 3611:5, 3611:17, 3668:20, 3669:12, 3672:13, 3672:17, 3734:2
**wonder** [1] - 3652:8
**wood** [1] - 3626:12
**wooden** [4] - 3626:10, 3626:12, 3628:10, 3684:11
**word** [5] - 3605:15, 3605:20, 3634:16, 3641:13, 3682:23
**words** [1] - 3613:20
**works** [3] - 3712:15, 3712:23, 3713:14
**world** [1] - 3648:14
**worse** [3] - 3654:4, 3654:7, 3654:8
**worth** [2] - 3712:17, 3712:20
**wraps** [1] - 3724:17

## Y

**yellow** [1] - 3614:11
**yesterday** [5] - 3611:9, 3615:16, 3631:4, 3674:5, 3674:21
**York** [2] - 3599:18, 3600:13

## Z

**Zach** [3] - 3614:10, 3616:2, 3616:3
**Zachary** [2] - 3602:5, 3614:9

**zoomed** [1] - 3665:11
**zoomed-in** [1] - 3665:11