```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.                                        1:21-cr-00175-TJK-3
                                          1:21-cr-00175-TJK-5
1-ETHAN NORDEAN                           1:21-cr-00175-TJK-6
2-JOSEPH R. BIGGS
3-ZACHARY REHL                    Washington, D.C.
5-ENRIQUE TARRIO                  Wednesday, March 1, 2023
6-DOMINIC J. PEZZOLA,             9:00 a.m.
                      Defendants.
- - - - - - - - - - - - - - - - x
```

---

### TRANSCRIPT OF JURY TRIAL - DAY 41
### *** MORNING SESSION ***
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

---

**APPEARANCES:**

For the United States:     Jason B.A. McCullough, Esq.
                           Erik M. Kenerson, Esq.
                           Conor Mulroe, Esq.
                           Nadia Moore, Esq.
                           U.S. ATTORNEY'S OFFICE
                           555 4th Street, NW
                           Washington, DC 20530
                           (202) 252-7233

For the Defendants:        Nicholas D. Smith, Esq.
                           DAVID B. SMITH, PLLC
                           7 East 20th Street
                           Suite 4r
                           New York, NY 10003
                           (917) 902-3869

                           Norman A. Pattis, Esq.
                           PATTIS & SMITH, LLC
                           383 Orange Street
                           1st Floor
                           New Haven, CT 06511
                           (203) 393-3017

                           John D. Hull, IV, Esq.
                           HULL MCGUIRE PC
                           1420 N Street, NW
                           Washington, DC 20005
                           (202) 429-6520

APPEARANCES CONTINUED:

For the Defendants:        Carmen D. Hernandez, Esq.
                           7166 Mink Hollow Road
                           Highland, MD 20777
                           (240) 472-3391

                           Nayib Hassan, Esq.
                           LAW OFFICES OF NAYIB HASSAN, P.A.
                           6175 NW 153 Street
                           Suite 209
                           Miami Lakes, FL 33014
                           (305) 403-7323

                           Sabino Jauregui, Esq.
                           JAUREGUI LAW, P.A.
                           1014 West 49 Street
                           Hialeah, FL 33012
                           (305) 822-2901

                           Steven A. Metcalf, II, Esq.
                           METCALF & METCALF, P.C.
                           99 Park Avenue
                           6th Floor
                           New York, NY 10016
                           (646) 253-0514

                           Roger I. Roots, Esq.
                           ROGER ROOTS, ATTORNEY AT LAW
                           113 Lake Drive East
                           Livingston, MT 59047
                           (775) 764-9347

Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

# C O N T E N T S

**WITNESS:**                                                    **PAGE:**

JASON MCINTYRE
Direct Examination by Mr. Mulroe.................11415
Cross-Examination by Mr. Smith..................11487
Cross-Examination by Mr. Hull...................11503

11381

1  <u>**P R O C E E D I N G S**</u>

2      THE DEPUTY CLERK:  This is Criminal Matter 21-175,

3  United States of America v. Defendant 1, Ethan Nordean;

4  Defendant 2, Joseph R. Biggs; Defendant 3, Zachary Rehl;

5  Defendant 5, Enrique Tarrio; and Defendant 6, Dominic J.

6  Pezzola.

7      Present for the Government are Jason McCullough,

8  Erik Kenerson, Conor Mulroe, and Nadia Moore; present for

9  Defendant 1 is Nicholas Smith; present for Defendant 2 are

10  John Hull and Norman Pattis; present for Defendant 3 is

11  Carmen Hernandez; present for Defendant 5 are Nayib Hassan

12  and Sabino Jauregui; present for Defendant 6 are Steven

13  Metcalf and Roger Roots.  Also present are Defendant 1,

14  Mr. Nordean; Defendant 2, Mr. Biggs; Defendant 3, Mr. Rehl;

15  Defendant 5, Mr. Tarrio; and Defendant 6, Mr. Pezzola.

16      THE COURT:  All right.  Good morning to everyone.

17      A couple of preliminary matters, some of which, I

18  think -- all -- most of which you all have already -- we've

19  already discussed.  The first one, we have not.  It's come

20  to my attention that there is, at counsel table, a large red

21  mark on the table that's been made by pen, apparently, I was

22  told by the folks who maintain our courtroom.  So I'm going

23  to ask if folks would not deface the tables, whether that's

24  counsel or the defendants.  I need you all to just make sure

25  that none of that happens.  Is that -- was there not

1    anything defacing the table?

2            MR. SMITH:  No, Your Honor.  There's a sticker

3    that's on the table that I can -- it's --

4            THE COURT:  No, I -- there's a sticker, but then

5    my -- what I was informed of, that there's some other

6    defacing --

7            MR. HULL:  Your Honor, there is a stain --

8            THE COURT:  Okay.

9            MR. HULL:  -- of some type.  It appeared in the

10   last 48 hours.

11           THE COURT:  Well --

12           MR. HULL:  I'm not sure where it came from, but

13   it's there.  You're right.

14           THE COURT:  Well, it appeared somehow at counsel

15   table.  So I'd ask you all not to deface the court's

16   property and we'll -- and, hopefully, it will be easily

17   removed, and if it's not, I'm sure we'll be in touch, but

18   this is public property, and I'd appreciate there no --

19   there not be any destruction of that property.  So that's

20   number one.

21           Number two, we -- have the parties made any

22   further -- or really, there -- I guess the only -- the place

23   we left off on this instruction was whether Ms. Hernandez

24   had any comments or objections.

25           Ms. Hernandez, do you have anything to add as to

1     the instruction?

2          MS. HERNANDEZ:  Correct.  Your Honor, I object to

3     the instruction because of the language that states that it

4     can be used to show Mr. Bertino's role in the offense.  I

5     don't believe the Government has proved the offense of

6     seditious conspiracy at this point.  And, therefore, I

7     think -- I don't want the Court -- I don't want those words

8     coming from the Court's mouth to the jury, because to me it

9     sounds like -- I understand that's not what the Court is

10    saying, but I think it can be taken to sound as if the Court

11    is making a finding that there was, you know -- the

12    offense -- the only offense he pled guilty to, other than

13    the felon in possession which has nothing to do with our

14    clients, is seditious conspiracy.  So I object.  I think

15    it's prejudicial to my client to give that instruction at

16    this time.  And I would ask the Court not to -- I would

17    object to the Court giving that instruction.  I understand

18    that's the language in Tarantino.

19         THE COURT:  Even though we -- as Mr. Roots, I

20    think, had suggested, and the Government had agreed, that it

21    would be the role in the alleged offense?

22         MS. HERNANDEZ:  So you're changing it from "the

23    offense" to "the alleged offense"?

24         THE COURT:  I'm not changing it from what we

25    discussed yesterday, and that's what I articulated

1    yesterday.

2              MS. HERNANDEZ:  Okay.  I know -- I looked at the

3    written document, and I would prefer that -- with "the

4    alleged offense," it's not as prejudicial, I agree, and so

5    if the Court's going to give "the alleged offense" -- I

6    would still object to the language, but I will not object to

7    the Court -- I object to the language.  I don't want to

8    waive the objection to the language, but I'm not going to

9    stand here and say don't -- if the other -- if the others

10   want to give it, I'll let the Court decide.

11             THE COURT:  All right.  And, Mr. Roots, then, are

12   you -- given all of that, you're fine with me giving the

13   language as we discussed yesterday?

14             MR. ROOTS:  Yeah, I --

15             THE COURT:  Again --

16             MR. ROOTS:  Yeah, I moved for mistrial over this,

17   and I think mistrial is the only appropriate remedy, but

18   Your Honor has denied that.  So yes, I do want a limiting

19   instruction.  And I agree with Ms. Hernandez.  That language

20   shouldn't really be in it because this is such a weak case

21   compared to those other cases that, sort of, crafted that

22   type of language.  So with that objection, yeah, I would

23   like a -- the limiting instruction.

24             THE COURT:  All right.  So I'll give it as we

25   discussed yesterday and we'll go from there.

1          MS. HERNANDEZ:  Your Honor, and Tarantino made

2     clear, I think, including the cases that it cites, that the

3     reason it found no plain error was because the Government

4     did not use the fact of the plea as evidence -- in arguing

5     to the jury that it was evidence of the defendant's guilt.

6     So to the extent that that doesn't happen in this case,

7     also.

8          THE COURT:  Right.  Obviously, the whole reason

9     we're giving this instruction is so that the jury

10    understands they can use it for A but not B.  And,

11    obviously, if the Government strays from that in the future,

12    you may object, number one.  And, number two, I understand,

13    as I had discussed with Mr. Roots yesterday, that he

14    disagrees with Tarantino and, as I said, that's above my pay

15    grade and we'll -- you all have that objection preserved.

16         All right.  So the first thing I'll do when they

17    come out is give, as we have discussed, as amended, the

18    instruction that Mr. Roots and the Government had suggested.

19         The third thing is what the parties have teed up

20    here regarding this five minutes of video from the crypt.

21    As I understand it -- let me just make sure I understand

22    it -- Mr. Smith, your -- it's really a 403 objection.  In

23    other words, conceptually, you think it's fine for the

24    witness to say "here's what I experienced and here's how" --

25    I am -- I haven't heard the Government on this yet, but I'm

1    anticipating that the whole point of this is to say "and

2    this explains my actions later on at the door" or in other

3    circumstances.  And you're -- you don't object, as I

4    understand it, to the officer, sort of, describing this, but

5    five minutes of video is -- or any video, maybe -- but five

6    minutes of video is -- kind of, pushes 403?

7              MR. SMITH:  Yes, Your Honor.  And we're also

8    making an objection on relevance grounds.  We don't

9    understand why the officer's position later in time at the

10   upper west terrace door would need to be explained by his

11   position later in the crypt.  And if it needs to be

12   explained, even though it's not challenged by the defense,

13   then it could be simply described without showing a violent

14   scene that doesn't involve the defendants at really loud

15   decibels, and we think that the risk of jury confusion and

16   unfair prejudice lies in the apparent suggestion that these

17   two events are connected, Mr. Nordean's entry into the

18   building and this scene in the crypt, and we think it's

19   consistent with the Court's prior rulings.  The Court said

20   it would give the Government some leeway to prove a civil

21   disorder offense.  We've seen a lot of that in this trial.

22   And I just -- I think it's cumulative.  I think it's

23   irrelevant and it causes jury confusion.

24             THE COURT:  Okay.  I mean, I actually don't think

25   we've seen -- we -- the vast majority of what -- I don't

1    think the Government's offering it for that purpose, but

2    we'll find out, but --

3            MR. HULL:  (Indicating.)

4            THE COURT:  I see you, Mr. Hull.

5            -- but I don't think we've seen, you know -- short

6    of excising, you know, your clients from the rest of the

7    people that were around them, I actually don't think we've

8    seen that much that isn't somewhat tangential to your --

9    where your client -- basically, the -- that -- the Peace

10   Circle and west front.

11           Before I hear from Mr. Hull, let me just have the

12   Government at least articulate why they -- what they --

13   what their -- the basis -- the relevance basis and then, in

14   particular, you know, five minutes is a long time.  So let

15   me hear from the Government on that.

16           MR. MCCULLOUGH:  Thank you, Your Honor.

17           The -- so there are -- in terms of the relevance,

18   Mr. Smith has indicated both in, kind of, pretrial filings

19   that officers at the upper west terrace door had let

20   protesters in and that they effectively stood aside as

21   protesters made their way into the building and that, you

22   know, kind of, all of this was, you know, kind of,

23   non-violent, et cetera.  We've also heard other openings

24   with respect to the idea that officers were ill-prepared;

25   poorly trained; kind of, that litany of items.  And so, Your

1    Honor, this -- I mean, this testimony from this officer, he

2    will explain the series of events that brought him to that

3    upper west terrace door at 2:36 p.m., approximately, when

4    Mr. Nordean entered.  And this officer's ability to testify

5    to that through his experience and explain what his

6    experience was outside when he was assaulted, what his

7    experience was inside the crypt, and then what brought him

8    to the upper west terrace door, is, frankly, powerful

9    evidence to allow the jury to understand, you know, kind of,

10   how, you know, these two people end up meeting at the upper

11   west terrace door, if you will.  And so it -- I mean, just

12   the relevance is -- frankly, I think it's just evident on

13   its face.

14         In terms of the --

15         THE COURT:  Just to -- and to put a finer point on

16   it, to explain why the -- regardless of -- I'm not sure it's

17   relevant one way or the other what positions Mr. Smith has

18   taken in pretrial filings one way or the other, but I agree,

19   from what I can recall has been admitted, there has been --

20   I mean, the jury might well look at the scene of Mr. Nordean

21   entering and wonder -- and it appears as though -- I --

22   let's put it this way.  The -- this particular officer does

23   not step in front of him and attempt to stop him from

24   entering for whatever reason.  And your point is this

25   explains at least what was going on in his mind at that

```
 1    time?
 2              MR. MCCULLOUGH:  Exactly.  And he -- I mean, and
 3    his ability to communicate that to the jurors is very
 4    important.  And, Your Honor, the -- so with respect to the
 5    evidence of what happens in the crypt, there are a number of
 6    competing factors, but let's just stay right with the
 7    officer for the moment.  The officer can, of course,
 8    describe -- and he will describe -- how loud it was in the
 9    crypt, and he will describe the fact that protesters were
10    yelling at him as he was there, and what the video shows is
11    really the sheer volume of the crowd as compared to the
12    officers, which is an important factor that day; right?  The
13    number of individuals that were there, it really gives a
14    sense of that.  It gives a sense of the level of agitation
15    of the protesters and the fear that these officers had.
16    And, in fact, if Your Honor's had an opportunity to watch
17    the video, it has very -- it actually shows, in a very close
18    image, one of the officers who's there who, quite frankly,
19    Your Honor, it -- this is one of those situations where a
20    picture is worth a thousand words.  The fear in his eyes is
21    clear -- or at least apprehension.  I'm not going to put my
22    spin on it, but I'll tell you it allows you to really
23    humanize the officer, and that is important because that --
24    not only that officer, but that officer who is, kind of,
25    depicted very closely is also at the upper west terrace
```

1    door.  So he's two of the five officers who are up there.

2    It's a very important way to, kind of, demonstrate what they

3    went through that day.

4            Beyond that, the sound, the noise, and then the

5    sudden rush of the rioters, it's actually -- it's important

6    because it also explains the actions of the five officers

7    who were at the upper west terrace door.  The idea that you

8    can be standing there with a large crowd on the opposite

9    side of you and then it breaks and it becomes a -- frankly,

10   Your Honor, a life-threatening situation.  And so it is that

11   video evidence that -- frankly, he can say that, but the

12   video is going to show that and it will -- it's powerful

13   evidence that really allows the jury to understand what's

14   happening in that crypt, what this officer experienced prior

15   to arriving at the upper west terrace door.

16           With respect to the -- Mr. Nordean's view of, you

17   know, the potential risk of confusion, Your Honor, there

18   is -- Mr. Smith has very artfully, throughout this trial,

19   explained when things happened before and after, before and

20   after.  I have no doubt that we'll see that again with this;

21   that what happened in the crypt happened before we got to

22   the upper west terrace door.

23           THE COURT:  Well, not just --

24           MR. MCCULLOUGH:  And --

25           THE COURT:  -- not -- to be fair, not just before,

1    not just temporally, but that none of these defendants were

2    there.

3              MR. MCCULLOUGH:  Right.

4              THE COURT:  Right.

5              MR. MCCULLOUGH:  And so it will be very evident

6    that none of these defendants were there because, you know,

7    we're going to go from that experience to the upper west

8    terrace door where we, then, see Mr. Nordean.  So you

9    know -- and he'll explain, Yeah, I, you know -- this

10   happened and then, several minutes later, I end up at the

11   upper west terrace door.  And there, in comes Nordean.  And

12   we'll identify Nordean.  He, of course, doesn't know who he

13   is, but we'll make that very clear in the description.  So

14   that's the officer's experience.

15             Beyond that, Your Honor, in terms of, kind of,

16   demonstrating the riot -- I mean, I -- this is not, kind of,

17   our primary purpose of it, but it is incredibly relevant,

18   and in terms of the position of the crypt vis-à-vis the

19   first access to the building -- so the Senate wing door, as

20   Your Honor knows has been a focus of the testimony, which is

21   cracked at 2:11; breached at 2:13.  Now, Mr. Pezzola goes

22   left with members of the crowd; other people go right.

23   Turning right takes you into the crypt.  And so the people

24   that are, you know -- the people that enter the building and

25   this line of officers holds off, this is that, you know,

1    kind of, second group.  And, you know, in terms of, you

2    know, risk of confusion, again, the person who enters the

3    building at 2:13, we know where he went.  We've described

4    that -- Inspector Loyd described where he went, up into the

5    Ohio Clock Corridor.  So there's no risk of confusion in

6    terms of, were any of these individuals involved in that?

7    But the idea that, yeah, this is what happened when those

8    floodgates opened -- this group went right; this group went

9    left -- he's not going to testify to any of that, but, Your

10   Honor, we have the ability to put that evidence in right now

11   with an officer who has first-hand knowledge of that

12   experience and then, you know, we get to argue that in terms

13   of the way that -- what happened there that day.  And it's

14   an important component of it in terms of demonstrating the

15   civil disorder and the amount of -- the numbers that were

16   there that day.

17            THE COURT:  Is -- the officer will say, "This five

18   minutes reflects, you know -- I was there during this five

19   minutes and this reflects what I experienced"?

20            MR. MCCULLOUGH:  Oh, yes, Your Honor.  Yes.  The

21   officer was there.  The officer will describe being to the

22   right side of the screen as this happened.  He will describe

23   attempting to hold the line.  He will describe the way that

24   the crowd let loose on him and how his body became pinned up

25   against a wall and he was unable to move until the crowd

1    gave way and he was able to move.  And then he will describe

2    how he saw an officer who appeared to be by himself and went

3    to help that officer and that's what ultimately led him to

4    the upper west terrace doors.

5            THE COURT:  Okay.

6            MR. MCCULLOUGH:  And, Your Honor -- and I also

7    just -- I'll just note, we do not intend to play -- we will

8    play a significant part of the five-minute video, but we do

9    not intend to play five minutes straight through.  It's --

10   it is the entire video.  We do intend to play, I believe,

11   from the starting point to 2:36, thereabout.  Ms. Rhode's

12   got my notes, as well.  And then we'll pick up again towards

13   the end.  So we're not playing the full five-and-a-half

14   minutes.  It's probably closer to about 3 or 3:15.  But, you

15   know, I realize that that's, kind of, a distraction, you

16   know?  I think the, you know -- the focus of this argument

17   is, is it relevant?  Is it prejudicial?  And, Your Honor, I

18   think, you know -- kind of, going away, on all fronts, I

19   think this is just evidence that the jury deserves to see.

20           THE COURT:  Mr. Smith?

21           MR. SMITH:  Thank you, Your Honor.

22           There was a Government witness who testified about

23   this exact moment when Mr. Nordean entered the upper west

24   terrace doors.  It was Officer Loyd.  And the Court will

25   recall that we did not cross-examine Officer Loyd in a

1    manner to suggest that the officers had allowed Mr. Nordean

2    to enter the building.  The cross-examination was about

3    whether Mr. Nordean used force or physically interfered with

4    those officers.  Now, Officer Loyd responded, That's the

5    sign of a defeated police force.  But I commented at the

6    time, Those are your words; those are not ours.  And we did

7    not, at any point, suggest that those officers were derelict

8    in their duty.  So what you heard from Mr. McCullough was an

9    explanation for -- a preemptive defense of a suggestion that

10    hasn't been made.  That might be appropriate for redirect,

11    if Mr. Nordean were to cross this witness and Mr. -- Officer

12    Riggleman and say, Well, didn't those officers allow the

13    defendant to enter the building?  Weren't they consenting to

14    that?  Then perhaps what Mr. McCullough said to explain the

15    terror in the officer's mind [sic] would be appropriate, but

16    we're not -- we haven't done that.

17              THE COURT:  But isn't that -- I mean, it -- some

18    of the offenses here are trespassory.  And isn't it a fair

19    thing for the jury to wonder -- to look at that video and

20    think, Well, why -- if -- why wasn't -- why didn't the

21    officer do that?  I mean, isn't it a fair -- just from the

22    video of what happened, isn't it a fair thing for the

23    Government to be able to put on evidence to explain what was

24    going on in that officer's mind when he -- I can't remember

25    what it showed exactly, but when he more or less did not

 1   stop Mr. Nordean?

 2          MR. SMITH:  Well, Your Honor, that could be fair,

 3   but we think the length of the video that's being shown and

 4   its, kind of, dramatic and inflammatory nature is --

 5   outweighs -- substantially outweighs whatever probative

 6   value that has when it's not being attacked by the defense.

 7          THE COURT:  All right.

 8          MR. SMITH:  We're --

 9          THE COURT:  All right.  Fair enough.

10          Mr. Hull, and then Ms. Hernandez.

11          MR. HULL:  Thank you, Your Honor.  Dan Hull for

12   Joe Biggs.

13          I would agree with Mr. Smith that this is highly

14   prejudicial and confusing.  Under 403, I don't think you

15   need to get there.  When I first saw this, I was wondering

16   how we ever got to a point where something in the crypt like

17   this video could appear anywhere in this case.  We've lost

18   the plot if this comes in.  These gentlemen, all of them,

19   are here because they were leaders.  That has been the north

20   star of this case since the very beginning, since

21   detention-land we were in two years ago.  It's what's kept

22   them where they are right now.  And I think to -- at this

23   point, to suggest to the jury that -- and they would take it

24   this way, as smart as I think they are -- that somehow we

25   were part of the violence there or the -- our individual

1    defendants were is pushing this a little far --

2              THE COURT:  Well --

3              MR. HULL:  -- even under tool theory.

4              THE COURT:  Mr. Hull, let me just stop you right

5    there, though.

6              MR. HULL:  Yeah.

7              THE COURT:  We have spent a lot of time on the

8    conspiracy aspects of this case, no question, but if you

9    look at the indictment, there are many charges that are

10   not -- that don't link up with the conspiracy at all, some

11   that are, you know -- the evidence of some may be stronger

12   than others, but the -- and for you to say, Well, none of

13   our clients -- I mean, one of your clients, you know, is

14   charged with breaking the window that let in a heck of a lot

15   of people or at least being one of a couple of people who

16   did.  I guess my point is just the case isn't -- I know

17   we've spent a lot of time -- all of us have spent a lot of

18   time and effort on the conspiracy aspect of this, but there

19   are charges beyond the conspiracy that the Government still

20   has to prove up or has to try to prove up.  I have to allow

21   them to try to prove up.  Isn't that fair?

22             MR. HULL:  Your Honor, I disagree.  Breaking the

23   window is the -- that's alleged in the indictment is the

24   most violent thing alleged with respect to these defendants

25   once they get into the Capitol.  And I really think that,

11397

1   you know, the jury has every reason to think at this point

2   that, you know -- they come -- let's face it, they all came

3   in with certain ideas about the Proud Boys -- most of us did

4   before we knew anything about the case -- certain kinds of

5   stereotypes.  They are likely to think that, from looking at

6   this -- even a more-than-intelligent D.C. juror -- that, in

7   fact, these gentlemen were part of the kind of melee inside

8   the Capitol that you see here, and that's just not correct,

9   and not only that, as, I think, Mr. Smith has pointed out,

10  we are -- in terms of my client, Joe Biggs, I think we're at

11  least two or three floors away from this activity depicted,

12  and in the case of everyone else, probably one or two.  I

13  don't see how it could come in, again, and I think it, sort

14  of, shows how we have strayed away from, you know, the story

15  we're all trying to tell from, you know, different points of

16  view here.  This should not come in.  It has nothing to do

17  with our clients.  I'm not sure that there -- it has

18  anything to do with even Proud Boys, but it's -- even under

19  the wildest extrapolation of tool theory, I just don't think

20  it's appropriate.

21          THE COURT:  All right.  Ms. Hernandez?  You had

22  your hand up.

23          MS. HERNANDEZ:  So Your Honor, I -- obviously, I

24  agree with all the arguments made by Mr. Smith and Mr. Hull,

25  but I additionally said this item is not relevant and, as

 1    described by Mr. McCullough, it's not relevant at all to

 2    Mr. Rehl.  I mean, he's linking Officer Riggleman's

 3    testimony to whatever happened when Mr. Nordean entered the

 4    Capitol.  My -- Mr. Rehl is not entering the Capitol through

 5    there.  So I'm making a 401 argument -- a separate 401

 6    argument.  It's not relevant to Mr. Rehl at all.  The

 7    description, as described by Mr. McCullough -- I mean, he,

 8    kind of, proves the 403 point.  He's talking about the

 9    officer -- the fear in the officer's eyes and all of that.

10    That sounds pretty unduly prejudicial, particularly when

11    none of the defendants were involved in the violent or

12    hand-to-hand clash that led to the officer having fear in

13    his eyes.  So I would object on 401 and 403 grounds.

14              With respect to the civil disorder argument -- I

15    mean, I think there's been more than enough evidence to

16    support a civil disorder.  I mean, we have watched multiple

17    videos of the events in the stealing of the -- or the taking

18    of the officer's shield and all of that.  I mean, there were

19    multiple videos of what --

20              THE COURT:  But that's --

21              MS. HERNANDEZ:  -- happened, the --

22              THE COURT:  But --

23              MS. HERNANDEZ:  -- confrontation there, the --

24              THE COURT:  Let me just -- just, though, to make

25    this point, that was relevant to another charge.  That's

```
 1    not -- I mean --
 2              MS. HERNANDEZ:  Well --
 3              THE COURT:  -- right?  So --
 4              MS. HERNANDEZ:  Well, but the civil disorder, it
 5    seems to me, it's -- that particular series of videos where
 6    they are showing Mr. Pezzola supposedly and I think
 7    Mr. Greene was in that, that's much more relevant -- because
 8    some of the defendants were involved -- to any kind of
 9    charge, including civil disorder, than this one would be.
10    So in terms of the 403, you know, one of the 403 factors is,
11    you know, the necessity for that evidence.  I think -- I
12    mean, I -- my argument would be, obviously, on the civil
13    disorder -- is my client's participation in that, but I
14    don't -- I think the Government has proved there was civil
15    disorder that day.  I don't --
16              THE COURT:  All right.
17              MS. HERNANDEZ:  I mean, I --
18              THE COURT:  All right.
19              MS. HERNANDEZ:  Allegedly, but I'm just saying I
20    don't -- so I'm objecting, 401, 403.  And then, I guess, if
21    the Court rejects it, I'd move for severance.
22              THE COURT:  All right.  So let me just --
23              MR. MCCULLOUGH:  Your Honor --
24              THE COURT:  I'll just -- did -- I'm sorry.  Who
25    just spoke?
```

```
 1              MR. MCCULLOUGH:  (Indicating.)

 2              THE COURT:  Mr. McCullough?

 3              MR. MCCULLOUGH:  Yes.  Just to -- one item on the

 4    record.  Mr. Smith represented that he did not ask about the

 5    officers themselves and their duties.  He did -- I can point

 6    to the transcript.  I can cite a number of lines, Page 3795,

 7    where he asked a number of questions of Inspector Loyd about

 8    the officer's performance that day:  How would you

 9    characterize their attitude towards the protesters at this

10    point?  Do you witness any of these officers attempting to

11    arrest any of those individuals -- arrest any of these

12    individuals?  Instruct them to leave the Rotunda?  So --

13              THE COURT:  But was that -- that's the -- but

14    that's -- okay.  Fair enough.

15              MR. MCCULLOUGH:  This is this upper west terrace

16    door event.  This was speaking about this officer, Officer

17    Riggleman; Officer Lopez; Millard.  This is this group that

18    he is questioning their conduct in terms of what they were

19    doing.  It is -- multiple pages which I could cite for Your

20    Honor, but that was absolutely put at issue by Mr. Smith in

21    terms of his questioning of Inspector Loyd.  He is

22    absolutely correct -- Mr. Smith, as he often is -- that with

23    respect to the question about Mr. Nordean specifically,

24    sure.  Was Mr. Nordean acting violently?  But with respect

25    to the questioning as to the officer's performance at that
```

11401

1    door, it was very much a series of questions about their

2    non-performance.

3            THE COURT:  All right.  I'll give Mr. Smith an

4    opportunity to respond.

5            MR. SMITH:  Your Honor, I think our response is

6    that that's not what we said.  We said that we didn't

7    question the -- whether the officers had been derelict.  We

8    were trying to establish that Mr. Nordean had not used force

9    or had, you know, physically interfered with the officers.

10   There's a difference between that line -- that logic and the

11   logic that the officers had not complied with their duties

12   or had consented.  So that's what we meant, Your Honor.

13           THE COURT:  And what are the questions you were

14   reading off, Mr. McCullough, from the transcript?  I can see

15   you looking at something.  So I assume it's a transcript.

16           MR. MCCULLOUGH:  It is a transcript, Your Honor.

17   Yeah.  I mean, I think these -- I think they absolutely go

18   to the officer's performance.  I -- Mr. Smith:  And so I'm

19   going to draw a circle around some of these law enforcement

20   officers on the left side of the screen.  Do you see them?

21   And he's pointing to Millard, Officer Junior [ph], Officer

22   Seresa [ph], who are on the left side as opposed to Mr. --

23   Officer Riggleman who's on the right side.  I'm going to

24   draw a circle around some of these law enforcement.  How

25   would you characterize their attitude toward the protesters

1    at this point?  This is as the rioters are streaming inside.

2    Do you witness any of these officers attempting to arrest

3    any of these individuals or -- arrest any of these

4    individuals?  Instruct them to leave?

5            I mean --

6            THE COURT:  All right.  I think, look, regardless

7    of -- I don't want to pin this all on those questions, to be

8    honest.  I mean, I think -- look, I think -- a couple of

9    things.  As far as the relevance goes, I do think the

10   Government gets a little leeway to be able to have an

11   officer who was -- who, at least as to Mr. Nordean, was

12   present and has been, kind of, part -- present when he

13   entered and allow that officer to explain why he took the

14   actions he took or why he did not take the actions he did

15   not take and -- so that's number one.  And, frankly, it

16   sounds like the door was cracked a bit to this, but even if

17   it hadn't been, I think explaining -- the officers

18   explaining why they acted the way they did, particularly

19   given the panoply of types of offenses that are charged

20   here, including trespassory offenses, it -- the Government

21   gets some leeway to -- for them to explain that.  Number

22   one.  Number two, then the question is -- and I think even,

23   on some level -- I think most of the defendants, sort of,

24   concede that on some level.

25            Then the question is, well, is this -- is the

1    video itself -- does it pass 403?  And I think, look, it --

2    what happened that day -- let's put it this way.  These

3    officers went through -- a lot of folks did -- a very

4    traumatic experience that day and -- some of them did,

5    anyway -- and allowing the officer to say "look, this is

6    what I experienced and this affected how I responded later

7    on," I think, is fair game.  I think -- in other words, it's

8    an extraordinary situation that people -- that officers were

9    there and folks were coming into the Capitol.  I think they

10   get to put on, you know, extraordinary evidence or, kind of,

11   evidence that captures exactly why the officers felt the way

12   they did that day.  There would be -- I, you know -- I'm

13   glad to hear we're not going to hear all five minutes of it,

14   but I do think it passes 403.  And I think the other thing

15   is the danger -- I think it's very -- it will be very easy,

16   both in how the Government introduces it but then, also, as

17   far as cross-examination goes, to make clear that none of

18   the defendants -- this is all coming in for the officer to

19   be able to explain how the officer acted, and the

20   defendants -- you all are going to be able to cross the

21   officer and make clear this had nothing to do -- at least

22   these other incidents had nothing to do with your clients.

23          Ms. Hernandez made a separate 401 argument and a

24   motion for severance.  I mean, I've denied the motion for

25   severance before, and I don't think this changes those --

1    that rationale.  There is going to be evidence -- there has

2    been evidence of all different stripes that is relevant to

3    one defendant that is not relevant to the other defendants.

4    Again, I don't think that's going to be confusing to the

5    jury.  Apparently, this is all going to focus on

6    Mr. Nordean's entrance into the building and, obviously, it

7    won't be relevant directly to Mr. Rehl, but that's not a

8    reason for me to not admit it, and I don't think I have

9    grounds to sever at this point.  So I am going to allow it

10   and we'll go from there.

11            MR. PATTIS:  (Indicating.)

12            THE COURT:  Yes, Mr. Pattis?

13            MR. PATTIS:  Judge, lest this go unsaid, in re red

14   mark, because this case is so widely reported and there is a

15   suggestion that we were less than careful with the public's

16   property, I'd invite the Court to come down and view the

17   mark.  It is perfectly symmetrical and appears in --

18   identical in form to stickies that are over here.  And it's

19   not a mark that was made at -- from all -- from appearance's

20   perspective -- view, deliberately or with an intent to

21   deface public property.  And a sense of alarm arose on our

22   side of the aisle when the Court suggested we might hear

23   from someone otherwise.  I've not observed anyone be

24   careful -- be careless with the public property or intend to

25   defame [sic] it.  So we would invite you to come to view it,

 1    because we're concerned that you might think we've been

 2    disrespectful to this room or the government's property.

 3            THE COURT:  I will take you up on your offer, but

 4    not now, number one, or have the court staff report back to

 5    me.  But let me just -- so you -- to clarify, what you're

 6    saying is you think this mark was caused by a stickie placed

 7    on the table?

 8            MR. PATTIS:  No.  I don't know what it was --

 9            THE COURT:  Okay.

10            MR. PATTIS:  -- caused by.  Apparently -- I'm told

11    it was here on Monday.  I'm sitting here at a point -- at a

12    place that I don't customarily sit, but as luck would have

13    it, there is a chartreuse-colored stickie that appears to be

14    about an inch-and-three-quarters square and it perfectly

15    covers the area that is a chartreuse mark.  There's a corner

16    torn off, but be- -- the -- because of the fact that it's

17    a -- because it's a perfect match and nothing that we're

18    able to do here defaces it by applying moisture and whatnot,

19    I don't know how to account for it, but if that's the mark

20    it's just weird and --

21            THE COURT:  All right.  I'll just -- fair enough.

22    And I'll just say for the record, no one else is using this

23    courtroom and, obviously, no one else is sitting at that

24    table other than the defendants and the defense counsel.

25    We'll get to the bottom of it.  And, again, I don't know --

1    we'll have court staff look at it and see if it can't be

2    remediated, but I hear -- I understand the point you're

3    making.

4          MR. HULL:  Your Honor, Dan Hull for Joe Biggs.

5          I was going to ask you to reconsider your 401

6    ruling, and I would ask you -- I -- to do that before we got

7    on to staingate, but I -- I don't see why this video --

8          THE COURT:  Hold on one second, Mr. Hull.

9          MR. HULL:  Yeah.

10          THE COURT:  Counsel, I reprimand all of you for

11    not being at attention while one of your brethren is

12    speaking.

13          Mr. Hull?

14          MR. HULL:  I fail to see how this video, under any

15    stretch of 401 in this case, comes in.  This is the best --

16    and you don't see a lot of them -- 401 objection for

17    exclusion that you see.  Things don't get excluded much

18    based on relevance.  And I'm also intrigued by the notion

19    that somehow, we need to show -- I'm not sure exactly how to

20    analyze this -- we need to show -- or the Government -- it

21    feels it needs to show how the officers were reacting.  The

22    officers -- the entire Capitol Hill police force is there to

23    protect that perimeter, and what they're acting like once

24    the perimeter is, you know, breached and there's a secondary

25    breach going into the building -- seems to me to be even

```
 1    less relevant than the crypt video.  So this is not a
 2    personal injury case.  These are people who were trained a
 3    lot of times in Quantico-type settings.  And I find it --
 4    I -- almost unfathomable that we would have -- no -- we have
 5    evidence about how the cops are reacting when it's their job
 6    to protect the perimeter.  That said, I'll get off that.  I
 7    would ask you to reconsider.
 8             On staingate -- let's get back to it -- those are
 9    my chartreuse -- I'll have to admit -- Post-it notes.  So
10    we'll get that -- it's a res ipsa loquitur kind of thing, I
11    think.
12             THE COURT:  All right.  A ray of clarity, then, on
13    that.
14             MR. SMITH:  (Indicating.)
15             THE COURT:  Mr. Smith --
16             MR. SMITH:  Just for the record really quickly, we
17    received this morning, three minutes before the hearing, a
18    document from the next witness --
19             THE COURT REPORTER:  Slow down.
20             THE COURT:  Hold on.
21             MR. SMITH:  Yeah.
22             THE COURT:  All right.
23             MR. SMITH:  At -- early this morning, shortly
24    before the hearing, we received notes from the officer -- or
25    the Architect of the Capitol employee, McIntyre, the next
```

1    witness, indicating -- concerning the black fence he's going

2    to testify about.  The notes have -- appear to show what

3    sections of the fence were used on the morning of

4    January 6th.  The notes indicate how long each fence segment

5    is by inch.  So Your Honor, the problem that's posed for the

6    defense is I've been furiously attempting to do the math

7    here and figure out, you know -- reverse-engineer whether

8    this fence that was used on January 6th is the same fence

9    that was purchased in 2008 by the Architect of the Capitol.

10   We have just two data points on that purchase order which is

11   the length -- the total length, 328 linear feet, and the

12   total cost which is $32,000.  So Your Honor, we're in a --

13   we're, kind of, in a tight spot here.  We have -- we were

14   just given relevant information that would allow us to

15   impeach a witness and, you know, we're scrambling here

16   with --

17              THE COURT:  It -- look, it -- it's the witness's

18   notes?

19              MR. SMITH:  No --

20              THE COURT:  You said --

21              MR. SMITH:  Your Honor, we're not sure -- I

22   believe that Mr. Mulroe will represent that these notes were

23   found in the Architect of the Capitol records this morning.

24   But, Your Honor, we're, kind of -- this is a key issue in

25   the case, how much damage might have been caused to one

1    fence segment; therefore, one needs to know how long the

2    fence segment is, and we just got this, Your Honor.

3                THE COURT:  I don't know what it is.  How many

4    pages is it?

5                MR. SMITH:  It's two pages, Your Honor, but the

6    problem is not the number of pages; it's the calculations.

7    We just have inches now for various segments and we have --

8    it's broken down into fence segments on the north side,

9    center out, and south side from center out.  So we have

10   to -- Mr. Mulroe represents he believes that the fence at

11   issue, the segment, was the north side, center out, but

12   then, Your Honor, there's about 20 entries for different

13   fence segments in inches which --

14               THE COURT:  Why -- I hear what you're saying.

15   You're going to be able to cross the witness until the cows

16   come home about this document; right?

17               MR. SMITH:  But, Your Honor, I would have to do

18   the math, you're saying, in real time?

19               THE COURT:  I don't know why you need math to ask

20   the witness -- I understand why, ultimately, you need the

21   math, but my point is if -- I guess you -- all the -- you

22   have two pages of information.  I don't understand why you

23   can't just use it to question the witness along all the

24   lines you would like and leave the math for later.

25               MR. SMITH:  So Your Honor, the witness is going to

1    testify, I believe, that there was a purchase order in 2008

2    for 30- -- for $32,000 paid for approximately 32 -- 328

3    linear feet of fencing.  Then, Your Honor -- and Mr. -- I

4    believe the witness is going to represent that each foot of

5    fencing works out to about $97 per foot.  Then we have a

6    representation from the Architect of the Capitol that

7    each -- setting aside the total cost of $32,000, each

8    segment of the fence would cost around $3,700.  So --

9            THE COURT:  Sounds like a good question to ask

10    this witness, how that can be.

11            MR. SMITH:  Well, then, Your Honor -- then we got

12    the actual lengths of the fences used on January 6th and we

13    have to put the inches into feet and then calculate whether

14    this is the same size as the fence for the purchase order in

15    2008.  Does Your Honor understand what I'm saying?  So we

16    don't -- we have no evidence in the record showing that the

17    fence that was broken is the same fence that corresponds

18    with the 2008 purchase order unless we do the math on this

19    page to calculate it.  I'm struggling -- I'm trying to do

20    the math right now --

21            THE COURT:  Okay.

22            MR. SMITH:  -- but we haven't had any time.  We're

23    trying to object -- correspond, you know -- argue with the

24    Court about different issues.

25            THE COURT:  Okay.  How long is this witness's

11411

```
 1    direct going to be, Mr. Mulroe?
 2              MR. MULROE:  I would put it at about an hour to an
 3    hour-and-a-half --
 4              THE COURT:  All right.  So we're --
 5              MR. MULROE:  -- on the longer end.
 6              THE COURT:  We're at least going to have one break
 7    and, maybe, the lunch break.  So let -- we'll cross that
 8    bridge when we cross to it.
 9              MR. ROOTS:  (Indicating.)
10              THE COURT:  Mr. Roots?
11              MR. ROOTS:  Yeah.  Even during direct, we would
12    object to some invoices.  There are a lot of redactions.
13    We've been provided with different invoices regarding both
14    the window issue, which we're also challenging the $1,000
15    amount, and the fence.  We've been given some -- but by the
16    way, every single invoice we have has different numbers and
17    there are redactions.  The vendor's name is redacted.  So
18    this is a violation of our right under the Sixth Amendment
19    to confront our accusers.  We will object to all that
20    redacted stuff on confrontation grounds.  We haven't been
21    able to -- they're going to put the representative of the
22    Architect of the Capitol on to talk about numbers and costs.
23    We are not able, because the -- of all these redactions, to
24    bring the vendor in to -- we don't even know the vendor.
25    And so this is a violation of the confrontation clause and
```

1     we will object to all that.

2          THE COURT:  Have -- so I mean, I might have --

3     I -- you might have made your objection before one minute

4     before we're about to have the witness take the stand, but

5     let me just ask this.

6          Have these items been produced -- have -- in

7     unredacted form to the defense or are these redactions

8     things that they have been part of what you produced from

9     the beginning?

10          MR. MULROE:  Your Honor, the redactions have been

11     produced from the beginning, and the redactions are on the

12     documents as we, the Government, received them from the

13     Architect of the Capitol which I understand to be part of

14     the legislative branch.  So I don't think that we have any

15     issue of Mr. Roots or any other defense counsel asking the

16     witness about what's under those redaction boxes.  I think

17     it is the name of the vendor for the glass and then other

18     certain internal proprietary information for the Architect

19     of the Capitol, but we just don't have the unredacted copy

20     to produce even if we wanted to.

21          THE COURT:  All right.  So look, I --

22          MR. ROOTS:  It's still a violation of the

23     confrontation clause.

24          THE COURT:  It can't -- but it can't be -- the

25     redactions -- the Government has turned over -- or

```
 1        Mr. Pattis will appreciate my correction.  The -- at least

 2   the executive branch has turned over everything they have to

 3   you; right?  So the fact that another branch of

 4   government -- or let's say it was -- a private actor

 5   redacted something and then gave it to the Government.  The

 6   Government turns it over to you.  They can't make the

 7   redaction magically disappear.  So I think, for now -- I

 8   mean, look, you -- there are other sorts of ways for you to

 9   get at that information, of course.  You can ask the

10   witness, for starters, but then there's, obviously, other

11   tools you had and have at your disposal, but I don't think

12   that's a reason for them not to be able to put on this

13   witness and we go from there.

14            Let's bring in the witness and the jury.

15            (Brief pause.)

16            THE DEPUTY CLERK:  Jury panel.

17            (Jury returned to jury box.)

18            THE COURT:  All right.  Everyone may be seated.

19            Let me have counsel just pick up the phone for one

20   moment for a bench conference.

21            (Bench conference:)

22            THE COURT:  I just want to make sure that no

23   counsel -- all right.

24            (Brief pause.)

25            Can I have everyone's attention up here.  I just
```

1    want to make sure no counsel are -- have concerns about me

2    giving the instruction that we talked about with the witness

3    in the courtroom and on the stand.  Obviously, they're, kind

4    of, disconnected issues, but ordinarily I wouldn't give an

5    instruction with a witness already having taken the stand.

6    Does anyone object to that?  Is there any objection to that?

7            MR. HULL:  No, Your Honor.

8            THE COURT:  All right.  I just --

9            MS. HERNANDEZ:  Your Honor, I'm sorry, just -- I

10   guess you could make clear to the -- it has nothing to do

11   with this witness.

12           THE COURT:  Sure.

13           MS. HERNANDEZ:  Yeah.  And, Your Honor, also, I'm

14   sorry.  What happened over there right before you --

15           THE COURT:  The juror fell off his seat.  He fell

16   and he was helped by his fellow juror and another individual

17   there.  The juror fell from his seat.

18           All right.  No objection to that?  All right.

19   Very well.

20           (Return from bench conference.)

21           THE COURT:  All right.  Welcome back, ladies and

22   gentlemen.

23           Before we go any further -- and this has nothing

24   to do with the witness who you'll hear from next -- but I'm

25   going to -- I have another instruction for you.

```
 1              You have heard testimony that certain witnesses --
 2    namely, Matthew Greene and Jeremy Bertino -- pled guilty to
 3    certain charges related to January 6th.  The evidence
 4    regarding their guilty pleas was admitted for limited
 5    purposes relating to those witnesses' credibility or those
 6    witnesses' acknowledgement of their role in the alleged
 7    offense.  You may not use the fact that either witness
 8    entered a guilty plea, nor the fact that I accepted those
 9    pleas, as evidence of the guilt of any defendant on trial in
10    this case.  I will instruct you further at the end of the
11    trial regarding your consideration of testimony from a
12    witness with a plea agreement.
13              And with that, the Government may call its next
14    witness.
15              MR. MULROE:  Thank you, Your Honor.
16              The United States calls Jason McIntyre.
17    JASON MCINTYRE, WITNESS FOR THE GOVERNMENT, SWORN
18                      DIRECT EXAMINATION
19    BY MR. MULROE:
20    Q.  Good morning, sir.
21    A.  Good morning.
22    Q.  Please start by introducing yourself to the jury,
23    stating your full name and spelling your last name.
24    A.  Good morning.  My name is Jason McIntyre.  J-A-S-O-N;
25    McIntyre, M-C-I-N-T-Y-R-E.
```

1    Q.  And, Mr. McIntyre, that microphone stem is adjustable

2    and the base is movable.  So feel free to position that

3    whichever way is going to let you to speak directly and nice

4    and close to the microphone.

5            Mr. McIntyre, where do you work?

6    A.  I work for the Architect of the Capitol.

7    Q.  Architect of the Capitol; is that a single person or is

8    that an entity?

9    A.  It's a legislative branch agency.

10   Q.  What's your position with the Architect of the Capitol?

11   A.  I am the deputy superintendent for the United States

12   Capitol and Capitol Visitor Center.

13   Q.  I want to ask you a little bit about the Architect of

14   the Capitol generally.  What is the Architect of the

15   Capitol?

16   A.  We are a legislative branch agency made up of about

17   2,500 employees, and we are responsible for the care,

18   maintenance, historic preservation, and construction

19   activities that occur both in the United States Capitol as

20   well as the Capitol complex.

21   Q.  So care, maintenance, construction, preservation.  What

22   all are the specific activities of the office that go into

23   those things?

24   A.  My office, we employ about 225 employees who are

25   responsible from -- for all aspects of historic preservation

1    and maintenance, to include plumbing, painting, carpentry,

2    sheet metal, mechanic, cleaning -- daily cleaning, as well

3    as other activities that may need to occur within the

4    Capitol and on the outside of the Capitol building.

5    Q.   So, kind of, full spectrum of the trades?

6    A.   Correct.

7    Q.   And you referred to "my office," or your office, with

8    about 225 employees.  Do you work for or run a particular

9    part of the Architect of the Capitol?

10    A.   Our office would be -- is called the Capitol

11    superintendent's office.

12    Q.   And what are the duties, generally speaking, of the

13    Capitol superintendent's office as distinct from the overall

14    Architect of the Capitol?

15    A.   Our group is focused on the Capitol building and the

16    Capitol Visitor Center.

17    Q.   I'd like to ask you a little bit of the history of the

18    Architect of the Capitol.  How long has it been around?

19    A.   The Architect of the Capitol was established in 1793.

20    Q.   So about 230 years?

21    A.   Correct.

22    Q.   And has it always been the same size as it is now?

23    A.   No.  It's grown over time, as all agencies -- it began

24    with the laying of the cornerstone of the original

25    foundation of the Capitol building and, over time, as

1  additional buildings have come to the Capitol complex,

2  the -- the -- the size of the agency has grown.

3  Q.  The very first work on the foundation of that building,

4  the Architect of the Capitol was there for?

5  A.  That is correct.

6  Q.  Does the Architect of the Capitol have a mission

7  statement?

8  A.  We do --

9  Q.  What is that?

10  A.  -- yes.  Our mission statement is to serve, preserve,

11  and inspire.

12  Q.  Mr. McIntyre, I want to ask about your role specifically

13  within the Architect of the Capitol.  How long have you been

14  with the office?

15  A.  14 years.

16  Q.  So since about 2008, would that be?

17  A.  Correct, 2008.

18  Q.  And walk the jury through the positions that you've held

19  with Architect of the Capitol.

20  A.  When I began with the Architect of the Capitol, I was a

21  fire protection engineer, and then became an assistant

22  superintendent for the House office buildings.

23          THE COURT:  Sir, can I -- I'm sorry to interrupt,

24  but I don't think you're catching the microphone.  Thank

25  you.  Yes.

1          THE WITNESS:  I'll repeat myself.  When I began

2     with the Architect of the Capitol, I started as a fire

3     protection engineer, and then became an assistant

4     superintendent for the House office buildings.  And I'm now

5     the deputy superintendent for the United States Capitol

6     building.

7     BY MR. MULROE:

8     Q.  What about before coming to work at the Capitol?  Did

9     you work before that?

10    A.  I did, yes.

11    Q.  Where?

12    A.  I worked for the United States Navy.

13    Q.  What did you do for the Navy?

14    A.  I was a fire protection engineer for their facilities

15    construction program.

16    Q.  And what is the educational background that's prepared

17    you to hold all those roles?

18    A.  I have a four-year engineering degree.

19    Q.  Mr. McIntyre, over the course of your testimony, I'm

20    going to be asking you some questions about the value of

21    certain items at the Capitol.  Is the nature of your work

22    such that you've got some familiarity with how much

23    different things cost on the Capitol grounds?

24    A.  Yes.

25    Q.  I want to orient you in time to January 6th, 2021.  So

1    you were with the Architect of the Capitol at that time?

2    A.  Yes, I was.

3    Q.  Did you have the same role that you have now?

4    A.  I did.

5    Q.  Before going to the 6th, let me ask you a little bit

6    about the time period leading up to the 6th.  In the weeks

7    preceding January 6th of 2021, was there anything

8    significant going on on the Capitol grounds that was a focus

9    of the Architect of the Capitol's attention?

10   A.  Yes.  We were in the process of constructing the

11   presidential inaugural stands and support facilities for the

12   upcoming January 20th, 2021, presidential inauguration.

13   Q.  How often does the Architect of the Capitol carry out

14   that work?

15   A.  Once every four years.

16          MR. MULROE:  And, Ms. Rohde, if we could have

17   Exhibit-105, which I believe is in evidence, for the witness

18   and jury.

19   BY MR. MULROE:

20   Q.  Can you see the image on your screen, Mr. McIntyre?

21   A.  Yes, I can.

22   Q.  Are there parts of that image that are relevant to the

23   preparations for the inauguration every four years?

24   A.  Yes.  This rendering shows the temporary construction

25   that occurs on the west front of the building every four

1    years.

2    Q.  And the screen is a touchscreen that you can annotate,

3    if that's helpful.  But what are the specific things that

4    get put up every four years?

5    A.  Every four years, the area here (indicating) has -- is

6    where the primary major construction occurs.  We have

7    temporary bleachers located at this location, (indicating.)

8    We have media stands on both sides of the -- what is called

9    the presidential inaugural stands, (indicating.)  All of

10   that is constructed between about Labor Day of the year

11   preceding the inaugural and all -- we are working on those

12   facilities all the way through the -- January 19th of the

13   year of the inaugural.

14   Q.  And on the rendering that we see, where does the main

15   action, so to speak, of the inauguration take place?

16   A.  The president takes the oath of office on this very

17   center section that I've circled.  (Indicating.)

18   Q.  All right.  I'm clearing the annotations, and just one

19   or two more questions about inauguration preparations.

20           How long does the entire process take to get the

21   grounds ready?

22   A.  We begin planning for this well over, you know, a

23   year-and-a-half prior to the inaugural.  The construction

24   activities, as I said, take, you know, a few months.  We

25   begin right after the Labor Day concert series ends on the

1      Capitol grounds -- and then we begin that temporary

2      construction -- all the way through the inaugural itself.

3      And then we take about another month to disassemble

4      everything and return the grounds to their condition they

5      were prior to the inaugural.

6      Q.  Is all of that work done by Architect of the Capitol

7      staff or do outside contractors pitch in?

8      A.  It's a mix of both Architect of the Capitol staff as

9      well as an outside construction contractor.

10     Q.  Is that true more generally apart from the inauguration?

11     Does Architect of the Capitol sometimes rely on private

12     entities to help do the work of the office?

13     A.  We do from time to time.  It depends on the scale as

14     well as the skill set and how fast something needs to be

15     completed.

16     Q.  Mr. McIntyre, I'll take you now to January 6th, 2021.

17     Were you working that day?

18     A.  I was working virtually on the 6th.

19     Q.  Was that common, during that time, to be working

20     remotely?

21     A.  It was, yes.

22     Q.  Did there come a time during the 6th that you learned

23     that something out of the ordinary was going on at the

24     Capitol?

25     A.  Yes.

1    Q.  Tell us when and how you heard that.

2    A.  My supervisor was on-site that day.  We -- along with

3    about a third of our staff.  And you -- shortly, you know --

4    in the afternoon, my boss and I were on the phone quite

5    frequently both looking at the news coverage as well as

6    personal accounts from my -- the employees that work for me

7    as well as my boss on things -- on activities that were

8    occurring at the Capitol.

9    Q.  And on the 6th, generally, was construction active on

10   that day on the stage?

11   A.  We -- not during the middle of the day.  So much of the

12   construction we do -- to allow Congress to continue doing

13   business during the day, much of our construction happens

14   off hours.  The -- we had been given prior notice that there

15   may be large crowds at the Capitol on the 6th.  And so much

16   of our construction activities did not occur on the 6th.

17   Q.  When you, working virtually, heard about what was going

18   on at the Capitol, did that mean anything to you in terms of

19   your professional duties as part of the Architect of the

20   Capitol?

21   A.  Absolutely.  You know, our goal is to preserve the

22   Capitol -- one of our goals is to preserve the United States

23   Capitol and, obviously, as we are responsible for the care

24   and the maintenance of the Capitol, any damage to the

25   Capitol, we are responsible for identifying what that damage

1    is, how to fix it, and how much it would cost in order to

2    fix that.

3             On the 6th, my boss and I made the decision to

4    have teams prepped for the morning of the 7th in order to

5    identify what damage there was to the building.

6    Q.  And just to spell it out, what was it about what you saw

7    or heard on the 6th that made you think that damage might be

8    an issue?

9    A.  We were getting reports from our employees and others

10   that there was damage to doors, windows, graffiti, general

11   damage to the grounds, et cetera.

12   Q.  Walk us through, then, step by step, what were the

13   actions that you and your colleagues took, you know,

14   starting first thing when you began responding to what

15   occurred?

16   A.  On the -- so on the afternoon of the 6th, as I

17   mentioned, we stood up what we call our disaster assessment

18   teams.  Those disaster assessment teams -- we began

19   identifying individuals who would be able to make it to work

20   as early as the Capitol Police gave us permission to come

21   back to the building.  Those disaster assessment teams are

22   made up of, on average, five or six employees that --

23   architects, engineers, trades-men and -women for the

24   Architect of the Capitol.  And those teams are responsible

25   for systematically going through the building both on the

1    exterior as well as the interior of the building and

2    identifying what damage there is, if that damage is an

3    immediate safety issue, and if that -- or if that damage can

4    be repaired at a later time, and then ultimately those teams

5    are responsible for helping to put in place the plan of

6    action to make those repairs.

7    Q.   In the time that you had been with the Architect of the

8    Capitol, had disaster assessment teams been called into

9    action before?

10   A.   Only once before in the time frame that I've been with

11   the -- with the Architect of the Capitol.

12   Q.   What was that for?

13   A.   The 2011 earthquake in Mineral, Virginia, that impacted

14   our buildings.

15   Q.   I'm not sure if you told us, but did you personally go

16   to the Capitol as part of this disaster response effort?

17   A.   Yes, on the morning of the 7th.

18   Q.   What time did you arrive?

19   A.   Shortly before 5:00 a.m.

20   Q.   Was it light out or dark out at that time?

21   A.   The sun had not come up yet.

22   Q.   What were your first impressions on arriving at the

23   grounds in the dark?

24   A.   You know, we typically keep the Capitol building, since

25   it's a, you know -- we -- it's a working office building,

1    but we also -- the Capitol building is more or less kept as

2    a working museum.  It's, you know -- we -- our mission is to

3    provide not only a place of business for Congress to carry

4    out their business, but also a location where the American

5    public can come and visit the building and be inspired by

6    what they see.  The building on the morning of the 7th was

7    very different than any other morning that I've come to work

8    in my 14 years.  The amount of general disarray, trash, the

9    state of the grounds -- if you can imagine, we have a whole

10   team of people, not in my office, but that work for the

11   Architect of the Capitol -- their mission is to care for the

12   Capitol grounds.  And so even on times of when we have large

13   crowds, we have employees there that are there to take care

14   of the building and the grounds, trash collection, you know,

15   general maintenance.  If something is broken, we fix it.

16   And seeing the building on the morning of the 7th, it --

17   quite different than any other morning I've ever seen it.

18   Q.  Had you ever seen it anywhere close to that?

19   A.  Not to my recollection.

20   Q.  Not even after the earthquake?

21   A.  No.

22   Q.  As you reviewed the scene, was there any evidence of

23   breaches to the building?

24   A.  Yes.

25   Q.  Tell us about that.

1    A.   The primary evidence from breaches were broken windows,

2    broken doors.  I had about 25 of my employees who stayed in

3    the building who were sheltered in place during much of the

4    events of the 6th, and then stayed in the building after the

5    police had cleared the building to help get the building

6    ready for Congress to get back into session.  Those 25

7    employees, some of them were responsible for assisting

8    United States Capitol Police in resecuring the building, and

9    much of that was plywood over top of any broken windows or

10   broken doors.  That was -- that occurred throughout the

11   evening of the 6th into the morning of the 7th.

12   Q.   So you said you arrived around 5:00 a.m.  Did you stay

13   on the grounds past when the sun came up?

14   A.   Yes.

15   Q.   And did you have a chance to observe the grounds, the

16   exterior of the Capitol?

17   A.   Yes.

18        MR. MULROE:  Ms. Harris, could we have the screen

19   just for the witness for a moment.

20   BY MR. MULROE:

21   Q.   And, Mr. McIntyre, I'm going to show you a series of

22   four videos.  I'm just going to show you the first couple of

23   seconds of each and ask you whether these are videos that

24   you reviewed prior to coming to court today and whether you

25   recognize what's in them.

```
 1                MR. MULROE:  So Ms. Rohde, starting with 479A,
 2      please.
 3                (Video played.)
 4                THE DEPUTY CLERK:  Mr. Mulroe, just so you know,
 5      479A, if you're doing A, B, C, and D, they're already
 6      admitted.
 7                MR. MULROE:  Thank you.
 8                THE DEPUTY CLERK:  You're welcome.
 9                MR. MULROE:  Saved me a couple of minutes.
10                Let's have the screen, please, for the jury, as
11      well, then.
12      BY MR. MULROE:
13      Q.  So Mr. McIntyre, starting with 479A, is this a video
14      that shows the Capitol grounds on January 7th?
15      A.  Yes.
16      Q.  And having reviewed this before, does this video show
17      them in about the same state that you encountered them?
18      A.  Yes.
19      Q.  Does it fairly and accurately depict the Capitol
20      grounds?
21      A.  Yes.
22                MR. MULROE:  Let's let 479A, please, play,
23      Ms. Rohde.
24                (Video played.)
25                MR. MULROE:  And we can pause there.
```

1    BY MR. MULROE:

2    Q.  Now, what is it that we see on the screen at the

3    10-second mark?

4    A.  This is a shot of the media stands on the west front

5    north side of the Capitol grounds.  This is showing you the

6    scaffolding.  The tattered white fabric that you see here is

7    what would be called the scaffolding scrim.  That was

8    previously attached to the scaffolding.  It was -- it's a --

9    kind of, a cover so that, during the television event, you

10   don't see all of the metal pipes.  You see a solid white

11   sheet, almost, that covers up all of those pipes.

12   Q.  And prior to January 6th, is that the state the scrim

13   was in?

14   A.  No.  The scrim had been recently installed and it was in

15   good condition.

16           MR. MULROE:  Continue the video.

17           (Video played.)

18           MR. MULROE:  And moving on, please, Ms. Rohde, to

19   479B.

20           (Video played.)

21           MR. MULROE:  And let's pause there at the

22   beginning.

23   BY MR. MULROE:

24   Q.  Mr. McIntyre, we can hear and see leaf blowers or snow

25   blowers.  Was cleanup part of what had to happen on

1    January 7th?

2    A.  Yes.

3    Q.  Why?

4    A.  First and foremost, there is an inaugural that was going

5    to happen in 13 days.  We had to assess -- at this location,

6    we had to assess any damages that had occurred to the

7    temporary structure, to not only make sure that the

8    structure was structurally safe, but also to identify what

9    construction activities now needed to occur to get it back

10   to its condition it was prior to the events of the 6th.  And

11   we still had construction activities to -- that had not yet

12   been completed, that needed to be completed within those

13   next 13 days.

14             MR. MULROE:  We're at three seconds.  Let's let

15   the video play.

16             (Video played.)

17             MR. MULROE:  Let's pause there for a moment,

18   Ms. Rohde.

19   BY MR. MULROE:

20   Q.  At 52 seconds, Mr. McIntyre, we -- well, what is the

21   structural feature we see going through the middle of the

22   screen here?

23   A.  To the -- the area that I've outlined in green, that is

24   the balustrade of the lower west front terrace of the United

25   States Capitol.  Everything to the left of that balustrade

1    is the temporary wooden structure that is built for the

2    presidential inaugural.  That's what we call the

3    presidential inaugural area.  Everything to the right of

4    that balustrade is where the stands begin.

5    Q.  So if it were not for the inauguration, this balustrade

6    would, kind of, be the edge of the terrace overlooking --

7    A.  That is correct.

8    Q.  -- open space?

9         Is it normally, kind of, blue like that?

10   A.  No.  Unfortunately, in the early morning of the 6th, we

11   had finalized the painting of the blue sections that you see

12   on the right-hand side of this balustrade.  And the blue

13   that you see on top of the balustrade is actually

14   footprints, people walking through semi-wet blue paint and

15   tracking that on top of the historic stone structure.

16   Q.  And just to orient us geographically, is this a monument

17   in the distance we can see there?

18   A.  Yes, that's the Washington Monument.

19   Q.  All right.  Clearing --

20   A.  That is a view looking down the United States -- the

21   National Mall.

22        MR. MULROE:  Clearing the screen, then, let's keep

23   playing from 52 seconds.

24        (Video played.)

25        MR. MULROE:  And then next, please, Ms. Rohde,

```
1     479C.
2                (Video played.)
3                MR. MULROE:  And pause there.
4    BY MR. MULROE:
5    Q.  So at the two-second mark, Mr. McIntyre, just to orient
6    us, what part of the building do we see?
7    A.  This is what is called the lower west terrace exit from
8    the basement floor of the Capitol.  We are standing outside
9    the building, looking back toward the building.
10               MR. MULROE:  Let's continue at two seconds.
11               (Video played.)
12               MR. ROOTS:  Your Honor, I would object to
13   relevance.  These men --
14               THE COURT:  Hold on.  Hold on, sir.  I'll hear you
15   at sidebar.
16               (Brief pause.)
17               MR. ROOTS:  I think I fully stated my objection.
18               THE COURT:  Hold --
19               (Bench conference:)
20               THE COURT:  Well, let me ask the --
21               (Brief pause.)
22               If -- Mr. Roots, I will -- you can hear me?  Can
23   you hear me?  I understand --
24               MR. ROOTS:  Yes.
25               THE COURT:  I understand your objection.  I
```

1    just -- you need to be able to hear me talk to the

2    Government.

3            How -- I think I do understand the objection.  How

4    much more of this, sort of, overview -- I mean, we are

5    talking about a lot of -- the jury is seeing a lot of things

6    that, obviously, the defendants did not have anything

7    directly to do with.

8            MR. MULROE:  Yes, Your Honor.  There is one more

9    video of a similar length.  So we are well over halfway

10   through it.  I do just want to, for the record, note the

11   relevance of this is, one, establishing the civil disorder;

12   and then, two, more specifically with respect to this

13   witness's testimony, he's going to be testifying about the

14   cost of repairs that were made, and that cost is higher

15   because of the urgency and the need to triage and the sheer

16   quantity of work that was necessary to get done in a very

17   short amount of time because of what happened on the 6th.

18   And so I think that showing this overall picture, you know,

19   is very necessary for the jury to understand that part of

20   what goes into the costs.

21           THE COURT:  But is the cost of the things that the

22   defendants are charged with -- did that have to be done at a

23   very quick pace that this is relevant to?

24           MR. MULROE:  Yes, Your Honor.  So the glass

25   repairs were one of -- I expect the witness will testify

1    that the glass repairs were one of the most urgent items to

2    get taken care of before the inauguration.  I would just

3    front that the particular window at issue here was not

4    repaired until after the inauguration, but the glass

5    contract, you know, was done on a very, very abbreviated

6    timeline.

7            THE COURT:  And is he going to testify as the --

8    as to the total amount of costs that were associated with

9    January 6th?

10            MR. MULROE:  I don't anticipate asking him that.

11    I don't think that that figure would necessarily be

12    directly relevant to the counts charging these defendants.

13            MR. METCALF:  (Indicating.)

14            THE COURT:  All right.  Mr. Metcalf, I have

15    already -- I mean, I'm not going to hear from you because I

16    heard from Mr. Roots.  I mean, I can't have multiple

17    lawyers -- I mean, I -- if one of you objects, that's fine.

18    I'll hear from you.  I'm not going to hear --

19            MR. METCALF:  Your Honor, it's a different issue

20    than what Mr. --

21            THE COURT:  All right.

22            MR. METCALF:  -- Roots objected to.

23            THE COURT:  What's the issue?

24            MR. METCALF:  Based on the cost with the window, I

25    just have been going through what is premarked as 931A, and

1    I would just like to lodge an objection as to relevance and

2    jury confusion.

3            THE COURT:  Okay.  Mr. Metcalf, we'll get to that

4    when we get to it or we'll get to it at a break.  I'm not

5    going to take up an objection to an exhibit just out of

6    order randomly.

7            Mr. -- as to the objection that's been lodged,

8    I'll give the Government a little more leeway here.

9    Obviously, you get a little leeway for the reasons you

10   described, but I don't -- it won't be much more leeway.  If

11   you have another minute or two of this, fine, but we need to

12   move on to the things that are directly relevant to these

13   defendants.

14           MR. METCALF:  Your Honor, I just have one other

15   issue with regards to what's being shown right now.

16           THE COURT:  Uh-huh.

17           MR. METCALF:  Ms. Harris indicated that these

18   exhibits were already admitted, the 479 -- it seems like A

19   through D.  I have no notes indicating when these were

20   admitted before.

21           THE COURT:  Well, we can consider that.  I think

22   the issue was there was a witness who I, sort of,

23   conditionally admitted a bunch of things with -- subject to

24   objections for relevance and the like.  That's where I think

25   the confusion lies.  So I'd ask -- we can --

```
 1              Ms. Harris, there were a bunch of things that
 2    were, sort of, en masse admitted.  I think we -- just since
 3    we have this moment -- I was going to do it at a break, but
 4    we need to be careful.  If we're talking about something the
 5    jury has not seen yet, we should still treat it as --
 6    Ms. Harris, you should not -- I know this is hard, but we
 7    need to communicate and you should not necessarily treat it
 8    as admitted for all purposes.  Give the defense a chance to
 9    object and the like.  Because there were things that were
10    admitted, sort of, en masse, and I think it was really
11    just almost an issue of authenticity and foundation rather
12    than having a -- all the objections heard.  Does that --
13              MR. MULROE:  Your Honor --
14              THE COURT:  -- make sense?
15              MR. MULROE:  Your Honor --
16              THE DEPUTY CLERK:  Okay.  And if you want to go
17    back and just look at -- it was January 13th through
18    Inspector Loyd.
19              THE COURT:  Oh.  So maybe, they -- if it was --
20    oh, okay.
21              MR. MULROE:  Your Honor --
22              THE COURT:  I think that's that category, but,
23    maybe, Mr. Mulroe's going to clarify.
24              MR. MULROE:  Yes.  This was part of the large set
25    that we --
```

1           THE COURT:  Right.

2           MR. MULROE:  -- had put in conditionally through

3    Inspector Loyd.  We eventually decided not to show this with

4    him just for the sake of moving things along.

5           THE COURT:  All right.  Just -- I would just say,

6    we'll all -- the Government and Ms. Harris and I will try to

7    be cognizant of -- if there are things that have not been

8    before the jury, even though I technically, sort of,

9    admitted them en masse, we do need to give the defendants an

10   opportunity to object if there's some sort of relevance, 403

11   objection, et cetera.

12          All right.  So let's proceed.

13          MR. METCALF:  Thank you.

14          (Return from bench conference.)

15          MR. MULROE:  All right.  Let's keep moving.

16   Ms. Rhode, would you let the video play.

17          (Video played.)

18          MR. MULROE:  And then, lastly, Ms. Rohde, 479D,

19   please.

20          (Video played.)

21   BY MR. MULROE:

22   Q.  Now, Mr. McIntyre, as you and the disaster assessment

23   teams took a look at what all needed to be done, was that

24   amount of work something that could be accomplished all at

25   once or did the Architect of the Capitol have to set

1    priorities?

2    A.  We had to set priorities.

3    Q.  What were the considerations that went into prioritizing

4    the work?

5    A.  We had to look at not only do we have the skill set to

6    make those repairs, do we have the materials to make those

7    repairs in the time frame -- much of this area that -- in

8    these videos, obviously, is on the congressional -- on the

9    presidential inaugural stands, so a very different timeline

10   than something that may have occurred elsewhere in the

11   building.  Big thing for us --

12   Q.  Just to unpack that, something that happened on what you

13   might call the back side of the inaugural side --

14   A.  On the east front of the building, correct.

15   Q.  On the east front.  Higher or lower priority?

16   A.  In this area, on the west front, certainly, a higher

17   priority.

18   Q.  Because that's what's going to be on the TV cameras when

19   the inauguration occurs?

20   A.  That is correct.

21   Q.  Okay.  I cut you off there.  Please keep going.

22   A.  The biggest challenge for us during this time frame in

23   January of 2021 was availability of materials in the middle

24   of the pandemic.  The hardest part for our office in

25   general, or any construction contractor at the time, was

1    finding the materials needed and getting them to you.  Being

2    able to purchase the materials was one thing, but being able

3    to get them delivered to you is another.  So for us, that

4    was one of the primary factors on, could we make these

5    repairs through Architect of the Capitol employees or would

6    we have to contract this out?

7    Q.  Phrase "supply chain" relevant at all there?

8    A.  Yes.

9    Q.  Tell us how.

10   A.  The supply chain at the time was very difficult, to say

11   the least.  Price of materials had gone -- were going way

12   up, as well as the availability to ship the products that

13   you purchased from wherever they were manufactured or stored

14   in a warehouse to the Capitol complex.

15   Q.  And in terms of prioritizing which work to complete

16   first, you mentioned the inauguration.  Was security a

17   factor in this at all?

18   A.  Yes, it was.

19   Q.  How so?

20   A.  As we talked about earlier, there were broken exterior

21   windows and doors.  Those broken exterior windows and doors

22   were one of our highest priorities, not just from an

23   Architect of the Capitol perspective, but also from a United

24   States Capitol Police perspective.  This is a secured

25   building.  You can't enter the building without proper

1    identification and clearances and, especially during the

2    pandemic, only -- there were no visitors allowed in the

3    building at this time.

4         We worked with the Capitol Police to identify with

5    them what their priorities were for us to help them resecure

6    the building, which resulted in much of the -- what you

7    would call the exterior envelope of the building:  Doors,

8    windows, things of that nature.

9    Q.  So you talked about the inauguration.  You talked about

10   security.  Did climate come into play at all?

11   A.  It does, yes.  We have -- you can imagine the

12   building -- the Capitol building; it not only itself is

13   historic, but it houses many historic pieces of art --

14   artwork, statutes, marble busts, different aspects --

15        (Brief interruption.)

16   BY MR. MULROE:

17   Q.  Just hold on one moment.

18   A.  And different items in the building that rely on

19   temperature and humidity control.  Having broken windows,

20   broken glass in doors, broken doors, things of that nature,

21   doesn't allow us to maintain the best temperature and

22   humidity control in the building, especially in the winter.

23   In the winter, if you can imagine, it's the middle of

24   January.  Needing to make sure that we maintain proper

25   humidity control as well as temperature control is important

1    to our building.  Our building also has -- if any of you

2    have ever been in the building, the building has works of

3    art that are part of the building, and so those are called

4    frescos.  Those frescos are the -- directly painted on the

5    wet plaster when the plaster was being applied.  Much of

6    that dates from the 1850s.  And temperature and humidity

7    control is very important for the plaster -- those plaster

8    walls.  If you don't keep it in a consistent-ish temperature

9    and humidity range, you can start to see delamination of

10   that plaster which would result in a loss of that historic

11   fabric.

12   Q.  Thinking back to 2021, not too many 60-degree days that

13   winter, were there?

14   A.  I don't remember.

15   Q.  Mr. McIntyre, I want to start asking you now about some

16   of the specific damage and specific repairs that took place.

17   I want to start with windows.

18           MR. MULROE:  So Ms. Rohde, could we have

19   Exhibit-425, please.  And you can actually take that to the

20   27-second mark and pause it there.

21           (Video played.)

22           MR. METCALF:  Your Honor, at this point, I object

23   as far as cumulative.

24           THE COURT:  Okay.  Well, I just noticed, in any

25   event, we -- now is a time -- a good break time, I think,

1     when you're switching topics, to take our morning 10-minute

2     break.

3              So ladies and gentlemen, I'll have Ms. Harris

4     excuse you for 10 minutes.  We'll give the court reporter a

5     chance to rest and we'll come back.

6              (Jury returned to jury room.)

7              THE COURT:  All right.  You all may be seated.

8              Sir, you may step down.

9              (Witness steps down.)

10             I'll wait for Ms. Harris to come back into the

11    room.

12             All right.  Again, you all may be seated.

13             Mr. Metcalf, before we go to break, I mean, he's

14    about to testify as to the value of things.  How is it

15    cumulative?  There's been no testimony on this.

16             MR. METCALF:  As far as showing the jury the video

17    and this image, again, I'm -- I'm objecting on cumulative

18    grounds.  If we're talking about two windows, which is what

19    he's going to basically testify to, from my understanding,

20    and what the cost is for each one of those windows, they

21    have exhibits that they've prepared for him to be able to

22    explain that.  It -- the jury doesn't need to have to go see

23    the video of Mr. Pezzola again at the window.  They've

24    already seen it 15 times.  So --

25             THE COURT:  I don't know about 15.

1    MR. METCALF:  This objection for this video in

2    particular, I think, is reasonable.  He could go through the

3    different exhibits that have been prepared for this witness

4    and that we've been noticed on, and 425 is not one of those

5    exhibits that we were noticed on with this witness as well.

6         THE COURT:  All right.

7         MR. METCALF:  So --

8         THE COURT:  Mr. -- all right.

9         MR. METCALF:  For all those reasons, I believe

10   that it's unnecessary, and it's highly prejudicial as well.

11   So cumulative grounds and relevance grounds and 403 grounds.

12        THE COURT:  All right.  Mr. Mulroe.

13        MR. HULL:  Biggs joins, Your Honor.

14        THE COURT:  All right.  Mr. Mulroe.

15        MR. MULROE:  Your Honor, the purpose of showing

16   this still from the video is to orient the witness to which

17   windows we're talking about.  We need to show him the

18   windows in question to ask him questions about those.  I

19   don't know that there's any other way to direct him to which

20   of the many, many panes of glass we are talking about.

21        THE COURT:  Okay.

22        MR. MULROE:  I also think that, you know -- first

23   of all, I think we -- even if we were to show this video

24   again, a cumulative objection would not be well placed, but

25   I think, under the circumstances of what we're using it for,

1        the objection should be overruled.

2                THE COURT:  You're just showing a still?

3                MR. MULROE:  We're just showing a still.  I think

4        that -- I had planned to show the 22 seconds following that

5        and then pause it again and ask him, you know, what shape

6        the window was in when he reviewed it compared to what we

7        see in the video.  I think that would be entirely proper,

8        but --

9                THE COURT:  Okay.

10               MR. MULROE:  -- I'd defer to the Court.

11               THE COURT:  I'm going to overrule the objection.

12       I mean, they've seen this a few times.  I'm sure they'll see

13       it a few more times.  But explaining what witness -- what

14       windows we're talking about, I think that's fair.  So I'll

15       overrule -- it's a reasonable objection, but I'm going to

16       overrule the objection.

17               MR. MULROE:  And I would just ask, Your Honor, I

18       think the first objection in this witness was from

19       Mr. Roots, and then there have been some from Mr. Metcalf.

20       I know a little bit of flexibility in formality is, you

21       know, appropriate at times, but I think that, for the

22       orderliness of the proceedings, we should respect the

23       one-lawyer rule.

24               THE COURT:  No, you are correct, and I've said

25       that from the beginning.  So if -- Mr. Metcalf, you or

```
 1        Mr. Roots can object on a -- obviously, on a
 2   witness-by-witness basis, but just one of you, please.
 3             MR. METCALF:  Thank you.
 4             THE COURT:  We need to take our 10 minutes for the
 5   court reporter.  We'll be back in 10.
 6             THE DEPUTY CLERK:  All rise.  This Honorable Court
 7   stands in recess for 10 minutes.
 8             (Brief recess taken.)
 9             THE DEPUTY CLERK:  Jury panel.
10             (Jury returned to jury box.)
11             THE DEPUTY CLERK:  We are back on the record in
12   Criminal Matter 21-175, United States of America v. Ethan
13   Nordean, et al.
14             THE COURT:  All right.  Mr. Mulroe, you may
15   proceed.
16             (Brief pause.)
17             (Witness resumes the witness stand.)
18   BY MR. MULROE:
19   Q.  All right.  Mr. McIntyre, welcome back.
20             Where we left off, we were just about to look at
21   the 27-second mark of Exhibit-425.
22             MR. MULROE:  So Ms. Rohde, would you pull that up
23   for us, please.
24             And, Ms. Harris, if we could have it for the jury.
25   BY MR. MULROE:
```

11446

1    Q.  Mr. McIntyre, the window we see on the left side of the

2    screen here, are you familiar with that window?

3    A.  Yes, I am.

4    Q.  Do you know where in the Capitol that's located?

5    A.  Yes, that's located on the west front of the building on

6    the -- what's called the Senate connecting corridor.

7    Q.  Are you able to point that out to us on the map that's

8    over your left shoulder?  Feel free, with the Court's

9    indulgence, to stand up if you need to reach.  But where is

10   the Senate connecting corridor?

11   A.  (Indicating.)  The area right next to -- where the

12   Breach No. 4 is pointing, that's the area called the Senate

13   connecting corridor.

14   Q.  Can you tell us just a little bit about what the Senate

15   connecting corridor is and when it came to be.

16   A.  That section of the building is from the 1850s when the

17   Capitol building was expanded both north and south, north

18   for the Senate; south for the House.  That corridor was

19   the -- kind of, the hallway, so to speak, that connected the

20   original center section building and the Senate wing

21   extension.

22   Q.  And what happens in the Senate connecting corridor

23   nowadays?

24   A.  The primary function of that is a hallway that connects

25   the Senate wing extension and the Senate wing.

1    Q.  Going back to the window on the screen, are each of

2    these parts of the window a separate pane of glass or is

3    this all one big pane of glass?

4    A.  Those are individual panes of glass.

5    Q.  So lower left, lower right, upper left, upper right,

6    four different ones that we can at least partially see; is

7    that accurate?

8    A.  That is correct.

9             MR. MULROE:  All right.  Ms. Rohde, if we could

10   play that video to the 49-second mark.

11             (Video played.)

12             MR. MULROE:  And pause it there.

13   BY MR. MULROE:

14   Q.  Mr. McIntyre, when you arrived at the Capitol on

15   January 7th, did you have an opportunity to observe that

16   window in the Senate connecting corridor?

17   A.  Yes.

18   Q.  What kind of shape was the window in when you found it?

19   A.  At that time, both of those panes of glass were boarded

20   up from -- on the inside of the building and from the

21   outside of the building.  The glass was -- had been removed

22   at that point.

23   Q.  So no glass left in the panes?

24   A.  That is correct.

25   Q.  You said boarded up.  Were these windows part of the

1    temporary repairs that you told us about earlier?

2    A.  Yes, both of these were temporarily covered up by

3    plywood by Architect of the Capitol employees on the night

4    of the 6th.

5    Q.  So the labor for who actually did the work was employees

6    of the Architect of the Capitol?

7    A.  For the temporary means of securing that window, that is

8    correct.

9    Q.  And what about the materials for the temporary repairs,

10   that plywood, is that something that your office had on hand

11   or did you have to purchase it?

12   A.  We did have that on hand, yes.

13   Q.  Now, from your perspective, was the temporary repair

14   something that would be suitable for the longer term?

15   A.  No, not for the long-term.

16   Q.  Why not?

17   A.  Again, this was a working office building and it -- a

18   working office building for senators and members of

19   Congress, but also, from a safety and security perspective,

20   it still had -- there were many things in the building,

21   including these windows, that we needed to make an

22   identification of.  Did it need to be repaired immediately

23   or could it wait?  Something of this nature at this location

24   was on the higher end of our priority list.

25   Q.  And just to put it in context, were these panes the only

1    broken glass at the Capitol after January 6th or was other

2    glass broken, as well?

3    A.   These were not the only broken pieces of glass.  There

4    were many, many pieces of broken exterior glass and interior

5    glass.

6    Q.   All right.  So like the temporary repairs, I want to ask

7    you about the permanent repairs in terms of labor and in

8    terms of materials.

9            Starting with the materials, did the Architect of

10   the Capitol have sufficient glass on hand to make the

11   repairs of all these broken windows?

12   A.   Unfortunately, we did not.  Based on the number of

13   windows and the size of windows -- panes that were broken,

14   we did not have this much glass available on hand to make

15   the repairs.

16   Q.   So what, if any, steps did your office take to obtain

17   the glass that would be necessary?

18   A.   Beginning on the morning of the 7th, we began reaching

19   out to glass contractors that we have -- had successfully

20   worked with in the past to identify, did they have the

21   manpower to complete these repairs and, most importantly,

22   did they have the materials on hand?  We talked about supply

23   chain earlier.  If they didn't have it, we had low

24   confidence that they would be able to get it in time to help

25   us make these repairs.

1    Q.  And you said the word "manpower" in there, so let me

2    move to the labor part of the equation.  Was the plan to

3    have Architect of the Capitol employees do the actual

4    installation of the glass or was that something that would

5    be contracted out, as well?

6    A.  It -- we contracted that out, as well.

7    Q.  Why was that?

8    A.  Our paint shop is responsible for what we would call

9    glazing products in our buildings.  And if you recall back

10   to the video we saw earlier on the inaugural stands, our

11   paint shop is responsible for painting those stands.  And so

12   our -- we did not have the labor available at this time to

13   do any of this glass work.  They were now going to be tasked

14   with repainting the entire congressional stands within a --

15   within less than a two-week period.

16   Q.  So you mentioned talking to vendors or contractors.  I

17   want to ask you generally in the ordinary business of the

18   Architect of the Capitol, is a competitive bidding process

19   sometimes used to select contractors for projects?

20   A.  Most of the time, yes.

21   Q.  And when competitive bidding is used, what all does that

22   entail?

23   A.  For a competitive bidding process, you would develop a

24   scope of work, you would submit that to multiple qualified

25   contractors.  Those multiple qualified contractors would let

1    you know that they would like to bid on the project.  You

2    then do a -- for something of this nature, you would do a

3    site walk -- you would -- with all of the contractors so

4    they could each see what the expectations were.  You then

5    receive bids from those contract- -- you -- there is some

6    time frame, but then you receive bids from those

7    contractors.  You then have to compare those bids to each

8    other to make sure that they understood the scope correctly

9    and that they're each bidding on the same scope of work.

10   And then, from there, if we had any questions, we would have

11   to go back to those contractors with -- give them time to

12   respond, and then ultimately select a contractor based on a

13   predetermined set of factors.  Cost could be the primary

14   factor, timing could be the primary factor, or it could be a

15   combination of factors, as well.

16   Q.  So that whole process that you described, start to

17   finish, about how long would you expect that ordinarily to

18   take?

19   A.  For something of this nature, just to get them under

20   contract, 30 to 60 days.

21   Q.  And then on top of that 30 to 60 days, are there any

22   procedures connected with security or access that would add

23   more time to that?

24   A.  If it was a contractor who had not done business with us

25   before, they would, then, have to go through what's called

```
 1    United States Capitol Police suitability.  They would have
 2    to submit fingerprints for each of their employees, as well
 3    as have a criminal background investigation completed.  And
 4    then they would be able to -- if found suitable, they would,
 5    then, be able to obtain a congressional ID badge which would
 6    allow them to come onto our campus to perform work.
 7    Q.  Did the Architect of the Capitol go through that
 8    competitive bidding process to get the glass repairs done
 9    after January 6th?
10    A.  We did not.
11    Q.  Why not?
12    A.  First and foremost, timing.  There was a significant
13    amount of glass that overlooked the congressional stands.
14    That was a safety concern, based on its location.  As well
15    as the doors that you showed in one of the videos earlier,
16    that lower west terrace exit, those doors, which are used a
17    significant amount on the day of the inaugural -- that's
18    where everyone who comes out onto the presidential platform
19    and the congressional stands -- that's the entrance they use
20    from the building.  We had to make those repairs in less
21    than two weeks.  And to do a competitive bid for this, we
22    would not have been able to be under contract, and if it was
23    a contractor who had not previously done business with the
24    Architect of the Capitol, we would not be able to get them
25    through that Capitol -- United States Capitol Police
```

1    background checks prior to the time frame to make these

2    repairs.

3    Q.  So if you're not going through the bidding process, is

4    there a formal alternative under the procedures and

5    regulations governing the Architect of the Capitol?

6    A.  Yes, there is.  It's called a sole-source justification.

7    You can justify going to a single source, and there are

8    specific reasons to do that.

9    Q.  Was a sole-source justification used for the glass

10   repairs?

11   A.  Yes, it was.

12   Q.  Why was that, if it's additional to the reasons that you

13   already told us?

14   A.  As we've talked about, exigency, the speed at which we

15   needed to make these repairs from both a safety/security,

16   you know, temperature control, you know, aesthetics, all of

17   the above.

18   Q.  And when you do a sole-source justification, is that a

19   formal procedure or is it something that you just, kind of,

20   can do willy-nilly?

21   A.  We do have a formal procedure within the Architect of

22   the Capitol to submit and have a sole-source justification

23   approved.

24   Q.  Does it involve approvals by senior officials?

25   A.  Yes, it does.

1    Q.  What was it about -- well, I should ask -- withdrawn.

2         As part of the sole-source process for the

3    windows, did the Architect of the Capitol ultimately settle

4    on a glass vendor?

5    A.  We did, yes.

6    Q.  What was it about that glass vendor that made them the

7    right choice?

8    A.  We had reached out to several contract -- several glass

9    vendors.  The glass vendor that we selected had the material

10   in stock.  They had the manpower available to do the work in

11   the time frame that we were asking.  They had also

12   successfully done business with us in the past.  And they

13   had active background clearances to do work on the Capitol.

14   And their employees had what I called earlier a

15   congressional ID badge.

16   Q.  When you do a sole-source justification, do you get an

17   unlimited budget to work with?

18   A.  We do not.  We have to establish a budget prior to that

19   time frame so that -- and we have to have that funding

20   available in order to do that work.

21   Q.  And then, when a contractor proposes a price for a job,

22   do you just accept that automatically or is there any kind

23   of assessment that's done to it?

24   A.  We assessed their proposal -- sometimes called an

25   estimate or a proposal -- we assess that for both fair and

1    reasonable pricing.

2            MR. MULROE:  Your Honor, may I approach the

3    witness with an exhibit?

4            THE COURT:  You may, sir.

5    BY MR. MULROE:

6    Q.  Mr. McIntyre, I'm going to walk up and hand you what's

7    marked 931B, a two-page document.

8            MR. MULROE:  And we won't publish it yet, but,

9    Ms. Rohde, if you could have that queued up on the screen,

10   please.

11   BY MR. MULROE:

12   Q.  Mr. McIntyre, do you recognize the document I've just

13   handed you?

14   A.  Yes, I do.

15   Q.  What is that?

16   A.  This is one of the proposals in the many -- of the many

17   proposals provided to us.  What's on the screen is not the

18   document you handed me.

19            Okay.  Thank you.  This was one of the proposals

20   that was provided to the Architect of the Capitol by the

21   glass vendor to make repairs to the broken windows.

22   Q.  Does this proposal include the panes that we saw on the

23   video just a moment ago?

24   A.  Yes, it does.

25   Q.  And is this a fair and accurate reproduction of that

1    proposal from the glass company?

2    A.  Yes, it is.

3              MR. MULROE:  Move to admit 931B.

4              MR. ROOTS:  Objection on grounds already stated.

5              MR. MULROE:  One-lawyer rule, Your Honor.

6              THE COURT:  I'm sorry, Mr. Mulroe.  Can you repeat

7    that.

8              MR. MULROE:  Just pursuant to the decorum policy,

9    one lawyer per defendant, please.

10             THE COURT:  All right.  It has been Mr. Roots.

11   Mr. Roots is the attorney -- the relevant attorney.  I've

12   already overruled the objection.  You may proceed.

13             MR. MULROE:  Thank you, Your Honor.

14             And, Ms. Harris, if we may publish that, please.

15   BY MR. MULROE:

16   Q.  So Mr. McIntyre, let's just start at the top.  And if

17   you could walk us through the parts of this.

18             MR. MULROE:  Ms. Rohde, if we could zoom in just,

19   kind of, at the top part of it.  Yep.

20   BY MR. MULROE:

21   Q.  So starting with the date and the expiration,

22   Mr. McIntyre, tell us, chronologically, where did the repair

23   of these panes fit into the overall glass project that had

24   to be done?

25   A.  This was our second group of glass that needed to be

1    repaired following the events of the 6th.

2    Q.  And was this one completed by the time the inauguration

3    happened?

4    A.  This work was not completed prior to the inauguration.

5    Q.  Was any glass work completed prior to the inauguration?

6    A.  Yes, a significant amount.

7    Q.  And what decided which ones would come first in line?

8    A.  The primary decision factor was anything visible by --

9    on the day of the inaugural, any of the doors or windows

10   that were -- of entrances that would be used on -- to get in

11   or out of the building on the day of the inaugural, as well

12   as if there was anything that was deemed a critical safety

13   issue.

14   Q.  And so of all the steps in the repair of the glass, were

15   all the different parts of the project done by different

16   vendors or the same vendor?

17   A.  All of the glass was repaired by the same vendor.

18           MR. MULROE:  All right.  Ms. Rohde, if we could

19   take the call-out away.

20   BY MR. MULROE:

21   Q.  And then looking down on the first page, Mr. McIntyre,

22   we see a section with the heading: Date, Activity, and

23   Price.  What do we see under that?

24   A.  We see a list of a group of pieces of glass that the

25   contractor included as part of this proposal as a lump sum

1    price that you see in the -- on the right-hand side, that

2    $7,545.

3    Q.  And so we don't have to show it quite yet, but does the

4    list of panes continue on to the second page of the

5    proposal?

6    A.  Yes, it does.

7    Q.  Are all the panes the same size or different sizes?

8    A.  They are different size -- some of them are different

9    sizes.

10   Q.  And the panes that we saw in the video, do you see those

11   on this list?

12   A.  I do, yes.

13   Q.  Which ones are those?

14   A.  They are ones that are listed as the 24-inch by 54-inch

15   by one-quarter-inch clear laminated safety glass.

16   Q.  All right.  So as we see down this list, fair to say we

17   see different dimensions of different panes?

18   A.  Yes.

19              MR. MULROE:  And then, Ms. Rohde, if we could go

20   to the second page.

21   BY MR. MULROE:

22   Q.  That continues on with three more line items; is that

23   right?

24   A.  That is correct.

25   Q.  And I think you mentioned it, but just to clarify, did

11459

```
 1    the vendor itemize the price of these panes on a
 2    pane-by-pane basis or was it one lump sum for all the panes
 3    in this proposal?
 4    A.   They did not itemize.  This is a lump sum for the pieces
 5    of glass as part of this estimate -- this proposal.  My
 6    apologies.
 7    Q.   If we look at the bottom of all the costs, we see a line
 8    that says, Labor, furnish and install; is that right?
 9    A.   That is correct.
10    Q.   What does that figure represent?
11    A.   That is a lump sum cost for them to install the glass.
12    Q.   And is the labor cost broken down pane by pane or is
13    that an all-in lump sum?
14    A.   It's an all-in lump sum, as well.
15    Q.   What is that amount?
16    A.   $8,550.
17    Q.   Why are there so many different sizes of panes?
18    A.   If you could imagine, the United States Capitol has been
19    built and expanded many times over the years.  Each window
20    may have a different size piece of glass, depending upon
21    where it's located in the building, as well as some of these
22    pieces of glass are -- the windows that we saw in the
23    earlier video, some of these are at different locations in
24    the building where windows are smaller, or they may even be
25    in -- these may be pieces of glass that are in a door.
```

1    Q.  Now, looking at these costs, do we have the total at the

2    bottom, about 16,000-and-some dollars?

3    A.  That is correct.

4    Q.  Did you use the phrase "fair and reasonable" before,

5    Mr. McIntyre?

6    A.  I did, yes.

7    Q.  Was a review for fairness and reasonableness done on

8    this proposal we've got in front of us?

9    A.  Yes, it was.

10   Q.  And what was the conclusion that was reached?

11   A.  The conclusion was that it was fair and reasonable based

12   on comparing it to --

13            MR. ROOTS:  Objection.  Hearsay.  Who said this?

14            THE COURT:  Overruled.

15   BY MR. MULROE:

16   Q.  You can start over.

17   A.  It was determined that the $16,000 number was fair and

18   reasonable based on comparing it to other pricing that we

19   had received for other glass products in the recent past.

20   Q.  And, Mr. McIntyre, if I were to compare this to what it

21   might cost to put windows in my house, would that be a

22   reasonable way to assess the fairness and reasonableness of

23   this figure?

24   A.  No.

25   Q.  Why not?

1    A.  One of the challenges that we have, and many other

2    secure facilities have, is there's an inherent cost of doing

3    business.  Simply to get a piece of material onto our

4    campus, for a glass contractor to bring a product onto our

5    facility, it takes time for their employee to drive to an

6    off-site facility where they have to be -- where they have

7    to be screened, their vehicle has to be screened.  They then

8    have to come to our campus and be rescreened.  That takes

9    time.  Time costs money.  And so -- they also have to have

10   this -- they have to go through the background checks.  All

11   of the inherent time and effort it takes by the contractor

12   in order to do business at our facility or other secure

13   facilities inherently raises the price.

14            MR. ROOTS:  Your Honor, may we be heard at

15   sidebar?

16            THE COURT:  Yes, sir.

17            (Bench conference:)

18            MR. ROOTS:  The statute that penalizes damage to

19   federal property over $1,000 does not -- it leaves it up to

20   the jury to determine the value.  So here is this witness

21   talking about how government costs are higher

22   than Mr. Mulroe's house and it's for the jury -- listen, the

23   costs that are mentioned in the statute, there's nothing

24   about -- it's up -- this is a fact question for the jury.

25   So the -- it could be the jury determines that the value is

11462

1    based on Mulroe's house.  So they're giving a legal

2    conclusion that is not warranted by either the case law or

3    the statute.  The statute just says "damage over $1,000."

4    This is a jury question.  It is the same as damage to

5    Mr. Mulroe's window.

6            THE COURT:  Right -- no, no, no, what I understand

7    the witness to be doing is explaining why they paid them --

8    the amount of money they paid was required, for example,

9    because they have these screening requirements for people

10   who come in to work on the Capitol and that drives up the

11   cost, you know?  The question of -- and then they paid X.

12   But he's explaining why they paid X.  Why isn't that -- I

13   mean, the reasonableness or non-reasonableness is really

14   not -- I mean, the question, as you say, was the value of it

15   over 1,000 or not over 1,000?  He's explaining why they --

16   the costs are higher than if you just repair your own house,

17   because they have security concerns.  I don't see why he

18   can't just explain that as a matter of fact.

19           MR. ROOTS:  I think we would like a limiting

20   instruction after this is over so the jury is aware that it

21   is up to them to determine the value and the damage.  It's

22   not as stated by the Government.

23           THE COURT:  Well, I'm not -- okay.  We can talk

24   about that and, maybe, you're right, but I think the witness

25   is allowed to explain why the value is higher than if, for

1    example, you -- he's allowed to explain what went into the

2    cost and, you know, then the jury can make of that what they

3    will.  And, maybe, you're right.  So we can take that up

4    afterward, but I think he's allowed to explain this.

5              All right.  Mr. Mulroe, you may proceed.

6              (Return from bench conference.)

7    BY MR. MULROE:

8    Q.  All right.  Picking up where we left off, Mr. McIntyre,

9    based on the lump sum charges by the glass company to fix a

10   whole bunch of panes, did you undertake to calculate on a

11   pane-by-pane basis, sort of, the per-item cost of doing

12   these repairs?

13   A.  Yes, I did.

14             MR. MULROE:  May I approach with an exhibit, Your

15   Honor?

16             THE COURT:  You may.

17   BY MR. MULROE:

18   Q.  Mr. McIntyre, I'm going to hand you a one-page document

19   marked Government-931A.

20             MR. MULROE:  And if we could have the screen off

21   for the jury.

22   BY MR. MULROE:

23   Q.  Do you recognize that document?

24   A.  Yes, I do.

25   Q.  What is that?

1   A.  This is the estimate that I created to identify the cost

2   to repair a single pane of glass as part of the repairs

3   associated with the January 6th damage.

4   Q.  And is -- are these calculations based in part on the

5   figures from the glass company that we were just looking at?

6   A.  In part, yes.

7   Q.  Do they also include, in part, costs that the Architect

8   of the Capitol incurred directly?

9   A.  Yes, it does.

10          MR. MULROE:  Move to admit 931A.

11          THE COURT:  All right.  It will be admitted, and

12   permission to publish.

13   BY MR. MULROE:

14   Q.  All right.  So that set of numbers on the screen,

15   Mr. McIntyre, is that 931A?

16   A.  Yes, it is.

17   Q.  I would like to walk you through how you reached some of

18   these numbers.  And I'm going to do it by means of

19   Government Exhibit -- for demonstrative purposes only --

20   939.

21          MR. MULROE:  So Ms. Harris, if we could switch the

22   display, please, to the podium laptop.

23   BY MR. MULROE:

24   Q.  We're just going to take this in parts, Mr. McIntyre.

25   Does that sound good?

1    A.   Yes.

2    Q.   So the very first slide that we've got up, is this the

3    same document that we just saw?   The overall 931A with all

4    its parts.

5    A.   Yes, it is.

6    Q.   All right.   I'm going to focus you first on the section

7    that is labeled "Materials and Supplies" which I've

8    highlighted and which I'm now blowing up to the whole

9    screen.   So what does this part of the cost calculation

10   represent?

11   A.   This is a combination of any materials that the

12   Architect of the Capitol purchased in order to make these

13   repairs, as well as a -- as well as the glass material and

14   glass labor that were provided to us by a contractor.

15   Q.   So items 1 and 2, glass material contractor and glass

16   labor contractor, are those based on the proposal from the

17   glass company that we just saw?

18   A.   Yes, they are.

19   Q.   All right.   I want to ask you about each of those in

20   turn.   So starting with what I've just highlighted, the $200

21   per pane of material costs from the calculator -- from

22   the -- excuse me -- from the contractor.   When we go to the

23   next slide, we're going to set up a little table.   So the

24   top row says "Total Cost."   What is the number we see for

25   "Total Cost"?

1    A.  7,545.

2    Q.  And is that the same figure from the overall materials

3    cost of the glass company's proposal?

4    A.  Yes, it is.

5    Q.  Now --

6           MR. ROOTS:  Your Honor, may we be heard at sidebar

7    one last time?

8           THE COURT:  Yes, sir.

9           (Bench conference:)

10          MR. ROOTS:  Okay.  This is objectionable on 403

11   grounds.  It's misleading and unfairly prejudicial.  There's

12   part of this exhibit where they have superimposed an image

13   of Mr. Pezzola busting, you know -- with a broken window and

14   then there -- it's been superimposed over that, and also,

15   it's very misleading because they were -- I would remind the

16   Court that Count 7 -- we're really talking about Count 7.

17   Count 7 does not allow the Government to put on evidence of

18   two windows.  The -- Count 7 specifically says that we're

19   dealing with a window -- a single window -- adjacent to the

20   Senate wing door.  That's Count 7.  There is no two windows.

21   So that's very specific.  It's merely the window that is on

22   the left.  It cannot -- the Government cannot convict any of

23   these guys, especially Pezzola, of breaking the window on

24   the right.  It is only the specific window.  So there's only

25   one window at issue in Count 7, not the other one to the

1    right of that window.  It's very misleading.

2              THE COURT:  Okay.  This is, obviously, something

3    that could have been teed up long before now, but I assume

4    the Government's position is that they can prove two panes

5    that linked up with one window.

6              Is that correct?

7              MR. MULROE:  Yes, Your Honor.

8              THE COURT:  All right.  I mean, look,

9    Mr. Metcalf [sic], we can -- I'm not in the middle of the --

10   this -- overall -- okay.  I don't see the slide you're

11   talking about with Mr. Pezzola here, but the point is

12   they're in the middle of trying to prove up what these two

13   panes that we just saw video of Mr. Pezzola taking, maybe,

14   in part, but playing a role in smashing through, and they

15   are attempting to prove the cost of those two panes.  This

16   is a witness that can testify as to what the government

17   paid.  He's testifying as to how he calculated what the

18   government paid for those two panes.  I don't see anything

19   objectionable about it.  I really don't.

20             So you may proceed, Mr. Mulroe.

21             (Return from bench conference.)

22   BY MR. MULROE:

23   Q.  So picking up, Mr. McIntyre, the 7,545 is for all the

24   panes, total, from this order; correct?

25   A.  That is correct.

1    Q.  And if you could tell us, how many panes made up the

2    order?

3    A.  There were 28 panes of glass.

4    Q.  So to figure out what it costs on a pane-by-pane basis,

5    was it as simple as just dividing the 7,500 by 28 panes?

6              THE COURT:  I'm sorry.  Mr. Mulroe, just -- if

7    you'll just pause.

8              I just need all counsel and everyone to refrain

9    from speaking while we have a witness on the stand.

10             Mr. Mulroe, you may proceed.

11   BY MR. MULROE:

12   Q.  Did you just do that simple division of 7,545 divided by

13   28?

14   A.  I could have, but I don't feel like that would have been

15   a fair assessment.

16   Q.  Why not?

17   A.  There are three pieces of glass within this estimate

18   that are distinctly different than the other 25.

19   Q.  And what makes those three panes so different from the

20   rest?

21   A.  They are much thicker pieces of glass.

22   Q.  All right.  So I'm putting two additional lines on the

23   demonstrative.  We've got one-quarter-inch pane times 25 and

24   one-and-three-quarter-inch pane times 3; is that correct?

25   A.  That is correct.

1    Q.  Did you form an assessment of how much more valuable the

2    thicker panes were as compared to the thinner panes?

3    A.  Yes.

4    Q.  And what was that number?

5    A.  The inch-and-three-quarter panes are approximately four

6    times as expensive as a quarter-inch pane of glass.

7    Q.  So showing that four times multiplier on the

8    demonstrative.

9         And then based on -- I won't have you do all the

10   algebra here, but based on that four times multiplier, did

11   you figure out the cost of a quarter-inch pane and the cost

12   of a one-and-three-quarter-inch pane such that they would

13   add up to the total 7,545?

14   A.  Yes, we did -- I did.

15   Q.  What were those numbers?

16   A.  Approximately $200 for the quarter-inch pane of glass

17   and, obviously, as -- with a four-time multiplier, $800 for

18   those inch-and-three-quarter-inch pieces of glass.

19   Q.  And then just to check that math there, Mr. McIntyre,

20   and make sure it adds up, 200 times 25 is -- I know you may

21   not have scrap paper or a calculator up there.  But do you

22   have the product handy?

23   A.  Put me on the spot here.  No.

24   Q.  Does $5,000 sound about right?

25   A.  Yeah, $5,000.  Yes.

1   Q.  And what about 800 times 3?  Would $2,400 sound about

2   right?

3   A.  Yes, that is correct, $2,400.

4   Q.  So then if we add that 5,000 and 2,400, would that be

5   $7,400?

6   A.  That is correct, $7,400.

7   Q.  Now, Mr. McIntyre, I noticed that the number we got to

8   at the bottom, 7,400, is a little bit less than the actual

9   total price of the glass at 7,545.  Why is that?

10  A.  Again, this was an approximation.  Our glass contractor

11  did not provide us a pane-by-pane estimate.  They provided

12  us a lump sum.  This was -- that $200 number is --

13  ultimately, I rounded down on that $200 number.  I believe

14  it was $203.  And so in the -- to be fair, this is not an

15  exact science.  $203 is -- would be unfair to provide that

16  as an exact number, and so we rounded -- I rounded that down

17  to $200.

18  Q.  Why did you round down instead of rounding up?

19  A.  Again, I feel like that's the fairest assessment to make

20  when providing someone an estimate.

21  Q.  Okay.  So that is how we got to $200 per pane on

22  materials.  Do I have that right?

23  A.  That is correct.

24  Q.  What about the next line?  $231 per pane on glass labor

25  contractor.  Did you apply the same process or a different

1    process to reach that?

2    A.  The same process.

3    Q.  All right.  So maybe, we'll move through a little

4    faster.  But the total price of all the labor, would that be

5    8,550?

6    A.  That is correct.

7    Q.  And same number and same size of panes for purposes of

8    this calculation?

9    A.  Thickness of glass.  That is correct.

10   Q.  So that is a -- 25 quarter-inch and 3

11   one-and-three-quarter inches?

12   A.  That is correct.

13   Q.  Did you apply the same multiplier or a different

14   multiplier?

15   A.  It was the same multiplier, yes.

16   Q.  And what was that, again?

17   A.  Four times.

18   Q.  Now, if we apply that same math to the 8,550, would

19   these numbers be accurate based on your calculations and

20   based on the Exhibit-931A that you have in front of you?

21   A.  That is correct.

22   Q.  And then if we do 231 times 25, would $5,775 sound about

23   right?

24   A.  That is correct.

25   Q.  And then for the three one-and-three-quarter-inch panes

11472

```
1    put together, would $2,772 sound about right?

2    A.  Yes.

3    Q.  I hope someone will check me if I'm wrong.  But if we

4    add those figures together, would that reach a total of

5    $8,547?

6    A.  Yes, it does.

7    Q.  Now, once again, is there any discrepancy between the

8    product of those estimates and the actual all-in cost of the

9    glass labor?

10   A.  Again, rounded -- I rounded down in the event that there

11   was dollars and cents.

12   Q.  So once again, you've rounded down on the labor half of

13   it?

14   A.  Yes, I did.

15   Q.  All right.  Let's go back, then.  We've covered the 200

16   materials.  We've covered the 231 labor.  Let me ask you

17   about the remaining lines on this part of the cost

18   calculation.  $25 for HazMat sampling.  What is HazMat

19   sampling?

20   A.  In a building of our age, considering this section of

21   the building was constructed in the 1850s, there may be

22   hazardous materials as part of the glass, the window, the --

23   the material that holds the glass in place, which is called

24   glazing, the paint.  And so we have to -- in order to allow

25   either our employees or an outside contractor to do work on
```

1    that, we have to know what -- if there is any hazardous

2    material as part of that window assembly.  And so this

3    sampling amount was the amount that it costs for us to take

4    a sample of those materials and send it away to a laboratory

5    to have it determined if there's any hazardous materials we

6    have to address.

7    Q.  And this $25 for a single pane, is that itemized on a

8    pane-by-pane basis?

9    A.  That would be on a pane-by-pane basis, yes.

10   Q.  What about the next one?  Skipping over zero, but $35

11   for paint supplies.  It may be self-explanatory, but what is

12   that?

13   A.  That includes the paint, paint brushes, rollers, tape,

14   you know, all of those disposable items that goes along with

15   our -- with a -- the Architect of the Capitol's paint shop

16   employees, for them to perform the work after the contractor

17   has replaced this pane of glass.

18   Q.  So moving on in the demonstrative, Mr. McIntyre, back to

19   the overall picture of 931A, your cost calculation, we've

20   now covered everything in that red box for materials and

21   supplies; is that right?

22   A.  That is correct.

23   Q.  I want to move on, then, to the portion on the left that

24   I've just highlighted, a section that's captioned "Direct

25   Labor."  What all -- well, let me first go to the next slide

1    and blow that up a little bit.  What does the direct labor

2    section of the cost calculation represent?

3    A.  This represents the cost incurred by the Architect of

4    the Capitol, through our employees, performing work

5    associated with the repair of each pane of glass.

6    Q.  So beyond the work that the glass company did, was there

7    extra work to do?

8    A.  Yes.

9    Q.  What did that consist of?

10   A.  At -- as we talked about earlier, it was our insulation

11   shop, who is our qualified hazardous material workers.

12   Those workers take the samples in order to send them away,

13   and then they also -- we also -- it is the Architect of the

14   Capitol's painters who, after that pane of glass is

15   repaired, have to do the painting around that pane of glass

16   to make it match what would have been there prior to

17   January 6th.

18   Q.  And matching the paint appearance, is that necessary,

19   really, at the Capitol?

20   A.  Yeah.  We paint -- about 16 hours a day, something we're

21   painting within the buildings.  And so we would not have

22   the, you know -- a public corridor within the Capitol

23   building on the first floor of a heavily trafficked area of

24   the building have a section of the construction of the

25   building not be in a finished condition.

1    Q.  So let's just look at the numbers, then.  Starting with

2    the first line: AoC Painter, WG, Wage Rates.  What is the

3    number we see in the "Rate" column?

4    A.  $34.15.

5    Q.  And what is that?

6    A.  That's the average hourly rate of one of our painters in

7    our paint shop.

8    Q.  And how many hours on the part of the painters was

9    necessary for a pane of glass?

10   A.  Five hours.

11   Q.  So when you multiply that five hours by $34.15 an hour,

12   what do you get, roughly?

13   A.  $171.

14   Q.  And I don't see any cents there.  Did you round in the

15   amount column?

16   A.  I believe Excel would have rounded in this one, yes.  So

17   it would have rounded to the nearest dollar.

18   Q.  So moving to the next one, then, the insulation wage

19   rates, what's the rate?

20   A.  $37.57.

21   Q.  And how many hours from the insulators?

22   A.  Three hours.

23   Q.  What does that come to?

24   A.  $113.

25   Q.  And, again, rounding to the nearest dollar, is that how

11476

1    we get to the bottom line of that section, $283 of direct

2    labor total?

3    A.  That is correct.

4    Q.  All right.  So if we put that all together, then, as you

5    have done on Exhibit-931A, Mr. McIntyre, the $491 of

6    material and supplies plus the $283 of direct labor, what

7    bottom-line figure per pane of glass does that get us?

8    A.  $774 per pane of glass.

9    Q.  And now, I'm going to ask you a slightly more basic

10   arithmetic question.  But if we wanted to figure out the

11   cost of two panes of glass, what would we do?

12   A.  Add an additional $774.

13   Q.  All right.  So take that 774, multiply it by two.  About

14   what do we get?

15   A.  The 1,552 --

16   Q.  About --

17   A.  -- 58.

18   Q.  1,548?

19   A.  Yeah, 1,548.

20   Q.  And the easiest question of all.  Is that number, 1,548,

21   greater than $1,000?

22   A.  Yes, it is.

23   Q.  Mr. McIntyre, this $1,548, were there any costs

24   associated with the broken windows that are not encompassed

25   in that amount?

1    A.  We did not include the temporary means to secure the

2    window.  So the plywood as well as the labor for our

3    carpentry shop to cut the plywood to the appropriate size

4    and secure it to the door.

5    Q.  Now, overall, the approach that you took to generating

6    the pane-by-pane amount, would you characterize that as an

7    aggressive approach, a conservative approach, or somewhere

8    in between?

9    A.  I attempted to be as fair as possible, and be

10    conservative.  I felt that this was the most fair way to

11    take the lump sum proposal that we received for this group

12    of windows from our glass vendor and break it down on a

13    pane-by-pane basis.

14    Q.  Anything significant about the glass process or the

15    glass calculations that I haven't asked you?

16    A.  No.

17    Q.  All right.  Mr. McIntyre, in that case, I want to move

18    us to a different part of the Capitol.

19         MR. MULROE:  And I'll ask Ms. Rohde to pull up

20    what's in evidence as Government 492G, take that and just

21    pause it at the six-minute mark.

22         And once that's up, Ms. Harris, if you don't mind

23    publishing that from the Government table.

24         (Video played.)

25    BY MR. MULROE:

1    Q.  Can you see what's on the screen, Mr. McIntyre?

2    A.  Yes, I can.

3    Q.  Now, this fence that we can see taking up most of the

4    right side of the screen, do you recognize that fence?

5    A.  Yes, I do.

6    Q.  What is that?

7    A.  That is a temporary fence that we, the Architect of the

8    Capitol, install in the days leading up to the presidential

9    inaugural on the west front.

10    Q.  And if you would, just stand up and point out on the

11    map, if it's visible, where that fence runs when it's in

12    place.

13    A.  It runs approximately this location here.  (Indicating.)

14            MR. MULROE:  And for the record, just note the

15    witness is indicating the, sort of, gentle curve that the

16    Breach 2 sticker is pointing to.

17    BY MR. MULROE:

18    Q.  What's the purpose of this fence, Mr. McIntyre?

19    A.  During the inaugural, there are several different

20    sections of ticketed areas.  You can imagine this event

21    can -- there's over 100,000 tickets that are provided for

22    this event.  And so this is, you know -- similar to any

23    major venue, this is an area that provides, kind of, a

24    visual and, you know, a, kind of, crowd-control separation

25    between two ticketed areas of the presidential inaugural.

11479

1    Q.  How long has the Architect of the Capitol been using

2    this type of fence for the inauguration?

3    A.  We purchased this fence in 2008.

4    Q.  Walk us through the process of installing the fence.

5    When does work on the fence begin?

6    A.  Approximately two weeks -- two to three weeks prior to

7    each inaugural we bring this fencing out of storage.  We

8    have it -- we have this fencing stored in an off-site

9    storage location.  We bring this fencing to the site and

10   then our AoC employees install this fencing for about that

11   two- to three-week period leading up to an inaugural.  And

12   then we remove this fencing and put it back into storage.

13   Q.  Mechanically, how is it that the fence goes up?  Is it

14   affixed to the ground in any way?

15   A.  It is, yes.

16   Q.  How so?

17   A.  Each of the posts are -- use a construction anchor to go

18   into the concrete, and then each of the fence panels are,

19   then, secured to the posts.

20   Q.  So post to ground and then panel to post, basically?

21   A.  That is correct.

22   Q.  Was the fence in place on January 6th, 2021?

23   A.  Yes, it was.

24   Q.  Fully or partially?

25   A.  Fully.

1    Q.  Was the fence in place on January 7th, 2021?

2    A.  No, it was not.

3    Q.  What kind of shape was the fence in when you arrived at

4    the Capitol on the 7th?

5    A.  When I arrived on the 7th, the fence was completely

6    dismantled piece by piece, effectively.  Pieces were strewn

7    about the entire west front.  We found pieces all over the

8    stands, all over the grounds, in the building.  So it -- the

9    fence was a total loss.

10    Q.  When you say pieces, are you talking about those panels?

11    A.  No.  If you look on the picture here, each of these

12    vertical pieces, you know -- each of those pieces had --

13    for -- many of them had been broken off.  Once the top

14    rail -- once -- and you can see this one's already bent, and

15    one is already coming out of the assembly.  Once that top

16    rail and that bottom rail became out of parallel from each

17    other, each of those vertical pieces began to snap off.

18    Q.  What, if anything, did Architect of the Capitol staff do

19    with all these parts of the fence?

20    A.  Unfortunately, they were not reusable.  We recycled

21    them.

22    Q.  Why weren't they reusable?

23    A.  This was a -- it's a lightweight aluminum

24    powder-coated -- powder-coated is a type of paint process --

25    powder-coated finish fence.  And once that aluminum is no

1    longer straight, it's -- you -- you're not bending it back

2    without losing parts and pieces of the fence.  And based on

3    the amount of fence that had been heavily damaged, we made a

4    determination that it was not able to be put back together

5    or salvaged.

6    Q.  With this fence beyond repair, what, if anything, did

7    you do for inauguration to take its place?

8    A.  We did not have a suitable replacement, especially in

9    the time frame between the 6th and the 20th.  We -- at the

10   last minute, the presidential inaugural committee provided

11   for our use, similar to what you would see in an airport,

12   the, you know -- the black stanchions with the retractable

13   ropes that we temporarily placed along this location, and

14   then those were removed and crated back up.  They rented

15   those for this event.

16   Q.  Did the Architect of the Capitol have to pay anything

17   for the temporary barriers that were put in place instead of

18   the fence?

19   A.  We did not.

20   Q.  Did anyone?

21   A.  I -- the presidential inaugural committee would have

22   rented those.

23   Q.  I want to ask you, Mr. McIntyre, about the original

24   purchase of this black fence.

25              MR. MULROE:  And with the Court's permission, I'll

1    approach with what's marked Government Exhibit-932B.

2            THE COURT:  No -- without objection, you may, sir.

3    BY MR. MULROE:

4    Q.  (Indicating.)

5    A.  Thank you.

6    Q.  Mr. McIntyre, do you recognize the document I've handed

7    you -- it's about two pages -- marked 932B?

8    A.  Yes, I do.

9    Q.  What is that?

10   A.  This is the purchase order in -- from 2008 when the

11   fencing was purchased.

12   Q.  Is that the same fencing that was in place on

13   January 6th, 2021?

14   A.  Yes, it is.

15           MR. MULROE:  Move to admit 932B.

16           THE COURT:  All right.  It will be admitted.

17   BY MR. MULROE:

18   Q.  And I should ask first, Mr. McIntyre, at the top of the

19   screen, there are some redaction boxes.  As far as you're

20   aware, anything redacted that has anything to do with the

21   cost of the fence?

22   A.  No.

23   Q.  Let's move, then, to the -- Section 13 in the middle of

24   the page captioned "Schedule."  And what information do we

25   see in that little table there, Mr. McIntyre?

11483

1   A.  It identifies the commodity, the inaugural fencing for

2   the lower west terrace, and then a total cost of that

3   fencing at $32,000.

4   Q.  And would that be the whole fence or just part of the

5   fence or the fence plus some other stuff?

6   A.  This was the whole fence.

7              MR. MULROE:  Ms. Rohde, if we could go to the

8   second page and zoom in on the top, summary info

9   continuation page.

10  BY MR. MULROE:

11  Q.  What is the information we see on that part of the

12  exhibit?

13  A.  A brief description of the product that would be

14  provided to us for this $32,000.

15  Q.  Please read us that description.

16  A.  "Contractor shall provide and install 328 linear feet of

17  35-inch-tall two-line black powder-coated fence, style," and

18  then some redacted information.

19  Q.  And then location?

20  A.  "Location:  West front of the United States Capitol,

21  Washington, D.C."

22  Q.  All right.  So Mr. McIntyre, one more piece of math for

23  us here.

24             MR. MULROE:  If we could go back, please,

25  Ms. Harris, to the podium laptop.

1   BY MR. MULROE:

2   Q.  I'll ask you, Mr. McIntyre, given that we have the price

3   of the entire fence and given that we have the length of the

4   entire fence, what would we do to calculate the price per

5   linear foot of the fence?

6   A.  We would take the total cost, $32,000, of the product --

7   of the entire fence and divide that by the 328 linear feet

8   of fencing that was provided to us.

9   Q.  And would $97.56 sound like the right number if we did

10  that math?

11  A.  That is correct.

12  Q.  That's per foot of fence?

13  A.  That is per foot of fence.

14  Q.  Now, you've talked about panels, Mr. McIntyre.  Strike

15  that.

16          Let me ask first, this purchase order that we see

17  was from when?

18  A.  2008.

19  Q.  Do you know whether a competitive bidding process was

20  used to buy the fence or a sole-source justification or some

21  other procedure?

22  A.  It was competitively bid at the time.

23  Q.  Now, going to the panels that you've mentioned, were all

24  of the panels of the fence the same length or were they

25  different lengths?

1    A.  There were a handful that were a different length.

2    Q.  Are you aware of, generally speaking, what the lengths

3    in play were?

4    A.  Yes.

5    Q.  What was the most common length?

6    A.  The vast majority of the panels were 72 inches in

7    length.

8    Q.  Is that about six feet?

9    A.  Yes.

10   Q.  Now, as part of your professional experience,

11   Mr. McIntyre, are you familiar with the lifespan -- the

12   usable lifespan of materials like these fence parts?

13   A.  Yes.

14   Q.  Tell us, again, how often was this fence called into

15   use.

16   A.  Rough -- once every four years, each time for about two

17   to three weeks.

18   Q.  What did it do when it was not being used for the

19   inauguration?

20   A.  Our Architect of the Capitol employees would disassemble

21   each of those panels from the posts and then crate them back

22   up and take them back to an off-site storage facility where

23   we store other construction materials that we don't keep on

24   hand at the Capitol.

25   Q.  Is that the facility that you mentioned a bit earlier?

11486

1    A.  That is correct.

2    Q.  Is that facility, in your experience, appropriate for

3    keeping and maintaining things when they're not in use?

4    A.  Yes.  We store many construction materials at this

5    off-site warehouse.

6    Q.  Are you aware of what condition the fence parts were in

7    prior to January 6th, 2021?

8    A.  Yes.

9    Q.  What condition?

10   A.  I would consider them like new.

11   Q.  Like new?

12   A.  Like new.

13   Q.  Before January 6th, 2021, as far as you know, did the

14   Architect of the Capitol have any plans to replace the black

15   inaugural fence?

16   A.  No, we did not.

17   Q.  What about after January 6th?

18   A.  Unfortunately, yes; we will have to replace this fence

19   prior -- post January 6th.

20   Q.  Has that process started yet?

21   A.  We have not started that process yet.

22   Q.  Now, looking back to the amount that was paid in 2008, I

23   want to ask you just a couple of questions about time,

24   Mr. McIntyre.

25            You have been with the Architect of the Capitol

11487

1    for how long?

2    A.  14 years.

3    Q.  And in that time on the job, has your work caused you to

4    remain, kind of, aware of the prices of building materials

5    and other goods over time?

6    A.  Yes.

7    Q.  In your experience, has the cost of materials like

8    fencing gone up or gone down since 2008?

9    A.  Since 2008, the cost of building materials, including

10   fencing, has gone up.

11   Q.  We talked about the windows; we talked about the fence.

12   Speaking broadly and without going into details, were other

13   repairs necessary after January 6th, as well?

14   A.  Yes.

15   Q.  Did the inauguration ultimately go forward successfully?

16   A.  Yes, it did.

17          MR. MULROE:  Nothing further.

18          THE COURT:  All right.  Very well.

19                    CROSS-EXAMINATION

20   BY MR. SMITH:

21   Q.  Good afternoon, Mr. McIntyre.  I'm Nick Smith.  I'm

22   going to ask you some -- a few brief questions for Defendant

23   Ethan Nordean about the fence that you just testified about.

24   A.  Good afternoon.

25   Q.  So you testified that the black fence we were just

1    looking at at -- which was placed on January 6th around the

2    Breach No. 2 sticker behind you, that was the -- called the

3    inaugural fencing -- inaugural fence; correct?

4    A.   It's one of many fences that are installed as part of

5    the inaugural -- if you would like to call it the black

6    inaugural fence, I think that would be fair.

7    Q.   That works.

8         Okay.  So -- and you testified that the black

9    inaugural fence was placed where it was on January 6th for

10   purposes of the inauguration that would occur on

11   January 20th; right?

12   A.   That is correct.

13   Q.   Okay.  And so it -- the function of it, I think you

14   testified, was twofold, essentially.  It was aesthetic, to

15   demarcate sections of the crowd, some visitors from other

16   visitors, and the other function was crowd control; is that

17   what you said?

18   A.   It's so that one -- it's so that people would not cross

19   from one ticketed section into another, yes.

20   Q.   Okay.  And so the function of the fence was not to --

21   was not -- didn't relate to security for the vote count on

22   January 6th?

23   A.   That is correct.

24   Q.   Okay.  And so you testified that each segment of the

25   fence was about six feet in length -- linear feet; correct?

1   A.  That is correct.

2   Q.  Okay.  And I'm just going to draw something for you so

3   we're on the same page here.

4           MR. SMITH:  Ms. Harris, I'd just like permission

5   to have a blank screen up for the jury where I'll draw --

6           THE DEPUTY CLERK:  I'm sorry.  Say that again.

7           MR. SMITH:  I'd just like permission to show a

8   blank screen to the jury so I can make a diagram with my

9   finger.

10          THE COURT:  Yes.

11          THE DEPUTY CLERK:  Do you have an exhibit number

12  for it?

13          MR. SMITH:  It's -- it's not an exhibit.  It's --

14  I guess you could --

15          THE COURT:  Ms. Harris, you may give --

16          THE DEPUTY CLERK:  Okay.

17          THE COURT:  -- Mr. Smith access to the -- I guess

18  it's, sort of, an electronic ELMO.

19          MR. MULROE:  No objection.

20  BY MR. SMITH:

21  Q.  So Mr. McIntyre, I've drawn a dashed line in front of a

22  representation of the Capitol building that I've drawn at

23  the top.  Is it fair to say that the black fence that was in

24  front of the Capitol was in segments?  So --

25  A.  Individual panels, yes.

11490

1  Q.  Individual -- so -- yeah.  I was going to clarify that

2  Mr. Mulroe referred to them as panels.  I'll call them

3  panels or segments.  But in -- if this is a representation

4  of the fence that was -- existed in front of the Capitol on

5  January 6th, there were panels of the fence that are

6  detachable from one another; correct?

7  A.  They are all attached to posts.  So at the end of the

8  installation process -- it's similar to any fence line; if

9  part of that fence were to be pushed, it would ultimately --

10  it would impact the entire linear fence.

11  Q.  So I've drawn vertical lines on that diagram that I put

12  on the screen.  Are -- is that, kind of -- is this an

13  accurate, sort of, representation of how the fence was

14  assembled?  There are posts that are between various

15  segments of the fence, and they're all connected to the

16  posts individually?

17  A.  Yes.

18  Q.  Okay.  So there were some segments that were six feet in

19  length.  There were also some segments that were about four

20  feet in length; correct?

21  A.  Correct.  There's a handful of sizes.  If you imagine,

22  this fence line that we installed was not a straight line.

23  It has a slight curve in it.  And so when you're trying to

24  install fence panels that are straight, every so often, you

25  have to have a fence panel that's a little smaller so you

11491

1    can make up that radius.

2    Q.  And -- so I believe that you testified that the decision

3    was made to replace the entire -- the entire length of

4    fencing; correct?

5    A.  We did have to dispose of the entire length of the

6    fencing.

7    Q.  It -- okay.  And do you -- you testified that you --

8    when you came to the Capitol on January 7th, you witnessed

9    some of the fence destruction yourself; correct?

10   A.  That is correct.

11   Q.  You are not able to testify that every segment of the

12   fence -- I guess there would be over 30 segments of the

13   fence -- that every segment of the fence was destroyed;

14   correct?

15   A.  Correct.

16   Q.  So the decision to replace the entire fence was made

17   without regard to whether any individual segment or panel of

18   the fence was destroyed; correct?

19   A.  It was made as a collective whole.  If parts and pieces

20   of the fence are no longer usable, the ability to replicate

21   this fence is more expensive than replacing the entire

22   fence.

23   Q.  So if some segments of that fence in the diagram I just

24   showed you were not destroyed, for example, or destroyed

25   beyond repair, nevertheless, the decision will be made to

1    replace the entire fence?

2    A.  That is correct.

3    Q.  Okay.  So for example, if it -- if a protester were

4    standing in front of one individual segment of the fence

5    that was not destroyed and was not standing in front of

6    segments of the defense -- of the fence that were destroyed,

7    you would not be able to say that that individual caused the

8    Architect of the Capitol to replace the entire fence;

9    correct?

10              MR. MULROE:  Objection.  Calls for an opinion on

11   causation.

12              THE COURT:  Well -- overruled.

13              THE WITNESS:  Our office does not make a

14   determination on how the damage occurred.  Our office makes

15   a determination, if there is damage found, what that damage

16   is, the extent of that damage, and how to repair that

17   damage.

18              MR. SMITH:  Thank you.

19              I'm going to bring up, Ms. Harris, what was --

20   what the Government -- the Government's demonstrative for

21   the fence, the cost calculation.  Thank you.

22   BY MR. SMITH:

23   Q.  Can you see that, Mr. McIntyre?

24   A.  I can see that, yes.

25   Q.  Okay.  So you were asked first about where this $32,000

1    figure came from, and you testified that that was the price

2    that the Architect of the Capitol paid for the black

3    inaugural fence in 2008; correct?

4    A.  That is correct.

5    Q.  And you were asked to divide that by 328 linear feet

6    because that reflects the length of the black inaugural

7    fence that was purchased in 2008; correct?

8    A.  Correct.

9    Q.  And you arrived at a figure of $97.56; correct?

10   A.  That is correct.

11   Q.  You -- I don't think you were asked about what the

12   figure would be for any individual segment -- the cost

13   figure would be for any individual panel or segment of the

14   fence; correct?

15   A.  I was not.

16   Q.  Okay.  So I apologize for making you go through the math

17   now, but, maybe, I'll make it easier for you.  You said that

18   some of the panels were about seven feet in length; correct?

19   A.  Six feet, 72 inches.

20   Q.  Excuse me.  Six feet and -- 72 inches in length.  And so

21   if we multiply 6 by $97.56, we arrive at $585.36; correct?

22   A.  That math sounds correct, yes.

23   Q.  Okay.  And that's less than $1,000; right?

24   A.  That number is less than $1,000.

25   Q.  Okay.  And you said that some of the fence segments were

11494

1    four feet in length; correct?

2    A.   There were -- there are a handful of segments that are

3    shorter than six feet, yes.

4    Q.   And so if we were to multiply $97.56 times 4, we would

5    arrive at $390.24 for each segment or panel; correct?

6    A.   That math sounds correct.

7    Q.   And that's less than $1,000; right?

8    A.   That is less than $1,000.

9    Q.   So I'm going to bring up what was marked as Government

10   Exhibit-932A.  And you can let me know if you saw this one.

11           THE COURT:  Mr. Smith, while you do that, I'll

12   just note that the prior exhibit that you had up, we did not

13   identify.  It's -- it was 932B.

14           MR. SMITH:  It -- thank you, Your Honor.

15           THE COURT:  The prior exhibit.  Go ahead.  You may

16   proceed.

17           MR. SMITH:  So Ms. Harris, I'd like to publish

18   Government Exhibit-932A.  The data of this was incorporated

19   into the demonstrative the Government showed, but I'm going

20   to use it for a slightly different purpose.

21           MR. MULROE:  I'd ask to be heard briefly at

22   sidebar.

23           (Bench conference:)

24           THE COURT:  All right.  Mr. Mulroe?

25           MR. MULROE:  Your Honor, the primary thing I want

1   to note is just that the first page of the exhibit -- which

2   I don't know if Mr. Smith is interested in or not -- is a

3   letter from the Architect of the Capitol to a different

4   prosecution team, essentially, saying, Dear Ms. Prosecutor,

5   here's the information you asked for.  I think that's not

6   relevant and likely to contain hearsay.  So if Mr. Smith is

7   amenable to just admitting --

8          MR. SMITH:  I would not do that to Ms. Kearney.  I

9   have no intention to use it.

10         THE COURT:  All right.  So how do you want to

11  proceed just as a practical matter?  Is it only this page we

12  have up that you care about, Mr. Smith?

13         MR. SMITH:  Yes, Your Honor.  Yes.

14         THE COURT:  So we'll just admit -- I'll just admit

15  Page -- whatever -- however you want to identify it.  Page X

16  of Exhibit-Y.

17         MR. SMITH:  Thank you, Your Honor.

18         THE COURT:  All right.  It -- Mr. Mulroe, you look

19  like you're confused.

20         MR. MULROE:  I do just want to note one other

21  thing.  I think that what Mr. Smith may be about to do is to

22  impeach Mr. McIntyre with an inconsistent figure that was

23  supplied by the Architect of the Capitol.  I just want to be

24  clear.  I think we're not going to object.  We're fine with

25  him using it.  But I do want to be clear that this is not

1    his calculation, this is not his statement, and this is not

2    his --

3            THE COURT:  Well, it's -- I don't know if it's

4    impeaching, but it came from his office and it says an

5    estimate and I don't know why he can't ask him about it.

6    So -- and you've said you won't object.  So let's proceed.

7            MR. SMITH:  Thank you.

8            (Return from bench conference.)

9            MR. SMITH:  So Ms. Harris --

10            Permission to publish?

11            THE DEPUTY CLERK:  It will be admitted?

12            MR. SMITH:  Yes, it will be Page 3 of Government

13    Exhibit-932A --

14            THE COURT:  Yes.

15            MR. SMITH:  -- and only that page.

16            THE COURT:  Just that page shall be admitted.

17    BY MR. SMITH:

18    Q.  So Mr. McIntyre, can you see that page on your screen?

19    A.  Yes, I can.

20    Q.  Does it appear to be a damage estimate for the Capitol

21    breach from the Architect of the Capitol?

22    A.  Yes, it is.

23    Q.  And I'm going to draw a circle over a circle here.  I've

24    drawn a green circle around a section of black fencing.  Is

25    that the black fence we've been talking about?

1    A.  Yes, it is.

2    Q.  Okay.  And do you see that there is a little description

3    of the damage estimate next to the green line I've drawn?

4    A.  Yes.

5    Q.  And does it say that the cost to replace the full extent

6    of the damaged fencing was $32,000?

7    A.  Yes.

8    Q.  And what does the next line read?

9    A.  The estimate for one section is $3,500.

10   Q.  Do you recall how we went through -- first, how you went

11   through some math with Mr. Mulroe about the price -- the

12   cost per foot of the inaugural black fence?

13   A.  Yes.

14   Q.  And I think the cost per foot that you arrived at was

15   $97 and some change?

16   A.  That is correct.

17   Q.  And then you and I, on cross-examination, went through

18   some math about how -- what an individual panel or segment

19   of the fence would cost, using the multiplier of feet, the

20   length of the fence, and the $97 per foot figure; right?

21   A.  Correct.

22   Q.  And did we ever arrive at a figure that was above

23   $1,000?

24   A.  We did not.

25   Q.  Okay.  So can you -- this is a damage estimate from your

1  office; correct?

2  A.  It is from my office, yes.

3  Q.  Okay.  Can you -- do you understand, having reviewed

4  these materials with the Government, with the defense, and

5  before your testimony today, how that figure of $3,500 was

6  arrived at?

7  A.  I do understand where this number came from.

8  Q.  And where does it come from?

9  A.  Unfortunately, when my office prepared this document,

10  they provided a number that was associated with a different

11  section of fence panel.  There is a -- there are multiple

12  types of fences that were damaged on the date of the -- on

13  the 6th and, unfortunately, this was published without

14  proper review, and this was the damage estimate for a single

15  section of fencing of a different kind of fencing.

16  Q.  And, sir, do you know when this document was provided to

17  the prosecutors in this case?

18          MR. MULROE:  Objection --

19          THE WITNESS:  I do not.

20          MR. MULROE:  -- relevance.

21          THE COURT:  Overruled.

22  BY MR. SMITH:

23  Q.  Do you know when the office of the Architect of the

24  Capitol produced this information to the Government in

25  respect of the January 6th investigations?

11499

1   A.  I do not.

2   Q.  Thank you.

3       You testified that sometimes when the Architect of

4   the Capitol purchases materials, it goes through a bidding

5   process, and sometimes there's a no-bid process; correct?

6   A.  A -- that we would either go through a bidding process

7   or we would go through a sole-source.

8   Q.  And I think you testified that with respect to the black

9   fence and its purchase in 2008, there was a bidding process

10  on that; correct?

11  A.  It was a -- competitively bid, yes.

12  Q.  Okay.  What is your knowledge based on when you

13  testified to that?

14  A.  I have an individual who works for me who was the

15  requester for that fencing back in 2008, and they -- I have

16  personally spoken with them, looked at the -- and their

17  recollection is that it was a competitively bid process.

18  Q.  Their recollection.  Did you see any records?

19  A.  We do not have a sole-source justification on hand for

20  that.  And so, therefore, the determination was that it was

21  a competitively bid process.

22  Q.  I see.  Do you know whether $97 and change for one foot

23  of black fencing is a market price?

24  A.  Today or in 2008?

25  Q.  In 2008.

11500

1    A.   In 2008?  I did not make that determination --

2    Q.   Okay.

3    A.   -- back in 2008.

4    Q.   So I think one thing you testified about was that in a

5    bidding process, one feature of the bidding process, when

6    there's competition for a bid on materials that the Capitol

7    would purchase, is that they compete on price; correct?

8    A.   That could be a factor.

9    Q.   And if there is no competition on price, there's only

10   one supplier setting a price.  It's a take-it-or-leave-it

11   for the Capitol; correct?

12   A.   Potentially.  You have room to negotiate.  If we do not

13   believe that it is fair and reasonable, we would negotiate

14   with that contractor.  If that contractor didn't provide

15   pricing that we felt is fair and reasonable, we would not

16   proceed with a sole-source.

17   Q.   You -- in your direct examination, you were shown

18   Government Exhibit-492G, and you drew some lines -- some

19   green lines on the screen at the eight-minute mark.  And I

20   just want to bring that up and show that to you for one

21   brief moment here.

22            (Brief pause.)

23            MR. SMITH:  Ms. Harris, permission to publish

24   Government Exhibit-492G at eight minutes.  It must not have

25   been eight minutes.  There we go.

```
 1                    (Video played.)
 2    BY MR. SMITH:
 3    Q.  Do you recall seeing the black fence on the screen
 4    during your direct examination?
 5    A.  Yes.
 6    Q.  And I think you drew some green lines indicating how --
 7    well, do you recall drawing green lines on the screen?
 8    A.  I do remember drawing on the screen, yes.
 9    Q.  And do you remember what your testimony was when you
10    were drawing the green lines?
11    A.  We were talking about how -- the parts and pieces of the
12    fencing.
13    Q.  And do you recall what your -- the thrust of your remark
14    was about the parts and pieces?
15    A.  That there's a top rail, a bottom rail, and then
16    individual vertical pickets, balusters -- you may call them
17    something different -- but individual vertical rails that
18    connect to that top rail and that bottom rail.
19    Q.  So when you were drawing on this -- you were given this
20    picture as an example to draw on; correct, to describe -- to
21    make your point?
22    A.  I don't believe that was the purpose of Mr. Mulroe's
23    showing me this picture.  It was to -- for me to recall and
24    to say that this was the black fencing installed at the
25    inaugural.
```

11502

1    Q.  Correct.  Now, that is true.  I'm going to get to a more

2    detailed point here.

3            When you -- you said on January -- the morning of

4    January 7th, you viewed some of the black fence that had

5    been destroyed; correct?

6    A.  That is correct.

7    Q.  Okay.  Do you recall seeing this fence, this particular

8    segment?

9    A.  They're not distinguishable.  One piece is not

10   distinguishable from another.

11   Q.  They're not?

12   A.  This is a fence that is several hundred feet long made

13   up of very similar materials for that entire length.

14   Q.  So you would not be able to say today whether this piece

15   of fencing that you're looking at on this screen is one that

16   you saw on the morning of January 7th?

17   A.  Again, my office's responsibility is to determine if

18   there is damage and what the cost to repair that damage is,

19   not looking at --

20   Q.  So -- I understand, sir, and that's a fair point, but

21   I'm asking you something slightly different.  You testified

22   that you did see pieces of the fence on January 7th;

23   correct?

24   A.  That is correct.

25   Q.  You don't know today -- sitting here today -- whether

1    the image on the screen, this fence in the image, is one

2    that you saw on January 7th; correct?

3    A.  Correct.

4    Q.  And that was because you testified that once the fence

5    came down, it was difficult to determine which segment was

6    which; right?

7    A.  Correct.

8    Q.  Okay.  And do you know whether your office went through

9    the segments after the fence had come down to determine

10   where they had been originally placed before the whole fence

11   was torn down?

12   A.  No.

13   Q.  So there was no assessment done of whether damage to a

14   particular segment is associated with any particular point

15   in the line as it stood on January 6th?

16   A.  Again, our office wouldn't make a determination of how

17   damage occurred.  We would look at:  Is there damage?  How

18   do we repair that damage?  How much does it cost to repair

19   that damage?

20            MR. SMITH:  I think that's everything.  Thank you,

21   Mr. McIntyre.

22                    CROSS-EXAMINATION

23   BY MR. HULL:

24   Q.  Good morning, Mr. McIntyre -- well, good afternoon.

25   A.  Good afternoon.

1   Q.  My name's Dan Hull.  I represent Joe Biggs, along with

2   this gentleman over here in the teal tie.  And I just have a

3   few questions for you.

4           First of all, on January 7th, when you saw the

5   damage for the first time, did you have -- come to learn at

6   any point that any particular individuals were responsible

7   for the damage?

8   A.  Again, as I said before, my office's responsibility is

9   not to make a determination of how the damage occurred.  My

10  office's responsibility, as the Architect of the Capitol --

11  our mission is to determine if there is damage, how to

12  repair it, how much it would cost to repair it.

13  Q.  Okay.  So you don't have any information or knowledge

14  about any of the defendants, including my client, as

15  damaging the fence that day?

16  A.  No.

17  Q.  You have been with the office of the Architect of the

18  Capitol for 14 years; is that right?

19  A.  Just over 14 years, yes.

20  Q.  And eight years ago, you were promoted -- I assume it

21  was a promotion -- to deputy superintendent of the U.S.

22  Capitol?

23  A.  In 2019 is when I became deputy --

24  Q.  Got that job?

25  A.  Deputy superintendent.

11505

1    Q.  You switched over to the superintendent's office eight

2    years ago; is that fair to say?

3    A.  I used to -- I previously worked in the House

4    superintendent's office, and after many years in the House

5    superintendent's office, I accepted a position in the

6    Capitol superintendent's office.

7    Q.  I really appreciated your testimony from the standpoint

8    of somebody who's lived here a long time.  And I think you

9    said that you look at your job and the office -- and the job

10   of your office to serve -- let me see if I got this right --

11   preserve and inspire, something like that?

12   A.  That is correct.

13   Q.  And that's because you think of the Capitol as being not

14   just a place of work, but also a museum, a place where the

15   public can come in and out and see Americana; correct?

16   A.  It's the primary building of our United States

17   Government from our -- of our democracy.  It's the, you

18   know -- the center of our congressional business that

19   occurs, you know, on a daily basis every year.

20   Q.  So this is, kind of, a labor of love for you, as well as

21   a job; is that fair?

22   A.  I take pride in what I do.  Absolutely.

23   Q.  Sure.  No, I understand that.  And with respect to -- we

24   talked about serve, preserve, and inspire.  With respect to

25   preserve, does that include protecting the Capitol -- I

11506

1    assume that would mean making it safe.  Would you agree with

2    me?

3    A.  Protect is not -- that seems to me, the way that you're

4    describing it, more of a law enforcement and -- mission.

5    The Architect of the Capitol's mission is definitely

6    different, to, you know, serve, preserve, and inspire, you

7    know -- serve the American -- Congress and the Supreme

8    Court, preserve the nation's Capitol, and to inspire those

9    who come to our buildings.  That's our mission.

10   Q.  I understand that, but you do work with law enforcement,

11   people that, you know, are employed -- Capitol Police, other

12   sister, brother agencies that might have jurisdiction over

13   that plot of land.  So you do work with them, your office

14   does.

15   A.  Quite often, yes.

16   Q.  Okay.  And as part of that, you deal with certain kinds

17   of equipment, certain kinds of protocols or plans to

18   preserve?

19   A.  The Capitol Police, their mission, and law enforcement's

20   mission, I don't believe, is -- preserve is not part of

21   their mission.  I'm not sure I quite understand your

22   question.

23   Q.  Well, I think you said earlier in your testimony -- and

24   excuse me if I'm not being clear -- that you had notice -- I

25   think you said this very -- up front -- of large crowds that

1    were going to be at the Capitol on January 6th; is that

2    right?

3    A.   From time to time, our office does receive notification

4    from law enforcement that -- to expect crowds.  That may be

5    something from a planned demonstration to what you see at

6    the Supreme -- in front of the Supreme Court from time to

7    time based on when rulings are being handed down.  We are

8    certainly kept at least somewhat notified of large general

9    happenings on the campus.

10   Q.   And why is that important to you from the standpoint of

11   what you do?

12   A.   I have men and women in the building who may need to

13   know that -- if there's an area that they should avoid for

14   the day at the direction of the United States Capitol

15   Police.  And so --

16   Q.   Does it have anything to do with requests for certain

17   kinds of equipment or barriers or movable kinds of equipment

18   that you could use to control crowds at the perimeter?

19   A.   We are not responsible for -- my office is not

20   responsible for any of those items that you just listed.

21   Q.   Okay.  So you -- what -- your testimony is that your

22   interest, or why it's important that you had notice of large

23   crowds that day, was only to internally protect the people

24   that were under your command, if you will?

25   A.   It would be to pass along that United States Capitol

1    Police's message that -- to expect large crowds and to

2    anticipate that it may impact your day-to-day working on the

3    Capitol complex.

4    Q.  Okay.  But your testimony also, I guess, is that it had

5    nothing to do with equipment or requests or requisitions

6    that might be needed by, you know -- to secure the perimeter

7    around the Capitol.  January 6th is a very different day.

8    It only happens every four years.  And even, you know, aside

9    from 2020 [sic], it's a year that, you know, you would

10   expect to get requests not just on what to do about the

11   inaugural stage, but also to protect the, you know -- the

12   perimeter with certain kinds of equipment that you would

13   have in your office; is that correct?

14           MR. MULROE:  Objection.  Compound.

15           THE COURT:  Sustained.

16   BY MR. HULL:

17   Q.  Are you -- let me ask it a different way.  Bad question.

18           Are you ever involved in providing or help to

19   provide equipment or making recommendations about equipment

20   with respect to protecting the perimeter of the Capitol?

21   A.  No.

22   Q.  That never happens?

23   A.  Not my office, no.

24   Q.  So your testimony, I guess, also is that, as part of

25   your mission to preserve, that element of it, has nothing to

1    do with protecting the Capitol from outside attackers?

2    A.  Our mission is -- from a preserve perspective is both --

3    historic preservation perspective.  We're dealing with some

4    of the nation's oldest buildings and, you know, a building

5    that was originally started in, you know -- prior to 1800

6    and originally occupied in, you know -- in the early

7    1800s -- our mission is to make sure that that building is

8    historically preserved for generations to come.

9    Q.  I understand.  Do you ever have occasion to make

10   recommendations about certain kinds of equipment that might

11   be used to protect the Capitol and the Capitol grounds?

12   That's really my question.

13   A.  No.

14           MR. MULROE:  Asked and answered.

15           THE COURT:  Sustained.

16   BY MR. HULL:

17   Q.  Did anyone make a request to your office or to you about

18   commandeering certain kinds of equipment to protect the

19   perimeter in advance of January 6th?

20           MR. MULROE:  Object to scope.

21           THE COURT:  Sustained.

22           MR. HULL:  Your Honor, can we go to the phones?

23           THE COURT:  Let's do this.

24           Ladies and gentlemen, it's 12:27.  So I'm going to

25   let you all go to lunch and we'll see you at the end of the

```
 1    lunch hour.
 2              (Jury returned to jury room.)
 3              THE COURT:  All right.  Everyone may be seated.
 4              (Witness steps down.)
 5              MR. HULL:  I heard the click of the door.  I --
 6    Your Honor --
 7              THE COURT:  Mr. Hull, just hold on one second
 8    while the witness leaves the room.
 9              (Brief pause.)
10              All right.  Here's, I think, just where I am on
11    this.  He already answered the question.  The objection was
12    beyond the scope, which I sustained.  But also there's a
13    foundation question.  He -- he already said, That never
14    happens.  I mean, you asked him, actually, twice:  Do you
15    ever give recommendations for equipment to be moved around
16    for the security of the Capitol?  He said, on both
17    occasions, No, we don't do that.  And then you want to go
18    into, Well, did it happen on January 6th?  He already said
19    it never happens.
20              MR. HULL:  Your Honor, he's also said that, you
21    know, one important facet of his job is to preserve the
22    Capitol.
23              THE COURT:  But you asked him the question you're
24    getting at twice, and he said, No, it never happens.  I
25    don't know how --
```

11511

```
1            MR. HULL:  Well, you know, he's -- on

2     January 7th -- maybe I should have laid a better foundation.

3     On January 7th, he is inspecting, if you will, part of the

4     damage that's done to the west front of the Capitol with

5     respect to the inaugural stage.  He's obviously very

6     involved in that.  Protection -- that particular fence, what

7     I was going to ask him one more question about, is, you

8     know, a fence that comes up every four years.  He knows

9     about it.  He's known about it since 2004.  It has something

10    to do with controlling crowds.

11            THE COURT:  Right.  I'm just saying the --

12    literally, the exact -- all of that notwithstanding, you

13    asked him the foundational question.  If he had said, Well,

14    yes, sometimes we do, then you get to say, Well, did it

15    happen on January 6th?  But when he says, twice, No, we

16    never did it, in addition to scope, I think you have as -- a

17    foundational problem.

18            MR. HULL:  Your Honor, I understand.  I'll move on

19    when we come back and ask him a couple more questions.

20            THE COURT:  All right.  See you all at 1:30.

21            THE DEPUTY CLERK:  All rise.  This Honorable Court

22    stands in recess.

23            (Luncheon recess taken at 12:30 p.m.)

24                   * * * * * * * * * * *

25         CERTIFICATE OF OFFICIAL COURT REPORTER
```

1      I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

2    that the above and foregoing constitutes a true and accurate

3    transcript of my stenographic notes and is a full, true and

4    complete transcript of the proceedings to the best of my

5    ability, dated this 1st day of March 2023.

6                        /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                             Official Court Reporter

7                         United States Courthouse
                         Room 6722

8                         333 Constitution Avenue, NW
                         Washington, DC 20001

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,000** [9] - 11411:14, 11461:19, 11462:3, 11476:21, 11493:23, 11493:24, 11494:7, 11494:8, 11497:23
**$1,548** [1] - 11476:23
**$113** [1] - 11475:24
**$16,000** [1] - 11460:17
**$171** [1] - 11475:13
**$2,400** [2] - 11470:1, 11470:3
**$2,772** [1] - 11472:1
**$200** [6] - 11465:20, 11469:16, 11470:12, 11470:13, 11470:17, 11470:21
**$203** [2] - 11470:14, 11470:15
**$231** [1] - 11470:24
**$25** [2] - 11472:18, 11473:7
**$283** [2] - 11476:1, 11476:6
**$3,500** [2] - 11497:9, 11498:5
**$3,700** [1] - 11410:8
**$32,000** [8] - 11408:12, 11410:2, 11410:7, 11483:3, 11483:14, 11484:6, 11492:25, 11497:6
**$34.15** [2] - 11475:4, 11475:11
**$35** [1] - 11473:10
**$37.57** [1] - 11475:20
**$390.24** [1] - 11494:5
**$491** [1] - 11476:5
**$5,000** [2] - 11469:24, 11469:25
**$5,775** [1] - 11471:22
**$585.36** [1] - 11493:21
**$7,400** [2] - 11470:5, 11470:6
**$7,545** [1] - 11458:2
**$774** [2] - 11476:8, 11476:12
**$8,547** [1] - 11472:5
**$8,550** [1] - 11459:16
**$800** [1] - 11469:17
**$97** [4] - 11410:5, 11497:15, 11497:20, 11499:22
**$97.56** [4] - 11484:9, 11493:9, 11493:21, 11494:4

## /

**/s/Timothy** [1] - 11512:6

## 0

**06511** [1] - 11378:22

## 1

**1** [5] - 11378:6, 11381:3, 11381:9, 11381:13, 11465:15
**1,000** [1] - 11462:15
**1,548** [3] - 11478:8, 11476:19, 11476:20
**1,552** [1] - 11476:15
**1-ETHAN** [1] - 11378:4
**10** [4] - 11442:4, 11445:4, 11445:5, 11445:7
**10-minute** [1] - 11442:1
**10-second** [1] - 11429:3
**100,000** [1] - 11478:21
**10003** [1] - 11378:18
**10016** [1] - 11379:13
**1014** [1] - 11379:9
**113** [1] - 11379:15
**12:27** [1] - 11509:24
**12:30** [1] - 11511:23
**13** [3] - 11430:5, 11430:13, 11482:23
**13th** [1] - 11436:17
**14** [5] - 11418:15, 11426:8, 11487:2, 11504:18, 11504:19
**1420** [1] - 11378:24
**15** [2] - 11442:24, 11442:25
**153** [1] - 11379:5
**16** [1] - 11474:20
**16,000-and-some** [1] - 11460:2
**1793** [1] - 11417:19
**1800** [1] - 11509:5
**1800s** [1] - 11509:7
**1850s** [3] - 11441:6, 11446:16, 11472:21
**19th** [1] - 11421:12
**1:21-cr-00175-TJK-1** [1] - 11378:2
**1:21-cr-00175-TJK-2** [1] - 11378:3
**1:21-cr-00175-TJK-3** [1] - 11378:3
**1:21-cr-00175-TJK-5** [1] - 11378:4

## 1:21-cr-00175-TJK-6

[1] - 11378:4
**1:30** [1] - 11511:20
**1st** [2] - 11378:21, 11512:5

## 2

**2** [6] - 11381:4, 11381:9, 11381:14, 11465:15, 11478:16, 11488:2
**2,400** [1] - 11470:4
**2,500** [1] - 11416:17
**2-JOSEPH** [1] - 11378:5
**20** [1] - 11409:12
**200** [2] - 11469:20, 11472:15
**20001** [2] - 11379:19, 11512:8
**20005** [1] - 11378:25
**2004** [1] - 11511:9
**2008** [20] - 11408:9, 11410:1, 11410:15, 11410:18, 11418:16, 11418:17, 11479:3, 11482:10, 11484:18, 11486:22, 11487:8, 11487:9, 11493:3, 11493:7, 11499:9, 11499:15, 11499:24, 11499:25, 11500:1, 11500:3
**2011** [1] - 11425:13
**2019** [1] - 11504:23
**202** [3] - 11378:15, 11378:25, 11379:20
**2020** [1] - 11508:9
**2021** [11] - 11419:25, 11420:7, 11420:12, 11422:16, 11438:23, 11441:12, 11479:22, 11480:1, 11482:13, 11486:7, 11486:13
**2023** [2] - 11378:6, 11512:5
**203** [1] - 11378:22
**20530** [1] - 11378:15
**20777** [1] - 11379:3
**209** [1] - 11379:6
**20th** [4] - 11378:17, 11420:12, 11481:9, 11488:11
**21-175** [2] - 11381:2, 11445:12
**22** [1] - 11444:4
**225** [2] - 11416:24, 11417:8
**230** [1] - 11417:20

**231** [2] - 11471:22, 11472:16
**24-inch** [1] - 11458:14
**240** [1] - 11379:3
**25** [7] - 11427:2, 11427:6, 11468:18, 11468:23, 11469:20, 11471:10, 11471:22
**252-7233** [1] - 11378:15
**253-0514** [1] - 11379:13
**27-second** [2] - 11441:20, 11445:21
**28** [3] - 11468:3, 11468:5, 11468:13
**2:11** [1] - 11391:21
**2:13** [2] - 11391:21, 11392:3
**2:36** [2] - 11388:3, 11393:11

## 3

**3** [8] - 11381:4, 11381:10, 11381:14, 11393:14, 11468:24, 11470:1, 11471:10, 11496:12
**3-ZACHARY** [1] - 11378:5
**30** [4] - 11410:2, 11451:20, 11451:21, 11491:12
**305** [2] - 11379:7, 11379:10
**32** [1] - 11410:2
**328** [5] - 11408:11, 11410:2, 11483:16, 11484:7, 11493:5
**33012** [1] - 11379:9
**33014** [1] - 11379:6
**333** [2] - 11379:19, 11512:8
**35-inch-tall** [1] - 11483:17
**354-3111** [1] - 11379:20
**3795** [1] - 11400:6
**383** [1] - 11378:21
**393-3017** [1] - 11378:22
**3:15** [1] - 11393:14

## 4

**4** [2] - 11446:12, 11494:4
**401** [8] - 11398:5, 11398:13, 11399:20,

**11403:23**, 11406:5, 11406:15, 11406:16
**403** [13] - 11385:22, 11386:6, 11395:14, 11398:8, 11398:13, 11399:10, 11399:20, 11403:1, 11403:14, 11437:10, 11443:11, 11466:10
**403-7323** [1] - 11379:7
**41** [1] - 11378:8
**425** [1] - 11443:4
**429-6520** [1] - 11378:25
**472-3391** [1] - 11379:3
**479** [1] - 11435:18
**479A** [4] - 11428:1, 11428:5, 11428:13, 11428:22
**479B** [1] - 11429:19
**479C** [1] - 11432:1
**479D** [1] - 11437:18
**48** [1] - 11382:10
**49** [1] - 11379:9
**49-second** [1] - 11447:10
**492G** [1] - 11477:20
**4r** [1] - 11378:18
**4th** [1] - 11378:14

## 5

**5** [3] - 11381:5, 11381:11, 11381:15
**5,000** [1] - 11470:4
**5-ENRIQUE** [1] - 11378:6
**52** [2] - 11430:20, 11431:23
**54-inch** [1] - 11458:14
**555** [1] - 11378:14
**58** [1] - 11476:17
**59047** [1] - 11379:16
**5:00** [2] - 11425:19, 11427:12

## 6

**6** [4] - 11381:5, 11381:12, 11381:15, 11493:21
**6-DOMINIC** [1] - 11378:6
**60** [2] - 11451:20, 11451:21
**60-degree** [1] - 11441:12
**6175** [1] - 11379:5
**646** [1] - 11379:13
**6722** [2] - 11379:18,

11512:7
**6th** [51] - 11379:12,
11408:4, 11408:8,
11410:12, 11415:3,
11419:25, 11420:5,
11420:6, 11420:7,
11422:16, 11422:18,
11422:22, 11423:9,
11423:15, 11423:16,
11424:3, 11424:7,
11424:16, 11427:4,
11427:11, 11429:12,
11430:10, 11431:10,
11433:17, 11434:9,
11448:4, 11449:1,
11452:9, 11457:1,
11464:3, 11474:17,
11479:22, 11481:9,
11482:13, 11486:7,
11486:13, 11486:17,
11486:19, 11487:13,
11488:1, 11488:9,
11488:22, 11490:5,
11498:13, 11498:25,
11503:15, 11507:1,
11508:7, 11509:19,
11510:18, 11511:15

## 7

**7** [7] - 11378:17,
11466:16, 11466:17,
11466:18, 11466:20,
11466:25
**7,400** [1] - 11470:8
**7,500** [1] - 11468:5
**7,545** [5] - 11466:1,
11467:23, 11468:12,
11469:13, 11470:9
**7166** [1] - 11379:2
**72** [3] - 11485:6,
11493:19, 11493:20
**764-9347** [1] -
11379:16
**774** [1] - 11476:13
**775** [1] - 11379:16
**7th** [20] - 11424:4,
11425:17, 11426:6,
11426:16, 11427:11,
11428:14, 11430:1,
11447:15, 11449:18,
11480:1, 11480:4,
11480:5, 11491:8,
11502:4, 11502:16,
11502:22, 11503:2,
11504:4, 11511:2,
11511:3

## 8

**8,550** [2] - 11471:5,
11471:18
**800** [1] - 11470:1
**822-2901** [1] -
11379:10

## 9

**902-3869** [1] -
11378:19
**917** [1] - 11378:19
**931A** [5] - 11434:25,
11464:10, 11464:15,
11465:3, 11473:19
**931B** [2] - 11455:7,
11456:3
**932B** [3] - 11482:7,
11482:15, 11494:13
**939** [1] - 11464:20
**99** [1] - 11379:12
**9:00** [1] - 11378:6

## A

**a.m** [3] - 11378:6,
11425:19, 11427:12
**abbreviated** [1] -
11434:5
**ability** [5] - 11388:4,
11389:3, 11392:10,
11421:20, 11512:5
**able** [25] - 11393:1,
11394:23, 11402:10,
11403:19, 11403:20,
11405:18, 11409:15,
11411:21, 11411:23,
11413:12, 11424:19,
11433:1, 11439:2,
11442:21, 11446:7,
11449:24, 11452:4,
11452:5, 11452:22,
11452:24, 11481:4,
11491:11, 11492:7,
11502:14
**absolutely** [5] -
11400:20, 11400:22,
11401:17, 11423:21,
11505:22
**accept** [1] - 11454:22
**accepted** [2] -
11415:8, 11505:5
**access** [3] - 11391:19,
11451:22, 11489:17
**accomplished** [1] -
11437:24
**account** [1] -
11405:19
**accounts** [1] -

11423:6
**accurate** [5] -
11447:7, 11455:25,
11471:19, 11490:13,
11512:2
**accurately** [1] -
11428:19
**accusers** [1] -
11411:19
**acknowledgement**
[1] - 11415:6
**acted** [2] - 11402:18,
11403:19
**acting** [2] - 11400:24,
11406:23
**action** [3] - 11421:15,
11425:6, 11425:9
**actions** [5] - 11386:2,
11390:6, 11402:14,
11424:13
**active** [2] - 11423:9,
11454:13
**activities** [8] -
11416:19, 11416:22,
11417:3, 11421:24,
11423:7, 11423:16,
11430:9, 11430:11
**Activity** [1] - 11457:22
**activity** [1] - 11397:11
**actor** [1] - 11413:4
**actual** [4] - 11410:12,
11450:3, 11470:8,
11472:8
**add** [6] - 11382:25,
11451:22, 11469:13,
11470:4, 11472:4,
11476:12
**addition** [1] -
11511:16
**additional** [4] -
11418:1, 11453:12,
11468:22, 11476:12
**additionally** [1] -
11397:25
**address** [1] - 11473:6
**adds** [1] - 11469:20
**adjacent** [1] -
11466:19
**adjustable** [1] -
11416:1
**admit** [7] - 11404:8,
11407:9, 11456:3,
11464:10, 11482:15,
11495:14
**admitted** [14] -
11388:19, 11415:4,
11428:6, 11435:18,
11435:20, 11435:23,
11436:2, 11436:8,
11436:10, 11437:9,

11464:11, 11482:16,
11496:11, 11496:16
**admitting** [1] -
11495:7
**advance** [1] -
11509:19
**aesthetic** [1] -
11488:14
**aesthetics** [1] -
11453:16
**affected** [1] - 11403:6
**affixed** [1] - 11479:14
**afternoon** [6] -
11423:4, 11424:16,
11487:21, 11487:24,
11503:24, 11503:25
**age** [1] - 11472:20
**agencies** [2] -
11417:23, 11506:12
**agency** [3] - 11416:9,
11416:16, 11418:2
**aggressive** [1] -
11477:7
**agitation** [1] -
11389:14
**ago** [4] - 11395:21,
11455:23, 11504:20,
11505:2
**agree** [6] - 11384:4,
11384:19, 11388:18,
11395:13, 11397:24,
11506:1
**agreed** [1] - 11383:20
**agreement** [1] -
11415:12
**ahead** [1] - 11494:15
**aided** [1] - 11379:21
**airport** [1] - 11481:11
**aisle** [1] - 11404:22
**al** [1] - 11445:13
**alarm** [1] - 11404:21
**algebra** [1] - 11469:10
**all-in** [3] - 11459:13,
11459:14, 11472:8
**alleged** [7] - 11383:21,
11383:23, 11384:4,
11384:5, 11396:23,
11396:24, 11415:6
**allegedly** [1] -
11399:19
**allow** [11] - 11388:9,
11394:12, 11396:20,
11402:13, 11404:9,
11408:14, 11423:12,
11440:21, 11452:6,
11466:17, 11472:24
**allowed** [5] - 11394:1,
11440:2, 11462:25,
11463:1, 11463:4
**allowing** [1] - 11403:5

**allows** [2] - 11389:22,
11390:13
**almost** [3] - 11407:4,
11429:11, 11436:11
**alternative** [1] -
11453:4
**aluminum** [2] -
11480:23, 11480:25
**amenable** [1] -
11495:7
**amended** [1] -
11385:17
**Amendment** [1] -
11411:18
**AMERICA** [1] -
11378:2
**America** [2] - 11381:3,
11445:12
**American** [2] -
11426:4, 11506:7
**Americana** [1] -
11505:15
**amount** [18] -
11392:15, 11411:15,
11426:8, 11433:17,
11434:8, 11437:24,
11452:13, 11452:17,
11457:6, 11459:15,
11462:8, 11473:3,
11475:15, 11476:25,
11477:6, 11481:3,
11486:22
**analyze** [1] - 11406:20
**anchor** [1] - 11479:17
**annotate** [1] - 11421:2
**annotations** [1] -
11421:18
**answered** [2] -
11509:14, 11510:11
**anticipate** [1] -
11434:10, 11508:2
**anticipating** [1] -
11386:1
**anyway** [1] - 11403:5
**AoC** [2] - 11475:2,
11479:10
**apart** [1] - 11422:10
**apologies** [1] -
11459:6
**apologize** [1] -
11493:16
**apparent** [1] -
11386:16
**appear** [3] - 11395:17,
11408:2, 11496:20
**appearance** [1] -
11474:18
**appearance's** [1] -
11404:19
**APPEARANCES** [2] -

11378:11, 11379:1
**appeared** [3] -
11382:9, 11382:14,
11393:2
**applied** [1] - 11441:5
**apply** [3] - 11470:25,
11471:13, 11471:18
**applying** [1] -
11405:18
**appreciate** [2] -
11382:18, 11413:1
**appreciated** [1] -
11505:7
**apprehension** [1] -
11389:21
**approach** [6] -
11455:2, 11463:14,
11477:5, 11477:7,
11482:1
**appropriate** [7] -
11384:17, 11394:10,
11394:15, 11397:20,
11444:21, 11477:3,
11486:2
**approvals** [1] -
11453:24
**approved** [1] -
11453:23
**approximation** [1] -
11470:10
**Architect** [69] -
11407:25, 11408:9,
11408:23, 11410:6,
11411:22, 11412:13,
11412:18, 11416:6,
11416:7, 11416:10,
11416:13, 11416:14,
11417:9, 11417:14,
11417:18, 11417:19,
11418:4, 11418:6,
11418:13, 11418:19,
11418:20, 11419:2,
11420:1, 11420:9,
11420:13, 11422:6,
11422:8, 11422:11,
11423:19, 11424:24,
11425:7, 11425:11,
11426:11, 11437:25,
11439:5, 11439:23,
11448:3, 11448:6,
11449:9, 11450:3,
11450:18, 11452:7,
11452:24, 11453:5,
11453:21, 11454:3,
11455:20, 11464:7,
11465:12, 11473:15,
11474:3, 11474:13,
11478:7, 11479:1,
11480:18, 11481:16,
11485:20, 11486:14,

11486:25, 11492:8,
11493:2, 11495:3,
11495:23, 11496:21,
11498:23, 11499:3,
11504:10, 11504:17,
11506:5
**architects** [1] -
11424:23
**area** [11] - 11405:15,
11421:5, 11430:23,
11431:3, 11438:7,
11438:16, 11446:11,
11446:12, 11474:23,
11478:23, 11507:13
**areas** [2] - 11478:20,
11478:25
**argue** [1] - 11392:12,
11410:23
**arguing** [1] - 11385:4
**argument** [6] -
11393:16, 11398:5,
11398:6, 11398:14,
11399:12, 11403:23
**arguments** [1] -
11397:24
**arithmetic** [1] -
11476:10
**arose** [1] - 11404:21
**arrest** [4] - 11400:11,
11402:2, 11402:3
**arrive** [4] - 11425:18,
11493:21, 11494:5,
11497:22
**arrived** [7] - 11427:12,
11447:14, 11480:3,
11480:5, 11493:9,
11497:14, 11498:6
**arriving** [2] -
11390:15, 11425:22
**art** [2] - 11440:13,
11441:3
**artfully** [1] - 11390:18
**articulate** [1] -
11387:12
**articulated** [1] -
11383:25
**artwork** [1] - 11440:14
**aside** [3] - 11387:20,
11410:7, 11508:8
**aspect** [1] - 11396:18
**aspects** [3] - 11396:8,
11416:25, 11440:14
**assaulted** [1] -
11388:6
**assembled** [1] -
11490:14
**assembly** [2] -
11473:2, 11480:15
**assess** [4] - 11430:5,
11430:6, 11454:25,

11460:22
**assessed** [1] -
11454:24
**assessment** [10] -
11424:17, 11424:18,
11424:21, 11425:8,
11437:22, 11454:23,
11468:15, 11469:1,
11470:19, 11503:13
**assistant** [2] -
11418:21, 11419:3
**assisting** [1] -
11427:7
**associated** [6] -
11434:8, 11464:3,
11474:5, 11476:24,
11498:10, 11503:14
**assume** [4] -
11401:15, 11467:3,
11504:20, 11506:1
**AT** [1] - 11379:15
**attached** [2] -
11429:8, 11490:7
**attacked** [1] - 11395:6
**attackers** [1] -
11509:1
**attempt** [1] - 11388:23
**attempted** [1] -
11477:9
**attempting** [5] -
11392:23, 11400:10,
11402:2, 11408:6,
11467:15
**attention** [4] -
11381:20, 11406:11,
11413:25, 11420:9
**attitude** [2] - 11400:9,
11401:25
**attorney** [2] -
11456:11
**ATTORNEY** [1] -
11379:15
**ATTORNEY'S** [1] -
11378:14
**authenticity** [1] -
11436:11
**automatically** [1] -
11454:22
**availability** [2] -
11438:23, 11439:12
**available** [4] -
11449:14, 11450:12,
11454:10, 11454:20
**Avenue** [3] -
11379:12, 11379:19,
11512:8
**average** [2] -
11424:22, 11475:6
**avoid** [1] - 11507:13
**aware** [5] - 11462:20,

11482:20, 11485:2,
11486:6, 11487:4

---

# B

**B.A** [1] - 11378:12
**background** [5] -
11419:16, 11452:3,
11453:1, 11454:13,
11461:10
**bad** [1] - 11508:17
**badge** [2] - 11452:5,
11454:15
**balusters** [1] -
11501:16
**balustrade** [6] -
11430:24, 11430:25,
11431:4, 11431:5,
11431:12, 11431:13
**barriers** [2] -
11481:17, 11507:17
**base** [1] - 11416:2
**based** [18] - 11406:18,
11434:24, 11449:12,
11451:12, 11452:14,
11460:11, 11460:18,
11462:1, 11463:9,
11464:4, 11465:16,
11469:9, 11469:10,
11471:19, 11471:20,
11481:2, 11499:12,
11507:7
**basement** [1] -
11432:8
**basic** [1] - 11476:9
**basis** [10] - 11387:13,
11445:2, 11459:2,
11463:11, 11468:4,
11473:8, 11473:9,
11477:13, 11505:19
**became** [5] -
11392:24, 11418:21,
11419:3, 11480:16,
11504:23
**becomes** [1] - 11390:9
**BEFORE** [1] - 11378:9
**began** [7] - 11417:23,
11418:20, 11419:1,
11424:14, 11424:18,
11449:18, 11480:17
**begin** [5] - 11421:22,
11421:25, 11422:1,
11431:4, 11479:5
**beginning** [6] -
11395:20, 11412:9,
11412:11, 11429:22,
11444:25, 11449:18
**behind** [1] - 11488:2
**believes** [1] -
11409:10

**bench** [6] - 11413:20,
11414:20, 11437:14,
11463:6, 11467:21,
11496:8
**Bench** [5] - 11413:21,
11432:19, 11461:17,
11466:9, 11494:23
**bending** [1] - 11481:1
**bent** [1] - 11480:14
**Bertino** [1] - 11415:2
**Bertino's** [1] - 11383:4
**best** [1] - 11406:15,
11440:21, 11512:4
**better** [1] - 11511:2
**between** [7] -
11401:10, 11421:10,
11472:7, 11477:8,
11478:25, 11481:9,
11490:14
**beyond** [7] - 11390:4,
11391:15, 11396:19,
11474:6, 11481:6,
11491:25, 11510:12
**bid** [8] - 11451:1,
11452:21, 11484:22,
11499:5, 11499:11,
11499:17, 11499:21,
11500:6
**bidding** [12] -
11450:18, 11450:21,
11450:23, 11451:9,
11452:8, 11453:3,
11484:19, 11499:4,
11499:6, 11499:9,
11500:5
**bids** [3] - 11451:5,
11451:6, 11451:7
**big** [2] - 11438:11,
11447:3
**biggest** [1] - 11438:22
**Biggs** [7] - 11381:4,
11381:14, 11395:12,
11397:10, 11406:4,
11443:13, 11504:1
**BIGGS** [1] - 11378:5
**bit** [9] - 11402:16,
11416:13, 11417:17,
11420:5, 11444:20,
11446:14, 11470:8,
11474:1, 11485:25
**black** [19] - 11408:1,
11481:12, 11481:24,
11483:17, 11486:14,
11487:25, 11488:5,
11488:8, 11489:23,
11493:2, 11493:6,
11496:24, 11496:25,
11497:12, 11499:8,
11499:23, 11501:3,
11501:24, 11502:4

11516

**blank** [2] - 11489:5,
11489:8
**bleachers** [1] -
11421:7
**blow** [1] - 11474:1
**blowers** [2] -
11429:24, 11429:25
**blowing** [1] - 11465:8
**blue** [4] - 11431:9,
11431:11, 11431:12,
11431:14
**boarded** [2] -
11447:19, 11447:25
**body** [1] - 11392:24
**boss** [3] - 11423:4,
11423:7, 11424:3
**bottom** [9] - 11405:25,
11459:7, 11460:2,
11470:8, 11476:1,
11476:7, 11480:16,
11501:15, 11501:18
**bottom-line** [1] -
11476:7
**box** [3] - 11413:17,
11445:10, 11473:20
**boxes** [2] - 11412:16,
11482:19
**Boys** [2] - 11397:3,
11397:18
**branch** [5] - 11412:14,
11413:2, 11413:3,
11416:9, 11416:16
**Breach** [3] - 11446:12,
11478:16, 11488:2
**breach** [2] - 11406:25,
11496:21
**breached** [2] -
11391:21, 11406:24
**breaches** [2] -
11426:23, 11427:1
**break** [8] - 11411:6,
11411:7, 11435:4,
11436:3, 11441:25,
11442:2, 11442:13,
11477:12
**breaking** [3] -
11396:14, 11396:22,
11466:23
**breaks** [1] - 11390:9
**brethren** [1] -
11406:11
**bridge** [1] - 11411:8
**Brief** [6] - 11413:15,
11432:16, 11440:15,
11445:8, 11445:16,
11500:22
**brief** [6] - 11413:24,
11432:21, 11483:13,
11487:22, 11500:21,
11510:9

**briefly** [1] - 11494:21
**bring** [8] - 11411:24,
11413:14, 11461:4,
11479:7, 11479:9,
11492:19, 11494:9,
11500:20
**broadly** [1] - 11487:12
**broken** [23] - 11409:8,
11410:17, 11426:15,
11427:1, 11427:2,
11427:9, 11427:10,
11439:20, 11439:21,
11440:19, 11440:20,
11449:1, 11449:2,
11449:3, 11449:4,
11449:11, 11449:13,
11455:21, 11459:12,
11466:13, 11476:24,
11480:13
**brother** [1] - 11506:12
**brought** [2] - 11388:2,
11388:7
**brushes** [1] -
11473:13
**budget** [2] - 11454:17,
11454:18
**building** [77] -
11386:18, 11387:21,
11391:19, 11391:24,
11392:3, 11394:2,
11394:13, 11404:6,
11406:25, 11417:4,
11417:15, 11417:25,
11418:3, 11419:6,
11420:25, 11424:5,
11424:21, 11424:25,
11425:1, 11425:24,
11425:25, 11426:1,
11426:5, 11426:6,
11426:14, 11426:16,
11426:23, 11427:3,
11427:4, 11427:5,
11427:8, 11432:6,
11432:9, 11438:11,
11438:14, 11439:25,
11440:3, 11440:6,
11440:7, 11440:12,
11440:18, 11440:22,
11441:1, 11441:2,
11441:3, 11446:5,
11446:16, 11446:17,
11446:20, 11447:20,
11447:21, 11448:17,
11448:18, 11448:20,
11452:20, 11457:11,
11459:21, 11459:24,
11472:20, 11472:21,
11474:23, 11474:24,
11474:25, 11480:8,
11487:4, 11487:9,

11489:22, 11505:16,
11507:12, 11509:4,
11509:7
**buildings** [8] -
11418:1, 11418:22,
11419:4, 11425:14,
11450:9, 11474:21,
11506:9, 11509:4
**built** [2] - 11431:1,
11459:19
**bunch** [3] - 11435:23,
11436:1, 11463:10
**business** [10] -
11423:13, 11426:3,
11426:4, 11450:17,
11451:24, 11452:23,
11454:12, 11461:3,
11461:12, 11505:18
**busting** [1] - 11466:13
**busts** [1] - 11440:14
**buy** [1] - 11484:20
**BY** [43] - 11415:19,
11419:7, 11420:19,
11427:20, 11428:12,
11429:1, 11429:23,
11430:19, 11432:4,
11437:21, 11440:16,
11445:18, 11445:25,
11447:13, 11455:5,
11455:11, 11456:15,
11456:20, 11457:20,
11458:21, 11460:15,
11463:7, 11463:17,
11463:22, 11464:13,
11464:23, 11467:22,
11468:11, 11477:25,
11478:17, 11482:3,
11482:17, 11483:10,
11484:1, 11487:20,
11489:20, 11492:22,
11496:17, 11498:22,
11501:2, 11503:23,
11508:16, 11509:16

# C

**calculate** [4] -
11410:13, 11410:19,
11463:10, 11484:4
**calculated** [1] -
11467:17
**calculation** [7] -
11465:9, 11471:8,
11472:18, 11473:19,
11474:2, 11492:21,
11496:1
**calculations** [4] -
11409:6, 11464:4,
11471:19, 11477:15
**calculator** [2] -

11465:21, 11469:21
**call-out** [1] - 11457:19
**cameras** [1] -
11438:18
**campus** [4] - 11452:6,
11461:4, 11461:8,
11507:9
**cannot** [2] - 11466:22
**Capitol** [155] -
11396:25, 11397:8,
11398:4, 11403:9,
11406:22, 11407:25,
11408:9, 11408:23,
11410:6, 11411:22,
11412:13, 11412:19,
11416:6, 11416:7,
11416:10, 11416:12,
11416:14, 11416:15,
11416:19, 11416:20,
11417:4, 11417:9,
11417:10, 11417:13,
11417:14, 11417:15,
11417:16, 11417:18,
11417:19, 11417:25,
11418:1, 11418:4,
11418:6, 11418:13,
11418:19, 11418:20,
11419:2, 11419:5,
11419:8, 11419:21,
11419:23, 11420:1,
11420:8, 11420:13,
11422:1, 11422:6,
11422:8, 11422:11,
11422:24, 11423:8,
11423:15, 11423:18,
11423:20, 11423:22,
11423:23, 11423:24,
11423:25, 11424:20,
11424:24, 11425:8,
11425:11, 11425:16,
11425:24, 11426:1,
11426:11, 11426:12,
11427:8, 11427:16,
11428:14, 11428:19,
11429:5, 11430:25,
11432:8, 11437:25,
11439:5, 11439:14,
11439:23, 11439:24,
11440:4, 11440:12,
11446:4, 11446:17,
11447:14, 11448:3,
11448:6, 11449:1,
11449:10, 11450:3,
11450:18, 11452:1,
11452:7, 11452:24,
11452:25, 11453:5,
11453:22, 11454:3,
11454:13, 11455:20,
11459:18, 11462:10,
11464:8, 11465:12,

11474:4, 11474:19,
11474:22, 11477:18,
11478:8, 11479:1,
11480:4, 11480:18,
11481:16, 11483:20,
11485:20, 11485:24,
11486:14, 11486:25,
11489:22, 11489:24,
11490:4, 11491:8,
11492:8, 11493:2,
11495:3, 11495:23,
11496:20, 11496:21,
11498:24, 11499:4,
11500:6, 11500:11,
11504:10, 11504:18,
11504:22, 11505:6,
11505:13, 11505:25,
11506:8, 11506:11,
11506:19, 11507:1,
11507:14, 11507:25,
11508:3, 11508:7,
11508:20, 11509:1,
11509:11, 11510:16,
11510:22, 11511:4
**Capitol's** [4] -
11420:9, 11473:15,
11474:14, 11506:5
**captioned** [2] -
11473:24, 11482:24
**captures** [1] -
11403:11
**care** [7] - 11416:17,
11416:21, 11423:23,
11426:11, 11426:13,
11434:2, 11495:12
**careful** [3] - 11404:15,
11404:24, 11436:4
**careless** [1] -
11404:24
**Carmen** [2] - 11379:2,
11381:11
**carpentry** [2] -
11417:1, 11477:3
**carry** [2] - 11420:13,
11426:3
**case** [16] - 11384:20,
11385:6, 11395:17,
11395:20, 11396:8,
11396:16, 11397:4,
11397:12, 11404:14,
11406:15, 11407:2,
11408:25, 11415:10,
11462:2, 11477:17,
11498:17
**cases** [2] - 11384:21,
11385:2
**catching** [1] -
11418:24
**category** [1] -
11436:22

**causation** [1] - 11492:11
**caused** [5] - 11405:6, 11405:10, 11408:25, 11487:3, 11492:7
**causes** [1] - 11386:23
**CCR** [3] - 11379:17, 11512:1, 11512:6
**center** [6] - 11409:9, 11409:11, 11421:17, 11446:20, 11505:18
**Center** [2] - 11416:12, 11417:16
**cents** [2] - 11472:11, 11475:14
**certain** [12] - 11397:3, 11397:4, 11412:18, 11415:1, 11415:3, 11419:21, 11506:16, 11506:17, 11507:16, 11508:12, 11509:10, 11509:18
**certainly** [2] - 11438:16, 11507:8
**CERTIFICATE** [1] - 11511:25
**certify** [1] - 11512:1
**cetera** [3] - 11387:23, 11424:11, 11437:11
**chain** [3] - 11439:7, 11439:10, 11449:23
**challenge** [1] - 11438:22
**challenged** [1] - 11386:12
**challenges** [1] - 11461:1
**challenging** [1] - 11411:14
**chance** [3] - 11427:15, 11436:8, 11442:5
**change** [2] - 11497:15, 11499:22
**changes** [1] - 11403:25
**changing** [2] - 11383:22, 11383:24
**characterize** [3] - 11400:9, 11401:25, 11477:6
**charge** [2] - 11398:25, 11399:9
**charged** [3] - 11396:14, 11402:19, 11433:22
**charges** [4] - 11396:9, 11396:19, 11415:3, 11463:9
**charging** [1] - 11434:12

**chartreuse** [3] - 11405:13, 11405:15, 11407:9
**chartreuse-colored** [1] - 11405:13
**check** [2] - 11469:19, 11472:3
**checks** [2] - 11453:1, 11461:10
**choice** [1] - 11454:7
**chronologically** [1] - 11456:22
**Circle** [1] - 11387:10
**circle** [5] - 11401:19, 11401:24, 11496:23, 11496:24
**circled** [1] - 11421:17
**circumstances** [2] - 11386:3, 11443:25
**cite** [2] - 11400:6, 11400:19
**cites** [1] - 11385:2
**civil** [9] - 11386:20, 11392:15, 11398:14, 11398:16, 11399:4, 11399:9, 11399:12, 11399:14, 11433:11
**clarify** [4] - 11405:5, 11436:23, 11458:25, 11490:1
**clarity** [1] - 11407:12
**clash** [1] - 11398:12
**clause** [2] - 11411:25, 11412:23
**cleaning** [2] - 11417:2
**cleanup** [1] - 11429:25
**clear** [10] - 11385:2, 11389:21, 11391:13, 11403:17, 11403:21, 11414:10, 11458:15, 11495:24, 11495:25, 11506:24
**clearances** [2] - 11440:1, 11454:13
**cleared** [1] - 11427:5
**clearing** [3] - 11421:18, 11431:19, 11431:22
**CLERK** [13] - 11381:2, 11413:16, 11428:4, 11428:8, 11436:16, 11445:6, 11445:9, 11445:11, 11489:6, 11489:11, 11489:16, 11496:11, 11511:21
**click** [1] - 11510:5
**client** [4] - 11383:15, 11387:9, 11397:10, 11504:14

**client's** [1] - 11399:13
**clients** [6] - 11383:14, 11387:6, 11396:13, 11397:17, 11403:22
**climate** [1] - 11440:10
**Clock** [1] - 11392:5
**close** [3] - 11389:17, 11416:4, 11426:18
**closely** [1] - 11389:25
**closer** [1] - 11393:14
**coated** [4] - 11480:24, 11480:25, 11483:17
**cognizant** [1] - 11437:7
**colleagues** [1] - 11424:13
**collection** [1] - 11426:14
**collective** [1] - 11491:19
**colored** [1] - 11405:13
**COLUMBIA** [1] - 11378:1
**column** [2] - 11475:3, 11475:15
**combination** [2] - 11451:15, 11465:11
**coming** [6] - 11383:8, 11403:9, 11403:18, 11419:8, 11427:24, 11480:15
**command** [1] - 11507:24
**commandeering** [1] - 11509:18
**commented** [1] - 11394:5
**comments** [1] - 11382:24
**committee** [2] - 11481:10, 11481:21
**commodity** [1] - 11483:1
**common** [2] - 11422:19, 11485:5
**communicate** [2] - 11389:3, 11436:7
**company** [5] - 11456:1, 11463:9, 11464:5, 11465:17, 11474:6
**company's** [1] - 11466:3
**compare** [2] - 11451:7, 11460:20
**compared** [4] - 11384:21, 11389:11, 11444:6, 11469:2
**comparing** [2] - 11460:12, 11460:18

**compete** [1] - 11500:7
**competing** [1] - 11389:6
**competition** [2] - 11500:6, 11500:9
**competitive** [6] - 11450:18, 11450:21, 11450:23, 11452:8, 11452:21, 11484:19
**competitively** [4] - 11484:22, 11499:11, 11499:17, 11499:21
**complete** [3] - 11439:15, 11449:21, 11512:4
**completed** [7] - 11422:15, 11430:12, 11452:3, 11457:2, 11457:4, 11457:5
**completely** [1] - 11480:5
**complex** [4] - 11416:20, 11418:1, 11439:14, 11508:3
**complied** [1] - 11401:11
**component** [1] - 11392:14
**compound** [1] - 11508:14
**computer** [1] - 11379:21
**computer-aided** [1] - 11379:21
**concede** [1] - 11402:24
**conceptually** [1] - 11385:23
**concern** [1] - 11452:14
**concerned** [1] - 11405:1
**concerning** [1] - 11408:1
**concerns** [2] - 11414:1, 11462:17
**concert** [1] - 11421:25
**conclusion** [3] - 11460:10, 11460:11, 11462:2
**concrete** [1] - 11479:18
**condition** [6] - 11422:4, 11429:15, 11430:10, 11474:25, 11486:6, 11486:9
**conditionally** [2] - 11435:23, 11437:2
**conduct** [1] - 11400:18

**conference** [11] - 11413:20, 11413:21, 11414:20, 11432:19, 11437:14, 11461:17, 11463:6, 11466:9, 11467:21, 11494:23, 11496:8
**confidence** [1] - 11449:24
**confront** [1] - 11411:19
**confrontation** [4] - 11398:23, 11411:20, 11411:25, 11412:23
**confused** [1] - 11495:19
**confusing** [1] - 11395:14, 11404:4
**confusion** [7] - 11386:15, 11386:23, 11390:17, 11392:2, 11392:5, 11435:2, 11435:25
**Congress** [5] - 11423:12, 11426:3, 11427:6, 11448:19, 11506:7
**congressional** [7] - 11438:8, 11450:14, 11452:5, 11452:13, 11452:19, 11454:15, 11505:18
**connect** [1] - 11501:18
**connected** [4] - 11386:17, 11446:19, 11451:22, 11490:15
**connecting** [6] - 11446:6, 11446:10, 11446:13, 11446:15, 11446:22, 11447:16
**connects** [1] - 11446:24
**Conor** [2] - 11378:13, 11381:8
**consented** [1] - 11401:12
**consenting** [1] - 11394:13
**conservative** [2] - 11477:7, 11477:10
**consider** [2] - 11435:21, 11486:10
**consideration** [1] - 11415:11
**considerations** [1] - 11438:3
**considering** [1] - 11472:20
**consist** [1] - 11474:9

**consistent** [2] - 11386:19, 11441:8
**consistent-ish** [1] - 11441:8
**conspiracy** [6] - 11383:6, 11383:14, 11396:8, 11396:10, 11396:18, 11396:19
**constitutes** [1] - 11512:2
**Constitution** [2] - 11379:19, 11512:8
**constructed** [2] - 11421:10, 11472:21
**constructing** [1] - 11420:10
**construction** [19] - 11416:18, 11416:21, 11419:15, 11420:24, 11421:6, 11421:23, 11422:2, 11422:9, 11423:9, 11423:12, 11423:13, 11423:16, 11430:9, 11430:11, 11438:25, 11474:24, 11479:17, 11485:23, 11486:4
**contain** [1] - 11495:6
**context** [1] - 11448:25
**continuation** [1] - 11483:9
**continue** [4] - 11423:12, 11429:16, 11432:10, 11458:4
**CONTINUED** [1] - 11379:1
**continues** [1] - 11458:22
**contract** [6] - 11434:5, 11439:6, 11451:5, 11451:20, 11452:22, 11454:8
**contracted** [2] - 11450:5, 11450:6
**contractor** [20] - 11422:9, 11438:25, 11451:12, 11451:24, 11452:23, 11454:21, 11457:25, 11461:4, 11461:11, 11465:14, 11465:15, 11465:16, 11465:22, 11470:10, 11470:25, 11472:25, 11473:16, 11483:16, 11500:14
**contractors** [9] - 11422:7, 11449:19, 11450:16, 11450:19, 11450:25, 11451:3, 11451:7, 11451:11

**control** [9] - 11440:19, 11440:22, 11440:25, 11441:7, 11453:16, 11478:24, 11488:16, 11507:18
**controlling** [1] - 11511:10
**convict** [1] - 11466:22
**cops** [1] - 11407:5
**copy** [1] - 11412:19
**corner** [1] - 11405:15
**cornerstone** [1] - 11417:24
**correct** [83] - 11383:2, 11397:8, 11400:22, 11417:6, 11417:21, 11418:5, 11418:17, 11431:7, 11438:14, 11438:20, 11444:24, 11447:8, 11447:24, 11448:8, 11458:24, 11459:9, 11460:3, 11467:6, 11467:24, 11467:25, 11468:24, 11468:25, 11470:3, 11470:6, 11470:23, 11471:6, 11471:9, 11471:12, 11471:21, 11471:24, 11473:22, 11476:3, 11479:21, 11484:11, 11486:1, 11488:3, 11488:12, 11488:23, 11488:25, 11489:1, 11490:6, 11490:20, 11490:21, 11491:4, 11491:9, 11491:10, 11491:14, 11491:15, 11491:18, 11492:2, 11492:9, 11493:3, 11493:4, 11493:7, 11493:8, 11493:9, 11493:10, 11493:14, 11493:18, 11493:21, 11493:22, 11494:1, 11494:5, 11494:6, 11497:16, 11497:21, 11498:1, 11499:5, 11499:10, 11500:7, 11500:11, 11501:20, 11502:1, 11502:5, 11502:6, 11502:23, 11502:24, 11503:2, 11503:3, 11503:7, 11505:12, 11505:15, 11508:13
**correction** [1] - 11413:1
**correctly** [1] - 11451:8
**correspond** [1] - 11410:23

**corresponds** [1] - 11410:17
**Corridor** [1] - 11392:5
**corridor** [8] - 11446:6, 11446:10, 11446:13, 11446:15, 11446:18, 11446:22, 11447:16, 11474:22
**Cost** [2] - 11465:24, 11465:25
**cost** [44] - 11408:12, 11410:7, 11410:8, 11419:23, 11424:1, 11433:14, 11433:21, 11434:24, 11442:20, 11451:13, 11459:11, 11459:12, 11460:21, 11461:2, 11462:11, 11463:2, 11463:11, 11464:1, 11465:9, 11466:3, 11467:15, 11469:11, 11472:8, 11472:17, 11473:19, 11474:2, 11474:3, 11476:11, 11482:21, 11483:2, 11484:6, 11487:7, 11487:9, 11492:21, 11493:12, 11497:5, 11497:12, 11497:14, 11497:19, 11502:18, 11503:18, 11504:12
**costs** [14] - 11411:22, 11433:20, 11434:8, 11459:7, 11460:1, 11461:9, 11461:21, 11461:23, 11462:16, 11464:7, 11465:21, 11468:4, 11473:3, 11476:23
**counsel** [10] - 11381:20, 11381:24, 11382:14, 11405:24, 11406:10, 11412:15, 11413:19, 11413:23, 11414:1, 11468:8
**Count** [6] - 11466:16, 11466:17, 11466:18, 11466:20, 11466:25
**count** [1] - 11488:21
**counts** [1] - 11434:12
**couple** [7] - 11381:17, 11396:15, 11402:8, 11427:22, 11428:9, 11486:23, 11511:19
**course** [4] - 11389:7, 11391:12, 11413:9, 11419:19
**Court** [10] - 11379:17, 11379:18, 11383:17,

11393:24, 11404:22, 11445:6, 11506:8, 11507:6, 11511:21, 11512:6
**court** [17] - 11383:7, 11383:9, 11383:10, 11383:16, 11384:7, 11384:10, 11386:19, 11399:21, 11404:16, 11405:4, 11406:1, 11410:24, 11427:24, 11442:4, 11444:10, 11445:5, 11466:16
**COURT** [144] - 11378:1, 11381:16, 11382:4, 11382:8, 11382:11, 11382:14, 11383:19, 11383:24, 11384:11, 11384:15, 11384:24, 11385:8, 11386:24, 11387:4, 11388:15, 11390:23, 11390:25, 11391:4, 11392:17, 11393:5, 11393:20, 11394:17, 11395:7, 11395:9, 11396:2, 11396:4, 11396:7, 11397:21, 11398:20, 11398:22, 11398:24, 11399:3, 11399:16, 11399:18, 11399:22, 11399:24, 11400:2, 11400:13, 11401:3, 11401:13, 11402:6, 11404:12, 11405:3, 11405:9, 11405:21, 11406:8, 11406:10, 11407:12, 11407:15, 11407:19, 11407:20, 11407:22, 11408:17, 11408:20, 11409:3, 11409:14, 11409:19, 11410:9, 11410:21, 11410:25, 11411:4, 11411:6, 11411:10, 11412:2, 11412:21, 11412:24, 11413:18, 11413:22, 11414:8, 11414:12, 11414:15, 11414:21, 11418:23, 11432:14, 11432:18, 11432:20, 11432:25, 11433:21, 11434:7, 11434:14, 11434:21, 11434:23, 11435:3, 11435:16, 11435:21, 11436:14, 11436:19, 11436:22, 11437:1, 11437:5, 11441:24, 11442:7, 11442:25, 11443:6,

11443:8, 11443:12, 11443:14, 11443:21, 11444:2, 11444:9, 11444:11, 11444:24, 11445:4, 11445:14, 11455:4, 11456:6, 11456:10, 11460:14, 11461:16, 11462:6, 11462:23, 11463:16, 11464:11, 11466:8, 11467:2, 11467:8, 11468:6, 11482:2, 11482:16, 11487:18, 11489:10, 11489:15, 11489:17, 11492:12, 11494:11, 11494:15, 11494:24, 11495:10, 11495:14, 11495:18, 11496:3, 11496:14, 11496:16, 11498:21, 11508:15, 11509:15, 11509:21, 11509:23, 11510:3, 11510:7, 11510:23, 11511:11, 11511:20, 11511:25
**Court's** [2] - 11384:5, 11446:8
**court's** [4] - 11382:15, 11383:8, 11386:19, 11481:25
**Courthouse** [2] - 11379:18, 11512:7
**courtroom** [3] - 11381:22, 11405:23, 11414:3
**cover** [1] - 11429:9
**coverage** [1] - 11423:5
**covered** [4] - 11448:2, 11472:15, 11472:16, 11473:20
**covers** [2] - 11405:15, 11429:11
**cows** [1] - 11409:15
**CR** [1] - 11378:2
**cracked** [2] - 11391:21, 11402:16
**crafted** [1] - 11384:21
**crate** [1] - 11485:21
**crated** [1] - 11481:14
**created** [1] - 11464:1
**credibility** [1] - 11415:5
**Criminal** [2] - 11381:2, 11445:12
**criminal** [1] - 11452:3
**critical** [1] - 11457:12
**CROSS** [2] - 11487:19, 11503:22
**cross** [10] - 11393:25,

11394:2, 11394:11, 11403:17, 11403:20, 11409:15, 11411:7, 11411:8, 11488:18, 11497:17
**Cross** [2] - 11380:4, 11380:4
**CROSS-EXAMINATION** [2] - 11487:19, 11503:22
**cross-examination** [3] - 11394:2, 11403:17, 11497:17
**Cross-Examination** [2] - 11380:4, 11380:4
**cross-examine** [1] - 11393:25
**crowd** [8] - 11389:11, 11390:8, 11391:22, 11392:24, 11392:25, 11478:24, 11488:15, 11488:16
**crowd-control** [1] - 11478:24
**crowds** [8] - 11423:15, 11426:13, 11506:25, 11507:4, 11507:18, 11507:23, 11508:1, 11511:10
**CRR** [3] - 11379:17, 11512:1, 11512:6
**crypt** [12] - 11385:20, 11386:11, 11386:18, 11388:7, 11389:5, 11389:9, 11390:14, 11390:21, 11391:18, 11391:23, 11395:16, 11407:1
**CT** [1] - 11378:22
**cumulative** [6] - 11386:22, 11441:23, 11442:15, 11442:17, 11443:11, 11443:24
**curve** [2] - 11478:15, 11490:23
**customarily** [1] - 11405:12
**cut** [2] - 11438:21, 11477:3

## D

**D.C** [3] - 11378:5, 11397:6, 11483:21
**daily** [2] - 11417:2, 11505:19
**damage** [37] - 11408:25, 11423:24, 11423:25, 11424:5,

11424:7, 11424:10, 11424:11, 11425:2, 11425:3, 11441:16, 11461:18, 11462:3, 11462:4, 11462:21, 11464:3, 11492:14, 11492:15, 11492:16, 11492:17, 11496:20, 11497:3, 11497:25, 11498:14, 11502:18, 11503:13, 11503:17, 11503:18, 11503:19, 11504:5, 11504:7, 11504:9, 11504:11, 11511:4
**damaged** [3] - 11481:3, 11497:6, 11498:12
**damages** [1] - 11430:6
**damaging** [1] - 11504:15
**Dan** [3] - 11395:11, 11406:4, 11504:1
**danger** [1] - 11403:15
**dark** [2] - 11425:20, 11425:23
**dashed** [1] - 11489:21
**data** [2] - 11408:10, 11494:18
**date** [2] - 11456:21, 11498:12
**Date** [1] - 11457:22
**dated** [1] - 11512:5
**dates** [1] - 11441:6
**DAVID** [1] - 11378:17
**DAY** [1] - 11378:8
**day-to-day** [1] - 11508:24
**days** [6] - 11430:5, 11430:13, 11441:12, 11451:20, 11451:21, 11478:8
**DC** [4] - 11378:15, 11378:25, 11379:19, 11512:8
**deal** [1] - 11506:16
**dealing** [2] - 11466:19, 11509:3
**Dear** [1] - 11495:4
**decibels** [1] - 11386:15
**decide** [1] - 11384:10
**decided** [2] - 11437:3, 11457:7
**decision** [5] - 11424:3, 11457:8, 11491:2, 11491:16, 11491:25
**decorum** [1] - 11456:8
**deemed** [1] - 11457:12

**deface** [3] - 11381:23, 11382:15, 11404:21
**defaces** [1] - 11405:18
**defacing** [2] - 11382:1, 11382:6
**defame** [1] - 11404:25
**defeated** [1] - 11394:5
**Defendant** [15] - 11381:3, 11381:4, 11381:5, 11381:9, 11381:10, 11381:11, 11381:12, 11381:13, 11381:14, 11381:15
**defendant** [5] - 11394:13, 11404:3, 11415:9, 11456:9, 11487:22
**defendant's** [1] - 11385:5
**Defendants** [3] - 11378:7, 11378:16, 11379:2
**defendants** [19] - 11381:24, 11386:14, 11391:1, 11391:6, 11396:1, 11396:24, 11398:11, 11399:8, 11402:23, 11403:18, 11403:20, 11404:3, 11405:24, 11433:6, 11433:22, 11434:12, 11435:13, 11437:9, 11504:14
**defense** [10] - 11386:12, 11394:9, 11395:6, 11405:24, 11408:6, 11412:7, 11412:15, 11436:8, 11492:6, 11498:4
**defer** [1] - 11444:10
**definitely** [1] - 11506:5
**degree** [1] - 11419:18
**delamination** [1] - 11441:9
**deliberately** [1] - 11404:20
**delivered** [1] - 11439:3
**demarcate** [1] - 11488:15
**democracy** [1] - 11505:17
**demonstrate** [1] - 11390:2
**demonstrating** [2] - 11391:16, 11392:14
**demonstration** [1] - 11507:5
**demonstrative** [6] -

11464:19, 11468:23, 11469:8, 11473:18, 11492:20, 11494:19
**denied** [2] - 11384:18, 11403:24
**depict** [1] - 11428:19
**depicted** [2] - 11389:25, 11397:11
**DEPUTY** [13] - 11381:2, 11413:16, 11428:4, 11428:8, 11436:16, 11445:6, 11445:9, 11445:11, 11489:6, 11489:11, 11489:16, 11496:11, 11511:21
**deputy** [5] - 11416:11, 11419:5, 11504:21, 11504:23, 11504:25
**derelict** [2] - 11394:7, 11401:7
**describe** [8] - 11389:8, 11389:9, 11392:21, 11392:22, 11392:23, 11393:1, 11501:20
**described** [7] - 11386:13, 11392:3, 11392:4, 11398:1, 11398:7, 11435:10, 11451:16
**describing** [2] - 11386:4, 11506:4
**description** [5] - 11391:13, 11398:7, 11483:13, 11483:15, 11497:2
**deserves** [1] - 11393:19
**destroyed** [7] - 11491:13, 11491:18, 11491:24, 11492:5, 11492:6, 11502:5
**destruction** [2] - 11382:19, 11491:9
**detachable** [1] - 11490:6
**detailed** [1] - 11502:2
**details** [1] - 11487:12
**detention** [1] - 11395:21
**detention-land** [1] - 11395:21
**determination** [7] - 11481:4, 11492:14, 11492:15, 11499:20, 11500:1, 11503:16, 11504:9
**determine** [6] - 11461:20, 11462:21,

11502:17, 11503:5, 11503:9, 11504:11
**determined** [2] - 11460:17, 11473:5
**determines** [1] - 11461:25
**develop** [1] - 11450:23
**diagram** [3] - 11489:8, 11490:11, 11491:23
**difference** [1] - 11401:10
**different** [42] - 11397:15, 11404:2, 11409:12, 11410:24, 11411:13, 11411:16, 11419:23, 11426:7, 11426:17, 11434:19, 11438:9, 11440:14, 11440:18, 11443:3, 11447:6, 11457:15, 11458:7, 11458:8, 11458:17, 11459:17, 11459:20, 11459:23, 11468:18, 11468:19, 11470:25, 11471:13, 11477:18, 11478:19, 11484:25, 11485:1, 11494:20, 11495:3, 11498:10, 11498:15, 11501:17, 11502:21, 11506:6, 11508:7, 11508:17
**difficult** [2] - 11439:10, 11503:5
**dimensions** [1] - 11458:17
**Direct** [2] - 11380:3, 11473:24
**direct** [8] - 11411:1, 11411:11, 11443:19, 11474:1, 11476:1, 11476:6, 11500:17, 11501:4
**DIRECT** [1] - 11415:18
**direction** [1] - 11507:14
**directly** [7] - 11404:7, 11416:3, 11433:7, 11434:12, 11435:12, 11441:4, 11464:8
**disagree** [1] - 11396:22
**disagrees** [1] - 11385:14
**disappear** [1] - 11413:7
**disarray** [1] - 11426:8
**disassemble** [2] - 11422:3, 11485:20
**disaster** [6] -

11424:17, 11424:18, 11424:21, 11425:8, 11425:16, 11437:22
**disconnected** [1] - 11414:4
**discrepancy** [1] - 11472:7
**discussed** [6] - 11381:19, 11383:25, 11384:13, 11384:25, 11385:13, 11385:17
**dismantled** [1] - 11480:6
**disorder** [9] - 11386:21, 11392:15, 11398:14, 11398:16, 11399:4, 11399:9, 11399:13, 11399:15, 11433:11
**display** [1] - 11464:22
**disposable** [1] - 11473:14
**disposal** [1] - 11413:11
**dispose** [1] - 11491:5
**disrespectful** [1] - 11405:2
**distance** [1] - 11431:17
**distinct** [1] - 11417:13
**distinctly** [1] - 11468:18
**distinguishable** [2] - 11502:9, 11502:10
**distraction** [1] - 11393:15
**DISTRICT** [3] - 11378:1, 11378:1, 11378:10
**divide** [2] - 11484:7, 11493:5
**divided** [1] - 11468:12
**dividing** [1] - 11468:5
**division** [1] - 11468:12
**document** [12] - 11384:3, 11407:18, 11409:16, 11455:7, 11455:12, 11455:18, 11463:18, 11463:23, 11465:3, 11482:6, 11498:9, 11498:16
**documents** [1] - 11412:12
**dollar** [2] - 11475:17, 11475:25
**dollars** [2] - 11460:2, 11472:11
**Dominic** [1] - 11381:5
**done** [17] - 11394:16,

11422:6, 11433:16, 11433:22, 11434:5, 11437:23, 11451:24, 11452:8, 11452:23, 11454:12, 11454:23, 11456:24, 11457:15, 11460:7, 11476:5, 11503:13, 11511:4
**door** [20] - 11386:2, 11386:10, 11387:19, 11388:3, 11388:8, 11388:11, 11390:1, 11390:7, 11390:15, 11390:22, 11391:8, 11391:11, 11391:19, 11400:16, 11401:1, 11402:16, 11459:25, 11466:20, 11477:4, 11510:5
**doors** [13] - 11393:4, 11393:24, 11424:10, 11427:2, 11427:10, 11439:21, 11440:7, 11440:20, 11452:15, 11452:16, 11457:9
**doubt** [1] - 11390:20
**down** [21] - 11404:16, 11407:19, 11409:8, 11431:20, 11442:8, 11442:9, 11457:21, 11458:16, 11459:12, 11470:13, 11470:16, 11470:18, 11472:10, 11472:12, 11477:12, 11487:8, 11503:5, 11503:9, 11503:11, 11507:7, 11510:4
**dramatic** [1] - 11395:4
**draw** [6] - 11401:19, 11401:24, 11489:2, 11489:5, 11496:23, 11501:20
**drawing** [4] - 11501:7, 11501:8, 11501:10, 11501:19
**drawn** [5] - 11489:21, 11489:22, 11490:11, 11496:24, 11497:3
**drew** [2] - 11500:18, 11501:6
**Drive** [1] - 11379:15
**drive** [1] - 11461:5
**drives** [1] - 11462:10
**during** [12] - 11392:18, 11411:11, 11422:19, 11422:22, 11423:11, 11423:13, 11427:3, 11429:9, 11438:22, 11440:1, 11478:19, 11501:4

**duties** [4] - 11400:5, 11401:11, 11417:12, 11423:19
**duty** [1] - 11394:8

## E

**early** [4] - 11407:23, 11424:20, 11431:10, 11509:6
**earthquake** [2] - 11425:13, 11426:20
**easier** [1] - 11493:17
**easiest** [1] - 11476:20
**easily** [1] - 11382:16
**East** [2] - 11378:17, 11379:15
**east** [2] - 11438:14, 11438:15
**easy** [1] - 11403:15
**edge** [1] - 11431:6
**educational** [1] - 11419:16
**effectively** [2] - 11387:20, 11480:6
**effort** [3] - 11396:18, 11425:16, 11461:11
**eight** [5] - 11500:19, 11500:24, 11500:25, 11504:20, 11505:1
**eight-minute** [1] - 11500:19
**either** [4] - 11415:7, 11462:2, 11472:25, 11499:6
**electronic** [1] - 11489:18
**element** [1] - 11508:25
**ELMO** [1] - 11489:18
**elsewhere** [1] - 11438:10
**employ** [1] - 11416:24
**employed** [1] - 11506:11
**employee** [2] - 11407:25, 11461:5
**employees** [20] - 11416:17, 11416:24, 11417:8, 11423:6, 11424:9, 11424:22, 11426:13, 11427:2, 11427:7, 11439:5, 11448:3, 11448:5, 11450:3, 11452:2, 11454:14, 11472:25, 11473:16, 11474:4, 11479:10, 11485:20
**en** [3] - 11436:2, 11436:10, 11437:9
**encompassed** [1] -

11476:24
**encountered** [1] - 11428:17
**end** [8] - 11388:10, 11391:10, 11393:13, 11411:5, 11415:10, 11448:24, 11490:7, 11509:25
**ends** [1] - 11421:25
**enforcement** [5] - 11401:19, 11401:24, 11506:4, 11506:10, 11507:4
**enforcement's** [1] - 11506:19
**engineer** [4] - 11408:7, 11418:21, 11419:3, 11419:14
**engineering** [1] - 11419:18
**engineers** [1] - 11424:23
**Enrique** [1] - 11381:5
**entail** [1] - 11450:22
**enter** [4] - 11391:24, 11394:2, 11394:13, 11439:25
**entered** [5] - 11388:4, 11393:23, 11398:3, 11402:13, 11415:8
**entering** [3] - 11388:21, 11388:24, 11398:4
**enters** [1] - 11392:2
**entire** [17] - 11393:10, 11406:22, 11421:20, 11450:14, 11480:7, 11484:3, 11484:4, 11484:7, 11490:10, 11491:3, 11491:5, 11491:16, 11491:21, 11492:1, 11492:8, 11502:13
**entirely** [1] - 11444:7
**entities** [1] - 11422:12
**entity** [1] - 11416:8
**entrance** [2] - 11404:6, 11452:19
**entrances** [1] - 11457:10
**entries** [1] - 11409:12
**entry** [1] - 11386:17
**envelope** [1] - 11440:7
**equation** [1] - 11450:2
**equipment** [10] - 11506:17, 11507:17, 11508:5, 11508:12, 11508:19, 11509:10, 11509:18, 11510:15
**Erik** [2] - 11378:12,

11476:24
**error** [1] - 11385:3
**especially** [4] - 11440:1, 11440:22, 11466:23, 11481:8
**Esq** [12] - 11378:12, 11378:12, 11378:13, 11378:13, 11378:16, 11378:20, 11378:23, 11379:2, 11379:4, 11379:8, 11379:11, 11379:14
**essentially** [2] - 11488:14, 11495:4
**establish** [2] - 11401:8, 11454:18
**established** [1] - 11417:19
**establishing** [1] - 11433:11
**estimate** [12] - 11454:25, 11459:5, 11464:1, 11468:17, 11470:11, 11470:20, 11496:5, 11496:20, 11497:3, 11497:9, 11497:25, 11498:14
**estimates** [1] - 11472:8
**et** [4] - 11387:23, 11424:11, 11437:11, 11445:13
**Ethan** [3] - 11381:3, 11445:12, 11487:23
**evening** [1] - 11427:11
**event** [7] - 11400:16, 11429:9, 11441:25, 11472:10, 11478:20, 11478:22, 11481:15
**events** [6] - 11386:17, 11388:2, 11398:17, 11427:4, 11430:10, 11457:1
**eventually** [1] - 11437:3
**evidence** [25] - 11385:4, 11385:5, 11388:9, 11389:5, 11390:11, 11390:13, 11392:10, 11393:19, 11394:23, 11396:11, 11398:15, 11399:11, 11403:10, 11403:11, 11404:1, 11404:2, 11407:5, 11410:16, 11415:3, 11415:9, 11420:17, 11426:22, 11427:1, 11466:17, 11477:20
**evident** [2] - 11388:12,

11521

11391:5
**exact** [4] - 11393:23, 11470:15, 11470:16, 11511:12
**exactly** [4] - 11389:2, 11394:25, 11403:11, 11406:19
**Examination** [3] - 11380:3, 11380:4, 11380:4
**EXAMINATION** [3] - 11415:18, 11487:19, 11503:22
**examination** [5] - 11394:2, 11403:17, 11497:17, 11500:17, 11501:4
**examine** [1] - 11393:25
**example** [5] - 11462:8, 11463:1, 11491:24, 11492:3, 11501:20
**Excel** [1] - 11475:16
**excising** [1] - 11387:6
**excluded** [1] - 11406:17
**exclusion** [1] - 11406:17
**excuse** [4] - 11442:4, 11465:22, 11493:20, 11506:24
**executive** [1] - 11413:2
**exhibit** [10] - 11435:5, 11455:3, 11463:14, 11466:12, 11483:12, 11489:11, 11489:13, 11494:12, 11494:15, 11495:1
**Exhibit** [2] - 11464:19, 11495:16
**Exhibit-105** [1] - 11420:17
**Exhibit-425** [2] - 11441:19, 11445:21
**Exhibit-492G** [2] - 11500:18, 11500:24
**Exhibit-931A** [2] - 11471:20, 11476:5
**Exhibit-932A** [3] - 11494:10, 11494:18, 11496:13
**Exhibit-932B** [1] - 11482:1
**Exhibit-Y** [1] - 11495:16
**exhibits** [4] - 11435:18, 11442:21, 11443:3, 11443:5
**exigency** [1] -

11453:14
**existed** [1] - 11490:4
**exit** [2] - 11432:7, 11452:16
**expanded** [2] - 11446:17, 11459:19
**expect** [5] - 11433:25, 11451:17, 11507:4, 11508:1, 11508:10
**expectations** [1] - 11451:4
**expensive** [2] - 11469:6, 11491:21
**experience** [10] - 11388:5, 11388:6, 11388:7, 11391:7, 11391:14, 11392:12, 11403:4, 11485:10, 11486:2, 11487:7
**experienced** [4] - 11385:24, 11390:14, 11392:19, 11403:6
**expiration** [1] - 11456:21
**explain** [14] - 11388:2, 11388:5, 11388:16, 11391:9, 11394:14, 11394:23, 11402:13, 11402:21, 11403:19, 11442:22, 11462:18, 11462:25, 11463:1, 11463:4
**explained** [3] - 11386:10, 11386:12, 11390:19
**explaining** [6] - 11402:17, 11402:18, 11444:13, 11462:7, 11462:12, 11462:15
**explains** [3] - 11386:2, 11388:25, 11390:6
**explanation** [1] - 11394:9
**explanatory** [1] - 11473:11
**extension** [2] - 11446:21, 11446:25
**extent** [3] - 11385:6, 11492:16, 11497:5
**exterior** [6] - 11425:1, 11427:16, 11439:20, 11439:21, 11440:7, 11449:4
**extra** [1] - 11474:7
**extraordinary** [2] - 11403:8, 11403:10
**extrapolation** [1] - 11397:19
**eyes** [3] - 11389:20, 11398:9, 11398:13

## F

**fabric** [2] - 11429:6, 11441:11
**face** [2] - 11388:13, 11397:2
**facet** [1] - 11510:21
**facilities** [5] - 11419:14, 11420:11, 11421:12, 11461:2, 11461:13
**facility** [6] - 11461:5, 11461:6, 11461:12, 11485:22, 11485:25, 11486:2
**fact** [10] - 11385:4, 11389:9, 11389:16, 11397:7, 11405:16, 11413:3, 11415:7, 11415:8, 11461:24, 11462:18
**factor** [6] - 11389:12, 11439:17, 11451:14, 11457:8, 11500:8
**factors** [5] - 11389:6, 11399:10, 11439:4, 11451:13, 11451:15
**fail** [1] - 11406:14
**fair** [28] - 11390:25, 11394:18, 11394:21, 11394:22, 11395:2, 11395:9, 11396:21, 11400:14, 11403:7, 11405:21, 11444:14, 11454:25, 11455:25, 11458:16, 11460:4, 11460:11, 11460:17, 11468:15, 11470:14, 11477:9, 11477:10, 11488:6, 11489:23, 11500:13, 11500:15, 11502:20, 11505:2, 11505:21
**fairest** [1] - 11470:19
**fairly** [1] - 11428:19
**fairness** [2] - 11460:7, 11460:22
**familiar** [2] - 11446:2, 11485:11
**familiarity** [1] - 11419:22
**far** [7] - 11396:1, 11402:9, 11403:17, 11441:23, 11442:16, 11482:19, 11486:13
**fast** [1] - 11422:14
**faster** [1] - 11471:4
**fear** [3] - 11389:15, 11389:20, 11398:9, 11398:12

**feature** [2] - 11430:21, 11500:5
**federal** [1] - 11461:19
**feet** [18] - 11408:11, 11410:3, 11410:13, 11483:16, 11484:7, 11485:8, 11488:25, 11490:18, 11490:20, 11493:5, 11493:18, 11493:19, 11493:20, 11494:1, 11494:3, 11497:19, 11502:12
**fell** [3] - 11414:15, 11414:17
**fellow** [1] - 11414:16
**felon** [1] - 11383:13
**felt** [3] - 11403:11, 11477:10, 11500:15
**fence** [113] - 11408:1, 11408:3, 11408:4, 11408:8, 11409:1, 11409:2, 11409:8, 11409:10, 11409:13, 11410:8, 11410:14, 11410:17, 11411:15, 11478:3, 11478:4, 11478:7, 11478:11, 11478:18, 11479:2, 11479:3, 11479:4, 11479:5, 11479:13, 11479:18, 11479:22, 11480:1, 11480:3, 11480:5, 11480:9, 11480:19, 11480:25, 11481:2, 11481:3, 11481:6, 11481:18, 11481:24, 11482:21, 11483:4, 11483:5, 11483:6, 11483:17, 11484:3, 11484:4, 11484:5, 11484:7, 11484:12, 11484:13, 11484:20, 11484:24, 11485:12, 11485:14, 11486:6, 11486:15, 11486:18, 11487:11, 11487:23, 11487:25, 11488:3, 11488:6, 11488:9, 11488:20, 11488:25, 11489:23, 11490:4, 11490:5, 11490:8, 11490:9, 11490:10, 11490:13, 11490:15, 11490:22, 11490:24, 11490:25, 11491:9, 11491:12, 11491:13, 11491:16, 11491:18, 11491:20, 11491:21, 11491:22, 11491:23, 11492:1,

11492:4, 11492:6, 11492:8, 11492:21, 11493:3, 11493:7, 11493:14, 11493:25, 11496:25, 11497:12, 11497:19, 11497:20, 11498:11, 11499:9, 11501:3, 11502:4, 11502:7, 11502:12, 11502:22, 11503:1, 11503:4, 11503:9, 11503:10, 11504:15, 11511:6, 11511:8
**fences** [3] - 11410:12, 11488:4, 11498:12
**fencing** [26] - 11410:3, 11410:5, 11479:7, 11479:8, 11479:9, 11479:10, 11479:12, 11482:11, 11482:12, 11483:1, 11483:3, 11484:8, 11487:8, 11487:10, 11488:3, 11491:4, 11491:6, 11496:24, 11497:6, 11498:15, 11499:15, 11499:23, 11501:12, 11501:24, 11502:15
**few** [5] - 11421:24, 11444:12, 11444:13, 11487:22, 11504:3
**figure** [17] - 11408:7, 11434:11, 11459:10, 11460:23, 11466:2, 11468:4, 11469:11, 11476:7, 11476:10, 11493:1, 11493:9, 11493:12, 11493:13, 11495:22, 11497:20, 11497:22, 11498:5
**figures** [2] - 11464:5, 11472:4
**filings** [2] - 11387:18, 11388:18
**finalized** [1] - 11431:11
**fine** [5] - 11384:12, 11385:23, 11434:17, 11435:11, 11495:24
**finer** [1] - 11388:15
**finger** [1] - 11489:9
**fingerprints** [1] - 11452:2
**finish** [2] - 11451:17, 11480:25
**finished** [1] - 11474:25
**fire** [3] - 11418:21, 11419:2, 11419:14
**first** [28] - 11381:19,

11385:16, 11391:19, 11392:11, 11395:15, 11418:3, 11424:14, 11425:22, 11427:22, 11430:4, 11439:16, 11443:22, 11444:18, 11452:12, 11457:7, 11457:21, 11465:2, 11465:6, 11473:25, 11474:23, 11475:2, 11482:18, 11484:16, 11492:25, 11495:1, 11497:10, 11504:4, 11504:5

**first-hand** [1] - 11392:11

**fit** [1] - 11456:23

**five** [15] - 11385:20, 11386:5, 11387:14, 11390:1, 11390:6, 11392:17, 11392:18, 11393:8, 11393:9, 11393:13, 11403:13, 11424:22, 11475:10, 11475:11

**five-and-a-half** [1] - 11393:13

**five-minute** [1] - 11393:8

**fix** [4] - 11424:1, 11424:2, 11426:15, 11463:9

**FL** [2] - 11379:6, 11379:9

**flexibility** [1] - 11444:20

**floodgates** [1] - 11392:8

**floor** [2] - 11432:8, 11474:23

**Floor** [2] - 11378:21, 11379:12

**floors** [1] - 11397:11

**focus** [5] - 11391:20, 11393:16, 11404:5, 11420:8, 11465:6

**focused** [1] - 11417:15

**folks** [4] - 11381:22, 11381:23, 11403:3, 11403:9

**following** [2] - 11444:4, 11457:1

**foot** [9] - 11410:4, 11410:5, 11484:5, 11484:12, 11484:13, 11497:12, 11497:14, 11497:20, 11499:22

**footprints** [1] - 11431:14

**FOR** [2] - 11378:1, 11415:17

**force** [4] - 11394:3, 11394:5, 11401:8, 11406:22

**foregoing** [1] - 11512:2

**foremost** [2] - 11430:4, 11452:12

**form** [3] - 11404:18, 11412:7, 11469:1

**formal** [3] - 11453:4, 11453:19, 11453:21

**formality** [1] - 11444:20

**forward** [1] - 11487:15

**foundation** [5] - 11417:25, 11418:3, 11436:11, 11510:13, 11511:2

**foundational** [2] - 11511:13, 11511:17

**four** [18] - 11419:18, 11420:15, 11420:23, 11420:25, 11421:4, 11421:5, 11427:22, 11447:6, 11469:5, 11469:7, 11469:10, 11469:17, 11471:17, 11485:16, 11490:19, 11494:1, 11508:8, 11511:8

**four-time** [1] - 11469:17

**four-year** [1] - 11419:18

**frame** [8] - 11425:10, 11438:7, 11438:22, 11451:6, 11453:1, 11454:11, 11454:19, 11481:9

**frankly** [6] - 11388:8, 11388:12, 11389:18, 11390:9, 11390:11, 11402:15

**free** [2] - 11416:2, 11446:8

**frequently** [1] - 11423:5

**frescos** [2] - 11441:4

**front** [23] - 11387:10, 11388:23, 11420:25, 11429:4, 11430:24, 11434:3, 11438:14, 11438:15, 11438:16, 11446:5, 11460:8, 11471:20, 11478:9, 11480:7, 11483:20, 11489:21, 11489:24, 11490:4, 11492:4,

11492:5, 11506:25, 11507:6, 11511:4

**fronts** [1] - 11393:18

**full** [5] - 11393:13, 11415:23, 11417:5, 11497:5, 11512:3

**fully** [3] - 11432:17, 11479:24, 11479:25

**function** [4] - 11446:24, 11488:13, 11488:16, 11488:20

**funding** [1] - 11454:19

**furiously** [1] - 11408:6

**furnish** [1] - 11459:8

**future** [1] - 11385:11

## G

**game** [1] - 11403:7

**general** [5] - 11424:10, 11426:8, 11426:15, 11438:25, 11507:8

**generally** [6] - 11416:14, 11417:12, 11422:10, 11423:9, 11450:17, 11485:2

**generating** [1] - 11477:5

**generations** [1] - 11509:8

**gentle** [1] - 11478:15

**gentleman** [1] - 11504:2

**gentlemen** [5] - 11395:18, 11397:7, 11414:22, 11442:3, 11509:24

**geographically** [1] - 11431:16

**given** [8] - 11384:12, 11402:19, 11408:14, 11411:15, 11423:14, 11484:2, 11484:3, 11501:19

**glad** [1] - 11403:13

**glass** [80] - 11412:17, 11433:24, 11434:1, 11434:4, 11440:20, 11443:20, 11447:2, 11447:3, 11447:4, 11447:19, 11447:21, 11447:23, 11449:1, 11449:2, 11449:3, 11449:4, 11449:5, 11449:10, 11449:14, 11449:17, 11449:19, 11450:4, 11450:13, 11452:8, 11452:13, 11453:9, 11454:4,

11454:6, 11454:8, 11454:9, 11455:21, 11456:1, 11456:23, 11456:25, 11457:5, 11457:14, 11457:17, 11457:24, 11458:15, 11459:5, 11459:11, 11459:20, 11459:22, 11459:25, 11460:19, 11461:4, 11463:9, 11464:2, 11464:5, 11465:13, 11465:14, 11465:15, 11465:17, 11466:3, 11468:3, 11468:17, 11468:21, 11469:6, 11469:16, 11469:18, 11470:9, 11470:10, 11470:24, 11471:9, 11472:9, 11472:22, 11472:23, 11473:17, 11474:5, 11474:6, 11474:14, 11474:15, 11475:9, 11476:7, 11476:8, 11476:11, 11477:12, 11477:14, 11477:15

**glazing** [2] - 11450:9, 11472:24

**goal** [1] - 11423:21

**goals** [1] - 11423:22

**goods** [1] - 11487:5

**governing** [1] - 11453:5

**GOVERNMENT** [1] - 11415:17

**government** [37] - 11381:7, 11383:5, 11383:20, 11385:3, 11385:11, 11385:18, 11385:25, 11386:20, 11387:12, 11387:15, 11394:23, 11396:19, 11399:14, 11402:10, 11402:20, 11403:16, 11406:20, 11412:12, 11412:25, 11413:4, 11413:5, 11413:6, 11415:13, 11433:2, 11435:8, 11461:21, 11462:22, 11466:17, 11466:22, 11467:16, 11467:18, 11477:20, 11477:23, 11492:20, 11494:19, 11498:4, 11498:24

**Government** [10] - 11393:22, 11437:6, 11464:19, 11482:1, 11494:9, 11494:18, 11496:12, 11500:18,

11500:24, 11505:17

**government's** [4] - 11387:1, 11405:2, 11467:4, 11492:20

**Government-931A** [1] - 11463:19

**grade** [1] - 11385:15

**graffiti** [1] - 11424:10

**greater** [1] - 11476:21

**green** [7] - 11430:23, 11496:24, 11497:3, 11500:19, 11501:6, 11501:7, 11501:10

**Greene** [2] - 11399:7, 11415:2

**ground** [2] - 11479:14, 11479:20

**grounds** [27] - 11386:8, 11398:13, 11404:9, 11411:20, 11419:23, 11420:8, 11421:21, 11422:1, 11422:4, 11424:11, 11425:23, 11426:9, 11426:12, 11426:14, 11428:14, 11428:20, 11429:5, 11442:18, 11443:11, 11456:4, 11466:11, 11480:8, 11509:11

**group** [8] - 11392:1, 11392:8, 11400:17, 11417:15, 11456:25, 11457:24, 11477:11

**grown** [2] - 11417:23, 11418:2

**guess** [10] - 11382:22, 11396:16, 11399:20, 11409:21, 11414:10, 11489:14, 11489:17, 11491:12, 11508:4, 11508:24

**guilt** [2] - 11385:5, 11415:9

**guilty** [4] - 11383:12, 11415:2, 11415:4, 11415:8

**guys** [1] - 11466:23

## H

**half** [4] - 11393:13, 11411:3, 11421:23, 11472:12

**halfway** [1] - 11433:9

**hallway** [2] - 11446:19, 11446:24

**hand** [15] - 11392:11, 11397:22, 11398:12,

11523

11431:12, 11448:10,
11448:12, 11449:10,
11449:14, 11449:22,
11455:6, 11458:1,
11463:18, 11485:24,
11499:19
**hand-to-hand** [1] -
11398:12
**handed** [4] -
11455:13, 11455:18,
11482:6, 11507:7
**handful** [3] - 11485:1,
11490:21, 11494:2
**handy** [1] - 11469:22
**happenings** [1] -
11507:9
**hard** [1] - 11436:6
**hardest** [1] - 11438:24
**Harris** [18] - 11427:18,
11435:17, 11436:1,
11436:6, 11437:6,
11442:3, 11442:10,
11445:24, 11456:14,
11464:21, 11477:22,
11483:25, 11489:4,
11489:15, 11492:19,
11494:17, 11496:9,
11500:23
**Hassan** [2] - 11379:4,
11381:11
**HASSAN** [1] - 11379:5
**Haven** [1] - 11378:22
**hazardous** [4] -
11472:22, 11473:1,
11473:5, 11474:11
**HazMat** [2] - 11472:18
**heading** [1] -
11457:22
**hear** [16] - 11387:11,
11387:15, 11403:13,
11404:22, 11406:2,
11409:14, 11414:24,
11429:24, 11432:14,
11432:22, 11432:23,
11433:1, 11434:15,
11434:18
**heard** [13] - 11385:25,
11387:23, 11394:8,
11415:1, 11423:1,
11423:17, 11424:7,
11434:16, 11436:12,
11461:14, 11466:6,
11494:21, 11510:5
**hearing** [2] -
11407:17, 11407:24
**hearsay** [2] -
11460:13, 11495:6
**heavily** [2] - 11474:23,
11481:3
**heck** [1] - 11396:14

**HELD** [1] - 11378:9
**held** [1] - 11418:18
**help** [6] - 11393:3,
11422:12, 11427:5,
11440:5, 11449:24,
11508:18
**helped** [1] - 11414:16
**helpful** [1] - 11421:3
**helping** [1] - 11425:5
**hereby** [1] - 11512:1
**Hernandez** [8] -
11379:2, 11381:11,
11382:23, 11382:25,
11384:19, 11395:10,
11397:21, 11403:23
**HERNANDEZ** [13] -
11383:2, 11383:22,
11384:2, 11385:1,
11397:23, 11398:21,
11398:23, 11399:2,
11399:4, 11399:17,
11399:19, 11414:9,
11414:13
**Hialeah** [1] - 11379:9
**higher** [7] - 11433:14,
11438:15, 11438:16,
11448:24, 11461:21,
11462:16, 11462:25
**highest** [1] - 11439:22
**Highland** [1] - 11379:3
**highlighted** [3] -
11465:8, 11465:20,
11473:24
**highly** [2] - 11395:13,
11443:10
**Hill** [1] - 11406:22
**himself** [1] - 11393:2
**historic** [7] -
11416:18, 11416:25,
11431:15, 11440:13,
11441:10, 11509:3
**historically** [1] -
11509:8
**history** [1] - 11417:17
**hold** [9] - 11392:23,
11406:8, 11407:20,
11419:17, 11432:14,
11432:18, 11440:17,
11510:7
**holds** [2] - 11391:25,
11472:23
**Hollow** [1] - 11379:2
**home** [1] - 11409:16
**honest** [1] - 11402:8
**Honor** [73] - 11382:2,
11382:7, 11383:2,
11384:18, 11385:1,
11386:7, 11387:16,
11388:1, 11389:4,
11389:19, 11390:10,

11390:17, 11391:15,
11391:20, 11392:10,
11392:20, 11393:6,
11393:17, 11393:21,
11395:2, 11395:11,
11396:22, 11397:23,
11399:23, 11400:20,
11401:5, 11401:12,
11401:16, 11406:4,
11408:5, 11408:12,
11408:21, 11408:24,
11409:2, 11409:5,
11409:12, 11409:17,
11409:25, 11410:3,
11410:11, 11410:15,
11412:10, 11414:7,
11414:9, 11414:13,
11415:15, 11432:12,
11433:8, 11433:24,
11434:19, 11435:14,
11436:13, 11436:15,
11436:21, 11441:22,
11443:13, 11443:15,
11444:17, 11455:2,
11456:5, 11456:13,
11461:14, 11463:15,
11466:6, 11467:7,
11494:14, 11494:25,
11495:13, 11495:17,
11509:22, 11510:6,
11510:20, 11511:18
**Honor's** [1] - 11389:16
**Honorable** [2] -
11445:6, 11511:21
**HONORABLE** [1] -
11378:9
**hope** [1] - 11472:3
**hopefully** [1] -
11382:16
**hour** [4] - 11411:2,
11411:3, 11475:11,
11510:1
**hour-and-a-half** [1] -
11411:3
**hourly** [1] - 11475:6
**hours** [8] - 11382:10,
11423:14, 11474:20,
11475:8, 11475:10,
11475:11, 11475:21,
11475:22
**House** [3] - 11418:22,
11505:3, 11505:4
**house** [6] - 11419:4,
11446:18, 11460:21,
11461:22, 11462:1,
11462:16
**houses** [1] - 11440:13
**hull** [8] - 11387:4,
11387:11, 11395:10,
11396:4, 11397:24,

11406:8, 11406:13,
11510:7
**Hull** [5] - 11378:23,
11381:10, 11395:11,
11406:4, 11504:1
**HULL** [22] - 11378:24,
11382:7, 11382:9,
11382:12, 11387:3,
11395:11, 11396:3,
11396:6, 11396:22,
11406:4, 11406:9,
11406:14, 11414:7,
11443:13, 11503:23,
11508:16, 11509:16,
11509:22, 11510:5,
11510:20, 11511:1,
11511:18
**Hull.......................
11503** [1] - 11380:4
**humanize** [1] -
11389:23
**humidity** [5] -
11440:19, 11440:22,
11440:25, 11441:6,
11441:9
**hundred** [1] -
11502:12

**I**

**ID** [2] - 11452:5,
11454:15
**idea** [3] - 11387:24,
11390:7, 11392:7
**ideas** [1] - 11397:3
**identical** [1] -
11404:18
**identification** [2] -
11440:1, 11448:22
**identifies** [1] -
11483:1
**identify** [8] -
11391:12, 11424:5,
11430:8, 11440:4,
11449:20, 11464:1,
11494:13, 11495:15
**identifying** [3] -
11423:25, 11424:19,
11425:2
**II** [1] - 11379:11
**ill** [1] - 11387:24
**ill-prepared** [1] -
11387:24
**image** [7] - 11389:18,
11420:20, 11420:22,
11442:17, 11466:12,
11503:1
**imagine** [6] - 11426:9,
11440:11, 11440:23,
11459:18, 11478:20,

11490:21
**immediate** [1] -
11425:3
**immediately** [1] -
11448:22
**impact** [2] - 11490:10,
11508:2
**impacted** [1] -
11425:13
**impeach** [2] -
11408:15, 11495:22
**impeaching** [1] -
11496:4
**important** [11] -
11389:4, 11389:12,
11389:23, 11390:2,
11390:5, 11392:14,
11440:25, 11441:7,
11507:10, 11507:22,
11510:21
**importantly** [1] -
11449:21
**impressions** [1] -
11425:22
**IN** [1] - 11378:1
**inaugural** [36] -
11420:11, 11421:9,
11421:11, 11421:13,
11421:23, 11422:2,
11422:5, 11430:4,
11431:2, 11431:3,
11438:9, 11438:13,
11450:10, 11452:17,
11457:9, 11457:11,
11478:9, 11478:19,
11478:25, 11479:7,
11479:11, 11481:10,
11481:21, 11483:1,
11486:15, 11488:3,
11488:5, 11488:6,
11488:9, 11493:3,
11493:6, 11497:12,
11501:25, 11508:11,
11511:5
**inauguration** [19] -
11420:12, 11420:23,
11421:15, 11421:19,
11422:10, 11431:5,
11434:2, 11434:4,
11438:19, 11439:16,
11440:9, 11457:2,
11457:4, 11457:5,
11479:2, 11481:7,
11485:19, 11487:15,
11488:10
**inch** [14] - 11405:14,
11408:5, 11458:15,
11468:23, 11468:24,
11469:5, 11469:6,
11469:11, 11469:12,

11524

11469:16, 11469:18, 11471:10, 11471:25
**inch-and-three-quarter** [1] - 11469:5
**inch-and-three-quarter-inch** [1] - 11469:18
**inch-and-three-quarters** [1] - 11405:14
**inches** [7] - 11409:7, 11409:13, 11410:13, 11471:11, 11485:6, 11493:19, 11493:20
**incidents** [1] - 11403:22
**include** [5] - 11417:1, 11455:22, 11464:7, 11477:1, 11505:25
**included** [1] - 11457:25
**includes** [1] - 11473:13
**including** [6] - 11385:2, 11399:9, 11402:20, 11448:21, 11487:9, 11504:14
**inconsistent** [1] - 11495:22
**incorporated** [1] - 11494:18
**incredibly** [1] - 11391:17
**incurred** [2] - 11464:8, 11474:3
**indicate** [1] - 11408:4
**indicated** [2] - 11387:18, 11435:17
**indicating** [17] - 11387:3, 11400:1, 11404:11, 11407:14, 11408:1, 11411:9, 11421:5, 11421:7, 11421:9, 11421:17, 11434:13, 11435:19, 11446:11, 11478:13, 11478:15, 11482:4, 11501:6
**indictment** [2] - 11396:9, 11396:23
**individual** [14] - 11395:25, 11414:16, 11447:4, 11489:25, 11490:1, 11491:17, 11492:4, 11492:7, 11493:12, 11493:13, 11497:18, 11499:14, 11501:16, 11501:17
**individually** [1] - 11490:16

**individuals** [8] - 11389:13, 11392:6, 11400:11, 11400:12, 11402:3, 11402:4, 11424:19, 11504:6
**indulgence** [1] - 11446:9
**inflammatory** [1] - 11395:4
**info** [1] - 11483:8
**information** [10] - 11408:14, 11409:22, 11412:18, 11413:9, 11482:24, 11483:11, 11483:18, 11495:5, 11498:24, 11504:13
**informed** [1] - 11382:5
**inherent** [2] - 11461:2, 11461:11
**inherently** [1] - 11461:13
**injury** [1] - 11407:2
**inside** [4] - 11388:7, 11397:7, 11402:1, 11447:20
**inspecting** [1] - 11511:3
**Inspector** [5] - 11392:4, 11400:7, 11400:21, 11436:18, 11437:3
**inspire** [5] - 11418:11, 11505:11, 11505:24, 11506:6, 11506:8
**inspired** [1] - 11426:5
**install** [6] - 11459:8, 11459:11, 11478:8, 11479:10, 11483:16, 11490:24
**installation** [2] - 11450:4, 11490:8
**installed** [4] - 11429:14, 11488:4, 11490:22, 11501:24
**installing** [1] - 11479:4
**instead** [2] - 11470:18, 11481:17
**instruct** [3] - 11400:12, 11402:4, 11415:10
**instruction** [13] - 11382:23, 11383:1, 11383:3, 11383:15, 11383:17, 11384:19, 11384:23, 11385:9, 11385:18, 11414:2, 11414:5, 11414:25, 11462:20
**insulation** [2] -

11474:10, 11475:18
**insulators** [1] - 11475:21
**intelligent** [1] - 11397:6
**intend** [4] - 11393:7, 11393:9, 11393:10, 11404:24
**intent** [1] - 11404:20
**intention** [1] - 11495:9
**interest** [1] - 11507:22
**interested** [1] - 11495:2
**interfered** [2] - 11394:3, 11401:9
**interior** [2] - 11425:1, 11449:4
**internal** [1] - 11412:18
**internally** [1] - 11507:23
**interrupt** [1] - 11418:23
**interruption** [1] - 11440:15
**intrigued** [1] - 11406:18
**introduces** [1] - 11403:16
**introducing** [1] - 11415:22
**investigation** [1] - 11452:3
**investigations** [1] - 11498:25
**invite** [2] - 11404:16, 11404:25
**invoice** [1] - 11411:16
**invoices** [2] - 11411:12, 11411:13
**involve** [2] - 11386:14, 11453:24
**involved** [5] - 11392:6, 11398:11, 11399:8, 11508:18, 11511:6
**ipsa** [1] - 11407:10
**irrelevant** [1] - 11386:23
**ish** [1] - 11441:8
**issue** [15] - 11400:20, 11408:24, 11409:11, 11411:14, 11412:15, 11424:8, 11425:3, 11434:3, 11434:19, 11434:23, 11435:15, 11435:22, 11436:11, 11457:13, 11466:25
**issues** [2] - 11410:24, 11414:4
**item** [3] - 11397:25, 11400:3, 11463:11

**itemize** [2] - 11459:1, 11459:4
**itemized** [1] - 11473:7
**items** [9] - 11387:25, 11412:6, 11419:21, 11434:1, 11440:18, 11458:22, 11465:15, 11473:14, 11507:20
**itself** [3] - 11403:1, 11422:2, 11440:12
**IV** [1] - 11378:23

## J

**January** [50] - 11408:4, 11408:8, 11410:12, 11415:3, 11419:25, 11420:7, 11420:12, 11421:12, 11422:16, 11428:14, 11429:12, 11430:1, 11434:9, 11436:17, 11438:23, 11440:24, 11447:15, 11449:1, 11452:9, 11464:3, 11474:17, 11479:22, 11480:1, 11482:13, 11486:7, 11486:13, 11486:17, 11486:19, 11487:13, 11488:1, 11488:9, 11488:11, 11488:22, 11490:5, 11491:8, 11498:25, 11502:3, 11502:4, 11502:16, 11502:22, 11503:2, 11503:15, 11504:4, 11507:1, 11508:7, 11509:19, 11510:18, 11511:2, 11511:3, 11511:15
**JASON** [3] - 11380:3, 11415:17, 11415:24
**Jason** [4] - 11378:12, 11381:7, 11415:16, 11415:24
**Jauregui** [2] - 11379:8, 11381:12
**JAUREGUI** [1] - 11379:8
**Jeremy** [1] - 11415:2
**job** [8] - 11407:5, 11454:21, 11487:3, 11504:24, 11505:9, 11505:21, 11510:21
**Joe** [4] - 11395:12, 11397:10, 11406:4, 11504:1
**John** [2] - 11378:23, 11381:10
**joins** [1] - 11443:13

**Joseph** [1] - 11381:4
**JUDGE** [1] - 11378:10
**judge** [1] - 11404:13
**Junior** [1] - 11401:21
**jurisdiction** [1] - 11506:12
**juror** [4] - 11397:6, 11414:15, 11414:16, 11414:17
**jurors** [1] - 11389:3
**jury** [42] - 11383:8, 11385:5, 11385:9, 11386:15, 11386:23, 11388:9, 11388:20, 11390:13, 11393:19, 11394:19, 11395:23, 11397:1, 11404:5, 11413:14, 11413:16, 11413:17, 11415:22, 11418:18, 11420:18, 11428:10, 11433:5, 11433:19, 11435:2, 11436:5, 11437:8, 11442:6, 11442:16, 11442:22, 11445:9, 11445:10, 11445:24, 11461:20, 11461:22, 11461:24, 11461:25, 11462:4, 11462:20, 11463:2, 11463:21, 11489:5, 11489:8, 11510:2
**Jury** [4] - 11413:17, 11442:6, 11445:10, 11510:2
**JURY** [1] - 11378:8
**justification** [7] - 11453:6, 11453:9, 11453:18, 11453:22, 11454:16, 11484:20, 11499:19
**justify** [1] - 11453:7

## K

**Kearney** [1] - 11495:8
**keep** [6] - 11425:24, 11431:22, 11437:15, 11438:21, 11441:8, 11485:23
**keeping** [1] - 11486:3
**KELLY** [1] - 11378:9
**Kenerson** [2] - 11378:12, 11381:8
**kept** [3] - 11395:21, 11426:1, 11507:8
**key** [1] - 11408:24
**kind** [39] - 11386:6, 11387:18, 11387:22, 11387:25, 11388:9,

11525

11389:24, 11390:2, 11391:15, 11391:16, 11392:1, 11393:15, 11393:18, 11395:4, 11397:7, 11398:8, 11399:8, 11402:12, 11403:10, 11407:10, 11408:13, 11408:24, 11414:3, 11417:5, 11429:9, 11431:6, 11431:9, 11446:19, 11447:18, 11453:19, 11454:22, 11456:19, 11478:23, 11478:24, 11480:3, 11487:4, 11490:12, 11498:15, 11505:20
**kinds** [8] - 11397:4, 11506:16, 11506:17, 11507:17, 11508:12, 11509:10, 11509:18
**knowledge** [3] - 11392:11, 11499:12, 11504:13
**known** [1] - 11511:9
**knows** [2] - 11391:20, 11511:8

## L

**labeled** [1] - 11465:7
**labor** [17] - 11448:5, 11449:7, 11450:2, 11450:12, 11459:12, 11465:14, 11465:16, 11470:24, 11471:4, 11472:9, 11472:12, 11472:16, 11474:1, 11476:2, 11476:6, 11477:2, 11505:20
**Labor** [4] - 11421:10, 11421:25, 11459:8, 11473:25
**laboratory** [1] - 11473:4
**ladies** [3] - 11414:21, 11442:3, 11509:24
**laid** [1] - 11511:2
**Lake** [1] - 11379:15
**Lakes** [1] - 11379:6
**laminated** [1] - 11458:15
**land** [2] - 11395:21, 11506:13
**language** [8] - 11383:3, 11383:18, 11384:6, 11384:7, 11384:8, 11384:13, 11384:19, 11384:22
**laptop** [1] - 11464:22,

11483:25
**large** [9] - 11381:20, 11390:8, 11423:15, 11426:12, 11436:24, 11506:25, 11507:8, 11507:22, 11508:1
**last** [4] - 11382:10, 11415:23, 11466:7, 11481:10
**lastly** [1] - 11437:18
**LAW** [3] - 11379:5, 11379:8, 11379:15
**law** [7] - 11401:19, 11401:24, 11462:2, 11506:4, 11506:10, 11506:19, 11507:4
**lawyer** [3] - 11444:23, 11456:5, 11456:9
**lawyers** [1] - 11434:17
**laying** [1] - 11417:24
**leaders** [1] - 11395:19
**leading** [3] - 11420:6, 11478:8, 11479:11
**leaf** [1] - 11429:24
**learn** [1] - 11504:5
**learned** [1] - 11422:22
**least** [12] - 11387:12, 11388:25, 11389:21, 11396:15, 11397:11, 11402:11, 11403:21, 11411:6, 11413:1, 11439:11, 11447:6, 11507:8
**leave** [4] - 11400:12, 11402:4, 11409:24, 11500:10
**leaves** [2] - 11461:19, 11510:8
**led** [2] - 11393:3, 11398:12
**leeway** [6] - 11386:20, 11402:10, 11402:21, 11435:8, 11435:9, 11435:10
**left** [15] - 11382:23, 11391:22, 11392:9, 11401:20, 11401:22, 11430:25, 11445:20, 11446:1, 11446:8, 11447:5, 11447:23, 11463:8, 11466:22, 11473:23
**legal** [1] - 11462:1
**legislative** [3] - 11412:14, 11416:9, 11416:16
**length** [20] - 11395:3, 11408:11, 11433:9, 11484:3, 11484:24, 11485:1, 11485:5,

11485:7, 11488:25, 11490:19, 11490:20, 11491:3, 11491:5, 11493:6, 11493:18, 11493:20, 11494:1, 11497:20, 11502:13
**lengths** [3] - 11410:12, 11484:25, 11485:2
**less** [11] - 11394:25, 11404:15, 11407:11, 11426:1, 11450:15, 11452:20, 11470:8, 11493:23, 11493:24, 11494:7, 11494:8
**lest** [1] - 11404:13
**letter** [1] - 11495:3
**level** [3] - 11389:14, 11402:23, 11402:24
**lies** [2] - 11386:16, 11435:25
**life** [1] - 11390:10
**life-threatening** [1] - 11390:10
**lifespan** [2] - 11485:11, 11485:12
**light** [1] - 11425:20
**lightweight** [1] - 11480:23
**likely** [2] - 11397:5, 11495:6
**limited** [1] - 11415:4
**limiting** [3] - 11384:18, 11384:23, 11462:19
**line** [18] - 11391:25, 11392:23, 11401:10, 11457:7, 11458:22, 11459:7, 11470:24, 11475:2, 11476:1, 11476:7, 11483:17, 11489:21, 11490:8, 11490:22, 11497:3, 11497:8, 11503:15
**linear** [8] - 11408:11, 11410:3, 11483:16, 11484:5, 11484:7, 11488:25, 11490:10, 11493:5
**lines** [10] - 11400:6, 11409:24, 11468:22, 11472:17, 11490:11, 11500:18, 11500:19, 11501:6, 11501:7, 11501:10
**link** [1] - 11396:10
**linked** [1] - 11467:5
**linking** [1] - 11398:2
**list** [5] - 11448:24, 11457:24, 11458:4,

11458:11, 11458:16
**listed** [2] - 11458:14, 11507:20
**listen** [1] - 11461:22
**litany** [1] - 11387:25
**literally** [1] - 11511:12
**lived** [1] - 11505:8
**Livingston** [1] - 11379:16
**LLC** [1] - 11378:20
**located** [4] - 11421:7, 11446:4, 11446:5, 11459:21
**location** [10] - 11421:7, 11426:4, 11430:5, 11448:23, 11452:14, 11478:13, 11479:9, 11481:13, 11483:19, 11483:20
**locations** [1] - 11459:23
**lodge** [1] - 11435:1
**lodged** [1] - 11435:7
**logic** [2] - 11401:10, 11401:11
**long-term** [1] - 11448:15
**look** [22] - 11388:20, 11394:19, 11396:9, 11402:6, 11402:8, 11403:1, 11403:5, 11406:1, 11408:17, 11412:21, 11413:8, 11436:17, 11437:23, 11438:5, 11445:20, 11459:7, 11467:8, 11475:1, 11480:11, 11495:18, 11503:17, 11505:9
**looked** [2] - 11384:2, 11499:16
**looking** [12] - 11397:5, 11401:15, 11423:5, 11431:20, 11432:9, 11457:21, 11460:1, 11464:5, 11486:22, 11488:1, 11502:15, 11502:19
**loose** [1] - 11392:24
**Lopez** [1] - 11400:17
**loquitur** [1] - 11407:10
**losing** [1] - 11481:2
**loss** [2] - 11441:10, 11480:9
**lost** [1] - 11395:17
**loud** [2] - 11386:14, 11389:8
**love** [1] - 11505:20
**low** [1] - 11449:23
**lower** [7] - 11430:24,

11432:7, 11438:15, 11447:5, 11452:16, 11483:2
**Loyd** [8] - 11392:4, 11393:24, 11393:25, 11394:4, 11400:7, 11400:21, 11436:18, 11437:3
**luck** [1] - 11405:12
**lump** [9] - 11457:25, 11459:2, 11459:4, 11459:11, 11459:13, 11459:14, 11463:9, 11470:12, 11477:11
**lunch** [3] - 11411:7, 11509:25, 11510:1
**Luncheon** [1] - 11511:23

## M

**M-C-I-N-T-Y-R-E** [1] - 11415:25
**machine** [1] - 11379:21
**magically** [1] - 11413:7
**main** [1] - 11421:14
**maintain** [3] - 11381:22, 11440:21, 11440:24
**maintaining** [1] - 11486:3
**maintenance** [5] - 11416:18, 11416:21, 11417:1, 11423:24, 11426:15
**major** [2] - 11421:6, 11478:23
**majority** [2] - 11386:25, 11485:6
**Mall** [1] - 11431:21
**manner** [1] - 11394:1
**manpower** [3] - 11449:21, 11450:1, 11454:10
**manufactured** [1] - 11439:13
**map** [2] - 11446:7, 11478:11
**marble** [1] - 11440:14
**March** [2] - 11378:6, 11512:5
**mark** [14] - 11381:21, 11404:14, 11404:17, 11404:19, 11405:6, 11405:15, 11405:19, 11429:3, 11432:5, 11441:20, 11445:21, 11447:10, 11477:21,

11526

11500:19
**marked** [5] - 11455:7,
11463:19, 11482:1,
11482:7, 11494:9
**market** [1] - 11499:23
**masse** [3] - 11436:2,
11436:10, 11437:9
**match** [2] - 11405:17,
11474:16
**matching** [1] -
11474:18
**material** [9] - 11454:9,
11461:3, 11465:13,
11465:15, 11465:21,
11472:23, 11473:2,
11474:11, 11476:6
**Materials** [1] - 11465:7
**materials** [27] -
11438:6, 11438:23,
11439:1, 11439:2,
11439:11, 11448:9,
11449:8, 11449:9,
11449:22, 11465:11,
11466:2, 11470:22,
11472:16, 11472:22,
11473:4, 11473:5,
11473:20, 11485:12,
11485:23, 11486:4,
11487:4, 11487:7,
11487:9, 11498:4,
11499:4, 11500:6,
11502:13
**math** [16] - 11408:6,
11409:18, 11409:19,
11409:21, 11409:24,
11410:18, 11410:20,
11469:19, 11471:18,
11483:22, 11484:10,
11493:16, 11493:22,
11494:6, 11497:11,
11497:18
**Matter** [2] - 11381:2,
11445:12
**matter** [2] - 11462:18,
11495:11
**matters** [1] - 11381:17
**Matthew** [1] - 11415:2
**McCullough** [8] -
11378:12, 11381:7,
11394:8, 11394:14,
11398:1, 11398:7,
11400:2, 11401:14
**MCCULLOUGH** [12] -
11387:16, 11389:2,
11390:24, 11391:3,
11391:5, 11392:20,
11393:6, 11399:23,
11400:1, 11400:3,
11400:15, 11401:16
**MCGUIRE** [1] -

11378:24
**McIntyre** [56] -
11407:25, 11415:16,
11415:24, 11415:25,
11416:1, 11416:5,
11418:12, 11419:19,
11420:20, 11422:16,
11427:21, 11428:13,
11429:24, 11430:20,
11432:5, 11437:22,
11441:15, 11445:19,
11446:1, 11447:14,
11455:6, 11455:12,
11456:16, 11456:22,
11457:21, 11460:5,
11460:20, 11463:8,
11463:18, 11464:15,
11464:24, 11467:23,
11469:19, 11470:7,
11473:18, 11476:5,
11476:23, 11477:17,
11478:1, 11478:18,
11481:23, 11482:6,
11482:18, 11482:25,
11483:22, 11484:2,
11484:14, 11485:11,
11486:24, 11487:21,
11489:21, 11492:23,
11495:22, 11496:18,
11503:21, 11503:24
**MCINTYRE** [2] -
11380:3, 11415:17
**MD** [1] - 11379:3
**mean** [35] - 11386:24,
11388:1, 11388:11,
11388:20, 11389:2,
11391:16, 11394:17,
11394:21, 11396:13,
11398:2, 11398:7,
11398:15, 11398:16,
11398:18, 11399:1,
11399:12, 11399:17,
11401:17, 11402:5,
11402:8, 11403:24,
11412:2, 11413:8,
11423:18, 11433:4,
11434:15, 11434:16,
11434:17, 11442:13,
11444:12, 11462:13,
11462:14, 11467:8,
11506:1, 11510:14
**means** [3] - 11448:7,
11464:18, 11477:1
**meant** [1] - 11401:12
**mechanic** [1] -
11417:2
**mechanically** [1] -
11479:13
**media** [2] - 11421:8,
11429:4

**meeting** [1] -
11388:10
**melee** [1] - 11397:7
**members** [2] -
11391:22, 11448:18
**men** [3] - 11424:23,
11432:13, 11507:12
**mentioned** [7] -
11424:17, 11439:16,
11450:16, 11458:25,
11461:23, 11484:23,
11485:25
**merely** [1] - 11466:21
**message** [1] - 11508:1
**metal** [2] - 11417:2,
11429:10
**Metcalf** [8] - 11379:11,
11381:13, 11434:14,
11435:3, 11442:13,
11444:19, 11444:25,
11467:9
**METCALF** [15] -
11379:11, 11434:13,
11434:19, 11434:22,
11434:24, 11435:14,
11435:17, 11437:13,
11441:22, 11442:16,
11443:1, 11443:7,
11443:9, 11445:3
**Miami** [1] - 11379:6
**microphone** [3] -
11416:1, 11416:4,
11418:24
**middle** [7] - 11423:11,
11430:21, 11438:23,
11440:23, 11467:9,
11467:12, 11482:23
**might** [13] - 11388:20,
11394:10, 11404:22,
11405:1, 11408:25,
11412:2, 11412:3,
11424:7, 11438:13,
11460:21, 11506:12,
11508:6, 11509:10
**Millard** [2] - 11400:17,
11401:21
**MILLER** [1] - 11512:1
**Miller** [2] - 11379:17,
11512:6
**mind** [4] - 11388:25,
11394:15, 11394:24,
11477:22
**Mineral** [1] - 11425:13
**Mink** [1] - 11379:2
**minute** [6] - 11393:8,
11412:3, 11435:11,
11477:21, 11481:10,
11500:19
**minutes** [17] -
11385:20, 11386:5,

11386:6, 11387:14,
11391:10, 11392:18,
11392:19, 11393:9,
11393:14, 11403:13,
11407:17, 11428:9,
11442:4, 11445:4,
11445:7, 11500:24,
11500:25
**misleading** [3] -
11466:11, 11466:15,
11467:1
**mission** [14] -
11418:6, 11418:10,
11426:2, 11426:11,
11504:11, 11506:4,
11506:5, 11506:9,
11506:19, 11506:20,
11506:21, 11508:25,
11509:2, 11509:7
**mistrial** [2] -
11384:16, 11384:17
**mix** [1] - 11422:8
**moisture** [1] -
11405:18
**moment** [9] - 11389:7,
11393:23, 11413:20,
11427:19, 11430:17,
11436:3, 11440:17,
11455:23, 11500:21
**Monday** [1] - 11405:11
**money** [2] - 11461:9,
11462:8
**month** [1] - 11422:3
**months** [1] - 11421:24
**monument** [1] -
11431:16
**Monument** [1] -
11431:18
**Moore** [2] - 11378:13,
11381:8
**more-than-
intelligent** [1] -
11397:6
**morning** [21] -
11381:16, 11407:17,
11407:23, 11408:3,
11408:23, 11415:20,
11415:21, 11415:24,
11424:4, 11425:17,
11426:6, 11426:7,
11426:16, 11426:17,
11427:11, 11431:10,
11442:1, 11449:18,
11502:3, 11502:16,
11503:24
**MORNING** [1] -
11378:9
**most** [10] - 11381:18,
11396:24, 11397:3,
11402:23, 11434:1,

11449:21, 11450:20,
11477:10, 11478:3,
11485:5
**motion** [2] - 11403:24
**mouth** [1] - 11383:8
**movable** [2] - 11416:2,
11507:17
**move** [13] - 11392:25,
11393:1, 11399:21,
11435:12, 11450:2,
11456:3, 11464:10,
11471:3, 11473:23,
11477:17, 11482:15,
11482:23, 11511:18
**moved** [2] - 11384:16,
11510:15
**moving** [5] -
11429:18, 11437:4,
11437:15, 11473:18,
11475:18
**MR** [207] - 11382:2,
11382:7, 11382:9,
11382:12, 11384:14,
11384:16, 11386:7,
11387:3, 11387:16,
11389:2, 11390:24,
11391:3, 11391:5,
11392:20, 11393:6,
11393:21, 11395:2,
11395:8, 11395:11,
11396:3, 11396:6,
11396:22, 11399:23,
11400:1, 11400:3,
11400:15, 11401:5,
11401:16, 11404:11,
11404:13, 11405:8,
11405:10, 11406:4,
11406:9, 11406:14,
11407:14, 11407:16,
11407:21, 11407:23,
11408:19, 11408:21,
11409:5, 11409:17,
11409:25, 11410:11,
11410:22, 11411:2,
11411:5, 11411:9,
11411:11, 11412:10,
11412:22, 11414:7,
11415:15, 11415:19,
11419:7, 11420:16,
11420:19, 11427:18,
11427:20, 11428:1,
11428:7, 11428:9,
11428:12, 11428:22,
11428:25, 11429:1,
11429:16, 11429:18,
11429:21, 11429:23,
11430:14, 11430:17,
11430:19, 11431:22,
11431:25, 11432:3,
11432:4, 11432:10,

11527

11432:12, 11432:17, 11432:24, 11433:8, 11433:24, 11434:10, 11434:13, 11434:19, 11434:22, 11434:24, 11435:14, 11435:17, 11436:13, 11436:15, 11436:21, 11436:24, 11437:2, 11437:13, 11437:15, 11437:18, 11437:21, 11440:16, 11441:18, 11441:22, 11442:16, 11443:1, 11443:7, 11443:9, 11443:13, 11443:15, 11443:22, 11444:3, 11444:10, 11444:17, 11445:3, 11445:18, 11445:22, 11445:25, 11447:9, 11447:12, 11447:13, 11455:2, 11455:5, 11455:8, 11455:11, 11456:3, 11456:4, 11456:5, 11456:8, 11456:13, 11456:15, 11456:18, 11456:20, 11457:18, 11457:20, 11458:19, 11458:21, 11460:13, 11460:15, 11461:14, 11461:18, 11462:19, 11463:7, 11463:14, 11463:17, 11463:20, 11463:22, 11464:10, 11464:13, 11464:21, 11466:6, 11466:10, 11467:7, 11467:22, 11468:11, 11477:19, 11477:25, 11478:14, 11478:17, 11481:25, 11482:3, 11482:15, 11482:17, 11483:7, 11483:10, 11483:24, 11484:1, 11487:17, 11487:20, 11489:4, 11489:7, 11489:13, 11489:19, 11489:20, 11492:10, 11492:18, 11492:22, 11494:14, 11494:17, 11494:21, 11494:25, 11495:8, 11495:13, 11495:17, 11495:20, 11496:7, 11496:9, 11496:12, 11496:15, 11496:17, 11498:18, 11498:20, 11498:22, 11500:23, 11501:2, 11503:20, 11503:23, 11508:14, 11508:16, 11509:14, 11509:16,

11509:20, 11509:22, 11510:5, 11510:20, 11511:1, 11511:18
**MS** [13] - 11383:2, 11383:22, 11384:2, 11385:1, 11397:23, 11398:21, 11398:23, 11399:2, 11399:4, 11399:17, 11399:19, 11414:9, 11414:13
**MT** [6] - 11379:16
**Mulroe** [18] - 11378:13, 11381:8, 11408:22, 11409:10, 11411:1, 11428:4, 11443:12, 11443:14, 11445:14, 11456:6, 11463:5, 11467:20, 11468:6, 11468:10, 11490:2, 11494:24, 11495:18, 11497:11
**MULROE** [104] - 11411:2, 11411:5, 11412:10, 11415:15, 11415:19, 11419:7, 11420:16, 11420:19, 11427:18, 11427:20, 11428:1, 11428:7, 11428:9, 11428:12, 11428:22, 11428:25, 11429:1, 11429:16, 11429:18, 11429:21, 11429:23, 11430:14, 11430:17, 11430:19, 11431:22, 11431:25, 11432:3, 11432:4, 11432:10, 11433:8, 11433:24, 11434:10, 11436:13, 11436:15, 11436:21, 11436:24, 11437:2, 11437:15, 11437:18, 11437:21, 11440:16, 11441:18, 11443:15, 11443:22, 11444:3, 11444:10, 11444:17, 11445:18, 11445:22, 11445:25, 11447:9, 11447:12, 11447:13, 11455:2, 11455:5, 11455:8, 11455:11, 11456:3, 11456:5, 11456:8, 11456:13, 11456:15, 11456:18, 11456:20, 11457:18, 11457:20, 11458:19, 11458:21, 11460:15, 11463:5, 11463:7, 11463:14, 11463:17, 11463:20, 11463:22, 11464:10, 11464:13, 11464:21, 11464:23,

11467:7, 11467:22, 11468:11, 11477:19, 11477:25, 11478:14, 11478:17, 11481:25, 11482:3, 11482:15, 11482:17, 11483:10, 11483:24, 11484:1, 11487:17, 11489:19, 11492:10, 11494:21, 11494:25, 11495:20, 11498:20, 11508:14, 11509:14, 11509:20
**Mulroe's** [5] - 11436:23, 11461:22, 11462:1, 11462:5, 11501:22
**Mulroe.................**
**11415** [1] - 11380:3
**multiple** [7] - 11398:16, 11398:19, 11400:19, 11434:16, 11450:24, 11450:25, 11498:11
**multiplier** [7] - 11469:7, 11469:10, 11469:17, 11471:13, 11471:14, 11471:15, 11497:19
**multiply** [4] - 11475:11, 11476:13, 11493:21, 11494:4
**museum** [2] - 11426:2, 11505:14
**must** [1] - 11500:24

## N

**Nadia** [2] - 11378:13, 11381:8
**name** [5] - 11411:17, 11412:17, 11415:23, 11415:24
**name's** [1] - 11504:1
**namely** [1] - 11415:2
**nation's** [2] - 11506:8, 11509:4
**National** [1] - 11431:21
**nature** [7] - 11395:4, 11419:21, 11440:8, 11440:20, 11448:23, 11451:2, 11451:19
**Navy** [2] - 11419:12, 11419:13
**Nayib** [2] - 11379:4, 11381:11
**NAYIB** [1] - 11379:5
**nearest** [2] - 11475:17, 11475:25

**necessarily** [2] - 11434:11, 11436:7
**necessary** [6] - 11433:16, 11433:19, 11449:17, 11474:18, 11475:9, 11487:13
**necessity** [1] - 11399:11
**need** [21] - 11381:24, 11386:10, 11395:15, 11406:19, 11406:20, 11409:19, 11409:20, 11417:3, 11433:1, 11433:15, 11435:11, 11436:4, 11436:7, 11437:9, 11442:22, 11443:17, 11445:4, 11446:9, 11448:22, 11468:8, 11507:12
**needed** [8] - 11430:9, 11430:12, 11437:23, 11439:1, 11448:21, 11453:15, 11456:25, 11508:6
**needing** [1] - 11440:24
**needs** [4] - 11386:11, 11406:21, 11409:1, 11422:14
**negotiate** [2] - 11500:12, 11500:13
**never** [5] - 11508:22, 11510:13, 11510:19, 11510:24, 11511:16
**nevertheless** [1] - 11491:25
**New** [3] - 11378:18, 11378:22, 11379:13
**new** [3] - 11486:10, 11486:11, 11486:12
**news** [1] - 11423:5
**next** [14] - 11407:18, 11407:25, 11414:24, 11415:13, 11430:13, 11431:25, 11446:11, 11465:23, 11470:24, 11473:10, 11473:25, 11475:18, 11497:3, 11497:8
**nice** [1] - 11416:3
**Nicholas** [2] - 11378:16, 11381:9
**Nick** [1] - 11487:21
**night** [1] - 11448:3
**nilly** [1] - 11453:20
**NJ** [3] - 11379:17, 11512:1, 11512:6
**NJ-CCR** [3] - 11379:17, 11512:1, 11512:6

**no-bid** [1] - 11499:5
**noise** [1] - 11390:4
**non** [3] - 11387:23, 11401:2, 11462:13
**non-performance** [1] - 11401:2
**non-reasonableness** [1] - 11462:13
**non-violent** [1] - 11387:23
**none** [5] - 11381:25, 11391:1, 11391:6, 11396:12, 11398:11, 11403:17
**NORDEAN** [1] - 11378:4
**Nordean** [19] - 11381:3, 11381:14, 11388:4, 11388:20, 11391:8, 11391:11, 11391:12, 11393:23, 11394:1, 11394:3, 11394:11, 11395:1, 11398:3, 11400:23, 11400:24, 11401:8, 11402:11, 11445:13, 11487:23
**Nordean's** [3] - 11386:17, 11390:16, 11404:6
**normally** [1] - 11431:9
**Norman** [2] - 11378:20, 11381:10
**north** [6] - 11395:19, 11409:8, 11409:11, 11429:5, 11446:17
**Nos** [1] - 11378:2
**note** [6] - 11393:7, 11433:10, 11478:14, 11494:12, 11495:1, 11495:20
**notes** [9] - 11393:12, 11407:9, 11407:24, 11408:2, 11408:4, 11408:18, 11408:22, 11435:19, 11512:3
**nothing** [11] - 11383:13, 11397:16, 11403:21, 11403:22, 11405:17, 11414:10, 11414:23, 11461:23, 11487:17, 11508:5, 11508:25
**notice** [3] - 11423:14, 11506:24, 11507:22
**noticed** [4] - 11441:24, 11443:4, 11443:5, 11470:7
**notification** [1] - 11507:3

11528

**notified** [1] - 11507:8
**notion** [1] - 11406:18
**notwithstanding** [1] - 11511:12
**nowadays** [1] - 11446:23
**number** [29] - 11382:20, 11382:21, 11385:12, 11389:5, 11389:13, 11400:6, 11400:7, 11402:15, 11402:21, 11402:22, 11405:4, 11409:6, 11449:12, 11460:17, 11465:24, 11469:4, 11470:7, 11470:12, 11470:13, 11470:16, 11471:7, 11475:3, 11476:20, 11484:9, 11489:11, 11493:24, 11498:7, 11498:10
**numbers** [8] - 11392:15, 11411:16, 11411:22, 11464:14, 11464:18, 11469:15, 11471:19, 11475:1
**NW** [5] - 11378:14, 11378:24, 11379:5, 11379:19, 11512:8
**NY** [2] - 11378:18, 11379:13

## O

**oath** [1] - 11421:16
**object** [22] - 11383:2, 11383:14, 11383:17, 11384:6, 11384:7, 11385:12, 11386:3, 11398:13, 11410:23, 11411:12, 11411:19, 11412:1, 11414:6, 11432:12, 11436:9, 11437:10, 11441:22, 11445:1, 11495:24, 11496:6, 11509:20
**objected** [1] - 11434:22
**objecting** [2] - 11399:20, 11442:17
**objection** [32] - 11384:8, 11384:22, 11385:15, 11385:22, 11386:8, 11406:16, 11412:3, 11414:6, 11414:18, 11432:17, 11432:25, 11433:3, 11435:1, 11435:5, 11435:7, 11437:11, 11443:1, 11443:24,

11444:1, 11444:11, 11444:15, 11444:16, 11444:18, 11456:4, 11456:12, 11460:13, 11482:2, 11489:19, 11492:10, 11498:18, 11508:14, 11510:11
**objectionable** [2] - 11466:10, 11467:19
**objections** [3] - 11382:24, 11435:24, 11436:12
**objects** [1] - 11434:17
**observe** [2] - 11427:15, 11447:15
**observed** [1] - 11404:23
**obtain** [2] - 11449:16, 11452:5
**obviously** [16] - 11385:8, 11385:11, 11397:23, 11399:12, 11404:6, 11405:23, 11413:10, 11414:3, 11423:23, 11433:6, 11435:9, 11438:8, 11445:1, 11467:2, 11469:17, 11511:5
**occasion** [1] - 11509:9
**occasions** [1] - 11510:17
**occupied** [1] - 11509:6
**occur** [5] - 11416:19, 11417:3, 11423:16, 11430:9, 11488:10
**occurred** [7] - 11424:15, 11427:10, 11430:6, 11438:10, 11492:14, 11503:17, 11504:9
**occurring** [1] - 11423:8
**occurs** [4] - 11420:25, 11421:6, 11438:19, 11505:19
**OF** [5] - 11378:1, 11378:2, 11378:8, 11379:5, 11511:25
**off-site** [4] - 11461:6, 11479:8, 11485:22, 11486:5
**offense** [11] - 11383:4, 11383:5, 11383:12, 11383:21, 11383:23, 11384:4, 11384:5, 11386:21, 11415:7
**offenses** [3] - 11394:18, 11402:19,

11402:20
**offer** [1] - 11405:3
**offering** [1] - 11387:1
**office** [41] - 11416:22, 11416:24, 11417:7, 11417:10, 11417:11, 11417:13, 11418:14, 11418:22, 11419:4, 11421:16, 11422:12, 11425:25, 11426:10, 11438:24, 11448:10, 11448:17, 11448:18, 11449:16, 11492:13, 11492:14, 11496:4, 11498:1, 11498:2, 11498:9, 11498:23, 11503:8, 11503:16, 11504:17, 11505:1, 11505:4, 11505:5, 11505:6, 11505:9, 11505:10, 11506:13, 11507:3, 11507:19, 11508:13, 11508:23, 11509:17
**OFFICE** [1] - 11378:14
**office's** [1] - 11502:17, 11504:8, 11504:10
**officer** [26] - 11386:4, 11388:1, 11388:22, 11389:7, 11389:23, 11389:24, 11390:14, 11392:11, 11392:17, 11392:21, 11393:2, 11393:3, 11394:21, 11398:9, 11398:12, 11400:16, 11402:11, 11402:13, 11403:5, 11403:18, 11403:19, 11403:21, 11407:24
**Officer** [10] - 11393:24, 11393:25, 11394:4, 11394:11, 11398:2, 11400:16, 11400:17, 11401:21, 11401:23
**officer's** [10] - 11386:9, 11388:4, 11391:14, 11394:15, 11394:24, 11398:9, 11398:18, 11400:8, 11400:25, 11401:18
**officers** [25] - 11387:19, 11387:24, 11389:12, 11389:15, 11389:18, 11390:1, 11390:6, 11391:25, 11394:1, 11394:4, 11394:7, 11394:12, 11400:5, 11400:10, 11401:7, 11401:9,

11401:11, 11401:20, 11402:2, 11402:17, 11403:3, 11403:8, 11403:11, 11406:21, 11406:22
**OFFICES** [1] - 11379:5
**OFFICIAL** [1] - 11511:25
**Official** [2] - 11379:18, 11512:6
**officials** [1] - 11453:24
**often** [5] - 11400:22, 11420:13, 11485:14, 11490:24, 11506:15
**Ohio** [1] - 11392:5
**oldest** [1] - 11509:4
**on-site** [1] - 11423:2
**once** [14] - 11396:25, 11406:23, 11420:15, 11425:10, 11437:25, 11472:7, 11472:12, 11477:22, 11480:13, 11480:14, 11480:15, 11480:25, 11485:16, 11503:4
**one** [87] - 11381:19, 11382:20, 11385:12, 11388:17, 11388:18, 11389:18, 11389:19, 11396:13, 11396:15, 11397:12, 11399:9, 11399:10, 11400:3, 11402:15, 11402:22, 11404:3, 11405:4, 11405:22, 11405:23, 11406:8, 11406:11, 11408:25, 11409:1, 11411:6, 11412:3, 11413:19, 11421:18, 11423:22, 11433:8, 11433:11, 11433:25, 11434:1, 11434:17, 11435:14, 11439:2, 11439:4, 11439:22, 11440:17, 11442:20, 11443:4, 11444:23, 11445:2, 11447:3, 11452:15, 11455:16, 11455:19, 11456:5, 11456:9, 11457:2, 11458:15, 11459:2, 11461:1, 11463:18, 11466:7, 11466:25, 11467:5, 11468:23, 11468:24, 11469:12, 11471:11, 11471:25, 11473:10, 11475:6, 11475:16, 11475:18,

11480:15, 11483:22, 11488:4, 11488:18, 11488:19, 11490:6, 11492:4, 11494:10, 11495:20, 11497:9, 11499:22, 11500:4, 11500:5, 11500:10, 11500:20, 11502:9, 11502:15, 11503:1, 11510:7, 11510:21, 11511:7
**one's** [1] - 11480:14
**one-and-three-quarter** [1] - 11471:11
**one-and-three-quarter-inch** [3] - 11468:24, 11469:12, 11471:25
**one-lawyer** [2] - 11444:23, 11456:5
**one-page** [1] - 11463:18
**one-quarter-inch** [2] - 11458:15, 11468:23
**ones** [4] - 11447:6, 11457:7, 11458:13, 11458:14
**open** [1] - 11431:8
**opened** [1] - 11392:8
**openings** [1] - 11387:23
**opinion** [1] - 11492:10
**opportunity** [4] - 11389:16, 11401:4, 11437:10, 11447:15
**opposed** [1] - 11401:22
**opposite** [1] - 11390:8
**Orange** [1] - 11378:21
**order** [16] - 11408:10, 11410:1, 11410:14, 11410:18, 11424:1, 11424:4, 11435:6, 11454:20, 11461:12, 11465:12, 11467:24, 11468:2, 11472:24, 11474:12, 11482:10, 11484:16
**orderliness** [1] - 11444:22
**ordinarily** [2] - 11414:4, 11451:17
**ordinary** [2] - 11422:23, 11450:17
**orient** [4] - 11419:25, 11431:16, 11432:5, 11443:16
**original** [3] - 11417:24, 11446:20,

11481:23
**originally** [3] -
11503:10, 11509:5,
11509:6
**otherwise** [1] -
11404:23
**outlined** [1] -
11430:23
**outside** [8] - 11388:6,
11417:4, 11422:7,
11422:9, 11432:8,
11447:21, 11472:25,
11509:1
**outweighs** [2] -
11395:5
**overall** [8] - 11417:13,
11433:18, 11456:23,
11465:3, 11466:2,
11467:10, 11473:19,
11477:5
**overlooked** [1] -
11452:13
**overlooking** [1] -
11431:6
**overrule** [3] -
11444:11, 11444:15,
11444:16
**overruled** [5] -
11444:1, 11456:12,
11460:14, 11492:12,
11498:21
**overview** [1] - 11433:4
**own** [1] - 11462:16

## P

**P.A** [2] - 11379:5,
11379:8
**P.C** [1] - 11379:11
**p.m** [2] - 11388:3,
11511:23
**pace** [1] - 11433:23
**Page** [3] - 11400:6,
11495:15, 11496:12
**PAGE** [1] - 11380:2
**page** [16] - 11410:19,
11455:7, 11457:21,
11458:4, 11458:20,
11463:18, 11482:24,
11483:8, 11483:9,
11489:3, 11495:1,
11495:11, 11495:15,
11496:15, 11496:16,
11496:18
**pages** [6] - 11400:19,
11409:4, 11409:5,
11409:6, 11409:22,
11482:7
**paid** [9] - 11410:2,
11462:7, 11462:8,

11462:11, 11462:12,
11467:17, 11467:18,
11486:22, 11493:2
**paint** [12] - 11431:14,
11450:8, 11450:11,
11472:24, 11473:11,
11473:13, 11473:15,
11474:18, 11474:20,
11475:7, 11480:24
**painted** [1] - 11441:4
**Painter** [1] - 11475:2
**painters** [3] -
11474:14, 11475:6,
11475:8
**painting** [5] - 11417:1,
11431:11, 11450:11,
11474:15, 11474:21
**pandemic** [2] -
11438:24, 11440:2
**pane** [38] - 11447:2,
11447:3, 11459:2,
11459:12, 11463:11,
11464:2, 11465:21,
11468:4, 11468:23,
11468:24, 11469:6,
11469:11, 11469:12,
11469:16, 11470:11,
11470:21, 11470:24,
11473:7, 11473:8,
11473:9, 11473:17,
11474:5, 11474:14,
11474:15, 11475:9,
11476:7, 11476:8,
11477:6, 11477:13
**pane-by-pane** [8] -
11459:2, 11463:11,
11468:4, 11470:11,
11473:8, 11473:9,
11477:6, 11477:13
**panel** [9] - 11413:16,
11445:9, 11479:20,
11490:25, 11491:17,
11493:13, 11494:5,
11497:18, 11498:11
**panels** [13] -
11479:18, 11480:10,
11484:14, 11484:23,
11484:24, 11485:6,
11485:21, 11489:25,
11490:2, 11490:3,
11490:5, 11490:24,
11493:18
**panes** [31] - 11443:20,
11447:4, 11447:19,
11447:23, 11448:25,
11449:13, 11455:22,
11456:23, 11458:4,
11458:7, 11458:10,
11458:17, 11459:1,
11459:2, 11459:17,

11463:10, 11467:4,
11467:13, 11467:15,
11467:18, 11467:24,
11468:1, 11468:3,
11468:5, 11468:19,
11469:2, 11469:5,
11471:7, 11471:25,
11476:11
**panoply** [1] -
11402:19
**paper** [1] - 11469:21
**parallel** [1] - 11480:16
**Park** [1] - 11379:12
**part** [42] - 11393:8,
11395:25, 11397:7,
11402:12, 11412:8,
11412:13, 11417:9,
11423:19, 11425:16,
11429:25, 11432:6,
11433:19, 11436:24,
11438:24, 11441:3,
11447:25, 11450:2,
11454:2, 11456:19,
11457:25, 11459:5,
11464:2, 11464:4,
11464:6, 11464:7,
11465:9, 11466:12,
11467:14, 11472:17,
11472:22, 11473:2,
11475:8, 11477:18,
11483:4, 11483:11,
11485:10, 11488:4,
11490:9, 11506:16,
11506:20, 11508:24,
11511:3
**partially** [2] - 11447:6,
11479:24
**participation** [1] -
11399:13
**particular** [11] -
11387:14, 11388:22,
11399:5, 11417:8,
11434:3, 11443:2,
11502:7, 11503:14,
11504:6, 11511:6
**particularly** [4] -
11398:10, 11402:18
**parties** [2] - 11382:21,
11385:19
**parts** [13] - 11420:22,
11447:2, 11456:17,
11457:15, 11464:24,
11465:4, 11480:19,
11481:2, 11485:12,
11486:6, 11491:19,
11501:11, 11501:14
**pass** [2] - 11403:1,
11507:25
**passes** [1] - 11403:14
**past** [4] - 11427:13,

11449:20, 11454:12,
11460:19
**Pattis** [4] - 11378:20,
11381:10, 11404:12,
11413:1
**PATTIS** [5] -
11378:20, 11404:11,
11404:13, 11405:8,
11405:10
**pause** [16] - 11413:15,
11413:24, 11428:25,
11429:21, 11430:17,
11432:3, 11432:16,
11432:21, 11441:20,
11444:5, 11445:16,
11447:12, 11468:7,
11477:21, 11500:22,
11510:9
**pay** [2] - 11385:14,
11481:16
**PC** [1] - 11378:24
**Peace** [1] - 11387:9
**pen** [1] - 11381:21
**penalizes** [1] -
11461:18
**people** [15] - 11387:7,
11388:10, 11391:22,
11391:23, 11391:24,
11396:15, 11403:8,
11407:2, 11426:10,
11431:14, 11462:9,
11488:18, 11506:11,
11507:23
**per** [14] - 11410:5,
11456:9, 11463:11,
11465:21, 11470:21,
11470:24, 11476:7,
11476:8, 11484:4,
11484:12, 11484:13,
11497:12, 11497:14,
11497:20
**per-item** [1] -
11463:11
**perfect** [1] - 11405:17
**perfectly** [2] -
11404:17, 11405:14
**perform** [2] - 11452:6,
11473:16
**performance** [4] -
11400:8, 11400:25,
11401:2, 11401:18
**performing** [1] -
11474:4
**perhaps** [1] -
11394:14
**perimeter** [8] -
11406:23, 11406:24,
11407:6, 11507:18,
11508:6, 11508:12,
11508:20, 11509:19

**period** [3] - 11420:6,
11450:15, 11479:11
**permanent** [1] -
11449:7
**permission** [7] -
11424:20, 11464:12,
11481:25, 11489:4,
11489:7, 11496:10,
11500:23
**person** [2] - 11392:2,
11416:7
**personal** [2] -
11407:2, 11423:6
**personally** [2] -
11425:15, 11499:16
**perspective** [7] -
11404:20, 11439:23,
11439:24, 11448:13,
11448:19, 11509:2,
11509:3
**Pezzola** [9] - 11381:6,
11381:15, 11391:21,
11399:6, 11442:23,
11466:13, 11466:23,
11467:11, 11467:13
**PEZZOLA** [1] -
11378:6
**ph** [2] - 11401:21,
11401:22
**phone** [2] - 11413:19,
11423:4
**phones** [1] - 11509:22
**phrase** [2] - 11439:7,
11460:4
**physically** [2] -
11394:3, 11401:9
**pick** [2] - 11393:12,
11413:19
**pickets** [1] - 11501:16
**picking** [2] - 11463:8,
11467:23
**picture** [6] - 11389:20,
11433:18, 11473:19,
11480:11, 11501:20,
11501:23
**piece** [7] - 11459:20,
11461:3, 11480:6,
11483:22, 11502:9,
11502:14
**pieces** [21] -
11440:13, 11449:3,
11449:4, 11457:24,
11459:4, 11459:22,
11459:25, 11468:17,
11468:21, 11469:18,
11480:6, 11480:7,
11480:10, 11480:12,
11480:17, 11481:2,
11491:19, 11501:11,
11501:14, 11502:22

**pin** [1] - 11402:7
**pinned** [1] - 11392:24
**pipes** [2] - 11429:10, 11429:11
**pitch** [1] - 11422:7
**place** [16] - 11382:22, 11405:12, 11421:15, 11425:5, 11426:3, 11427:3, 11441:16, 11472:23, 11478:12, 11479:22, 11480:1, 11481:7, 11481:17, 11482:12, 11505:14
**placed** [6] - 11405:6, 11443:24, 11481:13, 11488:1, 11488:9, 11503:10
**plain** [1] - 11385:3
**plan** [2] - 11425:5, 11450:2
**planned** [2] - 11444:4, 11507:5
**planning** [1] - 11421:22
**plans** [2] - 11486:14, 11506:17
**plaster** [5] - 11441:5, 11441:7, 11441:10
**platform** [1] - 11452:18
**play** [10] - 11393:7, 11393:8, 11393:9, 11393:10, 11428:22, 11430:15, 11437:16, 11440:10, 11447:10, 11485:3
**played** [14] - 11428:3, 11428:24, 11429:17, 11429:20, 11430:16, 11431:24, 11432:2, 11432:11, 11437:17, 11437:20, 11441:21, 11447:11, 11477:24, 11501:1
**playing** [3] - 11393:13, 11431:23, 11467:14
**plea** [3] - 11385:4, 11415:8, 11415:12
**pleas** [2] - 11415:4, 11415:9
**pled** [2] - 11383:12, 11415:2
**PLLC** [1] - 11378:17
**plot** [2] - 11395:18, 11506:13
**plumbing** [1] - 11417:1
**plus** [2] - 11476:6, 11483:5
**plywood** [5] -

11427:9, 11448:3, 11448:10, 11477:2, 11477:3
**podium** [2] - 11464:22, 11483:25
**point** [29] - 11383:6, 11386:1, 11388:15, 11388:24, 11393:11, 11394:7, 11395:16, 11395:23, 11396:16, 11397:1, 11398:8, 11398:25, 11400:5, 11400:10, 11402:1, 11404:9, 11405:11, 11406:2, 11409:21, 11441:22, 11446:7, 11447:22, 11467:11, 11478:10, 11501:21, 11502:2, 11502:20, 11503:14, 11504:6
**pointed** [1] - 11397:9
**pointing** [3] - 11401:21, 11446:12, 11478:16
**points** [2] - 11397:15, 11408:10
**Police** [9] - 11424:20, 11427:8, 11439:24, 11440:4, 11452:1, 11452:25, 11506:11, 11506:19, 11507:15
**police** [3] - 11394:5, 11426:24, 11427:5
**Police's** [1] - 11508:1
**policy** [1] - 11456:8
**poorly** [1] - 11387:25
**portion** [1] - 11473:23
**posed** [1] - 11408:5
**position** [7] - 11386:9, 11386:11, 11391:18, 11416:2, 11416:10, 11467:4, 11505:5
**positions** [2] - 11388:17, 11418:18
**possession** [1] - 11383:13
**possible** [1] - 11477:9
**post** [3] - 11479:20, 11486:19
**Post** [1] - 11407:9
**Post-it** [1] - 11407:9
**posts** [6] - 11479:17, 11479:19, 11485:21, 11490:7, 11490:14, 11490:16
**potential** [1] - 11390:17
**potentially** [1] - 11500:12
**powder** [4] -

11480:24, 11480:25, 11483:17
**powder-coated** [4] - 11480:24, 11480:25, 11483:17
**powerful** [2] - 11388:8, 11390:12
**practical** [1] - 11495:11
**preceding** [2] - 11420:7, 11421:11
**predetermined** [1] - 11451:13
**preemptive** [1] - 11394:9
**prefer** [1] - 11384:3
**prejudice** [1] - 11386:16
**prejudicial** [7] - 11383:15, 11384:4, 11393:17, 11395:14, 11398:10, 11443:10, 11466:11
**preliminary** [1] - 11381:17
**premarked** [1] - 11434:25
**preparations** [2] - 11420:23, 11421:19
**prepared** [5] - 11387:24, 11419:16, 11442:21, 11443:3, 11498:9
**prepped** [1] - 11424:4
**present** [9] - 11381:7, 11381:8, 11381:9, 11381:10, 11381:11, 11381:12, 11381:13, 11402:12
**preservation** [4] - 11416:18, 11416:21, 11416:25, 11509:3
**preserve** [13] - 11418:10, 11423:21, 11423:22, 11505:11, 11505:24, 11505:25, 11506:6, 11506:8, 11506:18, 11506:20, 11508:25, 11509:2, 11510:21
**preserved** [2] - 11385:15, 11509:8
**president** [1] - 11421:16
**presidential** [11] - 11420:11, 11420:12, 11421:9, 11431:2, 11431:3, 11438:9, 11452:18, 11478:8, 11478:25, 11481:10,

11481:21
**pretrial** [2] - 11387:18, 11388:18
**pretty** [1] - 11398:10
**previously** [3] - 11429:8, 11452:23, 11505:3
**price** [15] - 11439:11, 11454:21, 11458:1, 11459:1, 11461:13, 11470:9, 11471:4, 11484:2, 11484:4, 11493:1, 11497:11, 11499:23, 11500:7, 11500:9, 11500:10
**Price** [1] - 11457:23
**prices** [1] - 11487:4
**pricing** [3] - 11455:1, 11460:18, 11500:15
**pride** [1] - 11505:22
**primary** [10] - 11391:17, 11421:6, 11427:1, 11439:4, 11446:24, 11451:13, 11451:14, 11457:8, 11494:25, 11505:16
**priorities** [4] - 11438:1, 11438:2, 11439:22, 11440:5
**prioritizing** [2] - 11438:3, 11439:15
**priority** [3] - 11438:15, 11438:17, 11448:24
**private** [2] - 11413:4, 11422:11
**probative** [1] - 11395:5
**problem** [2] - 11408:5, 11409:6, 11511:17
**procedure** [3] - 11453:19, 11453:21, 11484:21
**procedures** [2] - 11451:22, 11453:4
**proceed** [10] - 11437:12, 11445:15, 11456:12, 11463:5, 11467:20, 11468:10, 11494:16, 11495:11, 11496:6, 11500:16
**proceedings** [2] - 11444:22, 11512:4
**Proceedings** [1] - 11379:21
**process** [26] - 11420:10, 11421:20, 11450:18, 11450:23, 11451:16, 11452:8, 11453:3, 11454:2, 11470:25, 11471:1,

11471:2, 11477:14, 11479:4, 11480:24, 11484:19, 11486:20, 11486:21, 11490:8, 11499:5, 11499:6, 11499:9, 11499:17, 11499:21, 11500:5
**produce** [1] - 11412:20
**produced** [5] - 11379:21, 11412:6, 11412:8, 11412:11, 11498:24
**product** [5] - 11461:4, 11469:22, 11472:8, 11483:13, 11484:6
**products** [3] - 11439:12, 11450:9, 11460:19
**professional** [2] - 11423:19, 11485:10
**program** [1] - 11419:15
**project** [3] - 11451:1, 11456:23, 11457:15
**projects** [1] - 11450:19
**promoted** [1] - 11504:20
**promotion** [1] - 11504:21
**proper** [4] - 11439:25, 11444:24, 11444:7, 11498:14
**property** [8] - 11382:16, 11382:18, 11382:19, 11404:16, 11404:21, 11404:24, 11405:2, 11461:19
**proposal** [12] - 11454:24, 11454:25, 11455:22, 11456:1, 11457:25, 11458:5, 11459:3, 11459:5, 11460:8, 11465:16, 11466:3, 11477:11
**proposals** [3] - 11455:16, 11455:17, 11455:19
**proposes** [1] - 11454:21
**proprietary** [1] - 11412:18
**prosecution** [1] - 11495:4
**prosecutor** [1] - 11495:4
**prosecutors** [1] - 11498:17
**protect** [7] - 11406:23,

11407:6, 11506:3, 11507:23, 11508:11, 11509:11, 11509:18
**protecting** [3] - 11505:25, 11508:20, 11509:1
**protection** [4] - 11418:21, 11419:3, 11419:14, 11511:6
**protester** [1] - 11492:3
**protesters** [6] - 11387:20, 11387:21, 11389:9, 11389:15, 11400:9, 11401:25
**protocols** [1] - 11506:17
**Proud** [2] - 11397:3, 11397:18
**prove** [7] - 11386:20, 11396:20, 11396:21, 11467:4, 11467:12, 11467:15
**proved** [2] - 11383:5, 11399:14
**proves** [1] - 11398:8
**provide** [6] - 11426:3, 11470:11, 11470:15, 11483:16, 11500:14, 11508:19
**provided** [11] - 11411:13, 11455:17, 11455:20, 11465:14, 11470:11, 11478:21, 11481:10, 11483:14, 11484:8, 11498:10, 11498:16
**provides** [1] - 11478:23
**providing** [2] - 11470:20, 11508:18
**public** [6] - 11382:18, 11404:21, 11404:24, 11426:5, 11474:22, 11505:15
**public's** [1] - 11404:15
**publish** [6] - 11455:8, 11456:14, 11464:12, 11494:17, 11496:10, 11500:23
**published** [1] - 11498:13
**publishing** [1] - 11477:23
**pull** [2] - 11445:22, 11477:19
**purchase** [11] - 11408:10, 11410:1, 11410:14, 11410:18, 11439:2, 11448:11, 11481:24, 11482:10,

11484:16, 11499:9, 11500:7
**purchased** [6] - 11408:9, 11439:13, 11465:12, 11479:3, 11482:11, 11493:7
**purchases** [1] - 11499:4
**purpose** [6] - 11387:1, 11391:17, 11443:15, 11478:18, 11494:20, 11501:22
**purposes** [5] - 11415:5, 11436:8, 11464:19, 11471:7, 11488:10
**pursuant** [1] - 11456:8
**pushed** [1] - 11490:9
**pushes** [1] - 11386:6
**pushing** [1] - 11396:1
**put** [25] - 11388:15, 11388:22, 11389:21, 11392:10, 11394:23, 11400:20, 11403:2, 11403:10, 11410:13, 11411:2, 11411:21, 11413:12, 11421:4, 11425:5, 11437:2, 11448:25, 11460:21, 11466:17, 11469:23, 11472:1, 11476:4, 11479:12, 11481:4, 11481:17, 11490:11
**putting** [1] - 11468:22

## Q

**qualified** [3] - 11450:24, 11450:25, 11474:11
**Quantico** [1] - 11407:3
**Quantico-type** [1] - 11407:3
**quantity** [1] - 11433:16
**quarter** [12] - 11458:15, 11468:23, 11468:24, 11469:5, 11469:6, 11469:11, 11469:12, 11469:16, 11469:18, 11471:10, 11471:11, 11471:25
**quarter-inch** [4] - 11469:6, 11469:11, 11469:16, 11471:10
**quarters** [1] - 11405:14
**questioning** [3] - 11400:18, 11400:21,

11400:25
**questions** [12] - 11400:7, 11401:1, 11401:13, 11402:7, 11419:20, 11421:19, 11443:18, 11451:10, 11486:23, 11487:22, 11504:3, 11511:19
**queued** [1] - 11455:9
**quick** [1] - 11433:23
**quickly** [1] - 11407:16
**quite** [6] - 11389:18, 11423:4, 11426:17, 11458:3, 11506:15, 11506:21

## R

**radius** [1] - 11491:1
**rail** [7] - 11480:14, 11480:16, 11501:15, 11501:18
**rails** [1] - 11501:17
**raises** [1] - 11461:13
**randomly** [1] - 11435:6
**range** [1] - 11441:9
**Rate** [1] - 11475:3
**rate** [2] - 11475:6, 11475:19
**Rates** [1] - 11475:2
**rates** [1] - 11475:19
**rather** [1] - 11436:11
**rationale** [1] - 11404:1
**ray** [1] - 11407:12
**re** [1] - 11404:13
**reach** [3] - 11446:9, 11471:1, 11472:4
**reached** [3] - 11454:8, 11460:10, 11464:17
**reaching** [1] - 11449:18
**reacting** [2] - 11406:21, 11407:5
**read** [2] - 11483:15, 11497:8
**reading** [1] - 11401:14
**ready** [2] - 11421:21, 11427:6
**real** [1] - 11409:18
**realize** [1] - 11393:15
**really** [17] - 11382:22, 11384:20, 11385:22, 11386:14, 11389:11, 11389:13, 11389:22, 11390:13, 11396:25, 11407:16, 11436:10, 11462:13, 11466:16, 11467:19, 11474:19, 11505:7, 11509:12

**reason** [6] - 11385:3, 11385:8, 11388:24, 11397:1, 11404:8, 11413:12
**reasonable** [9] - 11443:2, 11444:15, 11455:1, 11460:4, 11460:11, 11460:18, 11460:22, 11500:13, 11500:15
**reasonableness** [4] - 11460:7, 11460:22, 11462:13
**reasons** [4] - 11435:9, 11443:9, 11453:8, 11453:12
**receive** [3] - 11451:5, 11451:6, 11507:3
**received** [5] - 11407:17, 11407:24, 11412:12, 11460:19, 11477:11
**recent** [1] - 11460:19
**recently** [1] - 11429:14
**recess** [4] - 11445:7, 11445:8, 11511:22, 11511:23
**recognize** [5] - 11427:25, 11455:12, 11463:23, 11478:4, 11482:6
**recollection** [3] - 11426:19, 11499:17, 11499:18
**recommendations** [3] - 11508:19, 11509:10, 11510:15
**reconsider** [2] - 11406:5, 11407:7
**record** [7] - 11400:4, 11405:22, 11407:16, 11410:16, 11433:10, 11445:11, 11478:14
**recorded** [1] - 11379:21
**records** [2] - 11408:23, 11499:18
**recycled** [1] - 11480:20
**red** [3] - 11381:20, 11404:13, 11473:20
**redacted** [5] - 11411:17, 11411:20, 11413:5, 11482:20, 11483:18
**redaction** [3] - 11412:16, 11413:7, 11482:19
**redactions** [7] -

11411:12, 11411:17, 11411:23, 11412:7, 11412:10, 11412:11, 11412:25
**redirect** [1] - 11394:10
**referred** [2] - 11417:7, 11490:2
**reflects** [3] - 11392:18, 11392:19, 11493:6
**refrain** [1] - 11468:8
**regard** [1] - 11491:17
**regarding** [4] - 11385:20, 11411:13, 11415:4, 11415:11
**regardless** [2] - 11388:16, 11402:6
**regards** [1] - 11435:15
**regulations** [1] - 11453:5
**Rehl** [5] - 11381:4, 11381:14, 11398:2, 11398:4, 11398:6, 11404:7
**REHL** [1] - 11378:5
**rejects** [1] - 11399:21
**relate** [1] - 11488:21
**related** [1] - 11415:3
**relating** [1] - 11415:5
**relevance** [13] - 11386:8, 11387:13, 11387:17, 11388:12, 11402:9, 11406:18, 11432:13, 11433:11, 11435:1, 11435:24, 11437:10, 11443:11, 11498:20
**relevant** [20] - 11388:17, 11391:17, 11393:17, 11397:25, 11398:1, 11398:6, 11398:25, 11399:7, 11404:2, 11404:3, 11404:7, 11407:1, 11408:14, 11420:22, 11433:23, 11434:12, 11435:12, 11439:7, 11456:11, 11495:6
**rely** [2] - 11422:11, 11440:18
**remain** [1] - 11487:4
**remaining** [1] - 11472:17
**remark** [1] - 11501:13
**remediated** [1] - 11406:2
**remedy** [1] - 11384:17
**remember** [4] - 11394:24, 11441:14, 11501:8, 11501:9

**remind** [1] - 11466:15
**remotely** [1] - 11422:20
**remove** [1] - 11479:12
**removed** [3] - 11382:17, 11447:21, 11481:14
**rendering** [2] - 11420:24, 11421:14
**rented** [2] - 11481:14, 11481:22
**repainting** [1] - 11450:14
**repair** [14] - 11448:13, 11456:22, 11457:14, 11462:16, 11464:2, 11474:5, 11481:6, 11491:25, 11492:16, 11502:18, 11503:18, 11504:12
**repaired** [6] - 11425:4, 11434:4, 11448:22, 11457:1, 11457:17, 11474:15
**repairs** [26] - 11425:6, 11433:14, 11433:25, 11434:1, 11438:6, 11438:7, 11439:5, 11441:16, 11448:1, 11448:9, 11449:6, 11449:7, 11449:11, 11449:15, 11449:21, 11449:25, 11452:8, 11452:20, 11453:2, 11453:10, 11453:15, 11455:21, 11463:12, 11464:2, 11465:13, 11487:13
**repeat** [2] - 11419:1, 11456:6
**replace** [7] - 11486:14, 11486:18, 11491:3, 11491:16, 11492:1, 11492:8, 11497:5
**replaced** [1] - 11473:17
**replacement** [1] - 11481:8
**replacing** [1] - 11491:21
**replicate** [1] - 11491:20
**report** [1] - 11405:4
**reported** [1] - 11404:14
**REPORTER** [2] - 11407:19, 11511:25
**Reporter** [3] - 11379:17, 11379:18, 11512:6

**reporter** [2] - 11442:4, 11445:5
**reports** [1] - 11424:9
**represent** [6] - 11408:22, 11410:4, 11459:10, 11465:10, 11474:2, 11504:1
**representation** [4] - 11410:6, 11489:22, 11490:3, 11490:13
**representative** [1] - 11411:21
**represented** [1] - 11400:4
**represents** [2] - 11409:10, 11474:3
**reprimand** [1] - 11406:10
**reproduction** [1] - 11455:25
**request** [1] - 11509:17
**requester** [1] - 11499:15
**requests** [3] - 11507:16, 11508:5, 11508:10
**required** [1] - 11462:8
**requirements** [1] - 11462:9
**requisitions** [1] - 11508:5
**res** [1] - 11407:10
**rescreened** [1] - 11461:8
**resecure** [1] - 11440:5
**resecuring** [1] - 11427:8
**respect** [15] - 11387:24, 11389:4, 11390:16, 11396:24, 11398:14, 11400:23, 11400:24, 11433:12, 11444:22, 11498:25, 11499:8, 11505:23, 11505:24, 11508:20, 11511:5
**respond** [2] - 11401:4, 11451:12
**responded** [2] - 11394:4, 11403:6
**responding** [1] - 11424:14
**response** [2] - 11401:5, 11425:16
**responsibility** [3] - 11502:17, 11504:8, 11504:10
**responsible** [12] - 11416:17, 11416:25, 11423:23, 11423:25,

11424:24, 11425:5, 11427:7, 11450:8, 11450:11, 11504:6, 11507:19, 11507:20
**rest** [3] - 11387:6, 11442:5, 11468:20
**result** [1] - 11441:10
**resulted** [1] - 11440:6
**resumes** [1] - 11445:17
**retractable** [1] - 11481:12
**return** [1] - 11422:4
**Return** [5] - 11414:20, 11437:14, 11463:6, 11467:21, 11496:8
**returned** [4] - 11413:17, 11442:6, 11445:10, 11510:2
**reusable** [2] - 11480:20, 11480:22
**reverse** [1] - 11408:7
**reverse-engineer** [1] - 11408:7
**review** [2] - 11460:7, 11498:14
**reviewed** [5] - 11426:22, 11427:24, 11428:16, 11444:6, 11498:3
**Rhode** [1] - 11437:16
**Rhode's** [1] - 11393:11
**Riggleman** [3] - 11394:12, 11400:17, 11401:23
**Riggleman's** [1] - 11398:2
**right-hand** [2] - 11431:12, 11458:1
**riot** [1] - 11391:16
**rioters** [2] - 11390:5, 11402:1
**rise** [2] - 11445:6, 11511:21
**risk** [4] - 11386:15, 11390:17, 11392:2, 11392:5
**Road** [1] - 11379:2
**Roger** [2] - 11379:14, 11381:13
**ROGER** [1] - 11379:15
**Rohde** [16] - 11420:16, 11428:1, 11428:23, 11429:18, 11430:18, 11431:25, 11437:18, 11441:18, 11445:22, 11447:9, 11455:9, 11456:18, 11457:18, 11458:19,

11477:19, 11483:7
**role** [6] - 11383:4, 11383:21, 11415:6, 11418:12, 11420:3, 11467:14
**roles** [1] - 11419:17
**rollers** [1] - 11473:13
**room** [6] - 11405:2, 11442:6, 11442:11, 11500:12, 11510:2, 11510:8
**Room** [2] - 11379:18, 11512:7
**roots** [12] - 11383:19, 11384:11, 11385:13, 11385:18, 11411:10, 11412:15, 11432:22, 11434:16, 11444:19, 11445:1, 11456:10, 11456:11
**Roots** [3] - 11379:14, 11381:13, 11434:22
**ROOTS** [16] - 11379:15, 11384:14, 11384:16, 11411:9, 11411:11, 11412:22, 11432:12, 11432:17, 11432:24, 11456:4, 11460:13, 11461:14, 11461:18, 11462:19, 11466:6, 11466:10
**ropes** [1] - 11481:13
**Rotunda** [1] - 11400:12
**rough** [1] - 11485:16
**roughly** [1] - 11475:12
**round** [2] - 11470:18, 11475:14
**rounded** [8] - 11470:13, 11470:16, 11472:10, 11472:12, 11475:16, 11475:17
**rounding** [2] - 11470:18, 11475:25
**row** [1] - 11465:24
**RPR** [3] - 11379:17, 11512:1, 11512:6
**rule** [2] - 11444:23, 11456:5
**ruling** [1] - 11406:6
**rulings** [1] - 11386:19, 11507:7
**run** [1] - 11417:8
**runs** [2] - 11478:11, 11478:13
**rush** [1] - 11390:5

**S**

**Sabino** [2] - 11379:8,

11381:12
**safe** [2] - 11430:8, 11506:1
**safety** [5] - 11425:3, 11448:19, 11452:14, 11457:12, 11458:15
**safety/security** [1] - 11453:15
**sake** [1] - 11437:4
**salvaged** [1] - 11481:5
**sample** [1] - 11473:4
**samples** [1] - 11474:12
**sampling** [3] - 11472:18, 11472:19, 11473:3
**saved** [1] - 11428:9
**saw** [14] - 11393:2, 11395:15, 11424:6, 11450:10, 11455:22, 11456:10, 11459:22, 11465:3, 11465:17, 11494:10, 11502:16, 11503:2, 11504:4
**scaffolding** [3] - 11429:6, 11429:7, 11429:8
**scale** [1] - 11422:13
**scene** [4] - 11386:14, 11386:18, 11388:20, 11426:22
**Schedule** [1] - 11482:24
**science** [1] - 11470:15
**scope** [6] - 11450:24, 11451:8, 11451:9, 11509:20, 11510:12, 11511:16
**scrambling** [1] - 11408:15
**scrap** [1] - 11469:21
**screen** [29] - 11392:22, 11401:20, 11420:20, 11421:2, 11427:18, 11428:10, 11429:2, 11430:22, 11431:22, 11446:2, 11447:1, 11455:9, 11455:17, 11463:20, 11464:14, 11465:9, 11478:1, 11478:4, 11482:19, 11489:5, 11489:8, 11490:12, 11496:18, 11500:19, 11501:3, 11501:7, 11501:8, 11502:15, 11503:1
**screened** [2] - 11461:7

**screening** [1] - 11462:9
**scrim** [3] - 11429:7, 11429:12, 11429:14
**seat** [2] - 11414:15, 11414:17
**seated** [4] - 11413:18, 11442:7, 11442:12, 11510:3
**second** [8] - 11392:1, 11406:8, 11432:5, 11456:25, 11458:4, 11458:20, 11483:8, 11510:7
**secondary** [1] - 11406:24
**seconds** [6] - 11427:23, 11430:14, 11430:20, 11431:23, 11432:10, 11444:4
**Section** [1] - 11482:23
**section** [15] - 11421:17, 11446:16, 11446:20, 11457:22, 11465:6, 11472:20, 11473:24, 11474:2, 11474:24, 11476:1, 11488:19, 11496:24, 11497:9, 11498:11, 11498:15
**sections** [4] - 11408:3, 11431:11, 11478:20, 11488:15
**secure** [5] - 11461:2, 11461:12, 11477:1, 11477:4, 11508:6
**secured** [2] - 11439:24, 11479:19
**securing** [1] - 11448:7
**security** [7] - 11439:16, 11440:10, 11448:19, 11451:22, 11462:17, 11488:21, 11510:16
**seditious** [2] - 11383:6, 11383:14
**see** [66] - 11387:4, 11390:20, 11391:8, 11393:19, 11397:8, 11397:13, 11401:14, 11401:20, 11406:1, 11406:7, 11406:14, 11406:16, 11406:17, 11420:20, 11421:14, 11426:6, 11429:2, 11429:6, 11429:10, 11429:24, 11430:21, 11431:11, 11431:13, 11431:17, 11432:6, 11441:9, 11442:22,

11444:7, 11444:12, 11446:1, 11447:6, 11451:4, 11457:22, 11457:23, 11457:24, 11458:1, 11458:10, 11458:16, 11458:17, 11459:7, 11462:17, 11465:24, 11467:10, 11467:18, 11475:3, 11475:14, 11478:1, 11478:3, 11480:14, 11481:11, 11482:25, 11483:11, 11484:16, 11492:23, 11492:24, 11496:18, 11497:2, 11499:18, 11499:22, 11502:22, 11505:10, 11505:15, 11507:5, 11509:25, 11511:20
**seeing** [4] - 11426:16, 11433:5, 11501:3, 11502:7
**segment** [17] - 11408:4, 11409:1, 11409:2, 11409:11, 11410:8, 11488:24, 11491:11, 11491:13, 11491:17, 11492:4, 11493:12, 11493:13, 11494:5, 11497:18, 11502:8, 11503:5, 11503:14
**segments** [14] - 11409:7, 11409:8, 11409:13, 11489:24, 11490:3, 11490:15, 11490:18, 11490:19, 11491:12, 11491:23, 11492:6, 11493:25, 11494:2, 11503:9
**select** [2] - 11450:19, 11451:12
**selected** [1] - 11454:9
**self** [1] - 11473:11
**self-explanatory** [1] - 11473:11
**semi** [1] - 11431:14
**semi-wet** [1] - 11431:14
**Senate** [12] - 11391:19, 11446:6, 11446:10, 11446:12, 11446:14, 11446:18, 11446:20, 11446:22, 11446:25, 11447:16, 11466:20
**senators** [1] - 11448:18
**send** [2] - 11473:4, 11474:12

**senior** [1] - 11453:24
**sense** [4] - 11389:14, 11404:21, 11436:14
**separate** [3] - 11398:5, 11403:23, 11447:2
**separation** [1] - 11478:24
**Seresa** [1] - 11401:22
**series** [5] - 11388:2, 11399:5, 11401:1, 11421:25, 11427:21
**serve** [5] - 11418:10, 11505:10, 11505:24, 11506:6, 11506:7
**SESSION** [1] - 11378:9
**session** [1] - 11427:6
**set** [8] - 11422:14, 11436:24, 11437:25, 11438:2, 11438:5, 11451:13, 11464:14, 11465:23
**setting** [2] - 11410:7, 11500:10
**settings** [1] - 11407:3
**settle** [1] - 11454:3
**seven** [1] - 11493:18
**sever** [1] - 11404:9
**several** [5] - 11391:10, 11454:8, 11478:19, 11502:12
**severance** [3] - 11399:21, 11403:24, 11403:25
**shall** [2] - 11483:16, 11496:16
**shape** [3] - 11444:5, 11447:18, 11480:3
**sheer** [2] - 11389:11, 11433:15
**sheet** [2] - 11417:2, 11429:11
**sheltered** [1] - 11427:3
**shield** [1] - 11398:18
**ship** [1] - 11439:12
**shop** [6] - 11450:8, 11450:11, 11473:15, 11474:11, 11475:7, 11477:3
**short** [2] - 11387:5, 11433:17
**shorter** [1] - 11494:3
**shorthand** [1] - 11379:21
**shortly** [3] - 11407:23, 11423:3, 11425:19
**shot** [1] - 11429:4
**shoulder** [1] - 11446:8

**show** [16] - 11383:4, 11390:12, 11406:19, 11406:20, 11406:21, 11408:2, 11427:21, 11427:22, 11428:16, 11437:3, 11443:17, 11443:23, 11444:4, 11458:3, 11489:7, 11500:20
**showed** [4] - 11394:25, 11452:15, 11491:24, 11494:19
**showing** [11] - 11386:13, 11399:6, 11410:16, 11429:5, 11433:18, 11442:16, 11443:15, 11444:2, 11444:3, 11469:7, 11501:23
**shown** [3] - 11395:3, 11435:15, 11500:17
**shows** [5] - 11389:10, 11389:17, 11397:14, 11420:24, 11428:14
**sic** [4] - 11394:15, 11404:25, 11467:9, 11508:9
**side** [16] - 11390:9, 11392:22, 11401:20, 11401:22, 11401:23, 11404:22, 11409:8, 11409:9, 11409:11, 11429:5, 11431:12, 11438:13, 11446:1, 11458:1, 11478:4
**sidebar** [4] - 11432:15, 11461:15, 11466:6, 11494:22
**sides** [1] - 11421:8
**sign** [1] - 11394:5
**significant** [6] - 11393:8, 11420:8, 11452:12, 11452:17, 11457:6, 11477:14
**similar** [5] - 11433:9, 11478:22, 11481:11, 11490:8, 11502:13
**simple** [2] - 11468:5, 11468:12
**simply** [2] - 11386:13, 11461:3
**single** [7] - 11411:16, 11416:7, 11453:7, 11464:2, 11466:19, 11473:7, 11498:14
**sister** [1] - 11506:12
**sit** [1] - 11405:12
**site** [7] - 11423:2, 11451:3, 11461:6, 11479:8, 11479:9,

11485:22, 11486:5
**sitting** [3] - 11405:11, 11405:23, 11502:25
**situation** [2] - 11390:10, 11403:8
**situations** [1] - 11389:19
**six** [8] - 11424:22, 11477:21, 11485:8, 11488:25, 11490:18, 11493:19, 11493:20, 11494:3
**six-minute** [1] - 11477:21
**Sixth** [1] - 11411:18
**size** [9] - 11410:14, 11417:22, 11418:2, 11449:13, 11458:7, 11458:8, 11459:20, 11471:7, 11477:3
**sizes** [4] - 11458:7, 11458:9, 11459:17, 11490:21
**skill** [2] - 11422:14, 11438:5
**skipping** [1] - 11473:10
**slide** [4] - 11465:2, 11465:23, 11467:10, 11473:25
**slight** [1] - 11490:23
**slightly** [3] - 11476:9, 11494:20, 11502:21
**slow** [1] - 11407:19
**smaller** [2] - 11459:24, 11490:25
**smart** [1] - 11395:24
**smashing** [1] - 11467:14
**Smith** [23] - 11378:16, 11381:9, 11385:22, 11387:18, 11388:17, 11390:18, 11393:20, 11395:13, 11397:9, 11397:24, 11400:4, 11400:20, 11400:22, 11401:3, 11401:18, 11407:15, 11487:21, 11489:17, 11494:11, 11495:2, 11495:9, 11495:12, 11495:21
**SMITH** [40] - 11378:17, 11378:20, 11382:2, 11386:7, 11393:21, 11395:2, 11395:8, 11401:5, 11407:14, 11407:16, 11407:21, 11407:23, 11408:19, 11408:21, 11409:5, 11409:17,

11534

11409:25, 11410:11,
11410:22, 11487:20,
11489:4, 11489:7,
11489:13, 11489:20,
11492:18, 11492:22,
11494:14, 11494:17,
11495:8, 11495:13,
11495:17, 11496:7,
11496:9, 11496:12,
11496:15, 11496:17,
11498:22, 11500:23,
11501:2, 11503:20
**Smith..................
11487** [1] - 11380:4
**snap** [1] - 11480:17
**snow** [1] - 11429:24
**sole** [10] - 11453:6,
11453:9, 11453:18,
11453:22, 11454:2,
11454:16, 11484:20,
11499:7, 11499:19,
11500:16
**sole-source** [10] -
11453:6, 11453:9,
11453:18, 11453:22,
11454:2, 11454:16,
11484:20, 11499:7,
11499:19, 11500:16
**solid** [1] - 11429:10
**someone** [3] -
11404:23, 11470:20,
11472:3
**sometimes** [6] -
11422:11, 11450:19,
11454:24, 11499:3,
11499:5, 11511:14
**somewhat** [2] -
11387:8, 11507:8
**somewhere** [1] -
11477:7
**sorry** [7] - 11399:24,
11414:9, 11414:14,
11418:23, 11456:6,
11468:6, 11489:6
**sort** [14] - 11384:21,
11386:4, 11397:13,
11402:23, 11433:4,
11435:22, 11436:2,
11436:10, 11437:8,
11437:10, 11463:11,
11478:15, 11489:18,
11490:13
**sorts** [1] - 11413:8
**sound** [8] - 11383:10,
11390:4, 11464:25,
11469:24, 11470:1,
11471:22, 11472:1,
11484:9
**sounds** [6] - 11383:9,
11398:10, 11402:16,

11410:9, 11493:22,
11494:6
**source** [11] - 11453:6,
11453:7, 11453:9,
11453:18, 11453:22,
11454:2, 11454:16,
11484:20, 11499:7,
11499:19, 11500:16
**south** [3] - 11409:9,
11446:17, 11446:18
**space** [1] - 11431:8
**speaking** [6] -
11400:16, 11406:12,
11417:12, 11468:9,
11485:2, 11487:12
**specific** [7] -
11416:22, 11421:3,
11441:16, 11453:8,
11466:21, 11466:24
**specifically** [4] -
11400:23, 11418:12,
11433:12, 11466:18
**spectrum** [1] -
11417:5
**speed** [1] - 11453:14
**spell** [1] - 11424:6
**spelling** [1] -
11415:23
**spent** [3] - 11396:7,
11396:17
**spin** [1] - 11389:22
**spoken** [1] - 11499:16
**spot** [2] - 11408:13,
11469:23
**square** [1] - 11405:14
**staff** [6] - 11405:4,
11406:1, 11422:7,
11422:8, 11423:3,
11480:18
**stage** [3] - 11423:10,
11508:11, 11511:5
**stain** [1] - 11382:7
**staingate** [2] -
11406:7, 11407:8
**stanchions** [1] -
11481:12
**stand** [8] - 11384:9,
11412:4, 11414:3,
11414:5, 11445:17,
11446:9, 11468:9,
11478:10
**standing** [4] -
11390:8, 11432:8,
11492:4, 11492:5
**standpoint** [2] -
11505:7, 11507:10
**stands** [14] -
11420:11, 11421:8,
11421:9, 11429:4,
11431:4, 11438:9,

11445:7, 11450:10,
11450:11, 11450:14,
11452:13, 11452:19,
11480:8, 11511:22
**star** [1] - 11395:20
**start** [7] - 11415:22,
11441:9, 11441:15,
11441:17, 11451:16,
11456:16, 11460:16
**started** [4] - 11419:2,
11486:20, 11486:21,
11509:5
**starters** [1] - 11413:10
**starting** [8] -
11393:11, 11424:14,
11428:1, 11428:13,
11449:9, 11456:21,
11465:20, 11475:1
**state** [3] - 11426:9,
11428:17, 11429:12
**statement** [3] -
11418:7, 11418:10,
11496:1
**STATES** [3] - 11378:1,
11378:2, 11378:10
**states** [1] - 11383:3
**States** [21] - 11378:12,
11381:3, 11415:16,
11416:11, 11416:19,
11419:5, 11419:12,
11423:22, 11427:8,
11430:25, 11431:20,
11439:24, 11445:12,
11452:1, 11452:25,
11459:18, 11483:20,
11505:16, 11507:14,
11507:25, 11512:7
**stating** [1] - 11415:23
**statute** [4] - 11461:18,
11461:23, 11462:3
**statutes** [1] -
11440:14
**stay** [2] - 11389:6,
11427:12
**stayed** [2] - 11427:2,
11427:4
**stealing** [1] -
11398:17
**stem** [1] - 11416:1
**stenographic** [1] -
11512:3
**step** [4] - 11388:23,
11424:12, 11442:8
**steps** [4] - 11442:9,
11449:16, 11457:14,
11510:4
**stereotypes** [1] -
11397:5
**Steven** [2] - 11379:11,
11381:12

**sticker** [4] - 11382:2,
11382:4, 11478:16,
11488:2
**stickie** [2] - 11405:6,
11405:13
**stickies** [1] - 11404:18
**still** [9] - 11384:6,
11396:19, 11412:22,
11430:11, 11436:5,
11443:16, 11444:2,
11444:3, 11448:20
**stock** [1] - 11454:10
**stone** [1] - 11431:15
**stood** [3] - 11387:20,
11424:17, 11503:15
**stop** [3] - 11388:23,
11395:1, 11396:4
**storage** [4] - 11479:7,
11479:9, 11479:12,
11485:22
**store** [2] - 11485:23,
11486:4
**stored** [2] - 11439:13,
11479:8
**story** [1] - 11397:14
**straight** [4] - 11393:9,
11481:1, 11490:22,
11490:24
**strayed** [1] - 11397:14
**strays** [1] - 11385:11
**streaming** [1] -
11402:1
**Street** [6] - 11378:14,
11378:17, 11378:21,
11378:24, 11379:5,
11379:9
**stretch** [1] - 11406:15
**strewn** [1] - 11480:6
**strike** [1] - 11484:14
**stripes** [1] - 11404:2
**stronger** [1] -
11396:11
**structural** [1] -
11430:21
**structurally** [1] -
11430:8
**structure** [4] -
11430:7, 11430:8,
11431:1, 11431:15
**struggling** [1] -
11410:19
**stuff** [2] - 11411:20,
11483:5
**style** [1] - 11483:17
**subject** [1] - 11435:23
**submit** [3] - 11450:24,
11452:2, 11453:22
**substantially** [1] -
11395:5
**successfully** [3] -

**sticker** [4] - 11449:19, 11454:12,
11487:15
**sudden** [1] - 11390:5
**sufficient** [1] -
11449:10
**suggest** [3] - 11394:1,
11394:7, 11395:23
**suggested** [3] -
11383:20, 11385:18,
11404:22
**suggestion** [3] -
11386:16, 11394:9,
11404:15
**suitability** [1] -
11452:1
**suitable** [3] -
11448:14, 11452:4,
11481:8
**Suite** [2] - 11378:18,
11379:6
**sum** [9] - 11457:25,
11459:2, 11459:4,
11459:11, 11459:13,
11459:14, 11463:9,
11470:12, 11477:11
**summary** [1] -
11483:8
**sun** [2] - 11425:21,
11427:13
**superimposed** [2] -
11466:12, 11466:14
**superintendent** [6] -
11416:11, 11418:22,
11419:4, 11419:5,
11504:21, 11504:25
**superintendent's** [6] -
11417:11, 11417:13,
11505:1, 11505:4,
11505:5, 11505:6
**supervisor** [1] -
11423:2
**supplied** [1] -
11495:23
**supplier** [1] -
11500:10
**supplies** [3] -
11473:11, 11473:21,
11476:6
**Supplies** [1] - 11465:7
**supply** [3] - 11439:7,
11439:10, 11449:22
**support** [2] -
11398:16, 11420:11
**supposedly** [1] -
11399:6
**Supreme** [2] -
11506:7, 11507:6
**sustained** [4] -
11508:15, 11509:15,
11509:21, 11510:12

**switch** [1] - 11464:21
**switched** [1] - 11505:1
**switching** [1] - 11442:1
**SWORN** [1] - 11415:17
**symmetrical** [1] - 11404:17
**systematically** [1] - 11424:25

## T

**table** [10] - 11381:20, 11381:21, 11382:1, 11382:3, 11382:15, 11405:7, 11405:24, 11465:23, 11477:23, 11482:25
**tables** [1] - 11381:23
**take-it-or-leave-it** [1] - 11500:10
**tangential** [1] - 11387:8
**tape** [1] - 11473:13
**Tarantino** [3] - 11383:18, 11385:1, 11385:14
**TARRIO** [1] - 11378:6
**Tarrio** [2] - 11381:5, 11381:15
**tasked** [1] - 11450:13
**tattered** [1] - 11429:6
**teal** [1] - 11504:2
**team** [2] - 11426:10, 11495:4
**teams** [8] - 11424:4, 11424:18, 11424:21, 11424:24, 11425:4, 11425:8, 11437:23
**technically** [1] - 11437:8
**teed** [2] - 11385:19, 11467:3
**television** [1] - 11429:9
**temperature** [6] - 11440:19, 11440:21, 11440:25, 11441:6, 11441:8, 11453:16
**temporally** [1] - 11391:1
**temporarily** [2] - 11448:2, 11481:13
**temporary** [13] - 11420:24, 11421:7, 11422:1, 11430:7, 11431:1, 11448:1, 11448:7, 11448:9, 11448:13, 11449:6,

11477:1, 11478:7, 11481:17
**term** [2] - 11448:14, 11448:15
**terms** [16] - 11387:17, 11388:14, 11391:15, 11391:18, 11392:1, 11392:6, 11392:12, 11392:14, 11397:10, 11399:10, 11400:18, 11400:21, 11423:18, 11439:15, 11449:7, 11449:8
**terrace** [19] - 11386:10, 11387:19, 11388:3, 11388:8, 11388:11, 11389:25, 11390:7, 11390:15, 11390:22, 11391:8, 11391:11, 11393:4, 11393:24, 11400:15, 11430:24, 11431:6, 11432:7, 11452:16, 11483:2
**terror** [1] - 11394:15
**testified** [15] - 11393:22, 11487:23, 11487:25, 11488:8, 11488:14, 11488:24, 11491:2, 11491:7, 11493:1, 11499:3, 11499:8, 11499:13, 11500:4, 11502:21, 11503:4
**testify** [10] - 11388:4, 11392:9, 11408:2, 11410:1, 11433:25, 11434:7, 11442:14, 11442:19, 11467:16, 11491:11
**testifying** [2] - 11433:13, 11467:17
**testimony** [15] - 11388:1, 11391:20, 11398:3, 11415:1, 11415:11, 11419:19, 11433:13, 11442:15, 11498:5, 11501:9, 11505:7, 11506:23, 11507:21, 11508:4, 11508:24
**THE** [162] - 11378:1, 11378:1, 11378:9, 11381:2, 11381:16, 11382:4, 11382:8, 11382:11, 11382:14, 11383:19, 11383:24, 11384:11, 11384:15, 11384:24, 11385:8, 11386:24, 11387:4,

11388:15, 11390:23, 11390:25, 11391:4, 11392:17, 11393:5, 11393:20, 11394:17, 11395:7, 11395:9, 11396:2, 11396:4, 11396:7, 11397:21, 11398:20, 11398:22, 11398:24, 11399:3, 11399:16, 11399:18, 11399:22, 11399:24, 11400:2, 11400:13, 11401:3, 11401:13, 11402:6, 11404:12, 11405:3, 11405:9, 11405:21, 11406:8, 11406:10, 11407:12, 11407:15, 11407:19, 11407:20, 11407:22, 11408:17, 11408:20, 11409:3, 11409:14, 11409:19, 11410:9, 11410:21, 11410:25, 11411:4, 11411:6, 11411:10, 11412:2, 11412:21, 11412:24, 11413:16, 11413:18, 11413:22, 11414:8, 11414:12, 11414:15, 11414:21, 11415:17, 11418:23, 11419:1, 11428:4, 11428:8, 11432:14, 11432:18, 11432:20, 11432:25, 11433:21, 11434:7, 11434:14, 11434:21, 11434:23, 11435:3, 11435:16, 11435:21, 11436:14, 11436:16, 11436:19, 11436:22, 11437:1, 11437:5, 11441:24, 11442:7, 11442:25, 11443:6, 11443:8, 11443:12, 11443:14, 11443:21, 11444:2, 11444:9, 11444:11, 11444:24, 11445:4, 11445:6, 11445:9, 11445:11, 11445:14, 11455:4, 11456:6, 11456:10, 11460:14, 11461:16, 11462:6, 11462:23, 11463:16, 11464:11, 11466:8, 11467:2, 11467:8, 11468:6, 11482:2, 11482:16, 11487:18, 11489:6, 11489:10, 11489:11, 11489:15, 11489:16, 11489:17, 11492:12,

11492:13, 11494:11, 11494:15, 11494:24, 11495:10, 11495:14, 11495:18, 11496:3, 11496:11, 11496:14, 11496:16, 11498:19, 11498:21, 11508:15, 11509:15, 11509:21, 11509:23, 11510:3, 11510:7, 11510:23, 11511:1, 11511:20, 11511:21
**themselves** [1] - 11400:5
**theory** [2] - 11396:3, 11397:19
**thereabout** [1] - 11393:11
**therefore** [3] - 11383:6, 11409:1, 11499:20
**they've** [3] - 11442:21, 11442:23, 11444:12
**thicker** [2] - 11468:21, 11469:2
**thickness** [1] - 11471:9
**thinking** [1] - 11441:12
**thinner** [1] - 11469:2
**third** [2] - 11385:19, 11423:3
**thousand** [1] - 11389:20
**threatening** [1] - 11390:10
**three** [18] - 11397:11, 11405:14, 11407:17, 11430:14, 11458:22, 11468:17, 11468:19, 11468:24, 11469:5, 11469:12, 11469:18, 11471:11, 11471:25, 11475:22, 11479:6, 11479:11, 11485:17
**three-week** [1] - 11479:11
**throughout** [2] - 11390:18, 11427:10
**thrust** [1] - 11501:13
**ticketed** [3] - 11478:20, 11478:25, 11488:19
**tickets** [1] - 11478:21
**tie** [1] - 11504:2
**tight** [1] - 11408:13
**timeline** [2] - 11434:6, 11438:9
**timing** [2] - 11451:14, 11452:12

**Timothy** [1] - 11379:17
**TIMOTHY** [2] - 11378:9, 11512:1
**today** [6] - 11427:24, 11498:5, 11499:24, 11502:14, 11502:25
**together** [4] - 11472:1, 11472:4, 11476:4, 11481:4
**took** [6] - 11402:13, 11402:14, 11424:13, 11437:23, 11441:16, 11477:5
**tool** [2] - 11396:3, 11397:19
**tools** [1] - 11413:11
**top** [14] - 11427:9, 11431:13, 11431:15, 11451:21, 11456:16, 11456:19, 11465:24, 11480:13, 11480:15, 11482:18, 11483:8, 11489:23, 11501:15, 11501:18
**topics** [1] - 11442:1
**torn** [2] - 11405:16, 11503:11
**total** [14] - 11408:11, 11408:12, 11410:7, 11434:8, 11460:1, 11467:24, 11469:13, 11470:9, 11471:4, 11472:4, 11476:2, 11480:9, 11483:2, 11484:6
**Total** [2] - 11465:24, 11465:25
**touch** [1] - 11382:17
**touchscreen** [1] - 11421:2
**toward** [2] - 11401:25, 11432:9
**towards** [2] - 11393:12, 11400:9
**tracking** [1] - 11431:15
**trades** [2] - 11417:5, 11424:23
**trades-men** [1] - 11424:23
**trafficked** [1] - 11474:23
**trained** [2] - 11387:25, 11407:2
**TRANSCRIPT** [1] - 11378:8
**transcript** [7] - 11379:21, 11400:6, 11401:14, 11401:15,

11401:16, 11512:3, 11512:4

**transcription** [1] - 11379:21

**trash** [2] - 11426:8, 11426:14

**traumatic** [1] - 11403:4

**treat** [2] - 11436:5, 11436:7

**trespassory** [2] - 11394:18, 11402:20

**triage** [1] - 11433:15

**trial** [4] - 11386:21, 11390:18, 11415:9, 11415:11

**TRIAL** [1] - 11378:8

**true** [4] - 11422:10, 11502:1, 11512:2, 11512:3

**try** [3] - 11396:20, 11396:21, 11437:6

**trying** [6] - 11397:15, 11401:8, 11410:19, 11410:23, 11467:12, 11490:23

**turn** [1] - 11465:20

**turned** [2] - 11412:25, 11413:2

**turning** [1] - 11391:23

**turns** [1] - 11413:6

**TV** [1] - 11438:18

**twice** [3] - 11510:14, 11510:24, 11511:15

**two** [37] - 11382:21, 11385:12, 11386:17, 11388:10, 11390:1, 11395:21, 11397:11, 11397:12, 11402:22, 11408:10, 11409:5, 11409:22, 11421:19, 11432:5, 11432:10, 11433:12, 11435:11, 11442:18, 11450:15, 11452:21, 11455:7, 11466:18, 11466:20, 11467:4, 11467:12, 11467:15, 11467:18, 11468:22, 11476:11, 11476:13, 11478:25, 11479:6, 11479:11, 11482:7, 11483:17, 11485:16

**two-line** [1] - 11483:17

**two-page** [1] - 11455:7

**two-second** [1] - 11432:5

**two-week** [1] -

11450:15

**twofold** [1] - 11488:14

**type** [5] - 11382:9, 11384:22, 11407:3, 11479:2, 11480:24

**types** [2] - 11402:19, 11498:12

**typically** [1] - 11425:24

**U**

**U.S** [3] - 11378:14, 11379:18, 11504:21

**ultimately** [8] - 11393:3, 11409:20, 11425:4, 11451:12, 11454:3, 11470:13, 11487:15, 11490:9

**unable** [1] - 11392:25

**under** [12] - 11395:14, 11396:3, 11397:18, 11406:14, 11411:18, 11412:16, 11443:25, 11451:19, 11452:22, 11453:4, 11457:23, 11507:24

**understood** [1] - 11451:8

**undertake** [1] - 11463:10

**unduly** [1] - 11398:10

**unfair** [2] - 11386:16, 11470:15

**unfairly** [1] - 11466:11

**unfathomable** [1] - 11407:4

**unfortunately** [6] - 11431:10, 11449:12, 11480:20, 11486:18, 11498:9, 11498:13

**UNITED** [3] - 11378:1, 11378:2, 11378:10

**United** [21] - 11378:12, 11381:3, 11415:16, 11416:11, 11416:19, 11419:5, 11419:12, 11423:22, 11427:8, 11430:24, 11431:20, 11439:23, 11445:12, 11452:1, 11452:25, 11459:18, 11483:20, 11505:16, 11507:14, 11507:25, 11512:7

**unless** [1] - 11410:18

**unlimited** [1] - 11454:17

**unnecessary** [1] - 11443:10

unpack [1] - 11438:12

**unredacted** [2] - 11412:7, 11412:19

**unsaid** [1] - 11404:13

**up** [72] - 11385:19, 11388:10, 11390:1, 11391:10, 11392:4, 11392:24, 11393:12, 11396:10, 11396:20, 11396:21, 11397:22, 11405:3, 11413:19, 11413:25, 11416:16, 11420:6, 11421:4, 11424:17, 11424:22, 11425:21, 11427:13, 11429:11, 11435:5, 11439:12, 11445:22, 11446:9, 11447:20, 11447:25, 11448:2, 11455:6, 11455:9, 11461:19, 11461:24, 11462:10, 11462:21, 11463:3, 11463:8, 11465:2, 11465:8, 11465:23, 11467:3, 11467:5, 11467:12, 11467:23, 11468:1, 11469:13, 11469:20, 11469:21, 11470:18, 11474:1, 11477:19, 11477:22, 11478:3, 11478:8, 11478:10, 11479:11, 11479:13, 11481:14, 11485:22, 11487:8, 11487:10, 11489:5, 11491:1, 11492:19, 11494:9, 11494:12, 11495:12, 11500:20, 11502:13, 11506:25, 11511:8

**upcoming** [1] - 11420:12

**upper** [16] - 11386:10, 11387:19, 11388:3, 11388:8, 11388:10, 11389:25, 11390:7, 11390:15, 11390:22, 11391:7, 11391:11, 11393:4, 11393:23, 11400:15, 11447:5

**urgency** [1] - 11433:15

**urgent** [1] - 11434:1

**usable** [2] - 11485:12, 11491:20

**V**

**valuable** [1] - 11469:1

**value** [8] - 11395:6,

11419:20, 11442:14, 11461:20, 11461:25, 11462:14, 11462:21, 11462:25

**various** [2] - 11409:7, 11490:14

**vast** [2] - 11386:25, 11485:6

**vehicle** [1] - 11461:7

**vendor** [11] - 11411:24, 11412:17, 11454:4, 11454:6, 11454:9, 11455:21, 11457:16, 11457:17, 11459:1, 11477:12

**vendor's** [1] - 11411:17

**vendors** [3] - 11450:16, 11454:9, 11457:16

**venue** [1] - 11478:23

**vertical** [5] - 11480:12, 11480:17, 11490:11, 11501:16, 11501:17

**video** [36] - 11385:20, 11386:5, 11386:6, 11389:10, 11389:17, 11390:11, 11390:12, 11393:8, 11393:10, 11394:19, 11394:22, 11395:3, 11395:17, 11403:1, 11406:7, 11406:14, 11407:1, 11428:13, 11428:16, 11429:16, 11430:15, 11433:9, 11437:16, 11442:16, 11442:23, 11443:1, 11443:16, 11443:23, 11444:7, 11447:10, 11450:10, 11455:23, 11458:10, 11459:23, 11467:13

**Video** [14] - 11428:3, 11428:24, 11429:17, 11429:20, 11430:16, 11431:24, 11432:2, 11432:11, 11437:17, 11437:20, 11441:21, 11447:11, 11477:24, 11501:1

**videos** [7] - 11398:17, 11398:19, 11399:5, 11427:22, 11427:23, 11438:8, 11452:15

**view** [6] - 11390:16, 11397:16, 11404:16, 11404:20, 11404:25, 11431:20

**viewed** [1] - 11502:4

**violation** [3] -

11411:18, 11411:25, 11412:22

**violence** [1] - 11395:25

**violent** [4] - 11386:13, 11387:23, 11396:24, 11398:11

**violently** [1] - 11400:24

**Virginia** [1] - 11425:13

**virtually** [2] - 11422:18, 11423:17

**vis-à-vis** [1] - 11391:18

**visible** [2] - 11457:8, 11478:11

**visit** [1] - 11426:5

**Visitor** [2] - 11416:12, 11417:16

**visitors** [3] - 11440:2, 11488:15, 11488:16

**visual** [1] - 11478:24

**volume** [1] - 11389:11

**vote** [1] - 11488:21

**W**

**Wage** [1] - 11475:2

**wage** [1] - 11475:18

**wait** [2] - 11442:10, 11448:23

**waive** [1] - 11384:8

**walk** [7] - 11418:18, 11424:12, 11451:3, 11455:6, 11456:17, 11464:17, 11479:4

**walking** [1] - 11431:14

**wall** [1] - 11392:25

**walls** [1] - 11441:8

**warehouse** [2] - 11439:14, 11486:5

**warranted** [1] - 11462:2

**Washington** [7] - 11378:5, 11378:15, 11378:25, 11379:19, 11431:18, 11483:21, 11512:8

**watch** [1] - 11389:16

**watched** [1] - 11398:16

**ways** [1] - 11413:8

**weak** [1] - 11384:20

**Wednesday** [1] - 11378:6

**week** [2] - 11450:15, 11479:11

**weeks** [5] - 11420:6, 11452:21, 11479:6, 11485:17

**weird** [1] - 11405:20
**welcome** [3] - 11414:21, 11428:8, 11445:19
**West** [1] - 11379:9
**west** [27] - 11386:10, 11387:10, 11387:19, 11388:3, 11388:8, 11388:11, 11389:25, 11390:7, 11390:15, 11390:22, 11391:7, 11391:11, 11393:4, 11393:23, 11400:15, 11420:25, 11429:4, 11430:24, 11432:7, 11438:16, 11446:5, 11452:16, 11478:9, 11480:7, 11483:2, 11483:20, 11511:4
**wet** [2] - 11431:14, 11441:5
**WG** [1] - 11475:2
**whatnot** [1] - 11405:18
**whichever** [1] - 11416:3
**white** [2] - 11429:6, 11429:10
**whole** [10] - 11385:8, 11386:1, 11426:9, 11451:16, 11463:10, 11465:8, 11483:4, 11483:6, 11491:19, 11503:10
**widely** [1] - 11404:14
**wildest** [1] - 11397:19
**willy** [1] - 11453:20
**willy-nilly** [1] - 11453:20
**window** [28] - 11396:14, 11396:23, 11411:14, 11434:3, 11434:24, 11442:23, 11444:6, 11446:1, 11446:2, 11447:1, 11447:2, 11447:16, 11447:18, 11448:7, 11459:19, 11462:5, 11466:13, 11466:19, 11466:21, 11466:23, 11466:24, 11466:25, 11467:1, 11467:5, 11472:22, 11473:2, 11477:2
**windows** [29] - 11424:10, 11427:1, 11427:9, 11439:21, 11440:8, 11440:19, 11441:17, 11442:18, 11442:20, 11443:17,

11443:18, 11444:14, 11447:25, 11448:21, 11449:11, 11449:13, 11454:3, 11455:21, 11457:9, 11459:22, 11459:24, 11460:21, 11466:18, 11466:20, 11476:24, 11477:12, 11487:11
**wing** [5] - 11391:19, 11446:20, 11446:25, 11466:20
**winter** [3] - 11440:22, 11440:23, 11441:13
**withdrawn** [1] - 11454:1
**WITNESS** [5] - 11380:2, 11415:17, 11419:1, 11492:13, 11498:19
**Witness** [1] - 11510:4
**witness** [48] - 11385:24, 11393:22, 11394:11, 11400:10, 11402:2, 11407:18, 11408:1, 11408:15, 11409:15, 11409:20, 11409:23, 11409:25, 11410:4, 11410:10, 11412:4, 11412:16, 11413:10, 11413:13, 11413:14, 11414:2, 11414:5, 11414:11, 11414:24, 11415:7, 11415:12, 11415:14, 11420:17, 11427:19, 11433:25, 11435:22, 11442:9, 11443:3, 11443:5, 11443:16, 11444:13, 11444:18, 11445:2, 11445:17, 11455:3, 11461:20, 11462:7, 11462:24, 11467:16, 11468:9, 11478:15, 11510:8
**witness's** [3] - 11408:17, 11410:25, 11433:13
**witness-by-witness** [1] - 11445:2
**witnessed** [1] - 11491:8
**witnesses** [1] - 11415:1
**witnesses'** [2] - 11415:5, 11415:6
**women** [2] - 11424:23, 11507:12
**wonder** [2] - 11388:21, 11394:19

**wondering** [1] - 11395:15
**wooden** [1] - 11431:1
**word** [1] - 11450:1
**words** [5] - 11383:7, 11385:23, 11389:20, 11394:6, 11403:7
**workers** [2] - 11474:11, 11474:12
**works** [4] - 11410:5, 11441:2, 11488:7, 11499:14
**worth** [1] - 11389:20
**written** [1] - 11384:3

## Y

**year** [6] - 11419:18, 11421:10, 11421:13, 11421:23, 11505:19, 11508:9
**year-and-a-half** [1] - 11421:23
**years** [19] - 11395:21, 11417:20, 11418:15, 11420:15, 11420:23, 11421:1, 11421:4, 11421:5, 11426:8, 11459:19, 11485:16, 11487:2, 11504:18, 11504:19, 11504:20, 11505:2, 11505:4, 11508:8, 11511:8
**yelling** [1] - 11389:10
**yesterday** [5] - 11383:25, 11384:1, 11384:13, 11384:25, 11385:13
**York** [2] - 11378:18, 11379:13
**yourself** [2] - 11415:22, 11491:9

## Z

**Zachary** [1] - 11381:4
**zero** [1] - 11473:10
**zoom** [2] - 11456:18, 11483:8